Exhibit 15

**In The Matter Of:**

*TAGNETICS, INC.*

*October 18, 2019*

*LEGAL ELECTRONIC RECORDING, INC.*

*216-881-8000*

*www.lerinc.com*

Original File 20A7013.prn

**Min-U-Script® with Word Index**

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

|  |  |  |
|---|---|---|
| IN RE: | * | Case No. 19-30822 |
|  | * |  |
| TAGNETICS, INC. | * |  |
|  | * | October 18, 2019 |

* * * * * * * * * * * * * * * *

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE GUY R. HUMPHREY
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

STEPHEN B. STERN, ESQ.
ROBERT R. KRACHT, ESQ.
For Tagnetics, Inc.

KENNETH W. KAYSER
RONALD E. EARLEY
JONATHAN HAGER
Petitioning Creditors




Transcribed by:
- - - - - - - - - - - - - -
Legal Electronic Recording, inc.
5230 St. Clair Avenue
Cleveland, Ohio 44103
(216) 881-8000
www.lerinc.com

Proceeding recorded by electronic sound recording,
transcript produced by transcription service.
Job #20A7013

2

WITNESSES:


ON BEHALF OF TAGNETICS, INC.:

STERN, STEPHEN

     Direct examination............Page 18
     Cross-examination............Page 60
     Redirect examination.........Page 86

ON BEHALF OF KENNETH KAYSER:

KAYSER, KENNETH

     Direct testimony..............Page 93
     Cross-examination............Page 105

EARLEY, RONALD

     Direct examination............Page 129

ON BEHALF OF RONALD EARLEY:

EARLEY, RONALD

     Direct testimony..............Page 132
     Cross-examination............Page 138
     Redirect testimony...........Page 144

ON BEHALF OF JONATHAN HAGER:

HAGER, JONATHAN

     Direct testimony..............Page 148
     Cross-examination............Page 156

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 5 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 5 of 189 PAGEID #: 536

TAGNETICS (19-30822) 10-18-19

3

1        (Proceedings begin at 9:34 a.m.)

2        THE CLERK:  The United States Bankruptcy

3    Court for the Southern District of Ohio is now in

4    session until adjournment this 18th day of October

5    2019, the Honorable Guy R. Humphrey presiding.  You may

6    be seated.

7        On the docket for this morning is Case Number

8    19-30822, Tagnetics, Incorporated.  May the Court

9    please have appearances, beginning with counsel for

10   Tagnetics?

11       MR. STERN:  Good morning, Your Honor.

12   Stephen Stern on behalf of Tagnetics.

13       THE COURT:  Good morning, Mr. Stern.

14       MR. KRACHT:  Your Honor, Robert Kracht, from

15   McCarthy Lebit, in Cleveland, Ohio counsel for

16   Tagnetics.

17       THE COURT:  Good morning, Mr. Kracht.

18       MR. KRACHT:  Thank you.

19       THE CLERK:  Gentlemen, each stand and state

20   your full name for the record.

21       DR. KAYSER:  My name is Kenneth Kayser.

22       THE COURT:  Good morning, Mr. Kayser.

23       MR. EARLEY:  Ronald Earley.

24       THE COURT:  Good morning, Mr. Earley.

25       MR. HAGER:  This is Jon Hager.

**TAGNETICS (19-30822) 10-18-19**

4

1    THE COURT:  Good morning, Mr. Hager.  Okay, I

2  think we're here for the hearing, evidentiary hearing,

3  on the motion to enforce settlement, filed by

4  Tagnetics, and the response of the Petitioning

5  Creditors, Mr. Kayser, Mr. Earley and Mr. Hager.

6    We reviewed everything extensively, I think,

7  from that perspective.  We're ready to go, but I think

8  before we get started, I thought we would go over some

9  preliminary matters, make sure we're all on the same

10  page on everything.  But before I get into my

11  preliminary matters, are there any preliminary matters,

12  which the parties wish to address with the Court?

13    MR. STERN:  Your Honor, are we going to have

14  the opportunity for a brief opening statement after the

15  preliminary matters?

16    THE COURT:  Oh, yes, yes.

17    MR. STERN:  Then nothing at this time.

18    THE COURT:  Absolutely.  I just wanted to

19  kind of lay the groundwork for everybody, particularly

20  since we have pro se parties.  I like to try to lay the

21  groundwork as best as possible, so everybody

22  understands as best as possible, you know, how

23  hopefully things will operate during the course of the

24  day today.

25    Anything you, the pro se Petitioning

### TAGNETICS (19-30822) 10-18-19

5

1   Creditors, wish to raise with the Court at this time,

2   before I get into my preliminary matters?

3          DR. KAYSER:  No, sir.

4          MR. EARLEY:  No, thanks.

5          THE COURT:  All right.  Since Tagnetics has

6   filed a motion, we'll have Tagnetics -- after opening

7   statements, we'll have Tagnetics present its case.

8   They may call witnesses.  They will first conduct

9   examination of any witnesses they have.  We call that

10   direct examination.  And then the Petitioning Creditors

11   will have the right to conduct any cross-examination of

12   those witnesses, and then Tagnetics will have the right

13   to conduct what we call redirect examination, if they

14   want, questions based upon any questions you may have

15   asked them, and then you would be entitled to conduct

16   any cross-examination of those witnesses.

17          Let's -- to the extent possible, let's avoid

18   going back over the same ground we've already gone

19   over, you know.  And then after they complete their

20   case, after Tagnetics completes its case, then the

21   Petitioning Creditors will have an opportunity to

22   present your cases.

23          You each, in effect, have your own case, and

24   you can each call whatever witnesses you want in your

25   own cases.  You may testify in your own cases.

**TAGNETICS (19-30822) 10-18-19**

6

1    Fortunately or unfortunately, this is not the first

2    time I've had pro se parties in my courtroom.   It

3    creates an awkward situation -- it makes it more

4    awkward for hearings, because if you want to testify in

5    your own case, what you have to do is get in the

6    witness box, and in effect give a narrative, explain,

7    you know, what statements you want to state that you

8    think, you know, from an evidentiary factual viewpoint

9    support your position.

10          If an objection is stated during your

11   testimony, you need to make sure you stop and let me

12   rule on the objection, and then after I rule on the

13   objection, then you can proceed in accordance with my

14   ruling on the objection.

15          You will not be able to ask each other

16   questions.  In effect, Mr. Kayser can't put Mr. Hager

17   on the stand and stand at the lectern and ask

18   questions, because unless any of you are lawyers -- my

19   understanding, none of you are lawyers; is that

20   correct?

21          DR. KAYSER:  Yes.

22          THE COURT:  That would constitute the

23   unauthorized practice of law.  So you can testify in

24   your own cases, but you can't examine each other in

25   your own cases, and you can have, you know, each other

TAGNETICS (19-30822) 10-18-19

7

1   testify in your cases, but again, you're going to have

2   to get in the witness box and give a narrative of what

3   you think support the cases.

4          Let's see if there's anything -- are there

5   any questions on how that will operate?

6          DR. KAYSER:  Yes, Your Honor.  We had

7   intended to each call each other as witnesses and ask

8   the questions that apply to us all.

9          THE COURT:  I kind of thought that might be

10  the case from the way you filed your witness list, but

11  you cannot do that.  That is the unauthorized practice

12  of law.  You will not be able to do that.  You may feel

13  it puts you at a disadvantage, but you make conscious

14  decisions to hire lawyers or not to hire lawyers.

15         DR. KAYSER:  Understood.

16         THE COURT:  And because you didn't hire a

17  lawyer, I cannot -- I can't let you guys serve as

18  lawyers.  You need to go to law school, pass a bar

19  exam, to do that.  And since you haven't done that,

20  you're not entitled.  That's the law.  That's the law

21  in Ohio.

22         DR. KAYSER:  Yeah.  We're okay with it.  We

23  do understand.  Your Honor, I'm sorry to ask for a

24  clarification, but if each of us can call witnesses,

25  can we -- but we can't call each other as witnesses?

**TAGNETICS (19-30822) 10-18-19**

8

1      THE COURT:  You can call each other as

2  witnesses, yes.  You can do that.  You each can get up

3  there and testify in what we call a form of a

4  narrative, stating your -- you know, what facts you

5  think support each other's cases, but one of you can't

6  be at the lectern asking another questions to elicit

7  that testimony.  That's serving as a lawyer, and that's

8  the unauthorized practice of law, and you can't do it.

9      DR. KAYSER:  Understood.  Your Honor, one

10  question.  How do we present the exhibits then?

11      THE COURT:  You can just say -- well, you can

12  have the exhibits in the witness box, and then

13  describe, okay, you know, I'm looking at, and you have

14  to make sure that Tagnetics' counsel have copies of

15  those exhibits, so they know what you're testifying

16  about.  And you can say, Your Honor, I'm looking at an

17  email dated July 20th, 2019, it's from me to Mr. Stern,

18  you know, and then that way you identify the document.

19  And then that's how.  And then when you're done you can

20  move for admission of those exhibits, and that's how

21  you would introduce exhibits.

22      DR. KAYSER:  We'll do our best.

23      THE COURT:  I understand.  It's -- you know,

24  it's -- that's what the law is.  I have to enforce the

25  law and apply the law, and that's the risk you take in

**TAGNETICS (19-30822) 10-18-19**

9

1   the situation you're in, representing yourselves on a

2   pro se basis.

3          When we get done with all the evidentiary

4   presentations, you'll be able to make closing

5   arguments.  That's where you have the opportunity to

6   stand at the lectern and argue why the facts, which

7   have been elicited today, support your legal position.

8          Now, with respect to the exhibits, I think

9   there's some overlap with the exhibits.  It's from a

10  Court perspective, if you both -- let's say you both

11  have July 20th, 2019 email as an exhibit, the Court

12  finds it easier just to use one of those set of

13  exhibits.  They're duplicative on each side, rather

14  than referring -- using two different copies of the

15  same exhibit.

16         To that extent, the Court's preference would

17  be to use Tagnetics' exhibits to the extent they're

18  duplicate, just because they're a little bit easier for

19  us to follow as they're more separate emails, for

20  instance.  But that's the only reason.  From

21  administrative ease purposes, that would work better

22  from the Court's perspective.

23         So if Tagnetics has introduced, you know, the

24  July 20th email, my preference is if you're going to

25  refer to the July 20th email, just to use Tagnetics'

**TAGNETICS (19-30822) 10-18-19**

10

1    exhibit for that, so we don't have to, like I say, have

2    duplicative same exhibits.  And if Tagnetics has

3    introduced a document already, and particularly if I've

4    admitted it, you don't need to go through the process

5    of identifying it and having it admitted.  It's already

6    been admitted.  You can use that.  We don't need to go

7    over that groundwork with an exhibit that's already

8    been admitted.

9         Any other questions before we get started

10   with opening statements?

11        MR. KRACHT:  Your Honor, I just want to note,

12   one of our exhibits is a composite exhibit of all of

13   what we believe to be the relevant emails and it's

14   actually the A.  Is that going to pose --

15        THE COURT:  No, that's fine.  I think that's

16   -- you know, as long as each one gets admitted or the

17   whole total gets admitted, that's fine.

18        MR. KRACHT:  And if for some reason we would

19   have say one or two excluded, that could be removed

20   from the exhibit at the time.

21        THE COURT:  Yeah, I think that's fine.

22        MR. KRACHT:  Thank you.

23        THE COURT:  Any questions from the

24   Petitioning Creditors?  No, okay.  Great.  Why don't we

25   have opening statements then?  Now, on the opening

**TAGNETICS (19-30822) 10-18-19**

11

1    statements -- go ahead and take the lectern, Mr. Stern.

2    I just want to ask, when you are making opening

3    statements or talking to Court, not as a witness,

4    please take the lectern.  Our recording system works

5    much better that way.  Now, if you're just making an

6    objection to a witness's testimony, you can just stand

7    up and make your objection from your seat, but

8    generally making presentations and lengthier

9    discussions with the Court, my preference is for you to

10   stand at the lectern.  When you're testifying, you'll

11   be in the witness box.

12          I'm trying to think if there was something

13   related to that.  Well, that's all I can think of.  I'm

14   sorry, Mr. Stern.  One other thing we could do, let's -

15   - what I'd like to do is have Ms. Behnken swear in the

16   three Petitioning Creditors and then we'll take a five-

17   minute break and you can make your opening statements.

18          The reason I'd like the Petitioning Creditors

19   to be sworn is what we have found after, like I said,

20   unfortunately having a number of pro se parties in the

21   courtroom before, it's difficult for them to separate

22   out what's a legal argument or a statement at the

23   lectern, versus testimony, and so it's easier for us

24   just to have them under oath for everything they state,

25   and that way we don't have to worry about well, was

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 14 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 14 of 189 PAGEID #: 545

TAGNETICS (19-30822) 10-18-19

12

1    that sworn testimony or not sworn testimony.  So

2    anything you state, we're going to, in effect, treat as

3    sworn testimony, and swear you in now.

4            THE CLERK:  Your Honor, are you okay with

5    swearing all of them at the same time?

6            THE COURT:  Yeah, that's fine.

7            THE CLERK:  Gentlemen, please stand.

8            (Petitioning Creditors sworn.)

9            THE CLERK:  Thank you.

10           THE COURT:  Okay, let's take a five-minute

11   recess and then you can make your opening statements.

12           THE CLERK:  All rise.  Court is in recess.

13           (Off the record from 9:50 a.m. until 9:58

14   a.m.)

15           THE CLERK:  Court is again in session.  You

16   may be seated.

17           THE COURT:  Okay.  I wanted to clarify one

18   thing.  Now, we have to treat each of the Petitioning

19   Creditors' cases, in effect, as a separate case.  Mr.

20   Kayser, if you want to call Mr. Hager or Mr. Earley in

21   your case, you can, and you can examine them from the

22   lectern.  And Mr. Earley, you can do the same with Mr.

23   Kayser and Mr. Hager.  And same with Mr. Hager, he can

24   call Mr. Kayser and Mr. Earley, and examine them.

25   That's -- a pro se party can do that.  That's not the

### TAGNETICS (19-30822) 10-18-19

13

1  unauthorized practice of law.

2       Now, Mr. Kayser though can't question

3  witnesses in Mr. Hager's case or Mr. Earley's case, and

4  vice versa.

5       DR. KAYSER:  Okay.

6       THE COURT:  So Mr. Kayser, if you want to

7  examine Mr. Earley and Mr. Hager in your case, you may

8  do so, and Mr. Earley, you can do the same with the

9  other two, and Mr. Hager, you can do the same with the

10 other two.  You just can't serve as lawyers in anybody

11 else's case.  Okay.  I wanted to clarify that.  We're

12 all on the same page with that?

13      DR. KAYSER:  Yes, Your Honor.

14      THE COURT:  Great.  We ready for opening

15 statements?

16      MR. STERN:  Yes, Your Honor.

17      THE COURT:  You may proceed, Mr. Stern, and

18 then after Mr. Stern makes the opening statement for

19 Tagnetics, each of you can make your opening

20 statements, if you wish.

21      MR. STERN:  Good morning, Your Honor.  May it

22 please the Court, I am Stephen Stern on behalf of the

23 alleged Debtor, Tagnetics, Inc.  We are here today on

24 our motion to enforce the settlement agreement.  We

25 think the terms are pretty clearly set forth.  The

**TAGNETICS (19-30822) 10-18-19**

14

1  pertinent email is a series of emails that I refer to

2  in the motion as our term sheet that were exchanged on

3  July 26, 2019, and it lays out very clearly the terms

4  of the -- the key terms of the agreement.

5          And as that email string reflects, the

6  alleged Creditors, not once, not twice, but three times

7  confirmed in writing the terms of that -- those key

8  terms of the settlement agreement, and this was

9  communicated to the Court, that we have an agreement in

10  place.

11          It was only after the fact, when we exchanged

12  the written settlement agreement, where we learned

13  about these alleged concerns that they had, clearly

14  going beyond the scope of the payment terms that were

15  set forth, and the phrase -- key phrase in the term

16  sheet says "full mutual releases, no carve-outs."  And

17  as the Creditors are seeking, there's a number of

18  carve-outs that they are seeking.

19          One thing that I would like to point out, and

20  if there was any confusion when looking at our brief, I

21  refer to 123, there's a reference to an email in the

22  brief on July 26.  It is on Page 6 of our brief, where

23  we copied the chart of an email that was sent from Mr.

24  Hager to me on July 26 at 4:42 on there.  That was not

25  attached to our brief.  That was our exhibits, Exhibit

## TAGNETICS (19-30822) 10-18-19

15

1   I.  That was added after the fact.  Exhibits that we

2   put for our exhibits today do mirror the exhibits we

3   had attached to our motion, except Exhibit I is the

4   only added one, and that is the one that contains that

5   missing email there, in the event there's any confusion

6   on the part of the Court when looking through the

7   brief.  My apologies about that oversight.

8          But as that third email reflects, in caps it

9   says, "Total settlement," with those numbers, and yet

10  the alleged Creditors are seeking additional payments

11  beyond that total settlement figure, and again seeking

12  exceptions to the full mutual releases, no carve-outs.

13         Those discussions happened over a period of

14  time, and those emails reflect, I repeatedly encouraged

15  the alleged Creditors to seek counsel, to advise them

16  on this process.  And just to be perfectly frank, was

17  quite surprised when seeing the exceptions and the

18  additional payments that they were seeking after the

19  fact.

20         We think the settlement agreement, which was

21  -- I think it's Exhibit C -- Exhibit B, with the

22  exhibits, Exhibit 2, to the motion, accurately sets

23  forth the key terms of the agreement, and we're ready

24  to proceed with the evidence that supports that.

25         Thank you, Your Honor.

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 18 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 18 of 189 PAGEID #: 549

TAGNETICS (19-30822) 10-18-19

16

1      THE COURT:  Thank you, Mr. Stern.  Okay.  One

2 of you want to at least start?

3      MR. EARLEY:  Yes, sir, and I'll give the

4 opening statement for all three of us.

5      THE COURT:  Okay.

6      MR. EARLEY:  Your Honor, the Petitioning

7 Creditors intend to show that the terms of the proposed

8 settlement agreement offered on August 14th in no way

9 resembles the proposal forwarded -- put forth by the

10 Petitioning Creditors on July 20th, 2019.

11      We also will show that the negotiations

12 between Tagnetics and the Petitioning Creditors between

13 July 20 and July 26 only focused on cash payments, and

14 not any other term or terms of the agreement.  The

15 evidence will show a significant difference in the

16 proposed settlement agreement, once Tagnetics secured

17 the postponement of the scheduled trial.

18      THE COURT:  Thank you.  I will accept that as

19 the opening statement of Mr. Earley.  Mr. Kayser, do

20 you wish to state anything different?  You don't need

21 to state the same thing Mr. Earley just stated.  Is

22 there anything additional you --

23      DR. KAYSER:  There's nothing more I need to

24 state until testimony.

25      THE COURT:  Okay.  So are you adopting Mr.

**TAGNETICS (19-30822) 10-18-19**

17

```
1   Earley's opening statement as your opening statement?

2           DR. KAYSER:  Yes.

3           THE COURT:  Okay, thank you.  Same questions

4   for you, Mr. Hager.

5           MR. HAGER:  I'll adopt his statement.

6           THE COURT:  This all goes back to the fact

7   that you can't be each other's attorneys, and -- but I

8   don't want to cover the same ground if we don't have to

9   cover the same ground on this stuff.  Okay.  Mr. Stern,

10  do you have any witnesses you wish to call?

11          MR. STERN:  Yes, Your Honor.  I'll be the

12  testifying witness and Mr. Kracht will examine me.

13          THE COURT:  Okay.

14          MR. STERN:  I'm just going to take up with me

15  the binder of exhibits.

16          THE COURT:  That's fine.  I do have one

17  point.  As you referenced Exhibit I, which you said was

18  not attached to your motion.  It does not appear that

19  it's in my booklet either, so --

20          MR. STERN:  Really?  May I take a look at

21  that?

22          THE COURT:  Yeah, absolutely, please.  Ms.

23  Behnken.

24          MR. STERN:  Does your binder have Exhibit I?

25  Okay.
```

## TAGNETICS (19-30822) 10-18-19

18

```
1              THE COURT:  Okay, thank you.
2              THE CLERK:  Sir, please stand.  Raise your
3   right hand.
4              MR. STERN:  My apologies.
5                STEPHEN STERN, WITNESS, SWORN
6              THE CLERK:  Please state your full name for
7   the record.
8              MR. STERN:  Stephen with a P-H, Stern, S-T-E-
9   R-N.
10             THE CLERK:  Thank you.
11             DIRECT EXAMINATION OF STEPHEN STERN
12  BY MR. KRACHT:
13  Q    Mr. Stern, you're one of the lawyers for
14  Tagnetics in this case, correct?
15  A    I am.
16  Q    Can you provide some background of your nature
17  of your practice?
18  A    Sure.  I was admitted to practice in 1996, after
19  I graduated from GW Law School.  I forget whether I was
20  admitted in October, November, December, but that was
21  when I was first admitted to practice, and have been
22  practicing for approximately 23 years.
23       My practice is litigation oriented.  The early
24  part of my career did a lot of employment counsel
25  litigation and then over the last I'd say probably 15,
```

**TAGNETICS (19-30822) 10-18-19**

19

1  16 years, a good amount of commercial and business

2  litigation, in courts.  And along the way, negotiated

3  many, many settlements.

4  Q     Do you practice in the area of bankruptcy at

5  all?

6  A     I do not.

7  Q     So this is your first foray into that?

8  A     It is.

9  Q     But you do -- would you say that the majority of

10  your cases in your litigation practice go to trial, or

11  are they settled?

12  A     Trial is definitely the exception.  Most are

13  either resolved through settlement negotiations or on

14  motions.

15  Q     Okay.  And so the settlement that we're talking

16  about today in this case that we're seeking to enforce,

17  is that something that is unique in your experience of

18  how a settlement was negotiated?

19  A     No.  The only unique part I'd say is that this

20  happened while I was on vacation, the discussions.

21  Q     What role did you play in connection with the

22  settlement negotiations with the Petitioning Creditors?

23  A     Sure.  I forgot the exact date.  I can refer to

24  the exhibits, but we -- that week -- I guess the week

25  before I went on vacation, had some discussions.  I

**TAGNETICS (19-30822) 10-18-19**

20

1  forgot whether it was with Mr. Kayser or Mr. Earley,

2  opening the door -- it may have just been the email,

3  when we first started communicating about the

4  possibility of having settlement discussions.

5      They happened on and off over that week, leading

6  up to the 16th.  There was some discussions that were -

7  - or demands that were made by the alleged Creditors,

8  flat out rejected those.  Then they made some -- then

9  we made some counteroffers.  Those were flat out

10  rejected, and then the discussions really picked up in

11  earnest the 24th, 25th and 26th.  Really, the 26th is

12  the key day.

13  Q    Okay.  I'm going to try to use this contraption

14  here, and if you can turn to Tagnetics' Exhibit A,

15  please?

16  A    Okay.

17  Q    If I can adjust this?  Okay.  Can you identify

18  Exhibit A?

19  A    Sure.  This is a series of emails, email string,

20  between me and the alleged Creditors.  Even though

21  sometimes only one of the alleged Creditors' emails

22  appears, I remember on these emails, I was

23  communicating with all of them, and that's reflected on

24  some of them.

25      The email string starts on -- with an email from

**TAGNETICS (19-30822) 10-18-19**

21

1   me addressed to Mr. Kayser on Friday, July 19th, 2019,

2   at 4:14 p.m., and then you can see the series of emails

3   back and forth, where demands were made, rejected, and

4   the reflection of our settlement negotiations, at least

5   in writing, but does not account for every telephone

6   communication that occurred.

7   Q      Okay.  So Exhibit A then goes from most recent

8   to the earlier emails, so --

9   A      Yes.

10  Q      So it's in reverse order, correct?

11  A      Correct.

12  Q      Now, did you have any phone conversations during

13  this period with any of the Petitioning Creditors?

14  A      I did.  I don't remember speaking -- when we had

15  our first conversations.  I may have spoken with Mr.

16  Kayser once or twice, but on the date -- key day, July

17  26, I was speaking primarily, if not exclusively, with

18  Mr. Earley.

19  Q      Okay.  Directing your attention to Exhibit A, if

20  you can go through several of those earlier emails,

21  where there are a number, it would appear, of both

22  monetary items that are being discussed, as well as

23  non-monetary items.  Can you address those, please?

24  A      Sure.  I guess the first one does reflect that I

25  spoke with Mr. Kayser, either earlier that day or the

### TAGNETICS (19-30822) 10-18-19

22

1   day before, because it opens up with, "Following up on

2   our conversation, this email identifies everyone who

3   should be copied on email communications, regarding

4   potential settlement discussions."

5   Q     And that's the July 19 email, correct?

6   A     Yes, and this is where I was setting the

7   groundwork, because I was going away on vacation the

8   following day.  I wanted to make sure that people were

9   available to communicate, in the event I had trouble

10  being able to access email or phone calls.  I wanted to

11  make sure my partner, Jon Kagan, was available to step

12  in if need be.  Fortunately, there were no difficulties

13  communicating.  I was able to communicate the entire

14  time, so he was not really involved in the process.

15  Q     Okay.  I'm directing your attention to the next

16  email in line there.  It looks like it's July 20th at

17  4:54.

18  A     Yes, I see that one.

19  Q     And who is that from?

20  A     That was sent from Mr. Kayser to me, and with a

21  CC to a number of other people involved in the case,

22  including the other alleged Creditors, you as my co-

23  counsel, and other people -- other attorneys that were

24  as co-counsel in the case.

25  Q     Okay.  And can you describe for the Court what

**TAGNETICS (19-30822) 10-18-19**

23

1   was the subject matter of that email?

2   A     Sure.  This reflects a substantive communication

3   about potential settlement, where Mr. Kayser, on behalf

4   of -- what I interpreted, on behalf of himself, and it

5   does say "our final offer," so I interpreted this to be

6   him speaking on behalf of him, Mr. Earley, and Mr. --

7   I'm drawing a blank.

8   Q     Mr. Hager?

9   A     Mr. Hager.  My apologies.  That they made

10  monetary demands, which are reflected there in the

11  first part of the email.  You can see certain monetary

12  amounts to Mr. Earley, Mr. Kayser, Mr. Hager, with the

13  total being -- or payments to all three of them --

14  $486,700 and change.  And then it goes on to proceed

15  with setting forth other combination of non-monetary

16  demands, and some other monetary demands to be made, to

17  be included, as well, in the settlement.

18  Q     And did you respond to those gentlemen?

19  A     Yes.  My response is reflected in the next email

20  in the string, which is on Page 5 of the exhibit.  It's

21  an email from me to Mr. Kayser, Mr. Earley, Mr. Hager.

22  It's address to Ken, Ron and Jon.  It's at 10:46 a.m.,

23  and in that email I acknowledge receipt of their

24  demand, and while I -- and I'm reading the second

25  sentence, "While I and the Tagnetics team appreciate

**TAGNETICS (19-30822) 10-18-19**

24

1  the overture to try to reach negotiated resolution,

2  event you put forward is not realistic."  And I go on

3  to explain why what they're requesting is not even on

4  the table for a realistic settlement discussion.

5  Q    Okay.  And would you present to the Court what

6  those objections were to that proposal?

7  A    Sure.  So part of the problem was a large

8  monetary payment up front, initial payment, and that

9  was something I explained in Paragraph 2, that is not

10  feasible.  Talked a little bit about some of the

11  structures to a deal that we could possibly accommodate

12  at the time, but was only -- what was a potential

13  possibility, not making any clear offer or saying this

14  will be a deal term.

15      Then in the third paragraph I go on to say,

16  "insisting on any other structure than what I've

17  outlined above all but assumes that we proceed with the

18  bankruptcy proceeding."  So structurally they're

19  putting forth all these monetary terms, was way out of

20  line with what Tagnetics was willing or able to do.

21  Q    Okay.  Directing your attention to the response,

22  I take it, from that.

23  A    Yeah.  I'm just -- this is where I first

24  encouraged them to seek their own counsel in this --

25  I'm sorry, I did not do that there.  Oh, no, I do.  If

**TAGNETICS (19-30822) 10-18-19**

25

1  you look at the one, two, three, fourth email, I do at

2  the very end of that say, "You can and should seek your

3  own counsel, as I'm sure he or she will tell you the

4  same thing," the stuff that I was saying about what

5  happens if you proceed with bankruptcy.

6  Q    That's the fourth paragraph on the July 23rd

7  email at 10:46; is that correct?

8  A    Yes.

9  Q    Did any of the Petitioning Creditors respond to

10 that communication?

11 A    They did.  A little while later, not much after

12 my email, Mr. Earley responded in an email at 1:34

13 p.m., again with some CCs on it, and then after

14 rejecting, without putting out any specific terms, he

15 then put forth a new offer, and it says, "Stephen, here

16 is our offer after your email this morning.  Let me

17 know if there is any interest."  And in that email

18 there's a chart that is reflected at the top of Page 5

19 of this email string, and it lays out a series of

20 monetary payments.  There are no other terms referenced

21 in that email.  It is strictly a monetary payment

22 chart.

23 Q    And did you respond to that proposal?

24 A    I did.  My next email is the following day in

25 the afternoon.  Looks like on July 24th at 5:56 p.m.,

**TAGNETICS (19-30822) 10-18-19**

26

1    just Ron, Ken and Jon, "Thank you for your revised

2    demand.  This structure is more in line with what

3    Tagnetics thinks is feasible, but the initial payment

4    is way too high for a cash-strapped company."  And I go

5    on to explain what we're looking at in terms of a

6    potential lower initial monetary payment.  Then after -

7    - which we offered a lower number there.

8         "The remainder of the payment schedule, after

9    the initial payment you proposed, is acceptable,

10   provided that the payments are contingent," and I go on

11   to some contingencies.  And I go on explaining that

12   further.  And then just go on to continue explaining

13   that in the email.

14   Q    Okay.  Did you receive a response to your email

15   from any of the Petitioning Creditors?

16   A    It was a flat-out rejection completely, email

17   from Mr. Earley later that evening, on the 24th.  His

18   email is very short and succinct.  It says, "Stephen,

19   no chance.  Look forward to meeting you on Monday."  So

20   no counter proposal or anything on that.

21   Q    And that's reflected, is it not, in what's

22   referenced as a July 24, 2019 email from Mr. Earley to

23   you at 7:43 p.m., correct?

24   A    That's correct, and that's on Page 3 of the

25   exhibit.

**TAGNETICS (19-30822) 10-18-19**

27

1   Q      Did you respond to Mr. Earley's response?

2   A      I did.  The next day I sent a short email that

3   says, "It seems silly and, quite frankly, odd to simply

4   cut off negotiations.  If there is a counteroffer you

5   would like Tagnetics to consider, please send it and I

6   will forward it to the company for consideration.

7   Continuing down this path essentially guarantees that

8   you, Ken and Jon do not receive any money, and each of

9   you are at risk for having to pay money, parens, and

10  the money that Ken received last week in settlement

11  through KBL is subject to a preference and will have to

12  be returned if the Court imposes a bankruptcy on the

13  company.  I look forward to your response."  And that's

14  on July 25th, 2019, at 12:42 p.m. from me to all three

15  of them, even though it only shows Ron's name there.

16  Q      And that would be at the top of Page 3 of

17  Exhibit A, correct?

18  A      Correct.

19  Q      Okay.  Did you receive a response from any of

20  the Petitioning Creditors to that email?

21  A      I did.  Later that day, looks like even less

22  than an hour later, I received a response from Mr.

23  Earley at 1:25 p.m., and that email is reflected at the

24  bottom of Page 2 of the exhibit, on to the top of Page

25  3, and again it's pretty short and to the point.  It

TAGNETICS (19-30822) 10-18-19

28

1    says, "Stephen, they raised 90,000 for the first

2    settlement, they should be able to find another 90 for

3    us.  Here is my counter proposal."  And it lists that -

4    - well, I'll call the payment schedule chart that was

5    included below, with different numbers, and it shows an

6    initial payment 30,000 each, to each of the three

7    alleged Creditors, and then two subsequent payments at

8    six and 12 months, and then there is an additional

9    payment at -- upon the occurrence of what was referred

10   to as a liquidity event, and then the last line of that

11   chart shows the total payments to each of the three

12   alleged Creditors.  No other terms or conditions are

13   reflected in that email or counter proposal from Mr.

14   Earley.

15   Q     Okay.  And that response shows up on Page 2, at

16   the bottom of Page 2, email from Mr. Earley, dated July

17   25th at 1:25, and the chart you're talking about

18   carries over onto the next page, top of Page 3,

19   correct?

20   A     Correct.

21   Q     Did you respond to that email?

22   A     I did.  The next morning at 8:24 a.m., I sent an

23   email, again, to -- responding, saying, "Ron, while we

24   appreciate your logic around the $90,000" -- it says

25   "90k number," "$90,000 number, you are miscalculating

### TAGNETICS (19-30822) 10-18-19

29

1    the company's situation.  We had hoped to negotiate
2    with you outside of court on settlement while the
3    parties pursued arbitration, as the terms of your
4    contracts require, but the Court ruled against that.
5    The company does not have an ability to raise another
6    90k in the near term.  Now, unfortunately, the options
7    to avoid substantial risk on both sides is very
8    limited.  The three of you prevail on Monday, your
9    claims will be worthless, and Ken and Bob, as well as
10   S-Tek and counsel for KBL, and S-Tek will have to
11   return the money they received last week.  If Tagnetics
12   prevails, the company will move to require that you pay
13   all Tagnetics' attorneys' fees and litigation costs in
14   this matter, which are significant and growing by the
15   day."

16        Go on to proceed, "Tagnetics and I cannot
17   understand why each of you are pursuing the course of
18   action that essentially guarantees you will not get
19   paid the amounts you claim you are owed.  The company
20   has made a reasonable proposal.  I would like to hear
21   back from each of you on the company's most recent
22   proposal.  Ken and Jon, I have not heard back from you
23   and I would like to know your position, as well.  As
24   before, in light of the risks involved, I suggest you
25   seek advice from bankruptcy counsel.  The path you have

**TAGNETICS (19-30822) 10-18-19**

30

1   chosen seems counterproductive and contrary to the

2   outcome you claim to seek."

3   Q     Did you receive a response from any of the

4   Petitioning Creditors to that email?

5   A     I did.  So really -- well, what happened between

6   that and the next email, which is on this email string,

7   is at, looks like 3:27 p.m., or that email at 8:24

8   p.m., I remember this very distinctly, because that was

9   my last day of vacation.  We were heading home that

10  day, and I was supposed to be driving.  I was in the

11  passenger seat.  Had a bunch of calls in the morning on

12  matters related to this and other stuff, and then

13  starting early in the afternoon, I remember it was

14  around one o'clock, give or take a little bit, the

15  phone calls became fast and furious between me and --

16  not exclusively Mr. Earley, certainly primarily with

17  Mr. Earley.  I think it was exclusively with Mr.

18  Earley, where we were calling one another frequently,

19  going back and forth, trying to negotiate a settlement.

20  And we ultimately did reach one.

21        And I remember, when we finally came to terms on

22  one, I was very deliberate in how I worded things, and

23  one of the key terms, before we closed the deal, one of

24  the things that they insisted on, was that they get

25  full releases, completely, and I had some real concerns

### TAGNETICS (19-30822) 10-18-19

31

1  about that, representing the company for certain

2  reasons that I don't think are pertinent here, but I

3  said, I'm duty bound to bring this to my client's

4  attention, I will do that, I will tell you I'm not

5  recommending it, but I'll let the client know.  And

6  after some discussions with the CEO of the company, I

7  was told I was authorized to make an agreement that

8  included the monetary terms that we ultimately agreed

9  to, which are reflected in the email, but the key was

10  also full mutual releases, no carve-outs.  And that's

11  reflected in my email later on that reflects the terms.

12      And I remember, the company was fine, giving the

13  three alleged Creditors full releases, despite some of

14  the reservations I had, as long as it was mutual, full

15  mutual releases, no carve-outs, and that was the phrase

16  that went over, over and over again, in my discussions.

17  Q     And that discussion occurred on that issue as a

18  result of concerns that one or more of the Petitioning

19  Creditors had about claims that the company may have

20  against them, correct?

21  A      Correct.  They were very clear about that, and

22  wanted to be released from certain terms of other

23  agreements that they had with the company, and it was

24  adamant that that was not negotiable from their

25  perspective, and so they wanted to make sure that they

## TAGNETICS (19-30822) 10-18-19

32

1   were fully released, and the company's response was, if

2   we're going to fully release them, we're going to get

3   full release, as well, and move on from there.

4   Q      So was the concept of a mutual release with no

5   carve-outs dictated by the Petitioning Creditors?

6   A      I think so, because they were the ones that was

7   driving it, and my client -- our client ultimately said

8   they were fine with it, as long as it's mutual, and

9   they were willing to go along with that.

10  Q      Okay.  Directing your attention to Page 1 of

11  Exhibit A, I think you referred to that in opening as

12  the term sheet?

13  A      This is.  This is where, after we had --

14  remember, there were many phone calls.  When we finally

15  came to terms, I remember I said to Mr. Earley, I'm

16  going to then send you an email that sets forth the key

17  terms, and I want to make sure that I hear back from

18  you guys, confirming before we call the Court, that

19  this is what we agreed to.  We should not be calling

20  the Court until we have an email exchange confirming

21  this is what we agreed to.

22         I was very sensitive to the fact that we have

23  pro se parties.  I was also very aware of the

24  sensitivity of these negotiations.  I was very, very

25  deliberate about this, because now that we were at that

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 35 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 35 of 189 PAGEID #: 566

1   point, I wanted to make sure there was no
2   misunderstandings.  And I wrote it out that way too.
3   My email clearly says, at 3:27 p.m., "Ron, Kevin, Jon,
4   below sets forth the terms of the agreement we reached
5   by phone.  Each of you please reply, confirming
6   agreement to these terms, and that I need you to
7   initiate a call to the Court to advise of the
8   settlement.  It makes no sense for us to have to show
9   up at court on Monday, now that we have an agreement in
10  place that will be documented more thoroughly in a
11  settlement agreement.  We can work on the written
12  settlement agreement over the weekend."  And I wrote,
13  "Key terms: Payment of $90,000 ($30,000 each), within
14  three days of a fully executed agreement.  The
15  remaining schedule of payments as you proposed below,
16  accepting 12 and 18 months instead of six and 12
17  months."  And that's referring to the schedule that I
18  was referring to, the schedule chart that's reflected
19  in July 25th email.
20       And then that phrase, "full mutual releases (no
21  carve-outs)."  Then another term, "Dismissal/withdrawal
22  of claims by each of you to be filed within one day of
23  receiving payment."  And I said, "I believe this
24  captures the key terms we discussed.  Please confirm."
25       And then I remember there was a bit of a delay.

### TAGNETICS (19-30822) 10-18-19

34

1   I was a bit surprised by the delay.  I called Mr.

2   Earley once or twice.  I may have spoken with Mr.

3   Kayser.  I don't remember exactly who I was speaking

4   with at this time.  I'm pretty sure at least one of

5   them was Mr. Earley.  And I said -- and I got an email

6   response from Mr. Hager at 3:56 p.m. saying, "Mr.

7   Earley is discussing this with the Court at this

8   moment.  I am responding for Kayser, Early and Hager,

9   saying we agree to the terms put forth as documented

10  above."  He wrote "above," but it's really -- I

11  interpret that to mean the email below.  And so that

12  was confirmation number one, that the term sheet, as I

13  described it, in my 3:27 p.m. email, is agreed to and

14  confirmed.

15  Q     Okay.  Then at the top of Exhibit A on Page 1,

16  there's another email from Mr. Hager.

17  A     Yes.

18  Q     At 3:58, which is within the same time frame

19  here.  And could you address that, as well?

20  A     And there, so to me that's confirmation number

21  two.  What he did is he copied my email at 3:27 p.m.

22  and copied it into his email.  He says, "Stephen, I

23  will clarify that we agree to the terms you set forth

24  in your last email and represented below.  Key terms."

25  And lists those four key terms that I just described

**TAGNETICS (19-30822) 10-18-19**

35

1   moments ago, and no other terms, none of these other

2   terms that were referenced in the July 20th email or

3   anything earlier.  These are the key terms of the

4   settlement agreement.

5   Q   All right.  I'm asking you to refer now to

6   Exhibit I, which now the Judge has a copy of, as well.

7   Can you identify what Exhibit I represents?

8   A   So again, there was some back and forth about

9   when I was going to hear from the Court.  I ultimately

10   did speak with -- forgive me for referring to you by

11   your first name.  I remember Joni.  I don't want to

12   mispronounce the last name.  I did eventually speak

13   with her.

14   I got an email from Mr. Hager at 4:09 saying,

15   "Stephen, the Court will be calling you momentarily to

16   confirm we have an agreement among all parties."  And

17   then a short while after that, he sent another email to

18   me, again -- so for the third time, confirming the key

19   terms of the agreement.  It's the top email in that

20   string on Exhibit I, July 26, 2019, it says at 4:36

21   p.m., and it's from Mr. Hager to me, with a copy to Mr.

22   Earley and Mr. Kayser.  It says, "Stephen, to make sure

23   there is no confusion, we are confirming the following

24   payment schedule and amount as part of this agreement,"

25   and lays out that payment chart that I was referring to

**TAGNETICS (19-30822) 10-18-19**

36

1  earlier.  It's the same exact one that we agreed to,

2  except the only difference is there's two differences,

3  or three.

4       The second and third payments instead of six and

5  12 months, now are written out to be 12 and 18 months,

6  which accurately reflects what we agreed to, and then

7  in the bottom line where totals of payments, it says,

8  "Total settlement," and the "Total" is written in all

9  caps, to me emphasizing the point, this is what we

10 agreed to, total settlement payment, nothing more

11 beyond that.

12 Q     Thank you.  Directing your attention now to

13 Exhibit B.

14 A     B as in boy?

15 Q     B as in boy.  Can you identify that?  I believe

16 there's an email on the first page.

17 A     Yes.  This is -- so the first page is the cover

18 email that I sent to Mr. Kayser, Mr. Earley and Mr.

19 Hager, attaching the draft settlement agreement.  I

20 worked on the settlement agreement.  Admittedly, it

21 took me a little bit longer than I had originally

22 anticipated.  That was unfortunate, but I did get it to

23 them, out by the date that I committed to getting it to

24 them, after we had the status conference with the

25 Court, and then the subsequent pages of that exhibit

**TAGNETICS (19-30822) 10-18-19**

37

1  reflect what the agreement that I drafted, that I

2  believe accurately reflects and is taken off of the

3  term sheet, those email exchanges between me and the

4  alleged Creditors, on July 26th.

5  Q     All right.  I'm also directing your attention

6  now to Exhibit H, if you will.  Originally there were

7  six Petitioning Creditors; is that correct?

8  A     Correct.  Originally six, three of which settled

9  out earlier in this case, and Exhibit H reflects a

10  redacted version of that settlement agreement with the

11  other three Petitioning Creditors in this case.  Those

12  Petitioning Creditors were KBL Ventures, LTD, which I

13  understand to be owned by Mr. Kayser, one of the

14  remaining Petitioning Creditors and one of the people

15  here today, and that is reflected in -- at least as the

16  CEO, because if you look at the last page of that

17  exhibit, he is the one that signed on behalf of Kayser

18  Ventures, LTD.  That's on Page 6.

19       The other settling Petitioning Creditors in that

20  settlement agreement were S-Tek, Inc., and a gentleman

21  by the name of Robert Strain.

22  Q     You negotiated that settlement, as well; is that

23  correct?

24  A     I did.  I negotiated that settlement with Kayser

25  Ventures and S-Tek were represented by counsel and Mr.

**TAGNETICS (19-30822) 10-18-19**

38

1  Strain was proceeding pro se.  Most of the negotiations

2  were with the attorney.  There was some negotiations

3  separately with Mr. Strain, but not much.

4  Q    Other than -- well, the redacted sections here

5  most likely deal with the monetary aspects of the

6  transaction, I take it?

7  A    They were.  It deals with the monetary aspects

8  of it, some non-monetary terms, typical language about

9  -- you know, I took out all those terms.  I left in

10  here for purposes of this proceeding only the

11  introduction, just show who this is between, the

12  signature page again to show who it's between, and then

13  elements of or portions of the releases, because one of

14  the objections that we got subsequent to sharing the

15  draft settlement agreement was including Compass

16  Marketing, Inc., specifically among the releases.  And

17  I was very, very surprised to see that, because first

18  of all --

19  Q    What you're saying is that after you transmitted

20  what has been identified as a part of Exhibit B, the

21  settlement agreement, regarding the remaining

22  Petitioning Creditors, that one of the issues that came

23  up was whether or not there should be a carve-out as to

24  Compass?

25  A    Yes.  I'm sorry.  Thank you for that

**TAGNETICS (19-30822) 10-18-19**

39

1   clarification.  So, yes.  After I transmitted Exhibit

2   B, one of the responses I got back from the alleged

3   Creditors was an objection to including Compass

4   Marketing, Inc., in the release.  If you look at

5   Exhibit B for a moment, if you look at -- in Paragraph

6   -- in Section 4, Section 5 and Section 6, which are the

7   releases that would be provided by Mr. Kayser, in 4 Mr.

8   Early, in 5 Mr. Hager, and 6, I'll just read the

9   opening of Mr. Kayser's paragraph, because the language

10  mirrors itself.  "In exchange for the consideration

11  described herein, Kenneth Kayser on his own behalf and

12  on behalf of his heirs, successors and assigns, as well

13  as all corporate and operating affiliates, related

14  entities, in which Kenneth Kayser has controlling

15  interest, hereby releases and discharges Tagnetics, as

16  well as its current and former parent companies,

17  corporate and operating affiliates, subsidiaries, and

18  related entities (including specifically Compass

19  Marketing, Inc., as well as each of their current and

20  former directors, officers, shareholders and other

21  equity holders, agents, employees, accountants,

22  attorneys, insurers, collectively the Tagnetics

23  releasees.)"  And that language appears in each of the

24  release paragraphs.

25          The reason why --

**TAGNETICS (19-30822) 10-18-19**

40

1  Q     Was this any different than the nature and scope

2  of the releases in the original settlement agreement

3  that's referenced as Exhibit H, with the --

4          DR. KAYSER:  Your Honor, I object to this

5  line of questioning as relevance.  I mean, what was

6  appropriate to settle with Kayser Ventures is not

7  necessarily appropriate with what a settlement would be

8  with the individuals who had contracts with Tagnetics.

9          THE COURT:  Any response, Mr. Kracht?

10          MR. KRACHT:  Yes, Your Honor.  We're getting

11  to the point that we were going to try to make on that.

12  It has to do with whether there was a carve-out or not

13  that was requested and the logic of that, and how these

14  otherwise were similar agreements drafted after

15  negotiations by Mr. Stern, with the original -- the

16  other Petitioning Creditors that were released, which

17  included in part, because of his status with Kayser

18  Ventures, Mr. Kayser, as well.

19          THE COURT:  I'm going to overrule the

20  objection, but let me state this.  I'm going to let you

21  finish this questioning, but I'm going to be honest.

22  I'm very skeptical of the position that Compass -- this

23  argument or position that including Compass in the

24  release would be a carve-out.  I don't understand that

25  from a legal perspective.  I don't follow your argument

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 43 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 43 of 189 PAGEID #: 574

TAGNETICS (19-30822) 10-18-19

41

```
1   that including Compass in the release would be a carve-
2   out.  And okay, I can understand that, if the July 26th
3   emails said based upon all the terms in the settlement
4   agreement with Strain and KB whatever, and so forth,
5   but that's not what the July 26th email says.
6           MR. KRACHT:  Correct, Your Honor.
7           THE COURT:  So I'm being honest with you, I'm
8   --
9           MR. KRACHT:  Quite frankly --
10          THE COURT:  I'm not buying it right now, and
11  you're going to have to do an awful lot of convincing
12  that including Compass in the release is a carve-out.
13          MR. KRACHT:  We're not saying that, Your
14  Honor.  We're saying that there was no carve-out,
15  saying that the release didn't apply to Compass.  They
16  were a part of the overall release that was given.  A
17  carve-out of Compass would have said, you know, the
18  Tagnetics, its officers, directors, affiliates, blah,
19  blah, blah, excepting Compass, which would give -- what
20  would have occurred if that happened, would have been
21  they would have been able to retain any claims they may
22  have against Compass.  That would have been the carve-
23  out.  We didn't agree to the carve-out.
24          THE COURT:  I understand that's your
25  argument.  I understand that.
```

TAGNETICS (19-30822) 10-18-19

42

1       MR. KRACHT:  Mm-hmm.

2       THE COURT:  But your July 26th emails don't

3    say Tagnetics, its affiliates, Compass, blah, blah,

4    blah.  And so I don't know how you explode and include

5    your July 26 email to include all the affiliates and

6    everything, when the key terms and everything else,

7    from what I read, don't include affiliates and blah,

8    blah, blah, and officers and agents and blah, blah,

9    blah.

10       MR. KRACHT:  That's why we're --

11       THE COURT:  The settlement agreement does.

12       MR. KRACHT:  That's why we're contrasting, to

13    the extent there is something to contrast, the earlier

14    settlement agreement, because there is a distinction,

15    there was a carve-out there that we were going to get

16    to.

17       THE COURT:  Again, I'll let you proceed with

18    this questioning.  I'll overrule the objection, but,

19    you know, I'm skeptical about this position.

20       MR. KRACHT:  Understood.

21       MR. STERN:  Well, as in every settlement

22    agreement I've drafted in my career on behalf of a

23    company, I don't think there's a single one that I

24    could think of off the top of my head, where I did not

25    include the entity itself that's a party to the case,

**TAGNETICS (19-30822) 10-18-19**

43

1    its parents, affiliates and subsidiaries.  That's

2    standard operating procedure in any settlement

3    agreement, I think I've ever done in my entire career.

4    And in this case, an affiliate of Tagnetics is Compass

5    Marketing, Inc., and as evidenced by the fact that we

6    included specifically Compass Marketing, Inc. in the

7    prior settlement that Mr. Kayser had signed, to show

8    that this is not a surprise.  This is something that

9    was standard procedure in settlements generally,

10   parents, subs, operating affiliates, so that's in all -

11   - typical in agreements, and in this case specifically

12   Compass, because Mr. Kayser had signed on that before.

13   And we didn't specifically mention Compass before that

14   either, until we got to the draft settlement agreement,

15   which Mr. Kayser signed, without objection.

16        So when I got the objection later on, after I

17   sent Exhibit B to the alleged Creditors, I was very

18   surprised.  I'm just mirroring the language that was

19   acceptable before, and is typical in all sorts of

20   agreements about -- where you release affiliates,

21   parents and subs, and that's -- again, I don't think

22   I've ever done an agreement where it didn't include

23   that language.

24   BY MR. KRACHT:

25   Q    Now, when you look at Exhibit H, the prior

TAGNETICS (19-30822) 10-18-19

44

1   settlement, there was a carve-out that was addressed in

2   that particular case, right?

3   A     Yes, thank you.  So we did have to include a

4   carve-out and we could provide an un-redacted version,

5   if need be.  It is redacted in here.  But the KBL

6   releases, because Mr. Kayser is an individual who owns

7   KBL, as we understood it, there is a carve-out at the

8   end of his -- of his release, because if you look at

9   the language -- I'm going to read Page 2, Section 5, of

10  Exhibit H.

11        "KBL releases.  In exchange for the

12  consideration described herein, Kayser Ventures, LTD,

13  on its own behalf and on behalf of its current and

14  former parent companies, corporate operating

15  affiliates, subsidiaries and related entities, as well

16  as each of their current and former directors,

17  officers, shareholders and other equity holders," and

18  then go on and on.  Releases, Tagnetics, and again has

19  the same language there, "its corporate operating

20  affiliates, subsidiaries and related entities,

21  including specifically Compass Marketing, Inc."

22        The reason why we had to include a carve-out at

23  the end of Section 5, because we knew that Mr. Kayser

24  had his own individual claims, and based on that

25  language, we did not negotiate a separate settlement

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 47 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 47 of 189 PAGEID #: 578

**TAGNETICS (19-30822) 10-18-19**

45

1   for his individual claims.  We knew that he was

2   proceeding on those.  It was part of the understanding

3   of the deal terms.  It would have been intellectually

4   dishonest to try to -- try to get a release of his

5   individual claims, when you had the KBL claims and were

6   only negotiating about KBL at the time.  We were not

7   negotiating about Mr. Kayser's individual claims.

8          So, at the end of this paragraph -- it is

9   redacted, but we could provide an un-redacted version.

10         DR. KAYSER:  Your Honor, I object.  I do not

11  have in front of me what he's reading from, and so I

12  can't follow what's going on here.  And in addition,

13  this is irrelevant.  What Kayser Ventures' settlement

14  said does not affect and was never meant to affect, and

15  my counsel for Kayser Ventures isn't here.

16         THE COURT:  Do you have -- let me ask you,

17  Mr. Kayser, do you have their exhibits in front of you?

18         DR. KAYSER:  But it's redacted in there,

19  also.  And I didn't bring with me the settlement

20  agreement from Kayser Ventures.

21         THE COURT:  Well, I think he was reading from

22  -- is the carve-out redacted or is the carve-out -- are

23  the carve-outs redacted?

24         MR. STERN:  It should be at the end of --

25         THE COURT:  I'm going to sustain the

**TAGNETICS (19-30822) 10-18-19**

46

1    objection then.  If you're talking about something that
2    was redacted from the exhibit, I agree.  I think Mr.
3    Kayser is absolutely right, and I'm going to sustain
4    the objection, to the extent you're testifying about
5    him trying to read something that's redacted from an
6    exhibit.  And let me say this much, I will probably --
7    if they move admission of Exhibit H, I will probably
8    admit it, but I'm, again, being forthright and honest,
9    from what I've seen of everything, I tend to agree,
10   Exhibit H, I think, is irrelevant.  I'm being
11   forthright and honest with you.  You know, I think
12   really for the most part, Exhibit H is irrelevant,
13   because what you -- what terms you entered into with
14   other parties on another settlement, even though a same
15   case, I'm struggling to understand the relevance to
16   settlement with these three other parties.
17          MR. KRACHT:  Just a question, Your Honor.
18   Would it be permissible to substitute Exhibit H,
19   redacted version, with a revised version that shows
20   that language that we're talking about now?
21          THE COURT:  Is there objection --
22          DR. KAYSER:  Yes, I would object in that it's
23   irrelevant.
24          MR. KRACHT:  Mr. Kayser was a party to --
25          DR. KAYSER:  It's a separate entity.  The

**TAGNETICS (19-30822) 10-18-19**

47

1    fact that I happened to be the chairman of that company

2    is not relevant to this portion of the case.

3              THE COURT:  Mr. Earley, any objection?

4              MR. EARLEY:  I object also.  I agree.

5              THE COURT:  Mr. Hager?

6              MR. HAGER:  I object, likewise.

7              THE COURT:  Yeah, I'm going to sustain those

8    objections.  You know, we had exhibit filing date, and

9    that's why we have exhibit filing dates.  You had

10   plenty of opportunity to consider this.  And now you

11   want to substitute one that you think is more favorable

12   to you than the one you submitted in this largely

13   redacted version.  And not only that, I mean, I often

14   will allow exhibits to be introduced, even though they

15   missed the filing date, but I do -- again, coupled with

16   the fact that I do believe Exhibit H is not -- is

17   largely, if not totally, irrelevant to what's before me

18   today, I'm going to sustain the objection.

19             MR. KRACHT:  Thank you, Your Honor.

20             THE COURT:  To the request you've made.

21   BY MR. KRACHT:

22   Q     Okay.  Mr. Stern, if you can look to Exhibit C?

23   A     Yes.

24   Q     Can you identify that document?

25   A     This is an email from me to Mr. Hager, with a

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 50 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 50 of 189 PAGEID #: 581

1   copy to Mr. Kayser, and Earley, on August 19, 2019, at

2   7:48 p.m., where I am responding.  It's an email

3   string.  That's the most recent one in the string was

4   the one I just identified.  There's an earlier email in

5   this string from Mr. Hager to me, with a copy to Mr.

6   Kayser, Mr. Earley, on August 16th, 2019, at 2:19 p.m.

7   Q    And that's on Page 2 of Exhibit C, correct?

8   A    Yes, and in that first email in the string, from

9   Mr. Hager, it sets forth a number of objections that

10  they have to the terms -- the written terms of the

11  settlement agreement, that I provided to them, as in

12  Exhibit B, on August 14th.

13  Q    Okay.  And you responded to those objections to

14  the settlement agreement?

15  A    I did, and that's my August 19th email to them,

16  which is the first page of the exhibit, where I try to

17  go through the substantive discussions and explain, you

18  know -- I mean, I guess my opening line is, "Many of

19  the terms included below clearly fall outside the scope

20  of what we agreed to, the email exchange we had on July

21  26, 2019, at 3:56 p.m. and again at 3:58 p.m."

22  Apparently some of the times must have been flipping

23  back and forth in the emails, now that I'm looking at

24  this.  "Without going blow by blow, the terms of

25  Paragraph 4 clearly call for payments that were not

Case 1:21-cv-00309-ELH  Document 44-15  Filed 09/07/21  Page 51 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 51 of 189 PAGEID #: 582

TAGNETICS (19-30822) 10-18-19

49

1    included in the July 26 email exchange, setting forth

2    the settlement payments.  In addition, those requests

3    for additional payments clearly seek an exception to

4    the full mutual releases, no carve-outs.  I'm not sure

5    how you can now ask for payments that were not

6    previously agreed to, seek exceptions to full mutual

7    releases, no carve-outs."

8         And it goes on to explain those a little bit

9    more detail.  I'm going, again, back to the full mutual

10   releases, no carve-outs, that's a repeated theme of

11   these discussions.  There's some other terms at the

12   bottom, where they were making a request for default

13   judgment.  Again, that was something that was

14   entertained in earlier emails.  I'd have to look back

15   at email or Exhibit A.  I think it was on the 20th.  It

16   was around where maybe 23rd, 24th, where the discussion

17   of default judgment was a possibility, but it clearly

18   wasn't one of the terms that were agreed to, because

19   there were not one, not two, but three emails

20   confirming the key terms of the agreement, without any

21   discussion for these other non-monetary terms.  Not

22   once was that included.

23   Q    And those non-monetary terms would have been

24   various carve-outs that they were seeking now after the

25   fact?

**TAGNETICS (19-30822) 10-18-19**

50

1   A      Correct.

2   Q      Directing your attention to Exhibit D.

3   A      Yes.

4   Q      Can you identify that, please?

5   A      So this is a response to -- another response to

6   the draft settlement agreement I provided on the 14th.

7   This is an email from Mr. Earley on the 16th at 11:52

8   a.m., and he expresses concerns similar to Jon Hager's,

9   and added a few other terms about a $30,000 loan

10  accruing interest, and then something related to stock

11  ownership.  He refers to Jon's, even though Jon's

12  didn't come to me until later in the day, I believe.

13  So obviously they -- I'm assuming they exchanged

14  discussions or emails and didn't realize the timing of

15  events, but these two were -- I interpreted as being

16  sent in collaboration with one another.

17  Q      Directing your attention to -- we'll skip over

18  E.  If you'd take a look at Exhibit F?

19  A      And then this is -- Mr. Earley apparently sent

20  an email to Mr. Hager and Mr. Kayser on August 20th,

21  2019, at 5:13 p.m., which he subsequently forwarded to

22  me on the 21st of August at 7:25 a.m., and it was only

23  to me, where they're identifying some additional

24  concerns about the settlement agreement, based on a

25  conversation that Mr. Earley had with a lawyer.  There

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 53 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 53 of 189 PAGEID #: 584

1   were concerns about the general release language.  It
2   sought a new provision that wasn't discussed before, an
3   acceleration clause for payments, something about a
4   non-compete agreement, which was not previously
5   discussed, and changing the voluntary dismissal of this
6   proceeding to without prejudice, instead of with
7   prejudice.  And then another statement about some
8   $30,000 loan, all of which we did not discuss
9   previously.
10  Q     So --
11  A     The only thing that might arguably have been
12  discussed, but again was Item 1, where they're making
13  an exception for Compass Marketing, but again from my
14  mind, full mutual releases, no carve-outs, that means
15  all parents, subs, and operating affiliates.  Compass
16  Marketing is an operating affiliate under Ohio law, as
17  I understand it, because of its ownership interest in
18  the entity.  We just decided to identify specifically
19  in the agreement, so that there wasn't an ambiguity
20  about that later on, because under Ohio law, as I
21  understand it, it constitutes an affiliate.
22  Q     So how did you and Tagnetics view these post-
23  settlement communications from the Petitioning
24  Creditors?
25  A     Sure.  I guess -- I want to be careful about not

**TAGNETICS (19-30822) 10-18-19**

52

1    revealing privileged communications, but Tagnetics was

2    surprised.  I was certainly surprised.  This to me was

3    clearly outside the scope of what we agreed to.  I was

4    -- as I mentioned earlier, I wanted to be very careful

5    about how I communicated those terms at the end, before

6    we called the Court.  And as I mentioned before, there

7    is not one, not two, but three confirming emails to

8    them, confirming the total payments and what the key

9    terms were, repeating the full mutual releases, no

10   carve-outs.  So this to me looked like more and more

11   exceptions.  To use the phrase, buyer's remorse.  I

12   don't know why there's been a change of heart, it

13   seemed to me, but that's the way I was interpreting it,

14   and that's the way I can fairly describe what

15   Tagnetics' reaction was, as well.

16   Q     Okay.  If you'll take a look at the next

17   exhibit?  I believe it's the final one, Exhibit G.

18   A     Okay.

19   Q     Can you identify that?

20   A     Sure.  This looks like -- let me go back to the

21   first email here.  This is more in the string of the --

22   so the first email in the string is from Mr. Hager to

23   me, with a copy to Mr. Kayser and Mr. Earley, on August

24   16th, where they identified their concern slash

25   objections to the settlement agreement that I provided

TAGNETICS (19-30822) 10-18-19

53

1    on the 14th.

2          The next email in that string is my response

3    that we had identified earlier.  I think that was

4    Exhibit D.  No, C is the next one in that string, I

5    believe, if I'm reading them correctly.  Yes.  And then

6    this is a response to my August 19th email, and this

7    came from Mr. Hager to me, with a copy to Mr. Kayser

8    and Mr. Earley on August 20th, 2019, at 9:23 a.m.,

9    again trying to explain what I saw as the different

10   terms and conditions than what we had agreed to on July

11   26th.

12   Q    Essentially then, to try to re-trade the

13   settlement that was reached on July 26th?

14   A    Yes.

15          MR. KRACHT:  I have nothing further, Your

16   Honor.

17          THE COURT:  Thank you, Mr. Kracht.

18          MR. KRACHT:  Would you entertain introduction

19   at this time or would you prefer to do that --

20          THE COURT:  Yeah, I think that would be fine,

21   if you want to move admission.

22          MR. KRACHT:  I'd like to move to admit

23   Exhibits A through I.

24          THE COURT:  Did you cover Exhibit E?

25          MR. KRACHT:  I did not, and if I could have a

**TAGNETICS (19-30822) 10-18-19**

54

1   minute talking to my co-counsel, would that be

2   permissible?

3          THE COURT:   Yeah, you may do so.   Unless you

4   want to be on the record with this discussion, I'd get

5   away from a microphone.   Yeah, Petitioning Creditors,

6   you can figure out whether you have any objections to

7   admission of these exhibits and if you want to, you

8   also -- I'll wait.

9          (Pause.)

10          MR. KRACHT:   Your Honor, after conferring

11   with co-counsel, I'm going to, if you would permit, ask

12   him a few questions about that exhibit.

13          THE COURT:   That's fine.

14   BY MR. KRACHT:

15   Q     Directing your attention to Exhibit E.

16   A     Yes.

17   Q     Can you identify that, please?

18   A     Sure.   When preparing the motion to enforce the

19   settlement agreement, I drafted this declaration for

20   Mr. Luis Fernandez, where -- who was the CFO of

21   Tagnetics, and he is now -- at the time he signed this,

22   he was Acting CFO, and so I drafted this, sent it to

23   him, asked him to make whatever tweaks or modifications

24   he needed to make.   He made a few small tweaks, signed

25   this and sent it back to me to include with our brief

**TAGNETICS (19-30822) 10-18-19**

55

1  on the motion to enforce settlement agreement.

2  Q      Okay.  And it addresses what particular point?

3  A      It addresses specifically Compass Marketing,

4  Inc.'s ownership interest in Tagnetics, Inc.

5  Q      And that was to what, demonstrate that it's an

6  affiliate?

7  A      Yes.  To show -- because with the research that

8  I had conducted under -- or my office had conducted and

9  shared it with me, so I didn't actually do the

10 research, to make sure I'm accurate in my statement to

11 the Court.  So, but based on my firm's research, under

12 Ohio law, an affiliate is any person, and a person is

13 defined as an individual or a corporate entity, that

14 owns more than ten percent of another company.  And in

15 this case, based on the ownership interest of Compass

16 Marketing having more than ten percent, we deemed it to

17 be an affiliate under Ohio law.

18 Q      Okay, thank you.

19         MR. KRACHT:  Nothing further, Your Honor.

20         THE COURT:  Okay.  And you're moving

21 admission of Exhibits A through I?

22         MR. KRACHT:  Yes, Your Honor, correct.

23         THE COURT:  Okay.  Petitioning Creditors, you

24 can let me know if you have any objections to the

25 admission of any of those exhibits.  You also have the

### TAGNETICS (19-30822) 10-18-19

56

1  right to, if you want to ask Mr. Stern or any other

2  witnesses questions about those exhibits, because you

3  dispute their authenticity or something like that,

4  before I admit them, you have the right to do that too.

5  So if you want to have me reserve my ruling on the

6  admission of those exhibits until you have the

7  opportunity to examine witnesses about those exhibits,

8  we can do that also.

9       DR. KAYSER:  Your Honor, I'm concerned about

10  the admission of this particular affidavit.

11       THE COURT:  Exhibit E, Mr. Fernandez's

12  affidavit?

13       DR. KAYSER:  From Luis Fernandez, yes.  And

14  the reason being that, you know, I was a long-time

15  director of this company, and as of the time of my

16  serving on the Board of Directors, Compass Marketing

17  was not a ten percent shareholder of this company.  And

18  that action may have taken place after the petition for

19  involuntary bankruptcy was filed, and I would have to

20  contact the lawyer, and we don't have Luis Fernandez

21  here to testify when this change to the ownership of

22  Tagnetics occurred, and I think that's an important

23  consideration.

24       THE COURT:  I think Mr. Kayser is making a

25  hearsay objection to the admission of Exhibit E.  He

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 59 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 59 of 189 PAGEID #: 590

TAGNETICS (19-30822) 10-18-19

57

1    didn't label that as a hearsay objection, but I think
2    he articulately objected to Exhibit E on the basis of
3    it being hearsay.  Mr. Earley, do you have an objection
4    to the admission?
5            MR. EARLEY:  I also object.
6            THE COURT:  Mr. Hager?
7            MR. HAGER:  Also object.
8            THE COURT:  Based upon their objections, I
9    will not admit Exhibit E.  I think it is flat-out
10   hearsay.  Mr. Kayser articulately stated why hearsay
11   should not be admitted, particularly hearsay such as
12   this, an affidavit of somebody who is not testifying
13   today, that they do not have the ability to cross-
14   examine on these statements.  So I will not admit
15   Exhibit E.
16           (Exhibit E rejected.)
17           THE COURT:  What about the other exhibits,
18   Mr. Kayser and Mr. Earley and Mr. Hager, other than E?
19   Is there an objection or do you want me to reserve
20   ruling on those exhibits?
21           DR. KAYSER:  Can we have just a moment, Your
22   Honor?
23           THE COURT:  Yeah, absolutely.  In fact, why
24   don't we take a five-minute recess?  You can discuss
25   those and then we'll --

**TAGNETICS (19-30822) 10-18-19**

58

1      DR. KAYSER:  Appreciate it.  Thank you.

2      THE COURT:  -- come back after a five-minute

3  recess.

4      THE CLERK:  All rise.  Court is in recess.

5      (Off the record from 11:02 a.m. until 11:14

6  a.m.)

7      THE CLERK:  Court is again in session.  You

8  may be seated.

9      THE COURT:  Okay.  We finished, I think, with

10  the direct examination of Mr. Stern.  And Mr. Kracht

11  proposed the admission of Exhibits, Tagnetics' Exhibits

12  A through I.  I already ruled on Exhibit E and

13  determined that E would not be admitted, based upon it

14  being hearsay, and I don't believe there's any

15  exception to the hearsay rule, which would cover an

16  affidavit of a person who is not here to testify.

17      And so I think that leaves the remaining

18  exhibits.  And the Petitioning Creditors were

19  conferring as to whether they had any objections to the

20  admission of those other exhibits.  So I think that's

21  where we lie.

22      Mr. Kayser, any objection?  And as I pointed

23  out earlier too, if you want the Court to reserve

24  ruling on admission of these other exhibits until you

25  have the opportunity to examine Mr. Stern or any other

**TAGNETICS (19-30822) 10-18-19**

59

1    witnesses, concerning those exhibits, that's also

2    something which the Court can do.  So that being said,

3    Mr. Kayser?

4           DR. KAYSER:  I don't believe I have any

5    objection to the other exhibits.  They are primarily

6    documents --

7           MR. HAGER:  Your Honor, I guess the question,

8    when you mention if we would like to cross, do we

9    suggest that we reserve your ruling or --

10          THE COURT:  You can still cross.  You'll

11   still have the opportunity to cross-examine Mr. Stern

12   about his --

13          MR. HAGER:  Sorry.

14          THE COURT:  -- testimony.  It's a good

15   question.  It's a good question.  You still have the

16   right to cross-examine Mr. Stern.  All I was -- point I

17   was making is -- is if you want me to reserve ruling on

18   admission of the other exhibits, until you cross-

19   examine Mr. Stern, because you may have some issue

20   about the authenticity or something of any of these

21   exhibits, I can reserve ruling on admission of those

22   exhibits until you have that opportunity.

23          MR. HAGER:  Thank you.

24          THE COURT:  So I believe Mr. Kayser said he

25   has no objections to admission of the other exhibits,

**TAGNETICS (19-30822) 10-18-19**

60

1  other than, you know, Exhibit E.  Mr. Earley, what

2  about you?

3          MR. EARLEY:  The same.  No objections.

4          THE COURT:  Mr. Hager?

5          MR. HAGER:  I have no objections.

6          THE COURT:  Okay.  Then the Court will admit

7  Tagnetics' Exhibits A through I, except for E.  We are

8  not -- the Court is not going to admit Exhibit E, but

9  will admit the other exhibits.

10          (Exhibits A, B, C, D, F, G, H, I admitted

11  into evidence.)

12          MR. KRACHT:  Thank you, Your Honor.

13          THE COURT:  Okay.  Now I think we're ready

14  for any cross-examination of Mr. Stern.  Mr. Kayser, do

15  you wish to cross-examine Mr. Stern?

16          DR. KAYSER:  I have a few questions for Mr.

17  Stern, yes.

18          CROSS-EXAMINATION OF STEPHEN STERN

19  BY DR. KAYSER:

20  Q    Mr. Stern, on -- from the email of July that I

21  sent to you on July 20th, did that form the basis for

22  the remainder of our negotiations?

23          MR. KRACHT:  Objection.  Do you have an

24  exhibit you can refer to, please?

25          DR. KAYSER:  It's our Exhibit 1, and I

**TAGNETICS (19-30822) 10-18-19**

61

1    believe it was your Exhibit --

2         MR. STERN:  Looking at Exhibit A, what is

3    Page 6 of the -- is that the one you're referring to?

4    BY DR. KAYSER:

5    Q     Yeah.

6    A     I don't know if I'd describe it as it forms the

7    basis of our subsequent negotiations, because I

8    responded by rejecting that email, and then I think

9    really where -- if you wanted to talk about one that

10   really forms the basis of it, you could maybe point to

11   either the July 23rd email from Mr. Earley, or the July

12   25th email from Mr. Earley, where those -- some of the

13   charts were there, and that set forth the terms.

14   Q     Would you read the top to the first line of that

15   email to me?

16   A     Which email are you referring to?

17   Q     The July 20th email, Exhibit 1 or Exhibit A.

18   A     So the first line says, "Stephen, as time is

19   very short, you should consider this as our final

20   offer.  If your client agrees to these terms, we will

21   send a letter to the Judge, indicating we have reached

22   an agreement.  This entire transaction must be

23   completed, including the transfer of funds, in time to

24   cancel the trial."  That's the opening paragraph I just

25   read.

**TAGNETICS (19-30822) 10-18-19**

62

1    Q    Doesn't that statement presume that our position

2    was, this is our final offer?

3    A    It does say it was the final offer, but

4    obviously it wasn't.

5    Q    Did we subsequently agree to renegotiate the

6    payment schedule?

7    A    I don't know about renegotiate.  That suggests

8    that there was an agreement in place and then we're

9    modifying it.

10   Q    In your response to this document -- let me find

11   the right response.  Can you give me -- in the response

12   to that, in Exhibit -- same exhibit.  Okay.  Page 5 of

13   Exhibit A.

14   A    So my response --

15   Q    The only objection you state in here is an

16   objection to the cash amount and to the payments --

17   actually, to the payment schedule.

18   A    That's not correct.  The opening paragraph of my

19   response on July 23rd is two sentences.  My opening

20   sentence says, "I'm in receipt of your demand to

21   resolve the litigation involving Tagnetics."  Second

22   sentence says, "While I and the Tagnetics team

23   appreciate the overture to try to reach a negotiated

24   resolution, the demand you put forward is not

25   realistic."

### TAGNETICS (19-30822) 10-18-19

63

1    Q      And the next statement is, the next sentence?

2    A      Yeah, and I go into some of the discussion, but

3    I -- I didn't qualify --

4    Q      The only thing discussed in this email is the

5    amount of cash, not the terms and conditions.  Why

6    didn't you include any argument about the terms and

7    conditions?

8    A      That is not correct.  If you look at the email

9    further down, there is a discussion about the default

10   judgment, so it's not only about monetary terms.  I

11   remember that was one of the discussions that we were

12   having.  So it's not limited only to monetary terms.

13   And as the final email on July 26 reflected, there were

14   non-monetary terms addressed in that.

15   Q      Can I ask you about your use of the word carve-

16   out?  That doesn't seem to be -- is that a good legal

17   word to use?

18   A      Well, it was -- I don't know how to really

19   answer that.  Let me try my best.  So it says, the

20   phrase that we're using on the 26th says, "full mutual

21   releases, no carve-outs."  No exceptions would be

22   another way of saying it.

23   Q      What's the definition of the word carve-out?

24   A      I would describe it as an exception to whatever

25   is agreed upon in terms of whatever the scope of the

**TAGNETICS (19-30822) 10-18-19**

64

1   agreement is.  In this case, we're talking about

2   releases.

3   Q     Is it a good legal word?  I'm just asking you

4   whether, as a lawyer, do you think that carve-out is a

5   clear word to use, without knowing what the context in

6   which carve-out is used?

7   A     I've used that phrase before.  Other lawyers

8   have used that phrase before.  It's not the first time

9   by any stretch in the course of my career, and the

10  phrase "carve-out," at least referencing July 26th as

11  the point it follows -- I'm reading from my email at

12  3:27 p.m., which is on Exhibit A.  Full mutual

13  releases, parens, no carve-outs, so meaning no

14  exceptions to the mutual releases.

15  Q     But you're adding a context to it, and is carve-

16  out a word that's defined by context?

17  A     I think every word requires an examination of

18  context.

19  Q     Have you ever looked carve-out up in a

20  dictionary?

21  A     I have not.

22  Q     Then I can't ask you what it says.  But carve-

23  out -- I can't testify here.

24        One last question.  In the settlement agreement

25  you sent us on August 14th, why did you mention Ron

### TAGNETICS (19-30822) 10-18-19

65

1   Earley's loan in the section on Ron Earley, if you had

2   dismissed all of these terms?

3   A    I know it was referenced at one point and we

4   limited to the monetary terms, as the chart reflects on

5   Mr. Earley's 25th email, and then again on Exhibit I,

6   the email that was sent by Mr. Hager, showing the

7   entirety of the monetary terms.  And I was just

8   reiterating that that loan is not part of this, because

9   it says, "total settlement."  There's no other monetary

10   payments to be made.

11   Q    Exhibit --

12   A    It is not unusual in my experience, at least the

13   way I draft agreements, when there is some discussion

14   of some point about maybe some other side term,

15   whatever the case may be, or some other agreement

16   that's out there, I like to make sure when there's a

17   release, we're enunciating the entire list of things,

18   to make sure that there's no argument later on --

19   Q    So you --

20   A    -- that I didn't include that or wasn't clear.

21   Q    So in your -- it was mentioned in the settlement

22   agreement that you were wiping out Ron's loan; is that

23   how you would characterize it?

24   A    I'd have to look back to the settlement

25   agreement that I drafted that I have a recollection of

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 68 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 68 of 189 PAGEID #: 599

TAGNETICS (19-30822) 10-18-19

66

1   including some references to other agreements.

2   Q     If you did that with Ron Earley's loan, why

3   didn't you do it with the other outside-the-contract

4   dollar amounts that -- for instance, the Kayser

5   Ventures, Core Technology license and also the other --

6   the deferred salary that was to be excluded in our

7   document?

8   A     Well, that's not accurate either, because if you

9   look at your release and this language is mirrored in

10  Mr. Earley's release and it is mirrored in Mr. Hager's

11  release.  I'm looking at Page 3 of Exhibit B.  I don't

12  want to reread the entire paragraph, but I go through

13  an illustrative list of examples, whether known or

14  unknown, by statute, contract or otherwise, including

15  but not limited to any claims for -- so I'm now

16  articulating the various types of claims you or any of

17  your colleagues may bring against Tagnetics.  Unpaid

18  wages, Romanette one.  Romanette two, unpaid notes or

19  other loans, including unpaid interest.

20  Q     All right.  I have no other questions.

21  A     Romanette three, unpaid dividends.  I think it's

22  important that I complete my testimony here.  Profits

23  or other distributions.  Romanette four, unpaid

24  royalties.  Romanette five, breach of contract

25  regarding goods or services provided or rendered, or

## TAGNETICS (19-30822) 10-18-19

67

1    equipment loaned to Tagnetics. Romanette six, breach

2    of express or implied contract or unjust enrichment.

3              DR. KAYSER:  Your Honor --

4              MR. STERN:  Romanette seven --

5              DR. KAYSER:  -- I'm done questioning.

6              THE COURT:  Okay.

7              MR. STERN:  I'm just answering the question

8    that was asked.

9              THE COURT:  I understand.  Yeah, and you're

10   referring to the draft settlement agreement, and I

11   think we can read the rest of that.

12             MR. STERN:  Okay.  They are a list of

13   illustrative types of claims.

14             THE COURT:  You made your point in response

15   to his question.  No further questions of Mr. Stern?

16             DR. KAYSER:  You guys?  Jon?

17             THE COURT:  Mr. Kayser, you have no further

18   questions?

19             DR. KAYSER:  Yes.  No further questions.

20             THE COURT:  Okay, thank you.  Mr. Earley, do

21   you have any?

22             MR. EARLEY:  No, I have no questions.

23             THE COURT:  And if I don't state it, if they

24   -- the way I will phrase it is you can -- if Mr. Kayser

25   has asked questions, you don't need to ask the same

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 70 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 70 of 189 PAGEID #: 601

TAGNETICS (19-30822) 10-18-19

68

1   questions.  If there is additional testimony which you

2   wish to elicit in your case, you may do so, but you

3   don't have to re-elicit any testimony or evidence

4   that's already been introduced.  But that -- and that's

5   going to run through, throughout the day today.  That's

6   going to be the rule.  You don't need to re-elicit

7   testimony or evidence that's already been elicited in

8   anybody's else's case.  So with that caveat, anything

9   additional you wish, Mr. Earley, to cross-examine Mr.

10  Stern on?

11          MR. EARLEY:  No, sir.

12          THE COURT:  Okay, thank you.  Same thing, Mr.

13  Hager, any additional --

14          MR. HAGER:  I do have some questions.

15          THE COURT:  Yes, you may.

16          MR. HAGER:  And I'm not revisiting the same

17  issue, but it is the same word, but only for a reason.

18          THE COURT:  That's fine.

19  BY MR. HAGER:

20  Q    So Mr. Stern, who introduced the word "carve-

21  out" on our phone call at I believe it was 12:44 on

22  July 26, that phone call that was between Mr. Earley,

23  Mr. Kayser, myself and you?

24  A    I don't remember who brought that up.  It would

25  be speculation, based on my general recollection of

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 71 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 71 of 189  PAGEID #: 602

TAGNETICS (19-30822) 10-18-19

69

1  discussions, but I have no specific recollection of

2  that.

3  Q     Do you remember specifically what the topic that

4  we were discussing, that we had disagreement about,

5  that led to actually you stating, okay, then no carve-

6  outs?

7  A     I'll assume for the moment, based on your

8  question, that I was the one that brought up the phrase

9  carve-outs.  But regardless, what I do remember about

10 the discussion about release was that I think it was

11 Mr. Earley who was pushing for the notion -- maybe Mr.

12 Kayser or you.  I don't remember who it was.  I think

13 it was Mr. Earley, was saying we need full releases,

14 referring to these other agreements that were in place,

15 because you didn't want to be -- you didn't want

16 Tagnetics to be able to sue on any -- on any

17 intellectual property rights, anything related to the

18 employment agreement.  You wanted complete freedom from

19 Tagnetics, and I had expressed some concern about that

20 at some point, so I said nevertheless, I'm duty-bound

21 to discuss this with my client, and I will do so.

22      I did bring it up with Tagnetics, and I did

23 report back, to my surprise, that Tagnetics did -- was

24 willing to agree to the full releases you requested,

25 provided it was mutual, meaning no carve-outs, full

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 72 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 72 of 189 PAGEID #: 603

TAGNETICS (19-30822) 10-18-19

70

1    mutual releases, and that's my general recollection of

2    how that conversation occurred.

3            MR. HAGER:  I don't know if I can clarify

4    that conversation now, or do I need to do it later?

5            THE COURT:  I mean, do you want to ask Mr.

6    Stern any more questions about that conversation or are

7    you saying you want to testify as to your recollection

8    of that conversation?

9            MR. HAGER:  I guess I could ask a question,

10   maybe get the same --

11           THE COURT:  You can ask him more questions.

12   BY MR. HAGER:

13   Q    Did you request that Tagnetics reserve the right

14   to have essentially a carve-out, or to reserve the

15   right to be able to come back and sue the Petitioning

16   Creditors in that phone call?

17   A    Well, one of the things I did explain -- I

18   understand now -- I think I know what you're talking

19   about.  At one point, when I expressed my initial

20   concern about giving the full mutual release to you and

21   Mr. Earley and Mr. Kayser, was that since there was

22   reference to some intellectual property issues, maybe

23   theft of trade secrets -- I may have probably given as

24   an example -- that's one I often use as an example, I

25   said I don't know if I could recommend that Tagnetics

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 73 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 73 of 189 PAGEID #: 604

TAGNETICS (19-30822) 10-18-19

71

1   agree to this, because I don't know what you guys have
2   taken or not taken.
3       So I said, I will nevertheless discuss it with
4   the client, but the client was willing to agree to
5   that, again, provided that it's mutual and there were
6   no carve-outs, which is what you were asking for
7   yourselves and I remember then saying it's going to be
8   mutual, and it will be all the way around, for all
9   parties involved.
10  Q    So was this specific discussion that you wanted
11  to -- you requested the reservation of Tagnetics to be
12  able to come back and prosecute us, if you will, at
13  some later date, and we disagreed with that --
14  A    Right, and then I eventually said --
15  Q    -- request specifically?
16  A    And then I eventually said that there is no
17  reservation, it's full mutual releases, no carve-outs,
18  so meaning you got the release you wanted.
19  Q    But in the context of that discussion, to the
20  point of carve-outs in context, as you alluded is
21  proper, were we discussing our disagreement with
22  Tagnetics, reserving the right to come back and
23  prosecute us about our employment agreements,
24  participation in the Board, all the same points that
25  had been raised in the original July 20th proposal?

**TAGNETICS (19-30822) 10-18-19**

72

1   A     I don't know if it was in the context of the

2   July 20th proposal.  That I don't -- I don't recall

3   that being the case.  But again, you did express some

4   concerns, that is correct, about what Tagnetics may

5   come back after you on, and I had some concerns about

6   that.  Nevertheless, I reported back to Tagnetics, had

7   a conversation with Tagnetics about it.  Tagnetics

8   ultimately agreed to the concession you wanted

9   Tagnetics to make, which was the full release of the

10  three of you, and in return there would be a full

11  mutual release of Tagnetics, as well, which is what is

12  on that term sheet on July 26th, as exactly as we

13  discussed.  That phrase is something that we discussed

14  and made sure that that was part of the discussion.  It

15  wasn't just one-sided.  It was both.

16  Q     The other question I guess I have for you is in

17  your final emails on the 26th, as we call the flurry of

18  emails trying to get to the deadline, which would have

19  postponed the trial, did you label any of those emails

20  as this is a term sheet?

21  A     No, I did not.  I just --

22  Q     You have been referring to it as a term sheet,

23  which I understand -- my experience with term sheets

24  and raising funds years ago for Tagnetics was, you

25  know, it's specifically calling everything out, but in

**TAGNETICS (19-30822) 10-18-19**

73

1  those emails you refer to them as key terms.

2  A     Yes.

3  Q     Which would key terms allude to the fact that

4  that's a portion of the agreement?  There are key terms

5  to an agreement and there are other terms to an

6  agreement?

7  A     Well, there are material terms and there are

8  other terms, as written in the draft settlement

9  agreement, that as far as I could tell, there weren't

10 any objections to, for example, some of the other terms

11 in the settlement agreement.  The Section 18 about

12 waiver, Section 17 about prevailing party status.  Now,

13 that was in the July 26th email, but those are pretty

14 common types of terms in settlement agreements that

15 I've entered into.  And as I referred to in the email

16 on the 27th, saying that these are the key terms, but I

17 said we have an agreement in place that will be

18 documented more thoroughly in a settlement agreement.

19 Referring to that they will be more elaborated on in a

20 written agreement, which is what I provided to the

21 three of you on August 17th.  I'm bad with dates, so I

22 have to think about that.

23 Q     So going back to your response to the July 20th

24 proposal, you responded July 23rd.  Did you

25 specifically address or specifically state that the

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 76 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 76 of 189 PAGEID #: 607

TAGNETICS (19-30822) 10-18-19

74

1  items listed as other items needing to be in the

2  settlement, did you specifically say those were

3  rejected?

4  A    I'm sorry, can you ask the question again?

5  Q    Sorry, trying to read my notes on the fly here.

6  So when you responded to Mr. Kayser's proposal of the

7  20th, did you specifically reject any of the terms

8  below, any of our requested terms that were below the

9  cash payment schedule at the top?  Did you specifically

10  say those other items are no longer being considered,

11  or are not to be considered?

12  A    I think the -- what I did write was your demand

13  put forward is not realistic.

14  Q    Which is that -- that's a fairly general

15  statement, right?

16  A    It is, but it refers to the entirety of the

17  demand.

18  Q    But it would beg the next statement to be

19  clarification of what you disagree with, correct?

20  A    Well, I disagreed with the entirety of the

21  demand.

22  Q    I mean, if I said the weather was terrible

23  outside, you'd say well, what's terrible about it?

24  Right?

25  A    Not necessarily.

**TAGNETICS (19-30822) 10-18-19**

75

1   Q     So, yeah, so I can't testify, so I can't go much

2   further.  But so did you specifically talk about in

3   Paragraph 2 the shortness of funds or the lack of

4   funds, if you will, of Tagnetics, at this point in

5   time, being able to make a payment at this point in

6   time?

7   A     That's one of the things I discussed, but I also

8   discussed the concept of the default judgment that was

9   being discussed, which is not a monetary term.  So it

10  wasn't limited only to the money that -- we were not

11  discussing only money in that email.

12  Q     But was there any reference to the KBL Core

13  agreement, the loan for Mr. Earley or --

14  A     No.

15  Q     So nothing for us to believe that you had

16  rejected those items that were being proposed on the

17  July 20 --

18  A     Well, I don't know how else to interpret "The

19  demand you put forth is not realistic."  That's

20  rejection of the term.  Now, furthermore, your response

21  -- in fact, it was Mr. Earley, "Here's our offer, after

22  your email this morning.  Let us know if there's any

23  interest."  It doesn't refer to any other terms.  And

24  then after that the next email I got was -- or another

25  email where, again, there was no monetary terms

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 78 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 78 of 189 PAGEID #: 609

TAGNETICS (19-30822) 10-18-19

76

1   involved, but it was from Mr. Earley, on July 25th at
2   1:25 p.m., it says, "Here is my counter proposal."  And
3   no other terms other than monetary terms in there.
4   What other non-monetary terms am I supposed to be
5   interpreting into that counter proposal on July 25th?
6   I don't know.  There's no incorporation to the July
7   20th email, no reference made to terms in the July 20th
8   email, and there were two or three counter -- two
9   counter proposals, if I'm doing my math correctly, that
10  didn't refer to any other non-monetary terms between
11  now -- the July 20th -- and at least I'm looking at
12  July 25th.  And again, the -- not once, not twice, but
13  three times in the confirmation emails on July 26th,
14  there were no other non-monetary terms included in the
15  emails from any of you.
16       In fact, the email from you on -- at 4:36,
17  Exhibit I, just to make sure there's no confusion.
18  Now, granted, that's the payment schedule, but if there
19  is some other non-monetary terms that I'm supposed to
20  be considering, I didn't see that in any of those three
21  emails.
22  Q    I just want to point out on that schedule, I was
23  correcting a typo, so on one of the charts that was
24  sent under my name, the first item was 300.
25  A    I saw that.  But you also added --

**TAGNETICS (19-30822) 10-18-19**

77

1   Q      There were three zeros, so I went ahead and just

2   --

3   A      I saw it, but you also added "total" in

4   capitals.  I mean --

5   Q      I do spreadsheets every day and so I always do

6   "total" in capitals so I can see it.  I didn't want to

7   read a lot into that total, but that's beside the

8   point.  Did you get an email from me on July 30th?

9   A      I don't know.

10  Q      It's in our Exhibit 5, which I can pull out.

11  A      I don't know --

12         MR. KRACHT:  Objection.

13         MR. STERN:  -- if it was sent to me.

14         MR. KRACHT:  It's outside the scope.  It's

15  outside the scope, Your Honor.

16         THE COURT:  Any response to the objection,

17  Mr. Hager?  Basically what he's saying is your question

18  is outside the scope of his -- what he testified to on

19  direct examination.  It's beyond what he testified to

20  on --

21         MR. HAGER:  I guess I'm trying to make the

22  point that in his statements earlier he said that we

23  were making new claims, that we had buyer's remorse, if

24  I remember your phrasing, and we were introducing new

25  monetary demands at that later date.  Is that correct,

**TAGNETICS (19-30822) 10-18-19**

78

1  you said --

2          MR. STERN:  Yes, as just what I testified to,

3  I would say that's a fair description.

4          MR. HAGER:  And so I was trying to make the

5  point that on that Tuesday, which was the day after the

6  weekend that we were expecting to see some kind of

7  draft agreement --

8          THE COURT:  Not -- we're kind of getting into

9  testimony.

10          MR. HAGER:  I'm sorry.  I can cover that

11  later.

12          THE COURT:  Now, if you have that -- if you

13  have that exhibit and you want to present it to Mr.

14  Stern and ask him if he received that, you may do that.

15  That's certainly, I think, well within the scope of

16  cross-examination, if it relates to his direct

17  testimony.  So to that extent, I'm going to overrule

18  your objection, Mr. Kracht.

19          MR. HAGER:  I apologize for muddling through

20  this.  I'll do my best.

21  BY MR. HAGER:

22  Q    So this is the email that was sent on -- let's

23  see if I can show this -- Tuesday, July 30th, at 9:33

24  a.m.

25  A    Can you just do me a favor and put the entirety

Case 1:21-cv-00309-ELH Document 44-15 Filed 09/07/21 Page 81 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 81 of 189 PAGEID #: 612

TAGNETICS (19-30822) 10-18-19

79

1    of that first page on, so I can see the full string?

2    Like, does this --

3    Q    Well, the header, this is just wrapped on to

4    another page.  So that was the table on this as a

5    follow-up.

6              THE COURT:  Do you have a hard copy you can

7    present to --

8              MR. KRACHT:  And what exhibit is this?

9              MR. HAGER:  This is part of our Exhibit 5.

10             THE COURT:  Does somebody have a hard copy

11   for the witness?

12             MR. HAGER:  Is this for you, Your Honor?

13             THE COURT:  We will need copies of any

14   exhibits you seek to introduce.

15   BY MR. HAGER:

16   Q    This is still a part of that thick Exhibit 5,

17   which was all the emails.

18             THE COURT:  Okay.  Mr. Kracht, do you have

19   that?

20             MR. KRACHT:  Exhibit 5, correct?

21             THE COURT:  Yeah.  I just want to make sure

22   you have that.

23             MR. KRACHT:  I don't believe there are

24   exhibit stickers, but they appear to -- did you

25   identify your exhibits like at the top of a document?

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 82 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 82 of 189  PAGEID #: 613

TAGNETICS (19-30822) 10-18-19

80

1          MR. HAGER:  Yes, at the first page it was

2    identified, yes.  So it follows the last table here.

3    July 30th --

4          MR. KRACHT:  This is still part of Exhibit 5?

5          THE COURT:  If you have the files, the

6    exhibit -- proposed exhibits they filed in Document

7    112-5, it would be 112-5, Page 1 of 24.

8          MR. KRACHT:  For some reason, Your Honor, I

9    don't have that in what I printed from what they filed

10   electronically.  I've got 3, 4 and I'm not running into

11   that page of Exhibit 5 for some reason.

12         THE COURT:  What page of Exhibit 5 is that

13   you have on the document camera, Mr. Hager?

14         MR. HAGER:  Looks like Page 16 in this copy.

15         MR. KRACHT:  I'm going off of, Your Honor,

16   the exhibits that are time stamped, based on what they

17   filed with the Court.  And what -- he's referring to a

18   document that has no court filing marks of any sort, so

19   I think there's some problem, unless I missed it, and I

20   apologize, if I did.

21         MR. HAGER:  Right here, this is where it

22   starts.  It's this, understood from Joni Behnken's

23   email and then, unfortunately, your printout, you ran

24   out of ink.  That's the discussion.  I'll try to make

25   it quick.

### TAGNETICS (19-30822) 10-18-19

81

1          MR. KRACHT:  Looks like we have it but

2     there's some copying issues from what we got off the

3     Court file.

4          THE COURT:  Yeah, I'm not sure -- Mr. Hager,

5     I'm not sure when you filed these or whoever filed

6     these with the Court, that in the process, that it all

7     got copied and into the system.

8          MR. HAGER:  He has the document.  It's just

9     the printout is faded.

10          MR. KRACHT:  You can't read it.

11          MR. HAGER:  Ran out of ink or something.

12          MR. KRACHT:  I don't think it's on our end.

13     I think it's -- I mean, I guess we could look at what

14     the Court shows as well, but the document he's

15     referring to, the text on the next page after that is

16     virtually illegible for several pages actually.

17          THE COURT:  Yeah.  I think there was a

18     problem --

19          MR. KRACHT:  How it was scanned when it was

20     fed in.

21          THE COURT:  Yeah, because what I'm looking at

22     in the court file exhibits does look significantly

23     different from what's on the monitor.

24          MR. HAGER:  Can I approach, Your Honor, just

25     show you what we have?

**TAGNETICS (19-30822) 10-18-19**

82

1        THE COURT:  Absolutely, yeah.

2        THE CLERK:  It is listed under 6, but it is

3   not legible.  It appears to be a scanning issue.  Your

4   Honor, if we took a recess I could probably retrieve it

5   from the Clerk's office.

6        THE COURT:  Yeah, why don't we take a short

7   recess to do that?  The Court is going to take a short

8   recess to retrieve the document from the Clerk's

9   office.

10        THE CLERK:  Court is in recess.

11        (Off the record from 11:50 a.m. until 12:06

12   p.m.)

13        THE CLERK:  Court is again in session.  You

14   may be seated.

15        THE COURT:  Okay.  We left off with Mr. Hager

16   trying to cross-examine Mr. Stern on what was part of -

17   - an email that was part of, I believe, the Petitioning

18   Creditors' Exhibit 5, and there was I think a scanning

19   problem or issue with the Petitioning Creditors'

20   exhibits at the Court, but I believe, Mr. Kracht, that

21   they did email these exhibits to you; is that correct?

22        MR. KRACHT:  I wasn't able to confirm that,

23   Your Honor, and it's very possible that that occurred.

24   I don't want to say that they weren't.

25        MR. HAGER:  We did.

## TAGNETICS (19-30822) 10-18-19

83

1       THE COURT:  Okay.  Mr. Hager says they were

2   emailed to you.  Is there any objection at this point

3   as to Mr. Hager's examining Mr. Stern on that -- was

4   that a July 30th?  Is that right?

5       MR. HAGER:  That's correct.

6       THE COURT:  Email?

7       MR. KRACHT:  I have that right now.  And no.

8       THE COURT:  All right.  You may proceed, Mr.

9   Hager.  Thank you.

10  BY MR. HAGER:

11  Q    So this email here, I want to know if you had

12  received it on July 30th?

13  A    I have no specific recollection that I did, but

14  I have no basis of saying that I did not.

15  Q    So then whether you can answer or not, whether

16  you read the attachment that was attached to that

17  email?

18  A    I have no recollection one way or the other.

19  I'm not saying that it wasn't sent to me.  I don't

20  specifically recall doing it.

21  Q    Can you see in this attachment the --

22  A    You have to pull it up a little bit for me to

23  see the entirety of it.  Now I can.

24  Q    There you go.  And that's -- there's a whole

25  other page, but anyway, as it's written here -- I guess

**TAGNETICS (19-30822) 10-18-19**

84

1   I can put the whole thing -- basically this attachment

2   looked very similar to the original proposal on July

3   20th.

4   A     I don't know.  I'd have to do a comparison, but

5   in my mind, even if it did, it doesn't matter, because

6   that wasn't part of what we agreed to on July 26th.  I

7   remember -- what I do remember, after we reached

8   agreement on the 26th, there were some emails back and

9   forth, and admittedly, I didn't pay close attention.  I

10  had just gotten back from vacation.  I'm trying to get

11  up to speed.  We had the agreement in place.  My sole

12  focus was to comply with the Court's directive to get

13  the agreed order in place, and then work on the

14  settlement agreement afterwards.

15        So I remember there's some emails that I

16  received from one or some combination of you guys, but

17  I have no recollection of what the specifics were and I

18  didn't -- I remember, whatever I saw, I didn't really

19  pay close attention to.

20  Q     Okay.  So you don't think you read this email

21  then?

22  A     I may have, but if I did I didn't really process

23  it.  I would say I may have taken a quick skim through,

24  but it wasn't something I was planning on paying

25  attention to, reading carefully or paying close

**TAGNETICS (19-30822) 10-18-19**

85

1   attention to.  We had the agreement in place.  I was

2   worried about the agreed order, as far as this case was

3   concerned.  That was my focus, that I remember being

4   the case.

5   Q    So when you received our concerns about the

6   draft agreement, did you say that we had added new

7   terms?

8   A    I remember having those discussions or that, you

9   know, exchange, after I sent the draft agreement.  I

10  have no recollection of doing that beforehand.

11  Q    But in your testimony didn't you say we had

12  added new terms, things that were never discussed?

13  A    Yes, and even based on that email there,

14  assuming that's what was sent, I would still say those

15  are new terms from what we discussed, because the

16  agreement on the 26th didn't reflect those terms.  And

17  as you may recall from the email strings at one point,

18  you cut off or it wasn't you specifically, Mr. Earley

19  said, cut off discussions, saying no chance, see you in

20  court.  Then I asked for a counter proposal and, again,

21  there were counter proposals, but no reference to any

22  of these other terms.

23       MR. HAGER:  So -- I don't think I can say

24  that.  I guess I'll cover that in my -- in our

25  examination later or witness testimony.  Okay.  I have

## TAGNETICS (19-30822) 10-18-19

86

1   nothing further right now.

2          THE COURT:  Thank you, Mr. Hager.  Any

3   redirect examination, Mr. Kracht?  You may proceed.

4          REDIRECT EXAMINATION OF STEPHEN STERN

5   BY MR. KRACHT:

6   Q     Directing your attention to Tagnetics Exhibit A,

7   Page 3.

8   A     Mm-hmm.

9   Q     It's the email at the bottom of that page from

10  Mr. Earley to you, dated July 24th at 7:43; is that

11  what you were referring to, where they cut off all

12  discussions, terminated any discussions?

13  A     Yes, that's what I interpreted their response to

14  be.  And, in fact, if you look at my email above that,

15  my email on the 25th at 12:42 p.m., it's exactly the

16  phrasing I used.  It seems silly, and quite frankly

17  odd, to simply cut off negotiations.  I thought we were

18  done.  Whatever transpired is over, and I'm trying to

19  revive discussions at that point, asking for a

20  counteroffer.

21  Q     And you're starting anew from that point?

22  A     That's the way I thought.

23         MR. KRACHT:  Okay.  Nothing further.

24         THE COURT:  Thank you, Mr. Kracht.  Any

25  recross-examination of Mr. Stern, Mr. Kayser?

### TAGNETICS (19-30822) 10-18-19

87

1    DR. KAYSER:  No.

2    THE COURT:  Mr. Earley?

3    MR. EARLEY:  No.

4    THE COURT:  Mr. Hager?

5    MR. HAGER:  No.

6    THE COURT:  Okay.  I've got a couple quick

7  questions, Mr. Stern, and then everybody is willing to

8  ask any additional questions based upon my questions.

9  There are just two questions.  One, the payment

10  schedule refers to a liquidity event.  What would you -

11  - what's your understanding as to what liquidity event

12  means?

13    MR. STERN:  We never discussed those details.

14  So when I put together the draft agreement, Your Honor,

15  there is a provision in the agreement, Section 2 on

16  Page 2 of Exhibit B, that -- where I provided a

17  definition of a liquidity event.  And my recollection

18  from the objections and concerns that I received from

19  the alleged Creditors, no one really objected to that

20  definition that I included.  It is a similar definition

21  -- I've written many agreements in my career.  This

22  doesn't come directly from another one, but it adopts

23  concepts that I've used before in other agreements, and

24  I wanted to make it as, you know, consistent with what

25  we were -- you know thinking of as what would be a

TAGNETICS (19-30822) 10-18-19

88

1   liquidity event and what would be an accurate and fair

2   description of that, and I think that's captured in

3   Section 2.

4           THE COURT:  Okay, thank you.  Well, that

5   answers that question for me.  I'm assuming then from

6   what you just testified, that your definition of

7   liquidity event, what was intended, in your

8   understanding of liquidity event, in that schedule, was

9   what you have in Paragraph 2 of your draft settlement

10  agreement?

11          MR. STERN:  Yes.  This is what I wanted to

12  use as the definition, and I think it fairly and

13  accurately describes the types of liquidity events that

14  would be potentially in play for Tagnetics.  And so to

15  -- I remember that was one of the conditions that they

16  wanted, they being the alleged Creditors, wanted for

17  the -- on the payment schedule for a certain event to

18  occur.  And I tried to -- my best to capture what the

19  concept was.  Granted, there were no details -- to be

20  fair, there were no details that were discussed between

21  us as to what would constitute a liquidity event.  It

22  was just a phrase that was used, and I tried to put

23  reasonable meat on the bones to fairly and accurately

24  describe what that might be, to capture that event, if

25  it were to occur.

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 91 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 91 of 189 PAGEID #: 622

TAGNETICS (19-30822) 10-18-19

89

1          THE COURT:  Thank you.  The second question

2     or area is some or all of the Petitioning Creditors, I

3     understand, I believe still have stock or equity

4     interest in Tagnetics.  From the July 26, if there was

5     a July 26th settlement, what's your position as to the

6     impact of that settlement agreement on the stock or

7     equity interest?

8          MR. STERN:  That is a fair question that I

9     don't think is really captured in the agreement.  The -

10    - we didn't ask for them to relinquish their stock

11    certificates, because that wasn't part of the

12    discussion, but it was to relinquish any rights that

13    the release does capture, the relinquishment of any

14    rights they might have had vis-a-vis those -- whether

15    it be payment of profits, dividends or anything prior

16    to that date, I think is certainly captured in the

17    essence of full mutual releases, no carve-outs.  But in

18    terms of what they had to do with their stock

19    certificates was not covered.

20         THE COURT:  Thank you.  Those are the only

21    questions the Court had for Mr. Stern.  Any questions

22    based upon my questions, Mr. Kracht, for Mr. Stern?

23         MR. KRACHT:  No, Your Honor.

24         THE COURT:  Okay.

25         MR. STERN:  May I step down, Your Honor?

**TAGNETICS (19-30822) 10-18-19**

90

1    THE COURT:  Hold on.  Mr. Kayser, any

2   questions for Mr. Stern, based upon the questions I

3   just asked?

4    DR. KAYSER:  No.

5    THE COURT:  No?  Mr. Earley?

6    MR. EARLEY:  No.

7    THE COURT:  Mr. Hager?

8    MR. HAGER:  No, sir.

9    THE COURT:  Thank you.  Mr. Stern, you may be

10  excused.

11    MR. STERN:  Thank you.  It's been interesting

12  sitting on this side of the microphone.

13    THE COURT:  It is different.  I have been --

14  was there as an attorney years ago, and I agree, it is

15  a much different experience being on the other side.

16    Okay.  Mr. Kracht or Mr. Stern, any other

17  witnesses you wish to call in Tagnetics' case?

18    MR. KRACHT:  No, Your Honor.

19    THE COURT:  Any other evidence then you wish

20  to introduce?  We've admitted all your exhibits except

21  E.  We've got Mr. Stern's testimony.  Any other

22  evidence you wish to introduce?

23    MR. KRACHT:  Nothing further, Your Honor.

24    THE COURT:  Okay, thank you.  What time is

25  it?

**TAGNETICS (19-30822) 10-18-19**

91

1          THE CLERK:  It's 12:17, Your Honor.

2          THE COURT:  12:17.  I think we -- now would

3   probably be a good time to break for lunch.  As my wife

4   would let all of you know, it's in your all best

5   interest to let the Court take a lunch break.  Whoever

6   came up with that Snickers' commercial with the prima

7   donnas in the Snickers' commercial, I think must have

8   known me.  At least my wife would say they knew me.  So

9   I hopefully will be much better behaved after getting

10  some nourishment and taking a short break for that.  So

11  why don't we do that now.  But I'll leave it up to you

12  how long you think we -- you wish, because I know all

13  of you probably have flights and so forth you need to

14  catch, so the -- taking a lunch break is not

15  negotiable, but the length of the lunch break is

16  negotiable.

17          MR. STERN:  Your Honor, to the point about

18  leaving, I booked my flight as late as possible today.

19  It's out of Cincinnati.  The latest I could fly out of

20  Dayton was like 2:30, and I thought that might be a

21  problem, but I probably have to be on the road back to

22  Cincinnati -- I realize we do have to get through this

23  hearing, probably by about 3:00, to catch my flight, to

24  make sure I return the car on time and everything.

25          THE COURT:  Okay.

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 94 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 94 of 189 PAGEID #: 625

**TAGNETICS (19-30822) 10-18-19**

92

1      MR. STERN:  I think we should be able to

2 finish in that time, but I want the Court to be aware,

3 so we can plan accordingly.

4      THE COURT:  Yeah.

5      DR. KAYSER:  Excuse me.  What time is your

6 flight out of Cincinnati?

7      MR. STERN:  5:20.  And it's about an hour and

8 15 minutes --

9      DR. KAYSER:  We'll do our best to be brief.

10      THE COURT:  Okay.

11      MR. STERN:  I don't know how much time you

12 guys were going to use, but --

13      DR. KAYSER:  I think we'll be brief.

14      MR. STERN:  So we should be on track then.

15      THE COURT:  Why don't we plan on being here

16 back in 30 minutes?  We can for sure getting started by

17 one o'clock, and then Ms. Behnken can -- and court

18 personnel can guide you to different places you can go.

19 Thank you.

20      THE CLERK:  All rise.

21      (Lunch break from 12:20 p.m. until 1:03 p.m.)

22      THE CLERK:  Court is again in session.  You

23 may be seated.

24      THE COURT:  Okay.  Before we took an

25 adjournment for lunch, Tagnetics rested its case and we

**TAGNETICS (19-30822) 10-18-19**

93

1　are now, I believe, prepared for the Petitioning

2　Creditors' cases.  Mr. Kayser, or do one of you -- it

3　doesn't have to be Mr. Kayser.  Who wishes to proceed

4　with their case first?

5　　　　　DR. KAYSER:  Your Honor, I will take the

6　witness stand and present a narrative.

7　　　　　THE COURT:  You may do so.

8　　　　　THE CLERK:  I just remind you, sir, you're

9　still under oath.

10　　　　　DR. KAYSER:  Understood.

11　　　　　DIRECT TESTIMONY OF KENNETH KAYSER

12　　　　　DR. KAYSER:  Let me start at the beginning, a

13　brief introduction of who I am.  I got my Ph.D. from

14　Purdue University in 1973.  I was -- after that became

15　an assistant professor at Purdue, Director of the

16　Center for Applied Stochastics and a Professor in the

17　Department of Aeronautics and Astronautics

18　　　　　I also was the founder of Tagnetics'

19　predecessor 20-some years ago.  I was the name on the

20　patents for the technology.  And ultimately that

21　company was sold to Hobart and then re-acquired and

22　went forward under another name, was reorganized one

23　other time, to become Tagnetics.  Ron Earley was the

24　president of that company.  I was the chairman and I

25　have been a director of this company throughout the

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 96 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 96 of 189 PAGEID #: 627

TAGNETICS (19-30822) 10-18-19

94

1   history of the company.

2            As of the beginning of this year, I resigned

3   as a director, with the express statement that we would

4   take legal action against the company, if the issues

5   concerning our contracts, among other issues with

6   creditors, were not resolved quickly.

7            Three months later we filed the petition, and

8   that's how we got to where we are today.

9            On July 19th we received a request from Mr.

10  Stern to make a proposal to settle this.  The three of

11  us sat down or by phone conference agreed on what the

12  terms of that settlement proposal should be, and that's

13  expressed in my July 20th email.  We agreed going into

14  this those were our terms.

15           A couple days after I sent that email, we got

16  a response from Mr. Stern, which has been introduced

17  into evidence previously, requesting a change in the

18  payout schedule, but not disputing the total amount we

19  agreed to settle for, which was, incidentally,

20  approximately 40 percent, which we thought was

21  contractually due to us.

22           I wasn't particularly in favor of doing a

23  settlement at all, given my history of asking for a

24  settlement previously, but I agreed to go along with

25  the other two petitioners, as they had been long-time

Case 1:21-cv-00309-ELH   Document 44-15   Filed 09/07/21   Page 97 of 100
Case: 3:19-cv-00363-TMR Doc #: 12-5 Filed: 02/27/20 Page: 97 of 189 PAGEID #: 628

TAGNETICS (19-30822) 10-18-19

95

1    employees of our company, and I wanted us all to be

2    more or less on the same page.

3            The terms of that July 20th letter, as far as

4    we knew, were never disputed except for the time table

5    on the payment of the funds.  I was not involved in the

6    negotiation, because I had agreed that I would -- it

7    would be up to the other two guys to determine what

8    that payout was to us.

9            When we first got the request to renegotiate

10   the payout terms, the three of us once again had a

11   conference call to agree and what we agreed to do was

12   allow Ron Earley to renegotiate the terms of that

13   payout.  We also agreed that the other terms were in

14   inviolate.  And we did not authorize Ron -- Mr. Earley,

15   nor did we expect there to be any renegotiation of

16   those terms.

17           We talked often over the next several days,

18   during the craziness of many conversations back and

19   forth concerning the amount.  In general, I didn't have

20   any significant input into that, other than to stress

21   in every conversation that the terms and conditions,

22   which we had outlined on July 20th, must be included in

23   any settlement agreement.

24           On Friday, a few hours before I guess around

25   3:00 or 3:30, I did hear that they had reached an

### TAGNETICS (19-30822) 10-18-19

96

1    agreement on the payout schedule, and both Ron Earley

2    and Jon Hager confirmed to me that they had not

3    renegotiated any other term, nor were they brought up.

4    And when Joni called me at 5:30 that evening, or not

5    evening, five o'clock -- I'm not sure of the exact time

6    Joni called, but it was later than I expected her to be

7    here, I told her that I had agreed to go along with

8    whatever Mr. Earley and Mr. Hager had agreed to.  She

9    told me that they had both sent a note to the Court.  I

10   don't recall exactly how that was sent.

11          So I agreed to go ahead and cancel the trial

12   at that time, given the assurances I had received from

13   both Mr. Earley and Mr. Hager that the terms had not

14   been discussed, and had not been agreed to, any changes

15   in those terms and conditions.

16          When I finally got a chance to read the email

17   that Mr. Stern had sent to me at 3:30 on Friday -- I

18   had been out doing some things.  I don't even recall

19   what errands I was running, but I wasn't able to see

20   the email until 5:30.  It said two things of

21   significance to me.

22          One is it had this vague term of carve-outs.

23   Carve-out is a word, when I -- I wasn't very happy with

24   what I got back from him.  Being a lawyer, I expected

25   there to be more clarity in what he sent back, rather

**TAGNETICS (19-30822) 10-18-19**

97

1  than less.  I Googled carve-out, looking for the

2  definition of carve-out, because I wanted to understand

3  what he was trying to say.  And basically there is no

4  specific definition of carve-out.  It's entirely a

5  definition due to context.

6        And while from our perspective, all three of

7  us and mine, our perspective was that we were

8  negotiating from the July 20th document.  And I

9  understood why both Mr. Hager and Mr. Earley would have

10  interpreted no carve-outs as meaning no changes to our

11  provision, other than the payment schedule, which was

12  being negotiated.

13        However, in that 3:30 email on Friday from

14  Mr. Stern, he also committed to getting a draft of the

15  settlement agreement over the weekend done.  When we

16  did not receive that settlement agreement on Monday,

17  the three of us had another conference call, and said,

18  you know, there's been no clear restatement of the

19  terms of the settlement we had agreed to.

20        As a result of receiving no communication

21  from Mr. Stern on Monday, the three of us selected Jon

22  Hager to write a response, reiterating the terms which

23  we had agreed to.  That was sent on Tuesday.  I don't

24  know the date.

25        The Judge, Your Honor, you had ordered that

### TAGNETICS (19-30822) 10-18-19

98

```
 1   there be, I believe, two weeks from the Friday for us
 2   to get an agreed order.  We did not hear from Mr.
 3   Stern.  We saw an agreed order, which he said we had to
 4   sign.  We didn't believe we had a clear agreement.  We
 5   refused to sign that agreement.  We later received the
 6   draft agreement, which he had sent, which we didn't
 7   agree to and we didn't -- we never signed an agreed
 8   order, because we did not have an agreement.
 9           We consequently had another conference call
10   with Your Honor, and -- excuse me for a second.  I have
11   to think about the time line.  I'm old.  I can't see
12   well and I don't hear well, so it takes me a while to
13   look at this stuff.
14           We had another conference call with you to
15   discuss -- during which you set a new deadline for when
16   we needed to have the agreement put together by.  We
17   did not have the agreement together by then, and there
18   was no negotiation.  There were very large gaps which,
19   frankly, I can't testify to.  I'm sure that Mr. Hager
20   will testify to the time line of the gaps, when we
21   never heard -- we repeatedly reiterated the terms and
22   conditions under which we were willing to settle.  We
23   never saw any edit to the draft agreement concerning --
24   we had no conversation with working out our
25   differences.
```