IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID J. BOSHEA,

 *Plaintiff*,

v.

COMPASS MARKETING, INC.,

 *Defendant*.

Civil Action No.  ELH-21-309

**MEMORANDUM OPINION**

Plaintiff David J. Boshea has filed suit against defendant Compass Marketing, Inc. ("Compass"), alleging that Compass owes him severance pay pursuant to a purported employment agreement. *See* ECF 1 (the "Complaint"); ECF 27 (the "First Amended Complaint"); ECF 48 (the "Second Amended Complaint").  Jurisdiction is premised on diversity, pursuant to 28 U.S.C. § 1332.  ECF 48, ¶ 5.

In the Second Amended Complaint, Boshea has lodged claims for breach of contract (Count I); violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code (2016 Repl. Vol., 2021 Supp.), §§ 3-501 *et seq*. of the Labor and Employment Article ("L.E.") (Count II);[1] and, in the alternative to Count II, violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 Ill. Comp. Stat. Ann. 115/1 *et seq*. (Count III).  ECF 48, ¶¶ 17-39.

Compass has answered.  *See* ECF 14 (Answer to Complaint); ECF 37 (Answer to First Amended Complaint); ECF 53 (Answer to Second Amended Complaint).  In addition, Compass has filed a Counterclaim against Boshea, as well as a Third-Party Complaint against currently

---

[1] The caption of Count II refers to the "Maryland Wage Payment and Collection *Act*." ECF 48 at 5 (emphasis added). However, the parties otherwise refer to the law as the Maryland Wage Payment and Collection *Law*, or MWPCL, which is its name. *See* L.E. § 3-509.

unidentified John Doe(s).   ECF 38.   Specifically, Compass has lodged a claim of tortious interference against Boshea and John Doe(s) (Count I); a claim of civil conspiracy against Boshea and John Doe(s) (Count II); and a claim of unjust enrichment against Boshea (Count III).   *Id.* ¶¶ 22-43.  Boshea has answered the Counterclaim.  ECF 45.

The parties engaged in discovery, pursuant to a Scheduling Order that was twice extended. *See* ECF 20; ECF 73; ECF 105.  During the course of discovery, there were a significant number of discovery disputes.  *See* ECF 31; ECF 33; ECF 36; ECF 54; ECF 63; ECF 64; ECF 79; ECF 80; ECF 81; ECF 102; ECF 106.   In large part, these disputes related to efforts by defendant to depose several non-parties.   The Court referred discovery and related scheduling matters to Magistrate Judge A. David Copperthite.  ECF 58; ECF 83.  He resolved those disputes.  *See* ECF 52; ECF 61; ECF 92; ECF 105; ECF 109.

Compass has moved for partial summary judgment.  ECF 93.  The motion is supported by a memorandum (ECF 93-1, collectively the "Motion") and several exhibits.  ECF 93-2 to ECF 93-4.  In particular, Compass seeks summary judgment solely as to plaintiff's MWPCL claim (Count II), on the ground that application of the MWPCL would be improper because plaintiff, a resident of Illinois, performed limited work in Maryland.

Plaintiff opposes the Motion (ECF 95, the "Opposition"), supported by exhibits.  ECF 95-1.  Compass has replied.  ECF 101 (the "Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

# I.    Factual Background[2]

Compass is a "sales and marketing agency."  ECF 93-2 (Decl. of Luis A. Fernandez, Compass Senior Vice President and Corporate Controller), ¶ 2.  It is incorporated in Virginia, but its principal place of business located in is Annapolis, Maryland.  *Id.*; ECF 95-1 (Aff. of David Boshea), ¶ 3.

Plaintiff resides in Illinois.  *See* ECF 48, ¶ 3; ECF 93-2, ¶ 6.  He began his employment with Compass in May 2007.  ECF 93-2, ¶ 5; ECF 93-3 (Pl.'s Am. Resps. to Def.'s First Set of Interrogs.) at 5; ECF 95-1, ¶ 4.  Plaintiff ceased working at Compass on or about March 3, 2020. ECF 93-2, ¶ 5; ECF 95-1, ¶ 4.   According to plaintiff, Compass involuntarily terminated his position without cause on that date, "claiming it had eliminated [his] position."  ECF 95-1, ¶¶ 18-19.  He asserts that, because he had worked more than three years at Compass, he is entitled to a severance payment of $540,000, pursuant to an employment agreement.  *Id*. ¶¶ 15-17, 20.

Boshea recounts several conversations that he had in March and April 2007 with John White, at the time the CEO of Compass, relating to joining Compass, including over email and in person in Naperville, Illinois.  ECF 93-3 at 4-5.[3]  Plaintiff claims that in May 2007, he travelled to the Compass offices in Annapolis, where he met with John White and signed a document titled

---

[2] In my discussion of the facts, I focus on those most relevant to the resolution of the Motion.  In addition, where appropriate, I provide background regarding the larger dispute between the parties.

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. But, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

[3] John White identifies himself as the founder, former CEO, and current Chairman of Compass. ECF 93-4 (Decl. of John White), ¶¶ 1-2. However, Boshea also refers to John White as "President" of Compass. ECF 95-1, ¶ 13. This issue is not material.  To avoid confusion between John White and his brothers, discussed *infra*, I usually refer to John White by his first and last name.

"Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment Competition" (the "Agreement").  ECF 93-3 at 5; ECF 95-1, ¶¶ 12-13; ECF 95-1 at 7-12 (text of the Agreement).  Plaintiff avers that he "started performing services" for Compass the same day that he signed the Agreement.  ECF 95-1, ¶ 13.  The precise date is not specified in the materials related to the Motion, although in the Second Amended Complaint, plaintiff alleges that Compass extended a written offer of employment to him "[o]n or about May 16, 2007."  ECF 48, ¶ 10.

The Agreement states that it is between Boshea, "residing" in Naperville, Illinois, and Compass, "having a place of business" in Annapolis.  ECF 95-1 at 7.  It is not dated.  It is purportedly signed by Boshea and John White, as CEO for Compass.  *Id.* at 11.

Of relevance here, the Agreement provides, in a section titled "Article 6. Severance," as follows, *id*. at 9:

> A.     If Employee's employment is terminated by COMPASS for any reason other than Cause, Employee shall receive severance payments totaling $180,000 (one hundred and eighty thousand U.S. dollars) which will be divided up into twenty-four payments and will commence with the Employee's effective date of termination and shall be made in accordance with COMPASS's normal payroll cycle. The period during which Employee receives severance payments shall be referred to as the "Severance Pay Period." Severance will increase one month for every month employed to a maximum severance of $540,000.

In addition, in a section titled "Article 8. Miscellaneous," the Agreement contains a choice of law provision that states, *id*. at 10:

> F.     The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.

Compass disputes the validity of the Agreement, arguing that the signature of John White "was forged." ECF 93-1 at 1. According to Compass, two expert witnesses retained by Compass have concluded that John White's signature is a forgery, and "the opinion of the expert witness retained by Boshea was 'inconclusive.'" *Id*. at 1-2; *see also* ECF 101 at 9 n.10. Furthermore, Compass maintains that Boshea "needed to be 'reminded' of the existence of this so-called severance agreement;" was unable to find a fully executed copy of the Agreement until shortly before the Complaint was filed; and he "collaborat[ed] with Daniel White and Michael White – two owners of Compass Marketing who have been trying to destroy the company for years." ECF 93-1 at 2 n.1.[4] Michael and Daniel White are brothers of John White. *See* ECF 40 at 2; ECF 42 at 2. These circumstances, Compass asserts, make Boshea's "claim highly dubious at best." ECF 93-1 at 2 n.1. However, Compass recognizes that this is a disputed issue of material fact that is "not ripe for decision at summary judgment." *Id*. at 2.[5]

In his Affidavit, plaintiff avers that between May 2007 and March 2020, Compass employed him as "Executive Vice President responsible for developing business, sales, and marketing to major retailers and [Compass's] key clients." ECF 95-1, ¶ 14. However, in his interrogatory responses, plaintiff stated that he began as "Compass Marketing Group Vice

---

[4] Michael and Daniel White previously worked at Compass, before apparently having a falling out with John White. They continue to be part owners of Compass, however. *See, e.g.*, ECF 40 at 2, 12; ECF 42 at 2, 8; ECF 93 at 2 n.1. The Court does not venture to characterize this situation any further, as it is not relevant to the resolution of the Motion. Nevertheless, these circumstances appear to have undergirded the discovery difficulties and general acrimony in this case. *See, e.g.*, ECF 40 at 1-2, 4-16; ECF 42 at 1-3, 5-14; ECF 52 at 3, 6-9; ECF 54 at 1-10; ECF 81 at 2-15; ECF 82 at 2-4; *see also Compass Marketing, Inc. v. Flywheel Digital, LLC, et al.*, GLR-22-379 (D. Md.) (separate case in this District naming Daniel White and Michael White, among others, as defendants).

[5] Compass has not provided evidence supporting its claim that the Agreement is a forgery. However, it seems clear that this will be a significant factual dispute at trial.

President" before receiving the title of "Executive Vice President" in "approximately 2013 or 2014," although he maintained that his "role never changed."  ECF 93-3 at 5.  This apparent discrepancy is not material.

The key facts, for purposes of this Motion, relate to plaintiff's contact with Maryland during his employment with Compass.  In his Affidavit, Boshea concedes that he "spent most of [his] time working for Compass in Illinois," but states that "Compass often required that [he] attend meetings at its Annapolis, Maryland office."  ECF 95-1, ¶ 5.  In particular, he avers that from when he started working at Compass in May 2007 until the end of 2007, he travelled to Annapolis for work "at least seven times for periods ranging from two to three days."  *Id*. ¶ 6.  And, "[b]etween 2008 to 2017" he claims to have travelled "sporadically" to Maryland in connection with his Compass employment "for meetings held approximately quarterly for two to three-day periods." *Id*. ¶ 7.[6]  Beginning in 2017, according to plaintiff, Compass experienced financial problems, causing it to "terminate many employees and curtail travel."  *Id*. ¶ 8.  Nevertheless, plaintiff "recall[s] traveling to Annapolis at least once per year after January 1, 2017 for approximately two to three days each trip."  *Id*. ¶ 9.  On each trip to Maryland, plaintiff states that he generally remained in the state while working for "two or three days," although on one trip he spent "seven days in Maryland for work." *Id*. ¶ 10.  In sum, plaintiff avers: "I estimate that I worked in Maryland no less than 40 and no more than 50 days working in Maryland during my employment."  *Id*. ¶ 11.

In his Declaration, Fernandez avers: "Throughout his entire period of employment with Compass Marketing, David Boshea lived and worked in the State of Illinois."  ECF 93-2, ¶ 6. However, Compass does not dispute that plaintiff traveled to Maryland at certain times in

---

[6] It is unclear if plaintiff intended to assert that this period of quarterly trips included 2017. As noted, Boshea goes on to state that his travel was reduced beginning in 2017. *See* ECF 95-1, ¶¶ 8-9.

connection with his work for Compass, nor does it dispute plaintiff's contention that he was required to do so.  In his Declaration, John White states that for "the first ten years of [plaintiff's] employment" with Compass, plaintiff "came to Maryland sporadically," for an average of "no more than four times per year related to his work."  ECF 93-4, ¶ 3.  This is essentially consistent with plaintiff's statements as to his quarterly travel to Maryland between 2008 and 2017.  *See* ECF 95-1, ¶ 7.

However, John White also avers that during plaintiff's "final three years of employment" (*i.e.*, the three years leading up to March 2020), plaintiff came to Maryland for work just one time for two days.  ECF 93-4, ¶ 4.  Fernandez makes the same assertion.  ECF 93-2, ¶¶ 11-12.  This appears to contradict plaintiff's statement that he travelled to Annapolis "at least once per year after January 1, 2017."  ECF 95-1, ¶ 9.

In its Reply, Compass identifies an apparent contradiction in plaintiff's Affidavit.  *See* ECF 101 at 3 n.3.  According to Compass, adding up the specific assertions in plaintiff's Affidavit as to his trips to Maryland between 2007 and 2020, and assuming that each trip was three days long, would equate "at most" to 150 days worked by plaintiff in Maryland during his employment with Compass.  *Id.*; *see* ECF 95-1, ¶¶ 6-10.  But, plaintiff also avers that he worked no more than 50 days in Maryland while at Compass, a much lower number.  ECF 95-1, ¶ 11.  Using the 50-day figure, Compass calculates that plaintiff spent 1.56% of his total employment at Compass in Maryland.  ECF 101 at 3.  And, using the 150-day figure, Compass calculates this proportion at 4.7%.  *Id.* at 3 n.3.  Nevertheless, Compass argues that only the 50-day figure "warrants consideration at summary judgment."  *Id.*

Plaintiff also avers that between 2008 and 2013 Compass provided him with his own office at its headquarters in Maryland.  ECF 95-1, ¶ 7.  Compass "disputes this allegation," but does not

detail or cite to any material to create a genuine dispute of material fact. ECF 101 at 8 n.9. In any case, Compass notes that Boshea does not claim the company provided him with an office after 2013, nor does plaintiff specifically state that he worked in the office. *Id*. at 8.

According to Fernandez, since at least 2013—the earliest year for which Compass possesses payroll records—plaintiff only had federal and Illinois taxes withheld from his wages. ECF 93-2, ¶¶ 8-9. Throughout the entire period of plaintiff's employment with Compass, he was enrolled in the company's "health benefits plan for out-of-state employees." *Id*. ¶ 10. Plaintiff states in his interrogatory responses that Compass reimbursed his home office expenses, and also his business-related golf club membership fees. ECF 93-3 at 9. Citing this interrogatory response, the Motion maintains: "Compass Marketing also agreed to pay for Boshea's membership to the White Eagle Golf Club in Naperville, Illinois, close to Boshea's home." ECF 93-1 at 3. The cited interrogatory response does not actually refer to this specific club, instead generically referring to "Golf Club Membership" (ECF 93-3 at 9), although various other interrogatory responses mention plaintiff's meetings at the White Eagle Golf Club. *See id*. at 7, 8, 10. But, plaintiff does not dispute the Motion's characterization in the Opposition.

Plaintiff avers in his Affidavit that Compass "employed most of its employees" at its Annapolis headquarters. ECF 95-1, ¶ 3.[7] On the other hand, Fernandez states in his Declaration that Compass "has several employees that work outside of the State of Maryland." ECF 93-2, ¶ 7. For example, Fernandez and Kevin Nemetz, the "Senior Vice President, Sales," live and work in Illinois, like plaintiff; Jerry Cain, the Compass "President," "resides in Utah;" and a Compass "Product Manager" resides in California. ECF 93-2, ¶ 7. However, these assertions by plaintiff

---

[7] The Opposition itself states, without citation to the record, that "Compass employs the vast majority of its workforce in Maryland." ECF 95 at 1. However, this is not the language used in plaintiff's Affidavit.

and Fernandez do not necessarily contradict each other.  Nor does Compass appear to dispute that at least some Compass employees were employed in Maryland.

As noted, plaintiff's employment was terminated in March of 2020.  *Id.* ¶ 5; ECF 95-1, ¶ 4.  Compass has not paid plaintiff the severance payment that Boshea claims is due under the Agreement.  ECF 95-1, ¶ 21.  In the Second Amended Complaint, plaintiff alleges that Compass's failure to pay the $540,000 in severance constitutes a breach of contract (*i.e.*, the Agreement), as well as a violation of the MWPCL or, alternatively, the IWPCA.  *See* ECF 48, ¶¶ 17-39.  However, as discussed, Compass disputes the validity of the Agreement.  *See* ECF 93-1 at 1-2.

Beyond the validity of the Agreement, there appear to be other factual issues that are in dispute, or are underdeveloped in the record.  However, these issues are not material for purposes of the Motion.

There is no dispute that Compass's principal place of business is Annapolis, Maryland. There is no dispute that plaintiff performed a substantial majority of his work for Compass in Illinois, not Maryland.  But, there is also no dispute that, for most of his tenure with Compass, plaintiff was periodically required to travel to Maryland for work, and he did so.

Additional facts are discussed, *infra*.

## II.     Legal Standards

### A.  Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v.*

*Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ."  But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; accord *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).  But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).  Rather, "there must be evidence on which the jury could reasonably find for the nonmovant."  *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; accord *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Kellen v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty*., 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'"  *CTB, Inc*., 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc*., 370 F.3d 423, 433 (4th Cir. 2004)).  In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion."  *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *see also CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co*., 499 Fed. App'x 285, 294 (4th Cir. 2012).  "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial.  Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment."  *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997).  At the same time, if testimony from a nonmovant is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even

if it is uncorroborated and self-serving.  *Lovett v. Cracker Barrel Old Country Store, Inc*., 700 F.

App'x 209, 212 (4th Cir. 2017).

### B.  *Lex Loci Contractus*

Plaintiff has alleged a claim for breach of contract.  "When choosing the applicable state

substantive law while exercising diversity or supplemental jurisdiction, a federal district court

applies the choice of law rules of the forum state."  *Ground Zero Museum Workshop v. Wilson*,

813 F. Supp. 2d 678, 696 (D. Md. 2011); *see Colgan Air, Inc. v. Raytheon Aircraft Co*., 507 F.3d

270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd*., 807 F. Supp. 2d 386, 389 n.13 (D.

Md. 2011).  Maryland is the forum state.

As to contract claims, Maryland applies the law of the state in which the contract was

formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of

another state.  *See, e.g.*, *Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015);

*Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co.

v. ARTRA Grp., Inc*., 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela

Power Co*., 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245

(2014).  "For choice-of-law purposes, a contract is made where the last act necessary to make the

contract binding occurs."  *Konover Prop. Tr., Inc. v. WHE Assocs*., 142 Md. App. 476, 490, 790

A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co*., 116 Md. App.

605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

In this case, plaintiff asserts that the Agreement was signed in May 2007 in Annapolis,

Maryland, by himself and John White.  *See* ECF 93-3 at 5; ECF 95-1, ¶ 13.  And, the Agreement

contains a choice of law provision that states, ECF 95-1 at 10: "The terms of this Agreement shall

be governed by the laws of the State of Maryland, without regard to conflicts of laws principles

thereof."  As noted, Compass disputes the validity of the Agreement.  But, to the extent that the Agreement is valid, Maryland law would generally govern a breach of contract claim relating to the Agreement.

However, the Maryland Court of Appeals has "long recognized an exception to the application of *lex loci contractus*: [it] refuse[s] to apply the doctrine when doing so would be 'contrary to a strong public policy of this State.'"  *Cunningham*, 441 Md. at 337, 107 A.3d at 1211 (quoting *ARTRA Group, Inc*., 338 Md. at 573, 659 A.2d at 1301).  "In order for Maryland's public policy to override the doctrine, it 'must be very strong and not merely a situation in which Maryland law is different from the law of another jurisdiction.'"  *Cunningham*, 441 Md. at 337, 107 A.3d at 1211 (quoting *Allstate Ins. Co. v. Hart*, 327 Md. 526, 530, 611 A.2d 100, 102 (1992)).

As discussed, *infra*, traditional *lex loci contractus* principles do not appear to apply to MWPCL claims, because of a strong public policy exception.  Nevertheless, *lex loci contractus* serves as background for some of the cases discussed below.

### C.  Principles of Statutory Construction; Extraterritoriality

Principles of statutory construction are relevant to this case, because two claims arise from alleged violations of Maryland statutes.  The Fourth Circuit has instructed that, when interpreting a state statute, a federal court should "apply the statutory construction rules applied by the state's highest court."  *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009); *see Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc*., 492 F.3d 484, 489 (4th Cir. 2007).  Notably, Maryland "follows the general principles of statutory interpretation."  *Johnson v. Mayor & City Council of Balt*., 430 Md. 368, 377, 61 A.3d 33, 38 (2013).  Therefore, I shall reference federal and Maryland cases.

In general, the task of interpreting a statute starts with the text. *Murphy v. Smith*, ___ U.S. ___, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific statutory language in dispute."); accord *United States v. Bryant*, 949 F.3d 168, 174-75 (4th Cir. 2020). To ascertain a statute's meaning, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)). Terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); accord *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020). Courts may also consider a statute's history and purpose to give effect to its language. *See Gundy*, 139 S. Ct. at 2126. However, courts may "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls.").

In Maryland, the "'cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the General Assembly.'" *Conaway v. State*, 464 Md. 505, 523, 212 A.3d 348, 358 (2019) (citation omitted); *see Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004). To that end, the Maryland Court of Appeals follows a two-step approach. *See Johnson*, 430 Md. at 377-78, 61 A.3d at 38. Courts first examine "'the plain meaning of the statutory language[.]'" *Id.* at 377, 61 A.3d at 38 (citation omitted). If the language "'is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, [the] inquiry is at an end.'" *Id.* (citation omitted). However, if the statute's "'language is ambiguous or unclear, [courts] seek to discern the intent of

the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.'" *Id*. (citation omitted).

At the first step, courts "'do not read statutory language in a vacuum,'" nor do they "'confine [their] interpretation of a statute's plain language to the isolated section alone.'" *Williams v. Peninsula Reg'l Med. Ctr.*, 440 Md. 573, 580-81, 103 A.3d 658, 663 (2014) (citation omitted); *see Gundy*, 139 S. Ct. at 2126; *Bryant*, 949 F.3d at 175-76.  Rather, the statutory language "'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'" *In re J.C.N.*, 460 Md. 371, 391, 190 A.3d 329, 341 (2018) (citation omitted).

As the Maryland Court of Appeals has explained, however, courts may "'neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute.'" *McCloud v. Dep't of State Police, Handgun Permit Review Bd*., 426 Md. 473, 480, 44 A.3d 993, 997 (2012) (citation omitted).  Moreover, the statute must be read "'as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Conaway*, 464 Md. at 523, 212 A.3d at 358; *see Bourgeois v. Live Nation Ent's, Inc.*, 430 Md. 14, 27, 59 A.3d 509, 516 (2013).  And, a court should strive to "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Bellard v. State*, 452 Md. 467, 481-82, 157 A.3d 272, 280-81 (2017).

Words in a statute are assigned their "ordinary meaning." *Balt. City Det. Ctr. v. Foy*, 461 Md. 627, 645, 197 A.3d 1, 11 (2018).  But, dictionary definitions may provide a "'useful starting point'" to determine an undefined term's meaning in common parlance. *Montgomery Cty. v. Deibler*, 423 Md. 54, 67, 31 A.3d 191 (2011) (citation omitted); *see also Foy*, 461 Md. at 645, 197 A.3d at 11; *Bottini v. Dep't of Fin*., 450 Md. 177, 195, 147 A.3d 371, 382 (2016) (using dictionary

definition to construe the meaning of the term "money" in a statute).   However, dictionary definitions are not necessarily dispositive.  *Deibler*, 423 Md. at 67, 31 A.3d at 198.  And, when a court turns to a dictionary to clarify a statutory term, the court should endeavor to consult an edition that was extant at the time that the challenged statute was enacted.  *Harvey v. Marshall*, 389 Md. 243, 260 n.11, 884 A.2d 1171, 1181 n.11 (2005).

The Maryland Court of Appeals has recognized a "constructional rule" that "unless an intent to the contrary is expressly stated, acts of the [Maryland] legislature will be presumed not to have any extraterritorial effect."  *Chairman of Bd. of Tr. of Emps. Ret. Sys. v. Waldron*, 285 Md. 175, 183-84, 401 A.2d 172, 177 (1979); *see also, e.g.*, *Sandberg v. McDonald*, 248 U.S. 185, 195 (1918) ("Legislation is presumptively territorial and confined to limits over which the law-making power has jurisdiction."); *Elyazidi v. SunTrust Bank*, 780 F.3d 227, 237 (4th Cir. 2015) ("In Maryland, regulatory statutes are 'generally construed as not having extra-territorial effect unless a contrary legislative intent is expressly stated.'") (internal citation omitted); *State ex rel. Gildar v. Kriss*, 191 Md. 568, 573, 62 A.2d 568, 569 (1948) ("Ordinarily a statute is not applicable extraterritorially, but only to acts done within the jurisdiction.").

## D.  The MWPCL

L.E. § 3-505(a) governs payment to an employee upon termination.  It provides, in part: "[E]ach employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated."

The MWPCL provides an employee with the right to bring a civil suit against an employer to recover unpaid wages.  *See* L.E. § 3-507.2(a); *Mohiuddin v. Doctors Billing & Management Solutions, Inc*. 196 Md. App. 439, 446, 9 A.3d 859, 863 (2010).  "The MWPCL is a statutory cause

of action, the purpose of which is 'to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages.'" *Cunningham*, 441 Md. at 322-23, 107 A.3d at 1202 (quoting *Battaglia v. Clinical Perfusionists, Inc.*, 338 Md. 352, 364, 658 A.2d 680, 686 (1995)).

Among other things, the MWPCL "protects employees from wrongful withholding of wages upon termination." *Stevenson v. Branch Banking and Trust Corporation, t/a BB&T*, 159 Md. App. 620, 635, 861 A.2d 735, 743 (2004) (citing L.E. § 3-505). The MWPCL does not focus on "the amount of wages payable but rather the duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment." *Friolo v. Frankel*, 373 Md. 501, 513, 819 A.2d 354, 362 (2003).

In particular, under the MWPCL, if an employer fails to pay an employee all wages due on termination of employment, "after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages." L.E. § 3-507.2(a); *see Baltimore Harbor Charters, Ltd. v. Ayd*, 365 Md. 366, 382-83, 780 A.2d 303, 312-13 (2001). "[A] claim under the MWPC[L] must be filed within three years and two weeks from the date on which the employer should have paid the wage." *Butler v. VisionAIR, Inc.*, 385 F. Supp. 2d 549, 554 (D. Md. 2005).

If "a court finds that an employer withheld the wage of an employee in violation of [the MWPCL] and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." L.E. § 3-507.2(b). "The assessment whether a bona fide dispute exists centers on whether the party resisting the claim 'has a good faith basis for doing so, whether there is a legitimate dispute over the validity of the claim or the amount that is owing.'" *Roley v. Nat'l Professional Exchange, Inc.*, 474 F. Supp. 3d 708, 725 (D. Md. 2020) (quoting *Admiral Mortgage v. Cooper*, 357 Md. 533, 543, 745 A.2d 1026,

1031 (2000)), *aff'd*, 860 Fed. App'x 264 (4th Cir. 2021).   However, "an employee is not presumptively entitled to enhanced damages, even if the court finds that wages were withheld without a bona fide dispute." *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 662, 97 A.3d 621, 630 (2014).[8]

"'Wage' means all compensation that is due to an employee for employment."  L.E. § 3-501(c)(1).  This includes, per the statute, bonuses, commissions, fringe benefits, overtime wages, or "any other remuneration promised for service."  L.E. § 3-501(c)(2).  Of relevance here, "a severance benefit that is based upon the length and/or nature of the employee's service and promised upon termination, may be recoverable under the [MWPCL]." *Stevenson*, 159 Md. App. at 644, 861 A.2d at 749.  Compass does not appear to dispute that the severance payment at issue here, if actually owed, falls within the MWPCL's definition of "wage."

An "employer" within the purview of the MWPCL includes "any person who employs an individual in the State or a successor of the person."  L.E. § 3-501(b).  The term "employ" means "to engage an individual to work," L.E. § 3-101(c)(1), including "allowing an individual to work" and "instructing an individual to be present at a work site."  L.E. § 3-101(c)(2)(i) and (ii).  *See also Mohiuddin*, 196 Md. App. at 446, 9 A.3d at 863.  However, the MWPCL does not define "employee."

### III.    Discussion

### A.

Emphasizing Maryland law's general presumption against extraterritoriality, Compass contends that plaintiff's contact with Maryland was far too attenuated to permit the application of

---

[8] The IWPCA contains a different damages scheme, providing for "damages of 5% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid." 820 Ill. Comp. Stat. Ann. 115/14(a).

the MWPCL.  ECF 93-1 at 5-11.  Compass concedes that, because it is headquartered in Maryland, it may be an "employer" under the MWPCL in certain contexts.  *Id*. at 5-6.  But, it argues that plaintiff cannot claim the law's protections because he was not employed in Maryland.  *Id*.  In the alternative, Compass asks the Court to certify this question to the Maryland Court of Appeals.  *Id*. at 11-12.

"The Court of Appeals of Maryland has not had occasion to decide directly how the presumption against extraterritoriality applies in the context of the Maryland wage laws."  *Poudel v. Mid Atlantic Professionals, Inc.*, TDC-21-1124, 2022 WL 345515, at *3 (D. Md. Feb. 4, 2022). Pointing to this remark, Compass asserts that the Maryland Court of Appeals has not provided "clear direction" with regard to the application of the MWPCL to plaintiff's case.  ECF 93-1 at 6. Therefore, the Motion states: "The question of whther [sic] the presumption against extraterritorial reach (or which employees are subject to the protections of the MWPCL) should be certified to the Maryland Court of Appeals[.]"  *Id*. at 11 (all-capital letters altered); *see id*. at 11-12.

"As a court sitting in diversity, [the Court has] an obligation to interpret the law in accordance with the Court of Appeals of Maryland, or where the law is unclear, as it appears that the Court of Appeals would rule. . . . To forecast a decision of the state's highest court [the Court] can consider, *inter alia*: canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions."  *Wells v. Liddy*, 186 F.3d 505, 527-28 (4th Cir. 1999) (internal citations omitted).  The Court may also "turn[] to the 'state's intermediate appellate court' as the 'next best indicia' of state law."  *Scott v. Old Navy, LLC*, ___ F. App'x ___, 2022 WL 2764415, at *6 n.8 (4th Cir. July 15, 2022) (quoting *Priv. Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002)).

Under the Maryland Uniform Certification of Questions of Law Act, Md. Code (2020 Repl. Vol., 2021 Supp.), § 12-601 *et seq*. of the Courts and Judicial Proceedings Article ("C.J."), this Court may certify a question of law to the Maryland Court of Appeals "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling [Maryland] appellate decision, constitutional provision, or statute . . . ." C.J. § 12-603. Certification "ensur[es] the correct legal outcome, aid[s] in judicial economy, and manifest[s] proper respect for federalism." *Sartin v. Macik*, 535 F.3d 284, 291 n.6 (4th Cir. 2008).

When deciding whether certification of a question of law is appropriate, a federal court must undertake a two-part inquiry. First, the court must consider whether the answer "'may be determinative of an issue in pending litigation.'" *Antonio v. SSA Sec., Inc*., 749 F.3d 227, 234 (4th Cir. 2014) (quoting C.J. § 12-603)). Second, it must "evaluate whether [the question may be answered] based on a 'controlling appellate decision, constitutional provision, or statute of [Maryland].'" *Antonio*, 749 F.3d at 234 (second alteration in original) (quoting C.J. § 12-603).

I am satisfied that certification is not warranted. As discussed in detail below, the decision by the Maryland Court of Appeals in *Cunningham*, 441 Md. 310, 107 A.3d 1194, offers strong guidance, even if the facts in that case are not precisely the same as those in this case. And, the decision by the Maryland Court of Special Appeals in *Himes Associates, Ltd. v. Anderson*, 178 Md. App. 504, 943 A.2d 30 (2008), strengthens this guidance. *Cf. Scott*, 2022 WL 2764415, at *6 n.8. And, as I explain, several judges of this Court have confronted similar issues, and none have thought it necessary to certify the question. *See, e.g.*, *Poudel*, 2022 WL 345515, at *3 (noting that "Maryland courts have allowed claims under the Maryland wage laws to proceed even when the employer is based out-of-state, the employee is primarily engaged to work out-of-state, and the

employee worked in Maryland on only a limited basis"); *Roley*, 474 F. Supp. 3d at 719-20 (deciding a very similar case). I join them.

## B.

Considering relevant decisions of the Maryland state courts, as well as several recent rulings of this Court applying these decisions, including in contexts similar to this case, I am satisfied that the MWPCL applies in plaintiff's case. The cases and arguments offered by Compass to the contrary are distinguishable or not persuasive.

In *Himes*, 178 Md. App. 504, 943 A.2d 30, Himes Associates ("Himes"), the original defendant, was a Virginia-based company; Anderson, the plaintiff employee, worked primarily in Virginia, but also attended meetings twice a month at a client site in Baltimore. *Id*. at 513-15, 533-35, 943 A.2d at 35-36, 46-48. Anderson sued to recover severance pay, which was equivalent to three months' pay. *Id*. at 513, 943 A.3d at 35. Himes argued that "because it [was] a Virginia corporation and Anderson was hired to eventually run its office in Virginia, Anderson was never employed as 'an individual in the State' of Maryland for purposes of the MWPCL." *Id*. at 533, 943 A.2d at 46 (quoting L.E. § 3-501(b)).

The trial court held that Himes could be subject to the MWPCL, and the Maryland Court of Special Appeals affirmed. *Id*. at 532-36, 943 A.2d at 46-49. The Court of Special Appeals reasoned, *id.* at 535, 943 A.2d at 48:

> The plain language of LE section 3–101 covers the situation in which a company outside of Maryland directs its employee to go to a work site in Maryland. There is nothing unclear about that language. The language directly applies to the evidence in this case about Anderson's work for Himes. That evidence showed that, as part of his function as a project manager for Himes for the Lockheed Martin Project, Anderson had to attend meetings twice a month at Lockheed Martin's Baltimore office, in the State of Maryland. On that evidence alone, Himes was an "employer" under the MWPCL, and therefore was subject to liability for violating it.

The Court of Special Appeals rejected Himes's invitation to apply factors developed by the Maryland courts to determine whether an employee is "regularly employed" in Maryland for purposes of the Maryland Workers' Compensation Act, L.E. § 9-101 *et seq.* The court said, 178 Md. App. at 536, 943 A.2d at 49 (quoting L.E. §§ 9-203 and 3-101(c)(2)(ii)): "If the legislature had intended the MWPCL to apply only to employers of those individuals who are 'regularly employed' in Maryland, it could have said so. . . . Being 'regularly employed' in Maryland is a higher standard than having been 'instruct[ed] ... to be present at a work site' in Maryland."

Himes also cited to guidance by the Maryland Department of Labor arguably supporting its position. However, the Maryland intermediate appellate court said that the guidance "cannot alter the plain meaning of the language of the controlling statute or its application to the evidence in this case." *Id.* at 535, 943 A.2d at 48.

*Cunningham*, 441 Md. 310, 107 A.3d 1194, which was decided in 2015, is the most relevant decision of the Maryland Court of Appeals. *Cunningham* concerned an MWPCL claim by an attorney, Feinberg, who worked for a Virginia-based law firm, pursuant to an employment contract executed in Virginia. *Id*. at 316, 107 A.3d at 1198. The attorney was "hired . . . to serve as a Maryland attorney," and attended various meetings and proceedings in Maryland, but spent "the vast majority of his time" at the firm's Virginia office. *Id*. at 316-17, 107 A.3d at 1198. The trial court concluded that, under *lex loci contractus* choice of law principles, the contract was governed by Virginia law, and so the MWPCL did not apply. *Id*. at 317-19, 107 A.3d at 1199. But, the Maryland Court of Appeals determined that the MWPCL applied.

Noting that "various federal courts have struggled to identify whether the private cause of action under the MWPCL is a contract-based, tort-based, or statute-based cause of action," the Maryland Court of Appeals remarked: "Although the cause of action assumes the existence of

some sort of underlying contract, it does not sound *per se* in contract. . . . Instead, a MWPCL action may be an independent, stand-alone claim." *Id*. at 323-26, 107 A.3d at 1202-04. The court concluded that the doctrine of *lex loci contractus* did not apply. *Id*. at 326-36, 107 A.3d at 1204-11. As subsequently summarized by Judge Chuang of this Court, the Maryland Court of Appeals "found that because the employment contract at issue did not have a choice-of-law provision, and the case did not involve a 'dispute over the validity and enforceability of the contract' or 'a dispute over the construction or interpretation of one of the express terms or provisions of the contract,' *lex loci contractus* did not apply." *Hausfeld v. Love Funding Corp.*, 131 F. Supp. 3d 443, 458 (D. Md. 2015) (quoting *Cunningham*, 441 Md. at 327-29, 107 A.3d at 1205-06).

But, the Maryland Court of Appeals went further. In what that court characterized as "a nifty bit of considered dicta," it said: "[E]ven if *lex loci contractus* applied, we think that it would not preclude a claim such as Respondent's under the MWPCL, as the MWPCL represents a strong public policy of Maryland." *Cunningham*, 441 Md. at 321, 107 A.3d at 1201. Indeed, the Maryland Court of Appeals criticized prior federal court decisions finding to the contrary, and cited legislative history. *Id*. at 342-48, 107 A.3d at 1214-18. Moreover, the court considered workers' compensation case law and noted, *id*. at 349, 107 A.3d at 1218: "Maryland is willing generally to allow itself to be used as a forum by workers seeking recovery of their wage claims." The court concluded, *id*.: "The mere fact that [plaintiff] and Petitioners entered into a 'Virginia' employment contract does not prohibit . . . maintenance of [plaintiff's] claims under the MWPCL."

Judges of this Court have considered *Himes* and *Cunningham* in exploring the reach of the MWPCL. Although obviously not binding authority, these cases offer helpful guidance.

*Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622 (D. Md. 2015), concerned an MWPCL claim by an employee who lived in Maryland and worked in the Baltimore office of a New Jersey-

based company, and in which the relevant contract contained a New Jersey choice of law provision. *Id*. at 626-27, 629.  Prior to the issuance of the appellate decision in *Cunningham*, Judge Blake had ruled that the MWPCL did not apply, based on this choice of law provision.  *Id*. at 628-29. However, after *Cunningham*, she reversed this ruling, holding that the MWPCL did apply.  *Id*. at 628-37.  Judge Blake acknowledged that *Cunningham*'s discussion of the strong public policy exception was dicta.  *Id*. at 630-31.  But, Judge Blake concluded that, as "'dictum which is a clear exposition of the law'" and not "'in conflict with other decisions'" of the Maryland Court of Appeals, "*Cunningham's* considered dicta" was binding on this Court.  *Id*. (quoting *Sherby v. Weather Bros. Transfer Co.*, 421 F.3d 1243, 1244 (4th Cir. 1970)).

Judge Chuang decided *Hausfeld*, 131 F. Supp. 3d 443, shortly after *Blanch*.  The plaintiff in *Hausfeld*, a loan originator, worked in the Washington, D.C. office of the defendant employer, which was based in that jurisdiction.  *Id*. at 447-48.  However, plaintiff's supervisors "encouraged" the plaintiff "to spend minimal time in the office," and the plaintiff spent much of his time out of the office at "marketing functions, potential client meetings, and site visits," including in Maryland.  *Id*. at 448.  The plaintiff also "often worked from his home in Maryland."  *Id*.

The defendant contended that the MWPCL did not apply because the parties' work was based in Washington, D.C., and the plaintiff's employment contract originated there.  *Id*. at 454-55.  But, Judge Chuang rejected these arguments.  *Id*. at 454-58.  As to the defendant's latter argument, relating to contractual choice of law, Judge Chuang reached the same conclusion as Judge Blake: "*Cunningham* unmistakably expressed the view of Maryland's highest court that the MWPCL represents the strong public policy of Maryland."  *Id*. at 458.  Thus, even if ordinary *lexi loci contractus* doctrine pointed in favor of the application of District of Columbia law, he

"conclude[d] that Maryland law would apply because of Maryland's strong public policy interest that earned wages must be paid." *Id*. at 457.

Moreover, considering the defendant's first argument, Judge Chuang found that the defendant was "an 'employer' under the MWPCL, such that the statute applies to [the plaintiff's] earnings." *Id*. at 456. Citing L.E. § 3-101, *Himes*, and *Cunningham*, he observed: "The threshold for establishing employment in Maryland under the MWPCL is relatively low." *Id.* at 455. Further, he said, *id.*: "The MWPCL . . . applies to a company that either allows an employee to work in Maryland or instructs the employee to be present at a work site in Maryland." Moreover, "[t]he employee does not have to be regularly employed in Maryland." *Id*. Instead, "[a]ll that is required is that the individual work to some extent in Maryland." *Id*. Considering the plaintiff's work activities, Judge Chuang concluded: "The sum of Hausfeld's involvement across borrowers, events, and site visits is sufficient to meet the threshold of employment in Maryland, particularly when coupled with the work that Hausfeld did for the company from his home in Maryland." *Id*. at 456.

*Roley*, 474 F. Supp. 3d 708, decided two years ago by Judge Chuang, is strikingly similar to this case. As such, it is liberally cited by plaintiff. *See* ECF 95 at 2-11.[9]

In *Roley*, the defendant, National Professional Exchange, Inc. ("NPX"), was incorporated in Nevada but based in Maryland, where it employed several people. 474 F. Supp. 3d at 713, 720. It was a nonprofit that specialized in enabling U.S. government agencies to utilize the services of qualified individuals whom they could not hire through normal processes. *Id.* at 712-13.

_____

[9] The plaintiff in *Roley* appealed to the Fourth Circuit on issues apart from the applicability of the MWPCL. *See* 860 Fed. App'x 264. The Fourth Circuit did not address the applicability of the MWPCL.

Roley, the plaintiff, was a retired U.S. Air Force colonel who was hired by NPX in 2011. *Id*. at 712-13. Initially, he worked as an NPX contractor in Honolulu, Hawaii. *Id*. at 713. Then, from 2012 until Roley left NPX in 2016, Roley was assigned to the United States Indo-Pacific Command in Hawaii. *Id*. at 713-14. Although the U.S. government funded Roley's salary, NPX administered the payment of the salary, provided Roley with a benefits package, and withheld his taxes. *Id*. During his time with NPX, "Roley traveled to Maryland seven times, each time to attend a multi-day conference related to his work." *Id*. at 714. However, NPX's Managing Director "asserted that she had no knowledge that Roley ever performed any work in Maryland relating to his duties." *Id*.

Judge Chuang concluded that the MWPCL applied to Roley's circumstances. *Id*. at 719-20. He noted that "[t]he MWPCL defines an employer as 'any person who employs an individual in the State.'" *Id*. at 719 (quoting L.E. § 3-501(b)). NPX employed individuals in Maryland. *Id*. Thus, he reasoned, 474 F. Supp. 3d at 719: "As a matter of the plain text of the statute, the MWPCL pulls NPX into its purview." *Id*. Rejecting NPX's argument that "an entity is an 'employer' for purposes of an MWPCL claim only if the 'individual' working in Maryland is the employee bringing the claim," he remarked that the statutory definition "contains no such requirement." *Id*. Judge Chuang said, *id*.: "To the extent that this is a broad reading of the statute, it is consistent with the intent of the statute . . . In fact, as Maryland courts have recognized, the MWPCL was passed not just to benefit Maryland employees, but also to ensure that Maryland employers pay their employees what they are owed."

Judge Chuang continued, *id*. at 720 (internal citations omitted):

> Here, NPX operated out of an office in Maryland, including for purposes of its payroll activity. Maryland plainly has an interest in ensuring that an employer operating in Maryland, such as NPX, does not withhold wages from its employees. To the extent that the MWPCL arguably should be limited so as not to include

employees with no connection of any kind to Maryland, that is not the case here. Not only was Roley's payment administered from the NPX office in Maryland, but he also worked in Maryland during seven multi-day business trips to Maryland during his five years as an NPX employee. Where the MWPCL has been found to apply to a project manager for a Virginia corporation who worked at the company Virginia headquarters but had to attend meetings twice a month in a client's office in Maryland, Roley's work for a Maryland-based company that paid him from a Maryland office, which included several work trips to Maryland, provides more than a sufficient basis to permit the application of the MWPCL.

The case of *Boyd v. SFS Communications, LLC*, PJM-15-3068, 2021 WL 1430723 (D. Md. Apr. 15, 2021), is relied upon by Compass. *See* ECF 93-1 at 7-8, 10-11. It was a class action by "cable television, internet, and telephone technicians" against several employer defendants, alleging a failure to pay overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*.; the Maryland Wage and Hour Law ("MWHL"), L.E. §§ 3-413 and 3-415; and the MWPCL. *Boyd*, 2021 WL 1430723, at *1. Judge Messitte largely found for plaintiffs, although he ordered supplemental briefing regarding damages. *Id*. at *1, 11.

Much of the opinion is not relevant here. However, Judge Messitte ruled that class members could not recover damages under the MWHL or MWPCL for weeks in which they performed no work in Maryland. *Id*. at *9-10. He concluded that although *Himes* "establishes the more general principle that an employer based outside Maryland can be subject to liability under the MWPCL where it directed its employees to perform some work in Maryland," it did not signify that "once a Maryland employer is determined to be 'subject to liability for violating [Maryland wage] law,' liability extends to all work performed by its employees, whether or not such work was performed in Maryland." *Id*. at *9 (quoting *Himes*, 178 Md. App. at 535, 943 A.2d at 48). Instead, he calculated damages on a week-to-week basis, following what he described as the lead of the FLSA. *Id*. at *10.

Compass also cites *Poudel*, 2022 WL 345515, which was decided by Judge Chuang in February 2022. *See* ECF 93-1 at 6-7. In that case, the plaintiffs were Nepalese-English interpreters who brought an MWPCL claim against their employer, a Maryland-based company that provided language services to the U.S. government. *Poudel*, 2022 WL 345515, at *1. Plaintiffs performed all of their work at the U.S. embassy in Kabul, Afghanistan; there was no allegation that they performed any work in Maryland, or even in the United States. *Id*. at *1, 4. Nevertheless, they sought to impose MWPCL liability on their employer, because it was based in Maryland.

Judge Chuang granted defendant's motion to dismiss, holding the MWPCL did not apply. *Id*. at *2-6. He first described the expansive reach of the MWPCL under existing case law, stating, *id*. at *3:

> The Court of Appeals of Maryland has not had occasion to decide directly how the presumption against extraterritoriality applies in the context of the Maryland wage laws. The Court of Appeals, however, has expressed that its protection of workers through the MWPCL "represents Maryland's strong public policy." *See Cunningham v. Feinberg*, 107 A.3d 1194, 1197–98 (Md. 2015). Consistent with this principle, Maryland courts have allowed claims under the Maryland wage laws to proceed even when the employer is based out-of-state, the employee is primarily engaged to work out-of-state, and the employee worked in Maryland on only a limited basis. . . . These courts did not limit the application of the MWPCL only to work conducted in Maryland. *See Himes Assocs., Ltd*., 943 A.2d at 48; *Cunningham*, 107 A.3d at 1218. Indeed, *Cunningham* specifically referenced the fact that Maryland courts have allowed for the application of Maryland workers' compensation laws to both an incident occurring in Maryland and three incidents suffered by the same worker that occurred out-of-state as illustrative of the general principle that "Maryland is willing generally to allow itself to be used as a forum by workers seeking recovery of their wage claims." *Cunningham*, 107 A.3d at 1218 (citing *Pro-Football, Inc. v. McCants*, 51 A.3d 586, 596–97 (Md. 2012)).

> Relying on this guidance provided by the Maryland courts, this Court has similarly applied the Maryland wage laws to cases in which an employee worked in both Maryland and another state, even when the majority of the work occurred out-of-state. . . . Thus, even without having explicitly analyzed the issue of extraterritoriality, the Maryland courts have effectively concluded that application of the Maryland wage laws is not extraterritorial, even as to work that occurred outside of Maryland, when there is at least some work that occurs in Maryland.

Accordingly, MAPI's citation to *Boyd v. SFS Communications, LLC*, No. PJM-15-3068, 2021 WL 1430723 (D. Md. Apr. 15, 2021), a case in which the discussion of extraterritoriality was in the context of a calculation of damages in a class action suit involving conduct in multiple states, rather than in relation to the general applicability of the Maryland wage laws to an employee who worked in multiple states, is not persuasive. *Id*. at *9–10.

However, Judge Chuang went on to find that "where Maryland has not stated an express intent to have the Maryland wage laws apply to the work of an employee who worked entirely outside the state, even one employed by a Maryland-based company, the MWHL and MWPCL do not apply to such work." *Id*. at *5. He noted that the Maryland Workers' Compensation Act specifies that an individual could be a covered employee for work performed "'wholly outside of the United States'" pursuant to an employment contract made in Maryland, but the MWHL and MWPCL contained no such provision. *Id*. at *4 (quoting L.E. § 9-203). And, Maryland Department of Labor guidance supported the view that at least some work had to be done in Maryland. *Id*. In addition, plaintiffs "cited no case in which an employer's presence in Maryland alone was enough to cover a non-Maryland resident employee for work performed wholly outside of Maryland, much less one whose work was performed entirely outside the United States, and the Court has not found any." *Id.* at *5.[10]

The plaintiffs' employment contracts in *Poudel* contained a choice of law provision applying Maryland law. *Id*. at *5. However, Judge Chuang rejected the argument that this meant the MWPCL or MWHL applied to their work. *Id*. at *5-6. He characterized *Cunningham* as "declin[ing] to link the issue of choice of law to the question of whether a particular state's wage

---

[10] Judge Chuang expressed no opinion as to whether the MWPCL might apply to other "examples of work by individuals physically located outside of Maryland that could arguably be considered to be work within the state," such as telework for a Maryland-based company. *Poudel*, 2022 WL 345515, at *5.

laws apply." *Id*. at *5.  He acknowledged that, unlike some of the cases discussed earlier, the contract at issue contained an express Maryland choice of law clause.  *Id*.  But, Judge Chuang stated: "Where the Maryland Court of Appeals has decoupled the issues of the applicable law governing an employment agreement from the applicability of state wage laws, the Court declines to conclude that the inclusion of a Maryland choice-of-law provision in the Employment Agreements provides a basis to find that the Maryland wage laws cover Plaintiffs' work which occurred exclusively in a foreign country." *Id*. at *6.

*Hearn v. Edgy Bees Inc.*, GJH-21-2259, 2022 WL 1689432 (D. Md. May 26, 2022), is also instructive.  It was decided after the briefing on the Motion.[11]  *Hearn* is consistent with the case law discussed above.

The plaintiff, an Arizona resident, brought an MWPCL claim (among others) against the defendant employer, which had its principal places of business in Maryland and Israel.  *Id*. at *1.  Although the plaintiff alleged that he was hired to work out of the defendant's Maryland office, his complaint contained no allegation that he actually ever travelled to, or worked in, Maryland, "even on one occasion." *Id*. at *4.  Judge Hazel remarked: "In *Poudel*, the Court noted that both state and federal courts have allowed Maryland wage claims to proceed where the employee is primarily engaged in work out-of-state but also did work in Maryland on a limited basis." *Id*.  Accordingly, Judge Hazel granted the defendant's motion to dismiss the MWPCL claim, but without prejudice to the plaintiff's ability to amend his complaint to "include factual allegations about travel to or work done in Maryland." *Id*.

---

[11] Counsel did not bring *Hearn* to this Court's attention.

**C.**

The case law makes clear that MWPCL has an expansive reach, but not a limitless reach. "Maryland is willing generally to allow itself to be used as a forum by workers seeking recovery of their wage claims." *Cunningham*, 411 Md. at 349, 107 A.3d at 1218.  And, "the MWPCL was passed not just to benefit Maryland employees, but also to ensure that Maryland employers pay their employees what they are owed." *Roley*, 474 F. Supp. 3d at 719.  Thus, "[t]he threshold for establishing employment in Maryland under the MWPCL is relatively low," such that "[t]he MWPCL . . . applies to a company that either allows an employee to work in Maryland or instructs the employee to be present at a work site in Maryland," and "[a]ll that is required is that the individual work to some extent in Maryland." *Hausfeld*, 131 F. Supp. 3d at 445.

"Maryland courts have allowed claims under the Maryland wage laws to proceed even when the employer is based out-of-state, the employee is primarily engaged to work out-of-state, and the employee worked in Maryland on only a limited basis. . . ." *Poudel*, 2022 WL 345515, at *3.  Based on this guidance from the Maryland courts, judges of this Court have "similarly applied the Maryland wage laws to cases in which an employee worked in both Maryland and another state, even when the majority of the work occurred out-of-state." *Id.*

In particular, Maryland courts and judges of this Court have permitted MWPCL claims by the employee of a Virginia company who worked primarily in Virginia but attended twice-monthly meetings in Baltimore, *Himes*, 178 Md. App. at 513-15, 532-36, 943 A.2d at 35-36, 46-49; by an attorney at a Virginia law firm who attended proceedings and meetings in Maryland, but spent the "vast majority" of his time in the firm's Virginia office, *Cunningham*, 441 Md. at 317, 107 A.3d at 1198; by an employee of a Washington, D.C. company whose office was in Washington, D.C., but who attended many functions for work in Maryland and also worked from home in Maryland,

*Hausfeld*, 131 F. Supp. 3d at 447-48, 454-58; and by an employee who worked almost exclusively in Hawaii, but was employed by a Maryland company that employed individuals in Maryland, and who travelled seven times over five years on work trips to Maryland.  *Roley*, 474 F. Supp. 3d at 712-14, 719-20.  Conversely, judges of this Court have rejected the application of the MWPCL in contexts in which the employee did not perform any work at all in Maryland, even where the employer was based in Maryland.  *Hearn*, 2022 WL 1689432, at *1, 4; *Poudel*, 2022 WL 345515, at *1-6.

The undisputed facts in this case fit comfortably within those circumstances in which the courts have permitted the application of the MWPCL.  To review, it is undisputed that Compass has its principal place of business in Maryland; that it employed at least some individuals in Maryland; that plaintiff lived and performed the substantial majority of his work in Illinois; and Compass required plaintiff to travel to Maryland for work at certain points during his employment. *See, e.g.*, ECF 93-2, ¶¶ 2, 6-7, 11-12; ECF 93-4, ¶ 4; ECF 95-1, ¶¶ 3, 5-11.  This travel occurred periodically throughout plaintiff's time at Compass, which began in 2007, and included quarterly trips to Maryland for a period of time, although the travel to Maryland declined significantly beginning in 2017 and through termination of plaintiff's employment in 2020.  *See* ECF 93-2, ¶¶ 11-12; ECF 93-4, ¶ 4; ECF 95-1, ¶¶ 5-11.

These facts are quite similar to *Roley*, in which the plaintiff—like Boshea—lived and worked out of state while employed for a Maryland company, only traveling to Maryland for "seven multi-day business trips to Maryland during his five years as an NPX employee."  *Roley*, 474 F. Supp. 3d at 720.  Indeed, it appears that plaintiff here likely spent more time in Maryland than the plaintiff in *Roley*, given Boshea's quarterly trips to Compass for the period between approximately 2008 and 2017.

Compass argues that the facts in this case "demonstrate a far more tenuous connection to the State of Maryland than in *Roley*," emphasizing that Boshea worked for Compass longer than Roley worked for NPX, as well as Boshea's reduced travel during the final three years of his tenure.   ECF 93-1 at 10.   But, the facts in *Roley* indicate otherwise.

*Cunningham*, *Himes*, and *Hausfeld* also upheld the application of the MWPCL to claims in which "the employee [was] primarily engaged to work out-of-state, and the employee worked in Maryland on only a limited basis."   *Poudel*, 2022 WL 345515, at *3.   Indeed, in *Cunningham*, 441 Md. at 317, 107 A.3d at 1198, the employee spent the "vast majority" of his time working out of state.   The chief distinction between those cases and this one is that those cases concerned an out-of-state employer.   But, this strengthens the application of the MWPCL to this case, which features a Maryland employer.   *Cf. Roley*, 474 F. Supp. 3d at 719 (noting that "the MWPCL was passed . . . to ensure that *Maryland employers* pay their employees what they are owed") (emphasis added).   In addition, while not controlling, the Agreement contains a Maryland choice of law provision.   *See* ECF 95-1 at 10.

Compass argues that there is no "clear direction from the Maryland Court of Appeals" as to the circumstances of this case.   ECF 93-1 at 6.   It is true that the facts in *Cunningham* were not precisely the same as those here, and the *Cunningham* opinion focused on choice of law issues that are not at the forefront of this dispute.   Nevertheless, the outcome and facts of *Cunningham*, described above, provide powerful support for the conclusion that the MWPCL applies here.

*Poudel*, which is primarily cited by Compass, actually buttresses plaintiff's position.   The facts in *Poudel* are quite distinct from those here: Boshea worked in Illinois and took periodic trips to Maryland; he did not spend all his time in Kabul, like the plaintiffs in *Poudel*.   The discussion of MWPCL case law in *Poudel*, which is quoted at length above, quite plainly supports application

34

of the MWPCL here, when at least some work was performed in Maryland.  *See Poudel*, 2022 WL 345515, at *3.

Nor is *Boyd* to the contrary.  The specific context in *Boyd* is quite different from the facts here, making its application to these circumstances difficult.  *Boyd* concluded that, when calculating damages for class members, damages under the MWPCL should not be awarded to class members for weeks they did not work in Maryland.  *Boyd*, 2021 WL 1430723, at *9-10.  But, Judge Messitte did not conclude in *Boyd* that the MWPCL could not be applied to the defendants at all.  Indeed, Compass criticizes *Boyd*'s use of week-by-week calculations.  *See* ECF 93-1 at 8; ECF 101 at 10.[12]  *See also Poudel*, 2022 WL 345515, at *3 (describing *Boyd* as a case "in which the discussion of extraterritoriality was in the context of a calculation of damages in a class action suit involving conduct in multiple states, rather than in relation to the general applicability of the Maryland wage laws to an employee who worked in multiple states").

Compass contends that the final three years of plaintiff's employment (*i.e.*, the three years prior to March 2020) are the "more appropriate time frame to examine" in order to determine the applicability of the MWPCL, because the MWPCL has a statute of limitations of approximately three years.  ECF 101 at 4; *see Butler*, 385 F. Supp. 2d at 554 ("[A] claim under the MWPC[L] must be filed within three years and two weeks from the date on which the employer should have paid the wage.").  As discussed, in this three-year period, plaintiff took substantially fewer trips to Maryland, although the exact number may be disputed.  *See* ECF 93-2, ¶¶ 11-12; ECF 93-4, ¶ 4; ECF 95-1, ¶ 9.

---

[12]  In spite of this criticism, the Motion briefly suggests that, in the alternative, the Court should follow *Boyd*'s lead and consider only a portion of plaintiff's asserted severance amount as earned in Maryland for MWPCL treble damages purposes, based on the amount of time he actually spent in Maryland. *See* ECF 93-1 at 10-11. I address this request, *infra*.

It is not obvious, in light of the precedent discussed above, that even focusing on this period of reduced trips would preclude application of the MWPCL.  But, Compass cites to no authority, and this Court is aware of none, indicating that the applicability of the MWPCL ought to be determined solely by examining the three-year limitations period.  In *Roley*, 474 F. Supp. 3d at 720, for example, the Court explicitly considered the plaintiff's "seven multi-day business trips to Maryland during his *five years* as an NPX employee."  (Emphasis added.)

Compass also points to content in the "The Maryland Guide to Wage Payment and Employment Standards" (the "Guide"), a publication of the Maryland Department of Labor.  ECF 101 at 6-7.  Specifically, the Guide states: "Claims for unpaid wages must be brought in the state in which the work was performed."  MARYLAND GUIDE TO WAGE PAYMENT AND EMPLOYMENT STANDARDS, MARYLAND DEP'T OF LABOR, at 3, https://www.dllr.state.md.us/labor/wagepay/mdguidewagepay.pdf (last visited July 15, 2022).  Compass "recognizes the Guide is not binding authority," but notes that this Court has previously cited it when analyzing the applicability of the MWPCL.  ECF 101 at 6 n.6 (citing *Poudel*, 2022 WL 345515, at *4).

It is not clear that this guidance actually conflicts with applying the MWPCL here, given that it is undisputed that plaintiff performed at least some work for Compass in Maryland.  Plainly, the Maryland courts, and this Court, have not been troubled by the Guide when applying the MWPCL to "cases in which an employee worked in both Maryland and another state, even when the majority of the work occurred out-of-state," as they have repeatedly.  *Poudel*, 2022 WL 345515, at *3.  Indeed, although *Poudel* cited this passage of the Guide when declining to apply the MWPCL to a context in which the employee performed no work in Maryland, it did not suggest that this guidance called into question the broader case law that the MWPCL applies when an

employee has worked mostly in another state, but partially in Maryland. *See id.* And, to the extent that this passage of the Guide militates against application of the MWPCL here, it "cannot alter the plain meaning of the language of the controlling statute or its application to the evidence in this case." *Himes*, 178 Md. App. at 535, 943 A.2d at 48 (disregarding arguably contrary guidance contained in the Guide).

Principles of statutory construction suggest the same result as the cases discussed earlier. Courts in Maryland first examine "'the plain meaning of the statutory language'" when conducting statutory interpretation. *Johnson*, 430 Md. at 377, 61 A.3d at 38 (citation omitted). The MWPCL applies to "[e]mployer[s]," meaning "any person who employs an individual in the State or a successor of the person." L.E. § 3-501(b). And, "employ[s]" includes "allowing an individual to work; and . . . instructing an individual to be present at a work site." L.E. § 3-101(c)(2). As noted, there does not appear to be any genuine dispute that Compass employs people in Maryland, and that it required (and certainly permitted) plaintiff, at certain points, to be present for work in Maryland. *See, e.g.*, ECF 95-1, ¶¶ 3, 5. Thus, Compass falls within the definition of an "employer" under the statute. *See Roley*, 474 F. Supp. 3d at 719; *Himes*, 178 Md. App. at 532-36, 943 A.2d at 46-49 (both performing similar analyses).

The conclusion of this textual analysis is consistent with the overall purpose of the MWPCL. As noted, the MWPCL is designed "'to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages,'" *Cunningham*, 441 Md. at 323, 107 A.3d at 1202 (internal citation omitted), and "to benefit Maryland employees [and] ensure that Maryland employers pay their employees what they are owed." *Roley*, 474 F. Supp. 3d at 719. *See In re J.C.N.*, 460 Md. at 391, 190 A.3d at 341 (statutory language "'must be viewed within the context

of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'") (citation omitted).

Many of Compass's arguments boil down to the idea that it simply does not make intuitive sense for the MWPCL to apply here, given what defendant asserts is the attenuated connection to Maryland. *See, e.g.*, ECF 101 at 7 ("If the MWPCL can be applied in this case – where more than 98% (nearly 99%) of the work was performed outside the State of Maryland for nearly thirteen years (and an even higher percentage during the final three years of employment) – it begs the question, what is the cutoff to establish extraterritorial reach?"). But, the Court is obligated to apply the statute, as enacted by the Maryland General Assembly and interpreted by the Maryland Court of Appeals. And, in *Cunningham*, the Maryland Court of Appeals endorsed a broad interpretation of the MWPCL, observing that "Maryland is willing generally to allow itself to be used as a forum by workers seeking recovery of their wage claims." *Cunningham*, 411 Md. at 349, 107 A.3d at 1218. The Maryland Court of Special Appeals likewise upheld a broad construction in *Himes*. And, other judges of this Court have followed the lead of these decisions, in contexts with clear applicability to this case.

Defendant is quite right to point out Maryland's general presumption against the extraterritorial reach of its statutes. *See, e.g.*, *Elyazidi*, 780 F.3d at 237; *Waldron*, 285 Md. at 183-84, 401 A.2d at 177; *Gildar*, 191 Md. at 572, 62 A.2d at 569. But, this presumption has not precluded the application of the MWPCL to circumstances similar to this one, or those with even a more tenuous connection to Maryland, as discussed. As Judge Chuang noted in *Poudel*, 2022 WL 345515, at *3: "[T]he Maryland courts have effectively concluded that application of the Maryland wage laws is not extraterritorial, even as to work that occurred outside of Maryland, when there is at least some work that occurs in Maryland."

38

I also briefly discuss the Agreement's choice of law provision.  As noted, according to plaintiff, the Agreement was signed by plaintiff and John White in May 2007 in Annapolis.  *See* ECF 95-1, ¶ 13.  And, the Agreement contains a choice of law provision stating, *id*. at 10: "The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof."  Unlike some of the cases discussed above, which featured substantial discussion of choice of law principles, the parties do not focus on this issue in their briefing, although they do mention the choice of law provision briefly.  *See* ECF 95 at 11-12; ECF 101 at 9.  In fact, plaintiff concedes that the choice of law provision in the Agreement is "not dispositive."  ECF 95 at 11.

Plaintiff's position is presumably in reaction to the "considered dicta" of the Maryland Court of Appeals in *Cunningham* that "the MWPCL represents a strong public policy of Maryland."  441 Md. at 321, 107 A.3d at 1201.  In *Poudel*, 2022 WL 345515, at *6, Judge Chuang characterized *Cunningham* as having "decoupled the issues of the applicable law governing an employment agreement from the applicability of state wage laws," and held that a similar Maryland choice of law provision did not, by itself, provide a basis to apply the MWPCL to work occurring "exclusively in a foreign country."

Of course, Compass disputes the validity of the entire Agreement, including its choice of law provision.  *See* ECF 101 at 9.  Given the parties' positions, and the fact that I conclude that the MWPCL otherwise applies, there is no need to discuss this issue at length.  But, if a factfinder were to conclude that the Agreement is valid, the existence of the Maryland choice of law provision at the very least does not weaken plaintiff's argument that the MWPCL applies.[13]

---

[13] If a factfinder were to conclude that the Agreement was *not* valid, the issue would presumably be moot, as there would not appear to be a basis for plaintiff's claims.

In sum, considering the expansive construction afforded to the MWPCL by the Maryland Court of Appeals, the Maryland Court of Special Appeals, and judges of this Court; the text of the statute; and the facts of this case, I readily conclude that the MWPCL applies to plaintiff's circumstances.  This outcome is amply anchored in the case law described above.

Compass expresses a concern that following the approach taken by Judge Chuang in *Roley* would subject any company that administers its payroll in Maryland to the MWPCL, even if the company has outsourced its payroll administration to a third party.  ECF 93-1 at 8-9.  And, defendant maintains that subjecting Compass to MWPCL liability in this context "opens the possibility that any employee who travels in connection with his/her employment would then be protected by the employment laws of every state the employee visits for employment."  ECF 101 at 8 n.8.

These concerns are misplaced.  My ruling is confined to this particular case, based on the particular factual circumstances in this case: namely, that Compass is headquartered in Maryland, and plaintiff took a series of trips to Maryland for his work with Compass over the course of his tenure with the company.  As I have expressed, this decision does little more than follow in the footsteps of similar rulings from judges of this Court and the Maryland courts, which have not led to the extreme cases hypothesized by Compass.

**D.**

Finally, I address an alternative proposed by Compass in lieu of granting the Motion entirely.  The Motion briefly suggests that the Court apply the MWPCL along the lines of *Boyd*, such that if Boshea were to prevail, the Court would only award damages under the MWPCL for a proportion of the severance amount consistent with the proportion of plaintiff's tenure when he actually performed work in Maryland.  ECF 93-1 at 10-11.

However, Compass's position is somewhat unclear.  Elsewhere in the Motion, Compass states that Judge Messitte's reliance on the FLSA in *Boyd* to allocate damages on a week-by-week basis was "not entirely correct . . . because not every claim under the MWPCL is premised on weekly wages."  ECF 93-1 at 8.  And, the Reply includes a section titled: "The Court's Decision in *Boyd* Illustrates the Untenable Framework of Applying the MWPCL in this Case."  ECF 101 at 10.  This section asserts that applying the logic of *Boyd* would mean that, if plaintiff prevailed, "the Court would need to allocate what portion of the $540,000 was earned in the State of Maryland."  *Id*.  But, according to the Reply, *id*.: "This could not possibly be the paradigm the Maryland General Assembly envisioned when it enacted the MWPCL. Indeed, engaging in such an allocation exercise in MWPCL cases further illustrates how, at least in this case, applying the MWPCL would be an improper exercise of extraterritorial reach."

In any event, I am not persuaded that a proportional allocation of the type suggested in the Motion is appropriate in this case.   As I have discussed, the circumstances of *Boyd* are much different than those presented here: the calculation of damages for class members working across multiple states versus the application of the MWPCL to a single individual seeking a severance payment.  Indeed, Compass itself acknowledges that the method employed by *Boyd* is a poor fit under these circumstances.  *See* ECF 93-1 at 8; ECF 101 at 10.

Moreover, none of the other cited cases, which often involved facts more analogous to those here, appear to have contemplated the approach taken in *Boyd*, or looked to the FLSA to interpret the MWPCL, as did *Boyd*.  *See, e.g.*, *Roley*, 474 F. Supp. 3d at 725-26 (discussing damages, and not suggesting that MWPCL damages should be prorated by the amount of time the plaintiff spent in Maryland); *Poudel*, 2022 WL 345515, at *3 (noting that "*Cunningham* specifically referenced the fact that Maryland courts have allowed for the application of Maryland

workers' compensation laws to both an incident occurring in Maryland and three incidents suffered by the same worker that occurred out-of-state as illustrative of the general principle that 'Maryland is willing generally to allow itself to be used as a forum by workers seeking recovery of their wage claims'") (quoting *Cunningham*, 441 Md. at 318, 107 A.3d at 1218); *Himes*, 178 Md. App. at 523, 541-43, 943 A.2d at 41, 51-53 (affirming the trial court's award of treble damages on the severance payment).

### IV.    Conclusion

For the reasons stated above, I shall deny the Motion.  Plaintiff may continue with his claim under the MWPCL (Count II).

An Order follows, consistent with this Memorandum Opinion.

Date: July 22, 2022                          _____/s/_____
                                             Ellen L.  Hollander
                                             United States District Judge