**DAVID J. BOSHEA'S MOTION TO AMEND SCHEDULING
ORDER AND FOR LEAVE TO FILE HIS PARTIAL MOTION
FOR  SUMMARY JUDGMENT UNDER FED.R.CIV.P. 16(b)(4)**

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | | |
|---|---|---|
| **DAVID J. BOSHEA** | * | |
| **Plaintiff/Counter-Defendant,** | * | |
| **v.** | * | |
| **COMPASS MARKETING, INC.** | * | **Case No. 1:21-CV-00309-ELH** |
| **Defendant/Counter-Plaintiff.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

David J. Boshea, under Rule 56 of the Federal Rules of Civil Procedure and Local Rule 105, submits the following Memorandum in Support of Motion for Partial Summary Judgment:

## INTRODUCTION

This lawsuit turns on whether David Boshea, an Illinois resident (SOF 1), and Compass Marketing, Inc., a Virginia corporation headquartered in Maryland (SOF 2), agreed to the terms of the Compass Marketing, Inc. Agreement Related to Employment and Post-Employment Compensation in May 2007. The facts show David Boshea can enforce his severance agreement through the application of the statute of frauds, even though Compass claims its Chairman, John White, did not sign it.

## BACKGROUND

After David Boshea left college at age 23, he joined Keebler's marketing department doing everything possible to help the cookie company build its brand. (SOF 5). His position involved meeting with buyers for grocery stores and other customers to convince them to order more products. (SOF 6). He even went to stores and stocked shelves to ensure the customers displayed Keebler's products correctly. (SOF 6). After a year, David joined American Home Products, a

consumer company, and rose to the position of Area Manager for one-half of the state of Michigan, in which he managed a sales force that marketed products as diverse as PAM cooking spray, Easyoff, Saniflush, Woolite, and Chef Boyardee. (SOF 7). Although he managed a team, David remained a top producer at American Home Products. (SOF 8).

When he was 27, David moved to American Home Products' corporate headquarters as a Marketing Manager, running the Woolite brand for the entire company before he received a promotion to deal with finance, trademarking, and supply chain issues for one-third of American Home Products' brands. (SOF 9). While working in Manhattan, David worked in the office of American Home Products' Chairman, Jack Stafford, and met with the Chairman almost every morning. (SOF 10). After working in Manhattan, he moved to Maryland as a District Manager for the company, the youngest person ever to hold that position. (SOF 11). David managed a team of people and took responsibility for the company's business in three states –  Pennsylvania, Maryland, and Virginia. (SOF 12). While in that position, American Home Products was renamed Wyeth.[1] (SOF 12). Wyeth transferred David to Chicago, where he served as a National Account Manager and managed sales teams and category management teams for retailers such as Kmart, Sears, Walgreens, and Target. (SOF 13). Eventually, he became an employee of Pfizer Inc., an American multinational pharmaceutical and biotechnology corporation headquartered in Manhattan, when it purchased Wyeth.[2] David did not need to change jobs, as he was moving up in the ranks. (SOF 14).

---

[1] https://en.wikipedia.org/wiki/Wyeth
[2] https://www.pfizer.com/news/press-release/press-release-detail/pfizer_completes_acquisition_of_wyeth

David next joined Energizer Holdings, Inc., as a National Account Manager in May 2004. (SOF 15). Energizer, a market leading battery company, entrusted David with responsibility for leading a cross-functional direct business team with sales of $175 million. (SOF 16). He managed Energizer's Sears, Kmart, Walgreens, and sporting goods channels with full profit and loss responsibility. (SOF 17).

In the early 2000s, David assisted John White and his brother, Daniel White, in starting Compass. (SOF 18). In addition to helping Compass draft a business plan (SOF 19), David helped Compass get a foot into the door at American Home Products. (SOF 20).

In 2007, as a 45 year old, David was in the prime of his career. Early that year, John White approached David to solicit him to join Compass as its top salesperson. (SOF 21). In an April 1, 2007 email to David, John White encouraged David to join Compass in a senior position and introduced the idea of David receiving an exit package:

> Also, you and I need to make sure we discuss an exit plan for you, even seperate from me selling Compass. We need to respect that we are friends and that working together could possibly hurt our relationship (has not happened before but I was always working for you!!!!). I just want to define expectations up front so we limit the chances of getting on two different tracks, but I want us both to agree how we can spit if we need to so we can be certain to save our freindshlp.
>
> (SOF 22).

David initially did not consider Compass, a small marketing company, a logical fit for his career. (SOF 23). John White, however, relentlessly pursued David to entice him to join Compass as a Group Vice President. (SOF 24). He offered David a substantial salary, a country club membership, and a severance agreement if David joined Compass. (SOF 25). John White and his brother Daniel even flew to Chicago to sell David on joining Compass. (SOF 26). In a May 16, 2007 offer letter, John White, on Compass' behalf, promised David a $180,000.00 annual salary, a bonus, health insurance, a car allowance, 401k, a home office expense, a laptop, a copy machine,

and reimbursement of all business-related travel expenses, two-weeks of vacation in 2007, and three-weeks of vacation in 2008, 100% percent of business related country club membership fees up to $32,000.00 over three years, and "an involuntary exit package' of 3 times your salary (1 year will be immediately vested, with the additional 2 years accrued over the next three years)." (SOF 27 and 28).

The severance agreement would provide an "involuntary exit package" of three times David's salary, with one year immediately vested and an additional two years accruing over the next three years. (SOF 29). Because David believed his wife was leery of him joining the upstart company, David was unsure about leaving a well-known national brand for Compass. (SOF 30). John White convinced David that he would have the severance agreement if anything went wrong. (SOF 31). David used the offer of a severance agreement to convince his wife that he should join Compass. (SOF 32). After carefully considering the opportunity, David decided to join Compass, with the severance package acting as a strong driver in his decision to do so. (SOF 38).

Compass had struggled over the past several years before David was terminated due to what David viewed as John White's erratic management style. (SOF 39). However, David's relationship with John White became particularly strained in the fall of 2019. (SOF 46). At that time, John White asked David to fly to Saudi Arabia with him and some other members of the Compass team. (SOF 47). John White wanted David to participate in the trip to raise investor money for a defunct company (SOF 48), Tagnetics, in which David believed John White had a direct or indirect financial interest. (SOF 49). David Boshea believed that John White envisioned David's role on the trip as the promoter of a contract between Tagnetics and Walgreens for a marketing product. (SOF 50). Because he worked for Compass on the Walgreens account, David knew he would have to lie if he promoted the Tagnetics/Walgreens contract, which did not exist.

4

(SOF 51). Moreover, David, from working for Compass, that Tagnetics had not been an active company for several years. (SOF 52). David felt he could not lie about the Walgreens contract to help John White and Tagnetics obtain investor funds, the purpose of which was questionable to David. (SOF 53).

After David declined to join John White on the trip, his relationship with John White deteriorated. (SOF 54). The following spring, after nearly thirteen years with the company, Compass eliminated David's position, i.e., Executive Vice President. (SOF 56). Because Compass has admitted and continues to admit it terminated David without cause (SOF 60), David's termination by Compass triggered his right to receive his severance payments.

Compass struggled over the last several years before David was terminated due to what David viewed as John White's erratic management style. (SOF 38). In March 2020, Compass delivered John White's unsigned letter, which stated, "Regrettably, your position was one of the positions selected to be eliminated due to a necessary reduction in force." (SOF 41). When David followed up on the letter, he spoke with Erin Songer and Jerry Cain at Compass, who confirmed Compass terminated David only due to a reduction in force. (SOF 40). Shortly after he received the termination letter, David attempted to contact John White by telephone; however, John White did not take his calls. (SOF 42). David also sent an email on March 16, 2020 to Erin Songer with a copy to John White, in which David reminded Compass of its need to pay the severance. (SOF 43). In the email, David wrote:

> Hope your well. In follow up I wanted to follow up on my Compass exit payments:
>
> …
>
> "Misc Payments : My exit plan agreement with John White $540,000 earned after 3 years of service ( John White has agreement), …
>
>  (SOF 44).

No one from Compass disputed David's request or ever even responded to it. (SOF 45).

### COMPASS PROVIDED A SIMILAR SEVERANCE AGREEMENT TO A LOWER LEVEL EMPLOYEE AROUND THE SAME TIME AS IT AGREED TO DAVID BOSHEA'S SEVERANCE AGREEMENT

John Adams, a Compass employee, joined Compass shortly before David and has a similar severance agreement to David's. After John White interviewed John Adams, Mr. Adams joined Compass in May 2007 as a Senior Account Executive. (SOF 83). John Adams, who held the same position on the date of his deposition as he did when he joined Compass (SOF 84), received an employment contract with a severance term that provided him with a vested right to $120,000.00 in severance over a twenty-four month period. (SOF 85).

Although John Adams held a position in sales, Compass employed him at a lower level in the organization than David. (SOF 86). He described John White as being in the first tier at Compass on the organization chart, Michael White resting in the second tier, and David Boshea in the third level. (SOF 87). John Adams said he was on the fourth tier below David. (SOF 88).

John Adams and Compass agreed to a severance agreement bearing the same title with terms substantially similar to David Boshea's severance agreement. (SOF 82). While Compass promised both John Adams and David Boshea severance, David's severance was more substantial. Given their prospective value to the Compass at the time they joined, logic dictates that Compass would be more generous to David with respect to severance. Under John Adams' severance agreement, he had a right to receive $120,000.00 if Compass terminated him without cause. (SOF 89).

The primary difference between David Boshea and John Adams' severance agreements is that David Boshea received a vested right to $180,000.00, which equaled his salary at the time, to be paid over twenty-four pay periods, increasing one month for every month David Boshea remained employed to a maximum severance of $540,000.00. (SOF 90).

At his deposition, John Adams identified Exhibit 2 as his severance agreement with Compass. (SOF 91). John Adams has a version of his severance agreement he signed in his possession, but John Adams testified that Compass failed to provide a signed version to John Adams. (SOF 92). Compass also did not produce one in discovery. (SOF 92).

### DAVID BOSHEA HOLDS AN ENFORCEABLE AGREEMENT

Although Compass agreed to the terms contained in David Boshea's severance agreement in May 2007, including in emails, an offer letter, and a signed severance agreement, Compass claims the severance agreement is unenforceable. While Compass asserts that John White never signed the severance agreement and that someone forged his signature (SOF 62). John White admits he remembers nothing about his negotiations with David Boshea. (SOF 63).

John White testified:

Q. What is your recollection as to whether or not David Boshea had a severance agreement?

A.  I don't have a recollection of this time period that you're referring to.

Q. Okay. So you just don't recall?

A. I don't remember.

(SOF 93).

Although he claims to remember nothing about what he and David Boshea discussed in the period leading up to David joining Compass. 9SOF 64). In fact, John White does not recall whether Compass gave David Boshea a severance agreement (SOF 65) and cannot contest David Boshea's testimony that the parties entered into such a contract. John White cavalierly maintains Compass would never have agreed to the amount of severance contained in the severance agreement because it involved an extraordinarily large amount of money. (SOF 66). His conjecture is not a statement creating a genuine issue of fact, however. As the Fourth Circuit has explained, upon a motion for summary judgment, the opposing party "must produce 'specific facts showing that there is a

genuine issue for trial,' rather than resting upon the bald assertions of his pleadings." *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985) (abrogated on other grounds). "Genuineness," the court continued, "means that the evidence must create fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes." *Id*.

John White also does not recall signing Defendant Compass Marketing, Inc's Answers to Plaintiff David J. Boshea's First Set of Interrogatories on August 9, 2021, which occurred less than one year before he appeared for his May 18, 2022 deposition. (SOF 68).

The facts show David Boshea has a right to receive the full amount of severance Compass promised to pay him for his nearly 155 months of service, amounting to $540,000.00. (SOF 58). Notwithstanding any of the severance agreement's terms, Compass has failed to pay Boshea *any* of the severance pay owed to him. Further, Compass has not claimed that David Boshea failed to perform his obligations under the severance agreement. Hence, its failure to pay Boshea the severance payments is not due to a bona fide dispute. The Maryland Wage Payment and Collection Law (the "Wage Act") applies to severance payments. Accordingly, Compass violated the Wage Act by failing to pay Boshea the severance it owes him.

### DAVID BOSHEA CAN ENFORCE THE SEVERANCE AGREEMENT AGAINST COMPASS

David Boshea has the right to enforce the severance agreement against Compass on two bases. First, he may enforce it under the statute of frauds. Second, he has an entitlement to his severance payments under the doctrine of promissory estoppel.

The Maryland Statute of Frauds provides:

> Unless a contract or agreement upon which an action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or another person lawfully authorized by that party, an action may not be brought:

(1) To charge a defendant on any special promise to answer for the debt, default, or miscarriage of another person;

(2) To charge any person on any agreement made on consideration of marriage; or

(3) On any agreement that is not to be performed within 1 year from the making of the agreement.

Md. Code Ann., Cts. & Jud. Proc. § 5-901 (West).

Compass hired David Boshea as an employee at will. *See Towson Univ. v. Conte,* 384 Md. 68, 79, 862 A.2d 941 (2004). By the severance agreement's terms, Compass would owe David Boshea $180,000.00 if it terminated him without cause the day after it hired him.

In *Griffith v. One Inv. Plaza Associates*, 62 Md. App. 1, 5, 488 A. 2d 182, 183 (1985), the parties entered into an oral agreement, terminable at will by either party, in which neither party alleged a term of employment. The *Griffith* court determined that the parties' oral contract constituted a contract of indefinite duration. In discussing when the statute of frauds barred a claim, the court noted that "there are two sets of circumstances under which the one-year provision of the Statute of Frauds will bar a claim. One occurs when the parties " 'expressly and specifically' agreed that their oral contracts were not to be performed within one year." *Id.,* at 5, 184 (quoting *Sun Cab Co. v. Carmody*, 257 Md. 345, 350, 263 A. 2d 1 (1970)). "The other occurs when it is impossible by the terms of the contract for it to be performed fully within one year." *Griffith*, at 5, 184.

Under Subsection (3) of § 5-901, an enforceable contract exists if the parties can possibly perform it within one year from the date of contracting, whether or not it is not in writing.

First, Maryland law is clear that § 5-901 does not apply "when a contract can be completed within the span of a year by *any* possibility, even if the parties intended for the contract to extend for a longer period of time." *Lacy v. Arvin*, 140 Md. App. 412, 429 n.5 (2001) (emphasis in original). *See also Pitman v. Aran*, 935 F. Supp. 637, 648 (D. Md. 1996) ("Maryland courts have strictly applied the 'one year' provision of the Statute of Frauds, whereby the statute

will not apply where the contract can, by any possibility, be fulfilled or completed in the space of a year.") (cleaned up).

*Pearson v. Sharpe*, No. 1504, Sept. term, 2020, 2022 WL 1498734, at *4 (Md. Ct. Spec. App. May 12, 2022).

In *Pearson*, the defendant asked to borrow $71,422.74 from the plaintiff, Pearson, to be repaid in installments of $1,500.00 per month. While the agreement contemplated payments over almost 48 months, the court noted that the defendant could have paid Pearson within one year and therefore held the statute of frauds did not bar her recovery.

Here, ample evidence exists that the parties agreed to the severance term. Although Compass contests John White's signature on David Boshea's severance agreement, David Boshea can still enforce it against Compass. On May 16, 2007, John White sent an offer letter that provided:

> In exchange for your execution of our company non-compete and non-disclosures we will offer an "involuntary exit package" of 3 times your salary (1 year will be immediately vested, with the additional 2 years accrued over the next three years). This will cover any involuntary termination from the company, other then for cause.
>
> (SOF 28).

No one contests that David Boshea signed the severance agreement, which constituted the sole requirement for making the "involuntary exit package" referenced in the May 16, 2007 offer letter enforceable. The offer letter did not require that Compass sign it to be enforceable. Moreover, John White does not contest that he promised Compass would pay David Boshea's severance. Instead, he defers by claiming he could not recall any of the negotiations the parties conducted. In contrast, David Boshea specifically remembers the parties' conversations, has identified their communications, and even recalls meeting with John White in Maryland when John White delivered the signed severance agreement to him. Given John White's failure to remember what

occurred and David Boshea's sharp retention of facts crucial to his decision and career, David's recollection remains unrebutted.

Daniel White, John White's brother, confirmed John White blind copied him on a May 22, 2007 email John White sent at 1:24 a.m. to David Boshea to which he attached a Word version of the severance agreement. (SOF 67). Every Microsoft Word document contains properties a party can access by clicking the File button and Info tab. Doing so exposes the document's properties. As reflected in Group Exhibit G to the Gregory Jordan Declaration, the properties of the draft severance agreement disclose the following information[3]:

| Category Shown on the Draft Severance Agreement | Description of the Category | Information Shown in the Category |
|---|---|---|
| Total Edit Time | The total time anyone spent editing the document | 12 minutes |
| Title | the original title of the base document used | Adams Employment Agree… |
| Last Modified | Date and time of date the last modification to the document | 5/22/2007 1:22 AM |
| Created | Date and time of date of the documents creation | 5/22/2007 1:20 AM |
| Last Printed | Date and time of date at which someone printed the document | 1/9/2007 6:14 PM |
| Last Modified | The last person to modify the document | john |

No evidence of any dispute between John and Daniel White in May 2007, as reflected by the fact that Daniel White joined his brother John in soliciting David Boshea to join Compass. (SOF 26). Given that the last modification to the draft severance agreement occurred before John White sent his email and 12 years and ten months before Compass terminated David Boshea, the

---

[3] David Boshea can provide the native email for the Court's review should the Court determine that such production would assist the Court in its determination of David Boshea's motion.

unrebutted evidence shows that Compass and David Boshea had an agreement. To find otherwise would frustrate the purpose of the statute of frauds.

The purpose of the statute of frauds is not to find a means to prevent a party from enforcing a contract; instead, the legislature enacted it to avoid fraud. As stated in a case under the Uniform Commercial Code's provision, citing the general statute, the court in *MEMC Elec. Materials, Inc. v. BP Solar Int'l, Inc.*, 196 Md. App. 318, 9 A.3d 508 (2010) stated,

> Furthermore, the purpose of the Statute is to avoid fraud—not to prevent enforcement of legitimate transactions. Consequently, in regard to that purpose, we have stated that the Statute is intended to prevent successful fraud [through] inducing the enforcement of contracts that were never in fact made. It is not to prevent the performance or enforcement of oral contracts that have in fact been made; it is not to create a loophole of escape for dishonest repudiators. Therefore, we should always be satisfied with "some note or memorandum" that is adequate, when considered with the admitted facts, the surrounding circumstances, and all explanatory and corroborative and rebutting evidence, to convince the court that there is no serious possibility of consummating a fraud by enforcement. *Collins v. Morris,* 122 Md. App. 764, 773–74, 716 A.2d 384 (1998). This purpose has guided our examination of the sufficiency of particular writings under the Statute.

*Id.*, 196 Md. App. at 340, 521.

### BASED ON PROMISSORY ESTOPPEL, COMPASS MUST COMPLY WITH ITS PROMISES BY PAYING DAVID BOSHEA'S SEVERANCE

In *Pavel Enters. v. A.S. Johnson Co., Inc.,* 342 Md. 143, 674 A.2d 521 (1996),  the  court set forth a four-part test for determining whether promissory estoppel would take a contract outside the restrictions of the statute of frauds and noted that Maryland courts have long held that view. "This Court has decided cases based on detrimental reliance as early as 1854, and the general contours of the doctrine are well understood by Maryland courts. The historical development of promissory estoppel, or detrimental reliance, in Maryland has mirrored the development nationwide." *Pavel*, 342 Md. at 164, 674 A.2d at 531. To resolve any confusion concerning the proper means for determining whether promissory estoppel occurred, the court mandated that,

Maryland courts are to apply the test of the *Restatement (Second) of Contracts* § 90(1) (1979), which we have recast as a four-part test:

1. a clear and definite promise;

2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on that part of the promisee;

3. which does induce actual and reasonable action or forbearance by the promisee; and

4. causes a detriment which can only be avoided by the enforcement of the premises.

*Pavel,* 342 Md. at 166, 674 A.2d at 532.

Applying the test to the facts, (1) the severance agreement constitutes a clear and definite promise; (2) the severance agreement confirms John White's promises to David Boshea in his April 1, 2007 email and the May 16, 2007 offer letter; (3) based on the various documents and promises John White made to David Boshea, Compass had to reasonably expect its offer would induce action on David Boshea's part; and (4) the promise induced David to stay at Compass for almost thirteen years.

Since Compass now attempts to shirk its obligations, the detriment David Boshea suffered by leaving a substantial position with Energizer, a prominent American company, can be avoided only if the Court enforces the severance agreement.

### IN ADDITION TO PROMISSORY ESTOPPEL, THE STATUTE OF FRAUDS DOES NOT PREVENT DAVID BOSHEA FROM RECEIVING THE ENTIRE SEVERANCE COMPASS AGREED TO PROVIDE

The fact that a contract may be performed within one year and thus fall outside the Statute of Frauds restrictions does not limit David Boshea to a single year's severance payment. In *Griffith v. One Inv. Plaza Assocs.*, 62 Md. App. 1, 488 A.2d 182 (1985), the court held that the statute did not preclude Griffith's claims because the oral contract was capable of being performed within one year, even though the measure of damages included those accruing after the first year. *See id.*, at 8, 185.

Other jurisdictions have considered instances involving both the statute of frauds and severance payments. In *Lunn Partners Multiple Opportunities Portfolio, L.P. v. Brakulis*, No. 03 C 3289, 2004 WL 2792835, a Northern District of Illinois case, the defendant and counter-plaintiff, Brakulis, filed a counterclaim for breach of contract against the plaintiff and counter-defendant, Valley, alleging that Valley had failed to pay the entire severance due to him under an oral employment agreement between the parties. The oral employment agreement was an at-will agreement terminable at will by either party and provided for one year of severance salary. Valley terminated Brakulis' employment approximately one and a half years after entering into the oral agreement and began paying him severance in weekly installments of $2500/week. Valley made only 23 of 52 payments owed before stopping the payment of severance to Brakulis. The *Lunn Partners* court found that at-will employment contracts are enforceable even if orally made and even if actual performance took longer than one year. The court also found that complete performance by one party renders oral contracts enforceable under the statute of frauds, "particularly where the only performance obligation for the other party is the payment of money." *Id.*, at *2.

Valley first argued that because the performance of the contract took place over the span of more than one year, it was barred by the statute of frauds. It next argued that since the payment of severance was contingent upon Brakulis having worked for at least one day, and the severance package was structured to be payable over one year's time, the performance of the oral agreement required a minimum of a year and a day and was therefore barred by the statute. *See id.*, at *3. The *Lunn Partners* court found that because the severance agreement was an at-will agreement, Valley could have terminated it at any time, and it could have structured the severance to be paid out in less than one year, as in one lump sum. Accordingly, the *Lunn Partners* court found that "[s]ince

14

these conditions would have rendered the contract performance within a year, the statute of frauds does not apply." *Id.*

The *Lunn Partners* court further noted that in the context of employment agreements, full performance by the employee generally bars the application of the statute of frauds. *Id.*; *see also Mapes v. The Kalva Corp.*, 68 Ill. App. 3d 362, 386 N.E. 2d 148 (2d Dist. 1979). The *Lunn Partners* court cited *Reiss v. El Bauer Chevrolet Co.*, 96 Ill. App. 2d 266, 238 N.E. 2d 619 (1968) for the proposition that the "Statute of Frauds is no defense to an executed contract of employment, particularly where all that remains to be done by the other party is the payment of money." *Lunn Partners*, at *3 (quoting *Reiss*, at 269, 621).

Similarly, "[a] plaintiff in Maryland may effectively prevent a defendant from using the statute of frauds as a shield if the plaintiff can show it has substantially performed its part of the alleged oral agreement and plaintiff's performance evinces a clear indication of the existence of the agreement." *Heritage Oldsmobile-Imports v. Volkswagen of America, Inc.*, 264 F. Supp. 2d 282, 290 (D. Md. 2003).

In *Schara v. Commercial Envelope Mfg. Co.*, 321 F. 3d 240 (1st Cir. 2003), an employee, Schara, sued his former employer, Commercial, for bonuses not paid during Schara's three years of employment with Commercial under an alleged oral agreement between the parties. On appeal from a directed jury verdict for the employee, Schara, the court upheld the verdict, finding that the statute of frauds did not apply to the oral agreement even though the performance of the agreement took place over three years and the alleged bonus was to be paid over the course of two years. In discussing the possible application of the statute of frauds, the court noted that "[o]ver the past century, there has been a general trend to cut back on the reach of the Statute." *Id.*, at 243. The court also noted that "New York has consistently chosen to construe the one-year provision of the

15

Statute—the requirement that contracts not performable within a year fall within the Statute—narrowly." *Id.* "'Wherever an agreement has been found to be susceptible of fulfillment within that time, in whatever manner and however impractical, this court has held the one-year provision of the Statute to be inapplicable, a writing unnecessary, and the agreement not barred.'" *Id.* (quoting *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y. 2d 449, 455, 472 N.E. 2d 992, 994 (1984)).

The Schara court also found it noteworthy that the policy concerns underlying the application of the statute were not present in that case – Schara's claims were not based solely on oral testimony, but were supported by various writings drafted and presented to him by Commercial. Although Commercial argued the two-year payout period for Schara's bonus sufficed to place the agreement within the statute of frauds, the court disagreed, stating that "[b]ecause 'the terms of the contract here … included an event which might end the contractual relationship of the parties within a year, defendant's possible liability beyond that time [does] not bring the contract within the statute.'" *Id.*, at 245 (quoting *Cron v. Hargro Fabrics, Inc.*, 91 N.Y. 2d 362, 370, 694 N.E. 2d 56, 60  (1998)) (itself quoting *Martocci v. Greater N.Y. Brewery, Inc.*, 301 N.Y. 57, 62, 92 N.E. 2d 887, 889 (1950)).

Similarly, in *White Lighting Co. v. Wolfson*, 68 Cal. 2d 336, 438 P. 2d 345 (1968), an employer, White, sued an officer of the company, Wolfson, for return of money advanced to him against future commissions by the company. Wolfson counterclaimed, alleging an oral agreement with the company granting him one percent (1%) of the company's annual gross sales in excess of million dollars. The lower court dismissed the claim, and Wolfson appealed. The Supreme Court of California overturned the lower court's ruling dismissing the counterclaim, ruling that the oral agreement for the commission was not invalid under the statute of frauds, even though the one percent (1%) commission on annual gross sales in excess of one million could not be computed

16

until one year had elapsed. In making its determination, the *Wolfson* court found that the statute of frauds does not apply to oral agreements for an indefinite duration, even if the compensation for the services is to be measured by their value to the employer over a period of more than one year. The court also found that because Wolfson's employment could be terminated at will by either party, it could under its terms be performed within one year.

> When Wolfson's employment relationship with White was terminated, Wolfson had completely performed; White's performance consisted of nothing more than compensating Wolfson. Moreover, as we have explained, the inclusion of the provision for a bonus ascertainable only after one year does not invalidate the oral agreement under the statute of frauds.
>
> *Id.*, at 344, (Pacific Reporter citation not available).

In *Zulke v. AC&DC Power Technologies, LLC*, 356 Ga. App. 299, 846 S.E. 2d 624 (2020), a Georgia case, the appellate court reversed the lower court's grant of summary judgment in favor of the employer where a former employee sued his former employer for promissory estoppel and breach of contract. The claims were based on the employer's alleged failure to pay incentive and severance payments to the employee under an oral employment agreement where the parties performed for more than a year. The court found that, because the oral employment agreement was for an indefinite duration, the agreement was not subject to the statute of frauds. Further, the court found that the employee was entitled to a five percent (5%) incentive payment, along with his severance when he continued to work in his second year. In explaining how it reached its conclusion, the *Zulke* court stated,

> The fact that some contingencies in a contract, such as the second and third-year incentives in this agreement, might not come to pass if the contract is terminated within a year does not mean that the contract containing such contingencies is unenforceable. Rather, "if an agreement whose performance would otherwise extend beyond a year *may* be completely performed within a year on the happening of some contingency, it is *not* within the statute of frauds.
>
> *Id.*, at 301, 627 (emphasis in original).

The *Zulke* court found the employer's argument that incentive and severance payment terms at issue here were unenforceable as not vesting in Zulke before one year unavailing, noting that it had rejected such an argument in *E.D. Lacey Mills, Inc. v. Keith*, 183 Ga. App. 357, 359 S.E. 2d 148 (1987), quoting itself in that case, "[A]n employee may sue on an oral contract for employment terminable at will for the amount of compensation due him, *based upon services actually performed by him up to the time of his discharge*, and *not* for damages or for compensation for services *not* performed[.]" *Zulke*, at 302, 628 (quoting *E.D. Lacey*, at 359, 152). The *Zulke* court also found it noteworthy that the plaintiff had arguably earned his severance pay at the commencement of his second year. *See id.*

In another Georgia case, the court in *Vernon v. Assurance Forensic Accounting*, 33 Ga. App. 377, 774 S.E. 2d 197 (2015) found that an oral compensation agreement for the payment of severance did not implicate the statute of frauds because it could be performed within one year. In *Vernon*, an employer argued that an oral compensation agreement could not be performed within a year. The *Vernon* court found that even though the payment of severance did not actually begin within a year of making the agreement, where the agreement immediately went into effect when agreed to by parties, it was possible the employer could have terminated the employee the same day the parties entered into the contract, thereby triggering the severance pay obligation. *See id*, at 387, 208.

As was the case in *Vernon*, Compass' severance pay obligation went into effect the moment the parties entered into the severance agreement, even though the severance was not to be paid within a year of making the agreement, and the parties performed for more than one year. Accordingly, under the analysis contained in *Griffith*, *Lunn Partners*, *Schara*, *Wolfson*, *Zulke*, and

18

*Vernon*, David Boshea is entitled to the entire three years of severance owed under the severance agreement.

### DAVID BOSHEA IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I.

Count I of the Complaint concerns a claim for breach of contract. "Under Maryland law, the elements of a breach of contract are 1) a contractual obligation and 2) a material breach of that obligation." *Cowan Systems LLC v. Ocean Dreams Transport, Inc.*, Civil No. WDQ-11-366, 2012 WL 4514582, *3 (D. Md. September 27, 2012).

David Boshea and Compass signed an agreement titled, "Compass Marketing, Inc. Agreement Related to Employment and Post-Employment Compensation" in May 2007. (SOF 33). Specifically, in May 2007, David Boshea traveled to Compass' offices in Annapolis, Maryland. After arriving at the office, he was placed in a conference room. John White walked into the conference room where he was sitting and handed David a signed version of the severance agreement bearing his signature. John White asked him to sign the Agreement, which he did. He then handed the document back to John White. The document each signed included David Boshea's comments regarding the Agreement. (SOF 34). The Agreement provides that if David Boshea is terminated for any reason other than for cause, David Boshea will receive severance payments totaling $180,000.00 paid over 24 months, commencing on David Boshea's effective date of termination, and paid in accordance with Compass' normal payroll cycle. (SOF 35). Compass' normal payroll schedule involved twice monthly payments of salary or wages. (SOF 36). The Agreement further provides that David Boshea's severance will increase one month for every month he is employed with Compass to a maximum severance of $540,000.00. (SOF 37).

Compass employed David Boshea under that severance agreement from May 2007 until March 2020 (SOF 57). Compass does not claim David failed to perform his obligations under the severance agreement. (SOF 60). Notwithstanding the terms in Article 6 of the severance

agreement, Compass has failed to pay David Boshea any of the severance pay it owes him. (SOF 59). Compass has materially breached the severance agreement by failing to pay David Boshea the severance payments owed to him under Article 6 of the severance agreement.

Because there is no genuine issue of material fact, this Court should enter summary judgment in David Boshea's favor and against Compass on Count I of the Complaint.

**DAVID BOSHEA IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II OF THE COMPLAINT.**

Compass' failure to pay David Boshea any severance payments violated the Maryland Wage Payment and Collection Law, Labor and Employment (the "Wage Act"), which applies to severance pay. *See Stevenson v. Branch Banking and Trust Corp.*, 159 Md. App. 620, 644 (2004).

> Given the broad language of the statute and its remedial purpose, we conclude that the scope of Maryland's Wage Payment Act extends to the type of severance pay that represents deferred compensation for work performed during the employment. Thus, a severance benefit that is based on the length and/or nature of the employee's service, and promised upon termination, may be recoverable under the Wage Payment Act.
>
> *Id.*

Under the severance agreement, Compass had to pay David Boshea severance payments through the end of February 2021. (SOF 61). With respect to those payments, Compass failed to pay David in accordance with § 3-502 or § 3-505 of the Wage Act since more than two weeks have elapsed from the date on which Compass failed to pay the wages owing to him as of that date. Further, because Compass has never claimed David failed to perform his obligations under the severance agreement, Compass' failure to pay him any of the severance payments he is due is not due to a bona fide dispute about those payments.

As noted above, in his deposition, John White testified that he has no recollection of what terms he and David Boshea discussed when Compass hired Boshea. (SOF 63). He testified that Compass would not have agreed to pay David $540,000.00 in severance pay because he would

never have agreed to pay that much in severance. (SOF 66). So other than John White's claim concerning his signature and his claim that he would not have agreed to pay David Boshea $540,000.00 severance, Compass has provided no evidence whatsoever that contradicts David's version of the events surrounding his employment by Compass. Without such evidence, no bona fide dispute exists as to whether Compass owes David Boshea the severance payments he seeks in this lawsuit.

As a result of Compass' failure to timely pay the sums owing to David Boshea as of February 28, 2021, under the Wage Act, David is entitled to receive from Compass an award of an amount not exceeding three times the wages owing to him as of February 28, 2021, which wages equal $540,000.00, along with reasonable counsel fees and other costs. *See* § 3-507.1(b) of the Wage Act.

Because there is no genuine issue of material fact, this Court should enter summary judgment in David Boshea's favor and against Compass on Count II of the Complaint.

### IF BOSHEA IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II, HE IS ALSO ENTITLED TO SUMMARY JUDGMENT ON COUNT III OF THE COMPLAINT[4]

For the same reasons that Compass' failure to pay David Boshea any severance payments violated the Wage Act, it also violates Illinois Wage Payment and Collection Act (the "IWPCA"), 820 ILCS 115/1 et seq. Accordingly, as a result of Compass' failure to timely pay the sums owing to David Boshea as of February 28, 2021, under the Illinois Wage Payment and Collection Act, David Boshea is entitled to receive from Compass an award of the wages owed to him and damages of 5% of the amount of any such underpayments for each month following the

---

[4] While the Court has ruled that Wage Act applies in this lawsuit (CM/ECF 111), in an abundance of caution, David Boshea seeks summary judgment on Count III.

date of payment during which such underpayments remain unpaid, along with reasonable counsel fees and other costs. *See* 820 ILCS 115/14.

Because there is no genuine issue of material fact, this Court should enter summary judgment in David Boshea's favor and against Compass on Count III of the Complaint.

**BOSHEA IS ENTITLED TO SUMMARY JUDGMENT ON COUNT III OF COMPASS' COUNTERCLAIM.**

In Count III of its Counterclaim and Third-Party Complaint, Compass claims that David Boshea received certain "off-payroll" payments in bi-weekly increments of $350.00, totaling $51,800.00 for his membership at the White Eagle Golf Club, which he was not entitled to receive. (SOF 69). Compass' claim, however, is contradicted by its payroll register, which shows that Compass paid David's membership dues for years while Compass employed him. (SOF 70).

In his deposition, John White testified that he did not know David Boshea that Compass paid David's White Eagle Golf Club membership dues; thus, if Compass paid the dues, it would have been unauthorized. (SOF 71). John White also testified that David Boshea did not have control over payroll, and that Michael White had total control over it. (SOF 72 and 73).

Notwithstanding John White's claim of ignorance, Michael White, the person responsible for Compass' payroll until May 2018, testified that Compass paid David Boshea's golf dues by reimbursing David, including deducting payroll taxes. (SOF 75). Michael White also testified that David Boshea paid $700 per month to White Eagle Golf Court, and Compass reimbursed David through two $350 payments. (SOF 76). In fact, the dues increased to $750 per month, and David asked that Compass increase the reimbursement. (SOF 77). John White responded, "I saw it as he copied me too. Just ignore." (SOF 78). As a result, the payments stayed at $700 per month

in two $350 increments. (SOF 79). Finally, Michael White confirmed that he believed John White was aware of the payments for the golf club membership. (SOF 80).

David Boshea confirms that he received the payments reflected in the payroll register to reimburse him for his membership at White Eagle Golf Club and that the amount contained in the payroll register Compass produced in discovery corresponds to the payments he received for that purpose. (SOF 81). Because the payroll register shows Compass paying David for his membership dues to the White Eagle Golf Club, the payments could not have been "off payroll," as alleged by Compass in Count III of its Counterclaim. The register shows David Boshea received $51,800.00 in bi-weekly increments of $350.00, to reimburse him for his White Eagle Golf Club membership. (SOF 74 and 81). Moreover, Michael White confirmed that, as the person responsible for Compass' payroll, he authorized Compass's payments for the golf membership. (SOF 73 and 75). Further, since Michael White had total control over payroll, Boshea cannot be held liable to Compass for those payments.

Because there is no genuine issue of material fact, this Court should enter summary judgment in Boshea's favor and against Compass on Count III of the Counterclaim.

## CONCLUSION

For all of the reasons mentioned above, this Court should grant summary judgment to Boshea on Counts I, II, and III of his Second Amended Complaint and Count III of Compass' Counterclaim and Third-Party Complaint.

WHEREFORE, for the preceding reasons, this Court should grant summary judgment in favor of plaintiff and counter-defendant, David J. Boshea, and against defendant and counter-plaintiff, Compass Marketing, Inc., on Counts I, II, and III of the Second Amended Complaint

filed by David J. Boshea and on Count III of the Counterclaim and Third-Party Complaint filed

by Compass Marketing, Inc., and for such other and further relief this Court deems just.

Dated:  July 31, 2022                              Respectfully submitted,

                                                  /s/Gregory J. Jordan
                                                  Gregory J. Jordan (Admitted Pro Hac Vice)
                                                  Jordan & Zito LLC
                                                  350 N. LaSalle Street, Suite 1100
                                                  Chicago IL 60654
                                                  (312) 854-7181
                                                  gjordan@jz-llc.com

                                                  Thomas J. Gagliardo (Bar No. 08499)
                                                  Of Counsel
                                                  Gilbert Employment Law, P.C.
                                                  1100 Wayne Ave, Suite 900
                                                  Silver Spring, Maryland 20910
                                                  tgagliardo@gelawyer.com

                                                  Counsel for David J. Boshea