**STATEMENT OF UNDISPUTED MATERIAL FACTS IN
SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| DAVID J. BOSHEA | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No. 1:21-CV-00309-ELH |
| v. | * | |
| | * | |
| COMPASS MARKETING, INC. | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AFFIDAVIT OF DAVID J. BOSHEA IN SUPPORT OF
## HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

I, David J. Boshea, being first duly sworn on oath, depose and state as follows:

1. Except as otherwise indicated in this affidavit, I have personal knowledge of the matters contained in this affidavit and would testify competently to such matters if called as a witness.

2. I submit this affidavit in connection with my Motion for Partial Summary Judgment in the above lawsuit.

3. After I left college at age 23, I joined Keebler's marketing department doing everything possible to help the cookie company build its brand.

4. My position involved meeting with buyers for grocery stores and other customers to convince them to order more products. I even went to stores and stocked shelves to ensure the customers displayed Keebler's products correctly.

5. After a year at Keebler, I joined American Home Products, a consumer company. I rose to Area Manager for one-half of Michigan in which I managed a sales force that marketed products as diverse as PAM cooking spray, Easyoff, Saniflush, Woolite, and Chef Boyardee.

6. Although I managed a team at American Home Products, I remained a top producer.

7. When I was 27, I moved to American Home Products' corporate headquarters as a Marketing Manager, running the Woolite brand for the entire company before I received a promotion to deal with finance, trademarking, and supply chain issues for one-third of American Home Products' brand.

8. While working in Manhattan, I worked in the office of American Home Products' Chairman, Jack Stafford, and met with the Chairman almost every morning.

9. After working in Manhattan, I moved to Maryland as a District Manager, the youngest person ever to hold that position.

10. I managed a team of people and took responsibility for the company's business in three states – Pennsylvania, Maryland, and Virginia. While I served in that position, American Home Products was renamed, Wyeth.

11. Wyeth transferred me to Chicago, where I served as a National Account Manager and managed sales teams and category management teams for retailers such as Kmart, Sears, Walgreens, and Target.

12. Eventually, I became an employee of Pfizer Inc., an American multinational pharmaceutical and biotechnology corporation headquartered in Manhattan, when it purchased Wyeth.

13. I later joined Energizer Holdings, Inc., as a National Account Manager in May 2004. Energizer.

14. Energizer was a large battery manufacturer who entrusted me with the responsibility for leading a cross-functional direct business team with sales of $175 million.

15. I managed Energizer's Sears, Kmart, Walgreens, and sporting goods channels with full profit and loss responsibility.

2

16. In the early 2000s, I assisted John White and his brother, Daniel White, in starting Compass Marketing, Inc. ("Compass").

17. I helped Compass draft a business plan.

18. I also helped Compass get a foot into the door at American Home Products.

19. Early in 2007, John White approached me and solicited me to join Compass as its top salesperson.

20. In an April 1, 2007 email to me at the email address I maintained at the time, Golf4me36@aol.com. I recognize the sender's email address to be the email address used by John White, who I knew to be Compass' Chairman and CEO. The email is a true and correct copy of the email I received without alterations. The date and time reflected on the email are the same as the date and time I received it. I retained a copy of the email in my business records relating to my employment with Compass. It was and has been my practice to maintain records concerning my business, including employment matters. A true and correct copy of the April 1, 2007 email is attached to this affidavit as Exhibit A.

21. In the April 1, 2007 email, John White solicited me to join Compass in a senior position and introduced the idea of receiving an exit package to me. It stated:

> Also, you and I need to make sure we discuss an exit plan for you, even seperate from me selling Compass. We need to respect that we are friends and that working together could possibly hurt our relationship (has not happened before but I was always working for you!!!!). I just want to define expectations up front so we limit the chances of getting on two different tracks, but I want us both to agree how we can spit if we need to so we can be certain to save our freindshlp.
>
> Exhibit A (misspelling in the original).

22. I initially did not consider Compass, a small marketing company, a logical fit for my career.

23. John White relentlessly pursued me to entice me to join Compass as a Group Vice President.

3

24. John White offered me a substantial salary, a country club membership, and a severance agreement if I went to Compass.

25. John White and his brother Daniel flew to Chicago to sell me on joining Compass.

26. In an unsigned May 16, 2007 offer letter, John White, on Compass' behalf, promised me a $180,000.00 annual salary, a bonus, health insurance, a car allowance, 401k, a home office expense, a laptop, a copy machine, and reimbursement of all business-related travel expenses, two-weeks of vacation in 2007, and three-weeks of vacation in 2008, 100% percent of business related country club membership fees up to $32,000.00 over three years, and "an involuntary exit package' of 3 times your salary (1 year will be immediately vested, with the additional 2 years accrued over the next three years)." I have attached the May 16, 2007 offer letter as Exhibit B.

27. Exhibit B is a true and correct copy of the May 16, 2007 letter I received without alterations. After receiving the letter, I spoke with John White and he confirmed that he sent the letter as an attachment to an email. John White also confirmed that Compass offered me the terms contained in the May 16, 2007 letter. I retained a copy of the May 16, 2007 letter in my business records relating to my employment with Compass. It was and has been my practice to maintain records concerning my business, including employment matters.

28. The May 16, 2007 offer letter John White sent me states:

> In exchange for your execution of our company non-compete and non-disclosures we will offer an "involuntary exit package" of 3 times your salary (1 year will be immediately vested, with the additional 2 years accrued over the next three years). This will cover any involuntary termination from the company, other then for cause.
>
> Exhibit B.

29. Because my wife told me she was leery of me joining an upstart company, and I believed she truly felt as such, I was unsure about leaving a well-known national brand for Compass.

4

30. John White convinced me I would have the severance agreement if anything went wrong.

31. I used the offer of a severance agreement to convince my wife that I should join Compass.

32. In or about May 2007, Compass and I entered into an agreement titled, "Compass Marketing, Inc. Agreement Related to Employment and Post-Employment Compensation" (the "Agreement"). *See* Agreement, attached hereto as Exhibit C.

33. Exhibit C is a true and correct copy of the Agreement I received without alterations.

34. In May 2007, I traveled to Compass' offices in Annapolis, Maryland. After arriving at the office, I was placed in a conference room. John White entered the conference room where I was sitting and handed me a signed version of the severance agreement bearing his signature. John White asked me to sign the Agreement, which I did. I then handed the document back to John White. The document each of us signed included comments I had regarding the Agreement.

35. I retained a copy of the Agreement that John White for Compass and I signed within my business records relating to my employment with Compass. It was and has been my practice to maintain records concerning my business, including employment matters.

36. The Agreement was a strong driver in my decision to join Compass.

37. Compass employed me from May 2007 until March 2020.

38. Before Compass terminated me, the company struggled over the last several years due to what I viewed as John White's erratic management style.

39. Compass terminated my employment without cause in March 2020.

40. When Compass terminated me, Jerry Cain and Erin Songer of Compass told me that the only reason for terminating me was due to a reduction in force.

41. Compass confirmed this in a March 3, 2020 email from Erin Songer that I received at 2:16 pm that day. The email, attached as Exhibit D, is in the same condition as when I received it. I

retained a copy of the March 3, 2020 email in my business records relating to my employment with Compass. It was and has been my practice to maintain records concerning my business, including employment matters.

42. The March 3, 2020 email stated, "Regrettably, your position was one of the positions selected to be eliminated due to a necessary reduction in force." Exhibit D.

43. I spoke with Erin Songer and Jerry Cain after receiving the March 3, 2020 email. They confirmed that Erin Songer sent Exhibit D and that Compass was letting me go due to a reduction in force.

44. Shortly after I received the termination letter, I attempted to contact John White by telephone; but he did not take my calls.

45. On March 16, 2020 at 12:42 pm, I emailed Erin Songer, copying John White and my wife, Julie Boshea, at the addresses I regularly used to communicate with each party. I have attached a true and correct copy of the March 16, 2020 email as Exhibit E. The date and time reflected on the email are the same as the date and time I sent it. I did not receive a message stating that the email did not go through to any of the parties. I retained a copy of the email in my business records relating to my employment with Compass. It was and has been my practice to maintain records concerning my business, including employment matters.

46. In the March 16, 2020 email, I reminded Compass that "Misc Payments : My exit plan agreement with John White $540,000 earned after 3 years of service (John White has agreement)." Exhibit E.

47. No one from Compass disputed my statement in the March 16, 2020 email or even responded to it.

48. While I was told Compass let me go due to a reduction in force, my relationship with John White became particularly strained in the fall of 2019.

49. In the fall of 2019, John White asked me to fly to Saudi Arabia with him and other members of the Compass team.

50. John White wanted me to participate in the trip to raise investor money for what I believed to be a defunct company, Tagnetics.

51. I believed that John White had a direct or indirect financial interest in Tagnetics.

52. John White told me that he envisioned my role on the trip as the promoter of a contract between Tagnetics and Walgreens for a marketing product.

53. Because I worked for Compass on the Walgreens account, I knew I would have to lie if I promoted the Tagnetics/Walgreens contract since such a contract did not exist.

54. I knew from working for Compass on Tagnetics that Tagnetics had not been an active company for several years.

55. I felt I could not lie about the Walgreens contract to help John White and Tagnetics obtain investor funds, the purpose of which I viewed as questionable.

56. I declined to join John White on the trip, and my relationship with John White became strained as a result.

57. The following spring, after nearly thirteen years with the company, Compass eliminated my position, i.e., Executive Vice President.

58. For my membership at the White Eagle Golf Club, I received payroll payments from Compass in bi-weekly increments of $350.00, totaling $51,800.00.

59. I received the payments, which are the same payments reflected in the Compass payroll register produced in discovery, to reimburse me for my membership fees at White Eagle Golf Club in Naperville, Illinois.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that my statements are true and correct.

**FURTHER AFFIANT SAITH NAUGHT.**

Dated: July 31, 2022

David J. Boshea