Exhibit D

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
 2                     WESTERN DIVISION

 3                       - - -
    UNITED STATES OF AMERICA,     .  Case Number 1:17-cr-117
 4                                .
              Plaintiff,          .
 5                                .  Day 5 of Jury Trial
            - v -                 .  Testimony of Curtis Baggett
 6                                .
    QIAN WILLIAMS,                .  Tuesday, September 17, 2019
 7                                .  9:13 a.m.
              Defendant.          .  Cincinnati, Ohio
 8   . . . . . . . . . . . . . .  .

 9

            TRANSCRIPT OF EXCERPT OF PROCEEDINGS
10     BEFORE THE HONORABLE MICHAEL R. BARRETT, and a JURY

11

    For the Plaintiff:
12
    KARL P. KADON, ESQ. (AUSA)
13  EBUNOLUWA A. TAIWO, ESQ.
    United States Attorney's Office
14  221 East Fourth Street, Suite 400
    Cincinnati, Ohio  45202
15

16  For the Defendant:

17  RICHARD W. MONAHAN, ESQ.
    Federal Public Defender's Office
18  Chiquita Center
    200 East Fifth Street, Suite 350
19  Cincinnati, Ohio  45202

20  Also Present:     Qian Williams, defendant
                      Agent Ken Baker
21                    Agent Dale Taylor
                      Kara Killen, investigator
22                    Michelle Ewing, tech support
                      Rachel Garretson, paralegal
23
    Law Clerk:        Kathleen Bedree, Esq.
24
    Courtroom Deputy: Barbara A. Crum
25
    Court Reporter:   Maryann T. Maffia, RDR
```

```
 1                      P R O C E E D I N G S

 2                            * * *

 3            THE COURT:  Anytime you're ready, Barb.

 4            COURTROOM DEPUTY:  All rise for the jury.  This court

 5   is now in session pursuant to the recess.

 6        (The jury entered the courtroom at 9:13 a.m.)

 7            THE COURT:  Good morning, guys.  How we doing?  All

 8   right.

 9       Karl and Ebun, do you have any more witnesses or documents

10   to present at this time?

11            MR. KADON:  No, Your Honor.  The government will --

12   introduce no more evidence in its case-in-chief, and at this

13   time we'll rest.

14            THE COURT:  Thank you.

15       So the government has concluded its presentation.

16       Richard, you're absolutely under no obligation to present

17   any evidence or testimony, but do you have any evidence or

18   testimony to present at this time?

19            MR. MONAHAN:  We do, Your Honor.  We would call Curt

20   Baggett.

21            THE COURT:  Okay.

22       Good morning, sir.  Come on up to the front, face Miss

23   Crum, and she is going to administer the oath or affirmation.

24   Just come on up, any way you can make it.  How are you?

25        (The witness was duly sworn by the courtroom deputy.)
```

1          THE WITNESS:  Yes, ma'am, I do.

2          THE COURT:  All right.  When you're ready, make

3   yourself comfortable, get close to the microphone.  Don't

4   worry about me back here, don't look at me.  Direct your

5   answers towards the ladies and gentlemen of the jury.  When

6   you're situated, please state your name full and spell your

7   last name so Maryann can take it down.

8          THE WITNESS:  Thank you, sir.

9      My name is Curtis Baggett, B-a-g-g-e-t-t.

10          THE COURT:  Thank you.

11      Richard.

12                     CURTIS BAGGETT

13   a witness herein, testified as follows:

14                   DIRECT EXAMINATION

15   BY MR. MONAHAN:

16   Q.  Good morning, Mr. Baggett.

17   A.  Good morning, sir.

18   Q.  Would you please tell the jury how you are employed.

19   A.  I'm a forensic document examiner, a handwriting expert.

20   Q.  Okay.  And where do you reside?

21   A.  I live in Dallas, Texas.  Richardson, actually.  It's 12

22   miles north of downtown Dallas.

23   Q.  And you're here in Cincinnati this morning, and you're

24   here just for the purpose of this case?

25   A.  That's correct, sir.

CURTIS BAGGETT - DIRECT

1   Q.   Okay.  I want to talk to you a little bit about your

2   background, if we could start there.

3   A.   Yes, sir.

4   Q.   Would you first start by just telling the jury, what is

5   your educational background?

6   A.   I have a degree in speech education, a master's degree in

7   counseling and guidance.  I spent two years studying document

8   examination with Dr. Ray Walker.  I finished that school in

9   1987, so I've been doing this a little over 30 years.

10  Q.   Okay.  And you mentioned Dr. Ed Walker?

11  A.   Dr. Ray Walker, my mentor, yes, sir.

12  Q.   Okay, Ray Walker.  Tell me about Dr. Ray Walker.  What was

13  his training?  What did that involve?

14  A.   Well, he studied handwriting about 30 years.  He was the

15  best handwriting analyst I'd ever seen.  Dr. Walker was a

16  professional document examiner commissioned to do handwriting

17  analysis, and he taught courses in document examination.  So I

18  took his course and finished his course and was certified by

19  his school.

20  Q.   Okay.  You said that -- did you say that was a two-year

21  course?

22  A.   Two-year course.

23  Q.   Okay.  And subsequently you said at that point you started

24  doing work as a handwriting examiner?

25  A.   I did.

CURTIS BAGGETT - DIRECT

1  Q.  And have you had other training relating to examining

2  handwriting?

3  A.  Yes, sir.  I took -- I have taken continuing education

4  courses, and I really -- I was dean of the Forensic Document

5  Examination School at Handwriting University for five years

6  and taught at that university.

7  Q.  Okay.  And when was that that you did that?

8  A.  2000 to 2004, I think was the years.

9  Q.  Okay.  And let's talk about actual experience in the

10  field.  You have had occasion to provide opinions related to

11  handwriting testimony?

12  A.  Yes, sir.  I've actually completed more than 5,000 cases

13  with opinions and written letters.  In the last five years,

14  I've been admitted to testify in court, in federal and state

15  courts, over a hundred times all over the United States.  I'm

16  the only expert in the USA who has examined documents and/or

17  testified in every state of the USA and at least a dozen

18  foreign countries.

19  Q.  Okay.  So it sounds like during the course of your years

20  of experience you have examined handwriting?

21  A.  I have, yes, sir.

22  Q.  And could you estimate how many times you have been

23  retained to examine handwriting, if it's something you can

24  give an estimate to?

25  A.  Yes, over 5,000 cases that I've, that I have been paid to

 1   render an opinion on, yes, sir.

 2   Q.   Okay.  When you examine handwriting, are there a set of

 3   principles and methods that are used to do that analysis?

 4   A.   Yes, sir.

 5   Q.   And are those principles and methods principles and

 6   methods that are accepted in the community of handwriting

 7   analysis?

 8   A.   Yes.  We use the ACE methodology:  Analyze, Compare and

 9   Evaluate.  That's what the F.B.I., Secret Service, Postal

10   Services use.  All across the nation, that's what the courts

11   accept as a methodology.

12        Actually, we do a side-by-side comparison.  There is

13   about, oh, it's at least 20 or 30 different things we look for

14   in the handwriting to make an adequate comparison.

15   Q.   When you do your analysis, do you follow those methods and

16   principles?

17   A.   Yes, sir, I do.

18   Q.   And do you apply them reliably in your cases?

19   A.   Yes, sir.

20   Q.   Okay.  You mentioned you have been retained a number of

21   times to do that.  Can you give an example of some places you

22   have been retained to do handwriting analysis or some

23   organizations that have retained you?

24   A.   Well, I've worked for many different state governments,

25   and I've been appointed by federal courts to testify and

CURTIS BAGGETT  -  DIRECT

1  render my opinion.  So yes, sir, all over the United States.

2  Q.  All right.  And you've indicated that you do continuing

3  education related to handwriting analysis?

4  A.  Yes, sir.

5  Q.  Explain for the jury what that entails.

6  A.  Well, it entails learning additional things if there's

7  more stuff available to learn and rehashing some of the other

8  things you've already learned.  We do that at conventions.  We

9  do that on the internet mostly now because we read what other

10 people have to say and hopefully learn something new.

11 Q.  With your continuing training, do you stay, you believe,

12 up to date on what the most modern methods of handwriting

13 analysis are?

14 A.  I hope so, yes, sir.

15 Q.  Okay.  All right.  Were you, in fact --

16     Oh, and I think we did hear testimony.  You have testified

17 and been authorized to give opinion in courts before?

18 A.  Yes, sir.  Yes, sir.

19 Q.  All right.  I think you said a hundred or more times?

20 A.  No.  A good question, Richard.  I said that in the last

21 five years I have been allowed to testify in federal and state

22 courts by a court in my field in the last five years over a

23 hundred times.  I don't even remember how many total.

24 Q.  Fair enough.  All right.  Were you, in fact, retained to

25 review handwriting in the Qian Williams case?

CURTIS BAGGETT - DIRECT

1  A.  Yes, sir, I was.

2  Q.  And just as a matter of mention, have you testified

3  previously before Judge Barrett?  Just have you testified

4  previously before Judge Barrett related to this case?

5  A.  Yes, sir, I have.

6  Q.  All right.  And did you, in fact, analyze handwriting in

7  this case?

8  A.  Yes, sir, I did.

9  Q.  Okay.  And in analyzing handwriting, were you provided

10 what are known as known signatures to look at?

11 A.  Yes.  What I am provided is purported known signatures.  I

12 never know exactly where they came from, but they are given of

13 the documents of a purported known person who has written

14 usually their signatures or handwriting.  Then I look at the

15 pattern of writing and compare it to the questioned document,

16 which is registered as a Q document and the K documents.

17 Q.  So K documents you're referring to as, those are the known

18 documents?

19 A.  Correct, sir.

20 Q.  And then Q documents is the questioned documents?

21 A.  That's right.  Yes, sir.

22 Q.  So when you're doing that analysis, are you comparing the

23 known document to the questioned document?

24 A.  Correct, sir.

25 Q.  And what is the point of that comparison?  What are we

1  doing?  What are you doing with that?

2  A.  Well, the job I'm asked to do is to decide and if, in my

3  opinion, the same person wrote the K documents and the Q

4  documents or not.

5  Q.  Fair enough.  Just to get this out, have you been privy to

6  any other part of the investigation on this case?

7  A.  No, sir.

8  Q.  Okay.  So your role has been limited to looking at

9  signatures and doing your analysis, correct?

10 A.  That's all I'm concerned about, and that's all I care

11 about, yes.

12 Q.  Okay.  So you have analyzed signatures in this case.  Have

13 the methods and principles that you have used to analyze the

14 signatures in this case been part of the accepted methods and

15 practices for handwriting analysis in your field?

16 A.  Yes.

17 Q.  Okay.  We mentioned earlier whether there are accepted

18 methods and principles.  Did you follow those accepted methods

19 and principles in doing the analysis in this case?

20 A.  Yes, sir, I did.

21 Q.  And do you believe, based on the documents you were

22 provided, you were given sufficient facts or data in order to

23 make your analysis?

24 A.  Yes, sir.

25 Q.  Okay.  Let's turn at this time then to the exhibits that

CURTIS BAGGETT - DIRECT

1    you reviewed in this case.

2          MR. MONAHAN:  The first one I want to show, Judge, is

3    Government's Exhibit 91, which has already been admitted, if I

4    may publish?

5          THE COURT:  Yeah, if it's already in, of course.

6    Q.  I think if you look at the defendant's exhibit book --

7        I'd prefer to do this.  There is a book on your right, if

8    you look at --

9          MR. MONAHAN:  Where are we?

10         MS. GARRETSON:  N.

11   Q.  -- N, starting at Number 1.  That's going to be the

12   exhibits we're going to refer to.  It's way back.  It's

13   probably at the very back of that book.

14   A.  Okay, I got it.

15   Q.  N1 is going to be the first one.  I don't know if there is

16   a copy of this in the book.  This came actually from the

17   government's book, so you can turn and look at the screen

18   behind you there.  See the screen right there?  That's the

19   exhibit that has been admitted.

20       First, let me just ask, have you seen this document?

21   A.  Yes, sir.

22   Q.  Okay.  I know it's kind of small on that screen.  You were

23   given a copy of this, correct?

24   A.  Yes, I was.

25   Q.  Okay.  And the signature here that's purported to be Qian

CURTIS BAGGETT -  DIRECT

1   Williams', is that the signature that you were analyzing as

2   part of this case?

3   A.  Yes.

4   Q.  And also these initials here on the left-hand side, were

5   those initials you were analyzing as part of this case?

6   A.  Yes, sir.

7   Q.  Okay.  Now, if you would turn please to N1?  Let me first

8   ask, is this a document that you were provided a copy of as

9   part of your analysis in this case?

10  A.  Yes.

11  Q.  And was this identified as a known signature of Qian

12  Williams?

13  A.  Yes.  I've labeled that as a K4, which is Known 4, yes.

14  Q.  Okay.  And just in looking at the face of the document,

15  this has got a signature that purports to be Qian Williams'.

16  If you look down at the bottom, it is signed before a notary

17  public on December 9th of 2017; is that correct?

18  A.  Yes.

19  Q.  Okay.  Was this document important in your analysis of the

20  handwriting in this case?

21  A.  It was.

22          MR. MONAHAN:  Your Honor, I'd move to admit

23  Defendant's Exhibit N1.

24          MS. TAIWO:  No objection.

25          MR. MONAHAN:  May I publish?

CURTIS BAGGETT - DIRECT

```
 1              THE COURT:  You may.

 2         (Defendant's Exhibit Number N1 was admitted.)

 3              MR. MONAHAN:  I'm going to pop these up on the screen

 4    for the jury's benefit.  I just want to let them see.

 5    Q.  So this is the document N1 that we're referring to,

 6    correct?

 7    A.  This is my examination, was of the one, Qian Williams'

 8    signature.

 9    Q.  Okay.  So this is what you were using as a known signature

10    for Qian Williams?

11    A.  That's correct.

12    Q.  Because it's signed in front of a notary, correct?

13    A.  Yes, sir.

14    Q.  Okay.  So that's N1.  Let's set that aside and flip over

15    and look at N2.  This is a document you've also seen before;

16    is that correct?

17    A.  Yes, sir.

18    Q.  And this also was presented to you with a known signature

19    of Qian Williams, correct?

20    A.  Yes, sir.

21    Q.  Looking at the document again, we have a signature that

22    purports to be Qian Williams, correct?

23    A.  Correct.

24    Q.  And we have -- if you kind of look at the document itself,

25    it is a document that appears to have been signed in a court
```

CURTIS BAGGETT - DIRECT

1    proceeding on January 21st of 2004. Does that appear to be

2    correct?

3    A.  Yes, it does.

4    Q.  That's the date it was saved on that court docket.

5          MR. MONAHAN:  So Your Honor --

6    Q.  Oh, and was this a document that you utilized in your

7    analysis of the signatures that you will be testifying to

8    today?

9    A.  Yes.

10          MR. MONAHAN:  Your Honor, I would move to admit

11   what's been marked as Defendant's Exhibit N2.

12          MS. TAIWO:  No objection, Your Honor.

13          THE COURT:  It's admitted and can be published.

14       (Defendant's Exhibit Number N2 was admitted.)

15   Q.  Again for the jury's benefit, we have on this document a

16   signature of Qian Williams, correct?

17   A.  Yes, sir.

18   Q.  And then reviewing the rest of it, it's obvious this was

19   for a court proceeding back in 2004, correct?

20   A.  Yes, sir.

21   Q.  Okay.  This document also contains initials on the

22   document?

23   A.  It does.

24   Q.  All right.  So let's put that one aside.  We're going to

25   go to one final comparison.  This is labeled as Defendant's

CURTIS BAGGETT - DIRECT

1  Exhibit N3?

2  A.  Yes, sir.

3  Q.  And, again, have you seen N3 before?

4  A.  I have.

5  Q.  And was this presented to you as a known signature of Qian

6  Williams?

7  A.  It was.

8  Q.  Okay.  And, again, looking at the face of this document,

9  this appears to be a document that Mr. Williams signed here in

10  court on August 30th, 2019, correct?

11  A.  Yes, sir.  Right.

12      MR. MONAHAN:  This is a document the Court would

13  recognize.  I'm going to move to admit Defendant's Exhibit N3.

14      MS. TAIWO:  No objection, Your Honor.

15      THE COURT:  It's admitted.

16  (Defendant's Exhibit Number N3 was admitted.)

17  Q.  So, again, we have here a signature of Qian Williams,

18  correct?

19  A.  Yes, sir.

20  Q.  And we have a date?

21  A.  Yes.

22  Q.  It's August 30th, 2019.  We have an individual that signed

23  this particular document?

24  A.  Yes, sir.

25  Q.  This document was a document that you also considered in

CURTIS BAGGETT - DIRECT

1  your analysis about handwriting that we're going to discuss

2  today, correct?

3  A.  That's correct, sir.

4  Q.  All right.  So those three documents N1, N2 and N3,

5  defendant's exhibits, did you take those signatures and place

6  them into an exhibit of your own for comparison purposes?

7  A.  I did.  And the exhibit, I enlarged those 200 percent so I

8  don't have to take each one of them and put them under a

9  microscope in order to do the examination.  It's clear enough

10  to do my examination and make a presentation at 200 percent,

11  yes, sir.

12  Q.  Take a look at N4.

13  A.  Yes, sir.

14  Q.  We have on this document several signatures.  You've

15  identified them as K4, K5 and K6 with dates.  So are K4, K5

16  and K6 the three known signatures of Qian Williams that we

17  just looked at?

18  A.  That's correct.

19  Q.  You said you enlarged them; is that correct?

20  A.  Yes.

21  Q.  And the purpose for enlarging them is --

22  A.  To see it better, yes, sir.

23  Q.  Okay.  To get a better look at the signatures?

24  A.  Yes.

25  Q.  Also on this document you have a Q2.  Is that the

CURTIS BAGGETT - DIRECT

1  signature that was taken from Government's Exhibit 91 which

2  was supposedly Mr. Williams' signature on this statement?

3  A.  Yes.

4  Q.  Okay.  And you were also the one that put that together on

5  this exhibit?

6  A.  I did.

7  Q.  And is that as well enlarged for better viewing?

8  A.  Correct.

9  Q.  Okay.  This document, this Defendant's Exhibit N4, was

10 this prepared during the normal course of your business as a

11 handwriting examiner?

12 A.  Yes.

13 Q.  And is it important to your analysis of the signatures in

14 this case?

15 A.  Very much so, yes, sir.

16        MR. MONAHAN:  Your Honor, I would move to admit

17 Defendant's Exhibit N4.

18        MS. TAIWO:  No objection, Your Honor.

19        THE COURT:  It's admitted.

20     (Defendant's Exhibit Number N4 was admitted.)

21        MR. MONAHAN:  I'm going to show that to the jury.

22 Q.  Okay.  So this is basically a side-by-side or an

23 up-and-down comparison of the three known signatures and the

24 one questioned signature, correct?

25 A.  Yes, sir.

CURTIS BAGGETT - DIRECT

1    Q.  Before we get too deep in that analysis, we have another

2    page or two.  Let's get all our documents before the jury, and

3    then you can refer to them as needed.  Is that a fair way of

4    doing that?

5    A.  Yes, sir.

6    Q.  Let's take a look at Defendant's Exhibit N5.  Taking a

7    look at this, this appears to be what you identified as Q2; is

8    that correct?

9    A.  It is.

10   Q.  Is this the questioned signature of Qian Williams?

11   A.  That's correct.

12   Q.  And is this the questioned signature that was taken off of

13   Government's Exhibit Number 91?

14   A.  That's correct, sir.

15   Q.  All right.  And what have you done with this signature?

16   A.  I've enlarged it another 200 percent.

17   Q.  Okay.  So was this Defendant's Exhibit N5 used as a part

18   of your analysis of the signatures in this case?

19   A.  That's correct, yes, sir.

20   Q.  And was it important to that analysis?

21   A.  Yes.

22   Q.  And is it important for the jury to see and understand in

23   your analysis?

24   A.  Yes, sir.

25           MR. MONAHAN:  Your Honor, I'd move to admit

CURTIS BAGGETT - DIRECT

1   Defendant's Exhibit N5.

2           MS. TAIWO:  No objection, Your Honor.

3           THE COURT:  It's admitted.

4       (Defendant's Exhibit Number N5 was admitted.)

5   Q.  I'm going to show this to the jury, and you can refer to

6   it as needed.

7       So that is what you've blown up a bit larger in terms of

8   Q2, which was the defendant's signature on this page, correct?

9   A.  Yes, sir.

10  Q.  All right.  And I think we have one more.  This is N6.

11  Okay.  I mentioned earlier that there were some initials on

12  the questioned document, "QW."  Does N6 address the issues of

13  these initials?

14  A.  That makes a presentation, yes.

15  Q.  Okay.  So let's talk about what you've done here.  I see

16  up in the upper left-hand corner you have "K5 initial."  Have

17  you taken a known set of initials there and placed that in the

18  upper left-hand corner?

19          THE COURT:  Richard, let me just ask Ebun if she has

20  an objection, because it may simplify the presentation.

21          MR. MONAHAN:  Sure.

22          THE COURT:  Ebun, do you have an objection?

23          MS. TAIWO:  I do not, Your Honor.

24          THE COURT:  So it's admitted.

25          MR. MONAHAN:  I appreciate that.  It will speed

CURTIS BAGGETT - DIRECT

1    things up.

2            THE COURT:  Thank you.

3        (Defendant's Exhibit Number N6 was admitted.)

4    Q.  So tell the jury what we're looking at.

5    A.  Well, it's an enlarged copy of the signature on the K5,

6    which we've made the presentation, and the initials.  So we

7    have the initial and a signature that we took off of the known

8    page of K5 handwriting signatures.

9        On the right side are the Q2 initials that we already

10   looked at the signature, which is presented as Q2 on top of

11   N4.

12   Q.  Okay.  So the left side is what you knew were

13   Mr. Williams' signature; the right side are what's in

14   question.  Can I say that simply as far as initials, correct?

15   A.  Correct.

16   Q.  Okay.  I see some handwriting, this blue handwriting.  Was

17   that yours or was that from the previous --

18   A.  No, that is -- well, it's right, "K5 initial" and "K5."

19   Q.  So are those the documents that we have today that will be

20   helpful to you in sharing with the jury what your analysis of

21   these signatures is?

22   A.  Yes, sir.

23   Q.  Okay.  Let's start with the punch line, and then we'll

24   talk through your analysis.

25   A.  Okay.

CURTIS BAGGETT - DIRECT

1  Q.  Do you believe that the signature on Government's Exhibit

2  91 of Qian Williams, do you believe that was signed by the

3  same person as the person who signed the three known signature

4  documents which are N1, N2, and N3?

5  A.  I do not believe that.  The same person did not sign the

6  Q2 document.

7  Q.  Are you able today to explain to the jury why you believe

8  that to be the case?

9  A.  Yes, sir.

10  Q.  Okay.  Take what documents you think would be most helpful

11  to start, and would you explain to us your process, how you

12  analyzed the signature, and what you think the differences

13  are.

14          THE WITNESS:  Would you put N4 on the screen, please?

15  A.  Well, let me explain, Richard, if I may.  Handwriting is

16  not handwriting, it's brain writing.  Brain writing, much like

17  DNA, fingerprints, voice recognition, it's individualized

18  according to one's particular brain.  So what we're looking

19  for in the known documents is to establish a pattern of

20  handwriting of the little habits that we don't notice if we

21  just look at it overall.  Then when we find those patterns,

22  then we compare it to the questioned signator or handwriting

23  in order to determine.  Our rules are very simple in the

24  forgery business.  One significant unexplainable difference

25  indicates a forgery.  So if you find more, then it supports

CURTIS BAGGETT - DIRECT

```
 1    the side that thinks it's a forgery.
 2         So let me point out some of the differences.
 3         Number one, we notice that in K4 --
 4         Richard, would you kindly point that so that I see it?
 5              THE COURT:  You can draw on the screen.
 6              THE WITNESS:  Oh, I can?  Thank you, sir.
 7              THE COURT:  I believe you can.
 8              THE WITNESS:  Yes, it's got a little --
 9    A.   In the K4, we'll notice that the Q's are oval-shaped.
10    They begin with a little hook right here.  So we want to
11    compare those three because that is a pattern.  He has a
12    little hook and an oval shape.
13         So when we look at Q2, it doesn't have a little hook.  It
14    starts on the left side, leaves a vacant spot, and then it has
15    kind of a straight line and then begins to curve.  So there is
16    a significant difference in the very beginning stroke of his
17    signator.
18    Q.   So your first point of focus is related to the way that
19    the Q is made?
20    A.   In the beginning stroke, correct, in the first part of
21    that Q.  There are more parts, but I'll get to that in a
22    minute, Richard.
23    Q.   Sure.  If you want for her to clear that screen in between
24    thing you're pointing to, we can have that done.  Just let us
25    know.
```

1   A.   Thanks.

2        The most significant part about his handwriting, if you

3   look at Q-I-A-N, K5 has a Q-I-A-N, and it's not

4   distinguishable, but you can count the tops of the points of

5   the letters and it's the same.

6        And so is K6.  It's a little worse signature because we

7   don't have the original.  But there is a Q.  It's got a little

8   hook at the top.  It got a point for the I.  It's got a place

9   for the A.  Then it has two little points, looks like, for the

10  N.

11       Now, that's the pattern.  He knows how to spell his name.

12  Obviously, as I said, the most significant difference is the

13  fact that the forger can't spell his name.  It's Q, I --

14  Q.   You're referring to the questioned document at this point?

15  A.   Yes.  I'm sorry.  Thank you.

16       It's Q.  It's I.  The A is distinguishable even though it

17  doesn't resemble too much K4.  A.  The N consists of two

18  strokes on top.  But notice in K4 there is a point on top and

19  a point at the bottom.  Even though we can't see the point on

20  top, the bottom has a curved part, so there is another

21  significant difference because you don't change the way you

22  write all of a sudden for any particular reason.

23       But the most significant thing I said was it's misspelled.

24  It's Q-I-A-N.  That's one, two, three, four points.  It's got

25  an extra letter at the end of it, a huge mistake.

CURTIS BAGGETT - DIRECT

1  Q.  All right.  Did you notice other differences in the

2  signatures?

3  A.  Yeah.  Let me go to the second most significant

4  difference, which equal to the first one, which is Williams is

5  misspelled.  Obviously --

6  Q.  Would it help to clear those others out of the way?

7  A.  No, no.  That's a point I want to --

8      On K4, let's look at it first.  W-I-L-L.  The I is

9  distinguishable.  A is distinguishable.  M is distinguishable.

10  And even though the end stroke is obviously an S, it's not

11  particularly distinguishable but it exists.

12      In K5, it's a printed signature, but it's W-I-L-L-I-A-M

13  and a printed S.

14      K6, W-I-L-L-I-A-M and some kind of symbol that looks

15  similar to an S.

16      In the questioned document, it's W-I-L-L-I -- well, if

17  it's an A, then the M only has two letters on top, or points,

18  and it has no S.

19      Now, you added a letter in the first name and left off one

20  in the second name.  Now that's very, very significant because

21  his pattern is obvious in the three that I've shown you, that

22  is K4, K5, and K6.

23      Now, let's explore some of the other differences because

24  one significant difference might be sufficient, but if you

25  have several -- and I pointed out that the first part of the Q

CURTIS BAGGETT - DIRECT

1    is different.

2        One of the first indications of forgery is stops and

3    starts.  If you go to the bottom part -- and I will show it a

4    minute, Richard, when I ask you to put it in 400 percent.  The

5    bottom part stops and then restarts.  We can't tell where that

6    one letter and the right side of the Q, but it stops on the

7    bottom here right here.

8        Now, remember, Q4 has a curve.  The bottom part comes

9    around in one stroke and comes up to the top, and there's no

10   stops and starts that I can tell in it.

11       The second part of the name is Williams -- I mean, the

12   second name is Williams.  There is a stop and start after the

13   I, which in the enlarged copy looks more like an E because it

14   has a little line at the top of the I and his are not re --

15   they are retraced.

16   Q.  Are you referring to the I and the first L?

17   A.  No.  I'm referring to the I in Williams, W-I.  I'm just

18   pointing out the fact that it has a little loop in it and his

19   does not.  These are retraced.

20       I want to point out that the W-L-L is almost level on top.

21   If you'll notice in K4, the second L drops below the left one.

22   So it slants down.

23   Q.  Is that also the same in K6?

24   A.  What is your question, Richard?

25   Q.  Is that also the same in K6?

CURTIS BAGGETT - DIRECT

1    A.   Yes, K5 and 6.  All three of his, the right side of the L,

2    the second L in Williams drops down, which is his pattern, his

3    habit, and they didn't capture that in the top.  So I'm just

4    pointing out additional differences in the signature.  It's

5    really hard to forge someone's signature even though you can

6    make it look alike, but when you get involved in the little

7    characteristics and idiosyncrasies of your particular writing,

8    it's hard to reproduce those.

9         So yes, all three of his drop down on the right.  K6 is

10   most prevalent.  It drops way down.

11        Now, let me see the others.  I think the little left side

12   of the W in Q2 is -- it has a little different curve to it.

13   The curve in K6 curves from the top, and this is just the

14   opposite.  It really looked to me like it's not retraced

15   because it got a little curve in the top of the downstroke,

16   and his doesn't do that.

17        Let me see some others.  I think that's sufficient,

18   Richard.  There are significant differences.

19   Q.   So you pointed out a couple of significant differences and

20   some other more subtle differences that you caught; is that a

21   fair assessment of that?

22   A.   Yes, sir.  I think they're all significant because they

23   are distinctively different.

24   Q.   Okay.

25   A.   But yes, the two most -- if you could write them and

 1  value, I guess, the two top ones are obviously -- you couldn't

 2  think that he'd write his signature and add one letter to one

 3  name and miss one on the second name.

 4  Q.  All right.  So having completed that analysis, I come back

 5  to this point.  Do you believe that the person who signed Q2

 6  was the same person who signed K4, K5 and K6?

 7  A.  I do not, no, sir.

 8  Q.  Okay.  Let's take a look now at initials.  You've also

 9  done an analysis of some initials.  I think you said that was

10  N6; is that correct?

11  A.  Yeah, N6.

12  Q.  Do we need to look at N5 in any more detail for the jury?

13  A.  Yes.  Let me point out a couple of things that are obvious

14  when you're enlarging again 200 percent.  It will verify

15  because sometimes it's not real obvious to the naked eye.

16  Q.  So I've laid up here Q2, which you were just talking about

17  a moment ago.  This is a bigger picture of that Q2?

18  A.  That's correct.  Good, Richard.  If you look at the first

19  stroke in the Q, it's obviously coming down this way.  Then

20  the second part of that, it's obviously a start and a restart.

21  Then there is a break additional.  Remember I said one of the

22  first things we look for is a stop and a start, because if you

23  are tracing or writing someone else's, it's hard to make their

24  curves.  So obviously that comes down, then it comes here, and

25  then it stops again right here.  So it's a break.

1        I just started --

2                THE WITNESS:  Can you clear that, young lady?

3   A.  So the little line that connects from here to there comes

4   straight, and then you can see below there where this line

5   starts below that line.  So there is obviously a stop and a

6   start about three times there in that first line.  Then if you

7   look at the bottom part where it comes back in a V, comes back

8   up, stops, at the line is a gap.  It doesn't close.  So there

9   is another stop and a start, which you don't do because when

10  you're writing your name it has fluidity, and you don't just

11  stop and start in the middle.

12  Q.  These are the subtle differences to the untrained eye --

13  A.  Say it again, Richard.  I didn't --

14  Q.  These are subtle differences to the untrained eye.  Make

15  sure the jury understands what you mean by stop and start.

16  What does stop and start --

17  A.  It's a break in the line.  It's called line quality.  So

18  part of your -- your letter comes straight across.  When you

19  stop in the middle, you just don't do that.  I mean, somebody

20  is tracing it, writing it, and they have to stop it and then

21  they start again.

22       In the first picture, if you just show their signature,

23  you don't see it because it's so minute.  But when you enlarge

24  it again and put it under the microscope, it's obvious that

25  somebody started here, stopped here, and restarted here.

CURTIS BAGGETT - DIRECT

1   There is a gap between it.

2   Q.  So do you see this stop-and-start process in the known

3   signatures that were below that?

4   A.  No.  Just look down below in K4.  I pointed out a while

5   ago the circular, and the bottom is connected and goes all the

6   way to the top, so it is -- his circular part of his Q is

7   continuous.  It has fluidity from the beginning to the end.

8   Q.  Does this go to the way people make their letters when

9   they write?  Is that what this has to do with?

10  A.  Yes, sir.

11  Q.  I know that sounds --

12  A.  Yes.  No, it's -- cursive writing -- if you're printing,

13  you stop and start and start another letter.  But in cursive,

14  most of us, most of us with that cursive writing do one word

15  with one stroke.  You know, we just keep going.  That's what

16  cursive is, connecting strokes.  So yes, a stop and start then

17  is real obvious.

18      The same thing happened -- let me point out two more

19  things.  There is a stop and start here between the I and the

20  L.  A stop and start -- well, it's not distinguishable.  Right

21  here, I couldn't tell it continued.  This is obviously a stop

22  and start because, see, you can see the beginning of the I,

23  W-I-L-L-I.  And, of course, it's not even straight like this.

24  So there is several significant differences in nearly all of

25  the handwriting of the forged signator.

CURTIS BAGGETT - DIRECT

1   Q.  All right.  And then let's finally go to -- I just

2   mentioned the initials, which is N6.  Let's talk about the

3   initials here on this document.

4       I'm not sure it's all going to fit and be visible.  Let's

5   start at the top and work our way down.

6       Do I need to make that bigger?

7   A.  No, no.  That's sufficient.  I was just seeing where to

8   start.

9       If you'll notice again -- and remember that his habit is

10  to start on the Q with a little hook.  If you'll notice in the

11  initial, he starts with a little hook.  So he's consistent.

12  His habits and pattern are consistent.  He starts with a

13  little hook.

14      Now, if we look at the initials that we are questioning

15  that I think -- and I think I can prove to you that he didn't

16  sign those.  There's no little hooks -- there might be one,

17  but he doesn't start with the same way.

18      Now, if you just looked at it, Mr. Williams has a little

19  slant to the right.  The oval shape leans to the right.  These

20  almost lean to the left.  Look at the third one down.  It has

21  a completely different slant, which is one of the things that

22  we look at in handwriting.  We either slant left, right, or

23  kind of in the middle and variations therein.

24      So, obviously, this person -- I don't -- his writing is

25  more slanted to the left because he couldn't hold it to those

CURTIS BAGGETT - DIRECT

1   others.

2       Now, the W is important because he starts his W almost to

3   the top.  Probably 80 percent from the bottom to the top is

4   where he starts his W in relationship to the Q.  He does it on

5   his initials.  He does it on his signature.

6       The Q2 starts about 60 percent on the first one, about 40

7   percent on the second one, about 65 percent on the third,

8   55 on the next one.  So the pattern is not consistent there.

9       And of course the W slants to the left, and then these

10  three W's -- let's see.  One, two, three -- well, the fifth

11  one and sixth one, they have loops in the middle of the W, and

12  he does not in any of his.

13      Q2 initials, the top one is two different lines, has a

14  stop and start.  You just don't see a person doing his cursive

15  name with a half W and then another half W and across in the

16  middle.  It just doesn't happen.

17      And then the end stroke on the Q2 initial on top is barely

18  higher than the left side.  His habit is way up higher, if you

19  notice here.

20      And so there was very significant differences.

21      The beginning stroke in one, two, three four go down.

22  It's like the forged document in the Q signature, it starts on

23  the left, doesn't touch, doesn't have a hook in it.  This one

24  has a double touch in it.

25      So there are numerous differences, and so it's my opinion

CURTIS BAGGETT - CROSS

1  that the initials too were forged like the signature on Q2.
2  Q.  Okay.  So you do not believe that the -- kind of take it
3  back to the exhibit itself.  Government's Exhibit 91, you've
4  identified that you do not believe this signature (indicating)
5  that purports to Qian Williams is made by the same person who
6  made the signature on the known documents, correct?
7  A.  It was not written by Mr. Williams, that is correct.
8  Q.  And then in terms of the initials here on the left-hand
9  side, you do not believe those initials were made by the same
10  person who made --
11  A.  They do not match one to the other, and they certainly do
12  not match Mr. Williams.
13          MR. MONAHAN:  Thank you.  I have no further
14  questions, Judge.
15          THE COURT:  Cross-examination, Ebun?
16          MS. TAIWO:  Yes, Your Honor.  Thank you.
17                  CROSS-EXAMINATION
18  BY MS. TAIWO:
19  Q.  Good morning, Mr. Baggett.
20  A.  Good morning.
21  Q.  My name is Ebu Taiwo, and I, along with Karl Kadon, who I
22  believe you've already met, represent the government in this
23  case.
24  A.  Yes.  I hope you're as nice as he is.
25  Q.  I'll try.

1      So first I want to do -- I want to ask you a few questions

2  about the discipline of handwriting analysis.  Now, it's fair

3  to say it's a highly subjective field?

4  A.  Well, I think, just like this Court, that somebody has to

5  make an opinion based on the evidence that's presented.  So

6  that is subjective.  That's what that means.

7  Q.  It's been described as much art as it is science?

8           MR. MONAHAN:  I'm going to object, Your Honor,

9  without some reference to what that is.

10          THE COURT:  Well, if the witness understands the

11  question, he can try to answer it.

12  A.  I don't know that I've heard it put that way, but I agree

13  with that, yes.

14  Q.  And unlike DNA or fingerprints, there is not a specific

15  number of points or characteristics that must line up or

16  correspond to support a finding that the same person wrote an

17  example?

18  A.  I don't agree with that at all.

19  Q.  Okay.  Let's talk about what you yourself describe the

20  discipline as being.

21      Do you recall saying, "There is no scientific methodology.

22  It is a misnomer.  There is not a scientific method in the

23  sense of being a formal procedure.  It furnishes no map for

24  exploring the unknown.  It is an attitude and philosophy in

25  the collection and study of data.  Consequently, it makes no

1    contribution to the fundamental determination of what is or

2    was not the science.  That's it.  It's a silly word anyhow.

3    Methodology."

4    A.  And your question?

5    Q.  Do you remember describing the discipline of --

6    A.  I do.  You went back about 20 years.  I have since --

7    Q.  I'm thorough.

8    A.  I've kind of changed my mind.  There are over 620, I

9    think, the last time I looked, different kinds of sciences

10   taught in our public schools and colleges in the United

11   States.  Science itself --

12       I objected because some document examiners call themselves

13   scientists, and I objected to that because I don't profess to

14   be a scientist.  What science really means is an investigation

15   and research.

16       So I have modified my stance slightly, but I do agree with

17   what I said before, and it is an investigation.  That's what

18   science is.  We are not scientists.

19   Q.  So you're relying on your experience and training in

20   making your assessments?

21   A.  My experience and training and education and specialized

22   training, yes, all of that.

23   Q.  So let's talk about that education and training.

24       Do you have an advanced degree in forensic examination?

25   A.  I do not.

CURTIS BAGGETT - CROSS

1  Q.  And what did you describe your bachelor's degree as being

2  in?

3  A.  Speech education.

4  Q.  And what training did you receive in handwriting analysis

5  specifically?

6  A.  I spent two years in school with Dr. Walker.  Before that,

7  I spent about ten years with him studying personality analysis

8  and handwriting strokes and what they mean and how they are

9  formed and shaped.

10 Q.  Could you describe your two-year program?  How many hours

11 in class per week were you involved?

12 A.  We went two nights a week, our regular semesters for two

13 years.  I can't remember if we were off on the summer or not.

14 I can't remember.

15 Q.  And you received your instruction from Dr. Walker?

16 A.  I did.

17 Q.  And are you aware that Dr. Walker was determined not to be

18 qualified as a handwriting analyst by a number of courts,

19 including the Fifth Circuit?

20 A.  That's not true.  One case is all I've ever found.  I

21 don't think you found any more.  You said several.

22 Q.  There is a District Court case as well, several.

23 A.  That's the one that are appealing, into the Fifth Circuit

24 where it was ruled on.

25 Q.  And it was affirmed?

1    A.   Yes.  One judge said he wasn't qualified.

2    Q.   The Circuit is a panel of judges.

3         Are you certified by any organizations?

4    A.   Yes.

5    Q.   Which organizations?

6    A.   American Bureau of Document Examiners.

7    Q.   Are you aware that this organization is no longer

8    registered in the state of California?

9    A.   That wasn't the one that I was certified by.

10   Q.   That's the one you've indicated, American Bureau of

11   Document Examiners?

12   A.   No.  That was the name of the one that Dr. Walker had in

13   1987.  He actually died in 1992 before the advent of the

14   internet, which records everything.  So it existed, and I have

15   a certificate that shows that.

16   Q.   So it existed but it no longer exists?

17   A.   That's true.

18   Q.   In your résumé you detailed that you're affiliated with

19   The American College of Forensic Examiners International; is

20   that correct?

21   A.   No longer.  I am not a member.

22   Q.   You're no longer a member, and you recognize that that

23   organization is separate and apart from The American Board of

24   Forensic Document Examiners which many courts have found is

25   the hallmark organization for forensic handwriting?

CURTIS BAGGETT - CROSS

1    A.   I don't think that's true.   I think one Court said that,

2    erroneously.

3    Q.   Is it true that the American Board of Forensic Document

4    Examiners requires comprehensive written, practical, and oral

5    examinations that test the wide range of problems encountered

6    in document examination and requires recertification every

7    five years?

8    A.   I have -- I have no idea.   That little group has 113

9    members the last time I looked on the internet, and there are

10   over 5,000 or 6,000 document examiners in the United States,

11   so they are a very insignificant group of people.

12       There are no federal or state regulatory authorities that

13   govern our little group of forensic document examiners,

14   handwriting.

15   Q.   Would that be the same of the organizations that you are

16   affiliated with?

17   A.   I'm sorry, I don't understand your question.

18   Q.   Would that be the same, just as you've described, that

19   there is no national body, that there is no similar body with

20   the organizations that you are affiliated with?

21   A.   That is correct.   One of the groups has over 10,000

22   members that I was a member of.   We don't have groups like you

23   guys, lawyers and/or the medical profession, that you have to

24   be specialized in each area and licensed in each state.

25   Q.   Other than your affiliation with Handwriting University,

1  you've had zero academic appointments; is that correct?

2  A.  I don't know what that means.

3  Q.  Are you a member of a faculty of any other university or

4  college?

5  A.  No.  There are no colleges or universities in the United

6  States that offer degrees in handwriting or document

7  examinations.  They do have them in Europe, but not here.  So

8  to make a reference that I don't have a college degree in

9  document examination is very simple:  It does not exist.

10  Q.  What about forensic analysis?

11  A.  Of what, handwriting?

12  Q.  Anything.

13  A.  Well, we're not doing chemicals.

14  Q.  So let's talk a little bit about Handwriting University.

15  According to its website, it trains people to "start a

16  successful career as a handwriting expert, trainer, teacher,

17  or life design coach."

18      What is a life design coach?

19  A.  You're going to have to ask my son.  I'm not involved in

20  his university anymore, and I was only involved in the

21  forensic document examination part of his Handwriting

22  University.

23  Q.  So Handwriting University was and is an organization

24  that's run by your son?

25  A.  It's the largest handwriting school in the world.  He's

1  done very well.  Thank you, Miss Tidwell.

2  Q.  Taiwo.

3  A.  Taiwo.  Taiwo?  Okay.

4  Q.  Is Handwriting University a physical building, a physical

5  university, or is it an online university?

6  A.  It's a combination.

7  Q.  Where is it located?

8  A.  California.

9  Q.  And you live in Texas; isn't that correct?

10  A.  Yes, that's correct.

11  Q.  And you served as the dean of that university --

12  A.  Yes.

13  Q.  -- at one point in time?

14      Now, the Handwriting University is not accredited with the

15  Department of Education; is that correct?

16  A.  Yes, that's correct --

17  Q.  Is it accredited by any organization?

18  A.  -- as are 4,000 other little colleges and universities.

19  Like McDonald hamburgers, it graduates -- which is a separate

20  little college, it graduates 4,000 people a year, I think.

21  Q.  Is it accredited by any organization?

22  A.  No.

23  Q.  Looking at the university website, it advertises that

24  handwriting analysis can help you "look at anyone's

25  handwriting and spot their deep dark secrets, fears, esteem,

1   honesty, ethics, sex drives, and dozens of other personality

2   traits."

3       Do you agree with that assessment?

4   A.  Do I agree that's what's on his website or do I agree with

5   the fact that handwriting analysis demonstrates those things?

6   Q.  The latter.

7   A.  Yes.

8   Q.  What, if any, clinical research has been done to verify

9   those claims?

10  A.  Clinical referring to the mental or the physical part?

11  I'm not sure what you mean.

12  Q.  Any research that has been a double-blind, clinically-run

13  study that has been reviewed by peers, reviewed by people that

14  have said yes, you've done the science correctly?

15  A.  Yes.  There are scientific experiments that have been

16  conducted and affirmed that a document examiner's analysis are

17  more accurate than a lay person's.

18  Q.  And that it can reveal deep dark secrets, fears, esteem,

19  honesty, ethics, sex drive, and other personality traits?

20  A.  It's kind of what we're talking about, two different

21  entire fields and subjects.  You are referring to the

22  Handwriting University part that does handwriting analysis,

23  which is personality discernment, which you can get a degree

24  in Europe in that field and/or the document examinations.

25      What we're doing today is forensic document examination,

1 handwriting analysis on identification of signatures or

2 handwriting or documents, which has nothing to do with

3 personality analysis.

4 Q.  You've looked at a number of different samples that you

5 believe to be authored by the defendant?

6 A.  Yes.

7 Q.  And you can't actually testify that Qian Williams himself

8 signed those particular documents?

9 A.  I did not see him, that's correct.

10 Q.  And would it be fair to say that there is natural

11 variations among an individual's signature?

12 A.  Yes.

13 Q.  Because an individual cannot reproduce his or her own

14 signature identically?

15 A.  That is a belief.  I have no evidence that it's totally

16 accurate, but I believe that, yes.

17 Q.  So when looking at signatures, you're looking for both

18 similarities as well as dissimilarities?

19 A.  Correct.

20 Q.  So did you notice any dissimilarities among the documents

21 Qian Williams purported were his?

22 A.  Sure.

23 Q.  What dissimilarities did you see?

24 A.  Well, the first one was K4 and K6 are written in cursive,

25 K5 is written in print.  He has three different size Qs, to

```
 1   start with, and actually has three different size Ws.  So

 2   there are many differences, certainly in his known

 3   handwriting, but they are not significant differences.

 4   Q.  You've actually reviewed, beyond the ones that we've

 5   looked at today, a number of other signatures; is that

 6   correct?

 7   A.  Yes.

 8          MS. TAIWO:  I'm going to place on the projector

 9   Government's Exhibit X1.

10          COURTROOM DEPUTY:  Has that been admitted?

11          MS. TAIWO:  It has not been admitted.

12      Permission to approach?

13          THE COURT:  Sure.

14   Q.  Do you recognize that document?

15   A.  Yes, I do.

16   Q.  And what is it?

17   A.  It is a document that I produced in my office and enlarged

18   his four known documents to four questioned documents 200

19   percent.

20   Q.  And is it a fair and accurate copy of that document?

21   A.  It appears to be, yes.

22          MS. TAIWO:  Permission to approach?

23          THE COURT:  Of course.

24          MS. TAIWO:  Permission to admit Government's Exhibit

25   X1 into evidence?
```

1          MR. MONAHAN:  No objection.

2          THE COURT:  It's admitted.

3          MS. TAIWO:  Permission to publish?

4          THE COURT:  You may.

5          MS. TAIWO:  Thank you.

6     (Government Exhibit Number X1 was admitted.)

7  Q.  And if you could just describe again all of the different

8  exemplars that are included in there?

9  A.  Well, Q1, Q2, Q3 and Q4 were questioned documents that

10  were given to me to determine if, in my opinion, they were

11  written by the same person, whoever that might be, of the

12  known documents, which was K1, 2, 3, and 4 on this page.

13  Q.  And are there similarities between the Q1 through 4

14  documents and the K1 through 4 documents?

15  A.  Certainly.

16  Q.  What are those similarities?

17  A.  Well, the shape and the form and the slant are similar, as

18  an example.

19  Q.  Were you provided original documents for your review in

20  this case or reproductions?

21  A.  Reproductions.

22  Q.  And did you request the original documents?

23  A.  I think I did, and I think they were not available

24  immediately at least, yes.

25  Q.  Would you agree with me that without original documents

 1  you don't get certain data points such as the pressure of line

 2  to a page?

 3  A.  That would be the one thing that's not available, yes.

 4  Q.  So you can't tell if the pen the defendant was using was

 5  running low on ink?

 6  A.  Okay.  Say that again?

 7  Q.  You can't tell if the pen the author was using was running

 8  low on ink?

 9  A.  No.

10  Q.  And would you agree with me that reproduction and

11  enlargement can also distort signatures?

12  A.  I don't agree that just making a copy distorts a

13  signature, no.

14  Q.  When you enlarge them 200 percent, sometimes you get a

15  slight shakiness?

16  A.  Well, the pixels separate which appears to be a little

17  shakiness, yes.

18  Q.  When you talk about emotions or physical state, if you can

19  tell personality traits by signature, does it stand to reason

20  that handwriting characteristics may vary under certain

21  conditions?

22  A.  I'm sorry.  You want to ask that again?  I'm not sure what

23  you are asking me.

24  Q.  Does handwriting vary under certain conditions?

25  A.  It can.  It doesn't have to.

1    Q.   So if someone is in a hurry, could that affect a

2    signature?

3    A.   Sometimes.

4    Q.   What about if someone is injured?

5    A.   Brain?  Hand?  Foot?

6    Q.   Hand.

7    A.   If it affects their writing ability, then certainly it

8    could affect the results of the signature -- or the

9    handwriting, yes.

10   Q.   What if someone is restrained or in handcuffs, could that

11   affect the signature?

12   A.   I don't know.

13   Q.   Would it be fair to say that use of drugs, alcohol, as

14   well as a person's psychology could affect their signature?

15   A.   I'm doing a case like that now, yes.

16   Q.   What about emotional stress or nerves, could that affect

17   the way someone signed a document?

18   A.   It could.

19   Q.   What about something more deliberate?  Do individuals

20   sometimes purposefully alter their signature?

21   A.   We have those cases occasionally, yes.

22   Q.   So, for example, a credit card receipt, sometimes people

23   don't sign it exactly like they would for a birthday card?

24   A.   And your question is what?

25   Q.   Is that a possibility?

CURTIS BAGGETT - CROSS

```
 1   A.   Yes.  Of differences?  Yes.
 2   Q.   So, to be clear, your analysis is based on the handwriting
 3   samples which you were provided?
 4   A.   I make my analysis on the evidence that I have, yes.
 5   Q.   And you were not provided any extrinsic evidence?
 6   A.   Any what?
 7   Q.   Extrinsic evidence?
 8   A.   You see what I'm provided, yes.
 9   Q.   And you were not present when the forms were signed?
10   A.   I was not.
11   Q.   So you were relying on the defense's representations as to
12   which documents are bona fide signatures and which documents
13   are unknown?
14            MR. MONAHAN:  I'm going to object, Your Honor.
15            THE COURT:  Sustained.
16   Q.   You performed no clinical lab tests?
17   A.   Yeah.  All of my examinations are lab tested.
18   Q.   And that's the side-by-side comparisons of the various
19   signatures?
20   A.   That's one of the things we use.
21   Q.   So in terms of your methodology, is there a particular
22   name of the method that you use in analyzing signatures?
23   A.   ACE methodology is the name of it, yes.
24   Q.   And what does ACE stand for?
25   A.   Analyze, Compare, Evaluate.
```

1  Q.  Is that scientific standard used by the F.B.I. or other

2  law enforcement?

3  A.  I'm not a hundred percent sure.  I never went to the

4  F.B.I. school or participated, but the F.B.I. agents or former

5  agents that I've observed testifying always testify to that

6  fact, and that's what I know about that.

7  Q.  Are there any publications or treatises that you are aware

8  of that have identified the ACE methodology as the appropriate

9  scientific standard to be used in forensic document

10  examination?

11  A.  Yes.

12  Q.  Which ones?

13  A.  I have no recollection.

14  Q.  Are you aware of any published reports or journal articles

15  on studies that have been done on the error rate for the ACE

16  methodology?

17  A.  Well, the scientific studies didn't particularly reference

18  the ACE methodology.  They just referenced the results of

19  qualified handwriting document examiners compared to lay

20  persons to determine the value of people like myself

21  testifying.

22  Q.  Now, a number of publications seem to refer to an ACE-V.

23  What does the V stand for?

24  A.  Verification.

25  Q.  And verification means you have someone else looking at

 1  your analysis or opinions?

 2  A.  Exactly.

 3  Q.  And do you -- since you didn't mention the ACE-V, do you

 4  use a verifier?

 5  A.  Only when I get ready to go to court or a deposition, yes.

 6  Q.  Did you use a verifier in this case?

 7  A.  Yes.

 8  Q.  And who is that verifier?

 9  A.  Don Lehew.

10  Q.  And is that the same Don Lehew that submitted an affidavit

11  in support of your expert testimony in *Holly Dracz versus*

12  *American General Life Insurance* in the Middle District of

13  Georgia?

14  A.  Yes.

15  Q.  And isn't it true that, in that case, the District Court

16  found you unqualified to render an expert opinion in the field

17  of handwriting analysis, document exam --

18  A.  Not exactly.  I was not allowed to testify in that case,

19  the same reason you were not allowed to go on the space

20  shuttle to the moon on the last trip, because you weren't

21  retained.  I was not retained, and the judge said that I was

22  -- my qualifications back 20-something years ago were clearly

23  paltry compared to the other guy who had been with the F.B.I.

24  30 years or something.  So I don't think -- that was an unfair

25  comparison.

1    What he did say that you didn't reference was there was no

2  evidence to show all of these different things because I

3  wasn't there to present any evidence.  So, obviously, if one

4  does not appear because they weren't retained, then a judge

5  couldn't approve me to testify because I wasn't there.

6  Q.  Well, he found, based on his review of your C.V. and the

7  work that you performed, that you "lacked sufficient

8  knowledge, skill, experience, training and education," isn't

9  that correct?

10 A.  No.

11 Q.  Now, the Middle District of Georgia isn't the only court

12 to bar your testimony.  Are you aware that a judge in this

13 very courthouse recommended you be excluded as an expert

14 finding that you were "not qualified by skill, experience,

15 training or education as a handwriting expert to offer any

16 opinion concerning the authenticity of a signature"?

17 A.  No.

18 Q.  You're not aware that in 2014 Judge Litkovitz expressed

19 serious concerns --

20 A.  Who?  Who?  Say it again.

21 Q.  That in 2014, Judge Litkovitz expressed serious concerns

22 regarding the accuracy of your representations as to the

23 number of cases you have included and your years of

24 experience?

25 A.  I'm not aware of that.  If he said that, he is absolutely

1  wrong.

2  Q.  Are you aware that Judge Black adopted her recommendation

3  in toto?

4  A.  No.  I wasn't there, again, obviously.  When I don't make

5  an appearance because I wasn't retained, I'm not responsible

6  for what they may have known or not known because I wasn't

7  there to present my side.

8  Q.  How many courts have precluded you from testifying?

9  A.  I have no idea.  May I say that many attorneys attempt --

10  or clients attempt to use my letters without paying me to

11  testify, and so it would be the same answer.  If you're not

12  there, they can't allow you to testify.  Whatever they say is

13  usually prepared by an attorney, and the judge just signs it.

14  Q.  Do you recall undergoing a two-day examination concerning

15  your testimony in *United States v. Mary Revels* where the Court

16  considered and determined that you were not an expert in the

17  field of handwriting analysis and forensic --

18  A.  I certainly am, and the Court stated very clearly the

19  reasons that he said I was not an expert.  He said I was not

20  an expert because I did not have a degree in document

21  examination.  If you remember, I testified earlier it doesn't

22  exist.  So, obviously, that Court was wrong.  He said I was

23  not an expert because I was not a member of the little

24  113-unit group that you referenced a while ago, the ABFDE.  He

25  said I wasn't an expert because I was not a member.

CURTIS BAGGETT - CROSS

1      Remember I told you there were over 5- or 6,000 other

2   handwriting examiners in the USA who are not members of that

3   little organization.  So, clearly, the Court was wrong.

4   Q.  Did the Court also express concern about your criminal

5   history and the credibility that it would have in a court of

6   law?

7   A.  Yes, but the other hundreds of courts across the United

8   States that allow me to testify didn't have a reason not to --

9   Q.  And what is that criminal history?

10  A.  Excuse me?

11  Q.  What is that criminal history?

12  A.  I shot up in the air, told a guy to get off my property,

13  and I was convicted for Assault with a Deadly Weapon.

14  Q.  Isn't it true you have felony convictions for Theft and

15  Aggravated Assault dating back to 1989 and 1998, and you also

16  received a deferred adjudication after pleading guilty to the

17  misdemeanor offense of Tampering with a Government Record in

18  2000?

19  A.  That's right.  I was disabled, and my son signed the

20  statement saying that I didn't have a felony conviction.  Of

21  course, I had to take the blame for it because it was my

22  signature.

23      And I picked up a docu -- I picked up a computer, I guess,

24  from the post office.  When I found out it didn't belong to my

25  son, I took it back, and I was convicted.

CURTIS BAGGETT - CROSS

1  Q.  How many other cases --

2  A.  But I've done pretty good since then.

3  Q.  How many other cases were you challenged as a witness and

4  the defense decided to withdraw you and use someone else?

5  A.  I have no idea.

6  Q.  Did this just happen this summer in a case out of the

7  Southern District of Florida?

8  A.  I have no idea.

9  Q.  You're a professional expert witness, are you not?

10  A.  Yes, I am.

11  Q.  And how much do you charge generally for your

12  consultations?

13  A.  My fees are published.  I charge $400 to examine a

14  document and render a verbal opinion.  If my opinion meets

15  their needs, then I charge $300 to produce a notarized

16  opinion.  I'm about the cheapest in the nation.  That may be

17  why I'm number one.

18  Q.  And you've testified at a number of depositions?

19  A.  Yes.

20  Q.  How many full-blown trials have you testified in?

21  A.  I have no idea.

22  Q.  Mr. Baggett, I had a chance to look at your website, and I

23  took some excerpts from it.

24      In looking at your website, it seems like you have several

25  packages for services.  You've got a bronze package, you've

CURTIS BAGGETT - CROSS

1   got a gold package, and you have a silver package; is that

2   correct?

3   A.   Yes.

4   Q.   And could you describe those for the jury?

5   A.   I just did.  The first one is $400 to retain me and send

6   me documents that I compare one to the other and render a

7   verbal opinion.

8       The second one, if you -- if my findings meet their needs

9   and they choose to have a letter written so they can use it

10  for negotiation or to present, then it's $300 additional.

11      And the third is the combination of the first two, which

12  is $700 total.

13  Q.   Now, you've testified in this court twice for this case;

14  is that correct?

15  A.   Yes.

16  Q.   So would that be the platinum or diamond package?

17  A.   I'm sorry, what?

18  Q.   Would that be the platinum or diamond package?

19  A.   There is a platinum or diamond shown on my website?

20  Q.   How much have you charged the defense?

21  A.   I don't have those two.  I don't know why you're asking

22  me.

23  Q.   How much have you charged the defense for your testimony

24  in this case?

25  A.   I charge $2,000 a day.

CURTIS BAGGETT - CROSS

1   Q.   And is that plus travel expenses?

2   A.   Yes, of course.

3   Q.   And is that in addition to some of the other fees that

4   you've collected in this case?

5   A.   Yes.

6   Q.   Can you give us an idea of how much time you've spent

7   working on this analysis?

8   A.   I cannot.  And I've not been paid a penny yet, because

9   when you're dealing with the federal government it takes a

10  year sometimes to get your money.

11  Q.   In general, are most of the cases you've testified in

12  civil cases?

13  A.   They are a combination of civil and/or criminal.

14  Q.   How many times have you testified in a criminal trial?

15  A.   I have no idea.  I don't count those.

16  Q.   Why don't you count them?

17  A.   I have no reason to know the differences.  If my opinion

18  matches someone's needs and I can go to court and testify, I

19  could care less whether it's criminal or civil.  They hire me

20  to do a specific job and not because it's criminal or civil.

21  I have no need to count those.

22  Q.   Have you ever testified on behalf of the government in a

23  criminal trial?

24  A.   Yes.

25  Q.   Which occasion?

CURTIS BAGGETT - CROSS

1  A.  Well, I did a little case in Greenville, Texas, the other

2  day, and I don't remember all the others for the DA.  I did a

3  federal case in Dallas one time.  I have no recollection.

4  They all run together.  I do so many.

5  Q.  But you've testified on behalf of criminal defendants?

6  A.  Yes.

7  Q.  And does that include *Brown v The State of Texas* in which

8  the Court of Appeals of Texas concluded that a prosecutor's

9  use of the term "charlatan" in reference to you was a

10  reasonable deduction from the evidence?

11  A.  No, that's not correct.

12  Q.  You're not familiar with that opinion?

13  A.  That opinion had nothing to do with what you're asking me

14  about.  You asked me about document examination and rendering

15  an opinion.  That was a psychotherapist in that trial which

16  had nothing to do with what you're referencing.

17  Q.  But were you referred to as a charlatan?

18  A.  I've been called worse.  I'm sure you have too.

19      Yes, I was, in closing arguments, which actually, in the

20  United States you can't bring up the evidence in closing

21  arguments, but the Assistant DA did that day, he did call me a

22  charlatan.

23  Q.  And the Court of Appeals did find that was consistent with

24  the evidence?

25  A.  No.  What they found was it wasn't a reason to overturn

1    the verdict.  Thank you, Miss Turnbow.

2            MS. TAIWO:  No further questions.

3            THE COURT:  Richard?

4            MR. MONAHAN:  A couple, Judge.

5            THE COURT:  Sure.

6                    REDIRECT EXAMINATION

7    BY MR. MONAHAN:

8    Q.  How many experts do you know that don't get paid for their

9    services?

10   A.  I don't think I've ever met one, but I hope we get paid

11   quicker than you guys have been paying me.

12   Q.  It would be a pretty short career if you didn't charge for

13   your services, wouldn't it?

14   A.  Oh, yes, sir, it would.

15   Q.  Miss Taiwo mentioned you testified in this court before --

16   A.  Correct.

17   Q.  -- related to this very case before Judge Barrett,

18   correct?

19   A.  Yes, for Mr. Williams, correct.

20   Q.  Were you hired by Mr. Williams directly to do that?  Did

21   he pay you?

22   A.  No.  I haven't been paid.  It's been over a year.  Thank

23   you for asking.

24       If I'm not mistaken, an attorney named Gallagher was the

25   one who hired me on behalf of and for Mr. Williams.

 1   Q.   Okay.  And during that you testified in this very

 2   courtroom for that hearing, did you not?

 3   A.   Yes.

 4   Q.   In fact, Mr. Kadon questioned you?

 5   A.   Yes, he did.  He's very nice.

 6   Q.   Did he challenge your testimony?  Did he say you were not

 7   qualified to offer the opinion to the judge that day?  Do you

 8   remember?

 9   A.   Well, he -- two questions there, Richard.  He did

10   challenge my testimony, obviously.  He did not challenge my

11   background and experience and training or education as an

12   expert document examiner.  That part is correct.

13   Q.   Let's take a quick look at the transcript from that day,

14   since Ms. Taiwo brought it up.  Take a look -- if you've got

15   the defense book there, look at F3.  It might take a moment

16   for you to find that.  F3 is a transcript of the motion

17   hearing that day.

18   A.   You're sure there's an F in here?

19   Q.   F, as in Frank, 3?

20   A.   Am I in the right book, Richard?  I don't see that.

21           MR. MONAHAN:  May I help, Judge?

22           THE COURT:  Yeah, of course.

23   A.   Oh, I see it.

24   Q.   They're a little hard to spot.

25   A.   A little slow.  Okay.  What page, Richard?

CURTIS BAGGETT - REDIRECT

1  Q.  Take a look at page 89 of that transcript.

2  A.  I have page 89 in front of me.

3  Q.  Okay.  I want to ask you if you recall Mr. Kadon saying in

4  court that day, "For the record, I have no objection that he

5  is qualified to offer his opinion in this court at this

6  proceeding"?

7  A.  Yes.

8  Q.  Okay.  So they didn't raise any objection to the judge

9  that you shouldn't be allowed to testify at that proceeding?

10 A.  Obviously not.

11 Q.  Okay.  And that's the same gentleman sitting here at this

12 table?

13 A.  I recognize him.  Yes, sir.

14 Q.  All right.  Ms. Taiwo asked you some questions about the

15 known signatures in this case and whether you had any, I

16 guess, proof they're actually Mr. Williams' signatures.  Do

17 you remember that question she asked you?

18 A.  She did ask me that question, right.

19 Q.  First of all, let's start with the Defendant's N1.  You

20 identified this previously as K4.  This actual document was

21 presented at this previous Motion to Suppress hearing where

22 you testified in this court, correct?

23 A.  Correct, sir.

24 Q.  We used this same document, correct?

25 A.  Correct.

CURTIS BAGGETT - REDIRECT

1  Q.  Mr. Gallagher at the time.  The defendants used that same

2  document?

3  A.  Correct.

4  Q.  And that's been a year ago, about a year ago, this

5  testimony?

6  A.  Correct.

7  Q.  Has there been any challenge to your information about the

8  authenticity of that document being Mr. Williams' signature in

9  the last year?

10 A.  No.  I don't think there is any question that he signed

11 it.  She was just asking me if I had personal knowledge as a

12 witness.  I didn't see him sign it.  The judge apparently saw

13 him sign this last one, K6, according to the document itself.

14 That's what one she asked me, yes.  Thank you, Richard.

15 Q.  This document was signed in front of a notary, just

16 looking at the paperwork?

17 A.  Yes, sir.

18 Q.  And your understanding of a notary is that person has to

19 get identification from the person signing the document in

20 front of them, correct?

21 A.  They're supposed to, yes.

22 Q.  So did you have any reason to doubt that was Qian

23 Williams --

24 A.  I have no reason to doubt it.

25 Q.  And has that raised anything to you at any point in the

1  last year that that may not be Qian Williams' signature?

2  A.  No.  And I don't think she did that today.  She just asked

3  me.

4  Q.  Just making sure -- well, there is no question there.

5      Okay.  She asked you a couple of questions about enlarging

6  documents and whether that made them fuzzy or harder to read.

7  When you enlarge a signature, do you look at the original

8  before you enlarge it?

9  A.  I look at the documents that I have in the original form,

10  yes, sir, and then I compare them to that to see if there is

11  any differences that are significant or not.  And for the

12  purpose of illustration and for examination, the enlarged copy

13  certainly helps.

14  Q.  Okay.  Do you look at the copy of it before you enlarge it

15  and after you enlarge it to make sure that the copying process

16  didn't distort the signature in any way?

17  A.  I do.  And then sometimes if you go 400 percent, the

18  pixels separate.  And I do note that that is, and I hope that

19  I don't use those separations as a stop and start as an

20  example.

21          MR. MONAHAN:  I have no further questions.

22          THE COURT:  Ebun?

23          MS. TAIWO:  Yes, Your Honor, briefly.  Thank you.

24          THE COURT:  Sure.

25

1                          **RECROSS-EXAMINATION**

2    BY MS. TAIWO:

3    Q.  You read a particular part of the Motion to Suppress

4    transcript that mentioned that my colleague had no objections

5    at that particular proceeding.  Are you aware of the Federal

6    Rules of Criminal Procedure as to what testimony or evidence

7    is allowed in a motions hearing as opposed to a trial?

8    A.  I am not.

9              MS. TAIWO:  No further questions.

10             THE COURT:  You may step down, sir.  Thank you very

11   much.

12             THE WITNESS:  Thank you, Judge.  Good to see you

13   again.

14             THE COURT:  You can just leave that stuff.  You can

15   take your stuff, but just leave -- sorry, I thought you were

16   getting -- just leave the exhibit books.  Thank you.  Watch

17   your step there.

18        (The witness was excused at 10:30 a.m.)

19        (Conclusion of requested excerpt of proceedings.)

20                          * * *

21

22

23

24

25

INDEX

1                    I N D E X   O F   W I T N E S S E S

2

3    <u>DEFENSE WITNESS</u>                                    <u>PAGE</u>

4    <u>CURTIS BAGGETT</u>

5    Direct Examination by Mr. Monahan........        3
     Cross-Examination by Ms. Taiwo...........       31
6    Redirect Examination by Mr. Monahan......       55
     Recross-Examination by Ms. Taiwo.........       60
7

8
                          E X H I B I T S
9        <u>NUMBER</u>                                  <u>ADMITTED</u>

10   Defendant Exhibit N1 .................       12
     Defendant Exhibit N2 .................       13
11   Defendant Exhibit N3 .................       14
     Defendant Exhibit N4 .................       16
12   Defendant Exhibit N5 .................       18
     Defendant Exhibit N6 .................       19
13
     Government Exhibit X1.................       42
14

15

16

17

18                    C E R T I F I C A T E

19

20      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

21   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22

23   <u>S/MARYANN T. MAFFIA, RDR</u>

24   Official Court Reporter

25