# Exhibit A

| From: | Stephen Stern |
|---|---|
| To: | Gregory Jordan |
| Cc: | tgagliardo@gelawyer.com; Heather Yeung |
| Subject: | Boshea v. Compass Marketing, Inc. - Rebuttal Expert Report |
| Date: | Monday, November 1, 2021 9:14:53 AM |
| Attachments: | image001.png |
| | Payne Rebuttal 10.21.pdf |
| | John White Signature Report 10.21c.pdf |

Greg:

Attached is Compass Marketing's expert rebuttal report, which incorporates an analysis of the signature in question. Included with the report are the necessary disclosure materials regarding Mr. Payne's credentials and his testimony/litigation history.

Stephen



**Stephen B. Stern, Esq.**
stern@kaganstern.com

**Kagan Stern Marinello & Beard, LLC**
(410) 793-1610 (direct)
(410) 216-7900, ext. 1009
(410) 705-0836 (fax)
238 West Street
Annapolis, Maryland 21401
www.kaganstern.com



888-883-1352
www.appliedforensics.com

HANDWRITING & DOCUMENT EXAMINATION SINCE 1992

October 31, 2021

Stephen B. Stern, Esq.

Kagan Stern Marinello & Beard, LLC

238 West Street

Annapolis, Maryland 21401

**Dennis J. Ryan**
Forensic Document
Examiner*

**Laura Mancebo**
Forensic Document
Examiner*

**Jeffrey A. Payne**
Forensic Document
Examiner*

**Douglas K. Shaffer**
Forensic Chemist

*Certified by The American Board
of Forensic Document Examiners
(ABFDE)

**RE:  Rebuttal of the findings of Donna O. Eisenberg in the matter of Compass Marketing, Inc. vs. David J. Boshea, Jr.**

**SWGDOC** stands for the Scientific Working Group for Forensic Document Examination.  I also follow the SWGDOC standards.  The SWGDOC standard Eisenberg is referring to is *Standard Terminology for Expressing Conclusions of Forensic Document Examiners.*

Eisenberg reached an opinion that no conclusion could be reached as to the authorship of the questioned signature.  Her finding as defined by said standard is as follows:  **no conclusion** (totally inconclusive, indeterminable)—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another.  I however, reached a conclusion that John D. White highly probably did not write the signature in his own name on the questioned document (Exhibit Q-1). My finding as defined by said standard is as follows:  **strong probability** did not—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.  See https://www.swgdoc.org/ for the relevant SWGDOC standards and guidelines for the field of forensic document examination.)

**Eisenberg** – Forensic handwriting examinations are dependent upon the evidence containing sufficiency in quality, comparability, and quantity, all three of these criteria are deficient within the submitted evidence; and each criterion is discussed in greater detail below.

**New York**
1975 Hempstead Tpk
Suite 407
East Meadow, NY 11554
516-826-6429

**Washington, D.C.**
455 Massachusetts Ave N.W.
Suite 186
Washington, D.C. 20001
202-657-5187

**Maryland**
19813 Leitersburg Pike
PMB 313
Hagerstown, MD 21742

**Connecticut**
222 Main St
#219
Farmington, CT 06032
860-331-8228

**Boston**
75 Arlington St
Suite 500
Boston, MS 02216
617-523-2959

## Quality
**Eisenberg** – In conducting a forensic handwriting examination, the quality of the handwriting must be sufficient to enable an examiner to study the precise details of the writing act. The assessment of non-original evidence (as opposed to ink on paper) produced using photocopiers, scanners, or produced digitally, as well as using any of these methods in combination, amplifies the limitations in the value of the evidence. None of the submitted evidence contains original writing and all contain deficiencies in their clarity creating obstacles for this document examination. For example, direction of the pen's movement is not clearly discernible. Faint lines such as pen drags may have disappeared in the reproduction. Line quality cannot be accurately interpreted as the determination of pen pressure (the depth of the ink line into the paper) cannot be evaluated. The ink lines may be more uniform in appearance than in the original writing. With the evidence submitted, the quality of the reproductions significantly impedes the ability to discern fine details and features normally encountered when examining original evidence or superior quality non-original documents.

**Payne** – The digital images submitted in this case were sufficient in quality to conduct a thorough and comprehensive examination. I have to work with the best evidence submitted. This was recorded as a limitation in my examination, but I was able to arrive at a meaningful conclusion. The pen pressure was considered in my analysis and the consistent pen pressure observed in the questioned signature was one of the features that I noted as a sign of simulation. Digital images may mask some of the features present in an original inked signature, but the images in this case were of good enough quality to examine the significant features.

## Comparability
**Eisenberg** – When conducting a forensic handwriting examination, like items need to be compared. That is, handwriting must be compared with handwriting, handprinting must be compared with handprinting, and the same letters and letter combinations must be compared with one another. With respect to the signature comparison in this case, although the same name is repeated in the questioned and known evidence, the variation of each known signature relative to every other is substantial and precludes reaching an opinion of identification or elimination.

Eisenberg defines what comparability means yet refers here to the writer's variation. A writer's range of variation does not have anything to do with comparability of the writing. We have comparable writing in this case. We are comparing known signatures to a questioned signature. We are not comparing hand printing to cursive writing.

**Eisenberg** – Studying the variation in a person's handwriting is a critical aspect of forensic handwriting examinations. Variation refers to the fact that each signature written by an individual fluctuates to some degree from a master pattern. This phenomenon is referred to as natural variation and is an expected part of everyone's writing. The degree of variation among signatures written by an individual can range from slight to extreme. White's range of variation is exceptionally broad as depicted in the three samples below whereby characteristics such

as connecting strokes, letter formations, pen lifts, and height ratios do not share the commonality needed to evaluate his range of variation in order to identify or eliminate him as the writer of Exhibit Q1.

**Payne** – Eisenberg does a good job of defining what variation means yet contradicts herself by saying that Mr. White has an "exceptionally broad" range of variation, but in the next sentence says she cannot evaluate his range of variation.  Eisenberg describes Mr. White's range of variation as "exceptionally broad," but said the scale ranged from slight to extreme. As mentioned before, the fact that Mr. White does have a wide range of variation and the questioned signature does not fall within that range is additional evidence to prove he highly probably did not write the signature in his own name on the questioned document.

**Eisenberg** – When conducting a forensic handwriting comparison from a writer like White whose signature varies so widely, it is necessary that the examiner receives for a comparative examination a large number of sample signatures to ensure that all of his writing habits are reflected within the exemplars. The eight (8) signatures examined by Mr. Baggett, nor the twenty (20) signatures examined by me, do not provide sufficient material to reach any conclusion other than "no conclusion".

**Payne** – Eisenberg mentions the number of specimen signatures necessary again here in the comparability section, so I feel like I need to address it here as well.  I had nineteen known signatures which is a sufficient number to assess the writer's range of variation.  It is standard practice to request 10 to 15 signatures for comparison purposes.  Eisenberg had twenty signatures which is more than enough signatures to conduct a handwriting comparison and assess the writer's normal range of variation.  Had Eisenberg observed the evidence of simulation in the questioned signature, discussion with respect to the writer's range of variation would not have been such a "restrictive factor."

Quantity
**Eisenberg** – White's abbreviated signature is comprised of few letter forms and pen movements. The limited number of characters available for comparison, combined with insufficient clarity and wide range of variation within the known writing, precludes the necessary conditions required to reach an opinion of identification or elimination.

**Payne** – I disagree with Eisenberg about the quality and quantity of the evidence.  The signature is slightly abbreviated; however, it is a stylized signature making it more individual. The digital images submitted are sufficient in quality to conduct a thorough and comprehensive examination.  I had nineteen known signatures which is a sufficient number to assess the writer's range of variation.  It is standard practice to request 10 to 15 signatures for comparison purposes.  The fact that John D. White has a wide range of variation and that the questioned signature still did not fall within that normal range is more indicative that he did not sign his own name on the questioned document.

**Eisenberg** – As set forth in this report the submitted evidence is insufficient to reach a conclusion regarding authorship. Therefore, no conclusion can be rendered regarding the authenticity of the Exhibit Q1 signature due to the restrictions imposed by the evidence presented. The restrictive factors in this case are the result of the writer's wide range of variation, the nominal quantity of characters comprising the signature, and the inherent limitations imposed by examining non-original evidence.

**Payne** – The first two sentences of the opinion are redundant.  I don't agree that the evidence is insufficient to reach an opinion as to authorship.  I do agree that ideally, we would like to have the original documents to examine; however, I examined the questioned document/signature first and determined that the digital image was of sufficient quality to conduct a handwriting comparison. Secondly, I examined the digital images of the known documents/signatures and determined that they too were of sufficient quality.  This was a limitation to the exam; however, that is why I qualified my opinion.  After conducting a side-by-side comparison of the questioned signature to the known signatures of John D. White, I determined that John D. White highly probably did not sign the signature in his own name on the questioned document.  There were tell-tale signs that the questioned signature was an attempt to simulate a John D. White signature.  The overwhelming number of signs indicative of a simulation which can be easily demonstrated is the key evidence in this case and Eisenberg failed to observe these features in the questioned signature.

Jeffrey A. Payne
Forensic Document Examiner



888-883-1352
www.appliedforensics.com

**HANDWRITING & DOCUMENT EXAMINATION SINCE 1992**

October 31, 2021

Stephen B. Stern, Esq.

Kagan Stern Marinello & Beard, LLC

238 West Street

Annapolis, Maryland 21401

Re:     John D. White Signature Examination

**Dennis J. Ryan**
Forensic Document
Examiner*

**Laura Mancebo**
Forensic Document
Examiner*

**Jeffrey A. Payne**
Forensic Document
Examiner*

**Douglas K. Shaffer**
Forensic Chemist

*Certified by The American Board
of Forensic Document Examiners
(ABFDE)

**QUALIFICATIONS**

I, Jeffrey A. Payne, am a forensic document examiner with Applied Forensics LLC, in Washington, DC.  I have 20 years of experience in this field and have been employed by Applied Forensics LLC, in this capacity for the last four years.  My professional qualifications are summarized in the attached curriculum vitae *(See Appendix 1).*

The Scientific Working Group for Document Examination (SWGDOC, www.swgdoc.org) which was created in 1997.  SWGDOC developed standards and guidelines for the field of forensic document examination. SWGDOC was composed of private examiners and government examiners from local, state, and federal laboratories throughout the United States. SWGDOC began in 1997 as TWGDOC (Technical Working Group for Questioned Documents), was renamed SWGDOC in 1999, and was reorganized in 2001.  From 2000 to 2012 SWGDOC published their standards through American Society for Testing and Materials International (now simply ASTM International).  In 2012 SWGDOC stopped publishing their standards through ASTM.  Recently the responsibility for forensic

**New York**
1975 Hempstead Tpk
Suite 407
East Meadow, NY 11554
516-826-6429

**Washington, D.C.**
455 Massachusetts Ave N.W.
Suite 186
Washington, D.C. 20001
202-657-5187

**Maryland**
19813 Leitersburg Pike
PMB 313
Hagerstown, MD 21742

**Connecticut**
222 Main St
#219
Farmington, CT 06032
860-331-8228

**Boston**
75 Arlington St
Suite 500
Boston, MS 02216
617-523-2959

standards has been tasked to The Organization of Scientific Area Committees for Forensic Science (OSAC).  OSAC was created in 2014 to address a lack of discipline-specific forensic science standards. OSAC fills this gap by drafting proposed standards and sending them to standards developing organizations, which further develop and publish them.  OSAC strengthens the nation's use of forensic science by facilitating the development and promoting the use of high-quality, technically sound standards. These standards define minimum requirements, best practices, standard protocols, and other guidance to help ensure that the results of forensic analysis are reliable and reproducible.[2]  The training program I followed adhered to the SWGDOC standard for the Minimum Training Requirements for Forensic Document Examiners *(See Appendix 2).*

## Job Description

As a forensic document examiner, I conduct various types of examinations on documents. The types of examinations I conduct primarily include: handwriting, document authentication, and indentation analysis.  Handwriting examinations entail examining and comparing handwriting, such as cursive handwriting, hand printing, and signatures, to determine authorship.  Document authentication examinations entail examining features of a document such as printing processes and security features to determine whether a questioned document is genuine, counterfeit, or an altered genuine.  Indentation analysis examinations entail examining a document for indented impressions and deciphering any indented impressions identified, to the extent possible.  I issue written reports regarding my examinations, and I appear in court to testify when I am called to do so.

## Education

I have earned a Bachelor of Science degree in Microbiology from the University of Maryland, College Park.

## Formal Training

I received my formal training in forensic document examination at the United States Secret Service, in Washington, DC.  I successfully completed this comprehensive, apprenticeship-style

training program which encompassed all areas of forensic document examination.  The training involved working side-by-side with senior forensic document examiners and conducting independent research on a variety of topics specific to the field of questioned documents, including but not limited to handwriting and hand printing comparisons, office machine examinations (typewriter, printers, fax machines, etc.), photocopier examinations, ink examinations, paper examinations and indentation examinations.  For each topic, I wrote a formal research paper, and provided an oral presentation to the senior examiners, followed by an oral panel review of the subject matter.  I studied leading textbooks and articles in the field throughout my training.  The training program was comprised of examining hundreds of cases with a trainer and classroom instruction.  Upon successful completion of this training program, I was certified as a forensic document examiner, I began working independently in the field initially with supervised casework.  After completing the two years of requisite casework, I applied for certification by the American Board of Forensic Document Examiners (ABFDE) by entering their testing process.  The testing process takes approximately one year to complete and is comprised of three (3) parts: (1) one hundred question multiple choice test, (2) five practical problems or cases that cover the scope of the work of a Forensic Document Examiner and (3) an oral board where I was asked to present three of the five practical problems to a review board.  Upon successfully completing these three phases of the testing, I was given the Diplomate status with the ABFDE in August of 2011 (***See Appendix 3).***

## Membership in Professional Organizations

I hold a membership in the Mid-Atlantic Association of Forensic Scientists Questioned Documents Section.  I am certified by the American Board of Forensic Document Examiners (www.abfde.org).  The goal of the ABFDE is as follows: "*The American Board of Forensic Document Examiners (ABFDE) was established in 1977.  The Board's objectives are two-fold: to establish, maintain and enhance standards of qualification for those who practice forensic document examination, and to certify applicants who comply with ABFDE requirements for this expertise.  In doing so, the Board aims to safeguard the public interest by ensuring that anyone who claims to be a specialist in forensic document examination does, in fact, possess the necessary skills and qualifications.*"[1]

<u>**Testimony as a forensic document examiner:**</u>

Maryland vs. Jamell Stallings, Circuit Court for Prince George's County, MD, 2/13/2013

State vs. Marlene Abitanto, Superior Court of New Jersey, 3/8/2016

State vs. Willie Hymon, Superior Court of New Jersey, 1/12/2017

People of the State of New York vs. Elwell McPhail, State Court, Rochester, NY, 5/9/2018

Moses, Jr. et al vs. Somerset Community Services, Inc., Circuit Court of Somerset, Princess Anne, MD, 11/9/18

Estate of James Jeffries Dixon, Sr., Superior Court of the District of Columbia – Family Court, Washington, DC, 2/1/19

Phillip Frazier vs. Zianna Brown, Superior Court of the District of Columbia – Family Court, Washington, DC, 5/2/19

Najibullah Ahmad vs, Haji Noor Ahmad, Tahara Ahmad, Farid Ahmad, Zabeulah Ahmad – Fairfax Circuit Court, Fairfax, VA, 12/14/20


**ASSUMPTIONS**

The following assumptions have been established.

1.      The non-original evidence submitted in this case are true and accurate reproductions.

2.      The known signatures submitted from John D. White were executed by John D. White.


**BASIS OF EXAMINATION AND METHODOLOGY**

Forensic handwriting examination, which is conducted to determine authorship, is based on two fundamental principles.  The first is that no two people write exactly the same way, i.e. no two people possess the exact same combination of handwriting characteristics.  This principle describes the existence of individuality in handwriting.  The second fundamental principle is that no person writes exactly the same way twice, i.e. each person has a range of natural variation in handwriting characteristics.

**Fundamental Principle 1**

Individuality in handwriting develops during the process of learning how to write.  This typically occurs during the early years of elementary school, when a model of the letters of the alphabet is provided for the students to copy.  At this early stage, the writer is completely focused on how to reproduce the model letter formations that were provided; it is more like drawing than it is like handwriting because the movements are so deliberate.  As time passes and the writer becomes more comfortable with the handwriting process, the writer's focus begins to shift away from individual letter formations to the content of the writing.  Individuality in handwriting begins to develop as this shift in focus occurs; subconsciously, habits develop that deviate from the original model of handwriting that was provided.  Once the writer has become completely comfortable with the handwriting process, the formation of letters, letter combinations and words become an automatic part of the handwriting process.  At this point, the individual handwriting characteristics that were developed are ingrained as a natural and subconscious part of the writing process.

**Fundamental Principle 2**

Natural variation in handwriting characteristics exists because people cannot write with machine-like precision.  This variation is a normal part of the handwriting process which occurs around a person's master pattern, or what can be thought of as a basic "blueprint," for the formation of letters, letter combinations, and words.  These master patterns are ingrained into a person's subconscious handwriting habits; however, with the lack of machine-like precision, each attempt at executing a particular master pattern results in a slightly different product.  Sometimes people have multiple master patterns for a single letter formation, letter combination, or word formation, which can produce a greater range of natural variation.

The principles of individuality and natural variation in handwriting combine to form the foundation for forensic handwriting examination.  In order to identify handwriting to a specific person there must be a strong agreement in the combination of individual characteristics present in the questioned and known writing, the handwriting characteristics present in the questioned writing must fall within the range of natural variation of the known writer, and there

must be no unexplainable and repetitive differences in the handwriting characteristics of the questioned and known writing.  To reach an opinion of Elimination there must be strong and repetitive differences in the handwriting characteristics present in the questioned and known writing.

## Methodology
### Handwriting
The forensic examination of handwriting is a discriminatory process in which individuality in handwriting is analyzed, compared, and evaluated to make authorship determinations. Writing form, structure, quality, and movement are considered.  In the preliminary phase of a handwriting examination the forensic document examiner must determine whether the submitted handwriting is suitable for comparison.  This is done by assessing whether the submitted handwriting is comparable, possesses sufficient individualized characteristics, is freely and naturally executed, and whether a sufficient amount of handwriting is available.

To conduct a forensic handwriting examination, the questioned and known material must be comparable.  At a minimum, questioned and known material must be executed in the same writing style (cursive, hand printing, block lettering, signatures, numerals, etc.), and employ similar characters, words, and letter combinations.  There must also be a sufficient amount of comparable handwriting available to demonstrate the writing habits of the author as well as the author's natural variation in those writing habits.  Naturally executed handwriting is necessary to ensure that the writing habits observed demonstrate the author's normal and natural habits.

The first step in the forensic handwriting examination is to independently analyze the questioned and known material.   During this thorough analysis, individualized characteristics, as well as the extent of any variation observed, are noted.  Examples of individual characteristics considered include: character formations and direction of stroke, writing slant and spacing, the presence or absence of pen lifts, and height ratios.  Upon completion of these independent analyses, a detailed comparison of the individual features in the submitted

items is conducted.  The overall format, spacing, and fluency of the document, as well as the subtleties in execution of similar characters, words, and letter combinations are considered. Observations made during the comparison are evaluated, based on the examiner's training, experience, and education.  An opinion regarding authorship is formulated based on that evaluation in conjunction with consideration of examination limitations.

Forensic handwriting examinations are comprised of many interconnected factors, some of which may introduce limitations to the examination.  Some limiting factors include the examination of: machine copies of handwriting rather than original handwriting, unnaturally written writing, an insufficient amount of writing, writing that is general in nature (containing minimal individuality), and writing that is not comparable.

Applied Forensics utilizes nine standard terms for expressing conclusions in forensic handwriting examinations.  These terms are in alignment with the peer-reviewed and published Scientific Working Group for Forensic Document Examination (SWGDOC) Standard Terminology for Expressing Conclusions of Forensic Document Examiners *(See Appendix 4)*.  These nine terms include: No Conclusion, Indications (may have written/ may not have written), Probable (did write/did not write), Highly Probable (did write/did not write), Identification, and Elimination.

## SUBMITTED MATERIAL

## Questioned Document

The following was submitted as the questioned document:

**Q-1**   Digital image of a Compass Marketing Agreement Relating to Employment and Post-Employment Competition filed 02/05/2021 (Case 1:21-cv-00309-ELH Document 1-3).

*(See Appendix 5)*

**Known Writing**

The following was submitted as the known writing of John D. White:

**K-1**
**(a-e)**   Digital image of sheet of paper undated bearing five John D. White signatures (request writing).

**K-2**   Digital image of a Compass Marketing, Inc. Bank Check no. 5253 dated August 2, 2011 bearing a John D. White signature.

**K-3**
**(a&b)**   Digital image of a Manufacturers and Traders Trust Company Certified Banking Resolutions of Corporation undated bearing two (2) John D. White signatures.

**K-4**   Digital image of the signature page of document dated 9/26/2017 bearing a John D. White signature.

**K-5**   Digital image of the signature page of document dated Aug 1, 2007 bearing a John D. White signature.

**K-6**   Digital image of the signature page of document dated 6/15/2016 bearing a John D. White signature.

**K-7**   Digital image of the signature page of document dated 4/15/2019 bearing a John D. White signature.

**K-8**   Digital image of the signature page of an unknown document dated 3/6/2017 bearing a John D. White signature.

**K-9**   Digital image of a Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment Competition (Pages 1&4 of 5) dated 1/28/2007 bearing a John D. White signature.

**K-10**   Digital image of a Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment (Pages 1&4 of 5) dated 2/6/2007 bearing a John D. White signature.

**K-11**   Digital image of a Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment Competition (Pages 1&4 of 5) dated 6/7/2007 bearing a John D. White signature.

**K-12**   Digital image of a Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment (Pages 1&4 of 5) dated 9/10/2008 bearing a John D. White signature.

**K-13**   Digital image of a Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment (Pages 1&3 of 4) dated 2/24/2010 bearing a John D. White signature.

**K-14**   Digital image of a Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment (Pages 1&3 of 4) dated 10/17/2014 bearing a John D. White signature.

***(See Appendix 6)***

REPORT

**Examination and Comparison of the Questioned Signature of "John D. White" Depicted on Q-1 to the Known Signatures of John D. White.**

One questioned signature was submitted for analysis.  The questioned signature was on a Compass Marketing Agreement Relating to Employment and Post-Employment Competition filed 02/05/2021 (Case 1:21-cv-00309-ELH Document 1-3).  The questioned document was electronically submitted via email as a PDF.  I received request writing and non-request (course of business) related documents bearing the known signatures of John D. White.  The known signatures were also submitted as PDFs via email.  There was a total of nineteen known signatures.  The known signatures were dated from 2007 to 2021.  The known signatures of John D. White displayed a range of variation over this period.  The copy quality of the submitted documents was good and sufficient for examination purposes.  Known signatures were also submitted for David J. Boshea, Jr.  I was requested to determine if John D. White signed the signature in his own name on the questioned document and if not, whether or not David J. Boshea, Jr. signed the questioned signature.

I compared the known signatures to the questioned signature.  There was significant and fundamental disagreement in the handwriting characteristics observed regarding the questioned signature and the known signatures of John D. White.  The dissimilarity is displayed in the size and size ratios of lower and uppercase letters, the direction of initial and terminal strokes, tick marks, spacing, height ratios, pen-lifts, attention to the baseline, the overall letter design, and general appearance and writing style.

Now specifically noting some of the features that I observed:

**Exhibit Q-1 – John D. White signature –** the questioned signature is written slow and deliberately, the signature does not appear to be normally and naturally written with speed and spontaneity, the signature has blunt beginning and ending strokes, there is evidence of overwriting and patching, the starting point of the uppercase "J", straight stroke at the base of the loop, the blunt ending stroke below the baseline, starting point of the second letter, the sharp angle at the base of the letter and retrace back up with another sharp angle, the hesitation before the baseline, overhand arch formation, patching on the first loop, pen-lift before writing the second loop to complete the signature, and the signature ends with a short tremulous tick downward.

**Known signatures of John D. White** – the signatures are freely and naturally written, the signatures are written with speed and spontaneity, there are tapered beginning and ending strokes, the signatures are abbreviated and stylized, the signatures display a wide range of variation, the uppercase "J" formation, starting point of the "J", large rounded top loop, slant of the "J", the stroke goes down below the baseline and then back up to start the second movement, narrow lower formation which is slightly open on the right side, sometimes there is a pen-lift before the second letter formation, the uppercase "W" looks like a "U" formation, and the terminal "e" sometimes has an eyelet the size of which varies and other times it does not.

A freehand simulation is the copying of another's signature. The writer is essentially drawing the signature; therefore, the signature will not appear naturally written. The writer must achieve two goals in order to create a good quality copy of the signature. He or she must be familiar with their own habits enough to avoid incorporating these features in the simulated signature and know the subtle and inconspicuous characteristics of the signature that is being copied to make sure these are included.

A simulation generally differs from the genuine signature in some or all of these qualities: hesitation, unnatural pen lifts, patching, tremor, uncertainty of movement as portrayed by abrupt changes in direction of the line, and a stilted drawn quality devoid of free, normal writing movements combine to reveal the defective nature of a poor-quality simulation.

*(See Appendix 7)*

Opinion

Based on a comparison of the known signatures with the questioned signature, I have reached the following opinion:

It has been determined that John D. White (Known K-1 through K-14) highly probably did not write the signature in his own name on the questioned document. It appears that the signature is an attempt to simulate the signature of "John D. White." The examination of non-original documents was a limitation to the examination process.

**Remarks**

Kagan Stern Marinello & Beard, LLC requested the report in connection with its representation of Compass Marketing, Inc.

I hereby certify that this report is a complete and accurate statement of all of my opinions, and the basis and reasons for them, to which I will testify under oath.

These opinions are rendered on the best evidence available to the examiner and is subject to review should additional evidence become available for examination.

A second examiner has reviewed the submitted documents to verify if the examiner's conclusions are supported by the data in the comparison of the signatures.  The verification conducted was a blind verification. A blind verification is a type of verification in which the subsequent examiner(s) has no knowledge of the original examiner's decisions, conclusions or observed data to support the conclusions.

I am being compensated at the rate of $350 per hour for services rendered in connection with this report. My compensation does not depend on the outcome of the litigation or on the opinions expressed in this report. To the extent that new information, data, or analysis become available, I reserve the right to expand upon the opinions presented in this report.


Jeffrey A. Payne
Forensic Document Examiner

APPENDIX 1

# CURRICULUM VITAE





**Jeffrey A. Payne**
Certified Forensic Document Examiner

**Professional Experience**

11/2017→Present          **Applied Forensics, LLC   Washington, D.C.**
01/2010→10/2011          Certified Forensic Document Examiner

- Forensic Document Examiner for a state-of-the-art forensic document laboratory, since it opened a branch office in Maryland.

- Conducts a wide range of forensic document examinations and provides expert testimony relating to handwriting, hand printing, and numerals; indented, altered, erased or obliterated writing; typewriting, rubber stamps, notary seals, check writers, printing processes and other mechanical impressions; as well as other aspects of forensic document examination in cases that are civil or administrative in nature.

5-2021 to Present          **Science Applications International Corporation (SAIC)**
                          Forensic Document Examiner

- Conduct handwriting comparisons
- Use Instrumentation to identify and restore indented, obliterated and eradicated writing
- Conduct examinations to determine the authenticity of documents

5-2001 → 5-2021          **United States Government – Forensic Services Division**
                          *Forensic Document Examiner*

- Identify and eliminate the source of typewriting or other mechanical impression machines

**Jeffrey A. Payne**

- Use Instrumentation to identify and restore indented, obliterated, and eradicated writing

- Conduct examinations to determine the authenticity of a variety of documents such as credit cards, traveler's checks, driver's licenses, and social security cards

- Furnish reports regarding my findings and appear in court as an expert witness when called

6-1995  →  5-2001        **Quest Diagnostics, Incorporated – Microbiology Department**
Medical Technologist

- Made determinations about highly infectious microorganisms

- Worked in a Mycobacterium Tuberculosis (TB) laboratory conducting testing

- Responsible for testing patient blood specimens for the presence of bacteria

- Reported my results to clients to ensure proper patient care

9-1992  →  6-1995        **LabCorp – Microbiology Department**
*Medical Technologist*

- Bacterial testing of clinical specimens

## Education

1987  →  1992        **University of Maryland College Park,**
*Bachelor of Science*
  - Major:  Microbiology

## Specialized Training & Courses

- Rochester Institute of Technology – <u>Printing Process Identification and Image Analysis for Document Examiners</u>, Rochester, NY (2001)

- Mid-Atlantic Association of Forensic Scientists – <u>Digital Imaging for Document Examiners</u>, Hershey, PA (2001)

**Jeffrey A. Payne**

- Bureau of Engraving and Printing – <u>Printing of United States Currency</u>, Washington, DC (2001 & 2009)

- Jarboe Printing – <u>Conventional Printing Process – Offset Lithography</u>, Washington, DC (2001)

- SchlumbergerSema – Security Printing Facility – <u>Genuine Credit Card Production</u>, Owings Mills, MD (2001)

- De La Rue – Security Printing Facility – <u>Genuine Travelers Check Production</u>, Dulles, VA (2001, 2003 & 2007)

- American Bank Note Holographics, Incorporated – <u>Production of Genuine Holograms</u>, Elmsford, NY (2001, 2003 & 2006)

- Institute for Federal Printing and Electronic Publishing – United States Government Printing Office – <u>Printing Processes and Terminology – Introduction</u>, Washington, DC (2002)

- United States Secret Service – <u>Questioned Documents Course</u>, Glynco, GA (2002)

- James J. Rowley Training Center – <u>Crime Scene Investigation and Physical Evidence Course,</u> Beltsville, MD (2003)

- Axalto – <u>Genuine Credit Card and Smart Card Production</u>, Owings Mills, MD (2004)

- Sirchie – <u>Crime Scene Technology Evidence Collection Class,</u> Youngsville, NC (2005)

- ASCLD/LAB – <u>Assessor Training for Forensic Accreditation,</u> Clearwater Beach, FL (2007)

- Federal Bureau of Investigation – <u>Fundamentals of Handwriting Examinations,</u> Quantico, VA (2008)

- New York State Department of Motor Vehicles – Division of Field Investigations – <u>Fraudulent Document Training for the Law Enforcement Officer</u>, Valhalla, NY (2008)

- Mid-Atlantic Association of Forensic Scientists Workshop – <u>Leveraging Technology for QD Courtroom Presentations</u>, Baltimore, MD (2009)

- Forensic Science Service – <u>Statistics, Ridgeology and ACE-V</u>, Washington, DC (2009)

**Jeffrey A. Payne**

- Appleton – <u>Paper Mill Tour</u>, Roaring Springs, PA (2009)

- Oklahoma State University – Department of Forensic Sciences – <u>Forensic Examination of Questioned Documents</u> (Fall 2009)

- Oklahoma State University – Department of Forensic Sciences – <u>Historical Aspects of Questioned Documents</u> (Fall 2010)

- Oklahoma State University – Department of Forensic Sciences – <u>Forensic Handwriting Examinations:  Theory and Practice</u> (Spring 2011)

- American Society of Questioned Document Examiners – Working Multifaceted Cases (Summer 2011)

- American Society of Questioned Document Examiners – Skillful Freehand Signature Simulation Workshop (Summer 2014)

- Mid-Atlantic Association of Forensic Scientists Workshop – Forensic Examination of Biometrically Captured e-Signatures, Cambridge, MD (2015)

- Barnes International – Combined EMV and CPT Training Session, Washington, DC (2016)

- James J. Rowley Training Center - Ethics in Law Enforcement Course, Beltsville, MD (2017)

- Mid-Atlantic Association of Forensic Scientists – Questioned Documents Expert Testimony Workshop, Manassas, VA (2017)

- Mid-Atlantic Association of Forensic Scientists – VSC and ESDA Technology, Hunt Valley, MD (2018)

- Mid-Atlantic Association of Forensic Scientists – Examination of Signatures, Hunt Valley, MD (2018)

- Mid-Atlantic Association of Forensic Scientists – Charred and Water Soaked Documents, Hunt Valley, MD (2018)

- American Society of Questioned Document Examiners – The Greatest Forger to Ever Get Caught, Park City, UT (2018)

- American Society of Questioned Document Examiners – Handwriting Features Common to Hispanic Writers, Park City, UT (2018)

- American Society of Questioned Document Examiners (ASQDE) Opinion Measurement Workshop, Virtual Meeting

**Jeffrey A. Payne**

- American Society of Questioned Document Examiners (ASQDE) Digital Workflow, Virtual Meeting, 2020

- American Academy for Forensic Sciences – A Complete Introduction to Digitally Captured Signatures (DCS) and a Tutorial for Namirial

- Firma Certa Forensic Tool, Virtual Meeting 2021

- American Academy of Forensic Sciences – Technology and Design of Security Documents, Virtual Meeting (2021)

## Presentations/Instruction/Papers:

- Mid-Atlantic Association of Forensic Scientists – "Thermal Printing Processes" Frederick, MD

- Southwestern Association of Forensic Document Examiners – "Thermal Printing Processes" Honolulu, HI

- Southeastern Association of Forensic Document Examiners, Peachtree City, GA

- 9th Annual Drugs, Alcohol, and Impaired Driving Seminar – Baltimore, MD

- The Forensic Analysis of Thermal Transfer Printing – <u>Journal of Forensic Sciences</u> – September 2003

- International Association of Financial Crimes Investigators – Ocean City, MD

- National Conference of State Legislatures – Salt Lake City, UT

- United States Secret Service – Questioned Documents Course, Glynco, GA

- PIRA – Innovations in Security – Chicago, IL

- Rochester Institute of Technology – Printing Process Identification and Image Analysis for Document Examiners, Rochester, NY

- NYACT/NYPTI Auto Crime & Insurance Fraud Conference – Albany, NY

- National Odometer and Title Fraud Enforcement Association's 27th annual Conference – Charleston, WV

- Information Management Institute - 4th Annual Security Printing Conference – Baltimore, MD

- Mid-Atlantic Association of Forensic Scientists – "Questioned Identification Document System and Link Analysis Database, Optical Imaging Station, & Genuine Document System Handheld Device" Baltimore, MD

- American Society of Questioned Document Examiners – Philadelphia, PA

- MAAFS Fall Workshop – Expert Witness Testimony – Washington, DC

- Demystifying the ABFDE Certification Process – Washington, DC

- American Society of Questioned Document Examiners Park City, UT

## Conferences/ Seminars/ Professional Meetings Attended

| 05-2000 | International Conference on Payment Card Fraud - Lyon France |
| --- | --- |
| 06-2002 | International Association of Financial Crimes Investigators Training Seminar - Ocean City, MD |
| 10-2002 | Southwestern Association of Forensic Document Examiners Honolulu, HI |
| 10-2002 | Meeting of Interpol's Advisory Group on the Universal Classification System for Counterfeit Payment Cards - Washington, DC |
| 05-2003 | International Asian Organized Crime Conference - Boston, MA |
| 09-2003 | National Crime Scene and Forensic Sciences Conference - Chicago, IL |
| 04-2004 | Crime Scene Reconstruction Seminar - Fairfax, VA |
| 04-2004 | Mid-Atlantic Association of Forensic Scientists - Wilmington, DE |
| 05-2005 | 2nd International Conference on Asian Organized Crime and Terrorism Uncasville, CT |
| 08-2005 | American Society of Questioned Document Examiners - Montreal, Canada |
| 06-2006 | National Expert Witness Conference - Hyannis, Cape Cod, MA |
| 05-2007 | Mid-Atlantic Association of Forensic Scientists - Washington, DC |
| 06-2007 | International Association of Financial Crimes Investigators Training Seminar – Ocean City, MD |

# Jeffrey A. Payne

| | |
|---|---|
| 07-2007 | Scientific Working Group for Forensic Document Examination<br>Stafford, VA |
| 02-2008 | American Academy of Forensic Sciences – Washington, DC |
| 02-2008 | American Association of Motor Vehicle Administrators – FDR Advisory<br>Council - Arlington, VA |
| 09-2008 | European Document Experts Working Group Conference - Bunratty,<br>Ireland |
| 01-2009 | Scientific Working Group for Forensic Document Examination<br>Stafford, VA |
| 05-2009 | Mid-Atlantic Association of Forensic Scientists - Baltimore, MD |
| 07-2010 | Scientific Working Group for Forensic Document Examination<br>Woodbridge, VA |
| 08-2010 | American Society of Questioned Document Examiners<br>Victoria, British Columbia |
| 05-2012 | Mid-Atlantic Association of Forensic Scientists<br>Ellicott City, MD |
| 02-2013 | American Academy of Forensic Sciences<br>Washington, DC |
| 08-2014 | American Society of Questioned Document Examiners<br>Honolulu, HI |
| 05-2015 | Mid-Atlantic Association of Forensic Scientists<br>Cambridge, MD |
| 05-2018 | Mid-Atlantic Association of Forensic Scientists<br>Hunt Valley, MD |
| 08-2018 | American Society of Questioned Document Examiners<br>Park City, UT |
| 08-2020 | American Society of Questioned Document Examiners, Virtual Meeting |
| 02-2021 | American Academy of Forensic Sciences |

**Jeffrey A. Payne**

**Professional Memberships and Affiliations**

- The American Board of Forensic Document Examiners

- Mid-Atlantic Association of Forensic Scientists

- American Society of Crime Laboratory Directors/Laboratory Accreditation Board - Certified Technical Assessor

- Document Security Alliance

**Court Qualifications**

**United States District Court**

- Chicago, IL

- Corpus Christi, TX

- Albany, NY

**Superior Court of the District of Columbia – Criminal Division**

**Superior Court of New Jersey**

**Circuit Court for Prince George's County**

**District Court of Hong Kong**

**Provincial Court of British Columbia**

- North Vancouver, BC

APPENDIX 2

**SWGDOC Standard for Minimum Training Requirements for Forensic Document Examiners**

1. Scope

1.1 This standard provides minimum requirements and procedures that should be used for the fundamental training of forensic document examiners (SWGDOC Standard for Scope of Work of Forensic Document Examiners).

1.2 This standard may not cover all aspects of training for the topics addressed or for unusual or uncommon examinations.

1.3 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

2. Referenced Documents

2.1 *Standards:*

ASTM E1732 Terminology Relating to Forensic Science

SWGDOC Standard for Scope of Work of Forensic Document Examiners

SWGDOC Terminology Relating to the Examination of Questioned Documents

3. Terminology

3.1 For definitions of terms in this standard, refer to Terminologies E1732 and SWGDOC Terminology Relating to the Examination of Questioned Documents.

3.2 *Definitions of Terms Specific to This Standard:*

3.3 *technical visit, n*—travel for the purpose of obtaining information, knowledge, or training, including interaction with or demonstration by pertinent manufacturers, businesses, and laboratories.

4. Significance and Use

4.1 The procedures outlined here are grounded in the generally accepted body of knowledge and experience in the field of forensic document examination. By following these requirements and procedures, an appropriate trainee (see 5.2) can acquire the scientific, technical, and other specialized knowledge, skill, and experience required to reliably perform the work of a forensic document examiner (SWGDOC Standard for Scope of Work of Forensic Document Examiners).

5. Equipment and Personnel

5.1 *Training Materials and Equipment*:

5.1.1 Access to texts, periodicals, papers, and other professional literature.

5.1.2 Access to equipment appropriate to each area of instruction.

5.2 *Requirements for the Trainee Candidate*:

5.2.1 An earned baccalaureate degree or equivalent from an accredited college or university.

5.2.2 Documented successful completion of a form discrimination test.

5.2.3 Documented successful completion of a color perception test.

5.2.4 Documented successful completion of near and distant visual acuity tests with best corrected vision within six months prior to commencement of training.

5.3 *Requirements for the Trainer(s)*:

5.3.1 Requirements for the principal trainer:

5.3.1.1 The principal trainer shall be a forensic document examiner;

5.3.1.2 Have successfully completed the equivalent of a minimum of 24 months full-time supervised training;

5.3.1.3 Have been trained in the topics of instruction in this standard (Section 7); and

5.3.1.4 Have at least five years of full-time post-training experience as a forensic document examiner.

5.3.1.5 All of the above should be documented.

5.3.1.6 The principal trainer should have successfully completed a course or seminar in instructor development.

5.3.2 The qualifications of any other trainers shall be approved by the principal trainer.

6. Procedure

6.1 The training program shall be the equivalent of a minimum of 24 months full-time training under the supervision of a principal trainer.

6.1.1 The training program shall be successfully completed in a period not to exceed four years.

6.1.2 Each area of instruction will have an objective(s) established by the principal trainer. Examination(s) (for example, written test, oral test, practical exercise) will be administered in order to measure the trainee's knowledge.

NOTE 1—Although attending meetings and presentations is useful as supplemental training, it does not replace the training outlined in Section 7 of this standard. However, the principal trainer may grant credit to the trainee for knowledge (as in accordance with Section 7) acquired at such meetings and presentations.

6.1.3 The principal trainer may grant credit for prior training or experience in Section 7 subject areas when the trainee can demonstrate and document such training or experience.

6.1.4 A training record for each trainee will be maintained and will document the following:

6.1.4.1 Instruction in each topic area.

Copyright by SWGDOC (all rights reserved); Wed Jan 14 13:26:05 CDT 2015

6.1.4.2 A bibliography of relevant literature studied.

6.1.4.3 Examination(s) (for example, written test, oral test, practical exercise).

6.1.4.4 Case statistics (for example, number, type, items, reports).

6.1.4.5 Outside training, technical visits, courses, conferences, or workshops attended.

6.1.4.6 Research conducted.

7. Syllabus

7.1 A formal written training program will include specific topics of instruction. The order in which they are administered is discretionary; however, the amount of time must be adequate to ensure competency in all topic areas. The minimum specific topics are:

7.2 *Introduction and History of Forensic Document Examination*:

7.2.1 Ethical responsibilities.

7.2.2 Literature of the field.

7.2.3 Evolution of the field.

7.2.4 Historical cases.

7.2.5 Scientific method.

7.2.6 Research methodology.

7.3 *Evidence Handling Procedures*:

7.3.1 Procedures and protocols.

7.3.2 Relationship of forensic document examination to other forensic disciplines.

7.3.3 Collection and preservation.

7.3.4 Marking and documentation.

7.3.5 Chain of custody.

7.4 *Examination Procedures*:

7.4.1 Procedures and protocols.

7.4.2 Theory of individualization.

7.4.3 Case organization.

7.4.4 Note taking.

7.4.5 Conclusions and findings.

7.4.6 Report writing.

7.5 *Laboratory Instrumentation and Equipment*:

7.5.1 Procedures and protocols.

7.5.2 Physics of light pertinent to forensic document examination procedures.

7.5.3 Microscopy.

7.5.4 Measuring systems and devices.

7.5.5 Light sources.

7.5.6 Electrostatic detection devices.

7.5.7 Typewriter examination devices.

7.5.8 Computers and peripherals.

7.5.9 Other relevant laboratory equipment.

7.6 *Paper*:

7.6.1 Procedures and protocols.

7.6.2 History of paper.

7.6.3 Manufacturing processes.

7.6.4 Physical properties (for example, light-reactive, watermarks, dimensions, security features).

7.6.5 Physical matches (for example, fibers, tears, edge striations).

7.6.6 Tapes and adhesives.

7.6.7 Indentations.

7.7 *Writing Instruments and Inks*:

7.7.1 Procedures and protocols.

7.7.2 History of writing instruments and inks.

7.7.3 Properties of inks.

7.7.4 Destructive and nondestructive analyses of inks.

7.7.5 Writing instrument characteristics.

7.7.6 Sequence, direction, and pressure of strokes.

7.8 *Handwriting (including Cursive or Script Style Writing, Hand Printing, Signatures, Numerals, and Other Written Marks or Signs)*:

7.8.1 Procedures and protocols.

7.8.2 History and theory.

Copyright by SWGDOC (all rights reserved); Wed Jan 14 13:26:05 CDT 2015

7.8.3 Physiology of handwriting and motor control.
7.8.4 Handwriting systems.
7.8.5 Handwriting comparison process.
7.8.6 Individualizing characteristics (individual and class).
7.8.7 Features of handwriting (for example, variation, line quality, skill level).
7.8.8 Distorted handwriting.
7.8.9 Factors affecting handwriting (internal and external).
7.8.10 Tracings and simulations.
7.8.11 Other handwriting problems.
7.9 *Alterations, Obliterations, and Erasures*:
7.9.1 Procedures and Protocols.
7.9.2 Types of alterations (for example, page substitution, insertion).
7.9.3 Types of obliterations (for example, opaquing fluid, over-writing, chemical).
7.9.4 Types of erasures (physical and chemical).
7.9.5 Detection and decipherment techniques.
7.10 *Typewriters*:
7.10.1 Procedures and protocols.
7.10.2 History of typewriters.
7.10.3 Fundamentals of typewriter examination (individualization and comparison).
7.10.4 Typestyle classification.
7.10.5 Typing and correction ribbon examinations.
7.10.6 Paper fiber transfer.
7.11 *Computer Printers*:
7.11.1 Procedures and protocols.
7.11.2 History of computer printers.
7.11.3 Fundamentals of computer printer examinations (individualization and comparison).
7.11.4 Computer printing processes (impact and nonimpact).
7.11.5 Font classification.
7.12 *Photocopiers*:
7.12.1 Procedures and protocols.
7.12.2 History of photocopiers.
7.12.3 Electrostatic and other imaging processes.
7.12.4 Fundamentals of examination (individualization and comparison).
7.12.5 Alteration and manipulation techniques.
7.13 *Facsimiles*:
7.13.1 Procedures and protocols.
7.13.2 History of facsimile machines.
7.13.3 Imaging processes.
7.13.4 Fundamentals of examination (individualization and comparison).
7.13.5 Alteration and manipulation techniques.
7.14 *Printing Processes*:
7.14.1 Procedures and protocols.
7.14.2 History of printing.
7.14.3 Typography.
7.14.4 Characteristics of printing processes.
7.14.5 Fundamentals of examination (individualization and comparison).
7.14.6 Security features.
7.15 *Mechanical Impressions*:
7.15.1 Procedures and protocols.
7.15.2 History of devices (for example, check writers, rubber and polymer stamps, paper binders, staples, embossing devices, seals and stamped impressions, fasteners, hole punchers).
7.15.3 Fundamentals of examination (individualization and comparison).
7.16 *Charred and Soaked Documents*:
7.16.1 Procedures and protocols.
7.16.2 Care and preservation.
7.16.3 Examination and decipherment.
7.17 *Photography and Digital Imaging*:
7.17.1 Procedures and protocols.

Copyright by SWGDOC (all rights reserved); Wed Jan 14 13:26:05 CDT 2015

7.17.2 General photography.
7.17.3 Document photography.
7.17.4 Digital photography.
7.17.5 Digital imaging techniques.
7.17.6 Alteration and manipulation techniques.
7.17.7 Image editing software.
7.18 *Miscellaneous Examinations*:
7.18.1 Dependent upon the capabilities or requirements of the laboratory.
7.19 *Expert Witness and Legal Proceedings*:
7.19.1 Procedures and protocols.
7.19.2 Terminology.
7.19.3 Relevant law.
7.19.4 Adjudication systems.
7.19.5 Effective communication.
7.19.6 Courtroom demeanor.
7.19.7 Preparation and use of demonstrative exhibits.
7.19.8 Observation of pre-trial conferences and testimony of experts, actual or mock.
7.19.9 Participation as an expert witness in mock trials.
7.19.10 Understanding of critical challenges to the discipline.
7.20 *Practical Experience*:
7.20.1 Supervised casework.
7.20.2 Training or observation at other forensic document laboratories is recommended.
7.20.3 Supplemental education (for example, courses, seminars, technical visits, workshops).
8. Keywords
8.1 forensic document examination; forensic document examiner; forensic sciences; questioned documents; training

APPENDIX 3

# The American Board Of Forensic Document Examiners, Inc.®



*A non-profit organization incorporated in the District of Columbia for certifying qualified examiners in forensic handwriting comparison and all other facets of questioned document examination.*

## Sponsoring Organizations

*American Society of
Questioned Document Examiners*

*Canadian Society of Forensic Science*

*Southeastern Association of
Forensic Document Examiners*

*Southwestern Association of
Forensic Document Examiners*

## ABFDE is also recognized by

*American Academy of Forensic Sciences*

*The International Association for Identification*

*The Mid-Atlantic Association
Of Forensic Sciences*

**ABFDE is accredited by the Forensic Specialties Accreditation Board.**

## BACKGROUND

The American Board of Forensic Document Examiners, Inc. ® (ABFDE) was established in 1977 to identify qualified forensic scientists capable of providing essential professional services. Within its mandate, the Board provides a program of certification in forensic document examination with the dual purpose of serving the public interest and promoting the advancement of forensic

science. In purpose, function and organization, therefore, the ABFDE is analogous to certifying boards in other scientific fields.

At its inception, the Board was sponsored by the American Academy of Forensic Sciences. Today the Board is sponsored by the Canadian Society of Forensic Science, the American Society of Questioned Document Examiners, the Southwestern Association of Forensic Document Examiners, and the Southeastern Association of Forensic Document Examiners, and also is recognized by the American Academy of Forensic Sciences, the International Association for Identification, and the Mid-Atlantic Association of Forensic Sciences.

The ABFDE is the only certifying body that can claim such sponsorship and recognition.

The Board is composed of elected officers and directors who serve staggered terms, and a Professional Review Committee which upholds the ethical and professional rules of conduct that are set out in the ABFDE Bylaws.

## OBJECTIVES

The Board's objectives are two-fold: to establish, maintain and enhance standards of qualification for those who practice forensic document examination, and to certify applicants who comply with ABFDE requirements for qualified specialists. In doing so, the Board aims to safeguard the public interest by ensuring that anyone who claims to be a specialist in forensic document examination does, in fact, possess the necessary skills and qualifications.

Among the Board's diplomates are both examiners in private practice and examiners from police, state, county, and metropolitan agencies, including crime laboratories accredited through the American Society of Crime Laboratory Directors. This includes nationally and internationally recognized organizations such as: The Federal Bureau of Investigation; the Royal Canadian Mounted Police; the United States Secret Service; Immigration and Customs Enforcement; the United States Postal Inspection Service; the Internal Revenue Service; Revenue Canada – Customs, Excise and Taxation; the United States Army Crime Laboratory; and the United States Bureau of Alcohol, Tobacco and Firearms.

As qualified experts in the field, a number of diplomates have written authoritative books on a variety of topics related to document examination.

## CERTIFICATION

Certification is open to permanent residents of the United States of America, Canada and Mexico and is based on an applicant's record of education, training, experience, and achievement, as well as the results of the Board's formal examination process.

## QUALIFICATIONS

*General:* To qualify, applicants must be of good moral character, reputation, and integrity, and must possess high ethical and professional standing.

*Educational:* Applicants must have earned a baccalaureate degree from an educational institution. Acceptable institutions include those accredited by regional accrediting commissions recognized by the U.S. Office of Education, as well as other institutions recognized by the ABFDE.

## PROFESSIONAL EXPERIENCE

To apply, proof must be shown of a full-time training period of at least two years (or equivalent) in a forensic laboratory recognized by the Board.

In addition, applicants need to supply as references the names and addresses of three qualified Forensic Document Examiners who are recognized by the Board and who can attest to the applicant's qualifications for certification. References from persons other than Forensic Document Examiners are evaluated on an individual basis.

At the time of their application for certification, applicants must be actively engaged in the practice of forensic document examination. Applicants must also be able to demonstrate a record of appropriate professional activities in forensic document examination.

Forensic Document Examination is the application of document examination to the purposes of the law. Forensic Document Examinations are conducted when either elements of or an entire document's authenticity or authorship are in question. Examinations can include the identification of handwriting, signatures, and typewriting; the detection of alterations; analysis of inks and papers, stamps, photocopying or printing processes, and writing instruments; determination of the sequence of writing; or dating of documents.

## EXAMINATIONS

In addition to meeting the qualification requirements set out above, applicants must also take comprehensive written, practical and oral examinations that are based on a wide range of problems frequently encountered in document examination. Eligible applicants are required to undergo these examinations within two years of having their applications approved. Any applicant who fails to pass the examination may apply for retesting after six months.

## EXPLANATION OF TERMS

Although not intended to be selective or restrictive, the terms "acceptable to the Board" and "recognized by the Board" refer to an established laboratory or individual whose reputation can be proven or is known to be favorable.

---

For a directory of ABFDE Diplomates or further information about ABFDE and forensic document examination, go to:

**www.abfde.org**

APPENDIX 4

**SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners**

**1. Scope**

1.1 This terminology is intended to assist forensic document examiners in expressing conclusions or opinions based on their examinations.

1.2 The terms in this terminology are based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science that was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners.[1]

**2. Referenced Documents**

2.1 *Standards*

SWGDOC Standard for Scope of Work of Forensic Document Examiners

**3. Significance and Use**

3.1 Document examiners begin examinations from a point of neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.

3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. The expressions used to differentiate the gradations of opinions should not be considered as strongly defined "categories". These expressions should be guidelines without sharply defined boundaries.

3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.

3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, that is, to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.

3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in SWGDOC Standard for Scope of Work of Forensic Document Examiners, and it may be used by forensic examiners in other areas, as appropriate.

3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

**4. Terminology**

4.1 *Recommended Terms:*

**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.

*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.

**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order; however, the examiner is virtually certain that the questioned and known writings were written by the same individual.

*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.

DISCUSSION—Some examiners doubt the desirability of differentiating between strong probability and probable, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

---

[1] McAlexander T.V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science*, Vol 36, No. 2, March 1991, pp. 311–319.

Copyright by SWGDOC (all rights reserved); Wed Jan 14 13:26:05 CDT 2015

**probable**—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the" virtually certain" degree of confidence.
*Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

**indications (evidence to suggest)**—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.
*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.
DISCUSSION—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**no conclusion (totally inconclusive, indeterminable)**—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another. *Examples—No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

**indications did not**—this carries the same weight as the indications term that is, it is a very weak opinion.
*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence *suggests* that the John Doe of the known material did not write the questioned material, or I found indication*s* that the John Doe of the known material did no*t* write the questioned material but the evidence is far from conclusive.
See Discussion after indications.

**probably did not**—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.
*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.
DISCUSSION—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

**strong probability did not**—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.
*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.
DISCUSSION—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

**elimination**—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.
*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.
DISCUSSION—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1 When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

4.2 *Deprecated and Discouraged Expressions*:

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so

SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners

blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion*. To say that the suspect "could have written the material in question" says nothing about probability and is therefore meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

**consistent with**—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

**could not be identified/cannot identify**—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

**similarities were noted/differences as well as similarities**— these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

**cannot be associated/cannot be connected**—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

**no identification**—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing; to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as. "I no identified the writer" or "I made a no ident in this case."

**inconclusive**—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

**positive identification**—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

**[strong] reason to believe**—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

**qualified identification**—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination*.

APPENDIX 5

*[handwritten note top right: bought /sold. Classify ___ as key player to have this Contract.]*

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND

## POST-EMPLOYMENT COMPETITION

This Agreement is between the David John Boshea, residing at 4839 Clearwater LN. Naperville, IL. 60564 ("Employee") and COMPASS MARKETING, INC ("COMPASS"), having a place of business at 612 Third Street, Annapolis

## RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, health-beauty care, over the counter medicine, consumer products, and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible. intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee, as a senior executive, will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS senior executives;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

WHEREAS, COMPASS will be vulnerable to unfair post-employment competition by Employee because Employee will have access to and knowledge of COMPASS's Proprietary Information, will have a personal relationship with COMPASS's clients, customers, suppliers and others, and will generate good will which Employee acknowledges belongs to COMPASS;

NOW, THEREFORE, in consideration of Employee's employment with COMPASS, the severance benefit and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agrees to enter into this Agreement with COMPASS as a condition of employment pursuant to which COMPASS will limit Employee's rights, including, but not limited to, the right to compete against COMPASS, during and following termination of employment on the terms set forth in this Agreement. Intending to be legally bound, the parties agree as follows:

## ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:

Initial *[handwritten initials]*

Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, policies or products, other than to comply with law.

## ARTICLE 2. NON-COMPETITION:

A.    Subject to Article 2.B. below, Employee, during Employee's period of employment with COMPASS, and for a period of three years following the voluntary or involuntary termination of employment, shall not, without COMPASS's written permission, which shall be granted or denied in COMPASS's sole discretion, directly or indirectly, associate with (including, but not limited to, association as a sole proprietor, owner, employer, partner, principal, investor, joint venturer, shareholder, associate, employee, member, consultant, contractor or otherwise), or acquire or maintain ownership interest in, any Business which is competitive with that conducted by or developed for later implementation by COMPASS at any time during the term of Employee's employment, provided, however, if Employee's employment is involuntarily terminated by COMPASS for any reason other than Cause (as defined herein) then the term of the non-competition provision set forth herein will be modified to be one year following such termination of employment. For purposes of this Agreement, "Business" shall be defined as a person, corporation, firm, LLC, partnership, joint venture or other entity. Nothing in the foregoing shall prevent Employee from investing in a Business that is or becomes publicly traded, if Employee's ownership is as a passive investor of less than 1 % of the outstanding publicly traded stock of the Business.

B.    The provision set forth in Article 2.A above, shall apply to (i) all fifty states, and (ii) each foreign country, possession or territory in which COMPASS may be engaged in, or have plans to engage in, business (x) during Employee's period of employment, or (y) in the case of a termination of employment, as of the effective date of such termination or at any time during the twenty-four month period prior thereto.

C.    Employee acknowledges that these restrictions are reasonable and necessary to protect the business interests of COMPASS, and that enforcement of the provisions set forth in this Article 2 will not unnecessarily or unreasonably impair Employee's ability to obtain other employment following the termination (voluntary or involuntary) of Employee's employment with COMPASS. Further, Employee acknowledges that the provisions set forth in this Article 2 shall apply if Employee's employment is involuntarily terminated by COMPASS for Cause; as a result of the elimination of employee's position for performance-related issues; or for any other reason or no reason at all.

D.

## ARTICLE 3. NON-SOLICITATION:

A.  During the period of Employee's employment with COMPASS and for a period of three years following the termination of Employee's employment, regardless of the reason for termination, Employee shall not, directly or indirectly: (i) induce or encourage any employee of COMPASS to leave the employ of COMPASS, (ii) hire any individual who is or was an employee of COMPASS, or (iii) induce or encourage any customer, client, potential client, supplier or other business relation of COMPASS to cease or reduce doing business with COMPASS or in any way interfere with the relationship between any such customer, client, supplier or other business relation and COMPASS.

B.    A "customer of COMPASS" shall be defined to mean the entities or businesses to whom COMPASS sells the product lines of its clients.

C.    A "client of COMPASS" shall be defined to mean the supplier of product lines to COMPASS, which product lines are sold by COMPASS to its customers.

D.    A "potential client of COMPASS" shall be defined to mean the supplier of product lines to COMPASS that COMPASS is actively negotiating with to represent as a future COMPASS client, during the period of Employee's employment.

## ARTICLE 4. DISCOVERIES' AND WORKS:

Initial

Employee hereby irrevocably assigns, transfers, and conveys to COMPASS to the maximum extent permitted by applicable law Employee's right, title and interest now or hereinafter acquired, in and to all Discoveries and Works (as defined below) created, invented, designed, developed, improved or contributed to by Employee, either alone or jointly with others, while employed by COMPASS and within the scope of Employee's employment and/or with the use of COMPASS's resources. The terms "Discoveries and Works" include all works of authorship, inventions, intellectual property, materials, documents. or other work product (including, without limitation, Proprietary Information, patents and patent applications, patentable inventions, research, reports, software, code, databases, systems, applications, presentations, textual works, graphics and audiovisual materials). Employee shall have the burden of proving that any materials or works created, invented, designed, developed, contributed to or improved by Employee that are implicated by or relevant to employment by COMPASS are not implicated by this provision. Employee agrees to (i) keep accurate records and promptly notify, make full disclosure to, and execute and deliver any documents and to take any further actions requested by COMPASS to assist it in validating, effectuating, maintaining, protecting, enforcing, perfecting, recording, patenting or registering any of its rights hereunder, and (ii) renounce any and all claims, including, without limitation, claims of ownership and royalty, with respect to all Discoveries and Works and all other property owned or licensed by COMPASS. Any Discoveries and Works that, within six months after the termination of Employee's employment with COMPASS, are made, disclosed, reduced to a tangible or written form or description, or are reduced to practice by Employee and which pertain to the business carried on or products or services being sold or developed by COMPASS at the time of such termination shall, as between Employee and COMPASS, be presumed to have been made during such employment with COMPASS. Employee acknowledges that, to the fullest extent permitted by law, all Discoveries and Works shall be deemed "works made for hire" under the Copyright Act of 1976, as amended, 17 U.S.C. Section 101. Employee hereby grants COMPASS a perpetual, nonexclusive, royalty-free, worldwide, assignable, sublicensable license under all rights and intellectual property rights (including patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) in any Works and Discoveries, for all purposes in connection with COMPASS's current and future business, that Employee has created, invented, designed, developed, improved or contributed to prior to Employee's employment with COMPASS that are relevant to or implicated by such employment ("Prior Works"). Any Prior Works are disclosed by Employee in Schedule 1.

## ARTICLE 5. REMEDIES:

Employee acknowledges that in the event of any violation by Employee of the provisions set forth in Articles 1, 2, 3 or 4 above, COMPASS will sustain serious, irreparable and substantial harm to its business, the extent of which will be difficult to determine and impossible to fully remedy by an action at law for money damages. Accordingly, Employee agrees that, in the event of such violation or threatened violation by Employee, COMPASS shall be entitled to an injunction before trial before any court of competent jurisdiction as a matter of course upon the posting of not more than a nominal bond, in addition to all such other legal and equitable remedies as may be available to COMPASS. If COMPASS is required to enforce the provisions set forth in Articles 2 and 3 above by seeking an injunction, Employee agrees that the relevant time periods set forth in Articles 2 and 3 shall commence with the entry of the injunction. Employee further agrees that, in the event any of the provisions of this Agreement are determined by a court at competent jurisdiction to be invalid, illegal, or for any reason unenforceable as written, such court shall substitute a valid provision which most closely approximates the intent and purpose of the invalid provision and which would be enforceable to the maximum extent permitted by law.

## ARTICLE 6. SEVERANCE:



A.      If Employee's employment is terminated by COMPASS for any reason other than Cause, Employee shall receive severance payments totaling $180,000 (one hundred and eighty thousand U.S. dollars) which will be divided up into twenty-four payments and will commence with the Employee's effective date of termination and shall be made in accordance with COMPASS's normal payroll cycle. The period during which Employee receives severance payments shall be referred to as the "Severance Pay Period." Severance will increase one month for every month employed to a maximum severance of $540,000.

B       There are no other post-employment benefits. Employee, however, shall have certain rights to continue the Medical Plan under COBRA.

C       Termination for "Cause shall he defined as termination of employment due to: (i) conviction of or entry of a plea of guilty or nolo contendere to any criminal charge (or any similar crime for purposes of laws outside the United States), (ii) fraud or dishonesty, (iii) failure to perform assigned duties, (iv) working against the best interests of COMPASS, or (v) the violation of any of the covenants set forth in Articles 1, 2, 3 and 4 above.

Initial _ZpC_

D.      If Employee is terminated by COMPASS for reasons other than Cause, Employee will receive the severance payments during the Severance Pay Period even if Employee commences other employment during such period provided such employment does not violate the terms of Article 1, 2, 3 and 4 of this Agreement.

E.      In addition to the remedies set forth in Article 5, COMPASS reserves the right to terminate all severance payments if Employee violates any covenants set forth in Articles 1, 2, 3 or 4 of this Agreement.

F.      Employee's receipt of severance under this Agreement is contingent on Employee's execution of a release in a form reasonably acceptable to COMPASS, except that such release shall not include any claims by Employee to enforce Employee's rights under, or with respect to, this Agreement or any COMPASS benefit plan pursuant to its terms, and that the employee not revoking the release prior to the expiration of the applicable Age Discrimination in Employment Act revocation period.

## ARTICLE 7. TERM OF EMPLOYMENT:

Employee acknowledges that COMPASS has the right to terminate Employee's employment at any time for any reason whatsoever, provided, however, that any termination by COMPASS for reasons other than Cause shall result in the severance described in Article 6 above, to become due in accordance with the terms of this Agreement subject to the conditions set forth in this Agreement. Employee further acknowledges that the severance payments provided by COMPASS are in full satisfaction of any obligations COMPASS may have resulting from COMPASS's exercise of its right to terminate Employee's employment, except for those obligations which are intended to survive termination such as the payments to be made pursuant to retirement plans, deferred compensation plans and conversion of insurance.

## ARTICLE 8. MISCELLANEOUS:

A.      As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B.      This Agreement shall supersede and substitute for any previous employment, post-employment or severance agreement between Employee and COMPASS.

C.      If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.      Employee shall not be required to mitigate damages or the amount of any payment provided for under this Agreement by seeking other employment or otherwise.

E.      In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.      The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.

G.      Employee expressly consents to the application of Article 8.F to any judicial action or proceeding arising out of or relating to this Agreement. COMPASS shall have the right to serve legal process upon Employee in any manner permitted by law. In addition, Employee irrevocably appoints the General Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of

Initial

Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H.      Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 8.F and hereby agrees not to plead or claim the same.

I.      Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.      At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.      Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.      Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF**, and intending to he legally bound, the parties hereto have caused this Agreement to be signed.

by COMPASS MARKETING, INC.                                         by EMPLOYEE

Date:                                                                                          Date:

/s/                                                                                            /s/ David Boshea

John D. White, CEO                                                           David John Boshea

Q-1

Initial

**Schedule 1**

**Prior Works\***

---

\*          if no Prior Works are listed, Employee certifies that there are none.

Initial

APPENDIX 6

Signature Page For John White

**K-1(a-e)**

Compass MARKETING   COMPASS MARKETING INC
222 SEVERN AVE, SUITE 200
ANNAPOLIS, MD 21403

MANUFACTURERS & TRADERS TR CO
7-11/920

5253

08/02/2011

PAY TO THE
ORDER OF ____ Michael R White

$**119,239.00

One hundred nineteen thousand two hundred thirty-nine and 00/100**********************************************  DOLLARS

Michael R White
39650 Hiawatha Circle
Mechanicsville, MD  20659

MEMO      2010 Taxes $83118.00 Fed  $36121.00 state

⑈005253⑈ ⑆052000113⑈  97008124,3⑈

K-2

COMPASS MARKETING INO
08/02/2011      Michael R White

2010 Taxes $83118.00 Fed  $36121.00 state

5253
119,239.00

Checking - M&T Bank  2010 Taxes $83118.00 Fed  $36121.00 state

119,239.00

08/02/2011
COMPASS MARKETING INC      Michael R White

2010 Taxes $83118.00 Fed  $36121.00 state

119,239.00  5253

Checking - M&T Bank  2010 Taxes $83118.00 Fed  $36121.00 state

119,239.00

  

## MANUFACTURERS AND TRADERS TRUST COMPANY
### CERTIFIED BANKING RESOLUTIONS OF CORPORATION

**ACCOUNT NUMBER:**   00016004207832301

**DEPOSITOR:**   COMPASS MARKETING INC

| | |
|---|---|
| Name   JOHN D WHITE | Name |
| Title | Title |
| Address | Address |
| | |
| Telephone | Telephone |
| SSN | SSN |
| Signature | Signature |
| | |
| Name | Name |
| Title | Title |
| Address | Address |
| | |
| Telephone | Telephone |
| SSN | SSN |
| Signature | Signature |

I certify that the resolutions set forth below or provided separately to M&T Bank were duly adopted by the Board of Directors of Depositor, a corporation duly organized and validly existing under the laws of the State of _____ (the "Depositor"), by unanimous consent or at a meeting duly called and held on _____ that each of such resolutions is in full force and effect and none has been rescinded, revoked or modified, and that none of such resolutions nor any action pursuant thereto will violate any law, certificate of incorporation, by-law or agreement by which Depositor or any of its assets is bound. RESOLVED: that

1.   Manufacturers and Traders Trust Company ("M&T Bank") is hereby designated a depository for the Depositor and the officers or employees named herein or on a Rider hereto are hereby authorized to open a deposit account (the "Account") on behalf of Depositor.

2.   M&T Bank may purchase, give credit for, cash, accept, certify and pay from funds on deposit in the Account, without recourse, all items signed, drawn, accepted or endorsed on behalf of Depositor, whether under a title, the words "Authorized Signature" or otherwise, with the actual or purported facsimile signature of any one of the persons whose names, titles and specimen signatures appear above or on a Rider hereto or his or her successor in office (each an "Authorized Signer"), regardless of the circumstances under which the signature shall have become affixed so long as the signature is the actual signature of an Authorized Signer or resembles the facsimile signature of an Authorized Signer previously certified to M&T Bank. Depositor shall indemnify M&T Bank against all claims, damages, liabilities, costs and expenses (including, but not limited to, attorneys' fees and disbursements incurred by M&T Bank in connection with honoring any signature of any Authorized Signer (including any facsimile signature that resembles the facsimile signature of an Authorized Signer previously certified to M&T Bank) or any refusal to honor the signature of any person who is not an Authorized Signer. Depositor acknowledges and agrees that any requirement of Depositor that any item or other instrument for the payment of money signed, drawn, accepted or endorsed on behalf of Depositor bear the signature of more than one Authorized Signer is solely an internal requirement of Depositor and imposes no duty of enforcement on M&T Bank.

3.   Any Authorized Signer may, on behalf of Depositor, transact with and through M&T Bank all such business as he or she deems advisable upon such terms as he or she deems proper, including, but not limited to, discounting, selling, assigning, delivering and negotiating items, guaranteeing the obligations of others, applying for and using any ATM or debit card providing access to the Account, contracting for automated clearing house ("ACH") payments and funds transfer services, cash management, trust and investment products and any other services and transactions in any way related to the Account or the funds on deposit from time to time therein, and pledging, assigning or granting security interests or other rights in the Account to M&T Bank or to third parties, and in connection with any such transaction of business, do or perform all such acts or other things as he or she shall deem proper, including, but not limited to, signing, drawing, accepting, endorsing, executing and delivering items, guaranties, assignments, pledges, receipts, waivers, releases, indemnities and other instruments, agreements and documents, accepting, receiving, withdrawing and waiving demands and notices and incurring and paying liabilities, costs and expenses.

4.   In the event an Authorized Signer acting on behalf of Depositor shall apply for or contract with M&T Bank for any electronic funds transfer service that M&T Bank may make available to Depositor, including, but not limited to, any service that contemplates M&T Bank's execution of payment orders initiated by Depositor for the wire or ACH transfer of funds to or from an Account of Depositor, such Authorized Signer shall be empowered on behalf of Depositor to designate one or more persons (who may, but need not be, Authorized Signers), each of whom, acting alone, shall be authorized on behalf of Depositor to transmit payment orders to M&T Bank for the transfer of funds to or from Depositor's Account.

5.   Each person identified as an Authorized Signer, and each person or persons designated by an Authorized Signer to act on behalf of Depositor (who may, but need not be, Authorized Signers), shall have the power and authority to transact business and bind Depositor through electronic medium (e.g., the internet) and M&T Bank may rely on any of the following to the same extent as the actual signature and proof of identity of each such person to bind Depositor: any electronic signature or digital signature, under applicable law, of such person; any identifier issued by M&T Bank, its affiliates or any other party (e.g., Personal Identification Number associated with ATM or other card or any access device) to such person; any other criteria that M&T Bank may reasonably rely on which may serve as an indicator of authentication for such person.

I further certify that each person whose name appears above or on a Rider hereto opposite an office has been duly elected or appointed to and now holds such office of Depositor and that each other person whose name thus appears is acting for Depositor in the capacity opposite such person's name; and that each signature on this certification or a Rider hereto is a true specimen of the signature of the person whose signature it purports to be.

☐ I further certify that I am the sole owner of all the issued and outstanding stock of Depositor.

**Signature of Corporate Secretary**         **Date**

John White.
**Print Name**

Original - Account Services; Copy - Branch
PAD46 (12/03)

**K-3(a&b)**                                                                 AN5

A.      As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B.      This Agreement shall supersede and substitute for any previous employment or post-employment agreements between Employee and COMPASS.

C.      If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.      Removed.

E.      In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.      The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.
G.

I.      Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.      At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.      Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.      Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.

Date: _____

/s/ _____

John D. White, CEO

by Kevin Van Deusen

Date: 9/26/17

/s/ _____

K-4

agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D. Employee shall not be required to mitigate damages or the amount of any payment provided for under this Agreement by seeking other employment or otherwise.

E. In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F. The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designatedforum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.

G. Employee expressly consents to the application of Article 8.F to any judicial action or proceeding arising out of or relating to this Agreement. COMPASS shall have the right to serve legal process upon Employee in any manner permitted by law. In addition, Employee irrevocably appoints the General Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H. Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 8.F and hereby agrees not to plead or claim the same.

I. Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J. At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K. Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L. Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, the parties hereto have caused this Agreement to be signed.

by COMPASS MARKETING, INC.

Date: _As 1, 2007_

/s/ _[signature]_

John D. White, CEO

by EMPLOYEE

Date: _July 22, 2007_

/s/ _[signature]_

John Mancini

K-5

Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H.    Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 8.F and hereby agrees not to plead or claim the same.

I.    Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.    At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.    Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.    Employee affirms that Employee has had the opportunity to seek the advice of an attorney of his/her choice before signing this Agreement.

IN WITNESS WHEREOF, and intending to he legally bound, the parties hereto have caused this Agreement to be signed:

By **COMPASS MARKETING, INC.**

Date: 6/15/16

/s/ _____

By **EMPLOYEE**

Date: 6/15/16

/s/ _____

**K-6**

Date: 6/15/16

Initial: JGS

## ARTICLE 6. MISCELLANEOUS:

A.      As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B.      This Agreement shall supersede and substitute for any previous employment or post-employment agreements between Employee and COMPASS.

C.      If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.      Removed.

E.      In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.      The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.
G.

I.      Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.      At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.      Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.      Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.

Date:   _4/15/2019_

/s/   _____

John D. White, CEO

by Drew Rayman

Date:   _4/10/19_

/s/   _____

K-7

Date: _____

/s/  _____

John D. White, CEO

Date:   3/6/2017  _____

/s/   Jamie Nash  _____

Jamie Nash

K-8

Page 4 of 5

Date:  3/6/2017  _____

Initial:  _____

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND

## POST-EMPLOYMENT COMPETITION

This Agreement is between the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to companies in the following categories:  food, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible. intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee, as a senior executive, will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS senior execitoves;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

WHEREAS, COMPASS will be vulnerable to unfair post-employment competition by Employee because Employee will have access to and knowledge of COMPASS's Proprietary Information, will have a personal relationship with COMPASS's clients, customers, suppliers and others, and will generate good will which Employee acknowledges belongs to COMPASS;

NOW, THEREFORE, in consideration of Employee's employment with COMPASS, a one time cash payment of $1,000.00 (one thousand U.S. dollars), the severance benefit and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agrees to enter into this Agreement with COMPASS as a condition of employment pursuant to which Employee's right to compete against COMPASS during and following termination of employment on the terms set forth in this Agreement. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after

G. Employee expressly consents to the application of Article 8.F to any judicial action or proceeding arising out of or relating to this Agreement. COMPASS shall have the right to serve legal process upon Employee in any manner permitted bylaw. In addition, Employee irrevocably appoints the General Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H. Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 8.F and hereby agrees not to plead or claim the same.

I. Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J. At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K. Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L. Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF**, and intending to he legally bound, the parties hereto have caused this Agreement to be signed.

| | |
|---|---|
| by COMPASS MARKETING, INC. | by EMPLOYEE |
| Date: 1/28/07 | Date: 1/28/07 |
| /s/ | /s/ |
| John D. White, CEO | Alisa Greenwood |

**K-9**

# COMPASS MARKETING, INC.

## AGREEMENT RELATING TO EMPLOYMENT AND POST-EMPLOYMENT

This Agreement is between the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee, as a senior executive, will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS senior executives;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

WHEREAS, COMPASS will be vulnerable to unfair employment and post-employment competition by Employee because Employee will have access to and knowledge of COMPASS's Proprietary Information, will have a personal relationship with COMPASS's clients, customers, suppliers and others, and will generate good will which Employee acknowledges belongs to COMPASS;

NOW, THEREFORE, in consideration of Employee's employment with COMPASS, a one time cash payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agrees to enter into this Agreement with COMPASS as a condition of employment pursuant to which COMPASS will limit Employee's rights during and following termination of employment on the terms set forth in this Agreement. Intending to be legally bound, the parties agree as follows:

## ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:

Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which

Initial

In addition, Employee irrevocably appoints the General Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H.      Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 6.F and hereby agrees not to plead or claim the same.

I.      Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.       At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

L.      Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

M.     Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF**, and intending to he legally bound, the parties hereto have caused this Agreement to be signed.


by COMPASS MARKETING, INC.                    by EMPLOYEE

Date:  2/6/07                                  Date: 2/8/07

/s/                                            /s/

John D. White, CEO                             Gary Panebianco


**K-10**

Initial

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND

## POST-EMPLOYMENT COMPETITION

This Agreement is between the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to consumer product companies in the following categories:  food, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases: information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible. intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, John Greenwood ("Employee"), as a senior executive, will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS senior execitoves;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

WHEREAS, COMPASS will be vulnerable to unfair post-employment competition by Employee because Employee will have access to and knowledge of COMPASS's Proprietary Information, will have a personal relationship with COMPASS's clients, customers, suppliers and others, and will generate good will which Employee acknowledges belongs to COMPASS;

NOW, THEREFORE, in consideration of Employee's employment with COMPASS, a one time cash payment of $1,000.00 (one thousand U.S. dollars), the severance benefit and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agrees to enter into this Agreement with COMPASS as a condition of employment pursuant to which COMPASS will limit Employee's right to compete against COMPASS during and following termination of employment on the terms set forth in this Agreement. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been

Initial 

G.      Employee expressly consents to the application of Article 8.F to any judicial action or proceeding arising out of or relating to this Agreement. COMPASS shall have the right to serve legal process upon Employee in any manner permitted bylaw. In addition, Employee irrevocably appoints the General Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H.      Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 8.F and hereby agrees not to plead or claim the same.

I.      Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.      At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.      Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.      Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF**, and intending to he legally bound, the parties hereto have caused this Agreement to be signed.

by COMPASS MARKETING, INC.

Date:  /s/ 6/7/07

/s/

John D. White, CEO

by EMPLOYEE

Date:  5 - 16 -67

/s/ John Greenwood

John Greenwood

**K-11**

Initial

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT

This Agreement is between the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

NOW, THEREFORE, in consideration of a one time payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, whether or not, if paid by check, said check is cashed by Employee, Employee agrees to enter into this Agreement with COMPASS. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, employees, contractors, clients, customers, supplier, vendors, policies or products, other than to comply with law.

Date: 9/13/08

Initial: _____

'L.      Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

IN WITNESS WHEREOF, and intending to he legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.                                   by EMPLOYEE

Date:   _____                              Date:   _____

/s/     _____                              /s/     _____

John D. White, CEO                                          Dayna Bernard

K-12

Page 4 of 5

Date: _____
Initial: _____

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT

This Agreement is between James Chip DiPaula, the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

NOW, THEREFORE, in consideration of a one time payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, whether or not, if paid by check, said check is cashed by Employee, Employee agrees to enter into this Agreement with COMPASS. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, employees, contractors, clients, customers, supplier, vendors, policies or products, other than to comply with law.

Date: 2/24/10

Initial: _____

**ARTICLE 5. TERM OF EMPLOYMENT:** Employee acknowledges that COMPASS has the right to terminate Employee's employment at any time for any reason whatsoever.

## ARTICLE 6. MISCELLANEOUS:

A.   As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B.   This Agreement shall supersede and substitute for any previous employment or post-employment agreements between Employee and COMPASS.

C.   If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.   Removed.

E.   In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.   The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.

G.   ...

I.   Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.   At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.   Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.   Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF,** and intending to be legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.

Date:   2/24/2010

/s/ _____

John D. White, CEO

by EMPLOYEE

Date:   2/24/2010

/s/ _____

K-13

Page 3 of 4

Date: 2/24/10

Initial: _____

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT

This Agreement is between Alex McCord, the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

NOW, THEREFORE, in consideration of a one time payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, whether or not, if paid by check, said check is cashed by Employee, Employee agrees to enter into this Agreement with COMPASS. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, employees, contractors, clients, customers, supplier, vendors, policies or products, other than to comply with law.

Page 1 of 4

Date: 10/17/14
Initial: AJM

**ARTICLE 5. TERM OF EMPLOYMENT:** Employee acknowledges that COMPASS has the right to terminate Employee's employment at any time for any reason whatsoever.

**ARTICLE 6. MISCELLANEOUS:**

A.       As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B.       This Agreement shall supersede and substitute for any previous employment or post-employment agreements between Employee and COMPASS.

C.       If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.       Removed.

E.       In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.       The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.

G.       Removed.

I.       Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.       At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.       Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.       Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF,** and intending to be legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.

Date:  _16/17/2014_

/s/  _____

John D. White, CEO

by EMPLOYEE

Date:  _10/17/14_

/s/  _Alex White_

K-14

Date: _10/17/14_

Initial: _AJM_

APPENDIX 7

# John D. White Signature Comparison



**K-1d**

**K-3**

**K-7**

**K-8**

te:

**Q-1**



**Characteristics observed in the known signatures that were dissimilar in the questioned signature:**

1. Tapered beginning and ending strokes
2. Starting point of the uppercase "j"
3. Large loop with rounded top
4. The down stroke of the "J" goes down below the baseline and then back up to start the second movement
5. Narrow lower formation which is slightly open on the right
6. The uppercase "W" looks like a "U" formation
7. Terminal "e" sometimes has an eyelet the size of which varies

# Signs Showing Evidence of a Simulation

**Signs indicative of a simulation:**
1. Blunt beginning and ending strokes
2. Retouching/patching
3. Irregular pen-lifts/hiatus
4. Angular movements
5. Hesitation/Tremor

Q-1

# Relevant Terminology

- Blunt ending – the effect produced on beginning and ending strokes by the application of the writing instrument to the paper prior to starting any movement.  It is the opposite of flying start or flying finish.

- Hiatus – A gap in the writing stroke of a letter formed when the writing instrument leaves the paper, an interruption in the writing line.

- Patching – Retouching or going back over a defective portion of the writing stroke.

- Retouching – Touching up to correct or perfect a graphic execution.

- Tremor – A lack of smoothness, due to lack of skill, consciousness of the writing act or to the deliberate control of the writing instrument in copying or tracing.