```
             IN THE UNITED STATES DISTRICT COURT.
                  FOR THE DISTRICT OF MARYLAND
                        NORTHERN DIVISION
DAVID BOSHEA,                 )
        Plaintiff ,           )
                              )
        v.                    )  CASE NUMBER: ELH-21-cv-00309
                              )       CIVIL JURY TRIAL
COMPASS MARKETING, INC., )
        Defendant.            )    EXCERPT OF PROCEEDINGS
_____ ) Testimony of Donna Eisenberg


                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE ELLEN L. HOLLANDER
                UNITED STATES SENIOR JUDGE
                Thursday, February 22, 2024
                    Baltimore, Maryland


                  A P P E A R A N C E S

FOR THE PLAINTIFF:

     BY: GREGORY JORDAN, ESQUIRE
     BY: THOMAS GAGLIARDO, ESQUIRE


FOR THE DEFENDANT:

     BY: STEPHEN STERN, ESQUIRE
     BY: SHANNON HAYDEN, ESQUIRE


Also Present:

Noah Wolf, Paralegal


_____

     ***Proceedings Recorded by Mechanical Stenography***
      Transcript Produced by Computer-Aided Transcription
```

```
 1                        I N D E X

 2     WITNESS              DIRECT    CROSS     REDIRECT     RECROSS

 3     Donna Eisenberg
            By Mr. Jordan:    3
 4

 5     _____

 6

 7     Examination outside the presence of the jury:

 8     Donna Eisenberg
            By Mr. Jordan:    60
            By Mr. Stern:     63
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Requested portion of excerpt begins.)

 2    (12:14 p.m.)

 3              THE COURT:  Next witness.

 4              MR. JORDAN:  We'll call Donna Eisenberg.

 5              THE COURT:  Okay.

 6              THE CLERK:  Ma'am, if you could remain standing and

 7    raise your right hand for me.

 8              (Witness, sworn.)

 9              THE CLERK:  You may have a seat.  While talking

10    clearly into the microphone, can you please state your full

11    name and spell your last name for the record?

12              THE WITNESS:  My name is Donna Eisenberg.  Last name

13    is spelled E-i-s-e-n-b-e-r-g.

14              THE CLERK:  Thank you.

15                 D I R E C T   E X A M I N A T I O N

16    BY MR. JORDAN:

17    Q.   Good afternoon, Ms. Eisenberg.

18    A.   Good afternoon, sir.

19    Q.   What is your title and with whom are you employed?

20    A.   I'm a forensic document examiner and I work for myself,

21    and previously for the Federal Government.

22    Q.   Okay. How long have you been engaged in the field of --

23              THE COURT:  I'm sorry to interrupt.  You said you

24    worked for the Federal Government.  For whom did you work?

25              THE WITNESS:   I worked for the United States Secret
```

1    Service Forensic Lab for ten years and I worked for the

2    Department of Homeland Security for 24 years which was

3    originally the Immigration and Naturalization Service.  So it

4    was 34 years of Government service.

5              THE COURT:   Thank you.

6    BY MR. JORDAN:

7    Q.   And what were the time periods you were in the Secret

8    Service?

9    A.   I worked for the Secret Service from 1988 to 1998 and

10   then for which was then INS which became Homeland Security

11   from 1998 to 2022.

12   Q.   Okay. And then I believe that you indicate you were a

13   private examiner for yourself?

14             THE COURT:   I can't hear you, counsel.

15   Q.   That you were a private examiner for yourself. Do you

16   have your own company or something else?

17   A.   I work for myself. It is my own company. My own company

18   is called Forensic Document Examination Services, LLC and I

19   opened my private practice in 2008.

20   Q.   Okay. And what are your principal duties as a forensic

21   document examiner?

22   A.   As a forensic document examiner, I routinely receive

23   documents whose authenticity is in question. I determine

24   whether they're counterfeit or genuine or if they've been

25   altered, page substituted, something like that and/or

1    hammering identification examinations.

2    Q.   And what study and preparation have you had for this kind

3    of work?

4    A.   I have a bachelor of arts degree from the University of

5    Maryland. I have a master of forensic science degree from the

6    George Washington University.  And I successfully completed a

7    three-year apprenticeship program at the Secret Service where

8    I learned all aspects of documents such as printing processes,

9    writing instruments, hammering identification, things like

10   that.

11   Q.   What studies, if any, have you done or finished for your

12   formal service training at the Secret Service?

13   A.   Yes, sir. I routinely attend professional conferences and

14   I do workshops and seminars all related to topics in the field

15   of forensic document examination.

16   Q.   Are you recognized by any professional organization?

17   A.   Yes, sir.  I am certified by the American Board of

18   Forensic Document Examiners which is the North American body

19   recognized by the Courts for certifying qualified document

20   examiners.

21   Q.   And is that something that involves written, oral, or

22   something else?

23   A.   So in order to become board certified you need

24   professional and educational requirements. You need letters of

25   recommendation and then you need to sit for a written test,

 1    and then a practical test, and then orally defend the

 2    practical test to a board. And after completing that you are

 3    deemed qualified.  And then every five years you have to

 4    maintain your certification by earning 40 points.  And you

 5    earn points by presenting papers, writing papers, attending

 6    workshops, attending conferences.

 7    Q.   Have you obtained those 40 points within the required

 8    periods of time?

 9    A.   Yes, sir.  I've been -- I've been qualified by the Board

10    -- by the Forensic Board of Questioned Document Examiners

11    since 2022.

12    Q.   And do you know what the AAFS is?

13    A.   I'm sorry, 2002. Sorry.

14    Q.   I should have got that.

15    A.   Yeah.

16    Q.   Do you know what the AAFS is?

17    A.   Yes.  I'm also a member of the American Board of Forensic

18    Document Examiners -- I'm sorry, I'm a member of the American

19    Academy of Forensic Sciences Questioning Document Section, so

20    I'm a member of there as well.

21    Q.   How long have you been a member of the AAFS?

22    A.   Since 2018.

23    Q.   Okay. Have you ever published any materials concerning

24    document examination?

25    A.   Yes, sir. I wrote a chapter for a textbook that was

1    released in 2021 and I wrote a chapter that was in the

2    textbook and the textbook is called Forensic Document

3    Examinations in the 21st Century.

4              **THE COURT:**  And AAFS, is that something for which

5    there are eligibility criteria or you just pay your dues?

6              **THE WITNESS:**  No.  There are educational

7    requirements and professional requirements in order to be

8    accepted, yes.

9    **BY MR. JORDAN:**

10   Q.   Which is the one that you had to have the 40 points?

11   A.   That's the American Board of Forensic Document Examiners.

12   Q.   And similar to the AAFS, that's not something where you

13   just send a check, get a certificate?

14   A.   No, you need to have -- your employment and your line of

15   work is crucial for the acceptance into the AAFS.

16   Q.   Okay. Have you ever been qualified as an expert witness

17   in a court of law?

18   A.   Yes, sir.  I have.

19   Q.   And when did that occur?

20   A.   I've testified approximately 100 times and I've been

21   testifying since 1991.

22   Q.   Okay. Have you ever been rejected as an expert witness

23   for document examination?

24   A.   No, sir.  I have not.

25   Q.   I'm sorry, I didn't hear you.

```
 1    A.    No, sir.

 2    Q.    Okay.

 3          MR. JORDAN:  Your Honor, we offer Donna Eisenberg as

 4    an expert in the area of handwriting and document

 5    identification.

 6          THE COURT:  Any objection?

 7          MR. STERN:  No, Your Honor.  Just asking if Ms.

 8    Eisenberg could move the microphone a little bit closer. I'm

 9    having trouble hearing at times.

10          THE WITNESS:  Yes, sir. I'll just lean forward.

11          THE COURT:  The witness will be received as an

12    expert in the area of handwriting and document identification.

13    BY MR. JORDAN:

14    Q.    Are you an expert in any other area, by the way?  I hope

15    I was not --

16    A.    No, sir, I'm not.

17    Q.    Noah, if you could bring up Exhibit 18 which is Ms.

18    Eisenberg's report.  And I think as we indicated to you, Your

19    Honor, we offer this into evidence as her forensic handwriting

20    report.

21          THE COURT:  So as I'm understanding there's no

22    objection; is that right?

23          MR. STERN:  That's correct, Your Honor.

24          THE COURT:  Okay, then it will be received.

25    BY MR. JORDAN:
```

```
 1    Q.   Okay. So Ms. Eisenberg, Exhibit 18, what is it?

 2    A.   That is the forensic handwriting report I wrote on

 3    October 11, 2021.

 4    Q.   Okay. And how is it that you came about to prepare this

 5    report?

 6    A.   I received an inquiry from you and I was asked to look at

 7    the questioned document which is the -- which was a digital

 8    reproduction of Mr. White's signature on the Compass

 9    Marketing, Inc. agreement related to employment and

10    post-employment competition with 20 known exemplars that were

11    provided to me as well of Mr. White's signature.

12         MR. JORDAN:  Your Honor, could we have notice taken

13    that the questioned document that she is examining is our

14    Exhibit 8?  Because I didn't put it up on the screen, but I'm

15    trying to move things along.

16         MR. STERN:  I just want to make sure the number is

17    correct. I'm sure it is. No objection.

18         THE COURT:  No objection?  Okay.

19         MR. JORDAN:  So that is -- the questioned document

20    is the document just for the jury, it's the one that's in

21    evidence.

22         THE COURT:  So the questioned document is

23    Plaintiff's Exhibit 8.

24         MR. JORDAN:  Correct.

25    BY MR. JORDAN:
```

```
1      Q.    And so I'm sorry, you said you had how many exemplars to

2      review in addition to the questioned document?

3      A.    20.

4      Q.    And do you have an opinion regarding your forensic

5      examination of this document?

6      A.    My opinion is no conclusion. So let me back up and

7      explain the -- sorry, the opinions that are available for a

8      document examiner. We start at no conclusion, meaning we have

9      no bias one way or the other if the person did or did not

10     write the questioned signature. Then above that, above no

11     conclusion is indications the person did write. Above that is

12     they probably wrote. Above that is highly probably wrote and

13     above that is identification. On the flip side we have it in

14     the negative. Indications did not write. Probably did not

15     write. Highly probably did not write and elimination. Because

16     of the evidence that was provided to me and the deficiencies

17     that were in the evidence, I was not able to determine one way

18     or the other if Mr. White did or did not write his own name on

19     this questioned signature.

20     Q.    Okay. And what factors caused you to make that

21     determination?

22     A.    So in order to do a forensic handwriting examination

23     there's three criteria. You need quality of the writing,

24     comparability so that you're comparing the same thing, in this

25     case the same name that's written, and quantity. You need
```

1    enough known exemplars to do an examination. So did you want

2    me to talk about that?

3    Q.    With regard to quality, what was your view of the

4    document, Q1 of that Exhibit A and the exemplars that you've

5    stated?

6    A.    So the best evidence is ink on paper. You can see fine

7    lines, you can see pen movements, you can see pretty much

8    everything you need to see when conducting a forensic

9    handwriting examination. So because the copies that were

10   provided to me, the question and the known evidence, there was

11   diminished line quality because these documents were either

12   copies, or scans, or a combination of those.  And it makes

13   sense that a first generation photocopy is better than a fifth

14   or sixth or tenth copy. And what we had here, none of them

15   were first generation photocopies. They were all a combination

16   of scans and copies and that -- what happens is when you have

17   regular handwriting, like if you go to sign your name you

18   don't think about signing it because you know how to sign your

19   own name. So the pen hits the paper and you start writing.

20   Sometimes the pen hits the paper before you're actually ready

21   to start the letter and that's called a pen drag. So pen drags

22   are usually light in stroke.  And often when you have a

23   reproduction and as I said, a copy of a copy, those light

24   strokes often go away. They are often not visible at all.

25        And so again, that's part of the problem that I had with

1    this evidence, that a lot of the potential fine lines and pen

2    movements were not visible in these -- in the evidence.

3    Q.   Other than the questioned document, Compass was the one

4    who provided all of the 20-something documents; is that

5    correct?

6    A.   That's my understanding, yes.

7    Q.   And then I believe that you indicated that one of the

8    factors was comparability. In terms of comparability, what do

9    you review, take into account and determine?

10   A.   So when you do a handwriting examination you need to

11   prepare like items. For example, you can compare the word

12   "apple" to "apple."  You cannot compare the word "apple" to

13   "orange" because you need the same letters and letter

14   combination.

15        In this particular case we're dealing with the question

16   and the known signatures were all the name of John D. White.

17   The problem was that Mr. White has an illegible signature,

18   meaning you can't really read. You can see the J and that's

19   pretty much the only letter that you can clearly see in his

20   signature.

21        In addition, Mr. White -- so all of us have a range of

22   variation in our writing. Nobody can write the exact same way

23   twice. People are not machines. Every time, if you sat down

24   and wrote your name ten times on a piece of paper all in a row

25   you couldn't take any one of those signatures and superimpose

```
1    it on the other and have it perfectly aligned. That's called

2    variation and that's because we're human.

3        Some people have a narrow range of variation in which

4    case you don't need a lot of known samples to do a comparison.

5    Mr. White has an extremely wide range of variation so that

6    within the known signatures it would be difficult to take any

7    one of the known signatures, make it a question and compare it

8    to the others because it's just so broad, his range.

9        Now in normal handwriting examinations we ask for 10 to

10   20 known samples and that's usually sufficient. In this case

11   because Mr. White's range of variation is so broad, I needed

12   more than the 20 that I had. Literature will say that there

13   are some cases, in my opinion such as this one, where you need

14   30, 40, 50 specimens because his range is so wide. So the

15   question is does the questioned signature fall within the

16   range of variation exhibited within the known.  And I needed

17   more known to make that determination.

18           THE COURT:  Did you ask for them?

19           THE WITNESS:  Yes, ma'am.  I did.

20           THE COURT:  And did you get them?

21           THE WITNESS:  No, ma'am.

22           MR. STERN:  Your Honor, can we approach?

23           THE COURT:  Okay.

24           (Counsel approached the bench.)

25           MR. STERN:  We were never asked for any additional
```

```
1    samples.

2              THE COURT:  What?

3              MR. STERN:  We were never asked for any additional

4    samples. This is the first I've ever heard of this.

5              MR. JORDAN:  That's not true.

6              MR. STERN:  I don't -- there has never been a

7    request for additional samples. I'd like to know where that is

8    because that was the first time I've ever heard that.

9              THE COURT:  Did you ask them for them?

10             MR. JORDAN:  Yeah.

11             MR. STERN:  I don't recall ever hearing that before

12   because we would have gotten them. We're confident this is a

13   forgery.

14             THE COURT:  Nobody asked me.  So if you had this --

15   I mean, this is kind of stunning because that would have been

16   a subject of a motion to compel or something because if the

17   expert needs more and you didn't get them --

18             MR. STERN:  I never heard this before.

19             THE COURT:  I believe you. I'm just saying it's

20   surprising because it just was sort of called out for me to

21   clarify that. I didn't expect that answer.

22             MR. STERN:  I didn't expect that either, otherwise I

23   would have tried to object in advance and not let the jury

24   hear that. I don't know what to say.

25             MR. JORDAN:  It's in her report, the issue of that
```

```
 1      the quantity was insufficient quantity in her report.

 2              THE COURT:  Okay, but that's not asking him. It

 3      makes it sound like -- I mean, you'll be able to come back, I

 4      think, with that clarification. Nobody asked you.

 5              MR. STERN:  I can't testify.

 6              THE COURT:  No, but did she ever communicate. Well,

 7      it's got to be cured.

 8              MR. STERN:  I know.  And I don't know how -- that

 9      pun has been now dropped out there and it looks like I've

10      engaged in misconduct.

11              THE COURT:  No, I wouldn't say misconduct, but I

12      think it's important to clarify that you weren't -- the

13      defense wasn't asked to provide additional --

14              MR. STERN:  All I can say is did you ask--

15              THE COURT:  Did you transmit a request to them?

16              MR. JORDAN:  I believe I spoke with Mr. Stern with

17      regard to this. It's been a long time, but I recall --

18              MR. STERN:  I don't remember because I would have

19      gotten more. We have nothing to hide.

20              MR. JORDAN:  I mean, his expert and our expert had

21      the same number. His said they had a sufficient number of

22      exemplars.

23              THE COURT:  These would have been addressed if

24      anybody had asked me, if I had known that there was a problem.

25      I didn't know.
```

```
 1              MR. STERN:  I wouldn't have withheld more copies.

 2    We had plenty more examples.

 3              THE COURT:  Well, you can come to a stipulation, if

 4    you can, that there was no -- the defense does not believe it

 5    was ever asked to provide additional exemplars.

 6              MR. JORDAN:  You certainly can make that statement.

 7    I don't agree with that, but you can certainly --

 8              THE COURT:  Well, if it's not accurate we can't say

 9    it.  But the thing is if you want to look and see where you

10    transmitted that kind of request, I know you didn't ask me to

11    decide it, or Judge Copperthite.

12              MR. STERN:  Even if I did get that and I didn't

13    respond there would have been a follow-up. It wouldn't have

14    been like hey -- I'm not going to say a crass word, but there

15    was none of that. We produced everything we could. So Greg,

16    I--

17              MR. JORDAN:  You know what?  I recall it, it's in

18    her report.  It's been in her report for two years.

19              THE COURT:  Well, that's in her report that she

20    didn't have enough so I think --

21              MR. STERN:  But that's her conclusion. My expert

22    says it's the standard.

23              THE COURT:  But the problem is that it has left --

24    it suggests that they didn't cooperate.

25              MR. STERN:  Yes. My expert says the standard is
```

1      normal. The norm is either 10 to 15 or 15 to 20.

2           **THE COURT:**  It was so glaring.  That was why I asked

3      it.  Like she didn't have enough, well how come?  I figured

4      you were going to --

5           **MR. STERN:**  I didn't have time.  I didn't know what

6      she was going to say. She's saying --

7           **THE COURT:**  It's in the report.  It's not a

8      surprise, I guess.

9           **MR. STERN:**  --that the request was made.  That's

10     different. Yes, I was going to cross-examine her on this about

11     the norm because our expert says the norm is 10 to 15 or 15 to

12     20 and she had that number.  She's just saying there's a wide

13     range and my expert says you can reach the conclusion which is

14     very different than saying I'm withholding documents. Two very

15     different things.  She said that, but it's one thing to say "I

16     didn't have enough" versus "Hey, I want more."  That makes it

17     seem like hey -- She doesn't say "I need more to make a

18     conclusion."

19          **THE COURT:**  The one thing is I think this falls on

20     the plaintiff because to the extent you say that you did

21     transmit a request, you didn't bring it to the Court.

22          **MR. JORDAN:**  That's fine. You know what, Your Honor,

23     we can withdraw that saying that we don't have the --

24          **THE COURT:**  I'm sorry?

25          **MR. JORDAN:**  We can withdraw that portion of her

```
 1      testimony saying that we can't provide any -- Mr. Stern
 2      doesn't recall it and I don't have anything that says that I
 3      did it, other than recalling it orally so we withdraw that
 4      portion of the--
 5              THE COURT:  So we can say the parties agree that
 6      there was no indication that the defense was asked -- if this
 7      is accurate -- for additional exemplars.
 8              MR. JORDAN:  I don't want to make this the issue.
 9              MR. STERN:  I think the way you worded it, Your
10      Honor, is probably the best way. I'd rather it come from you.
11              MR. JORDAN:  Your Honor, as long as you can indicate
12      that our recollection is different, but we can't be sure.  So
13      it doesn't seem like I'm trying to pull something on the jury
14      either.
15              THE COURT:  So I don't want to misstate what you're
16      willing to have me say, so --
17              MR. JORDAN:  We can try to come up with a
18      stipulation over lunch. Let's do it after lunch.
19              THE COURT:  I don't think it matters that it has to
20      be this minute.
21              MR. STERN:  Well, that's lingering out there.
22              THE COURT:  I'm sorry?
23              MR. STERN:  It's lingering out there. I'd rather have
24      it addressed.
25              THE COURT:  Well, we already gave them their recess
```

1    so I think -- I don't really want to take a break at 12:30.

2              **MR. GAGLIARDO:**  Your Honor, I need to use the men's

3    room, if we're going to break sometime soon for lunch or

4    otherwise.  I just need to know.

5              **THE COURT:**  I normally break at 1.

6              **MR. GAGLIARDO:**  At 1?  I want to be respectful.

7    We're good.

8              **THE COURT:**  Can we come up with something then now?

9    The parties agree that -- well, I don't want to. You tell me

10   what you want me to say.

11             **MR. JORDAN:**  That the defense has no recollection of

12   it being requested.

13             **MR. STERN:**  That doesn't sound right.

14             **THE COURT:**  There's no indication -- the parties

15   agree that -- there's no indication that the request was made

16   to defense counsel; is that right?

17             **MR. STERN:**  For additional samples.

18             **MR. GAGLIARDO:**  Judge, may I be excused for a moment

19   while Mr. Jordan continues?

20             **THE COURT:**  I don't want to put words in anyone's

21   mouth.  The parties agree that there was no indication of -- I

22   was going to say of a request to the defense, not defense

23   counsel or defendant, but to the defense for additional

24   samples, handwriting samples.

25             **MR. GAGLIARDO:**  Did both parties agree to the 20?

```
 1      How did you get to 20?
 2              MR. JORDAN:  That was what Compass provided.
 3              MR. STERN:  My understanding from our expert--
 4              MR. GAGLIARDO:  Both parties accepted that there
 5      would be 20. One expert is going to say --
 6              THE COURT:  The parties agreed to just 20 samples.
 7      We could say that.
 8              MR. JORDAN:  Yeah.
 9              MR. STERN:  We can say that. I remember this was
10      what our expert asked for, we provided, we provided the same
11      set --
12              MR. JORDAN:  The parties agree.
13              MR. STERN:  We provided the same set.
14              THE COURT:  But the parties agree that there was an
15      agreement to provide 20 samples.
16              MR. STERN:  Right.  But I want to make -- like there
17      was no -- it's suggesting that again, I'm withholding
18      something.
19              THE COURT:  Right.
20              MR. GAGLIARDO:  But the parties agreed there's no
21      suggestion.
22              THE COURT:  But the parties agreed to provide 20
23      samples to the --
24              MR. STERN:  Right.
25              THE COURT:  --to the opposing expert.
```

 1              MR. STERN:  But that's also what was provided to our

 2      expert.

 3              THE COURT:  Right.

 4              MR. JORDAN:  And he came to a conclusion.

 5              THE COURT:  The parties agreed that each expert

 6      would be provided with 20 handwriting samples.

 7              MR. STERN:  I think with that additional statement

 8      because it still suggests she asked for more and we would not

 9      give it.

10              MR. JORDAN:  No, it's not.

11              MR. GAGLIARDO:  I'm going to stay out of it.

12              MR. JORDAN:  I just think the parties agree that --

13              THE COURT:  --each side would provide 20 samples.

14              MR. JORDAN:  Right. And I would just move on.

15              THE COURT:  Right. I think that's fair because that

16      answers why you only had 20.

17              MR. JORDAN:  Okay.

18              MR. STERN:  Okay.

19              MR. JORDAN:  Thank you, Your Honor.

20              MR. GAGLIARDO:  May I be excused for a moment, Your

21      Honor?

22              THE COURT:  Yes.

23              **(Counsel returned to their trial tables.)**

24              THE COURT:  Members of the jury, I just want to

25      explain to you that the parties agreed that each side would

 1  provide 20 handwriting samples.  Is that not right?

 2       **MR. JORDAN:**  They were the ones -- they provided all

 3  the samples. We provided Q, the questioned document.  They

 4  provided all the samples.

 5       **THE COURT:**  Right.  So let me see you back up here.

 6       **(Counsel approached the bench.)**

 7       **MR. STERN:**  The sequence of events was we had our

 8  expert first. You remember there's one that was --

 9       **THE COURT:**  Right, I do. I let you substitute.

10  Another ruling in your favor.

11       **MR. JORDAN:**  You just said that the parties provided

12  the samples. We didn't provide any.

13       **THE COURT:**  You didn't have to.

14       **MR. JORDAN:**  We didn't have any samples.

15       **MR. STERN:**  So it's agreed that 20 samples would be

16  provided --

17       **THE COURT:**  By the defense.

18       **MR. STERN:**  Yes.

19       **MR. JORDAN:**  You said both of them were doing it.

20       **THE COURT:**  Right, but it was to opposing experts.

21       **MR. JORDAN:**  Right, opposing experts.

22       **MR. STERN:**  Couple of things.  Let's back up for a

23  second. The sequence of events was we retained an expert.  She

24  was in rebuttal and then she was responding to -- and we had a

25  rebuttal to a rebuttal and then everyone was working within

```
 1        that 20 of what the analysis was.  So along those lines as
 2        long as it's accurate, but it's like well, we picked 20 and
 3        rejected -- I don't want it to be suggested that we're
 4        rejecting some offer or request for more.
 5                    MR. JORDAN:  That's what we just arrived at.
 6                    MR. STERN:  I know, that's what I'm saying. I don't
 7        think it sounds that good.
 8                    THE COURT:  So the parties agreed -- is it that the
 9        defense would provide 20 samples?
10                    MR. JORDAN:  Right.
11                    THE COURT:  Of Mr. White's handwriting; is that
12        accurate?
13                    MR. JORDAN:  Right.
14                    MR. STERN:  That makes it sound like we're limiting
15        it somehow.
16                    MR. JORDAN:  No.
17                    MR. STERN:  We didn't.
18                    THE COURT:  No, because 20 is the norm.
19                    MR. STERN:  Yes.  And I'll get that in
20        cross-examination.
21                    THE COURT:  So then --
22                    MR. STERN:  I don't know if she will agree with it.
23                    THE COURT:  Well, she said it.
24                    MR. STERN:  She did say it.
25                    MR. JORDAN:  Okay.
```

```
1            THE COURT:  So is that okay, the parties agree that
2    the defense was to provide 20 handwriting samples which they
3    did.
4            MR. STERN:  Right. And can I just put it in context
5    is it appropriate to give the reminder to the jury that she
6    did point out that's the norm?
7            MR. JORDAN:  What?
8            THE COURT:  No, she already said it and you're going
9    to, I'm sure, bring it out on cross.
10           MR. STERN:  Thank you, Your Honor.
11           MR. JORDAN:  I didn't hear what she said.
12           THE COURT:  Why don't you wait here in case it's not
13   right.
14           (Counsel returned to their trial tables.)
15           THE COURT:  Members of the jury, counsel agree that
16   the defense was asked to provide 20 samples and that's what
17   was provided. Thank you. Okay, you can continue.
18   BY MR. JORDAN:
19   Q.   I think you mentioned comparability?
20   A.   Yes, sir.
21   Q.   What do you mean by comparability?
22   A.   So as I was explaining that you need same letters and
23   letter combinations.  The way Mr. White writes his illegible
24   name, it's a very broad range.  So when I was trying to look
25   at similarities and differences in the questioned -- in the
```

1    questioned signature, I found multiple similarities and I

2    found some things that were not present. So basically my

3    opinion was either Mr. White wrote his own name or a second

4    person wrote his name. But the problem with that theory is

5    that there were very subtle handwriting characteristics that

6    were repeated in the known writing and the questioned. So

7    that's why I'm at a no conclusion because I think he could

8    have done it, I think someone else could have done it, but

9    there's no way to definitively note that.

10   Q.   Okay. Noah, can you bring up chart one? Can you describe

11   the range of variation in Mr. White's signature?

12   A.   Yes. Can I touch this and have it work? I'm sorry, can

13   I touch this screen and have it work?

14         **THE COURT:** The screen doesn't have it. There we go.

15         **THE WITNESS:** So that's not what we need.

16   **BY MR. JORDAN:**

17   Q.   There you go. So is this a chart out of your report?

18   A.   It is.

19   Q.   And it's in the same -- it's the same reflection of the

20   chart that appears in your report?

21   A.   Yes, sir.

22   Q.   Okay.

23         **MR. STERN:** I think there are arrows that I don't

24   see in the report.

25         **THE WITNESS:** It's the surrebuttal report.

```
1        BY MR JORDAN:

2        Q.   What page of your report is this on?

3        A.   It's on the surrebuttal report.

4             MR. STERN:  Your Honor, can we approach?

5             THE COURT:  Okay.

6             (Counsel approached the bench.)

7             MR. STERN:  I asked if there was a rebuttal report

8        and I was told no.

9             MR. JORDAN:  There was no rebuttal report that was

10       provided.  It was a -- the fact that she has arrows on it, I

11       don't think that makes it a different report.  This is in

12       her--

13            MR. STERN:  Rebuttal report.

14            MR. GAGLIARDO:  Mr. Wolf is looking for the slides

15       in the first report.  I think the only difference is as you

16       said, there are some arrows on these examples.

17            MR. STERN:  Is this part of an analysis that she has

18       not done before?

19            MR. GAGLIARDO:  It's the same analysis.  She's just

20       pointing out with more specificity.

21            MR. STERN:  Same analysis with more specificity?

22            MR. GAGLIARDO:  She'll explain her report.  There

23       you go, Judge, right there.

24            THE COURT:  It's right there.

25            MR. STERN:  There are not arrows on it and she's
```

Eisenberg - direct

1    talking about rebuttal.

2              MR. GAGLIARDO:  I'm saying that I think --

3              THE COURT:  One at a time.

4              MR. STERN:  I think this sounds like it's a

5    supplemental analysis to what we received.

6              MR. JORDAN:  Arrows are not a supplemental analysis.

7              MR. STERN:  But I have a feeling she's going to be

8    talking in detail now beyond what we've seen. That's what I'm

9    concerned about. I thought you had blow-ups of what was on

10   there and maybe they are, but the arrows are not part of this

11   and I think there's an additional analysis that we've not been

12   privy to.

13             THE COURT:  Did you depose her?

14             MR. STERN:  No, we did not. I asked for it, but we

15   were --

16             MR. JORDAN:  No, you did not ask. You did not ask

17   for her deposition. She didn't prevent you from taking her

18   deposition.

19             THE COURT:  I did or Judge Copperthite?

20             MR. STERN:  No, you did not.

21             THE COURT:  I mean, if you had attempted to in a

22   timely manner I can't understand how you wouldn't have been

23   able to, so that's why I asked the question.  There's been so

24   much haggling over discovery in this case. So I'm not sure

25   what the issue is. You're saying there's some new report?

 1           MR. STERN:  That's what it sounds like when she said

 2    a rebuttal report.

 3           THE COURT:  Well, this looks like it was in the

 4    report, but they're not in the same way because it doesn't say

 5    "pen lift/hiatus."

 6           MR. STERN:  Right. And that's what I'm concerned

 7    about.  This was not part of her analysis because I remember I

 8    went over this at length with my expert trying to understand

 9    things to ask and what not to ask. And there's no analysis of

10    pen lifts or anything like that.

11           MR. GAGLIARDO:  I believe it's correct to say that

12    all that chart does that the paper chart does not is add the

13    title and then insert the arrows which she could testify to

14    anyhow.

15           MR. STERN:  But that's not in her --

16           MR. GAGLIARDO:  It is in the report.  She said "I

17    looked at these, I found pen lifts" or whatever it is.

18           MR. STERN:  I would like to know where in her report

19    does it say that.

20           MR. GAGLIARDO:  How do you think she came to the

21    conclusion that she did?

22           MR. STERN:  The pen lifts and the hiatuses.  I don't

23    remember seeing that in her report and I'd like to know where

24    in her report it says that.

25           THE COURT:  So I guess my concern is this:

Eisenberg - direct

1    Typically reports don't come into evidence and the witness

2    just testifies and you have to provide the report.  But I

3    don't know that it bars them from asking something that's not

4    in the report. I'm just trying to look it up.

5              MR. STERN:  I guess what I'm concerned is is there

6    some additional analysis that I did not see. That's what I'm

7    concerned about.

8              THE COURT:  Can you proffer for us what you think

9    she's going to say?  Is it consistent with her report?

10             MR. STERN:  There's nothing in the report that talks

11   about pen lifts and hiatuses and that's my point.

12             THE COURT:  Well, I don't know what that means.

13             MR. STERN:  That's my concern.

14             MR. GAGLIARDO:  The essence of her testimony is as

15   she's testified, she couldn't make a conclusion because, and

16   she will break that down.

17             MR. JORDAN:  Variations on the signature.

18             MR. GAGLIARDO:  Right.  She'll break that down and

19   she'll point to the various exemplars and say "On this

20   exemplar, this is what I've found."

21             MR. STERN:  If this is allowed, then I should be

22   able to point out that these are not part of her report

23   because she does not say there's pen lifts. She does not talk

24   about hiatuses in her report. That's fine. I mean, it's not

25   fine.  If that's something that's allowed in then I should be

1    allowed to point that out in her report.

2              THE COURT:  I'm just trying to look at Rule 26 and

3    see if there's anything that requires her -- limits her

4    testimony to -- I mean, you have to get the report and you

5    did.

6              MR. STERN:  I did, but the report does not discuss

7    pen lifts and hiatuses, it discusses quality, variation, and

8    there's a third.

9              MR. JORDAN:  Comparability.

10             MR. STERN:  Comparability. I don't remember -- there

11   may be -- there's a brief discussion, very brief in

12   comparability. I don't think it goes into that detail, it just

13   -- we can look at it, it's right there.

14             MR. GAGLIARDO:  If I may, Judge, the expert simply

15   said, "Here's my conclusion:  It's not John White's signature,

16   it is John White's signature" and did nothing more. Produced

17   that report and then the party, the opposing party doesn't

18   take a deposition to find out what's more, that failure to

19   take the deposition can't preclude the proposing party's

20   expert testimony.

21             THE COURT:  So Rule 26 -- I just want to make sure I

22   have every number right because it's such a long rule. But 26,

23   I think it's (e), supplementing disclosures and responses:

24   Expert witness will be (e)(2). For an expert whose report must

25   be disclosed under Rule 26(a)(2)(B) the party's duty to

1    supplement extends both to information included in the report

2    and to information given during the expert's deposition.  Any

3    additions or changes to this information must be disclosed by

4    the time of the party's pretrial disclosures under Rule

5    26(a)(3) when they're due.  But I don't know that this is

6    different, so that's my concern.

7           **MR. STERN:**  Well, I think if we look at the

8    comparability section of her report --

9           **THE COURT:**  I mean, I've never seen -- read the

10   report, so I don't really know.

11          **MR. STERN:**  So the first part is on quality and

12   that's not at issue here. Then it's range which is not at

13   issue, and comparability --

14          **MR. JORDAN:**  I can go through this. You know what,

15   we're going to go through her report.  If you want to object,

16   object. We will go through her report.

17          **MR. STERN:**  Okay, we'll go through the report.

18          **THE COURT:**  Go through the report. The report is not

19   an issue.

20          **MR. STERN:**  That's right.

21          **THE COURT:**  Okay.

22          (**Counsel returned to their trial tables.**)

23   BY MR. JORDAN:

24   Q.   Turn to page 4 of 5. Ms. Eisenberg, there is a chart --

25   hold on, come down a little bit, Noah, so we can see the

1    title. The other way, other way. This is in the comparability

2    section of Exhibit 18. It's page 4 of 5. And there is a chart

3    up on your screen. Can you show the chart now, Noah?  And then

4    there are K6, K10, K15, okay?

5    A.   Yes, sir.

6    Q.   And that is comparing that to the original. Can you tell

7    me what you were identifying in each of these circled items?

8    A.   Yes, sir. So can you raise it up just a little bit?

9    Thank you. So in the boxes entitled K6, K10, and K15, they

10   were all written by Mr. White. Yet if you look at the area

11   that's circled, there's very little comparability amongst

12   those three signature samples.

13   Q.   What do you mean by that?

14   A.   I mean that Mr. White has a very broad range of variation

15   in his writing which means that the questioned signature could

16   fall within that range, but there is so much variation that

17   some of the features that are in the questioned signature are

18   not there, are not there.  But if I took, for example, Exhibit

19   15 and compared it to the remaining known, I wouldn't be able

20   to say that that was also written by Mr. White. So that's what

21   I mean by comparability and variation. His variation is so

22   wide that you need a lot more knowns in order to be sure that

23   you have the complete span of his variation in his writing.

24   Q.   This -- now I notice in K15 there appears to be a break

25   between letters. What is that called?

Eisenberg - direct                                                    33

```
 1      A.   It's called a pen lift.

 2      Q.   Okay. And with regard to K10, there is -- within the

 3   circle there appears to be some action in there, is it at the

 4   end?  Is that what we're looking at there?

 5      A.   Well, there's another pen lift in that one, but in a very

 6   different location.

 7      Q.   Okay, where is that?

 8      A.   So right after the J -- can I -- will this -- yeah, it

 9   will work.

10           THE COURT:  You can write on the screen, actually.

11           THE WITNESS:  Thank you, with just my finger?

12           THE COURT:  I'm sorry?

13           THE WITNESS:  With my finger?

14           THE COURT:  Yes.

15           THE WITNESS:  So --

16           MR. JORDAN:  May I approach, Your Honor?  May I

17   approach, Your Honor?

18           THE COURT:  Yes. Well, we as far as I know we use

19   our finger.

20           THE CLERK:  You can use your finger to draw.

21           MR. JORDAN:  I was trying to be helpful.

22           THE WITNESS:  If you can see where I was trying to

23   point after the J there's a pen lift.

24           THE COURT:  If you want to use the pen as a pointer,

25   that's fine. I didn't want you to use the pen on the screen.
```

 1    I'm sorry.

 2              **THE WITNESS:**  Yeah, okay. So that's a pen lift in a

 3    completely different location than the one in K15. K stands

 4    for known. And then in K6 just the entire area that has been

 5    circled, literally the J is legible and nothing else is

 6    legible. And the illegibility of all three of those samples

 7    are very different from one another, yet we know one person

 8    wrote it. And that's what I had to work with when I was

 9    comparing the questioned signature with the known. Very broad

10    range of variation.

11    Q.    Okay. Taking a look -- moving on, Noah. Come up to the

12    signatures. Now we have -- we have Q1 here?

13    A.    Yes, sir.

14    Q.    And that is the blown up signature on Exhibit 8 or the

15    severance agreement; is that right?

16    A.    Yes, sir.

17    Q.    Okay. And then below that you have some examples. Can you

18    explain to me -- first off, do you know what a striation is?

19    A.    Yes, I do.

20    Q.    What is that?

21    A.    So when you're using a ballpoint pen, the way the

22    ballpoint pen is you have a reservoir that's a tube inside the

23    pen and it's a reservoir of ink.  And the ball -- which is why

24    it's called a ballpoint pen -- rotates and picks up ink as you

25    write. Sometimes the pen, the ball does not pick up ink and so

1    you'll have what's called striations.  And it's not a full

2    coverage of the ink line. That's just something that often

3    happens when using a ballpoint pen. So striations are when it

4    looks -- well, you know, this example is really hard to see,

5    but there are striations in the questioned signature.

6    Q.   Are there striations in any other signatures?

7    A.   Not that I notice, no.

8    Q.   Okay. And then with regard to looking at the pen drag, do

9    you know what pen drag is?

10   A.   Yes.  I discussed pen drag with the jury, yes.

11   Q.   Okay. And is there -- are there any examples within the

12   exemplars of pen drag?

13   A.   Not really.  But you know, again, these are reproductions

14   and they're poor quality reproductions, so I would not expect

15   to see pen drags because those are light features like pen

16   movements that are rarely picked up this far down the line of

17   reproductions.

18   Q.   Okay. And then patching, what is patching?

19   A.   Patching is when you write and then after you're done

20   writing, you go back and you try and fill in some areas. So

21   there is some patching in Exhibit Q1, but there's also

22   patching in the known exemplars as well.  So this might just

23   be a habit of Mr. White.

24   Q.   Can you look at K2, K3, and K5 on this sheet and tell me

25   if there's any patching?

```
1    A.    Yes.

2    Q.    Okay. Where would that be?

3    A.    So in the second character -- let's see if I can get

4    this--

5    Q.    Are you talking about --

6    A.    K3.

7    Q.    K3?  Okay.

8    A.    Yeah. There's a lot of pen movement going on where I've

9    just put the poor rendition of an arrow.  But there's a lot of

10   pen movement going on there. It's not a single pen movement,

11   so it's patching or it's some other kind of movement going on.

12   Q.    When I think of patching it's like I write something and

13   then I touch it up. Is that what it is?

14   A.    Yes.

15   Q.    And so you see that in -- do you see that in K2, K3, and

16   K5?

17   A.    Yes. Again, in K5 in particular I'm going to circle that.

18   There's a lot of extra pen movements in that letter form.

19   Q.    Is there any patching in Q1, the questioned document?

20   A.    Yes.

21   Q.    Where is that?

22   A.    Here there's some patching there.

23   Q.    Okay, so that's something that's repeated in the

24   exemplars along with the questioned document?

25   A.    Exactly, yes.
```

1    Q.   Okay. Taking a look at K6 and K9 and the questioned

2    document, can you tell me is there any relationship first off

3    with K6 with regard to angular movements?

4    A.   Yes. Now is it possible to get rid of --

5              **THE COURT:**  Do you want to clear the markings?

6              **THE WITNESS:**  Yes, that's what I'm asking. Okay,

7    thank you. I'm sorry, so we're talking about angular?

8    **BY MR. JORDAN:**

9    Q.   Angular movements.

10   A.   So in the questioned signature, the top of -- there are

11   some angular movements.

12   Q.   What does that mean?

13   A.   So right here at the top of the J is a point. Here at the

14   top of whatever this letter is there's a point. So there's a

15   couple of sharp angles. But when we look at the knowns we see

16   plenty of sharp angles as well. So just with what we have on

17   the screen right here, the top of this J is pointed and K3,

18   this letter is pointed. If you go down there's lots of

19   examples of pointed areas. Well, in K5, this right here and in

20   K6 you have a point at the top of the J, you have pointed

21   here. If you keep going down there's plenty of areas that are

22   pointed.  Like in K8, the J, this character right here,

23   they're very angled. In K7, again, it's very angled.

24   Q.   But there are also exemplars where it doesn't occur; is

25   that right?

```
1    A.    That is right, yes.

2    Q.    So it's difficult to come to a conclusion?

3    A.    It is.

4    Q.    What is hesitation tremor?

5    A.    Hesitation or tremor is when -- so for example --

6              MR. STERN:   Your Honor, may we approach?

7              THE COURT:   I'm sorry?

8              MR. STERN:   May we approach, please?  It's also a

9    little after 1. Sorry for interrupting.

10             THE COURT:   I want to give Mr. Jordan the option of

11   deciding if this is a good breaking point. I don't want to

12   interrupt your flow.

13             MR. JORDAN:   I'm trying to move through, Your Honor.

14   There's a limited amount that we have left.

15             THE COURT:   Limited?

16             MR. JORDAN:   Yes.

17             THE COURT:   Okay, so if the jury can bear with us,

18   then let's keep going.

19             MR. JORDAN:   Yes.

20   BY MR. JORDAN:

21   Q.    So I think we were talking about hesitation tremor?

22   A.    Yes. So it's when you are writing and either you're not

23   sure what to write next so you kind of like hesitate and then

24   you resume or -- so in this case there's a hesitation mark

25   where I just put the circle. But that could also have been the
```

```
 1    cause of an uneven writing surface or a faulty pen movement.
 2    So it could be -- it could be that it's a hesitation, it could
 3    be a fault on the surface of the paper. Again, I can't know
 4    that which is a reason why I have a no conclusion for an
 5    opinion.
 6    Q.   If you could, there's a -- where does the -- on the Q1,
 7    where does the J start?
 8    A.   J starts right here.
 9    Q.   Okay. Are there any other examples where the J starts in
10    a similar area?
11    A.   Yes, there are. There are plenty.
12    Q.   Okay.
13    A.   If you -- well, let me just -- I have those numbers. So
14    if we go to the end of the chart where it's Exhibit 15, okay,
15    so we have that same starting point right here and right here
16    and I think there's more on the next page. Yes. And right
17    here. So all of those have the same starting point as the J in
18    the questioned signature.
19    Q.   Okay. Oh here we go, okay. Go down to the end of the
20    report, K -- it should be page 56. Okay. Now bring that up a
21    little bit. No, the other way, I'm sorry. These are signatures
22    where you were advised that John White just wrote his
23    signature?
24    A.   Yes, sir.
25    Q.   On a page. So can you tell me how these signatures
```

```
 1      compare?

 2      A.   To the questioned signature?

 3      Q.   Yeah.

 4      A.   I would say they're very different, but I would have to

 5      say dissimilar because different would say a different writer,

 6      but dissimilar we know that it's the same writer, but the

 7      variation of these signatures compared to many of the others

 8      that were provided is just drastically diverse.  And I would

 9      say that if any one of these signatures was the questioned

10      signature and you compared it to the rest of the known, you

11      wouldn't be able to say it's the same person.

12      Q.   So these signatures here, had these been the Q1 you would

13      not have been able to make any better conclusion than with

14      regard to Q1 versus the other numbers?

15      A.   That's exactly right.

16      Q.   Right, okay. And that is why?

17      A.   Because the variation is so wide. He has such -- so many

18      different versions of his signature.

19      Q.   And go back to the beginning of the chart, Noah, please.

20      And I apologize if I have done this already, but I want to

21      make sure I don't miss it. Did we discuss the pointed top?

22      A.   Well, partially, yes.

23      Q.   Can you explain the part you didn't explain?

24      A.   Yes. So if we look at K1, so we're talking about this

25      pointed top of the letter J. And then in K1 we also have a
```

```
 1        pointed top. If you look at K2 it's more rounded, but if we

 2        look at K6, you can move the chart, K6, it's pointed. And K8,

 3        down here it's pointed. And K11 which is on the next page.

 4                  THE COURT:  What about K7?

 5                  THE WITNESS:  Go back.  Yes, that's pointed as well,

 6        yes. There's many pointed Js. And am I permitted to reference

 7        the opposing expert?

 8                  MR. JORDAN:  In terms of --

 9                  MR. STERN:  Your Honor, can we approach?

10                  MR. JORDAN:  I don't know what she means.

11                  MR. STERN:  Can we approach?

12                  THE COURT:  Okay.

13                  (Counsel approached the bench.)

14                  MR. STERN:  Who is she talking about?  Because we

15        asked whether she was doing a report of Jeff Payne's and we

16        were told no. So is she referring to Mr. Baggett's report?  We

17        asked specifically about Jeff Payne after Your Honor's ruling

18        about that, so I don't know who --

19                  MR. JORDAN:  I'm not going to have her discuss the

20        rebuttal to Mr. Payne's report.

21                  THE COURT:  How much longer?  Because I think I need

22        to give --

23                  MR. JORDAN:  Five, six minutes, I think.

24                  MR. STERN:  But she's asking whether she can

25        reference --
```

1          THE COURT:  He said he's not going to ask her.

2          MR. JORDAN:  Let's take a break now and we'll just

3    finish up and we won't talk about Mr. Payne's report.

4          THE COURT:  Okay.

5          MR. JORDAN:  Thank you, Your Honor.

6          **(Counsel returned to their trial tables.)**

7          THE COURT:  Members of the jury, I don't want to

8    starve you so I'm going to let you have your luncheon recess

9    now. By the way, if you haven't noticed, on the first floor

10   there actually is an eating establishment.  I don't know if

11   you've seen it, but if you want to stay in the building,

12   that's an option. Of course you're free to roam around, but I

13   always have to remind you that you may not discuss the case

14   with anyone or allow anyone to discuss the case with you and

15   you must continue to keep an open mind about the case. Why

16   don't we ask you to return in an hour, so that would be 10

17   after 2 and we should be ready by 2:15. Make sure everybody is

18   back on time and we'll get started.

19          So also the witness, of course, while you're on the stand

20   you can't discuss your testimony with anyone or allow anyone

21   to discuss the case with you.

22          THE WITNESS:  Yes, ma'am.

23          THE COURT:  Thank you.  We're all in recess.

24          **(Recess was taken from 1:12 to 2:14 p.m.)**

25          THE COURT:  Okay, before we get started I just want

 1          to mention that at the luncheon break I did go back to my

 2     memorandum opinion addressing the -- at ECF 160, March 31 of

 3     2023 addressing the Motions in Limine and refreshed my memory.

 4     It was there that I discussed the Adams Employment Agreement,

 5     but the issue wasn't actually presented to me about whether

 6     his testimony was admissible. I know we already addressed it,

 7     but I just wanted to point it out.

 8          On page 6 of the opinion I noted that the metadata for

 9     the draft agreement indicated that John White created and

10     edited the document on May 22nd of 2007 citing ECF 138-3, and

11     the metadata also showed the title, Adams Employment

12     Agreement.

13          And then plaintiff asserted that at trial he intends to

14     call John Adams, a Compass employee who received substantially

15     the same employment agreement.  And I cited ECF 138 at 6. And

16     according to the plaintiff, Adams signed that agreement on or

17     about May 2, 2007. So that's almost around the same time as

18     Mr. Boshea's agreement. It's really about a month before. And

19     that was from ECF 119-3 at 36. Yes, the amount of the proposed

20     severance was less for Mr. Adams than for plaintiff and the

21     defendant maintained the Adams Employment Agreement was not

22     authentic.  And that's what I had said about it and I was not

23     presented with a question about it, it was an assertion by

24     plaintiff that plaintiff intended to call John Adams.

25          And certainly if there were someone to address what

```
 1    metadata means, the fact that the document at issue was
 2    adapted from Mr. Adam's agreement would seem important.
 3              MR. JORDAN:  The metadata issue was a different
 4    exhibit.
 5              THE COURT:  I'm sorry?
 6              MR. JORDAN:  The metadata issue was a different
 7    exhibit.
 8              THE COURT:  No, I know.  But I'm saying that was the
 9    forwarded e-mail.
10              MR. JORDAN:  Right.
11              THE COURT:  But there's been an objection to the
12    reference to metadata without an expert. And that was -- from
13    the defense.  And so you weren't even using that forwarded
14    e-mail exhibit. That's a different issue.
15              MR. JORDAN:  Correct.
16              THE COURT:  But it also had to do with metadata. So
17    I was just pointing that out in case anybody thought it was
18    relevant.
19              MR. JORDAN:  Okay.
20              THE COURT:  Okay, are we ready for the jury?
21              MR. JORDAN:  Yes, ma'am.
22              MR. STERN:  Yes, Your Honor. I didn't know whether
23    we need to introduce ourselves for the record to start.
24              THE COURT:  No, it's the afternoon. It's the same
25    day. Only at the beginning of every day.
```

```
 1            MR. STERN:  I couldn't remember. All the days blur
 2      together.
 3            THE COURT:  Well, the days seem long that's why you
 4      thought we needed to do it again.
 5            (The jury reentered the courtroom at 2:23 p.m.)
 6            THE COURT:  Okay, counsel, whenever you're ready.
 7      BY MR. JORDAN:
 8      Q.   Ms. Eisenberg -- Noah, can you show Ms. Eisenberg K11,
 9      right there, and then K -- the Q1 which is the questioned
10      document. And then what I want you to tell us if there is an
11      instance where in both of those signatures where the down
12      stroke stops.
13      A.   Yes, sir.
14      Q.   Okay, so Q1 and K11. First off, what does it mean to have
15      the down stroke stopped?
16      A.   So most of Mr. White's Js terminate.  It goes down past
17      the baseline and then curves up to the right. It doesn't
18      always happen that way. In exhibit K11, K11 you can see the
19      same stopping where I circled. So where he routinely turns to
20      the right and upward, he doesn't always do that. And once
21      again, this is something that might show up more often in more
22      exemplars, but it does show up in this set of exemplars.
23      Q.   Okay.
24      A.   So it's a similarity.
25      Q.   And then what -- when you say there's a U formation, what
```

1    does that mean?

2    A.    So if we look at the questioned signature, this movement

3    here is somewhat like a U formation. It might be part of the W

4    formation for White, but again, it's illegible so that's the U

5    formation. But if we go down to K2, you don't see that here.

6    It's a variation. If we look at K3, we don't see it at all in

7    there. And K4, it's not there either. But if we go to K15, we

8    get that same movement. So it's there. It's repeated in the

9    known writing.

10   Q.    Okay. And then what is it -- when you say that the E

11   sometimes has an eyelet the size of which varies, what is

12   that?

13   A.    Okay. So if we go up to the top to the questioned

14   signature, this is the E formation which is a very large loop

15   formation. The thing is Mr. White's Es are all over the place.

16   So if we look at K2, you can see it's smaller and if we look

17   at K4 you don't see it at all. It doesn't exist at all. K5

18   it's a completely different formation. It's flat on the top,

19   not angled. K10 -- can you get rid of the --

20             THE COURT:   Yeah.  Clear it, please.

21             THE WITNESS:   Thank you. Again, it's a completely

22   different formation than what we've seen in everything I've

23   just mentioned. K11, again, very different from every other

24   formation we've looked at. K14, can you go down a little bit,

25   please?  And again, if you could delete the circles that I

```
 1    have. Thank you. This is also completely different from all

 2    the other ones that we've seen.

 3    Q.   Is that unusual that it goes below the line there for Mr.

 4    White?

 5    A.   Well, we don't see it in any others, yes. But like I

 6    said, he's got a very wide range of variation and for

 7    everything you see, you also see things that you never see

 8    again like in 14A. And if we look at 15, so right here, very

 9    different. No E formation whatsoever. And keep going down,

10    please. And again, these Es you would never know that they're

11    Es. And so the question is does the ones that are in the

12    questioned signature fall within the range of variation of the

13    known signatures?  You can't tell because there's just so much

14    variety. And as I mentioned before, in 15E I don't see that

15    anywhere else. So if that were the questioned signature could

16    we eliminate Mr. White as the writer?  No, we can't.

17    Q.   And the reason we can't is only because we know it's his

18    or something else?

19    A.   That's the only reason we know, yes.

20    Q.   If you didn't know you couldn't know is what you're

21    saying?

22    A.   That's exactly what I'm saying, sir, yes.

23    Q.   Meaning it's inconclusive?

24    A.   Yes.

25    Q.   Okay. What is relevant slant?
```

```
1    A.   Slant refers to so if you have the drawn or imagery line

2    upon which the writing rests, some people write on that line,

3    some people write above it, some people angle it down, angle

4    it up. If you go to the top with the questioned signature --

5              MR. STERN:  Can I just ask a point of clarification?

6    What document are you -- what paper document are you holding?

7              THE WITNESS:  It's charts that I wrote.

8              MR. STERN:  Are those charts in your October 11,

9    2021 report?

10             THE WITNESS:  No.

11             MR. STERN:  Can we approach, Your Honor?

12             THE COURT:  Okay.

13             (Counsel approached the bench.)

14             MR. STERN:  I've not seen this.

15             THE COURT:  I don't know what it is.

16             MR. STERN:  She says she's looking at other charts

17   that are not in her report.

18             MR. JORDAN:  She's using it to reference numbers as

19   far as I can tell. I'm asking her about her report.

20             THE COURT:  He's not asking about the reports.

21             MR. STERN:  She's looking at charts.  She just said

22   she's looking at charts that are not in her report.

23             THE COURT:  Well, I don't know that she said they're

24   not in her report.

25             MR. STERN:  I just asked her are those in your
```

1    October 11, 2021 report and she said no.

2              MR. GAGLIARDO:  We're back to what happened before.

3    They're the same charts.  One with arrows, one without,

4    whatever markings --

5              MR. STERN:  But you don't want to see them--

6              THE COURT REPORTER:  I can only take down one person

7    at a time.

8              THE COURT:  I'm sorry.  Okay, one at a time. So I

9    don't know what she's looking at.

10             MR. JORDAN:  I won't have her use any report or

11   anything else.

12             MR. STERN:  There was a supplemental report.  I'm

13   sorry.  Go ahead, Greg, finish.

14             MR. JORDAN:  I'll just move on.

15             THE COURT:  Well, is there a supplemental report?

16             MR. STERN:  I'm going to ask that on cross. I have

17   to.

18             THE COURT:  Yeah, I agree with you.

19             MR. JORDAN:  Okay, she can give it to you if she has

20   anything.

21             MR. STERN:  It sounds like there is. We never saw

22   it.

23             MR. JORDAN:  I'm not presenting it. I told you, I'm

24   not presenting her supplemental report.

25             THE COURT:  Did you have one and not turn it over?

```
 1              MR. JORDAN:  I think that we had one and forgot to
 2      turn it over and so we're not using it. That is because it
 3      would be unfair, you know, in my mind and I'm not having her
 4      use --
 5              THE COURT:  That's a big thing to forget.
 6              MR. JORDAN:  What?
 7              THE COURT:  That's a big thing to forget.
 8              MR. JORDAN:  I know it is.
 9              MR. STERN:  And the law requires disclosure of all
10      the reports and analyses.
11              MR. GAGLIARDO:  They're not substantively different.
12      I think the supplemental is more -- the second report includes
13      criticisms of their expert. That's the major difference.
14              MR. STERN:  I'm going to refer to my rule expert if
15      I may, Your Honor. She's great on the rules.
16              MS. HAYDEN:  I was just going to say Rule 26.
17              THE COURT:  Well, just citing Rule 26 doesn't help
18      me.
19              MS. HAYDEN:  Rule 26 requires all opinions and facts
20      that were used to create those opinions.
21              THE COURT:  To what end?  In other words, is the
22      remedy that she not use it?  Because I agree that under Rule
23      26 obviously this just fell on me so I have no preparation,
24      but my understanding of Rule 26 is that the parties are
25      required to provide supplemental reports. But what's the
```

Eisenberg - direct                                            51

```
 1    remedy or what's the sanction if you will for the failure to
 2    do it if they don't use it?  And she isn't --
 3              MR. STERN:  She is.
 4              THE COURT:  No, I understand she is, that's also her
 5    work product.  But I don't know what it says so I don't know
 6    if it's any different or if it's just --
 7              MR. STERN:  Well then I'll ask her some questions on
 8    cross-examination to understand what this is and that document
 9    has to be -- we have to make sure we -- I don't know what it's
10    dated, I have no idea.
11              THE COURT:  I understand totally. The question I
12    have is if it doesn't say anything at odds with the first one,
13    for example, if it had more pictures or more --
14              MR. STERN:  My concern, Your Honor, and the thing
15    we've been trying to grasp, grapple with as we've been
16    listening to this testimony, and I understand Mr. Jordan is
17    walking through her report, we understood that's what he's
18    doing.  But I prepared a lot of my examination based on that
19    report and there's been no analysis of these pen drags,
20    hiatuses.  There's none of this analysis that we're hearing in
21    her report and it sounds like she did a supplemental report
22    that points it out and shows these differences.  And if that's
23    the case that she's referring to it, she's knowing hey, I
24    compared these three and --
25              THE COURT:  Are you saying that what she said is not
```

 1    consistent with her report?

 2          MR. STERN:  I'm just saying it's not in the report.

 3    I'm just saying it's --

 4          THE COURT:  So are you saying that her testimony is

 5    different from her report because she didn't address the

 6    issues that she's now being asked about?

 7          MR. STERN:  That's true.  Well, it seems that way to

 8    me because there's no comparison. This K1 -- I'm making up

 9    numbers, but K3, 5, and 10, whatever the numbers are. There's

10    nothing that connected those dots other than the three --

11    there's only three on right there and that's the only ones

12    where she called out specific numbers. She's referring to some

13    analysis it appears that's saying 6, 10, 12, 13 and I haven't

14    seen that. I have no idea what that is. And I'm just -- I'm

15    going off-the-cuff here because I've never seen this before.

16          THE COURT:  Okay, well that's a problem. So first of

17    all, we should provide it.  Even if you don't use it I think

18    that they should get a copy of it.

19          MR. STERN:  This affects my preparation for my

20    cross.

21          THE COURT:  I don't know if it does because I don't

22    know what's in it that's any different from what's already

23    been included in the original report, since I don't know

24    either one really.

25          MR. STERN:  Well, I know -- I will tell you this,

1    it's not surprising that when I was preparing my cross I was

2    confirming with my expert to get guidance on things that I can

3    feel comfortable with doing and what I wanted to leave him to

4    take care of and it's based on this report.  And it looks like

5    there's something else that's guiding this and that inhibits

6    me and limits my ability to prepare and understand what she's

7    going to be saying at trial. Because there is no detailed

8    analysis about this.

9              THE COURT:  Of course at the end of the day her

10   opinion is inconclusive anyway.

11             MR. STERN:  It is, I understand that. There's some

12   indication --

13             THE COURT:  She's going through as I understand it,

14   reasons for why she couldn't make a conclusion.

15             MR. STERN:  Well, I also think, Your Honor, while

16   we've been saying we don't know what's in there, it seems to

17   me this determination or analysis doesn't Your Honor and don't

18   we have to look at it in order to understand what we're even

19   talking about?  Because right now we're guessing.

20             THE COURT:  Yes, I think you do.  And I didn't

21   quarrel with that.

22             MR. JORDAN:  We'll make sure we'll provide that.

23             MR. GAGLIARDO:  I think we've circled back to where

24   we were before which is that an expert can explain her opinion

25   and she can testify beyond the four corners of the report. And

```
 1          that's all she's doing.
 2                    MR. STERN:  When was this report prepared?
 3                    MR. GAGLIARDO:  I don't know the answer.
 4                    THE COURT:  The supplement.
 5                    MR. GAGLIARDO:  The supplement, I honestly don't
 6          know.
 7                    MR. STERN:  This all seems relevant.
 8                    MR. GAGLIARDO:  I can find out.
 9                    THE COURT:  I'm going to have to send the jury for a
10          quick recess.
11                    MR. STERN:  I'm sorry for bringing this up, but I
12          just noticed she's reading from the page and I was like wait a
13          second, this doesn't look like the actual report.
14                    THE COURT:  Well, this may be a time where I
15          actually agree with you, Mr. Stern.
16                    MR. STERN:  Thank you.
17                    THE COURT:  It sounds like an issue we could have
18          avoided, that's for sure.
19                    (Bench conference ended.)
20                    THE COURT:  Members of the jury, I know we just
21          started, but I'm going to give you a chance to take another
22          break while we hammer out some issues here.  So rather than
23          keep you in the jury box, why don't you go back to the jury
24          room, refresh yourselves.  Again, you must not discuss the
25          case and continue to keep an open mind and we'll let you know
```

1          when we're ready.

2                       **(Jury exited the courtroom at 2:38 p.m.)**

3                       **(Conference resumed at the bench.)**

4                  **THE COURT:** So one possibility is to voir dire if you

5     will the expert on whether there's a supplement, whether it's

6     different from what she's already said, what is the

7     distinction between --

8                  **MR. STERN:** I don't know at this point. I just

9     noticed she looks like she's toggling between two different

10    things.

11                 **THE COURT:** But I think in general that Mr.

12    Gagliardo is right that it's not a script.

13                 **MR. JORDAN:** What she's looking at is numbers.

14                 **THE COURT:** But it does appear to me that there is a

15    supplement and if there is a supplement, it needed to be

16    produced and provided. And so whether there's actually any

17    real harm is another story. Because if it's not at odds with

18    what she said and just amplified somehow what she said, as

19    much as it's a violation of the rule it could be as we

20    sometimes say in the criminal cases, it's harmless error. It's

21    also what we say in criminal cases as plain error. But whether

22    it amounts to anything is all at this moment that I have to

23    worry about because I've got a jury in the box and a tight

24    schedule.

25                 **MR. STERN:** And Your Honor, just the thing that I'm

```
 1        most concerned about that I'm hearing without having the

 2        benefit of seeing this --

 3                    THE COURT:  Is that you're not prepared.

 4                    MR. STERN:  That, and there's a specific correlation

 5        pointing to A, B, C to indicate a pen lift, or a hiatus, or

 6        something with points and I've never seen that before and

 7        that's not in this report.  And that's my concern.

 8                    MR. GAGLIARDO:  If I may? This is a bit of a tempest

 9        in a teapot.  Your expert looked at everything and is going to

10        testify fully about everything and his testimony is not going

11        to change. And that's your refutation of whatever she says.

12                    MR. STERN:  Well, that is correct. There also is a

13        new analysis that she has to provide so I can prepare

14        accordingly and also I can then get guidance from my expert on

15        whether her analysis is right or wrong and whether he agrees

16        with it or not. That prepares my examination of him, it

17        prepares my examination of her. There's a lot to that. If I

18        don't know how she's connecting certain dots, no pun intended,

19        I keep saying I don't know.

20                    THE COURT:  Well, she gave very good explanations

21        that I think any layperson would understand. So I'm not sure

22        about that point that you just made about connecting the dots.

23                    MR. STERN:  She's pointing to specific samples.

24                    THE COURT:  Yes.

25                    MR. STERN:  And saying sample A, B, and C reflects
```

```
 1    X.   Samples, X, Y, Z represent Y. That's not been done.
 2              THE COURT:   That's not what?
 3              MR. STERN:   That's not been done. I've not seen that
 4    before and I had no idea that she had done that analysis.
 5              THE COURT:   Well, one possibility is that the report
 6    is produced and you have a chance before you complete your
 7    cross-examination to review the report and talk to your expert
 8    and then I think that would cure any potential prejudice. It
 9    does put us back on time, though.
10              MR. JORDAN:   What we can do is we can have Mr. White
11    go on now, give him the report, he can meet with his expert
12    and go over it.
13              THE COURT:   Well, he's made clear I have to say this
14    as well, whatever is the reason, Mr. Stern has said from the
15    beginning he wanted to put the experts back to back.
16              MR. JORDAN:   How?  I assume he's going to call --
17    I'll call her back and he can voir dire or talk to her about
18    these things anyway to put them back to back.
19              MR. GAGLIARDO:   I want to find out exactly how
20    different the two documents are.
21              THE COURT:   Okay, do you want to just ask her these
22    questions now?  I mean, we're on the record, of course.
23              MR. STERN:   I'd like to get a copy.  I have no idea.
24              THE COURT:   I understand. Do you have a copy for
25    him?
```

```
 1              MR. JORDAN:  I don't.

 2              MR. GAGLIARDO:  Can we talk to the witness?

 3              THE COURT:  No, I think we should talk to the

 4    witness on the record. Let's do that.

 5              MR. STERN:  To put initial context and I don't know

 6    whether this may be relevant and maybe this was an indication,

 7    I did get an e-mail, I don't remember what day and if it was

 8    sometime over the weekend or late last week where you asked

 9    whether I would consent to her providing a rebuttal analysis,

10    rebuttal testimony and I asked have I been provided a rebuttal

11    report and the answer was no.

12              MR. JORDAN:  Right. I'm not telling you I did and

13    the reason I didn't is you wanted Mr. Payne in the courtroom

14    and I said if you wanted Mr. Payne in the courtroom can I have

15    her in the courtroom and provide a rebuttal and you said you

16    declined to do that.

17              MR. STERN:  This is further indication that there's

18    some other report that they wanted to use in one form or

19    another that I haven't had the benefit of seeing.

20              THE COURT:  I think it's pretty clear there's

21    something that you didn't get.

22              MR. STERN:  There is.

23              MR. JORDAN:  There is, there's no doubt and I

24    apologize for that. That was not my reason for saying that. He

25    said he wanted Mr. Payne in the courtroom and I said if he
```

1   wants Mr. Payne in the courtroom listening to her, I want her

2   in the courtroom listening to him.  And then she can put on a

3   rebuttal if you allow that otherwise I don't want Mr. Payne in

4   the courtroom.  It had nothing to do with her rebuttal report.

5   It had to do with who was going to be in the courtroom and he

6   declined for Ms. Eisenberg to do that and he said fine, Mr.

7   Payne then will be excluded.

8        **MR. STERN:**  I think that's conflating -- there were

9   two different discussions going on. I did ask about having the

10  experts in the room, that was together. That was one thing and

11  then there was a separate e-mail about the rebuttal report and

12  I asked whether or not one has been provided and they said no.

13       **MR. JORDAN:**  Right. That was all in the same chain.

14       **MR. STERN:**  I don't want to conflate issues. They

15  were two separate issues in my mind. There was some overlap,

16  but they were two separate issues.

17       **MR. JORDAN:**  I'm not saying that I prepared it or

18  provided a rebuttal report, I just said --

19       **THE COURT:**  It's a pretty serious omission to fail

20  to provide it and it created all this headache now. I don't

21  know when it was prepared. Let's find out some details and

22  we'll figure out where we go next.

23       **MR. JORDAN:**  Okay.

24       **THE COURT:**  Okay, thank you. We can turn off the

25  husher.

```
 1                    (Counsel returned to their trial tables.)

 2                    THE COURT:  Did you want to ask the questions,

 3       counsel?

 4                    MR. JORDAN:  Do you want me to ask the questions?

 5                    THE COURT:  Yeah.

 6                    (Examination of Ms. Eisenberg outside the presence

 7       of the jury)

 8       BY MR. JORDAN:

 9       Q.   Ms. Eisenberg, did you prepare a rebuttal report to Mr.

10       Payne's testimony?

11       A.   Yes, sir.

12       Q.   Okay. And when did you do that?

13       A.   November 23, '21.

14       Q.   Okay. And I know that you've been reviewing or like going

15       back and forth with a piece of paper.  Was that your rebuttal

16       report that you were going back and forth when you were

17       looking at your report?

18       A.   It was really the charts so I know exactly which numbers

19       -- the points that we were talking about I went because I know

20       the numbers, so I was looking for the numbers so I could show

21       it on this screen here.

22       Q.   Were the points that you were talking about in your

23       original report?

24       A.   Yes, but with very less specificity.

25                    THE COURT:  I'm sorry?  I didn't hear your answer.
```

 1            THE WITNESS:  Yes, with less specificity.

 2    BY MR. JORDAN:

 3    Q.   Okay, what do you mean "less specificity"?

 4    A.   I didn't talk about as many -- I didn't give as many

 5    examples.

 6    Q.   Okay. So you gave more examples of the same points?

 7    A.   Yes.

 8    Q.   Okay. And then you're using your report to reference

 9    particular exemplar numbers?

10    A.   Numbers, yes.

11    Q.   What other purpose did you use that document for today?

12    A.   Nothing.

13    Q.   Okay. I can pass to Mr. Stern.

14            THE COURT:  How many pages is that report?

15            THE WITNESS:  Eight.

16    BY MR. JORDAN:

17    Q.   How many of the pages are charts?

18    A.   Six.

19    Q.   Okay, so there are two pages of commentary and six pages

20    of charts?

21    A.   Well, there's commentary on the -- where the charts are

22    as well.

23    Q.   Oh, okay, all right.

24            THE COURT:  By "chart," what exactly are you

25    referencing?  Are you talking about known signatures?  Okay,

1    so those are --

2            **THE WITNESS:**  So the blue background is the

3    questioned signature.  The green are the known signatures.

4            **THE COURT:**  So it's laid out in a more user friendly

5    fashion.  If anyone had had a chance to look at it, frankly

6    the way I think it would be more useful to a jury to see the

7    questioned document signature side-by-side with the known

8    signatures and that's not how it is in your original report.

9            **THE WITNESS:**  Yes, ma'am.

10           **THE COURT:**  I mean, what I'm looking at, it's above,

11   but for example, what's on the screen now I don't know if it

12   has a page number from the -- I assume -- I don't know if

13   that's from the actual report.

14           **THE WITNESS:**  That's from the original report and

15   that shows all of the signatures.

16           **THE COURT:**  Okay, then I think I stand corrected.

17   It's not side-by-side, but the known signatures are underneath

18   the questioned signature as opposed to next to each other.

19           **THE WITNESS:**  Yes.

20           **MR. STERN:**  But Your Honor, the known signatures

21   cover three pages in the report with the one on top of the

22   first page and then there's two more pages where the known

23   signatures follow.

24           **THE COURT:**  Right, because we discussed 20 or so,

25   right?

 1           MR. STERN:  Right, but there's -- I would like to

 2    I'm sorry --

 3           THE COURT:  No, go ahead.

 4           MR. STERN:  It sounds to me there's more connecting

 5    the dots comparing specifically --

 6           THE COURT:  Yes.  She said -- she was asked that and

 7    she said there's more information in -- there's less

 8    specificity I think is her words.

 9           MR. STERN:  Correct.

10           THE COURT:  In the original report.

11           MR. STERN:  Correct. And that's what I heard as

12    well. And then it was -- am I allowed to ask questions at this

13    point?

14           THE COURT:  Any objection to that?

15           MR. JORDAN:  No.

16           THE COURT:  Go ahead.

17           **(Examination of Ms. Eisenberg outside the presence**

18    **of the jury.)**

19    BY MR. STERN:

20    Q.   And this supplemental report you said was prepared on

21    November 23, 2021?

22    A.   Yes, sir.

23    Q.   And that was after having the opportunity to review Jeff

24    Payne's report?

25    A.   Yes, sir.

1    Q.   And in reviewing Jeff Payne's report -- was some of this

2    analysis in this November 23, 2021 report, were some of these

3    analyses in response to Jeff Payne's commentary?

4    A.   Yes. Excuse me, can I just explain?  Mr. Payne pointed

5    out differences in his report.  And what I did in my

6    surrebuttal report was show that he omitted similarities in

7    some of the other exemplars.  He just omitted them when they

8    existed.

9           THE COURT:  But she hasn't testified about that.

10          MR. JORDAN:  Right.

11          MR. STERN:  I understand, but this is guiding her

12   analysis and she's presenting to the jury while she's not

13   specifically pointing out what she's critiqued saying Mr.

14   Payne -- I disagree with Mr. Payne, this is guiding her

15   analysis.  And Your Honor, we move to strike and we did not --

16   we were not provided with this report and this is guiding the

17   testimony based on some analysis that we've never seen before.

18          THE COURT:  Well, I don't know that because I don't

19   actually know what the report says and I certainly haven't

20   compared it to the original.

21          MR. STERN:  But she just testified --

22          THE COURT:  She said it has more specificity.

23          MR. STERN:  But she also said part of this analysis

24   is driven by her analysis of Jeff Payne's report.  So that is

25   not what we've been presented with and that's not what she's

1    testifying about. That's the problem. I mean, that is what

2    she's testifying about, let me clarify. This supplemental

3    report she's been referring to. We've established that she's

4    been referring to this as she's giving testimony. And part of

5    that supplemental report while I understand she's not

6    specifically said Jeff Payne said X and let me point that out,

7    but it's clearly guiding her analysis in what she's presenting

8    to the jury. And part of her analysis that she's now

9    presenting to the jury is an analysis that we have not seen

10   before. And this was done only after Jeff Payne provided his

11   report. And so they've had this for over -- they've had this

12   for over two years.

13          **MR. JORDAN:**  Your Honor, first off I don't think

14   we've established that Ms. Eisenberg has gone outside the four

15   corners of her report.

16          **THE COURT:**  You don't think you've established what?

17          **MR. JORDAN:**  That Ms. Eisenberg has gone outside the

18   four corners of her report.  And second, they didn't choose to

19   depose Ms. Eisenberg. So, I mean, they could have asked her

20   whatever questions they had in the interim period. They let

21   her go -- we asked for Mr. Payne's deposition and got it. And

22   there's no reason that I know of that -- I don't think there

23   was an order -- there was an order saying that John White

24   couldn't testify, but not an order saying that --

25          **THE COURT:**  I appreciate that they could have and

1    should have perhaps, but that doesn't really answer my concern

2    because they still had a right to rely on the report that they

3    got.  And for the life of me, I'm trying to understand what

4    would have led you to not disclose a supplement prepared in

5    November of 2021.

6              **MR. STERN:**  Your Honor --

7              **THE COURT:**  Wait, I'm sorry.  What?

8              **MR. JORDAN:**  It was just an oversight.  It wasn't an

9    intention.

10             **THE COURT:**  Oversight, but it's two years ago. It's

11   not an oversight now. It's a very serious mistake.

12             **MR. STERN:**  Your Honor, this is why -- we didn't --

13   we did not know to even ask for this request to depose her

14   based on this new report because of the very absence of it. We

15   did not know about it. That alone puts us at a disadvantage.

16             **THE COURT:**  I don't know whether you would have --

17   this wouldn't -- if you didn't do it before I personally doubt

18   you were going to do it at all, so let's not go there. But you

19   were entitled to the report. And you should have had the

20   report. And I now have a situation where it's a violation of

21   the rule, they were entitled to it. I don't know whether the

22   witness' testimony deviates from her original report. It

23   certainly is more fulsome as she would have I think conceded

24   because she says that the supplement had more specificity.

25   And the specificity seems to include more description about

```
 1        some of the things that make her opinion more reliable:  The
 2        differences in the signatures pointing out, for example, the
 3        pointy J versus the rounded J; the U; the way the Es appear,
 4        et cetera. So I mean, I have a big concern and I think I have
 5        a big problem. And what's the remedy?
 6                 MR. STERN:  Your Honor, the jury has heard this.
 7                 THE COURT:  I'm not prepared to rule that I'm
 8        striking her testimony. So we have to see if we can come up
 9        with another solution. One solution is that --
10                 MR. STERN:  Well, Your Honor, should we be having
11        this discussion in front of the witness at this point?
12                 THE COURT:  Yeah, perhaps you should step outside.
13        It's not substantive about her testimony.
14                 MR. STERN:  Also it seems that we should also have a
15        copy of this report.
16                 THE COURT:  Yes, I know that. But if you don't mind
17        waiting outside.
18                 THE WITNESS:  I don't mind. Do you want a copy?
19                 MR. GAGLIARDO:  I was just looking for a copy.
20                 (Witness exited the courtroom.)
21                 MR. STERN:  Just so we know, can Denis --
22                 THE CLERK: I can make a copy.
23                 THE COURT:  Okay, we're going to get copies made.
24                 MR. STERN:  I think that's the easiest way.
25                 THE CLERK:  Your Honor, how many copies?
```

 1              THE COURT:  One for me and one for the other side.

 2     Actually, three copies.

 3              MR. JORDAN:  I need one.

 4              THE COURT:  I mean, there are a lot of options. One

 5     is if you wish to depose her, that's an option. Another option

 6     is that I delay the opportunity for your cross until you have

 7     a chance to confer with your expert. And I really don't know

 8     for a fact that there's -- let's not conflate the fact that

 9     there was a violation of counsel's obligation to produce that

10     document with whether it actually is significant. That I can't

11     answer. And at the moment I'm concerned with whether

12     substantively this amounts to anything. That's -- because I'm

13     in the middle of a trial with a jury in the box. We've already

14     invested three days in this case and I don't think anybody

15     wants to start over.

16              MR. JORDAN:  No.

17              THE COURT:  Which is another option.

18              MR. STERN:  Your Honor, I have to reserve my right

19     for that.

20              THE COURT:  I'm sorry?

21              MR. STERN:  I have to reserve my right for that

22     being an option.  And I want to note for the record that that

23     may be what may be necessary. I don't take that lightly and --

24     but at this point the jury is hearing her testify about things

25     that we haven't seen.

```
 1              THE COURT:  Right, but there may be other cures
 2    short of basically starting over with a new jury.
 3              MR. STERN:  I understand.
 4              THE COURT:  I don't know if you really want that.
 5              MR. STERN:  I'm just -- I don't want there to be any
 6    indication that I've consented to waiving that.
 7              THE COURT:  Well, you haven't.
 8              MR. STERN:  All right.
 9              THE COURT:  I wouldn't expect you to. But that's not
10    the issue. The issue is --
11              MR. STERN:  I understand.
12              THE COURT:  How, what options are available to
13    ameliorate the error so that I can preserve the ability of the
14    case to go forward. And at the end of the day, I don't know
15    whether anything she said really varies from her original
16    report. And the fact that she has additional examples of what
17    she said all along may be much ado about nothing.  And that's
18    what I don't know. I haven't read either report. Typically
19    reports don't even come in.  So I was surprised to see that.
20    Usually the expert testifies and their reports don't come into
21    evidence. You all agreed, so they're in evidence. And it's not
22    a script. But the fact is as -- I'm going to say this, as a
23    technical matter, you should have had that report and it's
24    incomprehensible to me that you don't have it. But whether it
25    really is causing any harm is what I'm now focusing on. And if
```

1     -- lots of times in cases, not necessarily mine, but in cases
2     as you all know from reading opinions issued by higher courts,
3     when the witness -- when there's something unexpected and the
4     other side is afforded an opportunity to address it with
5     perhaps speaking to a surprise witness or whatever it might
6     be, that's usually sufficient. So that's why I'm suggesting
7     that delaying your cross and giving you a chance to confer
8     with your expert might be the solution.
9         So the very first thing I notice is that this is clearly
10    in response to the defense expert. And this is -- this Court
11    allowed the defense to substitute Mr. Payne if I remember so
12    always no act of kindness goes unpunished.  I let the defense
13    have Mr. Payne and I don't remember for sure, I'd have to go
14    back to my notes, but it was probably over the plaintiff's
15    objection. And I think it's in ECF 159, my order letting you
16    substitute someone who I think hadn't been timely named or
17    something to that effect. But I don't want to misstate
18    anything. And she says in line 2, "The Payne report does not
19    alter my opinion of *no conclusion*" in italics "regarding the
20    authenticity of Mr. White's signature." And then she talks
21    about what Mr. Payne talked about.
22        **MR. STERN:**  Well, it looks like there's some
23    additional -- she does respond to Mr. Payne's analysis and
24    said, "Therefore, while it's feasible that a second" --
25        **THE COURT:**  Where are you?  It's a multipage report.

```
 1              MR. STERN:  The second full paragraph on the first

 2    page, first paragraph AB and then "Therefore," Your Honor, do

 3    you see that?

 4              THE COURT:  Yes.

 5              MR. STERN:  "While it's feasible that a second

 6    writer created a signature with habits similar to Mr. White's,

 7    it's equally possible that Mr. White wrote his own name given

 8    Mr. White's broad range of variation.  It is also feasible

 9    that the appearance of the questioned signatures do too."

10    None of this was in her analysis before. That's new.

11              MR. JORDAN:  This is her analysis. This is the

12    inconclusiveness of the analysis.

13              MR. STERN:  I'd like to see where she makes mention

14    of these things in her original analysis.

15              THE COURT:  Well, she talked in her testimony today

16    about irregular writing surfaces and pen malfunctions.

17              MR. STERN:  That's not in the original analysis.

18              THE COURT:  That's not in the original report you

19    mean?

20              MR. STERN:  And she's not talking about anything

21    specific in the questioned document. That was one of the

22    things that was so surprising to me and why -- and it affected

23    my decision about how to examine because there was -- and part

24    of the issue is the first, I think the first thing -- let me

25    turn back. I think the first thing she points to in the report
```

```
1    is quality. And when we -- quality is item number one in her

2    report. I'm looking at the one that's in evidence, Exhibit 18.

3    Page 3.

4            THE COURT:  Okay.

5            MR. STERN:  And we spent time going through and I

6    expect a lot of my cross-examination is going to be geared

7    towards the quality of the documents. For some reason when we

8    looked at the quality of her documents compared to the quality

9    of the copies that Mr. Payne was using, I don't know why hers

10   are so much blurrier. And look at her enlargement on that when

11   you compare it to -- I don't know, I have no idea why this is

12   the case so I just want to know -- one of the issues was the

13   quality. And hers were all blurry and I don't know why that's

14   the case. Or faded.

15           THE COURT:  Well, that's not relevant to what we're

16   talking about.

17           MR. STERN:  I know, but this was item 1 in her

18   report. Item 2 is comparability and she does not connect any

19   of this and doesn't give any critical analysis of the Q1 as

20   she's doing here. Same thing with the quantity. There's

21   nothing pointing to the areas of the Q1, which is the

22   questioned document, that show whether it's a simulation which

23   obviously I acknowledge that's up to us, I'm not -- but

24   there's also the other parts of the analysis where she's

25   pointing out there are indications that it could potentially
```

1    be authentic, which we've never seen that before.

2              **THE COURT:**  Which part you said you've never seen?

3              **MR. STERN:**  The end of this paragraph on page --

4              **THE COURT:**  The new report or the old one?

5              **MR. STERN:**  The new report. The new report, the ABC,

6    this is something new and I haven't even gotten to the second

7    page yet. And this whole -- she doesn't go through relative

8    height ratios comparing -- I'm now on page 2 of her

9    supplemental report.

10             **MR. GAGLIARDO:**  Your Honor, if I may.

11             **MR. STERN:**  There's nothing about the relative slant

12    analysis. She doesn't even uses the phrase "relative slant" I

13    think in the original report. I remember that was another term

14    I was like I don't remember hearing this before. So there are

15    new things in here that we have not -- that were not part of

16    her original report. And I'm just looking at this for the

17    first few minutes. I haven't had time to really dig in and

18    spend time analyzing. I'm just -- and here, I will point out--

19             **THE COURT:**  Well, it's very clear and I haven't

20    studied it, I'm just looking at it for the first time and very

21    quickly but it seems very clear that this is in response to

22    the Payne report. That word appears repeatedly. The Payne

23    report this, the Payne report that.  And she's answering the

24    Payne report. The problem is that in answering the Payne

25    report, she was more descriptive and more precise than she was

1  in her original report. And that's a problem because they

2  weren't told. And I think she needs to -- her testimony needs

3  to be limited to what was in her original report, in fairness.

4      Or conversely, another option would be to the extent that

5  the testimony has already come in, then the defense has to be

6  entitled to an opportunity to confer with Mr. Payne to find

7  out what, if any, additional material should be pursued in

8  cross-examination.

9          **MR. GAGLIARDO:**  We have no objection.

10         **MR. JORDAN:**  No objection to that, Your Honor.

11         **THE COURT:**  I mean, if that -- the report isn't

12  coming into evidence.  So to the extent it has all this

13  information in it, as far as the jury is concerned it's never

14  going to be known by the jury. And if what she said so far

15  varies from what she previously said -- and I don't know that

16  it varies, I think it's definitely more detailed or as she

17  said, used the word specificity, has greater specificity, then

18  you can follow-up with Mr. Payne and attack it if you're able

19  to. But how are you injured if I give you that opportunity?

20         **MR. STERN:**  Um, I can't speak for Mr. Payne how long

21  it takes him to analyze someone else's work.

22         **THE COURT:**  Well really what you need is the

23  transcript of what she said.

24         **MR. STERN:**  There's that, yes. There's also, I do

25  know from watching her she was looking down at this report

1    that we now have in our hand dated November 23, 2021 and

2    that's when it occurred to me that -- and then she would turn

3    to the other report.  It looked like she was mixing and

4    matching analyses by relying on the November 23, 2021 report

5    with the October 11, 2021 report saying I'm going to look at

6    November 23 and use that to augment my October 11. And that's

7    the issue. And that's the --

8            **THE COURT:**  But it's clearly meant to address Mr.

9    Payne's report of --

10           **MR. STERN:**  So she's now filling in gaps I guess for

11   lack of better terms that we -- that we're not familiar with I

12   guess is one way to say it, or at least is one way it appears.

13   I don't know. But look, it's a mixed bag, I'll say. Like on

14   one hand it seems like in looking at Mr. Payne's report she

15   realized that oh yeah, there are indications of simulation. I

16   understand that is good for us. But on the other hand there's

17   a lot more detail that she's using to try to justify her in

18   conclusion analysis saying there's also signs of authenticity

19   to it and that's a problem.

20           **THE COURT:**  Well, for one thing when the jury goes

21   back into the jury room the jury won't have her transcript,

22   they'll only have the report and the report doesn't say those

23   things, for what little that may be worth. But most of what's

24   in this report has not been testified to.

25           **MR. STERN:**  Well --

```
 1              THE COURT:  By "this report" I mean November 23,
 2     2021.
 3              MR. STERN:  Understood.  But Your Honor, what she
 4     has testified to while she hasn't specifically said "as I
 5     wrote on November 23rd," but what queued me in was how she was
 6     looking down and having some quick reference to connect I'm
 7     just going to use --
 8              THE COURT:  I'm not troubled by that. I mean, an
 9     expert like any witness, I mean, she could have prepared
10     herself for trial and found something more useful than her own
11     -- it's not a Bible. She's not bound to just stick to in order
12     to sort of decide how to answer a question, it's not a script.
13     I've said that before. I'm not troubled by the fact that she
14     had other resources, but --
15              MR. STERN:  It's another analysis.
16              THE COURT:  But you didn't have notice. That's what
17     troubles me.
18              MR. STERN:  And there's additional analyses.
19              THE COURT:  Right, but most of it is about the Payne
20     report and she hasn't been asked any of those questions. So I
21     think -- I'm not going to minimize it.  I'm troubled by
22     experienced counsel failing to produce this report. There's no
23     way around that -- and causing this big headache.
24          She definitely talks about examples of how she's unable
25     to make a conclusion. At the end of the day that opinion is
```

 1   never changed. She doesn't reach a conclusion that Mr. White

 2   was the author. She's basically buttressing her opinion that

 3   she can't make a conclusion. So I think the solution --

 4   because these are my choices:  I declare a mistrial and we

 5   start over. Do you really want me to do that other than you

 6   want to save it on the record so that you could have a good

 7   appeal point if you lose?  But do you really want me to start

 8   over?

 9        **MR. STERN:**  Can I confer with my client and my

10   co-counsel?

11        **THE COURT:**  Sure.  I'm not saying I will regardless

12   of what you tell me, but just tell me truly as an officer of

13   the court if you actually truly want me to start over.

14        **MR. STERN:**  I understand.  And also, Your Honor,

15   whatever I say I have to make sure no matter what, I have to

16   make sure the record is clear that I'm preserving that issue

17   or appeal if --

18        **THE COURT:**  Well, I don't think that's fair because

19   if you do that and -- if you're going to say one thing and

20   mean another, that's not fair. So if you tell me you don't

21   really want to start over but you're reserving your right to

22   complain that we don't start over, then I might just start

23   over.

24        **MR. STERN:**  All right.

25        **THE COURT:**  I mean, I don't know.  I feel like I'm

1    between a rock and a hard place and I blame plaintiffs for it,

2    I really do. This is experienced lawyers failing to turn over

3    a document like this is inexplicable to me.

4         **MR. STERN:**  And Your Honor, I don't take --

5         **THE COURT:**  I'm sorry, I didn't mean to interrupt

6    you but I'll just finish my thought. It's inexplicable,

7    indefensible, but it doesn't necessarily mean that it actually

8    is irreparable harm to you because I've offered ways that I

9    think we can cure it.  And if I didn't believe that those were

10   genuine cures I couldn't live with myself and we wouldn't do

11   it. So we're talking two separate things. I've got the one

12   hand sure, this was wrong and then what do I do if I can to

13   fix it?  And that's where I am right now. Can I offer you a

14   solution that will remediate this problem?

15        **MR. STERN:**  I understand.  And Your Honor, I didn't

16   mean to be disrespectful.

17        **THE COURT:**  I understand you need to talk to your

18   client.

19        **MR. STERN:**  And this is a lot to consider in a

20   relatively short period of time and I don't take --

21        **THE COURT:**  Do you want me to recess for the day?

22   But then I need to know whether we're reconvening tomorrow and

23   at what time and what I tell the jury about -- not to harp on

24   this for you, but I did expect the case to be finished by

25   Monday and I have a pretty busy day Tuesday. I don't remember,

 1   I didn't look to Wednesday and I don't know that I can change

 2   those things.

 3            **MR. STERN:**  Your Honor, I just want to be -- I do

 4   not take -- I'm not taking asking for -- I want to be clear,

 5   I'm not taking the concept of asking for a mistrial and

 6   starting over lightly. I'm actually -- that's a lot of stress

 7   for a lot of reasons.

 8            **THE COURT:**  Right.  And because then at the end of

 9   the day where will you be?  I'm not going to dismiss their

10   case as a sanction. So we'll start over. You'll have the

11   report and then what?  So Mr. Payne will do what for you and

12   what will we do differently at the next trial?  You'll have

13   the report, this will come in and then where are we?

14            **MR. STERN:**  Also I have no idea how long it would

15   take for me to get adequate input from Mr. Payne. I know how

16   much --

17            **THE COURT:**  Well, I know this. He's available

18   because he's going to be testifying.

19            **MR. JORDAN:**  He's actually here right now.

20            **MR. STERN:**  What I'm trying to explain though is

21   there's been several conversations we've had as he tells me

22   information so I can learn -- I'm not a handwriting expert,

23   Your Honor, but I've got to learn from my expert to make sure

24   I can ingest and comprehend. This is not something like hey,

25   talk to him for two or three hours and problem solved, at

1    least that's not the way I learn.  And than I'm going to toot

2    my own horn a little bit here.  When we were going back and

3    forth he told me it's pretty impressive how I learned the

4    stuff as well as I have.

5          **THE COURT:**  But it wasn't that much that you have to

6    learn.  You already learned a lot because you already spent

7    time with him.  He was preparing with you what to say on

8    cross.  So the only things now that you need to get educated

9    about are things that are new and how much was that really?

10          **MR. STERN:**  It could be a lot.

11          **THE COURT:**  But we know what it was. It's not a lot.

12    It doesn't seem like it's a lot. It seems like it's about a

13    little more detail about the Es, the loops, the slant, the

14    uneven writing surface, the pen not rolling smoothly.

15          **MR. STERN:**  Your Honor, I'll just note I don't know

16    exactly when Ms. Eisenberg got the Payne report, but there's

17    at least been -- there's at least -- I don't know how much

18    time there was, but there's a month-and-a-half between her two

19    reports here. I'm just --

20          **THE COURT:**  Yes.

21          **MR. GAGLIARDO:**  Let me try to narrow the focus to

22    what I think is salient. First of all, the original report on

23    page 3 under findings is exactly the same -- is the same as

24    the witness testified today and the same as contained in the

25    second report.

```
1            THE COURT:  When you say "the same," what are you

2      pointing to?

3            MR. GAGLIARDO:  Her finding is that she cannot

4      conclusively say whether it was John White who signed it or

5      someone else.

6            THE COURT:  Well, I made that point already.

7            MR. GAGLIARDO:  Right, correct.

8            THE COURT:  The ultimate opinion is the same.  The

9      question is how did she get there.

10           MR. GAGLIARDO:  Right.

11           THE COURT:  And she was offering more examples today

12     apparently.  And I can't represent this as accurate because I

13     didn't study either report. But it appears, she said it

14     herself, there's more --

15           MR. GAGLIARDO:  Specificity.

16           THE COURT:  --specificity in what she was saying

17     today than is contained in her original report.

18           MR. GAGLIARDO: Correct. I think the proper cure is

19     the second option that you suggested which is that Mr. Stern

20     have an opportunity to consult with Mr. Payne.

21           MR. JORDAN:  Who is here.

22           MR. GAGLIARDO:  He's been sitting in the hallway

23     since we came back from lunch, at least since then.

24           THE COURT:  Well, here's a reason we should have let

25     experts sit in on the testimony, which is not uncommon.
```

```
 1          MR. GAGLIARDO:  Well, here's the final point: The
 2     difference between the two experts, besides their ultimate
 3     conclusions, that Ms. Eisenberg says insufficient samples to
 4     do anything more than make a definite conclusion.  And Mr.
 5     Payne says, I had enough, I made a definite conclusion. That's
 6     the debate between the two experts. In terms of what they see
 7     in terms of hooks and points and whatever these, you know,
 8     other specifics are, I don't think there's a great deal of
 9     difference. There may be something here or there, but I think
10     it's the interpretation, not the analysis.
11          MR. STERN:  Your Honor, this is to the point I was
12     going to make right now.  I'm sorry.
13          THE COURT:  I was going to say it's only 3:10. So if
14     we recess for the day as much as I don't want to, that would
15     certainly give you time to confer with Mr. Payne and review
16     all this.
17          MR. STERN:  I will talk with him as soon as --
18     whenever we are recessed for the day.  But in response to what
19     Mr. Gagliardo just said, one of the things I was about to say
20     before he spoke and what occurred to me in looking at this
21     going back to the original report versus the supplemental one
22     is part of -- if you look, when Your Honor reads the original
23     report, two of the three factors that she points to is why she
24     can't reach a conclusion is based on quality of images and the
25     quantity of samples. Okay?  So now with the same samples after
```

1    reading Jeffrey Payne's report, she now is able to connect the

2    dots based on the samples she has and the quantity of samples

3    she has to make a more detailed analysis pointing out well,

4    when you look at this mark, or this angle, or this hiatus, or

5    this pen lift, or this slant -- I forgot the term of art that

6    she used, I never saw that term of art before -- this is a big

7    change from what was previously hey, not enough for me to be

8    able to tell and the quality of my images aren't so great. And

9    without that connecting those dots. So that's a pretty

10   significant change it appears to me with what I'm reading

11   right now for about however long we've had it.

12           **MR. GAGLIARDO:**  That all sounds like

13   cross-examination to me.

14           **MR. JORDAN:**  And I don't think that that's an

15   accurate recitation of either of her reports.

16           **THE COURT:**  Okay, well whether it's been somehow

17   amplified as a result of reading Mr. Payne's report or not, if

18   you're provided an opportunity to confer with your expert,

19   have I cured the problem?  Because you now have the report

20   belatedly, you have the report and you're going to have time

21   to talk to your expert. So compartmentalizing, as I'm

22   attempting to do, what I think was a serious failure of the

23   plaintiff to provide the report to you in a timely manner and

24   now we're here in the middle of the trial, have I not

25   adequately given you a cure?

 1          **MR. STERN:**  I don't know the answer to that. I'm not

 2     being --

 3          **THE COURT:**  No, I understand. Okay, so you're going

 4     to confer with your client and tell me if you want -- I'm

 5     going to send the jury home no matter what, but I'm going to

 6     let you confer with Mr. White now and then everyone else will

 7     stay put. Let's bring in the jury. I'm going to bring them

 8     back tomorrow morning at 9:30 with the hope that you're all

 9     satisfied we should continue, but I'll let you have a chance.

10     I'm here, I'm not going anywhere and we'll give you all the

11     time you need to talk to your client and then to talk, of

12     course, to your expert who I let you have.

13          **MR. STERN:**  Your Honor, just to -- like I said I

14     don't know the answer to that, it's because as an officer of

15     the court I take my responsibility seriously to respond and

16     try to figure out what's reasonable.  So that's why I was

17     purposely saying I don't know.

18          **THE COURT:**  I understand.

19          **MR. STERN:**  I'm taking everything that you're

20     saying--

21          **THE COURT:**  I know you'll factor in the fact that it

22     costs money to go to trial and if you all -- if you come to

23     the conclusion, it will be a factor in my consideration, it

24     will not necessarily control my decision.  But obviously, if

25     you tell me that you think you're so harmed by what happened

1    that we need to start over, I'm going to take that into

2    account and make my decision as to whether we resume tomorrow.

3    And I would ask Denis to make sure subtly that we have contact

4    information for all the jurors so that if I decide tonight

5    that we're not going forward, they don't even have to come in

6    tomorrow.

7         MR. STERN:  And Your Honor, I want to make sure I

8    understand the sequence of events.

9         THE COURT:  I'm going to send the jury home now. I'm

10   going to tell them to come in at 9:30, that we hit a roadblock

11   if that's okay, and I don't want to waste their time so I'm

12   going to let them go while we iron out some issues.  And in

13   the meantime I'm going to make sure my courtroom deputy has

14   their contact information because in the event between now and

15   when you leave if I decide that I can't go forward tomorrow in

16   fairness to you, then they'll be contacted and I won't bring

17   them in at all.

18        MR. STERN:  Understood.  So we're --

19        THE COURT:  We're not leaving. Your side,

20   plaintiff's side and I, we're staying. It's only the jury I'm

21   sending away. The first order of business is for you to talk

22   to your client and find out what he wants to do, taking into

23   account your wisdom and his personal lawyer sitting there as

24   well. And then if you should decide to go forward, of course

25   you'll have time you didn't know you were going to have to

```
1    talk to Mr. Payne.  And if he's an expert, I don't think it's
2    going to take him that long.  And I know you're smart, so I
3    don't actually think it will take you that long to get up to
4    speed either with whatever is new that this witness testified
5    to.
6              MR. STERN:  I just want to make sure that we'll have
7    some other place to go in the courthouse and then we come back
8    for us to confer?  Because my voice carries and I don't want
9    to be whispering.
10             MR. JORDAN:  Is there a witness room?
11             MR. STERN:  Is there someplace we can go?
12             THE COURT:  We used to have witness rooms back there.
13   I don't know what condition they're in.  There's a jury room
14   so after the jury leaves, you can go in there.
15             MR. STERN:  I want to make sure it's not like hey,
16   we're all here waiting for us to decide.  I want to take my
17   time to deliberate, get input from my client, get input from
18   my expert, get input from as you noticed there's another
19   lawyer here. The whole team. This is not going to be a few
20   minute endeavor.  I want to make sure I'm not holding --
21   you'll recess and then we'll say hey, we're ready to come
22   back.
23             THE COURT:  I mean, I know it's a big decision but I
24   don't think it should take that long.  And why don't you make
25   yourselves -- I'm happy to make the jury room available to
```

1      you.

2              THE CLERK:  Your Honor, I can open up Judge Bredar's

3      jury room.

4              MR. STERN:  So we can confer privately.

5              THE COURT:  But if you think it's going to take

6      hours, we do want to know because I don't want to keep them

7      here for hours.

8              MR. STERN:  I don't think it will take hours for us

9      to decide, but I'm a pretty deliberative person.  I want to

10     make sure that I'm thinking through this process appropriately

11     and I don't want to be -- this is not a decision I ever

12     anticipated making in my career. Let's put it that way.

13             THE COURT:  And don't forget, next time around

14     everybody just gets better. So this might be your respective

15     shots, I don't know, because you'll all have transcripts and

16     you'll know what you did wrong and what you did right and

17     you'll fix it.  So it's up to you how you want to go and

18     whether I grant the request. But the first instance is do you

19     make the request and that's where you need to talk to Mr.

20     White.

21             MR. STERN:  Yes.

22             THE COURT:  And we're going to make the jury room

23     available from the courtroom next door. I would ask

24     plaintiff's group to please stay here. All you need to do is

25     somehow -- how shall they let me know they're ready to

```
1    convene?

2              THE CLERK: Your Honor, I will stay in the courtroom.

3              MR. STERN:  So Denis will stay here.

4              THE COURT:  And he'll get the court reporter and in

5    the meantime we can -- I'll let plaintiff send their witness

6    home and stay in touch with her and we'll bring in the jury.

7    So let's get them on their way. That's the most important

8    thing. I've already imposed on them enough.

9              (Discussion held off the record.)

10             THE COURT:  And just a heads-up, counsel, when we're

11   bringing in the jury. The courtroom deputy said that when the

12   cases are over they hand out work slips and because I don't

13   know if the case is over, we came up with a way in which he's

14   going to just subtly say "Since we're getting out early I

15   thought I'd take this chance to hand out your work slips

16   today, hold onto them" and then he's going to ask them to

17   remain so he can give them to them because I don't know the

18   answer to whether we're going forward tomorrow, but if we

19   don't go forward they need those slips. Does that work?

20             MR. GAGLIARDO:  They won't know whether we're

21   continuing --

22             THE COURT:  No, they won't know. We're going to make

23   it seem like this is just a convenient time to hand them out.

24             MR. GAGLIARDO:  Thank you.

25             (The jury reentered the courtroom at 3:26 p.m.)
```

```
 1            THE COURT:  Ladies and gentlemen, we have some
 2    matters to discuss, counsel and the Court so I thought we
 3    could finish more quickly than it now appears we can. And so I
 4    can't justify keeping you in the jury room while we iron out
 5    some of these issues.  So I think it's best if I just allow
 6    you to leave for the day rather than continue to impose on you
 7    because it's already almost 3:30.
 8            So with that, of course I'm going to excuse you with the
 9    reminder that you must continue to keep an open mind and you
10    must not discuss the case with anyone or allow anyone to
11    discuss the case with you. And I think the clerk was going to
12    take advantage of the time just to hand out some paperwork to
13    you so I think you might be -- you want them to go in the jury
14    room to hand them out?
15            THE CLERK: Yes.
16            THE COURT:  From there you'll be on your way.  So
17    I'll see you tomorrow bright and early. I ask that you be in
18    that jury room at 9:25 and we should be ready for you at 9:30.
19    Have a very pleasant evening. The jury is excused.
20            (The jury was excused at 3:27 p.m.)
21            THE COURT:  Okay, so as soon -- do you have what you
22    need?
23            THE CLERK: I just need to print it out, Your Honor.
24            THE COURT:  So it will take a few minutes to do
25    that, to print the forms.
```

1          THE CLERK: Yes.

2          THE COURT:  So I don't think we should excuse your

3    witness until we know the jury is on its way so they don't run

4    into each other.

5          MR. JORDAN:  Right.

6          THE COURT:  As soon as the courtroom deputy tells me

7    the jury is gone -- or you can tell her to go now while

8    they're still in the jury room if you want to do that.

9          MR. JORDAN:  Okay.

10          THE COURT:  And just be sure you're in touch with

11   her to know whether she should return tomorrow morning. And

12   we'll just ask everyone else to stand by and as soon as -- in

13   a few minutes really it should be the case, Mr. Stern, that

14   the courtroom deputy is able to open up the adjoining jury

15   room for your convenience. And until further notice which I

16   expect to be as soon as possible, we'll stand in recess.

17          **(Recess was taken from 3:29 to 4:39 p.m.)**

18          **(Requested excerpt is complete.)**

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5           I, Nadine M. Bachmann, Certified Realtime Reporter

 6    and Registered Merit Reporter, in and for the United States

 7    District Court for the District of Maryland, do hereby

 8    certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

 9    true and correct transcript of the stenographically-reported

10    proceedings held in the above-entitled matter and that the

11    transcript page format is in conformance with the regulations

12    of the Judicial Conference of the United States.

13

14                        Dated this 22nd day of February, 2024.

15

16                        /s/

17                        _____

18                        NADINE M. BACHMANN, CRR, RMR
                           FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25
```

**'** 

**'21** [1] - 60:13

## /

**/S** [1] - 91:16

## 1

**1** [4] - 19:5, 19:6, 38:9, 72:17
**10** [6] - 13:9, 17:1, 17:11, 42:16, 52:9, 52:13
**100** [1] - 7:20
**11** [5] - 9:3, 48:8, 49:1, 75:5, 75:6
**119-3** [1] - 43:19
**12** [1] - 52:13
**12:14** [1] - 3:2
**12:30** [1] - 19:1
**13** [1] - 52:13
**138** [1] - 43:15
**138-3** [1] - 43:10
**14A** [1] - 47:8
**15** [7] - 17:1, 17:11, 32:19, 39:14, 47:8
**159** [1] - 70:15
**15E** [1] - 47:14
**160** [1] - 43:2
**18** [4] - 8:17, 9:1, 32:2, 72:2
**1988** [1] - 4:9
**1991** [1] - 7:21
**1998** [2] - 4:9, 4:11
**1:12** [1] - 42:24

## 2

**2** [5] - 42:17, 43:17, 70:18, 72:18, 73:8
**20** [24] - 9:10, 10:3, 13:10, 13:12, 17:1, 17:12, 19:25, 20:1, 20:5, 20:6, 20:15, 20:22, 21:6, 21:13, 21:16, 22:1, 22:15, 23:1, 23:2, 23:9, 23:18, 24:2, 24:16, 62:24
**20-something** [1] - 12:4
**2002** [1] - 6:13
**2007** [2] - 43:10, 43:17
**2008** [1] - 4:19
**2018** [1] - 6:22
**2021** [11] - 7:1, 9:3, 48:9, 49:1, 63:21, 64:2, 66:5, 75:1,

**75:4, 75:5, 76:2**
**2022** [2] - 4:11, 6:11
**2023** [1] - 43:3
**2024** [2] - 1:9, 91:14
**21st** [1] - 7:3
**22** [1] - 1:9
**22nd** [2] - 43:10, 91:14
**23** [7] - 60:13, 63:21, 64:2, 75:1, 75:4, 75:6, 76:1
**23rd** [1] - 76:5
**24** [1] - 4:2
**26** [8] - 30:2, 30:21, 30:22, 50:16, 50:17, 50:19, 50:23, 50:24
**26(a)(2)(B** [1] - 30:25
**26(a)(3** [1] - 31:5
**28** [1] - 91:8
**2:14** [1] - 42:24
**2:15** [1] - 42:17
**2:23** [1] - 45:5
**2:38** [1] - 55:2

## 3

**3** [3] - 2:3, 72:3, 80:23
**30** [1] - 13:14
**31** [1] - 43:2
**34** [1] - 4:4
**36** [1] - 43:19
**3:10** [1] - 82:13
**3:26** [1] - 88:25
**3:27** [1] - 89:20
**3:29** [1] - 90:17
**3:30** [1] - 89:7

## 4

**4** [2] - 31:24, 32:2
**40** [4] - 6:4, 6:7, 7:10, 13:14
**4:39** [1] - 90:17

## 5

**5** [3] - 31:24, 32:2, 52:9
**50** [1] - 13:14
**56** [1] - 39:20

## 6

**6** [3] - 43:8, 43:15, 52:13
**60** [1] - 2:8
**63** [1] - 2:8

## 7

**753** [1] - 91:8

## 8

**8** [3] - 9:14, 9:23, 34:14

## 9

**9:25** [1] - 89:18
**9:30** [3] - 84:8, 85:10, 89:18

## A

**AAFS** [6] - 6:12, 6:16, 6:21, 7:4, 7:12, 7:15
**AB** [1] - 71:2
**ABC** [1] - 73:5
**ability** [2] - 53:6, 69:13
**able** [11] - 10:17, 15:3, 27:23, 29:22, 32:19, 40:11, 40:17, 74:18, 83:1, 83:8, 90:14
**above-entitled** [1] - 91:10
**absence** [1] - 66:14
**Academy** [1] - 6:19
**acceptance** [1] - 7:15
**accepted** [2] - 7:8, 20:4
**according** [1] - 43:16
**accordingly** [1] - 56:14
**account** [3] - 12:9, 85:2, 85:23
**accurate** [6] - 16:8, 18:7, 23:2, 23:12, 81:12, 83:15
**acknowledge** [1] - 72:23
**act** [1] - 70:12
**action** [1] - 33:3
**actual** [2] - 54:13, 62:13
**Adam's** [1] - 44:2
**Adams** [7] - 43:4, 43:11, 43:14, 43:16, 43:20, 43:21, 43:24
**adapted** [1] - 44:2
**add** [1] - 28:12
**addition** [2] - 10:2, 12:21
**additional** [15] - 13:25, 14:3, 14:7, 15:13, 16:5, 18:7, 19:17, 19:23, 21:7, 27:11, 29:6, 69:16, 70:23, 74:7, 76:18
**additions** [1] - 31:3
**address** [4] - 43:25, 52:5, 70:4, 75:8

**addressed** [3] - 15:23, 18:24, 43:6
**addressing** [2] - 43:2, 43:3
**adequate** [1] - 79:15
**adequately** [1] - 83:25
**adjoining** [1] - 90:14
**admissible** [1] - 43:6
**ado** [1] - 69:17
**advance** [1] - 14:23
**advantage** [1] - 89:12
**advised** [1] - 39:22
**affected** [1] - 71:22
**affects** [1] - 52:19
**afforded** [1] - 70:4
**afternoon** [3] - 3:17, 3:18, 44:24
**ago** [1] - 66:10
**agree** [15] - 16:7, 18:5, 19:9, 19:15, 19:21, 19:25, 20:12, 20:14, 21:12, 23:22, 24:1, 24:15, 49:18, 50:22, 54:15
**agreed** [8] - 20:6, 20:20, 20:22, 21:5, 21:25, 22:15, 23:8, 69:21
**Agreement** [3] - 43:4, 43:12, 43:21
**agreement** [8] - 9:9, 20:15, 34:15, 43:9, 43:15, 43:16, 43:18, 44:2
**agrees** [1] - 56:15
**ahead** [4] - 49:13, 63:3, 63:16
**Aided** [1] - 1:22
**aligned** [1] - 13:1
**allow** [5] - 42:14, 42:20, 59:3, 89:5, 89:10
**allowed** [5] - 29:21, 29:25, 30:1, 63:12, 70:11
**almost** [2] - 43:17, 89:7
**alone** [1] - 66:15
**alter** [1] - 70:19
**altered** [1] - 4:25
**ameliorate** [1] - 69:13
**American** [5] - 5:17, 5:18, 6:17, 6:18, 7:11
**amount** [2] - 38:14, 43:19
**amounts** [2] - 55:22, 68:12
**amplified** [2] - 55:18, 83:17

**analyses** [4] - 50:10, 64:3, 75:4, 76:18
**analysis** [41] - 23:1, 26:17, 26:19, 26:21, 27:5, 27:6, 27:11, 28:7, 28:9, 29:6, 51:19, 51:20, 52:13, 53:8, 53:17, 56:13, 56:15, 57:4, 58:9, 64:2, 64:12, 64:15, 64:17, 64:23, 64:24, 65:7, 65:8, 65:9, 70:23, 71:10, 71:11, 71:12, 71:14, 71:17, 72:19, 72:24, 73:12, 75:18, 76:15, 82:10, 83:3
**analyze** [1] - 74:21
**analyzing** [1] - 73:18
**angle** [3] - 48:3, 83:4
**angled** [2] - 37:23, 46:19
**angles** [2] - 37:15, 37:16
**angular** [4] - 37:3, 37:7, 37:9, 37:11
**answer** [10] - 14:21, 54:3, 58:11, 60:25, 66:1, 68:11, 76:12, 84:1, 84:14, 88:18
**answering** [2] - 73:23, 73:24
**answers** [1] - 21:16
**anticipated** [1] - 87:12
**anyhow** [1] - 28:14
**anyway** [2] - 53:10, 57:18
**apologize** [2] - 40:20, 58:24
**appeal** [2] - 77:7, 77:17
**appear** [2] - 55:14, 67:3
**appearance** [1] - 71:9
**apple** [3] - 12:12
**appreciate** [1] - 65:25
**apprenticeship** [1] - 5:7
**approach** [9] - 13:22, 26:4, 33:16, 33:17, 38:6, 38:8, 41:9, 41:11, 48:11
**approached** [5] - 13:24, 22:6, 26:6, 41:13, 48:13
**appropriate** [1] - 24:5
**appropriately** [1] - 87:10
**area** [6] - 8:4, 8:12, 8:14, 32:10, 34:4,

39:10
**areas** [4] - 35:20, 37:19, 37:21, 72:21
**arrived** [1] - 23:5
**arrow** [1] - 36:9
**arrows** [8] - 25:23, 26:10, 26:16, 26:25, 27:6, 27:10, 28:13, 49:3
**art** [2] - 83:5, 83:6
**arts** [1] - 5:4
**aspects** [1] - 5:8
**asserted** [1] - 43:13
**assertion** [1] - 43:23
**assume** [2] - 57:16, 62:12
**attack** [1] - 74:18
**attempted** [1] - 27:21
**attempting** [1] - 83:22
**attend** [1] - 5:13
**attending** [2] - 6:5, 6:6
**augment** [1] - 75:6
**authentic** [2] - 43:22, 73:1
**authenticity** [3] - 4:23, 70:20, 75:18
**author** [1] - 77:2
**available** [5] - 10:7, 69:12, 79:17, 86:25, 87:23
**avoided** [1] - 54:18

## B

**bachelor** [1] - 5:4
**Bachmann** [1] - 91:5
**BACHMANN** [1] - 91:18
**background** [1] - 62:2
**bag** [1] - 75:13
**Baggett's** [1] - 41:16
**ball** [2] - 34:23, 34:25
**ballpoint** [4] - 34:21, 34:22, 34:24, 35:3
**Baltimore** [1] - 1:9
**bars** [1] - 29:3
**based** [6] - 51:18, 53:4, 64:17, 66:14, 82:24, 83:2
**baseline** [1] - 45:17
**bear** [1] - 38:17
**became** [1] - 4:10
**become** [1] - 5:23
**BEFORE** [1] - 1:8
**beginning** [3] - 40:19, 44:25, 57:15
**begins** [1] - 3:1
**belatedly** [1] - 83:20
**below** [2] - 34:17, 47:3
**Bench** [1] - 54:19
**bench** [6] - 13:24, 22:6, 26:6, 41:13, 48:13, 55:3
**benefit** [2] - 56:2, 58:19
**best** [3] - 11:6, 18:10, 89:5
**better** [4] - 11:13, 40:13, 75:11, 87:14
**between** [8] - 32:25, 55:7, 55:9, 78:1, 80:18, 82:2, 82:6, 85:14
**beyond** [2] - 27:8, 53:25
**bias** [1] - 10:9
**Bible** [1] - 76:11
**big** [7] - 50:5, 50:7, 67:4, 67:5, 76:23, 83:6, 86:23
**bit** [7] - 8:8, 31:25, 32:8, 39:21, 46:24, 56:8, 80:2
**blame** [1] - 78:1
**blow** [1] - 27:9
**blow-ups** [1] - 27:9
**blown** [1] - 34:14
**blue** [1] - 62:2
**blur** [1] - 45:1
**blurrier** [1] - 72:10
**blurry** [1] - 72:13
**Board** [5] - 5:17, 6:9, 6:10, 6:17, 7:11
**board** [2] - 5:23, 6:2
**body** [1] - 5:18
**BOSHEA** [1] - 1:2
**Boshea's** [1] - 43:18
**bound** [1] - 76:11
**box** [3] - 54:23, 55:23, 68:13
**boxes** [1] - 32:9
**break** [9] - 19:1, 19:3, 19:5, 29:16, 29:18, 32:24, 42:2, 43:1, 54:22
**breaking** [1] - 38:11
**Bredar's** [1] - 87:2
**brief** [2] - 30:11
**bright** [1] - 89:17
**bring** [9] - 8:17, 17:21, 24:9, 25:10, 39:20, 84:7, 85:16, 88:6
**bringing** [2] - 54:11, 88:11
**broad** [6] - 13:8, 13:11, 24:24, 32:14, 34:9, 71:8
**building** [1] - 42:11
**business** [1] - 85:21
**busy** [1] - 78:25
**buttressing** [1] - 77:2
**BY** [21] - 1:13, 1:13, 1:16, 1:16, 3:16, 4:6, 7:9, 8:13, 8:25, 9:25, 24:18, 25:16, 26:1, 31:23, 37:8, 38:20, 45:7, 60:8, 61:2, 61:16, 63:19

## C

**cannot** [2] - 12:12, 81:3
**care** [1] - 53:4
**career** [1] - 87:12
**carries** [1] - 86:8
**CASE** [1] - 1:4
**case** [24] - 10:25, 12:15, 13:4, 13:10, 24:12, 27:24, 38:24, 42:13, 42:14, 42:15, 42:21, 44:17, 51:23, 54:25, 68:14, 69:14, 72:12, 72:14, 78:24, 79:10, 88:13, 89:10, 89:11, 90:13
**cases** [6] - 13:13, 55:20, 55:21, 70:1, 88:12
**caused** [1] - 10:20
**causing** [2] - 69:25, 76:23
**Century** [1] - 7:3
**certain** [1] - 56:18
**certainly** [6] - 16:6, 16:7, 43:25, 64:19, 66:23, 82:15
**certificate** [1] - 7:13
**CERTIFICATE** [1] - 91:1
**certification** [1] - 6:4
**Certified** [1] - 91:5
**certified** [2] - 5:17, 5:23
**certify** [1] - 91:8
**certifying** [1] - 5:19
**cetera** [1] - 67:4
**chain** [1] - 59:13
**chance** [7] - 54:21, 57:6, 62:5, 68:7, 70:7, 84:9, 88:15
**change** [4] - 56:11, 79:1, 83:7, 83:10
**changed** [1] - 77:1
**changes** [1] - 31:3
**chapter** [2] - 6:25, 7:1
**character** [2] - 36:3, 37:22
**characteristics** [1] - 25:5
**chart** [12] - 25:10, 25:17, 25:20, 28:12, 31:24, 32:2, 32:3, 39:14, 40:19, 41:2, 61:24
**charts** [10] - 48:7, 48:8, 48:16, 48:21, 48:22, 49:3, 60:18, 61:17, 61:20, 61:21
**check** [1] - 7:13
**choices** [1] - 77:4
**choose** [1] - 65:18
**circle** [3] - 33:3, 36:17, 38:25
**circled** [5] - 32:7, 32:11, 34:5, 45:19, 53:23
**circles** [1] - 46:25
**cited** [1] - 43:15
**citing** [2] - 43:10, 50:17
**CIVIL** [1] - 1:4
**clarification** [2] - 15:4, 48:5
**clarify** [3] - 14:21, 15:12, 65:2
**clear** [8] - 37:5, 46:20, 57:13, 58:20, 73:19, 73:21, 77:16, 79:4
**clearly** [5] - 3:10, 12:19, 65:7, 70:9, 75:8
**clerk** [1] - 89:11
**CLERK** [11] - 3:6, 3:9, 3:14, 33:20, 67:22, 67:25, 87:2, 88:2, 89:15, 89:23, 90:1
**client** [6] - 77:9, 78:18, 84:4, 84:11, 85:22, 86:17
**closer** [1] - 8:8
**co** [1] - 77:10
**co-counsel** [1] - 77:10
**combination** [3] - 11:12, 11:15, 12:14
**combinations** [1] - 24:23
**comfortable** [1] - 53:3
**coming** [1] - 74:12
**commentary** [3] - 61:19, 61:21, 64:3
**communicate** [1] - 15:6
**company** [3] - 4:16, 4:17
**comparability** [14] - 10:24, 12:8, 24:19, 24:21, 30:9, 30:10, 30:12, 31:8, 31:13, 32:1, 32:11, 32:21, 72:18
**compare** [5] - 12:11, 12:12, 13:7, 40:1, 72:11
**compared** [6] - 32:19, 40:7, 40:10, 51:24, 64:20, 72:8
**comparing** [5] - 10:24, 32:6, 34:9, 63:5, 73:8
**comparison** [2] - 13:4, 52:8
**compartmentalizing** [1] - 83:21
**COMPASS** [1] - 1:5
**Compass** [4] - 9:8, 12:3, 20:2, 43:14
**compel** [1] - 14:16
**competition** [1] - 9:10
**complain** [1] - 77:22
**complete** [3] - 32:23, 57:6, 90:18
**completed** [1] - 5:6
**completely** [4] - 34:3, 46:18, 46:21, 47:1
**completing** [1] - 6:2
**comprehend** [1] - 79:24
**Computer** [1] - 1:22
**Computer-Aided** [1] - 1:22
**conceded** [1] - 66:23
**concept** [1] - 79:5
**concern** [7] - 28:25, 29:13, 31:6, 51:14, 56:7, 66:1, 67:4
**concerned** [7] - 27:9, 28:6, 29:5, 29:7, 56:1, 68:11, 74:13
**concerning** [1] - 6:23
**conclusion** [24] - 10:6, 10:8, 10:11, 16:21, 17:13, 17:18, 21:4, 25:7, 28:21, 29:15, 30:15, 38:2, 39:4, 40:13, 53:14, 70:19, 75:18, 76:25, 77:1, 77:3, 82:4, 82:5, 82:24, 84:23
**conclusions** [1] - 82:3
**conclusively** [1] - 81:4
**condition** [1] - 86:13
**conducting** [1] - 11:8
**confer** [10] - 68:7, 70:7, 74:6, 77:9, 82:15, 83:18, 84:4, 84:6, 86:8, 87:4
**conference** [1] - 54:19
**Conference** [2] - 55:3, 91:12

**conferences** [2] - 5:13, 6:6
**confident** [1] - 14:12
**confirming** [1] - 53:2
**conflate** [2] - 59:14, 68:8
**conflating** [1] - 59:8
**conformance** [1] - 91:11
**connect** [3] - 72:18, 76:6, 83:1
**connected** [1] - 52:10
**connecting** [4] - 56:18, 56:22, 63:4, 83:9
**consent** [1] - 58:9
**consented** [1] - 69:6
**consider** [1] - 78:19
**consideration** [1] - 84:23
**consistent** [2] - 29:9, 52:1
**consult** [1] - 81:20
**contact** [2] - 85:3, 85:14
**contacted** [1] - 85:16
**contained** [2] - 80:24, 81:17
**context** [2] - 24:4, 58:5
**continue** [6] - 24:17, 42:15, 54:25, 84:9, 89:6, 89:9
**continues** [1] - 19:19
**continuing** [1] - 88:21
**control** [1] - 84:24
**convene** [1] - 88:1
**convenience** [1] - 90:15
**convenient** [1] - 88:23
**conversations** [1] - 79:21
**conversely** [1] - 74:4
**cooperate** [1] - 16:24
**copies** [8] - 11:9, 11:12, 11:16, 16:1, 67:23, 67:25, 68:2, 72:9
**Copperthite** [2] - 16:11, 27:19
**copy** [10] - 11:14, 11:23, 52:18, 57:23, 57:24, 67:15, 67:18, 67:19, 67:22
**corners** [3] - 53:25, 65:15, 65:18
**correct** [12] - 8:23, 9:17, 9:24, 12:5, 28:11, 44:15, 56:12, 63:9, 63:11, 81:7,

81:18, 91:9
**corrected** [1] - 62:16
**correlation** [1] - 56:4
**costs** [1] - 84:22
**counsel** [10] - 4:14, 19:16, 19:23, 24:15, 45:6, 60:3, 76:22, 77:10, 88:10, 89:2
**Counsel** [10] - 13:24, 21:23, 22:6, 24:14, 26:6, 31:22, 41:13, 42:6, 48:13, 60:1
**counsel's** [1] - 68:9
**counterfeit** [1] - 4:24
**couple** [2] - 22:22, 37:15
**course** [7] - 42:12, 42:19, 53:9, 57:22, 84:12, 85:24, 89:8
**Court** [4] - 17:21, 70:10, 89:2, 91:7
**court** [4] - 7:17, 77:13, 84:15, 88:4
**COURT** [244] - 1:1, 3:3, 3:5, 3:23, 4:5, 4:14, 7:4, 8:6, 8:11, 8:21, 8:24, 9:18, 9:22, 13:18, 13:20, 13:23, 14:2, 14:9, 14:14, 14:19, 15:2, 15:6, 15:11, 15:15, 15:23, 16:3, 16:8, 16:19, 16:23, 17:2, 17:7, 17:19, 17:24, 18:5, 18:15, 18:19, 18:22, 18:25, 19:5, 19:8, 19:14, 19:20, 20:6, 20:14, 20:19, 20:22, 20:25, 21:3, 21:5, 21:13, 21:15, 21:22, 21:24, 22:5, 22:9, 22:13, 22:17, 22:20, 23:8, 23:11, 23:18, 23:21, 23:23, 24:1, 24:8, 24:12, 24:15, 25:14, 26:5, 26:24, 27:3, 27:13, 27:19, 27:21, 28:3, 28:25, 29:8, 29:12, 30:2, 30:21, 31:9, 31:18, 31:21, 33:10, 33:12, 33:14, 33:18, 33:24, 37:5, 38:7, 38:10, 38:15, 38:17, 41:4, 41:12, 41:21, 42:1, 42:4, 42:7, 42:23, 42:25, 44:5, 44:8, 44:11, 44:16, 44:20, 44:24, 45:3, 45:6, 46:20, 48:12,

48:15, 48:20, 48:23, 49:6, 49:8, 49:15, 49:18, 49:25, 50:5, 50:7, 50:17, 50:21, 51:4, 51:11, 51:25, 52:4, 52:16, 52:21, 53:9, 53:13, 53:20, 54:4, 54:9, 54:14, 54:17, 54:20, 55:4, 55:11, 55:14, 56:3, 56:20, 56:24, 57:2, 57:5, 57:13, 57:21, 57:24, 58:3, 58:20, 59:19, 59:24, 60:2, 60:5, 60:25, 61:14, 61:24, 62:4, 62:10, 62:16, 62:24, 63:3, 63:6, 63:10, 63:14, 63:16, 64:9, 64:18, 64:22, 65:16, 65:25, 66:7, 66:10, 66:16, 66:7, 67:12, 67:16, 67:23, 68:1, 68:4, 68:17, 68:20, 69:1, 69:4, 69:7, 69:9, 69:12, 70:25, 71:4, 71:15, 71:18, 72:4, 72:15, 73:2, 73:4, 73:19, 74:11, 74:22, 75:8, 75:20, 76:1, 76:8, 76:16, 76:19, 77:11, 77:18, 77:25, 78:5, 78:17, 78:21, 79:8, 79:17, 80:5, 80:11, 80:20, 81:1, 81:6, 81:8, 81:11, 81:16, 81:24, 82:13, 83:16, 84:3, 84:18, 84:21, 85:9, 85:19, 86:12, 86:23, 87:5, 87:13, 87:22, 88:4, 88:10, 88:22, 89:1, 89:16, 89:21, 89:24, 90:2, 90:6, 90:10, 91:18
**courthouse** [1] - 86:7
**courtroom** [18] - 45:5, 55:2, 58:13, 58:14, 58:15, 58:25, 59:1, 59:2, 59:4, 59:5, 67:20, 85:13, 87:23, 88:2, 88:11, 88:25, 90:6, 90:14
**Courts** [1] - 5:19
**courts** [1] - 70:2
**cover** [1] - 62:21
**coverage** [1] - 35:2
**crass** [1] - 16:14
**create** [1] - 50:20
**created** [3] - 43:9,

59:20, 71:6
**criminal** [2] - 55:20, 55:21
**criteria** [2] - 7:5, 10:23
**critical** [1] - 72:19
**criticisms** [1] - 50:13
**critiqued** [1] - 64:13
**cross** [14] - 17:10, 23:20, 24:9, 49:16, 51:8, 52:20, 53:1, 57:7, 68:6, 70:7, 72:6, 74:8, 80:8, 83:13
**CROSS** [1] - 2:2
**cross-examination** [6] - 23:20, 51:8, 57:7, 72:6, 74:8, 83:13
**cross-examine** [1] - 17:10
**CRR** [1] - 91:18
**crucial** [1] - 7:15
**cuff** [1] - 52:15
**cure** [4] - 57:8, 78:9, 81:18, 83:25
**cured** [2] - 15:7, 83:19
**cures** [2] - 69:1, 78:10
**curves** [1] - 45:17

## D

**Dated** [1] - 91:14
**dated** [2] - 51:10, 75:1
**DAVID** [1] - 1:2
**days** [3] - 45:1, 45:3, 68:14
**deal** [1] - 82:8
**dealing** [1] - 12:15
**debate** [1] - 82:6
**decide** [7] - 16:11, 76:12, 85:4, 85:15, 85:24, 86:16, 87:9
**deciding** [1] - 38:11
**decision** [5] - 71:23, 84:24, 85:2, 86:23, 87:11
**declare** [1] - 77:4
**declined** [2] - 58:16, 59:6
**deemed** [1] - 6:3
**defend** [1] - 6:1
**Defendant** [1] - 1:5
**defendant** [2] - 19:23, 43:21
**DEFENDANT** [1] - 1:15
**defense** [17] - 15:13, 16:4, 18:6, 19:11, 19:16, 19:22, 19:23, 22:17, 23:9, 24:2, 24:16, 44:13, 70:10,

70:11, 70:12, 74:5
**deficiencies** [1] - 10:16
**definite** [2] - 82:4, 82:5
**definitely** [2] - 74:16, 76:24
**definitively** [1] - 25:9
**degree** [2] - 5:4, 5:5
**delay** [1] - 68:6
**delaying** [1] - 70:7
**delete** [1] - 46:25
**deliberate** [1] - 86:17
**deliberative** [1] - 87:9
**Denis** [3] - 67:21, 85:3, 88:3
**Department** [1] - 4:2
**depose** [4] - 27:13, 65:19, 66:13, 68:5
**deposition** [6] - 27:17, 27:18, 30:18, 30:19, 31:2, 65:21
**deputy** [3] - 85:13, 88:11, 90:6, 90:14
**describe** [1] - 25:10
**description** [1] - 66:25
**descriptive** [1] - 73:25
**detail** [4] - 27:8, 30:12, 75:17, 80:13
**detailed** [3] - 53:7, 74:16, 83:3
**details** [1] - 59:21
**determination** [3] - 10:21, 13:17, 53:17
**determine** [3] - 4:23, 10:17, 12:9
**deviates** [1] - 66:22
**difference** [4] - 26:15, 50:13, 82:2, 82:9
**differences** [4] - 24:25, 51:22, 64:5, 67:2
**different** [29] - 17:10, 17:14, 17:15, 18:12, 26:11, 31:6, 33:6, 34:3, 34:7, 40:4, 40:5, 40:18, 44:3, 44:6, 44:14, 46:18, 46:22, 46:23, 47:1, 47:9, 50:11, 51:6, 52:5, 52:22, 55:6, 55:9, 57:20, 59:9
**differently** [1] - 79:12
**difficult** [2] - 13:6, 38:2
**dig** [1] - 73:17
**digital** [1] - 9:7
**diminished** [1] - 11:11
**dire** [2] - 55:4, 57:17
**DIRECT** [1] - 2:2

**disadvantage** [1] - 66:15
**disagree** [1] - 64:14
**disclose** [1] - 66:4
**disclosed** [2] - 30:25, 31:3
**disclosure** [1] - 50:9
**disclosures** [2] - 30:23, 31:4
**discovery** [1] - 27:24
**discuss** [11] - 30:6, 40:21, 41:19, 42:13, 42:14, 42:20, 42:21, 54:24, 89:2, 89:10, 89:11
**discussed** [3] - 35:10, 43:4, 62:24
**discusses** [1] - 30:7
**Discussion** [1] - 88:9
**discussion** [2] - 30:11, 67:11
**discussions** [1] - 59:9
**dismiss** [1] - 79:9
**disrespectful** [1] - 78:16
**dissimilar** [2] - 40:5, 40:6
**distinction** [1] - 55:7
**DISTRICT** [2] - 1:1, 1:1
**District** [1] - 91:7
**diverse** [1] - 40:8
**DIVISION** [1] - 1:2
**document** [35] - 3:20, 4:21, 4:22, 5:15, 5:19, 6:24, 7:23, 8:4, 8:12, 9:7, 9:13, 9:19, 9:20, 9:22, 10:2, 10:5, 10:8, 11:4, 12:3, 22:3, 36:19, 36:24, 37:2, 43:10, 44:1, 45:10, 48:6, 51:8, 61:11, 62:7, 68:10, 71:21, 72:22, 78:3
**Document** [7] - 4:18, 5:18, 6:10, 6:18, 6:19, 7:2, 7:11
**documents** [6] - 4:23, 5:8, 11:11, 12:4, 17:14, 57:20, 72:7, 72:8
**done** [10] - 5:11, 25:8, 26:18, 35:19, 40:20, 57:1, 57:3, 57:4, 65:10
**Donna** [6] - 1:6, 2:3, 2:7, 3:4, 3:12, 8:3
**door** [1] - 87:23
**dots** [6] - 52:10, 56:18, 56:22, 63:5,

83:2, 83:9
**doubt** [2] - 58:23, 66:17
**down** [19] - 12:23, 29:16, 29:18, 31:25, 35:16, 37:18, 37:21, 39:19, 41:3, 45:11, 45:15, 45:16, 46:5, 46:24, 47:9, 48:3, 49:6, 74:25, 76:6
**draft** [1] - 43:9
**drag** [5] - 11:21, 35:8, 35:9, 35:10, 35:12
**drags** [3] - 11:21, 35:15, 51:19
**drastically** [1] - 40:8
**draw** [1] - 33:20
**drawn** [1] - 48:1
**driven** [1] - 64:24
**dropped** [1] - 15:9
**due** [1] - 31:5
**dues** [1] - 7:5
**during** [1] - 31:2
**duties** [1] - 4:20
**duty** [1] - 30:25

# E

**e)(2)** [1] - 30:24
**E-i-s-e-n-b-e-r-g** [1] - 3:13
**e-mail** [4] - 44:9, 44:14, 58:7, 59:11
**early** [2] - 88:14, 89:17
**earn** [1] - 6:5
**earning** [1] - 6:4
**easiest** [1] - 67:24
**eating** [1] - 42:10
**ECF** [5] - 43:2, 43:10, 43:15, 43:19, 70:15
**edited** [1] - 43:10
**educated** [1] - 80:8
**educational** [2] - 5:24, 7:6
**effect** [1] - 70:17
**eight** [1] - 61:15
**Eisenberg** [21] - 1:6, 2:3, 2:7, 3:4, 3:12, 3:17, 8:3, 8:8, 9:1, 31:24, 45:8, 59:6, 60:6, 60:9, 63:17, 65:14, 65:17, 65:19, 66:16, 82:3
**Eisenberg's** [1] - 8:18
**either** [12] - 11:11, 14:22, 17:1, 18:14, 25:3, 38:22, 46:7, 52:24, 69:18, 81:13, 83:15, 86:4
**ELH-21-cv-00309** [1] -

1:4
**eligibility** [1] - 7:5
**eliminate** [1] - 47:16
**elimination** [1] - 10:15
**ELLEN** [1] - 1:8
**employed** [1] - 3:19
**employee** [1] - 43:14
**employment** [4] - 7:14, 9:9, 9:10, 43:15
**Employment** [3] - 43:4, 43:11, 43:21
**end** [9] - 33:4, 39:14, 39:19, 50:21, 53:9, 69:14, 73:3, 76:25, 79:8
**endeavor** [1] - 86:20
**ended** [1] - 54:19
**engaged** [2] - 3:22, 15:10
**enlargement** [1] - 72:10
**entire** [1] - 34:4
**entitled** [5] - 32:9, 66:19, 66:21, 74:6, 91:10
**equally** [1] - 71:7
**error** [3] - 55:20, 55:21, 69:13
**Es** [5] - 46:15, 47:10, 47:11, 67:3, 80:13
**ESQUIRE** [4] - 1:13, 1:13, 1:16, 1:16
**essence** [1] - 29:14
**established** [3] - 65:3, 65:14, 65:16
**establishment** [1] - 42:10
**et** [1] - 67:4
**evening** [1] - 89:19
**event** [1] - 85:14
**events** [3] - 22:7, 22:23, 85:8
**evidence** [13] - 8:19, 9:21, 10:16, 10:17, 11:6, 11:10, 12:1, 12:2, 29:1, 69:21, 72:2, 74:12
**exact** [1] - 12:22
**exactly** [8] - 36:25, 40:15, 47:22, 57:19, 60:18, 61:24, 80:16, 80:23
**examination** [17] - 5:15, 6:24, 7:23, 10:5, 10:22, 11:1, 11:9, 12:10, 23:20, 51:8, 51:18, 56:16, 56:17, 57:7, 72:6, 74:8, 83:13

**Examination** [4] - 2:6, 4:18, 60:6, 63:17
**examinations** [2] - 5:1, 13:9
**Examinations** [1] - 7:3
**examine** [2] - 17:10, 71:23
**examiner** [6] - 3:20, 4:13, 4:15, 4:21, 4:22, 10:8
**Examiners** [4] - 5:18, 6:10, 6:18, 7:11
**examiners** [1] - 5:20
**examining** [1] - 9:13
**example** [7] - 12:11, 32:18, 35:4, 38:5, 51:13, 62:11, 67:2
**examples** [1] - 16:2, 26:16, 34:17, 35:11, 37:19, 39:9, 61:5, 61:6, 69:16, 76:24, 81:11
**EXCERPT** [1] - 1:5
**excerpt** [2] - 3:1, 90:18
**excluded** [1] - 59:7
**excuse** [3] - 64:4, 89:8, 90:2
**excused** [4] - 19:18, 21:20, 89:19, 89:20
**exemplar** [2] - 29:20, 61:9
**exemplars** [15] - 9:10, 10:1, 11:1, 11:4, 15:22, 16:5, 18:7, 29:19, 35:12, 35:22, 36:24, 37:24, 45:22, 64:7
**exhibit** [4] - 44:4, 44:7, 44:14, 45:18
**Exhibit** [11] - 8:17, 9:1, 9:14, 9:23, 11:4, 32:2, 32:18, 34:14, 35:21, 39:14, 72:2
**exhibited** [1] - 13:16
**exist** [1] - 46:17
**existed** [1] - 64:8
**exited** [2] - 55:2, 67:20
**expect** [7] - 14:21, 14:22, 35:14, 69:9, 72:6, 78:24, 90:16
**experienced** [2] - 76:22, 78:2
**expert** [48] - 7:16, 7:22, 8:4, 8:12, 8:14, 14:17, 15:20, 16:21, 16:25, 17:11, 17:13, 20:3, 20:5, 20:10, 20:25, 21:2, 21:5, 22:8, 22:23, 28:8,

30:14, 30:20, 30:24, 41:7, 44:12, 50:13, 50:14, 53:2, 53:24, 55:5, 56:9, 56:14, 57:7, 57:11, 68:7, 69:20, 70:8, 70:10, 76:9, 79:22, 79:23, 83:18, 83:21, 84:12, 86:1, 86:18
**expert's** [1] - 31:2
**experts** [7] - 22:20, 22:21, 57:15, 59:10, 81:25, 82:2, 82:6
**explain** [9] - 10:7, 21:25, 26:22, 34:18, 40:23, 53:24, 64:4, 79:20
**explaining** [1] - 24:22
**explanations** [1] - 56:20
**extends** [1] - 31:1
**extent** [3] - 17:20, 74:4, 74:12
**extra** [1] - 36:18
**extremely** [1] - 13:5
**eyelet** [1] - 46:11

# F

**fact** [8] - 26:10, 44:1, 68:8, 69:16, 69:22, 76:13, 84:21
**factor** [2] - 84:21, 84:23
**factors** [3] - 10:20, 12:8, 82:23
**facts** [1] - 50:19
**faded** [1] - 72:14
**fail** [1] - 59:19
**failing** [2] - 76:22, 78:2
**failure** [3] - 30:18, 51:1, 83:22
**fair** [3] - 21:15, 77:18, 77:20
**fairness** [2] - 74:3, 85:16
**fall** [3] - 13:15, 32:16, 47:12
**falls** [1] - 17:19
**familiar** [1] - 75:11
**far** [5] - 33:18, 35:16, 48:19, 74:13, 74:14
**fashion** [1] - 62:5
**fault** [1] - 39:3
**faulty** [1] - 39:1
**favor** [1] - 22:10
**feasible** [3] - 70:24, 71:5, 71:8
**features** [2] - 32:17,

35:15
**February** [2] - 1:9, 91:14
**Federal** [2] - 3:21, 3:24
**FEDERAL** [1] - 91:18
**fell** [1] - 50:23
**few** [4] - 73:17, 86:19, 89:24, 90:13
**field** [2] - 3:22, 5:14
**fifth** [1] - 11:13
**figure** [2] - 59:22, 84:16
**figured** [1] - 17:3
**fill** [1] - 35:20
**filling** [1] - 75:10
**final** [1] - 82:1
**findings** [1] - 80:23
**fine** [7] - 11:6, 12:1, 17:22, 29:24, 29:25, 33:25, 59:6
**finger** [4] - 33:11, 33:13, 33:19, 33:20
**finish** [4] - 42:3, 49:13, 78:6, 89:3
**finished** [2] - 5:11, 78:24
**first** [26] - 11:13, 11:15, 14:4, 14:8, 22:8, 26:15, 31:11, 34:18, 37:2, 42:9, 45:14, 51:12, 52:16, 62:22, 65:13, 70:9, 71:1, 71:2, 71:24, 71:25, 73:17, 73:20, 80:22, 85:21, 87:18
**five** [2] - 6:3, 41:23
**fix** [2] - 78:13, 87:17
**flat** [1] - 46:18
**flip** [1] - 10:13
**floor** [1] - 42:9
**flow** [1] - 38:12
**focus** [1] - 80:21
**focusing** [1] - 69:25
**follow** [3] - 16:13, 62:23, 74:18
**follow-up** [2] - 16:13, 74:18
**FOR** [3] - 1:1, 1:12, 1:15
**foregoing** [1] - 91:8
**forensic** [10] - 3:20, 4:20, 4:22, 5:5, 5:15, 8:19, 9:2, 10:4, 10:22, 11:8
**Forensic** [8] - 4:1, 4:18, 5:18, 6:10, 6:17, 6:19, 7:2, 7:11
**forgery** [1] - 14:13
**forget** [3] - 50:5, 50:7,

87:13
**forgot** [2] - 50:1, 83:5
**form** [2] - 36:18, 58:18
**formal** [1] - 5:12
**format** [1] - 91:11
**formation** [10] - 45:25, 46:3, 46:4, 46:5, 46:14, 46:15, 46:18, 46:22, 46:24, 47:9
**forms** [1] - 89:25
**forth** [3] - 60:15, 60:16, 80:3
**forward** [7] - 8:10, 69:14, 85:5, 85:15, 85:24, 88:18, 88:19
**forwarded** [2] - 44:9, 44:13
**four** [3] - 53:25, 65:14, 65:18
**frankly** [1] - 62:5
**free** [1] - 42:12
**friendly** [1] - 62:4
**front** [1] - 67:11
**full** [3] - 3:10, 35:1, 71:1
**fully** [1] - 56:10
**fulsome** [1] - 66:23

### G

**gagliardo** [2] - 55:12, 82:19
**GAGLIARDO** [42] - 1:13, 19:2, 19:6, 19:18, 19:25, 20:4, 20:20, 21:11, 21:20, 26:14, 26:19, 26:22, 27:2, 28:11, 28:16, 28:20, 29:14, 29:18, 30:14, 49:2, 50:11, 53:23, 54:3, 54:5, 54:8, 56:8, 57:19, 58:2, 67:19, 73:10, 74:9, 80:21, 81:3, 81:7, 81:10, 81:15, 81:18, 81:22, 82:1, 83:12, 88:20, 88:24
**gaps** [1] - 75:10
**geared** [1] - 72:6
**general** [1] - 55:11
**generation** [2] - 11:13, 11:15
**gentlemen** [1] - 89:1
**genuine** [2] - 4:24, 78:10
**George** [1] - 5:6
**given** [3] - 31:2, 71:7, 83:25
**glaring** [1] - 17:2
**Government** [3] -

3:21, 3:24, 4:4
**grant** [1] - 87:18
**grapple** [1] - 51:15
**grasp** [1] - 51:15
**great** [3] - 50:15, 82:8, 83:8
**greater** [1] - 74:17
**green** [1] - 62:3
**Greg** [2] - 16:15, 49:13
**GREGORY** [1] - 1:13
**group** [1] - 87:24
**guess** [5] - 17:8, 28:25, 29:5, 75:10, 75:12
**guessing** [1] - 53:19
**guidance** [2] - 53:2, 56:14
**guiding** [5] - 53:5, 64:11, 64:14, 64:16, 65:7

### H

**habit** [1] - 35:23
**habits** [1] - 71:6
**haggling** [1] - 27:24
**half** [1] - 80:18
**hallway** [1] - 81:22
**hammer** [1] - 54:22
**hammering** [2] - 5:1, 5:9
**hand** [10] - 3:7, 75:1, 75:14, 75:16, 78:12, 88:12, 88:15, 88:23, 89:12, 89:14
**handwriting** [16] - 8:4, 8:12, 8:19, 9:2, 10:22, 11:9, 11:17, 12:10, 13:9, 19:24, 21:6, 22:1, 23:11, 24:2, 25:5, 79:22
**happy** [1] - 86:25
**hard** [2] - 35:4, 78:1
**harm** [1] - 55:17, 69:25, 78:8
**harmed** [1] - 84:25
**harmless** [1] - 55:20
**harp** [1] - 78:23
**HAYDEN** [3] - 1:16, 50:16, 50:19
**headache** [2] - 59:20, 76:23
**heads** [1] - 88:10
**heads-up** [1] - 88:10
**hear** [5] - 4:14, 7:25, 14:24, 24:11, 60:25
**heard** [5] - 14:4, 14:8, 14:18, 63:11, 67:6
**hearing** [6] - 8:9, 14:11, 51:20, 56:1,

68:24, 73:14
**height** [1] - 73:8
**held** [2] - 88:9, 91:10
**help** [1] - 50:17
**helpful** [1] - 33:21
**hereby** [1] - 91:7
**herself** [2] - 76:10, 81:14
**hesitate** [1] - 38:23
**hesitation** [5] - 38:4, 38:5, 38:21, 38:24, 39:2
**hiatus** [2] - 56:5, 83:4
**hiatuses** [5] - 28:22, 29:11, 29:24, 30:7, 51:20
**hide** [1] - 15:19
**higher** [1] - 70:2
**highly** [2] - 10:12, 10:15
**hit** [1] - 85:10
**hits** [2] - 11:19, 11:20
**hold** [2] - 31:25, 88:16
**holding** [2] - 48:6, 86:20
**HOLLANDER** [1] - 1:8
**home** [3] - 84:5, 85:9, 88:6
**Homeland** [2] - 4:2, 4:10
**honestly** [1] - 54:5
**Honor** [53] - 8:3, 8:7, 8:19, 8:23, 9:12, 13:22, 17:22, 18:10, 18:11, 19:2, 21:19, 21:21, 24:10, 26:4, 33:16, 33:17, 38:6, 38:13, 41:9, 42:5, 44:22, 48:11, 50:15, 51:14, 53:15, 53:17, 55:25, 62:20, 64:15, 65:13, 66:6, 66:12, 67:6, 67:10, 67:25, 68:18, 71:2, 73:10, 74:10, 76:3, 77:14, 78:4, 78:15, 79:3, 79:23, 80:15, 82:11, 82:22, 84:13, 85:7, 87:2, 88:2, 89:23
**Honor's** [1] - 41:17
**HONORABLE** [1] - 1:8
**hooks** [1] - 82:7
**hope** [2] - 8:14, 84:8
**horn** [1] - 80:2
**hour** [1] - 42:16
**hours** [4] - 79:25, 87:6, 87:7, 87:8
**human** [1] - 13:2
**husher** [1] - 59:25

### I

**idea** [6] - 51:10, 52:14, 57:4, 57:23, 72:11, 79:14
**identification** [5] - 5:1, 5:9, 8:5, 8:12, 10:13
**identifying** [1] - 32:7
**illegibility** [1] - 34:6
**illegible** [3] - 12:17, 24:23, 46:4
**imagery** [1] - 48:1
**images** [2] - 82:24, 83:8
**Immigration** [1] - 4:3
**important** [3] - 15:12, 44:2, 88:7
**impose** [1] - 89:6
**imposed** [1] - 88:8
**impressive** [1] - 80:3
**IN** [1] - 1:1
**Inc** [1] - 9:9
**INC** [1] - 1:5
**include** [1] - 66:25
**included** [2] - 31:1, 52:23
**includes** [1] - 50:12
**incomprehensible** [1] - 69:24
**inconclusive** [2] - 47:23, 53:10
**inconclusiveness** [1] - 71:12
**indefensible** [1] - 78:7
**indicate** [3] - 4:12, 18:11, 56:5
**indicated** [2] - 8:18, 12:7, 43:9
**indication** [8] - 18:6, 19:14, 19:15, 19:21, 53:12, 58:6, 58:17, 69:6
**indications** [4] - 10:11, 10:14, 72:25, 75:15
**inexplicable** [2] - 78:3, 78:6
**information** [8] - 31:1, 31:2, 31:3, 63:7, 74:13, 79:22, 85:4, 85:14
**ingest** [1] - 79:24
**inhibits** [1] - 53:5
**initial** [1] - 58:5
**injured** [1] - 74:19
**ink** [5] - 11:6, 34:23, 34:24, 34:25, 35:2
**input** [4] - 79:15, 86:17, 86:18
**inquiry** [1] - 9:6

**INS** [1] - 4:10
**insert** [1] - 28:13
**inside** [1] - 34:22
**instance** [2] - 45:11, 87:18
**instruments** [1] - 5:9
**insufficient** [2] - 15:1, 82:3
**intended** [2] - 43:24, 56:18
**intends** [1] - 43:13
**intention** [1] - 66:9
**interim** [1] - 65:20
**interpretation** [1] - 82:10
**interrupt** [3] - 3:23, 38:12, 78:5
**interrupting** [1] - 38:9
**introduce** [1] - 44:23
**invested** [1] - 68:14
**involves** [1] - 5:21
**iron** [2] - 85:12, 89:4
**irregular** [1] - 71:16
**irreparable** [1] - 78:8
**issue** [17] - 14:25, 18:8, 27:25, 31:12, 31:13, 31:19, 43:5, 44:1, 44:3, 44:6, 44:14, 54:17, 69:10, 71:24, 75:7, 77:16
**issued** [1] - 70:2
**issues** [8] - 52:6, 54:22, 59:14, 59:15, 59:16, 72:12, 85:12, 89:5
**italics** [1] - 70:19
**item** [3] - 72:1, 72:17, 72:18
**items** [2] - 12:11, 32:7

## J

**Jeff** [8] - 41:15, 41:17, 63:23, 64:1, 64:3, 64:24, 65:6, 65:10
**Jeffrey** [1] - 83:1
**John** [9] - 12:16, 30:15, 30:16, 39:22, 43:9, 43:14, 43:24, 65:23, 81:4
**Jordan** [5] - 2:3, 2:8, 19:19, 38:10, 51:16
**JORDAN** [113] - 1:13, 3:4, 3:16, 4:6, 7:9, 8:3, 8:13, 8:25, 9:12, 9:19, 9:24, 9:25, 14:5, 14:10, 14:25, 15:16, 15:20, 16:6, 16:17, 17:22, 17:25, 18:8, 18:11, 18:17,

19:11, 20:2, 20:8, 20:12, 21:4, 21:10, 21:12, 21:14, 21:17, 21:19, 22:2, 22:11, 22:14, 22:19, 22:21, 23:5, 23:10, 23:13, 23:16, 23:25, 24:7, 24:11, 24:18, 25:16, 26:1, 26:9, 27:6, 27:16, 29:17, 30:9, 31:14, 31:23, 33:16, 33:21, 37:8, 38:13, 38:16, 38:19, 38:20, 41:8, 41:10, 41:19, 41:23, 42:2, 42:5, 44:3, 44:6, 44:10, 44:15, 44:19, 44:21, 45:7, 48:18, 49:10, 49:14, 49:19, 49:23, 50:1, 50:6, 50:8, 53:22, 55:13, 57:10, 57:16, 58:1, 58:12, 58:23, 59:13, 59:17, 59:23, 60:4, 60:8, 61:2, 61:16, 63:15, 64:10, 65:13, 65:17, 66:8, 68:3, 68:16, 71:11, 74:10, 79:19, 81:21, 83:14, 86:10, 90:5, 90:9
**Js** [2] - 41:6, 45:16
**judge** [1] - 19:18
**Judge** [5] - 16:11, 26:23, 27:19, 30:14, 87:2
**JUDGE** [1] - 1:8
**Judicial** [1] - 91:12
**jurors** [1] - 85:4
**Jury** [1] - 55:2
**JURY** [1] - 1:4
**jury** [54] - 2:6, 9:20, 14:23, 18:13, 21:24, 24:5, 24:15, 35:10, 38:17, 42:7, 44:20, 45:5, 54:9, 54:20, 54:23, 55:23, 60:7, 62:6, 63:18, 64:12, 65:8, 65:9, 67:6, 68:13, 68:24, 69:2, 73:4, 74:14, 75:20, 75:21, 78:23, 84:5, 84:7, 85:9, 85:20, 86:13, 86:14, 86:25, 87:3, 87:22, 88:6, 88:11, 88:25, 89:4, 89:13, 89:18, 89:19, 89:20, 90:3, 90:7, 90:8, 90:14
**justify** [2] - 75:17, 89:4

## K

**K1** [3] - 40:24, 40:25, 52:8
**K10** [4] - 32:4, 32:9, 33:2, 46:19
**K11** [6] - 41:3, 45:8, 45:14, 45:18, 46:23
**K14** [1] - 46:24
**K15** [5] - 32:4, 32:9, 32:24, 34:3, 46:7
**K2** [5] - 35:24, 36:15, 41:1, 46:5, 46:16
**K3** [7] - 35:24, 36:6, 36:7, 36:15, 37:17, 46:6, 52:9
**K4** [2] - 46:7, 46:17
**K5** [5] - 35:24, 36:16, 36:17, 37:19, 46:17
**K6** [8] - 32:4, 32:9, 34:4, 37:1, 37:3, 37:20, 41:2
**K7** [2] - 37:23, 41:4
**K8** [2] - 37:22, 41:2
**K9** [1] - 37:1
**keep** [9] - 37:21, 38:18, 42:15, 47:9, 54:23, 54:25, 56:19, 87:6, 89:9
**keeping** [1] - 89:4
**kind** [5] - 5:2, 14:15, 16:10, 36:11, 38:23
**kindness** [1] - 70:12
**knowing** [1] - 51:23
**known** [26] - 9:10, 11:1, 11:10, 12:16, 13:4, 13:6, 13:7, 13:10, 13:16, 13:17, 15:24, 25:6, 32:19, 34:4, 34:9, 35:22, 40:10, 46:9, 47:13, 61:25, 62:3, 62:7, 62:17, 62:20, 62:22, 74:14
**knowns** [2] - 32:22, 37:15

## L

**Lab** [1] - 4:1
**lack** [1] - 75:11
**ladies** [1] - 89:1
**laid** [1] - 62:4
**large** [1] - 46:14
**last** [3] - 3:11, 3:12, 58:8
**late** [1] - 58:8
**law** [2] - 7:17, 50:9
**lawyer** [2] - 85:23, 86:19

**lawyers** [1] - 78:2
**layperson** [1] - 56:21
**lean** [1] - 8:10
**learn** [4] - 79:22, 79:23, 80:1, 80:6
**learned** [5] - 5:8, 80:3, 80:6
**least** [5] - 75:12, 80:1, 80:17, 81:23
**leave** [3] - 53:3, 85:15, 89:6
**leaves** [1] - 86:14
**leaving** [1] - 85:19
**led** [1] - 66:4
**left** [2] - 16:23, 38:14
**legible** [2] - 34:5, 34:6
**length** [1] - 28:8
**less** [5] - 43:20, 60:24, 61:1, 61:3, 63:7
**letter** [5] - 11:21, 12:13, 12:19, 24:23, 36:18, 37:14, 37:18, 40:25
**letters** [4] - 5:24, 12:13, 24:22, 32:25
**letting** [1] - 70:15
**life** [1] - 66:3
**lift** [6] - 33:1, 33:5, 33:23, 34:2, 56:5, 83:5
**lift/hiatus** [1] - 28:5
**lifts** [6] - 28:10, 28:17, 28:22, 29:11, 29:23, 30:7
**light** [3] - 11:22, 11:23, 35:15
**lightly** [2] - 68:23, 79:6
**Limine** [1] - 43:3
**limited** [3] - 38:14, 38:15, 74:3
**limiting** [1] - 23:14
**limits** [2] - 30:3, 53:6
**line** [8] - 7:14, 11:11, 35:2, 35:16, 47:3, 48:1, 48:2, 70:18
**lines** [3] - 11:7, 12:1, 23:1
**lingering** [2] - 18:21, 18:23
**listening** [3] - 51:16, 59:1, 59:2
**literally** [1] - 34:5
**literature** [1] - 13:12
**live** [1] - 78:10
**LLC** [1] - 4:18
**location** [2] - 33:6, 34:3
**look** [29] - 9:6, 16:9, 24:24, 29:4, 30:2,

30:13, 31:7, 32:10, 34:11, 35:24, 37:1, 37:15, 40:24, 41:1, 41:2, 46:2, 46:6, 46:16, 47:8, 53:18, 54:13, 62:5, 72:10, 75:5, 75:13, 79:1, 82:22, 83:4
**looked** [5] - 28:17, 46:24, 56:9, 72:8, 75:3
**looking** [19] - 26:14, 33:4, 35:8, 48:16, 48:21, 48:22, 49:9, 55:13, 60:17, 60:20, 62:10, 67:19, 72:2, 73:16, 73:20, 74:25, 75:14, 76:6, 82:20
**looks** [6] - 15:9, 28:3, 35:4, 53:4, 55:9, 70:22
**loop** [1] - 46:14
**loops** [1] - 80:13
**lose** [1] - 77:7
**lunch** [4] - 18:18, 19:3, 81:23
**luncheon** [2] - 42:8, 43:1

## M

**ma'am** [6] - 3:6, 13:19, 13:21, 42:22, 44:21, 62:9
**machines** [1] - 12:23
**mail** [4] - 44:9, 44:14, 58:7, 59:11
**maintain** [1] - 6:4
**maintained** [1] - 43:21
**major** [1] - 50:13
**malfunctions** [1] - 71:16
**manner** [2] - 27:22, 83:23
**March** [1] - 43:2
**mark** [2] - 38:24, 83:4
**Marketing** [1] - 9:9
**MARKETING** [1] - 1:5
**markings** [2] - 37:5, 49:4
**MARYLAND** [1] - 1:1
**Maryland** [3] - 1:9, 5:5, 91:7
**master** [1] - 5:5
**matching** [1] - 75:4
**material** [1] - 74:7
**materials** [1] - 6:23
**matter** [4] - 69:23, 77:15, 84:5, 91:10
**matters** [2] - 18:19,

89:2
**mean** [32] - 14:15, 15:3, 15:20, 24:21, 27:21, 29:24, 30:4, 31:9, 32:13, 32:14, 32:21, 37:12, 45:14, 46:1, 57:22, 61:3, 62:10, 65:1, 65:19, 67:4, 68:4, 71:19, 74:11, 76:1, 76:8, 76:9, 77:20, 77:25, 78:5, 78:7, 78:16, 86:23
**meaning** [3] - 10:8, 12:18, 47:23
**means** [4] - 29:12, 32:15, 41:10, 44:1
**meant** [1] - 75:8
**meantime** [2] - 85:13, 88:5
**Mechanical** [1] - 1:22
**meet** [1] - 57:11
**member** [4] - 6:17, 6:18, 6:20, 6:21
**members** [4] - 21:24, 24:15, 42:7, 54:20
**memorandum** [1] - 43:2
**memory** [1] - 43:3
**men's** [1] - 19:2
**mention** [2] - 43:1, 71:13
**mentioned** [3] - 24:19, 46:23, 47:14
**Merit** [1] - 91:6
**metadata** [7] - 43:8, 43:11, 44:1, 44:3, 44:6, 44:12, 44:16
**microphone** [2] - 3:10, 8:8
**middle** [2] - 68:13, 83:24
**might** [8] - 35:22, 45:21, 46:3, 70:5, 70:8, 77:22, 87:14, 89:13
**mind** [7] - 42:15, 50:3, 54:25, 59:15, 67:16, 67:18, 89:9
**mine** [1] - 70:1
**minimize** [1] - 76:21
**minute** [2] - 18:20, 86:20
**minutes** [4] - 41:23, 73:17, 89:24, 90:13
**misconduct** [2] - 15:10, 15:11
**miss** [1] - 40:21
**misstate** [2] - 18:15, 70:17
**mistake** [1] - 66:11
**mistrial** [2] - 77:4, 79:5
**mixed** [1] - 75:13
**mixing** [1] - 75:3
**moment** [4] - 19:18, 21:20, 55:22, 68:11
**Monday** [1] - 78:25
**money** [1] - 84:22
**month** [2] - 43:18, 80:18
**month-and-a-half** [1] - 80:18
**morning** [2] - 84:8, 90:11
**most** [5] - 45:16, 56:1, 75:23, 76:19, 88:7
**motion** [1] - 14:16
**Motions** [1] - 43:3
**mouth** [1] - 19:21
**move** [7] - 8:8, 9:15, 21:14, 38:13, 41:2, 49:14, 64:15
**movement** [7] - 36:8, 36:10, 36:11, 39:1, 46:2, 46:8
**movements** [7] - 11:7, 12:2, 35:16, 36:18, 37:3, 37:9, 37:11
**moving** [1] - 34:11
**MR** [336] - 3:4, 3:16, 4:6, 7:9, 8:3, 8:7, 8:13, 8:23, 8:25, 9:12, 9:16, 9:19, 9:24, 9:25, 13:22, 13:25, 14:3, 14:5, 14:6, 14:10, 14:11, 14:18, 14:22, 14:25, 15:5, 15:8, 15:14, 15:16, 15:18, 15:20, 16:1, 16:6, 16:12, 16:17, 16:21, 16:25, 17:5, 17:9, 17:22, 17:25, 18:8, 18:9, 18:11, 18:17, 18:21, 18:23, 19:2, 19:6, 19:11, 19:13, 19:17, 19:18, 19:25, 20:2, 20:3, 20:4, 20:8, 20:9, 20:12, 20:13, 20:16, 20:20, 20:24, 21:1, 21:4, 21:7, 21:10, 21:11, 21:12, 21:14, 21:17, 21:18, 21:19, 21:20, 22:2, 22:7, 22:11, 22:14, 22:15, 22:18, 22:19, 22:21, 22:22, 23:5, 23:6, 23:10, 23:13, 23:14, 23:16, 23:17, 23:19, 23:22, 23:24, 23:25, 24:4, 24:7, 24:10, 24:11, 24:18, 25:16, 25:23, 26:1, 26:4, 26:7, 26:9, 26:13, 26:14, 26:17, 26:19, 26:21, 26:22, 26:25, 27:2, 27:4, 27:6, 27:7, 27:14, 27:16, 27:20, 28:1, 28:6, 28:11, 28:15, 28:16, 28:18, 28:20, 28:22, 29:5, 29:10, 29:13, 29:14, 29:17, 29:18, 29:21, 30:6, 30:9, 30:10, 30:14, 31:7, 31:11, 31:14, 31:17, 31:20, 31:23, 33:16, 33:21, 37:8, 38:6, 38:8, 38:13, 38:16, 38:19, 38:20, 41:8, 41:9, 41:10, 41:11, 41:14, 41:19, 41:23, 41:24, 42:2, 42:5, 44:3, 44:6, 44:10, 44:15, 44:19, 44:21, 44:22, 45:1, 45:7, 48:5, 48:8, 48:11, 48:14, 48:16, 48:18, 48:21, 48:25, 49:2, 49:5, 49:10, 49:12, 49:14, 49:16, 49:19, 49:21, 49:23, 50:1, 50:6, 50:8, 50:9, 50:11, 50:14, 51:3, 51:7, 51:14, 52:2, 52:7, 52:19, 52:25, 53:11, 53:15, 53:22, 53:23, 54:2, 54:3, 54:5, 54:7, 54:8, 54:11, 54:16, 55:8, 55:13, 55:25, 56:4, 56:8, 56:12, 56:23, 56:25, 57:3, 57:10, 57:16, 57:19, 57:23, 58:1, 58:2, 58:5, 58:12, 58:17, 58:22, 58:23, 59:8, 59:13, 59:14, 59:17, 59:23, 60:4, 60:8, 61:2, 61:16, 62:20, 63:1, 63:4, 63:9, 63:11, 63:15, 63:19, 64:10, 64:11, 64:21, 64:23, 65:13, 65:17, 66:6, 66:8, 66:12, 67:6, 67:10, 67:14, 67:19, 67:21, 67:24, 68:3, 68:16, 68:18, 68:21, 69:3, 69:5, 69:8, 69:11, 70:22, 71:1, 71:5, 71:11, 71:13, 71:17, 71:20, 72:5, 72:17, 73:3, 73:5, 73:10, 73:11, 74:9, 74:10, 74:20, 74:24, 75:10, 75:25, 76:3, 76:15, 76:18, 77:9, 77:14, 77:24, 78:4, 78:15, 78:19, 79:3, 79:14, 79:19, 79:20, 80:10, 80:15, 80:21, 81:3, 81:7, 81:10, 81:15, 81:18, 81:21, 81:22, 82:1, 82:11, 82:17, 83:12, 83:14, 84:1, 84:13, 84:19, 85:7, 85:18, 86:6, 86:10, 86:11, 86:15, 87:4, 87:8, 87:21, 88:3, 88:20, 88:24, 90:5, 90:9
**MS** [2] - 50:16, 50:19
**multipage** [1] - 70:25
**multiple** [1] - 25:1
**must** [6] - 30:24, 31:3, 42:15, 54:24, 89:9, 89:10

## N

**Nadine** [1] - 91:5
**NADINE** [1] - 91:18
**name** [14] - 3:11, 3:12, 10:18, 10:25, 11:17, 11:19, 12:16, 12:24, 24:24, 25:3, 25:4, 71:7
**named** [1] - 70:16
**narrow** [2] - 13:3, 80:21
**Naturalization** [1] - 4:3
**necessarily** [3] - 70:1, 78:7, 84:24
**necessary** [1] - 68:23
**need** [31] - 5:23, 5:24, 5:25, 7:14, 10:23, 10:25, 11:8, 12:10, 12:13, 13:4, 13:13, 17:17, 19:2, 19:4, 24:22, 25:15, 32:22, 41:21, 44:23, 68:3, 74:22, 78:17, 78:22, 80:8, 84:11, 85:1, 87:19, 87:24, 88:19, 89:22, 89:23
**needed** [4] - 13:11, 13:16, 45:4, 55:15
**needs** [3] - 14:17, 74:2
**negative** [1] - 10:14
**never** [16] - 13:25, 14:3, 14:6, 14:18, 31:9, 47:7, 47:10, 49:21, 52:15, 56:6, 64:17, 73:1, 73:2, 74:13, 77:1, 83:6
**new** [12] - 27:25, 56:13, 66:14, 69:2, 71:10, 73:4, 73:5, 73:6, 73:15, 80:9, 86:4
**next** [9] - 3:3, 38:23, 39:16, 41:3, 59:22, 62:18, 79:12, 87:13, 87:23
**Noah** [8] - 1:19, 8:17, 25:10, 31:25, 32:3, 34:11, 40:19, 45:8
**nobody** [3] - 12:22, 14:14, 15:4
**None** [1] - 71:10
**none** [3] - 11:14, 16:15, 51:20
**norm** [5] - 17:1, 17:11, 23:18, 24:6
**normal** [2] - 13:9, 17:1
**normally** [1] - 19:5
**North** [1] - 5:18
**NORTHERN** [1] - 1:2
**note** [3] - 25:9, 68:22, 80:15
**noted** [1] - 43:8
**notes** [1] - 70:14
**nothing** [10] - 15:19, 29:10, 30:16, 34:5, 52:10, 59:4, 61:12, 69:17, 72:21, 73:11
**notice** [6] - 9:12, 32:24, 35:7, 70:9, 76:16, 90:15
**noticed** [4] - 42:9, 54:12, 55:9, 86:18
**November** [9] - 60:13, 63:21, 64:2, 66:5, 75:1, 75:4, 75:6, 76:1, 76:5
**NUMBER** [1] - 1:4
**number** [7] - 9:16, 15:21, 17:12, 30:22, 62:12, 72:1
**numbers** [12] - 39:13, 40:14, 48:18, 52:9, 52:12, 55:13, 60:18, 60:20, 61:9, 61:10

## O

**object** [3] - 14:23, 31:15, 31:16
**objection** [9] - 8:6,

8:22, 9:17, 9:18, 44:11, 63:14, 70:15, 74:9, 74:10
**obligation** - 68:9
**obtained** [2] - 6:7
**obviously** [3] - 50:23, 72:23, 84:24
**occur** [2] - 7:19, 37:24
**occurred** [2] - 75:2, 82:20
**October** [5] - 9:3, 48:8, 49:1, 75:5, 75:6
**odds** [2] - 51:12, 55:17
**OF** [4] - 1:1, 1:5, 1:7, 91:1
**off-the-cuff** [1] - 52:15
**offer** [4] - 8:3, 8:19, 23:4, 78:13
**offered** [1] - 78:8
**offering** [1] - 81:11
**officer** [2] - 77:12, 84:14
**OFFICIAL** [2] - 91:1, 91:18
**often** [5] - 11:22, 11:24, 35:2, 45:21
**old** [1] - 73:4
**omission** [1] - 59:19
**omitted** [2] - 64:6, 64:7
**once** [1] - 45:20
**One** [1] - 20:5
**one** [51] - 7:10, 9:20, 10:9, 10:17, 12:3, 12:7, 12:25, 13:7, 13:13, 17:15, 17:19, 22:8, 25:10, 27:3, 33:5, 34:3, 34:7, 40:9, 49:3, 49:6, 49:8, 49:25, 50:1, 51:12, 52:24, 55:4, 57:5, 58:18, 59:10, 59:12, 62:21, 67:9, 68:1, 68:3, 68:4, 71:21, 72:1, 72:2, 72:12, 73:4, 75:12, 75:14, 75:20, 77:19, 78:11, 82:19, 82:21
**ones** [4] - 22:2, 47:2, 47:11, 52:11
**open** [5] - 42:15, 54:25, 87:2, 89:9, 90:14
**opened** [1] - 4:19
**opinion** [14] - 10:4, 10:6, 13:13, 25:3, 39:5, 43:2, 43:8, 53:10, 53:24, 67:1,

70:19, 76:25, 77:2, 81:8
**opinions** [4] - 10:7, 50:19, 50:20, 70:2
**opportunity** [7] - 63:23, 68:6, 70:4, 74:6, 74:19, 81:20, 83:18
**opposed** [1] - 62:18
**opposing** [5] - 20:25, 22:20, 22:21, 30:17, 41:7
**option** [8] - 38:10, 42:12, 68:5, 68:17, 68:22, 74:4, 81:19
**options** [2] - 68:4, 69:12
**oral** [1] - 5:21
**orally** [2] - 6:1, 18:3
**orange** [1] - 12:13
**order** [11] - 5:23, 7:7, 10:22, 32:22, 53:18, 65:23, 65:24, 70:15, 76:11, 85:21
**organization** [1] - 5:16
**original** [20] - 32:6, 52:23, 60:23, 62:8, 62:14, 63:10, 64:20, 66:22, 69:15, 71:14, 71:17, 71:18, 73:13, 73:16, 74:1, 74:3, 80:22, 81:17, 82:21, 82:22
**originally** [1] - 4:3
**otherwise** [3] - 14:22, 19:4, 59:3
**ourselves** [1] - 44:23
**outside** [7] - 2:6, 60:6, 63:17, 65:14, 65:17, 67:12, 67:17
**overlap** [1] - 59:15
**oversight** [3] - 66:8, 66:10, 66:11
**own** [9] - 4:16, 4:17, 10:18, 11:19, 25:3, 71:7, 76:10, 80:2

**P**

**p.m** [7] - 3:2, 42:24, 45:5, 55:2, 88:25, 89:20, 90:17
**page** [19] - 4:25, 26:2, 31:24, 32:2, 39:16, 39:20, 39:25, 41:3, 43:8, 54:12, 62:12, 62:22, 71:2, 72:3, 73:3, 73:7, 73:8, 80:23, 91:11
**pages** [6] - 61:14,

61:17, 61:19, 62:21, 62:22
**paper** [8] - 11:6, 11:19, 11:20, 12:24, 28:12, 39:3, 48:6, 60:15
**papers** [2] - 6:5
**paperwork** [1] - 89:12
**paragraph** [3] - 71:1, 71:2, 73:3
**Paralegal** [1] - 1:19
**part** [15] - 11:25, 26:17, 27:10, 28:7, 29:22, 31:11, 40:23, 46:3, 64:23, 65:4, 65:8, 71:23, 73:2, 73:15, 82:22
**partially** [1] - 40:22
**particular** [2] - 12:15, 36:17, 61:9
**parties** [18] - 18:5, 19:9, 19:14, 19:21, 19:25, 20:4, 20:6, 20:12, 20:14, 20:20, 20:22, 21:5, 21:12, 21:25, 22:11, 23:8, 24:1, 50:24
**parts** [1] - 72:24
**party** [2] - 30:17
**party's** [3] - 30:19, 30:25, 31:4
**pass** [1] - 61:13
**past** [1] - 45:16
**patching** [10] - 35:18, 35:19, 35:21, 35:22, 35:25, 36:11, 36:12, 36:19, 36:22
**pay** [1] - 7:5
**payne** [2] - 59:1, 64:14
**Payne** [31] - 41:17, 58:13, 58:14, 58:25, 59:3, 59:7, 64:4, 64:14, 65:6, 65:10, 70:11, 70:13, 70:18, 70:21, 72:9, 73:22, 73:23, 73:24, 74:6, 74:18, 74:20, 76:19, 79:11, 79:15, 80:16, 81:20, 82:5, 82:15, 86:1
**Payne's** [14] - 41:15, 41:20, 42:3, 60:10, 63:24, 64:1, 64:3, 64:24, 65:21, 70:23, 75:9, 75:14, 83:1, 83:17
**pen** [41] - 11:7, 11:19, 11:20, 11:21, 12:1, 12:1, 28:5, 28:10, 28:17, 28:22, 29:11, 29:23,

30:7, 33:1, 33:5, 33:23, 33:24, 33:25, 34:2, 34:21, 34:22, 34:23, 34:24, 34:25, 35:3, 35:8, 35:9, 35:10, 35:12, 35:15, 36:8, 36:10, 36:18, 39:1, 51:19, 56:5, 71:16, 80:14, 83:5
**people** [5] - 12:23, 13:3, 48:2, 48:3
**perfectly** [1] - 13:1
**perhaps** [3] - 66:1, 67:12, 70:5
**period** [2] - 65:20, 78:20
**periods** [2] - 4:7, 6:8
**permitted** [1] - 41:6
**person** [7] - 10:9, 10:11, 25:4, 34:7, 40:11, 49:6, 87:9
**personal** [1] - 85:23
**personally** [1] - 66:17
**photocopies** [1] - 11:15
**photocopy** [1] - 11:13
**phrase** [1] - 73:12
**pick** [1] - 34:25
**picked** [2] - 23:2, 35:16
**picks** [1] - 34:24
**pictures** [1] - 51:13
**piece** [2] - 12:24, 60:15
**place** [3] - 46:15, 78:1, 86:7
**plain** [1] - 55:21
**Plaintiff** [1] - 1:3
**plaintiff** [8] - 17:20, 43:13, 43:16, 43:20, 43:24, 83:23, 88:5
**PLAINTIFF** [1] - 1:12
**plaintiff's** [3] - 70:14, 85:20, 87:24
**Plaintiff's** [1] - 9:23
**plaintiffs** [1] - 78:1
**pleasant** [1] - 89:19
**plenty** [4] - 16:2, 37:16, 37:21, 39:11
**point** [25] - 24:6, 29:11, 29:19, 29:22, 30:1, 33:23, 37:13, 37:14, 37:20, 38:11, 39:15, 39:17, 43:7, 48:5, 55:8, 56:22, 63:13, 65:6, 67:11, 68:24, 73:18, 77:7, 81:6, 82:1, 82:11
**pointed** [3] - 37:17, 37:18, 37:19, 37:20,

37:22, 40:21, 40:25, 41:1, 41:2, 41:3, 41:5, 41:6, 64:4
**pointer** [1] - 33:24
**pointing** [10] - 26:20, 44:17, 56:5, 56:23, 64:13, 67:2, 72:21, 72:25, 81:2, 83:3
**points** [12] - 6:4, 6:5, 6:7, 7:10, 51:22, 56:6, 60:19, 60:22, 61:6, 71:25, 82:7, 82:23
**pointy** [1] - 67:3
**poor** [2] - 35:14, 36:9
**portion** [3] - 3:1, 17:25, 18:4
**possibility** [2] - 55:4, 57:5
**possible** [3] - 37:4, 71:7, 90:16
**post** [1] - 9:10
**post-employment** [1] - 9:10
**potential** [2] - 12:1, 57:8
**potentially** [1] - 72:25
**practical** [2] - 6:1, 6:2
**practice** [1] - 4:19
**precise** [1] - 73:25
**preclude** [1] - 30:19
**prejudice** [1] - 57:8
**preparation** [3] - 5:2, 50:23, 52:19
**prepare** [5] - 9:4, 12:11, 53:6, 56:13, 60:9
**prepared** [9] - 51:18, 54:2, 56:3, 59:17, 59:21, 63:20, 66:4, 67:7, 76:9
**prepares** [2] - 56:16, 56:17
**preparing** [2] - 53:1, 80:7
**presence** [3] - 2:6, 60:6, 63:17
**present** [1] - 25:2
**Present** [1] - 1:18
**presented** [3] - 43:5, 43:23, 64:25
**presenting** [6] - 6:5, 49:23, 49:24, 64:12, 65:7, 65:9
**preserve** [1] - 69:13
**preserving** [1] - 77:16
**pretrial** [1] - 31:4
**pretty** [8] - 11:7, 12:19, 58:20, 59:19, 78:25, 80:3, 83:9,

87:9
**prevent** [1] - 27:17
**previously** [3] - 3:21, 74:15, 83:7
**principal** [1] - 4:20
**print** [2] - 89:23, 89:25
**printing** [1] - 5:8
**private** [3] - 4:13, 4:15, 4:19
**privately** [1] - 87:4
**privy** [1] - 27:12
**problem** [14] - 11:25, 12:17, 15:24, 16:23, 25:4, 52:16, 65:1, 67:5, 73:24, 74:1, 75:19, 78:14, 79:25, 83:19
**PROCEEDINGS** [2] - 1:5, 1:7
**proceedings** [1] - 91:10
**Proceedings** [1] - 1:22
**process** [1] - 87:10
**processes** [1] - 5:8
**produce** [2] - 68:9, 76:22
**Produced** [1] - 1:22
**produced** [4] - 16:15, 30:16, 55:16, 57:6
**product** [1] - 51:5
**professional** [4] - 5:13, 5:16, 5:24, 7:7
**proffer** [1] - 29:8
**program** [1] - 5:7
**proper** [1] - 81:18
**proposed** [1] - 43:19
**proposing** [1] - 30:19
**provide** [19] - 15:13, 16:5, 18:1, 20:15, 20:22, 21:13, 22:1, 22:12, 23:9, 24:2, 24:16, 29:2, 50:25, 52:17, 53:22, 56:13, 58:15, 59:20, 83:23
**provided** [25] - 9:11, 10:16, 11:10, 12:4, 20:2, 20:10, 20:13, 21:1, 21:6, 22:2, 22:3, 22:4, 22:11, 22:16, 24:17, 26:10, 40:8, 55:16, 58:10, 59:12, 59:18, 64:16, 65:10, 83:18
**providing** [1] - 58:9
**published** [1] - 6:23
**pull** [1] - 18:13
**pun** [2] - 15:9, 56:18
**purpose** [1] - 61:11
**purposely** [1] - 84:17

pursuant [1] - 91:8
**pursued** [1] - 74:7
**put** [12] - 9:14, 19:20, 24:4, 36:9, 38:25, 57:9, 57:15, 57:18, 58:5, 59:2, 84:7, 87:12
**puts** [1] - 66:15

## Q

**Q1** [11] - 11:4, 34:12, 35:21, 36:19, 39:6, 40:12, 40:14, 45:9, 45:14, 72:19, 72:21
**qualified** [4] - 5:19, 6:3, 6:9, 7:16
**quality** [14] - 10:23, 11:3, 11:11, 30:7, 31:11, 35:14, 72:1, 72:7, 72:8, 72:13, 82:24, 83:8
**quantity** [6] - 10:25, 15:1, 72:20, 82:25, 83:2
**quarrel** [1] - 53:21
**questioned** [36] - 9:7, 9:13, 9:19, 9:22, 10:2, 10:10, 10:19, 12:3, 13:15, 22:3, 24:25, 25:1, 25:6, 32:15, 32:17, 34:9, 35:5, 36:19, 36:24, 37:1, 37:10, 39:18, 40:2, 40:9, 45:9, 46:2, 46:13, 47:12, 47:15, 48:4, 62:3, 62:7, 62:18, 71:9, 71:21, 72:22
**Questioned** [1] - 6:10
**Questioning** [1] - 6:19
**questions** [7] - 51:7, 57:22, 60:2, 60:4, 63:12, 65:20, 76:20
**queued** [1] - 76:5
**quick** [2] - 54:10, 76:6
**quickly** [2] - 73:21, 89:3

## R

**raise** [2] - 3:7, 32:8
**range** [17] - 12:21, 13:3, 13:5, 13:8, 13:11, 13:14, 13:16, 17:13, 24:24, 25:11, 31:12, 32:14, 32:16, 34:10, 47:6, 47:12, 71:8
**rarely** [1] - 35:16

rather [4] - 18:10, 18:23, 54:22, 89:6
**ratios** [1] - 73:8
**reach** [3] - 17:13, 77:1, 82:24
**read** [3] - 12:18, 31:9, 69:18
**reading** [5] - 54:12, 70:2, 83:1, 83:10, 83:17
**reads** [1] - 82:22
**ready** [8] - 11:20, 42:17, 44:20, 45:6, 55:1, 86:21, 87:25, 89:18
**real** [1] - 55:17
**realized** [1] - 75:15
**really** [21] - 12:18, 19:1, 31:10, 35:4, 35:13, 43:18, 52:24, 60:18, 66:1, 68:7, 69:4, 69:15, 69:25, 73:17, 74:22, 77:5, 77:7, 77:21, 78:2, 80:9, 90:13
**Realtime** [1] - 91:5
**reason** [9] - 39:4, 47:17, 47:19, 57:14, 58:13, 58:24, 65:22, 72:7, 81:24
**reasonable** [1] - 84:16
**reasons** [2] - 53:14, 79:7
**rebuttal** [19] - 22:24, 22:25, 26:7, 26:9, 26:13, 27:1, 28:2, 41:20, 58:9, 58:10, 58:15, 59:3, 59:4, 59:11, 59:18, 60:9, 60:15
**recalling** [1] - 18:3
**receive** [1] - 4:22
**received** [5] - 8:11, 8:24, 9:6, 27:5, 43:14
**recess** [8] - 18:25, 42:8, 42:23, 54:10, 78:21, 82:14, 86:21, 90:16
**Recess** [2] - 42:24, 90:17
**recessed** [1] - 82:18
**recitation** [1] - 83:15
**recognized** [2] - 5:16, 5:19
**recollection** [2] - 18:12, 19:11
**recommendation** [1] - 5:25
**reconvening** [1] -

78:22
**record** [8] - 3:11, 44:23, 57:22, 58:4, 68:22, 77:6, 77:16, 88:9
**Recorded** [1] - 1:22
**RECROSS** [1] - 2:2
**REDIRECT** [1] - 2:2
**reentered** [2] - 45:5, 88:25
**refer** [1] - 50:14
**reference** [6] - 41:6, 41:25, 44:12, 48:18, 61:8, 76:6
**referencing** [1] - 61:25
**referring** [5] - 41:16, 51:23, 52:12, 65:3, 65:4
**refers** [1] - 48:1
**reflection** [1] - 25:19
**reflects** [1] - 56:25
**refresh** [1] - 54:24
**refreshed** [1] - 43:3
**refutation** [1] - 56:11
**regard** [6] - 11:3, 15:17, 33:2, 35:8, 37:3, 40:14
**regarding** [2] - 10:4, 70:19
**regardless** [1] - 77:11
**Registered** [1] - 91:6
**regular** [1] - 11:17
**regulations** [1] - 91:11
**rejected** [2] - 7:22, 23:3
**rejecting** [1] - 23:4
**related** [2] - 5:14, 9:9
**relationship** [1] - 37:2
**relative** [3] - 73:7, 73:11, 73:12
**relatively** [1] - 78:20
**released** [1] - 7:1
**relevant** [5] - 44:18, 47:25, 54:7, 58:6, 72:15
**reliable** [1] - 67:1
**rely** [1] - 66:2
**relying** [1] - 75:4
**remain** [2] - 3:6, 88:17
**remaining** [1] - 32:19
**remediate** [1] - 78:14
**remedy** [3] - 50:22, 51:1, 67:5
**remember** [13] - 15:18, 20:9, 22:8, 28:7, 28:23, 30:10, 45:1, 58:7, 70:11, 70:13, 73:13, 73:14, 78:25
**remind** [1] - 42:13

reminder [2] - 24:5, 89:9
**rendition** [1] - 36:9
**repeated** [3] - 25:6, 36:23, 46:8
**repeatedly** [1] - 73:22
**report** [165] - 8:18, 8:20, 9:2, 9:5, 14:25, 15:1, 16:18, 16:19, 17:7, 25:17, 25:20, 25:24, 25:25, 26:2, 26:3, 26:7, 26:9, 26:11, 26:13, 26:15, 26:22, 27:25, 28:2, 28:4, 28:16, 28:18, 28:23, 28:24, 29:2, 29:4, 29:9, 29:10, 29:22, 29:24, 30:1, 30:4, 30:6, 30:17, 30:24, 31:1, 31:8, 31:10, 31:15, 31:16, 31:17, 31:18, 39:20, 41:15, 41:16, 41:20, 42:3, 48:9, 48:17, 48:19, 48:22, 48:24, 49:1, 49:10, 49:12, 49:15, 49:24, 50:12, 51:17, 51:19, 51:21, 52:1, 52:2, 52:5, 52:23, 53:4, 53:25, 54:2, 54:13, 56:7, 57:5, 57:7, 57:11, 58:11, 58:18, 59:4, 59:11, 59:18, 60:9, 60:16, 60:17, 60:23, 61:8, 61:14, 62:8, 62:13, 62:14, 62:21, 63:10, 63:20, 63:24, 64:1, 64:2, 64:5, 64:6, 64:16, 64:19, 64:24, 65:3, 65:5, 65:11, 65:15, 65:18, 66:2, 66:14, 66:19, 66:20, 66:22, 67:15, 69:16, 69:18, 69:23, 70:18, 70:25, 71:18, 71:25, 72:2, 72:18, 73:4, 73:5, 73:9, 73:13, 73:16, 73:22, 73:23, 73:24, 73:25, 74:1, 74:3, 74:11, 74:25, 75:3, 75:4, 75:5, 75:9, 75:14, 75:22, 75:24, 76:1, 76:20, 76:22, 79:11, 79:13, 80:16, 80:22, 80:25, 81:13, 81:17, 82:21, 82:23, 83:1, 83:17, 83:19, 83:20, 83:23

**reported** [1] - 91:9
**REPORTER** [3] - 49:6, 91:1, 91:18
**reporter** [1] - 88:4
**Reporter** [2] - 91:5, 91:6
**reports** [8] - 29:1, 48:20, 50:10, 50:25, 69:19, 69:20, 80:19, 83:15
**represent** [2] - 57:1, 81:12
**reproduction** [2] - 9:8, 11:23
**reproductions** [3] - 35:13, 35:14, 35:17
**request** [11] - 14:7, 15:15, 16:10, 17:9, 17:21, 19:15, 19:22, 23:4, 66:13, 87:18, 87:19
**requested** [1] - 19:12
**Requested** [2] - 3:1, 90:18
**required** [2] - 6:7, 50:25
**requirements** [3] - 5:24, 7:7
**requires** [2] - 30:3, 50:9, 50:19
**reserve** [2] - 68:18, 68:21
**reserving** [1] - 77:21
**reservoir** [2] - 34:22, 34:23
**resources** [1] - 76:14
**respectful** [1] - 19:6
**respective** [1] - 87:14
**respond** [3] - 16:13, 70:23, 84:15
**responding** [1] - 22:24
**response** [4] - 64:3, 70:10, 73:21, 82:18
**responses** [1] - 30:23
**responsibility** [1] - 84:15
**rest** [1] - 40:10
**rests** [1] - 48:2
**result** [1] - 83:17
**resume** [2] - 38:24, 85:2
**resumed** [1] - 55:3
**retained** [1] - 22:23
**return** [2] - 42:16, 90:11
**returned** [5] - 21:23, 24:14, 31:22, 42:6, 60:1
**review** [5] - 10:2, 12:9,

57:7, 63:23, 82:15
**reviewing** [2] - 60:14, 64:1
**rid** [2] - 37:4, 46:19
**RMR** [1] - 91:18
**roadblock** [1] - 85:10
**roam** [1] - 42:12
**rock** [1] - 78:1
**rolling** [1] - 80:14
**room** [14] - 19:3, 54:24, 59:10, 75:21, 86:10, 86:13, 86:25, 87:3, 87:22, 89:4, 89:14, 89:18, 90:8, 90:15
**rooms** [1] - 86:12
**rotates** [1] - 34:24
**rounded** [2] - 41:1, 67:3
**routinely** [3] - 4:22, 5:13, 45:19
**row** [1] - 12:24
**Rule** [9] - 30:2, 30:21, 30:25, 31:4, 50:16, 50:17, 50:19, 50:22, 50:24
**rule** [5] - 30:22, 50:14, 55:19, 66:21, 67:7
**rules** [1] - 50:15
**ruling** [2] - 22:10, 41:17
**run** [1] - 90:3

## S

**salient** [1] - 80:22
**sample** [1] - 56:25
**samples** [1] - 13:4, 13:10, 14:1, 14:4, 14:7, 19:17, 19:24, 20:6, 20:15, 20:23, 21:6, 21:13, 22:1, 22:3, 22:4, 22:12, 22:14, 22:15, 23:9, 24:2, 24:16, 32:12, 34:6, 56:23, 57:1, 82:3, 82:25, 83:2
**sanction** [2] - 51:1, 79:10
**sat** [1] - 12:23
**satisfied** [1] - 84:9
**save** [1] - 77:6
**saw** [2] - 49:21, 83:6
**scans** [2] - 11:12, 11:16
**schedule** [1] - 55:24
**science** [1] - 5:5
**Sciences** [1] - 6:19
**screen** [9] - 9:14, 25:13, 25:14, 32:3,

33:10, 33:25, 37:17, 60:21, 62:11
**script** [3] - 55:12, 69:22, 76:12
**seat** [1] - 3:9
**second** [12] - 22:23, 25:3, 36:3, 50:12, 54:13, 65:18, 70:24, 71:1, 71:5, 73:6, 80:25, 81:19
**Secret** [5] - 3:25, 4:7, 4:9, 5:7, 5:12
**section** [2] - 31:8, 32:2
**Section** [1] - 6:19
**Security** [2] - 4:2, 4:10
**see** [37] - 11:6, 11:7, 11:8, 12:18, 12:19, 16:9, 22:5, 25:24, 29:6, 30:3, 31:25, 33:22, 35:4, 35:15, 36:3, 36:15, 37:15, 45:18, 46:5, 46:6, 46:16, 46:17, 47:5, 47:7, 47:14, 49:5, 62:6, 67:8, 69:19, 71:3, 71:13, 82:6, 89:17
**seeing** [3] - 28:23, 56:2, 58:19
**seem** [6] - 17:17, 18:13, 44:2, 45:3, 80:12, 88:23
**seminars** [1] - 5:14
**send** [5] - 7:13, 54:9, 84:5, 85:9, 88:5
**sending** [1] - 85:21
**SENIOR** [1] - 1:8
**sense** [1] - 11:13
**separate** [4] - 59:11, 59:15, 59:16, 78:11
**sequence** [3] - 22:7, 22:23, 85:8
**serious** [3] - 59:19, 66:11, 83:22
**seriously** [1] - 84:15
**Service** [6] - 4:1, 4:3, 4:8, 4:9, 5:7, 5:12
**service** [2] - 4:4, 5:12
**Services** [1] - 4:18
**set** [3] - 20:11, 20:13, 45:22
**several** [1] - 79:21
**severance** [2] - 34:15, 43:20
**shall** [1] - 87:25
**SHANNON** [1] - 1:16
**sharp** [2] - 37:15, 37:16
**sheet** [1] - 35:24

**short** [2] - 69:2, 78:20
**shots** [1] - 87:15
**show** [7] - 32:3, 45:8, 45:21, 45:22, 60:20, 64:6, 72:22
**showed** [1] - 43:11
**shows** [2] - 51:22, 62:15
**side** [11] - 10:13, 21:13, 21:25, 62:7, 62:17, 68:1, 70:4, 85:19, 85:20
**side-by-side** [2] - 62:7, 62:17
**sign** [2] - 11:17, 11:18
**signature** [34] - 9:8, 9:11, 10:10, 10:19, 12:17, 12:20, 13:15, 25:1, 25:11, 29:17, 30:15, 30:16, 32:12, 32:15, 32:17, 34:9, 34:14, 35:5, 37:10, 39:18, 39:23, 40:2, 40:10, 40:18, 46:2, 46:14, 47:12, 47:15, 48:4, 62:3, 62:7, 62:18, 70:20, 71:6
**signatures** [22] - 12:16, 12:25, 13:6, 13:7, 34:12, 35:6, 39:21, 39:25, 40:7, 40:9, 40:12, 45:11, 47:13, 61:25, 62:3, 62:8, 62:15, 62:17, 62:20, 62:23, 67:2, 71:9
**signed** [2] - 43:16, 81:4
**significant** [2] - 68:10, 83:10
**signing** [1] - 11:18
**signs** [1] - 75:18
**similar** [3] - 7:12, 39:10, 71:6
**similarities** [3] - 24:25, 25:1, 64:6
**similarity** [1] - 45:24
**simply** [1] - 30:14
**simulation** [2] - 72:22, 75:15
**single** [1] - 36:10
**sit** [2] - 5:25, 81:25
**sitting** [2] - 81:22, 85:23
**situation** [1] - 66:20
**six** [3] - 41:23, 61:18, 61:19
**sixth** [1] - 11:14
**size** [1] - 46:11
**slant** [6] - 47:25, 48:1,

73:11, 73:12, 80:13, 83:5
**slides** [1] - 26:14
**slips** [3] - 88:12, 88:15, 88:19
**smaller** [1] - 46:16
**smart** [1] - 86:2
**smoothly** [1] - 80:14
**solution** [5] - 67:9, 70:8, 77:3, 78:14
**solved** [1] - 79:25
**someone** [5] - 25:8, 43:25, 70:16, 74:21, 81:5
**someplace** [1] - 86:11
**sometime** [2] - 19:3, 58:8
**sometimes** [4] - 11:20, 34:25, 46:11, 55:20
**somewhat** [1] - 46:3
**soon** [6] - 19:3, 82:17, 89:21, 90:6, 90:12, 90:16
**sorry** [26] - 3:23, 6:13, 6:18, 7:25, 10:1, 10:7, 17:24, 18:22, 25:12, 33:12, 34:1, 37:7, 38:7, 38:9, 39:21, 44:5, 49:8, 49:13, 54:11, 60:25, 63:2, 66:7, 68:20, 78:5, 82:12
**sort** [2] - 14:20, 76:12
**sound** [3] - 15:3, 19:13, 23:14
**sounds** [8] - 23:7, 27:4, 28:1, 49:21, 51:21, 54:17, 63:4, 83:12
**span** [1] - 32:23
**speaking** [1] - 70:5
**specific** [4] - 52:12, 56:4, 56:23, 71:21
**specifically** [5] - 41:17, 63:5, 64:13, 65:6, 76:4
**specificity** [13] - 26:20, 26:21, 60:24, 61:1, 61:3, 63:8, 64:22, 66:24, 66:25, 74:17, 81:15, 81:16
**specifics** [1] - 82:8
**specimens** [1] - 13:14
**speed** [1] - 86:4
**spell** [1] - 3:11
**spelled** [1] - 3:13
**spend** [1] - 73:18
**spent** [2] - 72:5, 80:6
**stand** [4] - 42:19,

62:16, 90:12, 90:16
**standard** [2] - 16:22,
16:25
**standing** [1] - 3:6
**stands** [1] - 34:3
**start** [14] - 10:8, 11:19,
11:21, 39:7, 44:23,
68:15, 77:5, 77:7,
77:13, 77:21, 77:22,
79:10, 85:1
**started** [3] - 42:18,
42:25, 54:21
**starting** [4] - 39:15,
39:17, 69:2, 79:6
**starts** [2] - 39:8, 39:9
**starve** [1] - 42:8
**state** [1] - 3:10
**statement** [2] - 16:6,
21:7
**STATES** [2] - 1:1, 1:8
**States** [3] - 3:25, 91:6,
91:12
**stay** [7] - 21:11, 42:11,
84:7, 87:24, 88:2,
88:3, 88:6
**staying** [1] - 85:20
**stenographically** [1] -
91:9
**stenographically-
reported** [1] - 91:9
**Stenography** [1] -
1:22
**step** [1] - 67:12
**STEPHEN** [1] - 1:16
**stern** [8] - 15:16, 18:1,
54:15, 57:14, 61:13,
81:19, 85:7, 90:13
**STERN** [183] - 1:16,
8:7, 8:23, 9:16,
13:22, 13:25, 14:3,
14:6, 14:11, 14:18,
14:22, 15:5, 15:8,
15:14, 15:18, 16:1,
16:12, 16:21, 16:25,
17:5, 17:9, 18:9,
18:21, 18:23, 19:13,
19:17, 20:3, 20:9,
20:13, 20:16, 20:24,
21:1, 21:7, 21:18,
22:7, 22:15, 22:18,
22:22, 23:6, 23:14,
23:17, 23:19, 23:22,
23:24, 24:4, 24:10,
25:23, 26:4, 26:7,
26:13, 26:17, 26:21,
26:25, 27:4, 27:7,
27:14, 27:20, 28:1,
28:6, 28:15, 28:18,
28:22, 29:5, 29:10,
29:13, 29:21, 30:6,

30:10, 31:7, 31:11,
31:17, 31:20, 38:6,
38:8, 41:9, 41:11,
41:14, 41:24, 44:22,
45:1, 48:5, 48:8,
48:11, 48:14, 48:16,
48:21, 48:25, 49:5,
49:12, 49:16, 49:21,
50:9, 50:14, 51:3,
51:7, 51:14, 52:2,
52:7, 52:19, 52:25,
53:11, 53:15, 54:2,
54:7, 54:11, 54:16,
55:8, 55:25, 56:4,
56:12, 56:23, 56:25,
57:3, 57:23, 58:5,
58:17, 58:22, 59:8,
59:14, 62:20, 63:1,
63:4, 63:9, 63:11,
63:19, 64:11, 64:21,
64:23, 66:6, 66:12,
67:6, 67:10, 67:14,
67:21, 67:24, 68:18,
68:21, 69:3, 69:5,
69:8, 69:11, 70:22,
71:1, 71:5, 71:13,
71:17, 71:20, 72:5,
72:17, 73:3, 73:5,
73:11, 74:20, 74:24,
75:10, 75:25, 76:3,
76:15, 76:18, 77:9,
77:14, 77:24, 78:4,
78:11, 78:19, 79:3,
79:14, 79:20, 80:10,
80:15, 82:11, 82:17,
84:1, 84:13, 84:19,
85:18, 86:6, 86:11,
86:15, 87:4, 87:8,
87:21, 88:3
**Stern** [1] - 2:8
**stick** [1] - 76:11
**still** [3] - 21:8, 66:2,
90:8
**stipulation** [2] - 16:3,
18:18
**stopped** [1] - 45:15
**stopping** [1] - 45:19
**stops** [1] - 45:12
**story** [1] - 55:17
**stress** [1] - 79:6
**striation** [1] - 34:18
**striations** [4] - 35:1,
35:3, 35:5, 35:6
**strike** [1] - 64:15
**striking** [1] - 67:8
**stroke** [3] - 11:22,
45:12, 45:15
**strokes** [1] - 11:24
**studied** [1] - 73:20
**studies** [1] - 5:11

**study** [2] - 5:2, 81:13
**stuff** [1] - 80:4
**stunning** [1] - 14:15
**subject** [1] - 14:16
**substantially** [1] -
43:14
**substantive** [1] -
67:13
**substantively** [2] -
50:11, 68:12
**substitute** [3] - 22:9,
70:11, 70:16
**substituted** [1] - 4:25
**subtle** [1] - 25:5
**subtly** [2] - 85:3, 88:14
**successfully** [1] - 5:6
**sufficient** [3] - 13:10,
15:21, 70:6
**suggested** [2] - 23:3,
81:19
**suggesting** [2] -
20:17, 70:6
**suggestion** [1] - 20:21
**suggests** [2] - 16:24,
21:8
**superimpose** [1] -
12:25
**supplement** [8] - 31:1,
54:4, 54:5, 55:5,
55:15, 66:4, 66:24
**supplemental** [13] -
27:5, 27:6, 49:12,
49:15, 49:24, 50:12,
50:25, 51:21, 63:20,
65:2, 65:5, 73:9,
82:21
**supplementing** [1] -
30:23
**surface** [3] - 39:1,
39:3, 80:14
**surfaces** [1] - 71:16
**surprise** [2] - 17:8,
70:5
**surprised** [1] - 69:19
**surprising** [3] - 14:20,
53:1, 71:22
**surrebuttal** [3] -
25:25, 26:3, 64:6
**sworn** [1] - 3:8

# T

**tables** [5] - 21:23,
24:14, 31:22, 42:6,
60:1
**talks** [3] - 29:10,
70:20, 76:24
**team** [1] - 86:19
**teapot** [1] - 56:9
**technical** [1] - 69:23

**tempest** [1] - 56:8
**ten** [2] - 4:1, 12:24
**tenth** [1] - 11:14
**term** [3] - 73:13, 83:5,
83:6
**terminate** [1] - 45:16
**terms** [5] - 12:8, 41:8,
75:11, 82:6, 82:7
**test** [3] - 5:25, 6:1, 6:2
**testified** [8] - 7:20,
29:15, 64:9, 64:21,
75:24, 76:4, 80:24,
86:4
**testifies** [1] - 29:2,
69:20
**testify** [6] - 15:5,
28:13, 53:25, 56:10,
65:24, 68:24
**testifying** [4] - 7:21,
65:1, 65:2, 79:18
**testimony** [20] - 18:1,
29:14, 30:4, 30:20,
42:20, 43:6, 51:16,
52:4, 56:10, 58:10,
60:10, 64:17, 65:4,
66:22, 67:8, 67:13,
71:15, 74:2, 74:5,
81:25
**Testimony** [1] - 1:6
**textbook** [3] - 6:25,
7:2
**THE** [284] - 1:1, 1:1,
1:8, 1:12, 1:15, 3:3,
3:5, 3:6, 3:9, 3:12,
3:14, 3:23, 3:25, 4:5,
4:14, 7:4, 7:6, 8:6,
8:10, 8:11, 8:21,
8:24, 9:18, 9:22,
13:18, 13:19, 13:20,
13:21, 13:23, 14:2,
14:9, 14:14, 14:19,
15:2, 15:6, 15:11,
15:15, 15:23, 16:3,
16:8, 16:19, 16:23,
17:2, 17:7, 17:19,
17:24, 18:5, 18:15,
18:19, 18:22, 18:25,
19:5, 19:8, 19:14,
19:20, 20:6, 20:14,
20:19, 20:22, 20:25,
21:3, 21:5, 21:13,
21:15, 21:22, 21:24,
22:5, 22:9, 22:13,
22:17, 22:20, 23:8,
23:11, 23:18, 23:21,
23:23, 24:1, 24:8,
24:12, 24:15, 25:14,
25:15, 25:25, 26:5,
26:24, 27:3, 27:13,
27:19, 27:21, 28:3,

28:25, 29:8, 29:12,
30:2, 30:21, 31:9,
31:18, 31:21, 33:10,
33:11, 33:12, 33:13,
33:14, 33:15, 33:18,
33:20, 33:22, 33:24,
34:2, 37:5, 37:6,
38:7, 38:10, 38:15,
38:17, 41:4, 41:5,
41:12, 41:21, 42:1,
42:4, 42:7, 42:22,
42:23, 42:25, 44:5,
44:8, 44:11, 44:16,
44:20, 44:24, 45:3,
45:6, 46:20, 46:21,
48:7, 48:10, 48:12,
48:15, 48:20, 48:23,
49:6, 49:8, 49:15,
49:18, 49:25, 50:5,
50:7, 50:17, 50:21,
51:4, 51:11, 51:25,
52:4, 52:16, 52:21,
53:9, 53:13, 53:20,
54:4, 54:9, 54:14,
54:17, 54:20, 55:4,
55:11, 55:14, 56:3,
56:20, 56:24, 57:2,
57:5, 57:13, 57:21,
57:24, 58:3, 58:20,
59:19, 59:24, 60:2,
60:5, 60:25, 61:1,
61:14, 61:15, 61:24,
62:2, 62:4, 62:9,
62:10, 62:14, 62:16,
62:19, 62:24, 63:3,
63:6, 63:10, 63:14,
63:16, 64:9, 64:18,
64:22, 65:16, 65:25,
66:7, 66:10, 66:16,
67:7, 67:12, 67:16,
67:18, 67:22, 67:23,
67:25, 68:1, 68:4,
68:17, 68:20, 69:1,
69:4, 69:7, 69:9,
69:12, 70:25, 71:4,
71:15, 71:18, 72:4,
72:15, 73:2, 73:4,
73:19, 74:11, 74:22,
75:8, 75:20, 76:1,
76:8, 76:16, 76:19,
77:11, 77:18, 77:25,
78:5, 78:17, 78:21,
79:8, 79:17, 80:5,
80:11, 80:20, 81:1,
81:6, 81:8, 81:11,
81:16, 81:24, 82:13,
83:16, 84:3, 84:18,
84:21, 85:9, 85:19,
86:12, 86:23, 87:2,
87:5, 87:13, 87:22,
88:2, 88:4, 88:10,

88:22, 89:1, 89:15,
89:16, 89:21, 89:23,
89:24, 90:1, 90:2,
90:6, 90:10
**theory** [1] - 25:4
**Therefore** [2] - 70:24,
71:2
**they've** [3] - 4:24,
65:11
**thinking** [1] - 87:10
**third** [1] - 30:8
**THOMAS** [1] - 1:13
**three** [12] - 5:7, 10:23,
32:12, 34:6, 51:24,
52:10, 52:11, 62:21,
68:2, 68:14, 79:25,
82:23
**three-year** [1] - 5:7
**Thursday** [1] - 1:9
**tight** [1] - 55:23
**timely** [3] - 27:22,
70:16, 83:23
**title** [4] - 3:19, 28:13,
32:1, 43:11
**today** [6] - 61:11,
71:15, 80:24, 81:11,
81:17, 88:16
**together** [2] - 45:2,
59:10
**toggling** [1] - 55:9
**tomorrow** [8] - 78:22,
84:8, 85:2, 85:6,
85:15, 88:18, 89:17,
90:11
**tonight** [1] - 85:4
**took** [1] - 32:18
**toot** [1] - 80:1
**top** [12] - 37:10, 37:13,
37:14, 37:17, 37:20,
40:21, 40:25, 41:1,
46:13, 46:18, 48:4,
62:21
**topics** [1] - 5:14
**totally** [1] - 51:11
**touch** [5] - 25:12,
25:13, 36:13, 88:6,
90:10
**towards** [1] - 72:7
**training** [1] - 5:12
**TRANSCRIPT** [1] - 1:7
**transcript** [4] - 74:23,
75:21, 91:9, 91:11
**Transcript** [1] - 1:22
**Transcription** [1] -
1:22
**transcripts** [1] - 87:15
**transmit** [2] - 15:15,
17:21
**transmitted** [1] - 16:10
**tremor** [3] - 38:4, 38:5,

38:21
**TRIAL** [1] - 1:4
**trial** [12] - 21:23,
24:14, 31:22, 42:6,
43:13, 53:7, 60:1,
68:13, 76:10, 79:12,
83:24, 84:22
**tried** [1] - 14:23
**trouble** [1] - 8:9
**troubled** [3] - 76:8,
76:13, 76:21
**troubles** [1] - 76:17
**true** [3] - 14:5, 52:7,
91:9
**truly** [2] - 77:12, 77:13
**try** [5] - 18:17, 35:20,
75:17, 80:21, 84:16
**trying** [9] - 9:15,
18:13, 24:24, 28:8,
29:4, 30:2, 33:21,
33:22, 38:13, 51:15,
66:3, 79:20
**tube** [1] - 34:22
**Tuesday** [1] - 78:25
**turn** [7] - 31:24, 49:25,
50:2, 59:24, 71:25,
75:2, 78:2
**turns** [1] - 45:19
**twice** [1] - 12:23
**two** [17] - 16:18,
17:14, 55:9, 57:20,
59:9, 59:15, 59:16,
61:19, 62:22, 65:12,
66:10, 78:11, 79:25,
80:18, 82:2, 82:6,
82:23
**typically** [2] - 29:1,
69:18

**U**

**U.S.C** [1] - 91:8
**ultimate** [2] - 81:8,
82:2
**unable** [1] - 76:24
**uncommon** [1] - 81:25
**under** [4] - 30:25,
31:4, 50:22, 80:23
**underneath** [1] -
62:17
**understood** [3] -
51:17, 76:3, 85:18
**uneven** [2] - 39:1,
80:14
**unexpected** [1] - 70:3
**unfair** [1] - 50:3
**United** [3] - 3:25, 91:6,
91:12
**UNITED** [2] - 1:1, 1:8
**University** [2] - 5:4,

5:6
**unpunished** [1] -
70:12
**unusual** [1] - 47:3
**up** [36] - 8:17, 9:14,
10:6, 16:13, 18:17,
19:8, 22:5, 22:22,
25:10, 29:4, 32:3,
32:8, 34:11, 34:14,
34:24, 34:25, 35:16,
36:13, 39:20, 42:3,
45:17, 45:21, 45:22,
46:13, 48:4, 52:8,
54:11, 67:8, 72:23,
74:18, 86:3, 87:2,
87:17, 88:10, 88:13,
90:14
**ups** [1] - 27:9
**upward** [1] - 45:20
**useful** [2] - 62:6,
76:10
**user** [1] - 62:4
**uses** [1] - 73:12

**V**

**variation** [20] - 12:22,
13:2, 13:3, 13:5,
13:11, 13:16, 25:11,
30:7, 32:14, 32:16,
32:21, 32:23, 34:10,
40:7, 40:17, 46:6,
47:6, 47:12, 71:8
**variations** [1] - 29:17
**varies** [4] - 46:11,
69:15, 74:15, 74:16
**variety** [1] - 47:14
**various** [1] - 29:19
**versions** [1] - 40:18
**versus** [4] - 17:16,
40:14, 67:3, 82:21
**view** [1] - 11:3
**violation** [3] - 55:19,
66:20, 68:9
**visible** [2] - 11:24,
12:2
**voice** [1] - 86:8
**voir** [2] - 55:4, 57:17

**W**

**wait** [3] - 24:12, 54:12,
66:7
**waiting** [2] - 67:17,
86:16
**waiving** [1] - 69:6
**walking** [1] - 51:17
**wants** [3] - 59:1,
68:15, 85:22
**Washington** [1] - 5:6

**waste** [1] - 85:11
**watching** [1] - 74:25
**ways** [1] - 78:8
**Wednesday** [1] - 79:1
**week** [1] - 58:8
**weekend** [1] - 58:8
**whatsoever** [1] - 47:9
**whispering** [1] - 86:9
**White** [6] - 12:16,
39:22, 43:9, 46:4,
65:23, 81:4
**white** [17] - 10:18,
12:17, 12:21, 13:5,
24:23, 25:3, 32:10,
32:14, 32:20, 35:23,
47:4, 47:16, 57:10,
71:7, 77:1, 84:6,
87:20
**White's** [2] - 30:15,
30:16
**white's** [10] - 9:8,
9:11, 13:11, 23:11,
25:11, 45:16, 46:15,
70:20, 71:6, 71:8
**whole** [2] - 73:7, 86:19
**wide** [6] - 13:5, 13:14,
17:12, 32:22, 40:17,
47:6
**willing** [1] - 18:16
**wisdom** [1] - 85:23
**wish** [1] - 68:5
**withdraw** [3] - 17:23,
17:25, 18:3
**withheld** [1] - 16:1
**withholding** [2] -
17:14, 20:17
**WITNESS** [27] - 2:2,
3:12, 3:25, 7:6, 8:10,
13:19, 13:21, 25:15,
25:25, 33:11, 33:13,
33:15, 33:22, 34:2,
37:6, 41:5, 42:22,
46:21, 48:7, 48:10,
61:1, 61:15, 62:2,
62:9, 62:14, 62:19,
67:18
**witness** [19] - 3:3,
7:16, 7:22, 8:11,
29:1, 30:24, 42:19,
58:2, 58:4, 67:11,
70:3, 70:5, 76:9,
80:24, 86:4, 86:10,
86:12, 88:5, 90:3
**Witness** [2] - 3:8,
67:20
**witness'** [1] - 66:22
**Wolf** [2] - 1:19, 26:14
**word** [5] - 12:11,
12:12, 16:14, 73:22,
74:17

**worded** [1] - 18:9
**words** [3] - 19:20,
50:21, 63:8
**workshops** [2] - 5:14,
6:6
**worry** [1] - 55:23
**worth** [1] - 75:23
**write** [14] - 10:10,
10:11, 10:14, 10:15,
10:18, 12:22, 33:10,
34:25, 35:19, 36:12,
38:23, 48:2, 48:3
**writer** [4] - 40:5, 40:6,
47:16, 71:6
**writes** [1] - 24:23
**writing** [15] - 5:9, 6:5,
10:23, 11:19, 12:22,
25:6, 32:15, 32:23,
35:20, 38:22, 39:1,
46:9, 48:2, 71:16,
80:14
**written** [5] - 5:21,
5:25, 10:25, 32:10,
32:20
**wrote** [13] - 6:25, 7:1,
9:2, 10:12, 12:24,
25:3, 25:4, 34:8,
39:22, 48:7, 71:7,
76:5

**Y**

**year** [1] - 5:7
**years** [7] - 4:1, 4:2,
4:4, 6:3, 16:18,
65:12, 66:10
**yourself** [2] - 4:13,
4:15
**yourselves** [2] -
54:24, 86:25

**§**

**§** [1] - 91:8