# EXHIBIT 2

| | |
|---|---|
| **From:** | Cindy Johnson |
| **To:** | "gjordan@jz-llc.com" |
| **Cc:** | "abenigni@agdlaw.com" |
| **Subject:** | David Boshea |
| **Date:** | Tuesday, April 1, 2025 7:28:00 PM |
| **Attachments:** | Complaint- Second Amended.pdf |
| | image001.jpg |

Dear Greg:

This email comes in response to your inquiry posed in your email of Friday, "Can you please tell me the basis for claiming a contingent debt. I am unaware of anything other than supposition."

Attached you will find a Second Amended Complaint that is currently pending in state court in Maryland. I have been advised that starting at paragraph 250 are allegations relating to the claim that Compass has against David Boshea. Because David is deceased, Compass has been waiting for there to be an estate representative who can be named for David's estate in the Complaint. Although my client called Compass a contingent creditor, I think that, in the same way as we would call it in bankruptcy court parlance, this is more of an unliquidated claim. There are no "facts" that are "contingent" (e.g. either need to occur or not occur, for allegation of liability against David/his estate. The claims that Compass had against him for his actions (and now have against his estate) are simply unliquidated.

My understanding is that the Federal Court Judge had advised you that this complaint was out there. But, in the event that you have not seen it, and in the spirit of being sure that you understand that there's not simply "supposition" about the claim, I wanted to be sure it was provided to you.



Cindy M. Johnson (managing member)
Johnson Legal Group, LLC
140 S. Dearborn St., Suite 1510
Chicago, IL 60603
Phone: (312) 345-1306 Ext. 101
Fax: (312) 345-1308

CONFIDENTIALITY NOTICE: This message, which contains information from a law firm, may be confidential and privileged. If you have received this communication in error, you are not the addressee, or you are not authorized to receive for the addressee, you may not use, copy or disclose the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.

**IN THE CIRCUIT COURT OF MARYLAND FOR ANNE ARUNDEL COUNTY**

| | | |
|---|---|---|
| **COMPASS MARKETING, INC.** | : | |
| **105 Eastern Avenue** | : | |
| **Annapolis, Maryland 21403** | : | |
| **(Anne Arundel County)** | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **Case Number: C-02-CV-230000601** |
| | : | |
| **DANIEL WHITE** | : | |
| **21900 Fairway Drive** | : | |
| **Leonardtown, Maryland 20659** | : | |
| **(St. Mary's County)** | : | |
| | : | |
| **MICHAEL WHITE** | : | |
| **39650 Hiawatha Circle** | : | |
| **Mechanicsville, Maryland 20659** | : | |
| **(St. Mary's County)** | : | |
| | : | |
| **GEORGE WHITE** | : | |
| **15125 Woodville Road** | : | |
| **Waldorf, Maryland 20601** | : | |
| **(Charles County)** | : | |
| | : | |
| **JAMES COLUMBUS "CHIP" DIPAULA JR.** | : | |
| **11 Devon Hill Rd, Unit 4B** | : | |
| **Baltimore, Md 21210** | : | |
| **(Baltimore County)** | : | |
| | : | |
| **PATRICK MILLER** | : | |
| **743 Bywater Road** | : | |
| **Gibson Island, Md 20008** | : | |
| **(Anne Arundel County)** | : | |
| | : | |
| **FLYWHEEL DIGITAL LLC** | : | |
| **1801 Porter Street Suite 300** | : | |
| **Baltimore, Maryland 21230** | : | |
| **(Baltimore City)** | : | |
| | : | |
| **ASCENTIAL PLC,** | : | |
| **The Prow, 1 Wilder Walk, London, England** | : | |
| **W1B 5AP** | : | |
| | : | |
| **INFORMA, PLC** | : | |
| **5 Howick Place** | : | |
| **London, SW1P 1WG, UK.** | : | |

1

|  | : |
| --- | --- |
| **OMNICOM GROUP, INC.** | : |
| **280 Park Avenue** | : |
| **New York, New York 10017** | : |
|  | : |
| **DEBRA WHITE** | : |
| **39650 Hiawatha Circle** | : |
| **Mechanicsville, Maryland 20659** | : |
| **(St. Mary's County)** | : |
|  | : |
| **KELLY KATHLEEN WHITE** | : |
| **15125 Woodville Road** | : |
| **Waldorf, Maryland 20601** | : |
| **(Charles County)** | : |
|  | : |
| **JULIE WHITE** | : |
| **93 Bartlett Avenue** | : |
| **Providence, RI 02905** | : |
| **(Providence County)** | : |
|  | : |
| **ALEXANDER MCCORD** | : |
| **2606 Light Street** | : |
| **Baltimore, Maryland 21230** | : |
| **(Baltimore City)** | : |
|  | : |
| **THE CITY OF ANNAPOLIS** | : |
| **A municipal corporation** | : |
| **160 Duke of Gloucester Street** | : |
| **Annapolis, Maryland 21401** | : |
| **(Anne Arundel County)** | : |
|  | : |
| **SERVE: D. Michael Lyles, Esq.** | : |
| **City Attorney** | : |
| **160 Duke of Gloucester** | : |
| **Annapolis, MD 21401** | : |
|  | : |
| **ANNAPOLIS POLICE DEPARTMENT** | : |
| **199 Taylor Ave** | : |
| **Annapolis, MD 21401** | : |
| **(Anne Arundel County)** | : |
|  | : |
| **SERVE: D. Michael Lyles, Esq.** | : |
| **City Attorney** | : |
| **160 Duke of Gloucester** | : |
| **Annapolis, MD 21401** | : |
|  | : |
| **MIGUEL DENNIS** | : |
| **7400 Lesada Drive Apt 2D** | : |

2

**Windsor Mill, Maryland 21244**    :
**(Baltimore County)**              :
                                    :
   *Defendant*s      :

---

## SECOND AMENDED COMPLAINT

Plaintiff Compass Marketing, Inc. ("Compass"), through its undersigned counsel, and pursuant to Maryland Rule 2-341 and the Scheduling Order entered in this action, hereby submits its Second Amended Complaint against Defendants Daniel J. White ("Daniel" or "Daniel White"), Michael R. White ("Michael" or "Michael White"), George White ("George" or "George White"), James Columbus "Chip" DiPaula, Jr. ("DiPaula"), Patrick Miller ("Miller"), Debra White ("Debra"), Kelly Kathleen White ("Kelly"), Julie White ("Julie"), Alexander McCord ("McCord"), Flywheel Digital, LLC ("Flywheel"), Omnicom Group, Inc. ("Omnicom"), Ascential PLC ("Ascential"), Informa PLC ("Informa"), the City of Annapolis, Maryland ("Annapolis"), Annapolis Police Department ("APD"), and Miguel Dennis ("Dennis"). In support of its Second Amended Complaint, Compass asserts as follows:

## NATURE OF THE ACTION

1.   Compass initiated this lawsuit to seek redress for extensive, pervasive, wrongful, and actionable misconduct by each of the named Defendants that continues to cause grievous financial harm to Compass, the value of which—based upon current assessments by damages experts—exceeds $24,000,000,000. Specifically, and at various times over the past ten years, the named Defendants entered and agreed upon an unlawful business conspiracy against Compass. The conspiracy agreed upon by the Defendants, who joined expressly or tacitly and at varying points in time, had two primary goals – 1) convert Compass's monies and assets; and 2) destroy Compass's business to conceal such conversion of property, including through the further

3

conversion of monies, the initiation of sham litigation, abject fraud concerning the fabrication of ghost employees on Compass's payroll, defamation and tortious interference to ruin Compass's business relationships, usurping Compass's trade secrets and confidential information, and—through unlawful competition and/or direct efforts to sabotage Compass's client and business relationships—subvert Compass's competitiveness in the eCommerce marketplace. In addition, this lawsuit seeks a declaration on the share ownership interests of Compass so that it can continue to operate without the cloud on ownership created by Defendants Daniel White and Michael White in an effort to divert attention and resources away from Compass's pursuit of the claims herein.

2.      Compass is a marketing company that was founded in 1998 prior to the rise of eCommerce platforms that fundamentally changed the way consumers interact with and purchase retail goods. At its start, Compass assisted Fortune 100 companies that sold consumer packaged goods ("CPGs") in brick-and-mortar stores. In 2005, as consumer reliance on the internet expanded, Compass added online marketing eCommerce services to its CPG clients to support sales to online retailers, including Staples.com, OfficeDepot.com, OfficeMax.com, SamsClub.com, Walmart.com, and Amazon.com.

3.      Compass is pursuing this action against Defendants to recover compensatory damages, punitive and exemplary damages, statutory damages, injunctive and declaratory relief, and fees and costs, among other relief, for Defendants' wrongful conduct as alleged herein. Compass asserts the following causes of action against the respective Defendants identified in each Count:  Breach of Fiduciary Duty; Fraud/Fraudulent Concealment; Constructive Fraud; Unjust Enrichment; Tortious Interference with Contract; Tortious Interference with Prospective Advantage; Conspiracy to Tortiously Interfere with Contracts; Conspiracy to Tortiously Interfere with Prospective Advantage; Conspiracy to Commit Fraud/Fraudulent Concealment; Aiding and Abetting Tortious Interference with Contracts; Aiding and Abetting Tortious Interference with

Prospective Advantage; Aiding and Abetting Fraud/Fraudulent Concealment; Conversion; Conspiracy to Violate the Maryland Stored Wire and Electronic Communications and Transactional Records Access Act; Aiding and Abetting Violation of Maryland Stored Wire and Electronic Communications and Transactional Records Access Act; Declaratory Judgment; Maryland Uniform Trade Secrets Act ("MUTSA"); Unfair Competition; Conspiracy to Misappropriate Trade Secrets; Breach of Contract; Conspiracy to Breach Contract; Conspiracy to Unfairly Compete; Aiding and Abetting Misappropriation of Trade Secrets; Aiding and Abetting Unfair Competition; and Violations of the Maryland Public Information Act.

## **THE PARTIES**

4.    Plaintiff Compass is incorporated in the Commonwealth of Virginia and is a foreign corporation registered with the State of Maryland. Its principal place of business is located at 105 Eastern Avenue, Annapolis, Maryland, 21403. At all relevant times herein, Compass has been in good standing with the Commonwealth of Virginia and State of Maryland.

5.    Defendant Daniel White is an individual and resident of St. Mary's County, Maryland. Daniel served as Compass legal counsel and acted as its General Counsel from 1998 until around November 23, 2018, and was a member of Compass's Board of Directors from 1998 to February 14, 2019. Although Daniel served as an executive for Compass, his full-time position was as a State Prosecutor in St. Mary's County throughout most of his employment with Compass. Daniel currently owns 150 shares of Compass, which represents approximately 16.7% of the shares of the company. Daniel is the brother of Compass's current CEO and Executive Chairman, John White (the majority shareholder of Compass), and of Defendant Michael White. Daniel White also is the uncle of Defendant George White. Daniel is married to Defendant Kelly White.

6.      Defendant Michael White is an individual and a resident of St. Mary's County, Maryland.  Michael was Vice President of Operations and Comptroller of Compass from 2011 until on or about November 23, 2018, and was a member of Compass's Board of Directors from 2011 until February 14, 2019.  Although Michael served as an executive for Compass, his full-time position was as a Maryland State Trooper, and he later served as an Orphans' Court Judge.  Michael currently owns 150 shares of Compass, which represents approximately 16.7% of the shares of the company.  Michael is the brother of Compass's current CEO and Executive Chairman, John White (the majority shareholder of Compass), and of Defendant Daniel White.  Michael White also is the father of Defendant George White. Michael is married to Defendant Debra White.

7.      Defendant George White is an individual and resident of Charles County, Maryland.  George worked at Compass managing Compass's IT systems from on or about January 1, 2004 to on or about April 29, 2019.  While employed by Compass, George also was employed full-time as a Maryland State Trooper.  George is the son of Defendant Michael White, and the nephew of Defendant Daniel White.

8.      Defendant James "Chip" DiPaula is an individual and resident of Baltimore County, Maryland.  According to DiPaula's LinkedIn profile he served Compass as Senior Vice President of Business Development from March 2010 to March 2012, and as Executive Vice President managing the Compass eCommerce team from 2012 until his resignation. Prior to resigning from Compass, on September 4, 2014, DiPaula formed Flywheel Digital, LLC ("Flywheel"), with Defendant Patrick Miller.

9.      Defendant Patrick Miller is an individual and resident of Anne Arundel County, Maryland.  Miller was Vice President of Digital Strategy for the Compass eCommerce team from on or about January 31, 2011 until he resigned from the company. Prior to resigning from Compass, on September 4, 2014, Miller formed Flywheel Digital, LLC ("Flywheel"), with Defendant

6

DiPaula.

10.     Defendant Flywheel is a Maryland limited liability company licensed to do business in the State of Maryland.  Its principal place of business is located at 1801 Porter Street, Suite 300, Baltimore, Maryland 21230.  Flywheel is an eCommerce marketing company founded and developed using Compass's embezzled funds, and stolen trade secrets, proprietary information, and know-how. DiPaula and Miller incorporated Flywheel on or about September 3, 2014, the day before they both resigned from Compass and approximately thirty-six (36) days before leaving Compass.

11.     Defendant Ascential is a public limited company in the United Kingdom, with its principal place of business at The Prow, 1 Wilder Walk, London, England W1B 5AP. Prior to its delisting on the London Stock Exchange and acquisition by Defendant Informa, Ascential operated offices internationally and throughout the United States, including in Maryland. Ascential acquired Flywheel on or around November 1, 2018.

12.     Defendant Informa is a public liability company in the United Kingdom, with its principal place of business at 5 Howick Place, London, SW1P 1WG, United Kingdom.  In or around October of 2024, Informa completed its acquisition of Ascential, and, on information and belief, assumed its debts and liabilities, including Ascential's legal liability to Compass for trade secret misappropriation and/or conspiracy to commit business torts against Compass.

13.     Defendant Omnicom is a New York corporation with its principal place of business located at 280 Park Avenue, New York, New York 10017.  As a global marketing and corporate communications company, Omnicom operates throughout the United States, including in Maryland.  Omnicom acquired Flywheel, a Maryland LLC based in Baltimore, Maryland, in or around October of 2023.

14.     Defendant Julie White is an individual and resident of the State of Rhode Island. Despite never performing employment services for Compass, Julie White, a current Assistant United States Attorney for the District of Rhode Island, was covertly included on Compass's email system by Defendants Daniel and Michael White and unlawfully accepted wages from Compass in furtherance of an overarching conspiracy.

15.     Defendant Kelly White is an individual and resident of Charles County, Maryland, and the wife of Defendant Daniel White. Despite not performing employment services for Compass, Kelly White, was covertly included on Compass's payroll by Defendants Daniel and Michael White and unlawfully accepted wages from Compass in furtherance of an overarching conspiracy.

16.     Defendant Debra White is an individual and resident of St. Mary's County, Maryland, and the wife of Defendant Michael White. Despite not performing employment services for Compass, Debra White, was covertly included on Compass's payroll by Defendants Daniel and Michael White and unlawfully accepted wages from Compass in furtherance of an overarching conspiracy.

17.     Defendant McCord is an individual and resident of Baltimore County, Maryland, and the current Chief Executive Officer of Flywheel, and former-Compass employee.  McCord, upon information and belief, aided and abetted Omnicom's purchase of Flywheel in 2024, and thereby the companies' respective acquisition of trade secrets.

18.     Defendant City of Annapolis is a municipal corporation and local government entity located in Anne Arundel County, Maryland.  The City received written notice dated January 17, 2025, in compliance with the Local Government Tort Claims Act of the claims detailed herein prior to its joinder to this action.

19.     Defendant Annapolis City Police Department is a local government agency located

in Anne Arundel County, Maryland. The APD received written notice dated January 17, 2025, in compliance with the Local Government Tort Claims Act of the claims detailed herein prior to its joinder to this action.

20.     Defendant Miguel Dennis is an individual and resident of Anne Arundle County, Maryland.   Mr. Dennis is currently the Public Information Officer of the Annapolis Police Department, and, as detailed herein, his violations of law were committed through his misuse of this official capacity.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over each of the Defendants in this action pursuant to MD. CODE CTS. & JUD. PROC. § 6-102 and/or MD. CODE CTS. & JUD. PROC. § 6-103.

22.     Venue is proper before this Court pursuant to MD. CODE CTS. & JUD. PROC. § 6-201(b).

## FACTUAL BACKGROUND

### Compass's Ownership and Management Structure

23.     At its inception, Compass was owned by three individuals: John White, who served as the company's CEO and was issued 300 shares; Daniel White, who was issued 300 shares; and Robert Morgan, who was issued 300 shares.

24.     During a meeting held on June 11, 2001, an additional 300 shares were issued to John White in exchange for a convertible note that was issued to John White. After these additional shares were issued, John White held 600 shares of Compass.  The issuance of these additional shares to John White were reflected in the minutes of the meeting that day, as well as a new stock certificate issued in connection with the additional shares.

25.     During the same meeting on June 11, 2001, Daniel White gifted 150 of his shares to his brother Michael White.  Two new stock certificates were issued as a result, one to Daniel White for 150 shares and one to Michael White for 150 shares (and Daniel White's old stock

certificate for 300 shares was exchanged and retired).

26.    After the June 11, 2001 meeting, Compass's share ownership was as follows:  John White had 600 shares; Robert Morgan had 300 shares; Daniel White had 150 shares; and Michael White had 150 shares.

27.    In or about March 2004, Robert Morgan surrendered his 300 shares of Compass to the company, leaving the outstanding share balance as follows:  John White with 600 shares (approximately 66.7% of the shares); Daniel White with 150 shares (approximately 16.7% of the shares); and Michael White with 150 shares (approximately 16.7% of the shares).

28.    Since Robert Morgan surrendered his shares of Compass in or about March 2004, no other shares of Compass have been validly issued or transferred.  In other words, there has been no transaction since Robert Morgan surrendered his shares of Compass in or about March 2004 that would or did alter the ownership interests of Compass and its respective shareholders.  The stock ownership interests of John White, Daniel White, and Michael White described in the previous paragraph have remained unchanged since Robert Morgan surrendered his shares of Compass in or about March 2004.

29.    As the majority owner, John White managed sales and ran the Company as CEO and Chairman.  As the only attorney and Certified Public Accountant ("CPA") in the family, Daniel White oversaw and was responsible for the legal functions (serving as the company's General Counsel) and accounting functions.  Michael White directed operations and finances.

30.    While John served as CEO, he entrusted Michael with oversight of day-to-day operations, reasonably believing that Michael would act in the company's best interests as  an officer, shareholder and agent of Compass.

31.    As Vice President of Operations and Comptroller of Compass, Michael was the sole administrator of Compass's payroll and served as the sole trustee of the company's 401(k)

plan. His responsibilities also included exclusive oversight of the bookkeeping and financial accounts. Michael also worked with Daniel and an outside CPA (named Colin Robertson) to prepare and file Compass's annual income tax returns. Daniel and Michael each owed a fiduciary duty to Compass as employees.

32.     In addition, Daniel and Michael owed fiduciary duties to Compass in their capacity as officers and Board members. Further, Daniel, as an attorney licensed in Maryland, was required to follow the Maryland Attorneys' Rules of Professional Conduct.

<u>Background About Compass and How it Grew</u>

33.     Compass was founded on or about February 4, 1998, as a marketing company for consumer-packaged goods companies ("CPGs"). CPGs are products that customers consume and replace on a frequent basis. Examples of CPGs include beverages, cosmetics, and cleaning products.

34.     Compass became a very successful company. Eventually it grew to employ approximately 100 employees, serving multinational corporations.

35.     In 2005, Compass added online marketing eCommerce services to its CPG clients to support sales to online retailers, including Staples.com, OfficeDepot.com, OfficeMax.com, SamsClub.com, Walmart.com, and Amazon.com.

36.     The eCommerce expansion was a quick success. Compass represented iconic brands such as Splenda, Duracell, Neutrogena, Band Aid, Motrin, and Tylenol across Amazon, Target, Walmart, and Staples internet platforms, among many others listed below. Its revenue increased more than 1300% in six years, increasing from $284,894 in 2002, to $3,779,203 in 2008.



37.    John White recognized in the early 2000s that family norms in America had changed such that single family income was being replaced by dual family income (both members of a couple working). With Americans spending more time outside of the home, John White presciently anticipated that consumer behavior would continue to shift towards the convenience of purchasing consumer goods online.

38.    Compass saw Amazon as the future of eCommerce, correctly predicting by 2013 that "[t]he number of consumers researching or shopping online is steadily growing and will surpass 200 million by 2015." Compass understood that "Amazon customers are driven to purchase based on price, selection and convenience." Compass foresaw that pricing is "critical," but "shoppers are looking to save both time & money by shopping online." Compass was studying those "core drivers" that were "very important" to fueling the imminent online shopping explosion:



39.    Compass was introduced to Amazon, which at the time was an internet bookstore looking to expand its portfolio of products offered into the online shopping market by adding CPG products. Compass then began helping its CPG clients position, advertise, and sell products to online retailers, including on www.amazon.com (hereinafter, the "Platform" or "Amazon platform"). It was an instant success. Within several years, Compass had a dedicated eCommerce Department that served the biggest CPG manufacturers in the world on the Amazon platform, as well as on the Staples, Office Depot, and other online retailer platforms.

40.    Compass predicted Amazon's success resulting from the ongoing online explosion coming a decade before it arrived. Compass estimated, based on internal Amazon data in 2013, that

Amazon.com would be a 50 billion dollar business in the US by 2022. The actual growth has exceeded even Compass's ambitious growth projections.



41.    Compass also predicted the sales opportunity in Amazon's nascent specialty channels, such as Amazon Fresh (groceries) and Amazon Supply (office supplies), and in the data-rich search and social platform Amazon was building. The unique monthly visitors Amazon had in 2013 was 104 million in the US alone. Compass knew that optimizing its search campaigns for its clients would add value, so Compass built unique processes and formulas to optimize its clients' campaigns. Today, Amazon's unique monthly visitors total more than 2.5 billion worldwide.

42.    Compass spent years and invested substantial resources perfecting its proprietary business methods, processes, and platform communication strategies to allow Compass to drive sales of its clients' products, including on the Amazon platform. Prior to 2016, Amazon offered no back-end automation or application programming interface ("API") for sellers on its Platform. Consequently, Compass created an integrated set of processes to manually interact with the

Platform. The Compass eCommerce team developed deep expertise by, among other things, downloading Amazon data, querying that data through keyword searches, and then manually entering data inputs into Compass internal spreadsheets and software to develop proprietary formulas, methods, strategies, and tools (including formulas) to interact with the Platform.

43.     Compass positioned itself to be at the forefront of non-traditional channels of distribution for CPGs. Compass was at the ground level in assisting its clients to increase distribution and sales through eCommerce. In 2013, Compass positioned itself at the intersection of core growth areas underpinning eCommerce: sales, analytics, marketing, and logistics.



44.     Compass's early adoption of an eCommerce focus uniquely positioned the Company to grow alongside Amazon and other platforms. In 2013, Compass was primed for unparalleled success.



45.     By 2013, Compass was deeply invested in its partnership with Amazon, and that investment was paying dividends.  Compass relied on its knowledge of best practices regarding how to compete in this new retail channel, while advising clients how to compete.  Compass also partnered with Amazon to launch the "Add-on Store" that has now become a ubiquitous part of the Amazon shopping experience:



46.     Compass distinguished itself in the market by analyzing internal Amazon data, such as "market basket" data, to determine how to drive sales of its clients' products.  The Company's

analytics skillsets deepened such that by manually assessing Amazon data, Compass developed proprietary methods and protocols to increase page views and drive conversion that would have been unachievable otherwise.  Compass's clients were realizing astounding results by 2013 as a direct result of Compass's trade secrets and proprietary business know how.



Compass Built Out Its Operations to Assist Clients on the Amazon Platform

47.    Compass, due in large part from the massive early success of its eCommerce Department, secured significant growth from 2005 to 2014.  By 2014, Compass had more than 60 employees in 15 cities in the United States and abroad.  Compass made significant operational investments in its eCommerce Department, including a college intern program specifically set up to recruit and hire students from the University of Maryland to focus on eCommerce.

48.    By 2014, Compass had expanded its eCommerce services to support its clients' businesses internationally, and it launched its services in Canada, the United Kingdom, France, Germany, and Japan.  On behalf of Compass, Miller visited Amazon's United Kingdom headquarters, and DiPaula and John White visited India, along with its client Proctor & Gamble

17

("P&G"), to explore eCommerce in India. DiPaula oversaw Compass's efforts to hire a team in and expand into China, including by directing Compass employees to visit Alibaba in China.

49.     On or about March 1, 2010, Compass hired Chip DiPaula as Executive Vice-President of the International Division.

50.     On or about January 31, 2011, Compass hired Patrick Miller as Vice President of Digital Strategy for the Compass eCommerce team.

51.     When DiPaula and Miller joined Compass, neither had any substantive experience or familiarity with the CPG industry or the emerging eCommerce space.  Compass trained DiPaula and Miller on its proprietary business methods, processes, and platform communication strategies. DiPaula and Miller emerged as what Compass then believed to be trusted senior executives who ran the fastest growing part of Compass.

52.     DiPaula and Miller signed employment agreements that included certain post-employment restrictions stating:

    a.     Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where recognized by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged.

    b.     During the period of Employee's employment with COMPASS and for a period of two years following the termination of Employee's employment, regardless of the reason for termination, Employee shall not, directly or indirectly: (i) induce or encourage any employee of COMPASS to leave the employ of COMPASS, (ii) hire any individual who is or was an employee of COMPASS as of the date of employee's termination of employment or within a one year period prior to such date, or (iii) induce or encourage any customer, client, potential customer, potential client and/or other business relation of COMPASS to not do business or cease or reduce doing business with COMPASS or in any way interfere with the relationship between any such customer, client, potential client, supplier or other business relation and COMPASS.

53.    As part of routine employee onboarding, Compass gave each of DiPaula and Miller an Employee Handbook ("the Handbook").  The Handbook also prohibited

> Theft, misappropriation or unauthorized possession or use of property, documents, records or funds belonging to the Company, or any client or employee; removal of same from Company premises without authorization.

> Divulging trade secrets or other confidential business information to any unauthorized persons or to others without an official need to know.

> Obtaining unauthorized confidential information pertaining to clients or employees.

54.    Miller was especially familiar with the Compass Employee Handbook and the Company's expectations regarding handling of confidential and trade secret information because in his supervisory role, he was tasked with enforcing Handbook policies with subordinates on the eCommerce team.

55.    In 2012, DiPaula was promoted to Executive Vice President of the eCommerce team.



<u>Compass Developed Valuable Trade Secrets and Proprietary Business Know How</u>
<u>that Positioned it for Success</u>

56.    Before DiPaula and Miller took the helm, the Compass eCommerce team forged

19

relationships with the biggest CPG manufacturers in the world. Compass stood out as a resource for CPG manufacturers because while eCommerce remained a nascent field, access to consumer sales data was extremely limited. It therefore required substantial effort to first gain access and then unpack the consumer sales data that was instrumental to successfully marketing and selling products on eCommerce platforms.

57.    Access to the Amazon.com platform is especially scarce and, in its early years, access to Amazon's data was even more limited. Compass was one of a very few companies with a close enough relationship to Amazon suppliers to have been recognized as a certified Amazon partner and to therefore have access to receive real time Amazon consumer search, sales, and supply chain data. Because of Compass's unique and diverse client portfolio, Compass was granted access to Amazon vendor sales data beginning in 2011.

58.    As an Amazon vendor partner, Compass manually pulled Amazon data on behalf of its clients, by logging in with authorization to a restricted Amazon portal known as Amazon Vendor Central. From the inception of Compass's access to Amazon sales data in 2011 until around 2016, software tools were not available to automate review of the data. Compass had to manually download and review client sales information provided in Amazon reports by custom building proprietary formulas into excel spreadsheets.

59.    For more than a decade, Compass exerted significant time, resources, investment, and employee effort to analyze the Amazon sales data and eCommerce algorithms in order to build its proprietary formulas and platform. Its diversified client portfolio allowed Compass to study a high enough volume of client sales reports provided by Amazon to permit Compass the unique ability to understand and discern what pricing, promotions, and search strategies optimized sales and profitability for its clients. Over a long period of time, Compass compiled enough information to understand how Amazon interacted with consumers through promotional tactics to increase or

drive those consumers' purchases on Amazon.  Compass was specifically able to determine which Amazon promotional vehicles deliver the most value and under what circumstances.

60.     These determinations and data-driven insights enabled Compass to effectively advise clients on the entire Amazon process.  Compass understood all aspects of the sales/marketing strategy for CPGs selling to consumers on Amazon, including when products were likely to sell, how to stock inventory by season, how to forecast for upcoming quarters, and how to interact with Amazon on critical supply chain details.

61.     Compass's intricate understanding and years of dedicated research and investment allowed it to build out work product that described the proprietary business methods, processes, and platform communication strategies that were protected as trade secrets.

62.     By 2014, Compass's services to clients were informed by a scientific approach to achieving success for CPGs on the Amazon platform.  Compass had dissected the Amazon sales data to look "under the hood" of each Compass client's vendor account at Amazon, as Amazon's algorithms affected all vendor sales dramatically.  This unique line of sight into platform minutia allowed Compass to develop and offer clients unparalleled advice and services in the core areas such as search optimization, merchandizing, pricing, content, graphic design, and supply chain operations. Each area of service was optimized with Compass's proprietary system.

63.     Compass converted its unique line of sight into the Amazon platform into a significant business opportunity.  Prior to the tortious conduct that launched Flywheel, Compass was dominant in marketing the eCommerce space.

64.     Unbeknownst to Compass at the time, Flywheel began offerings identical to services Compass offered to the same eCommerce market.  Flywheel was only able to compete with Compass because Flywheel misappropriated the foundational information that Compass compiled and developed for more than a decade in order to assist clients in navigating eCommerce

platforms, and especially the Amazon platform.

<u>The eCommerce Guide Teaches the Compass Trade Secrets and Compass Implemented
Reasonable Measures to Protect These Valuable Assets</u>

65.     In November 2013, at John White's direction and after DiPaula and Miller joined
the eCommerce Department, the eCommerce team created the Compass eCommerce Guide ("the
eCommerce Guide").  The eCommerce Guide compiled Compass's trade secret, proprietary and
confidential Amazon protocols into a step-by-step guide used to train the Compass eCommerce
team and to execute on Compass's business strategy.  The eCommerce Guide memorialized the
years of research and work that Compass had invested to develop its proprietary processes
designed to increase and maximize its clients' sales on Amazon and other consumer sales
platforms.

66.     A sample of representative trade secret categories disclosed or referred to in the
eCommerce Guide include:

- Methods Compass has used and on which it continues to rely to interact with the
  back end of Amazon.com, known as vendorcentral.amazon.com, through its ASIN;

- Processes and communication strategies Compass has used and on which it
  continues to rely to interact with the back end of Amazon.com to enhance the
  visibility of its CPG clients' brands on the Amazon platform, including product
  positioning in response to user searches;

- Methods and communication strategies Compass has used and on which it
  continues to rely to interact with the back end of Amazon.com to implement
  strategic pricing;

- Processes and communication strategies Compass has used and on which it
  continues to rely to optimize efficiencies for clients in navigating the Amazon

supply chain, including processes to ensure on time arrival of products purchased on the Amazon platform;

- Methods Compass has used and on which it continues to rely to generate a "vendor score card" for its CPG clients that positions the products on the Amazon platform for maximum visibility by users;

- Methods, protocols, and communication strategies Compass has used and on which it continues to rely to generate pricing values for its CPG clients offering products on the Amazon platform that incorporate past sales activity, cost of goods sold, supply chain costs, and packaging costs into the recommended user-facing pricing values;

- Compilation of protocols to assist CPG clients navigating the competitive eCommerce landscape (*e.g.*, implementing target marketing, predicting user purchasing behavior, pricing products relative to competitors, increasing the rate of conversion, and improving supply chain efficiency);

- Methods and protocols Compass has used and on which it continues to rely to dissect Amazon sales data to generate pricing and forecasting recommendations for its CPG clients;

- Methods and formulas Compass has used and on which it continues to rely to generate a proprietary "Master Client Sheet" for each CPG client so as to optimize its positioning and sales offerings on the Amazon platform; and

- Formulas Compass has used and on which it continues to rely, including the "base equation," that automatically update data inputs in a client's "Master Client Sheet."

67. At the time of the first trade secret theft by DiPaula and Miller, the representative trade secret categories disclosed or referred to in the eCommerce Guide were maintained in a PowerPoint format that was descriptive of data stored, analyzed, and manipulated in corresponding spreadsheets.

68. Today, the representative trade secret categories disclosed or referred to in the eCommerce Guide have been migrated to a software tool known as the Compass Digital Analytics Program ("CDAP"). CDAP is an application platform for building and managing data applications and training videos in hybrid and multi-cloud environments.

69. Compass adapted its CDAP to automate the same processes that Compass was undertaking manually at the time of the original trade secret theft by DiPaula and Miller in 2014.

70. Given the value of the trade secrets within the eCommerce Guide, Compass implemented safeguards to ensure that the information was protected. For example, Compass limited access to only the employees working in Compass's Amazon Division of the eCommerce Department. The Amazon Division never consisted of more than 25 employees. The Amazon Division was housed in a single physical location in Annapolis, Maryland.

71. During new employee training for the eCommerce Department, Compass informed each individual that its processes are highly confidential and not to be shared with employees outside the eCommerce Department. New employees were required to complete a course to learn the confidential, proprietary, and trade secret information, including how such intellectual property should be handled. Once the new employee completed their training, Compass instructed them that they would be working in a separate branch of Compass. This ensured that the confidential, proprietary, and trade secret information never left the domain of the eCommerce team.

72.    Compass kept only one hard-copy version of the eCommerce Guide, which was stored in a single secure room accessible only to the members of the eCommerce Department. Compass restricts access to the room by lock and key.  No employee was permitted to remove the eCommerce Guide from the building. Compass has continuously implemented to this day these safeguards to ensure that the information is protected.

73.    During the relevant time period, only DiPaula, Miller and individuals on the eCommerce team had an electronic copy of the eCommerce Guide. Access required a username and password.

74.    Today, only two Compass employees have access to the CDAP source code that automates the same processes that Compass was undertaking manually at the time of the first trade secret theft by DiPaula and Miller in 2014.

75.    Compass did not share and has not shared the trade secrets within the eCommerce Guide or CDAP with its clients, even those clients it advises regarding the Amazon platform.

76.    As further outlined in this Second Amended Complaint, Compass discovered that former Compass executives DiPaula and Miller misappropriated the trade secrets described herein in or around September 2014 and used Compass trade secrets and funds to form Flywheel to compete unfairly with Compass.  Flywheel's success has been the direct result of its ongoing use of Compass's valuable trade secrets.  Flywheel's subsequent purchasers, Ascential and Omnicom, were and/or are aware of Flywheel's wrongful origins (including being notified by Compass of such wrongful origins) and have taken no steps to mitigate the damage to Compass or otherwise correct the continued trade secret misappropriation and unfair competition.  Flywheel and Omnicom continue to use Compass's trade secrets and compete with Compass unfairly.

<u>DiPaula & Miller Secretly Founded a Competing eCommerce Marketing Company
Called Flywheel</u>

77.     In 2014, DiPaula and Miller quit Compass.

78.     On or about September 3, 2014, the day before they resigned from Compass and unbeknownst to Compass, DiPaula and Miller formed Flywheel with the Maryland Secretary of State in furtherance of their secret plan to solicit and divert Compass's client base and business pipelines and to steal virtually all of Compass's most critical eCommerce trade secrets, including those specific to growing the Amazon account as detailed in Compass's eCommerce Guide.

79.     DiPaula and Miller offered to extend their two-week notice to more than a month to help "transition" tasks/projects. Believing DiPaula and Miller would act consistent with their fiduciary duties to Compass, Compass approved their request to extend their two weeks of notice to continue working at Compass well into October 2014.  It is only now believed that this request for an extension was not to assist with a smooth transition of responsibilities as they purported, rather solely for the purpose of Miller and Dipaula covertly stealing Compass trade secrets.

80.     On or about October 1, 2014, less than one month after submitting their notices of resignation to Compass, DiPaula emailed John White to ask if DiPaula and Miller could purchase the eCommerce Department:  "Patrick and I remain interested in the spin-off concept, as we feel vested in our colleagues we recruited and trained, and the clients we have nurtured these past few years."

81.     In the October 1, 2014, email, unbeknownst to Compass, DiPaula misrepresented to Compass the true projected value of the Amazon eCommerce business by stating it would be a "break-even year for the division." DiPaula also failed to include or even note a revenue projection compiled by Miller in November 2013 that forecasted more than $1 billion in sales revenue from Compass's eCommerce customers by 2023.  The difference between purporting it was worth breakeven, or zero, vs the $1 billion annually it was really worth is but one example of the extensive

concealment of the fraud. The graph below shows it is reasonable to conclude a corrupt motive to steal the trade secrets was the enormous projection of Compass's future ecommerce marketing revenue only Miller, and DiPaula, and likely Daniel and Michael White knew about.



82.      While continuing to conceal their true plan to solicit and divert Compass's client base and business pipelines and to steal virtually all of Compass's most critical eCommerce trade secrets in furtherance of their plan to compete unfairly with Compass, DiPaula again emailed John White on or about October 8, 2014, expressing his "disappointment with the pace of [Compass'] response" and emphasizing "the urgency of completing an agreement quickly," reiterating his and Miller's desire to purchase and own Compass's eCommerce business and all of its associated trade secrets and proprietary information and know-how.

83.      Compass elected to not sell its eCommerce division and intellectual property to DiPaula and Miller.  Unbeknownst to John White and Compass, DiPaula and Miller had already stolen Compass's trade secrets, proprietary information and know how, and intended to actively use such for Flywheel's benefit whether or not Compass agreed to DiPaula and Miller's proposed purchase of the eCommerce division.

84.    With respect solely to the question concerning whether Compass should seek to enforce the non-solicitation provisions in the DiPaula and Miller employment agreements, and with no corresponding knowledge or suspicion that DiPaula and Miller would be competing unfairly with Compass or had stolen Compass's trade secrets, proprietary information and know-how, John White presented the emails to Daniel White, Compass's acting General Counsel, and sought legal advice regarding how the Company should proceed. Daniel White advised John White that Compass should not pursue legal action against DiPaula and Miller for violations of their agreements, and should instead focus on maintaining its position in the marketplace, where Compass's trade secrets and proprietary information and know-how provided Compass with such a substantial competitive advantage in comparison to a newly formed business like Flywheel.

85.    At that time, John White had no reason to question Daniel White's loyalty to Compass as its General Counsel, officer and shareholder, whether any conflict of interest existed, or believe Daniel had entered an unlawful conspiracy with DiPaula, Miller, and Michael White to set up and fund an operation to steal Compass's intellectual property. As a result, John followed Daniel's legal advice not to investigate or otherwise pursue DiPaula or Miller.

86.    John White's decision to follow the legal advice of the company's General Counsel to not pursue legal action in 2014 against DiPaula and/or Miller in connection with their non-solicitation agreements, and instead focus on Compass's business, was reasonable. At the time, John White had no reason to believe DiPaula and Miller had improperly acquired and/or were using Compass's intellectual property, including its trade secrets and confidential information, to operate a competing business. At the time, John White also did not have reason to believe that Daniel White had breached his fiduciary duties to Compass by engaging in a conspiracy with Flywheel, DiPaula and Miller to steal Compass's assets.

87.     Further, because DiPaula and Miller had executed agreements prohibiting their use of Compass's proprietary information to which they had gained access during their Compass employment, John White and Compass presumed that DiPaula and Miller would abide by these legally enforceable, post-employment obligations to Compass and would not create or operate a competing business using stolen trade secrets and confidential information in violation of their common law and contractual obligations.

88.     Following Daniel's advice, Compass did not expend resources investigating DiPaula or Miller or bring any legal action for breaches of DiPaula's and Miller's agreements. Instead, Compass focused on leveraging its status as a fixture in the eCommerce industry, with over a decade of established client relationships and a dedicated eCommerce department with long developed and incredibly valuable and protectable intellectual property. Compass's decision not to bring legal action at the time was entirely reasonable given said decision was made on the advice of its General Counsel (Daniel White) and DiPaula and Miller had concealed their plan to compete using Compass's trade secrets and confidential information. Further, even after Flywheel emerged as a newcomer to the industry, Compass did not believe Flywheel posed a competitive threat given it had no established clients, personnel experienced in eCommerce or intellectual property of its own, and its owners had legal obligations not to misappropriate or use intellectual property to which they gained access by virtue of their Compass employment.

89.     However, unbeknownst to Compass, in October 2016, DiPaula and Miller recruited several members of the Compass eCommerce team to Flywheel, one being Defendant Alexander McCord.

90.     McCord was initially hired as a college intern at Compass and assigned to work for Defendants Miller and DiPaula in the ecommerce digital marketing department. In or around November of 2023, Defendant McCord gave an interview confirming that he had *no* ecommerce

marketing experience before joining Compass.

91.    On information and belief, the research and development that Defendant McCord references in his November 2023, interview, and that he admits he learned at Compass, was the confidential and proprietary foundational technology and trade secrets about Amazon.

92.    As a member of Compass's digital marketing department, McCord had access to Compass's Amazon-related trade secrets.

93.    Pursuant to Compass's standard practices, as a condition of his employment with Compass, Defendant McCord executed a non-disclosure agreement prohibiting his use and/or disclosure of any Compass proprietary information not known to the public, and thus he is, as of the date of this filing, barred from disclosing such information pursuant to his non-disclosure agreement.

94.    However, on information and belief, Defendant McCord violated and continues to violate his non-disclosure agreement by sharing proprietary information to Flywheel, as well as the company's subsequent purchasers, Ascential (now Informa) and Omnicom.

95.    In addition to this proprietary information, the departing Compass employees took with them a specialized training manual detailing Compass's proprietary eCommerce methods and processes, and, on information and belief, left with electronic and hard copy files that memorialized Compass's trade secret, proprietary, and confidential information regarding maximizing sales on Amazon—the crowning achievement of Compass's eCommerce business.

96.    Rather than compete fairly, DiPaula and Miller secretly leveraged the collective knowledge of this group of former Compass employees—Justin Liu (eCommerce Account Manager), Andrew Fox (eCommerce Account Manager), Mike O'Donnell (eCommerce Strategist), Alex McCord (Vice President and Accounts Manager of eCommerce), Dayna Acevedo (formerly Dana Bernard) (Chief of Staff), and Mike Menefee (eCommerce Account Executive)—

and the trade secrets and proprietary business know-how that had been stolen, as well as the embezzled funds from Compass, to build out and operate Flywheel as a successful enterprise with the intent of directly competing with Compass and interfering with Compass's business opportunities and client relationships.

97.     Unbeknownst to Compass, Flywheel began using Compass's trade secrets to specifically target Compass clients that worked with the former Compass employees and has been successful in converting some of them to Flywheel clients.  Specifically, by basing Flywheel's services on Compass's stolen trade secrets and proprietary business know how, Flywheel offered and continues to offer services identical to those offered by Compass.  Moreover, by relying on Compass's trade secrets that it misappropriated, Flywheel was able to rapidly accelerate, or avoid altogether, the research and development required to provide these services and that had taken Compass over a decade to formulate and implement. Compass could not and did not learn of these efforts because Flywheel concealed its clients and services from the public and because, as is customary in the industry, clients and agencies were under nondisclosure agreements that precluded them from identifying with whom they were working, including Flywheel.

98.     Flywheel's achievements are not a business success story, but rather are attributable to DiPaula's, Miller's, Daniel White's, and Michael White's long-secret scheme to steal Compass's most valuable trade secrets and proprietary business know-how to unfairly compete with Compass.

99.     Given the departure of Compass's eCommerce employees in late 2016, John White again brought his concerns to Daniel White and asked for legal advice concerning whether Compass could pursue DiPaula, Miller, and Flywheel for non-solicitation issues associated with the 2016 solicitations. Once again, Daniel advised Compass against pursuing legal action, advising that the two-year restriction on the DiPaula and Miller agreements had expired and that there was no objective reason to believe DiPaula, Miller and/or Flywheel were engaged in unlawful conduct.

In fact, Daniel told John that Daniel would not participate in any legal action against the former employees, DiPaula, Miller, or Flywheel, and if Compass wished to investigate and/or pursue the claims, it would need to hire outside counsel to do so. Unbeknownst to Compass at the time Daniel White gave this advice, Daniel (in collaboration with his brother Michael) had already partnered and conspired with DiPaula and Miller to secretly provide them with embezzled funds from Compass (as described below in the Flywheel Severance Scheme) to help set up and operate Flywheel to leverage their theft of trade secrets and confidential information to compete unfairly with Compass.

100.    At the time, Compass was unaware of Daniel's involvement in Flywheel, his conflict of interest, or the real reasons (as set forth below) why his legal advice was aimed to prevent the company from pursuing non-solicitation litigation at that time and/or further investigating Flywheel's operations. As a result, Compass followed the legal advice of Daniel, its General Counsel (who had an undisclosed conflict of interest) and decided not to pursue non-solicitation legal remedies or to investigate further at that time.

101.    What Compass (i) did not know in 2014, (ii) did not and could not have known when DiPaula and Miller launched Flywheel, (iii) did not and could not have known when DiPaula and Miller resigned from Compass, and (iv) did not and could not have known later in 2016 when DiPaula and Miller poached much of Compass's eCommerce talent, was that DiPaula and Miller, with embezzled funds from Compass, secretly built Flywheel upon the trade secret information and proprietary business know-how that rightfully belonged to Compass following more than a decade of intensive and expensive research and development. Indeed, due to extensive and ongoing efforts by DiPaula, Miller, Daniel White and Michael White to conceal this unlawful conduct, Compass did not learn until 2020 that DiPaula and Miller stole and used Compass materials to build out Flywheel as an enterprise to eventually offer services identical to those offered by

Compass, and to identical Compass clients and customers.

102.    From its inception, though unbeknownst to Compass, DiPaula and Miller, through Flywheel, conspired to compete unfairly, by using Compass's secretly stolen intellectual property, while concealing their fraud by spreading false information about Compass, all the while poaching certain Compass clients and customers and claiming not to be competing.

103.    By the time the extensive and brazen conspiracy by DiPaula, Miller, Daniel, and Michael was discovered, and Compass initiated an investigation into it and the surrounding misconduct discovered as set forth in this Amended Complaint, Flywheel had leveraged the Compass embezzled funds, and stolen trade secrets and proprietary information to turn itself into what Compass *had been* considering its growth trajectory for many years and its invaluable intellectual property.

104.    In just a few years, the startup Flywheel successfully capitalized upon its theft and the fiduciary and contractual breaches of its leadership to emerge as a target for acquisition by the UK-based, international conglomerate Ascential.  Ascential either knew or should have known of Flywheel's brazen origins, or it acted in reckless disregard of facts that it should have investigated in connection with its due diligence, which closed in or about November 2018.  Ascential rewarded the theft and misconduct by paying up to $400 million to acquire Flywheel, with an up-front payment of $60 million and the possibility of as much as an additional $340 million based on contingencies tied to aggressive growth performance metrics.  Tellingly, the structure and payment terms of the Ascential acquisition created a strong financial incentive and motive for Flywheel to continue its fraudulent concealment, as well as its poaching of Compass clients through the misuse of Compass's trade secrets and confidential information.  Ascential has had to restate its estimated cost of the acquisition because of the extraordinary growth of Flywheel since the purchase, all of which is based on core intellectual property stolen from Compass.

105.    Notwithstanding Compass having informed Ascential's executive management and Board of Directors of the material facts underlying the theft and wrongful conduct by Flywheel, DiPaula and Miller, Ascential elected to act in concert with Flywheel to further the misappropriation of Compass's trade secrets and proprietary business know how, unfairly compete with Compass, conceal the theft, sabotage Compass's business, and perpetuate the widespread fraud that drove Flywheel's and Ascential's success.

106.    In 2024, Flywheel and Compass's trade secrets were once again the subject of a new acquisition when Omnicom purchased the division from Ascential for approximately $830 million.  Again, and despite Omnicom having actual or constructive knowledge that it acquired Compass's stolen trade secrets and confidential information through its acquisition of Flywheel, Omnicom continues to leverage such misappropriated trade secrets and confidential information as of the date of this filing.  Like Ascential, even after being notified of Flywheel's fraudulent origins, Omnicom has elected to act in concert with Flywheel to further the misappropriation of Compass's trade secrets and proprietary business know how, unfairly compete with Compass, conceal the theft, sabotage Compass's business, and perpetuate the widespread fraud on which Flywheel's and now Omnicom's success is based.

<u>Compass Opens an Internal Investigation into Michael and Daniel White</u>

107.    On or about October 25, 2018, Michael White sent a company-wide e-mail, copying Daniel White, disparaging John White, and suggesting that the Compass Board of

Directors (which consisted of John White, Daniel White, and Michael White at that time) and others would be meeting soon to address various issues.

108.    After this email was distributed to the entire company, Michael White, Daniel White, and John White were not able to resolve their differences that were causing substantial disfunction in the management and operation of Compass. Accordingly, on or about November 23, 2018, John White terminated the employment of Michael White and Daniel White.

109.    Although Daniel White's and Michael White's employment had been terminated on or about November 23, 2018, each remained on the Compass Board of Directors, and each maintained their minority ownership interest in Compass.

110.    On February 14, 2019, the Compass Board of Directors held a special meeting and removed Daniel and Michael from the Board.

111.    After the termination of Daniel White's and Michael White's employment and their removal from Compass's Board of Directors, Compass hired Ronald Bateman ("Bateman") to investigate Daniel's and Michael's conduct as Compass officers. Compass also hired Luis Fernandez ("Fernandez") as its new Controller. Fernandez audited Compass's books and records.

112.    This lengthy and comprehensive investigation and audit uncovered approximately 14 years of various fraudulent schemes perpetrated by Daniel White and Michael White, which are detailed below, some of which included assistance from and collaboration with other individuals (such as scheme involving Flywheel and its founders) and some of which even pre-dated their collaboration with the Flywheel individuals and entity.

113.    Compass discovered that, after many years of success under John White's leadership, Daniel White and Michael White betrayed their brother and the company that they built together. Unbeknownst to John White, Compass's majority shareholder, Daniel White and Michael White engaged in a campaign to destroy the company in an attempt to

conceal their surreptitious siphoning of funds from the company for approximately 14 years for their own benefit (and also to benefit others). In addition to their embezzlement of Compass's monies, Daniel White and Michael White engaged in covert and coordinated efforts to damage the company's reputation and relationships with its clients, vendors, and others doing business directly and/or indirectly with the company. The ongoing concealment and sabotage attempts were, and continue to be, significant.

114.    It is clear from the schemes discovered and detailed below that Daniel and Michael exploited Compass and used Company funds to finance a life of luxury for themselves and their immediate family members and others. Daniel and Michael repeatedly violated their fiduciary duties to Compass and elevated their own wants and conveniences above what was in the best interest of Compass, its clients, and its many employees. Although Daniel's and Michael's efforts to secretly take down Compass started earlier, after Compass removed Daniel and Michael as directors and employees, Daniel and Michael became even more aggressive in orchestrating a far-reaching cover up of their wrongdoing, and they escalated their sabotage campaign intended to destroy the company so as to continue to conceal their fraudulent activities and schemes with others.

115.    Based upon its internal audits and investigations in 2020, Compass filed a lawsuit in February 2022 against Flywheel, DiPaula, Miller, Daniel White, George White, Michael White and Ascential in the U.S. District Court for the District of Maryland, ADD ITALICIZED CASE NAME, Case No. 1:22-cv-00379 (the "Federal Litigation"). On February 24, 2023, the District Court dismissed the Federal Litigation, having held that the two asserted federal claims were barred, and declining to exercise supplemental jurisdiction over Counts II and V-XXIII of the Federal Litigation complaint. As such, any applicable statute of limitations period applicable to the claims set forth and related to Counts II and V-XXIII were tolled while pending in the Federal

Litigation pursuant to 28 U.S. Code § 1367.

116.     What follows is a description of the various acts/schemes that Compass uncovered in connection with its investigation, along with efforts to conceal the fraud, the overwhelming majority of which was pursued in the Federal Litigation.

Secret Bank Account Scheme

117.     On or about December 1, 2008, Michael and Daniel opened a checking account in Compass's name at Community Bank of the Chesapeake (formerly County First Bank) ("Community Bank").  Michael and Daniel were and remain the only authorized signatories on the checking account.

118.     On or about June 15, 2009, Michael opened a savings account in Compass's name at Community Bank.  Michael White was the only authorized signatory on the savings account.

119.     The address associated with both Community Bank accounts ("the Secret Bank Accounts") was Michael's home address.

120.     These Secret Bank Accounts were created without Compass's knowledge or approval, and without proper documentation presented to the bank regarding Compass's ownership structure.

121.     Daniel and Michael White misappropriated Compass funds by improperly depositing Compass client checks into the Secret Bank Accounts and then using the funds for personal gain.

122.     From 2008 to 2020, Michael White and Daniel White used these Secret Bank Accounts to financially benefit themselves, their wives Debra White ("Debra") and Kelly White ("Kelly"), and corporations they owned or operated, including W-7 Enterprises LLC, Woodville Pines LLC, Leonardtown Investments LLC, Compass Limousines LLC, Spinnaker Group LLC, and Compass Foundation LLC.

123.    Debra and Kelly White were aware of their respective husbands' ploy to convert Compass's monies and destroy its business, agreed to such, and fraudulently accepted monies in furtherance of such.

124.    For example, the Secret Bank Accounts were used to make monthly payments on life insurance policies held by Michael and Daniel; pay money to Michael's unrelated gambling business; and initiate an unauthorized $200,000 wire transfer to the Washington Football Team (now the Washington Commanders).

125.    To date, disbursements from the Secret Bank Accounts show that more than $3.4 million was disbursed to Michael, and more than $632,000 was disbursed to Daniel. Indeed, in just the four months between January and April of 2019, Daniel and Michael withdrew at least $370,000 from the Secret Bank Accounts via checks written to themselves.

126.    Upon information and belief, around the time that Compass terminated Michael's and Daniel's employment, they drained the Secret Bank Accounts.  Each of these actions also constituted a breach of fiduciary duty to Compass.

127.    Prior to its extensive investigation and audit following Michael and Daniel's removal from the company, Compass did not have reason to suspect that Michael and Daniel were embezzling funds from Compass and/or engaging in the Secret Bank Account Scheme.  As discussed above, Daniel was not only Compass's General Counsel, but its CPA, while Michael held the position of Vice President of Operations and Comptroller.  Accordingly, John White entrusted his brothers, who were also officers and shareholders of the company, with the management and safekeeping of the family-business's assets, and neither knew nor had reason to know of Daniel and Michael's conversion of the company's monies for their own gain.

<u>Ghost Employee Scheme</u>

128.    Daniel and Michael added their family members Debra, Kelly, and Emile White to the Compass payroll and benefits programs even though Debra, Kelly, and Emile were never Compass employees.

129.    This scheme started in or around 1998, when Daniel and Michael added Debra (Michael's wife) to the payroll without Compass's knowledge or approval.

130.    Prior to April 1, 2010, Daniel and Michael added Kelly (Daniel's wife) to the payroll without Compass's knowledge or approval.

131.    In August of 2017, Daniel and Michael added Emile (Daniel's daughter) to the Compass payroll without Compass's knowledge or approval.

132.    In or around 2015, Daniel and Michael added Julie (Daniel's companion with no familial relation) to the Compass system as an employee without Compass's knowledge or approval. Julie White was aware that she had performed no employment services for Compass justifying any payments, but was aware that Daniel and Michael were actively conspiring to convert monies from Compass and destroy its business to conceal such conversion. Julie White actively and willingly agreed with such conspiracy and accepted these unearned monies in furtherance of such.

133.    From 2010 to 2019, Kelly received biweekly direct deposits from Compass into an account she maintained at Capital One.

134.    From 2013 to 2019, Debra received biweekly payroll direct deposits from Compass into an account she maintained at M&T Bank.

135.    From 2017 to 2019, Emile received biweekly payroll direct deposits from Compass.

136.    From 2014 to 2016, Julie received more than $3,600 in gifts and compensation from Compass.

137.    Michael and Daniel also enrolled Kelly and Debra in the company's 401(k) retirement plan, whereby portions of Kelly and Debra's "salaries" and matching contributions from Compass were deposited into accounts in each of their names.

138.    Kelly and Debra White were aware that their receipt of these salaries and benefits, despite having performed no work to earn such, was being carried out in furtherance of their respective spouses' conspiracy to steal Compass's monies and destroy the business to conceal such theft, and both Kelly and Debra White willingly and actively joined such conspiracy.

139.    From 1998 to 2019, Michael intentionally covered up these ghost employees in the Compass payroll system by creating fictitious spreadsheets and reports to provide to corporate leadership instead of running payroll reports directly through Compass's third-party payroll provider, Paychex.  Michael's falsified records prevented Compass from discovering the ghost employee scheme until Compass later initiated an investigation following the removal of Daniel and Michael from their roles at Compass.

140.    Again, prior to its extensive investigation and audit following Michael and Daniel's removal from the company, Compass did not have reason to suspect that Michael and Daniel were embezzling and/or unlawfully diverting funds through the use of ghost employees.

IRS Tax Check Scheme

141.    Michael and Daniel created a tax check scheme that allowed them to launder embezzled money through the Internal Revenue Service ("IRS") to be rebated back from the IRS annually ("IRS Tax Check Scheme").

142.    Michael and Daniel created the IRS Tax Check Scheme whereby they would issue additional electronic payroll payments to themselves and others that they called "tax checks." These fraudulent payments were remitted in addition to normal payroll payments, but were very large, and designated as 100% tax withholding so that the entirety of such sums would be remitted

to the IRS and/or the State of Maryland.

143.    As Compass's Vice President of Operations and Comptroller, Michael had exclusive control over designating the Compass (ghost) employees from whom the IRS received such additional payments, as well as the frequency and magnitude of such additional payments.

144.    For example, in 2015, Michael processed $520,000 in 100% tax withholding payments to himself and $530,000 to Daniel.

145.    In 2018, Michael processed $270,000 in 100% tax withholding payments to himself, and $230,000 to Daniel.

146.    Daniel and Michael also used the IRS Tax Check Scheme to benefit their families. In 2017, Michael processed $20,000 in 100% tax withholding payments for Debra and another $20,000 for Kelly, although neither was ever employed by or worked for Compass.

147.    As a result of the IRS Tax Check Scheme, Michael and Daniel knowingly funneled money through the IRS in the form of payroll disbursements that far exceeded their normal federal payroll tax withholdings to obtain large refunds, thereby embezzling millions of dollars, and laundering it through the IRS.

148.    Prior to its extensive investigation and audit following Michael and Daniel's removal from the company, Compass did not have reason to suspect that Michael and Daniel were embezzling funds from Compass and/or engaging in the IRS Tax Check Scheme.  As discussed above, Daniel was Compass's only CPA while Michael held the position of Vice President of Operations and Comptroller.  Accordingly, Compass entrusted Michael and Daniel with the management and safekeeping of its assets, and neither knew nor had reason to know of Daniel and Michael's conversion of the company's monies and concealment of such through a fraudulent tax withholding scheme.

<u>Shareholder Loan Scheme</u>

149.    Michael caused Compass to issue payments to himself and Daniel as purported reimbursement for personal loans to Compass, even though such loans were, in fact, never made to the company.  Michael then caused Compass to issue payments to himself and Daniel purporting to be principal and interest payments against the fake loans (the "Shareholder Loan Scheme"), in violation of their fiduciary duties to Compass.

150.    On or about June 7, 2015, Daniel received a check from Compass for $100,000 with "LTC" written on the memo line.  Upon information and belief, "LTC" stands for loan to company.

151.    On or about May 19, 2016, Daniel received a check from Compass for $70,000 with "LTC" written on the memo line.

152.    On or about January 24, 2019, Daniel received a check from Compass for $50,000 with "LTC" written on the memo line.

153.    On or about June 5, 2015, Michael received a check for $200,000 with "LTC" written on the memo line.

154.    On or about October 15, 2015, Michael received two checks for $100,000 each with "LTC" written on the memo line.

155.    On or about February 9, 2016, Michael received a check for $450,000 with "LTC" written on the memo line.

156.    On or about March 1, 2016, Michael received a check for $450,000 with "LTC" written on the memo line.

157.    On or about June 17, 2016, Michael received a check for $50,000 with "LTC" written on the memo line.

158.    On or about June 29, 2016, Michael received a check for $100,000 with "LTC" written on the memo line.

159.    On or about November 12, 2016, Michael received a check for $300,000 with "LTC" written on the memo line.

160.    On or about June 14, 2018, Michael received a check for $100,000 with "LTC" written on the memo line.

161.    On or about February 12, 2019, Michael received a check for $200,000 with "LTC" written on the memo line.

162.    On or about April 2, 2014, Daniel received a check for $62,451.87 with "2013 loan to company interest" in the memo line.

163.    On or about February 18, 2015, Michael received a check for $90,235.89 with "2014 Interest on K1 Loans to Company 9%" in the memo line, and Daniel received a check for $91,107 with "state taxes 2014 interest on K1 loans to company" in the memo line.

164.    On or about April 11, 2016, Daniel received a check for $55,459.48 with "2015 Interest Payment" in the memo line and Michael received a check for $71,865.89 with "2015 Interest Payment" in the memo line.

165.    Michael and Daniel's designations on the memo lines of the above-mentioned checks as "LTC" were intended to fraudulently conceal their campaign to convert Compass's monies, since these payments were not intended to repay any supposed loan extended by Michael or Daniel to the company.  Furthermore, these large sums of money purportedly "loaned" to Compass far exceed the annual incomes and net worth of both Michael and Daniel, making it virtually impossible for them to make such substantial "loans."

166.    In an e-mail dated August 21, 2017, that Compass recently discovered in connection with its internal investigation into this wrongdoing, Daniel White wrote the following to Michael White regarding unlawfully setting up Emile White as a ghost employee: "Anything she makes can come out of my BS loan."  Unfortunately, Compass only discovered this damning email during an

43

internal investigation several years later since, as detailed below, Compass's IT Administrator, who was responsible for monitoring, preserving and/or flagging suspicious emails, was Michael White's son and Daniel White's nephew, George White, who, unbeknownst to Compass, was actively engaged in a conspiracy with his father and uncle aimed to steal Compass's assets and conceal such theft and other misconduct.

167.    Michael and Daniel continued to use Compass funds from the secret Compass bank account they controlled to repay their fake loans even after they were fired and removed as Compass directors.  Each of these actions also was a breach of fiduciary duty to Compass.

<u>Information Technology Lockout of Compass Business Records and Accounts Scheme</u>

168.    Prior to May 2019, George White, Michael's son, was the IT Administrator at Compass while at the same time working full time as a Maryland State Trooper.  At times, George White was simultaneously on duty for the Maryland State Police and performing job duties for (and being compensated by) Compass.  In his role at Compass, George had administrator access to Compass's GSuite email, Microsoft, and QuickBooks accounts.

169.    Specifically, George controlled the Compass domain, including credentials and access to Compass Networking Administrator Credential login password and user ID; Compass servers, switches, and wireless access points; NAS (Synology, etc.); Firewall-Cisco ASA; Compass Marketing Routers; all Compass printers; all Compass phone systems; and Network Solutions Account for Compass's Domain Name Registrar.  George had the ability to change all of the above business records and accounts via his administrator's access.

170.    On or about April 29, 2019, after Daniel and Michael were voted off the Board of Directors, George had reason to believe that his removal was imminent.  George leveraged his control over the Compass IT systems to attempt to extort a large payment for himself.  Specifically, George demanded that Compass pay him an immediate $100,000 bonus, an increase in salary to

$297,000, and an additional severance package guaranteeing a full year base salary (of $297,000) in the event his employment was ever terminated.

171.    When Compass refused George's financial and other demands, George and his wife, Ashley White, resigned their employment with Compass.  Upon his resignation from employment, George unjustifiably refused to turn over to Compass the access/pass codes to the network accounts he managed for Compass.

172.    The company hard drive, cell phone and laptop assigned to George were similarly not returned to Compass upon his resignation.

173.    Sometime after April 30, 2019, in an effort to conceal the electronic records of financial fraud by his father and to conceal his efforts to extort Compass, as well as inflict other harm on Compass, George intentionally and maliciously cut off access to certain Compass employee email accounts with the compassmarketinginc.com domain, Microsoft, QuickBooks, and other business records and accounts (the "2019 Extortion Attempt").  Many of these email accounts belonging to Compass contain records that include and/or reflect Compass's trade secrets but continue to be concealed from Compass.

174.    Ever since, Compass has attempted to regain control of its books and records, with only limited success.

175.    To this day, Compass remains locked out of its own compassmarketinginc.com domain.  Compass does not have access to several of its employee email accounts or other business records maintained on QuickBooks that were maintained within the compassmarketinginc.com domain. Consequently, the Compass sales force was not able to communicate by email with clients or otherwise access the records required for Compass to do business.  Compass had no choice but to overhaul its IT infrastructure and establish a new compassmarketinginc.net domain, all at significant expense.

176.    A further consequence of the IT lockout and the company's continued inability to access the compassmarketinginc.com domain is that evidence relevant to this lawsuit and other legal actions continues to be concealed from Compass and cannot be preserved because that evidence is no longer within Compass's control.  Further, the evidence deliberately concealed by George White, in coordination with Daniel and Michael, further hindered Compass's internal due diligence and investigations and now cannot be relied on for purposes of litigation.  Moreover, even if access to the compassmarketinginc.com domain was somehow recovered pursuant to court order, it is likely that George and Michael, in coordination with Daniel, and whoever else has access to the domain has destroyed relevant evidence to cover up past wrongdoing.

177.    Because Compass has been unable to determine the full extent of the harm it has incurred in relation to the IT lockout in 2019, it has been unable to meaningfully assess the full extent of the damage caused to the company.

178.    The 2019 Extortion Attempt and subsequent IT lockout substantially impacted Compass.  It strained client relationships due to lost research and development, reports, sales, and account data.  The 2019 Extortion Attempt and subsequent IT lockout also impeded Compass's ability to file its income tax returns.

179.    To repair the situation, Compass expended significant effort, time, and money to create new accounts and business records.  Compass employees were compelled to engage in the time-consuming task of reaching out to clients and prospective clients to address problems arising from missing records and provide new contact information.

180.    Today, George and Michael continue to maintain dominion and control over the lost accounts and business records.  A third-party service provider was able to give Compass access to all incoming (but not outgoing) messages for its old domain.  Each month, Compass receives a Google invoice to George White at Compass Marketing for the domain name

compassmarketinginc.com and an email from Google Payments to Michael White for the domain name compassmarketinginc.com.

181.    In or about October 2021, Compass received an email from Google Invoice which showed that the number of individual email addresses under the compassmarketinginc.com domain was decreased from 79 to 60.  This decrease in individual email addresses raises concern that the actors in control of the domain have already engaged in spoliation.

182.    As confirmed by a Maryland State Police ("MSP") investigation in 2020, George White accessed the Compass network after his employment ended.  Specifically, without authorization from Compass, George unlawfully accessed the Compass network until at least July 31, 2019.

183.    By way of example, on information and belief, on or about May 8, 2019, George White logged into Compass's Microsoft account from the Annapolis State House.

184.    In addition, on or about May 13, 2019, someone logged into Compass's Microsoft account from Waldorf, Maryland, which is where George White resides, and which is close to where his father Michael resides.

185.    On or about May 14, 2019, at approximately 19:40:53 UTC, the Compass email account for Compass employee Jesse Williams (jwilliams@compassmarketinginc.com) was deleted from the Google system without authorization by Compass and without Compass's knowledge.  Upon information and belief, Michael was logged into the Compass Google account at the precise time the e-mail account was deleted, and the IP address used to delete the account geo-located back to Waldorf, Maryland, where Michael White resides.

186.    On or about October 10, 2019, Robert White (an individual who was employed by Compass at the time and who is Michael's son) received an unauthorized pay raise of $12,000 on

an annualized basis in the Kelly Payroll system. This unauthorized pay raise was given to Robert White by Michael White using John White's account and password to access the Kelly system. The IP address that accessed the Kelly Payroll system using John White's account and password to give Robert White this pay raise was 76.114.241.112, which was subscribed to Michael at the time, and at an address of 39650 Hiawatha Circle, Mechanicsville, Maryland, which is Michael's home address.

187.     On or about December 26, 2019, without Compass's authorization or knowledge, the e-mail recover address for John White's Compass email address under the previously used .com domain (jwhite@compassmarketinginc.com)mailto: was changed to michalrwhite@comcast.net, which is Michael White's personal email address, and the phone number was changed to (301) 481-5986, which is Michael's phone number.

<u>Sham Legal Claims Scheme</u>

188.     After Compass terminated the employment of Michael and Daniel and removed them from the Board of Directors, Michael and Daniel attempted to cover up their illicit conduct by filing a regulatory complaint and a lawsuit to dissolve Compass in its entirety.

189.     On or about October 8, 2019, Daniel sent letters to the General Counsel of Principal Financial Group (Compass's 401(k) plan administrator) and to the United States Department of Labor ("DOL") misrepresenting that he was the trustee for Compass's 401(k) plan. Daniel falsely claimed that then-Compass President Todd Mitchell embezzled funds from the plan.

190.     Principal Financial Group ("Principal") performed an investigation and concluded that Daniel was not the trustee of Compass's 401(k) plan and there were no improprieties with such plan.

191.     As a result of Daniel's false allegations, Compass incurred substantial legal fees.

192.    On or about December 2, 2019, Michael and Daniel filed a lawsuit against Compass in the Commonwealth of Virginia: *White et al. v. Compass Marketing, Inc. et al.*, Case No. CL19003628-00 (the "Virginia Lawsuit"). The Virginia Lawsuit sought judicial dissolution of Compass claiming, among other things, that the owners are deadlocked on management of the company.

193.    Through false representations to conceal Michael White's and Daniel White's fraudulent activities and as retribution for removing Michael and Daniel from their roles at Compass, the Virginia Lawsuit sought to transfer control of Compass from John White.

194.    The Virginia Lawsuit is premised in part on the false allegation that Daniel White and Michael White collectively own 50% of Compass (with Daniel and Michael claiming to each own 25% of the company).

195.    On or about April 2, 2021, Daniel and Michael abruptly non-suited the Virginia Lawsuit after the Virginia court granted a motion to compel that required Daniel and Michael to produce documents, answer interrogatories, and appear for depositions.

196.    Daniel White and Michael White re-filed the Virginia Lawsuit on or about October 4, 2021 in a case styled, *Michael White, et al. v. John White, et al.*, Case No. CL21004012-00. Like the original Virginia Lawsuit, the re-filed Virginia Lawsuit sought a judicial dissolution of Compass, and it was based, at least in part, on the false premise that Daniel White and Michael White collectively own 50% of Compass (with Daniel and Michael claiming to each own 25% of the company). The re-filed Virginia Lawsuit was not properly served on all the defendants within one year of re-filing, however, and it was subsequently dismissed.

<u>Anonymous Mailings Scheme</u>

197.    From October 2019 to present, an anonymous author has sent letters to individuals, companies, and the government using the United States mail service and email to damage

Compass's reputation (the "Anonymous Mailings Scheme").

198.    Notably, Verizon phone records indicate that Defendants DiPaula and Michael contacted each other 2 times (November 20 and 21, 2018), just prior to the beginning of the anonymous mailing campaign beginning.

199.    The Anonymous Mailings Scheme commenced on or about October 16, 2019, when an anonymous letter was mailed to Compass client Colgate Company ("Colgate").  As a result, Colgate pulled out of a Compass pilot program related to direct-to-consumer marketing.

200.    Similar letters were mailed to Compass clients Johnson & Johnson, Duracell, and Bush's Beans.

201.    Indeed, the Anonymous Mailing Scheme has proved remarkably successful with respect to tortiously interfering with Compass's client and business relationships.  By way of further example, in or around 2014, Compass and its affiliated entity, Tagnetics Inc., entered highly valuable partnerships with SES-imagotag ("SES") and Qualcomm Incorporated for the development, marketing, and implementation of electronic shelf label systems.  By 2018, these partnerships had yielded promising relationships with major retailers, and these shelf label systems had been implemented in approximately 80 Whole Foods locations and were also being tested in certain Walmart retailers.

202.    In 2019, SES and Qualcomm executives advised Compass CEO John White that they had received anonymous mailings disparaging Compass and falsely claiming that Compass was misusing confidential information in connection with litigation involving an affiliate of Compass called Tagnetics, Inc. ("Tagnetics"), and these mailings directly resulted in the termination of these partnerships.

203.    In 2024, SES and Qualcomm entered a significant contract with Walmart and without Compass to implement over 60 million digital shelf labels in hundreds of Walmart

locations. The immediate value of this Walmart contract alone is estimated to be over $4 billion. On information and belief, had SES and Qualcomm not terminated their partnerships with Compass and Tagnetics as a result of the Anonymous Mailings Scheme, Compass would have been a party to this 2024 contract with Walmart and, based on expert opinions developed to date, expects that Compass's now lost SES/Qualcomm partnership(s) would have generated revenue of over $10 billion.

204. Similar mailings and emails disparaging John White and Compass were sent over many months to various individuals and entities affiliated with Compass.

205. For example, a series of emails from www.protonmail.com ("Protonmail") were sent to Compass client Duracell and potential client, Microsoft. Protonmail is an email service that houses its servers in Switzerland so that Swiss privacy laws protect the user's identity. Protonmail does not have Internet Protocol Address logs, so the user's identity is untraceable.

206. Daniel White purchased an annual subscription for a Protonmail account and paid for it with his Compass American Express credit card.

207. During the Virginia Litigation, Compass learned that the return address (a P.O. Box) used on most, if not all, of the anonymous mailings was a P.O. Box registered and used by Charles Ewing, a retired Maryland State Trooper and friend of Michael White.

<u>The City of Annapolis and the Anonymous Publication of the Unredacted Police Report</u>

208. More recently, and beginning in February 2024, anonymous mailings and Proton emails containing an unredacted police report (the "Miguel Dennis Police Report") were sent to numerous Compass clients, resulting in the continued loss of valuable client accounts and contract opportunities due to this anonymous correspondence.

209. The Miguel Dennis Police Report constitutes an unredacted police report by in connection with a late 2022 call to 911 emergency services, along with associated witness

statements and bodycam footage.

210.    The Miguel Dennis Police Report was not legally permitted to be distributed in unredacted form because it contained personal information concerning John White, including his personal contact information and address, which are exempt from disclosure under the Maryland Public Information Act ("MPIA").

211.    Defendants Daniel and Michael White repeatedly sought disclosure of the Miguel Dennis Police Report in 2023.  Indeed, on or around February 13, 2023, Daniel White submitted a formal request under the MPIA for disclosure of the Miguel Dennis Police Report and associated files.  The City Attorney, D. Michael Lyles, Esq., denied the release of the Miguel Dennis Police Report noting that the MPIA did not allow its release, and the City also rejected further appeals by Daniel White to obtain the Miguel Dennis Police Report.

212.    Tellingly, Daniel White's email requesting disclosure of the Miguel Dennis Police Report under the MPIA contained certain language—"[former-Anne Arundel County Sheriff] Ronald Bateman has been falsely reporting crimes to his former colleagues at Annapolis City Police Department for years"—that is virtually identical to statements made in the subsequent defamatory anonymous ProtonEmails sent to Compass clients and associates to which the same Miguel Dennis Police Report would be attached.  Additionally, body-worn camera footage that only Daniel White had solicited and received from the APD in or around February of 2023, would also be included in the subsequent, anonymous email campaigns.

213.    Following this initial, and proper, denial of the disclosure of the Miguel Dennis Police Report, Dennis, the APD's Public Information Officer, shared these documents with someone he claimed "looked like Michael White."

214.    In February of 2024, Compass learned that the Miguel Dennis Police Report had been sent to a Compass client as an attachment to a defamatory email, alleging that Compass

employee Ron Bateman had filed a false police report of an attempted kidnapping of Compass's Chief Executive Officer.

215.    Upon learning of Dennis's circulation of the Miguel Dennis Police Report—sensitive information the City's Office of Law already told Daniel White was exempt from disclosure under the MPIA—Compass issued cease-and-desist letters to Mr. Dennis, APD Chief Jackson, the City Law Office, and Michael and Daniel White dated June 10, 2024 (the "Cease and Desists").

216.    The Cease and Desists sent to the City, Dennis, and Michael and Daniel White, followed two investigations by the APD into this patent misconduct by Mr. Dennis, which was inexplicably obstructed and protracted until May 31, 2024.  Upon review of the Miguel Dennis Police Report illegally distributed to Compass's clients, and internal affairs interviews with APD's Kathy Bucannon and Defendant Dennis, the APD's Internal Affairs Department ("IAD"), led by APD's Commander Ronda McCoy, _**sustained**_ administrative charges against Dennis.

217.    During the IAD investigation, upon information and belief, Defendant Dennis _admitted_ to distributing the non-redacted police report to at least one other person.  However, upon information and belief, Dennis also purposefully withheld the identity of the person to whom he admittedly distributed the unredacted report, claiming his memory _was not_ good enough to remember such recipient. Tellingly, however, Mr. Dennis disingenuously conceded his memory _was_ good enough to be able to remember that the person "looked like Michael White," his longtime friend and work associate at the MSP.

218.    On May 31, 2024, Commander McCoy sent a letter to Compass, which stated, "The Department has determined your complaint against Miguel Dennis has merit and is sustained for violation of department policy."

219.    Unfortunately, Mr. Dennis' direct supervisor, APD's Chief Jackson, alleged publicly in the Capital Gazette newspaper that the illegal distribution of the report by Mr. Dennis was simply an error during "an effort to provide expedited service," and also claimed he apologized to Compass. Both statements were knowingly false. Rather, this public *admission* of Mr. Dennis's wrongdoing was followed by the continued concealment of the identity or identities of the individual(s) to whom the APD "provided expedited service."

220.    On October 2, 2024, emboldened by the public comments of APD's Chief Jackson, as to the non-pursuit of criminal charges against Mr. Dennis, the Defendants Daniel and Michael White boldly continued their efforts in furtherance of the conspiracy to destroy Compass and defame its officers and tortiously interfere with the company's client relationships by sending the Dennis Police Report to *yet another* Compass client.

221.    Similarly, in November of 2024, the Miguel Dennis Police Report was again sent to another Compass client, which elected to terminate its business relationship with Compass as a result of this defamation.

222.    Dennis's misuse of his official office, and agreement to conspire with Daniel and Michale White, to defame Compass and its officers, to tortiously interfere with Compass's client relationships, and to destroy Compass's business, alongside the APD's refusal to prevent the misconduct after receiving proper notice and a formal Cease and Desist, subjects the City to vicarious liability. Specifically, Mr. Dennis misused his official position to violate the MPIA by intentionally releasing a report he *knew* was not subject to public disclosure, and that would be used in furtherance of the Flywheel Defendants' overarching conspiracy to destroy Compass's business.

223.    The circulation of the Miguel Dennis Police Report in violation of the MPIA and in furtherance of the Defendants' overarching conspiracy caused Compass enormous monetary

harm. Indeed, in 2024 alone, the anonymous mailings containing the Miguel Dennis Police Report, a component of the Anonymous Mailing Scheme, has cost Compass approximately $200,000.00 annually due to interference with its relationship with a 20-year Compass client, a contract with a local start-up company worth approximately $50,000.00, and, most recently on or about November 28, 2024, a contract with a local coffee company worth approximately $70,000.

224. The November 28, 2024, correspondence resulting in the loss of this contract constitutes one of the last overt acts of the Flywheel Defendants' overarching conspiracy to convert Compass's assets and destroy its business for purposes of concealing

225. Upon information and belief, the Anonymous Mailings Scheme, including the circulation of the Miguel Dennis Police Report, was and continues to be perpetrated by Daniel White and Michael White in furtherance of the Flywheel Defendants' overarching conspiracy to destroy Compass.

226. This Anonymous Mailings Scheme, including the circulation of the Miguel Dennis Police Report, has severely damaged and continues to severely damage Compass's reputation and has unlawfully interfered with both secured and potential business relationships.

227. Worse still, officials of the City and the APD effectively condoned the illegal conduct and conspired with Dennis and the Flywheel Defendants by refusing to lawfully respond to Compass's MPIA requests for information in furtherance of its internal investigation regarding the tortious and conspiratorial circulation of the Miguel Dennis Report.

228. Indeed, Compass submitted four MPIA requests in 2024 for information regarding the release of the Miguel Dennis Police Report, yet received unjustifiable refusals to produce such information and/or documents that were heavily redacted, including redactions of fields and narratives that did not seem to pertain to information exempt under the MPIA.

229.    Compass filed an appeal in connection with the City's and the APD's refusals to comply with the MPIA and finally, on January 31, 2025, such appeal was deemed to have merit by the Public Information Act Compliance Board (the "MPIA Board").  In its blistering January 31, 2025, written decision, the MPIA Board found that the City and the APD had violated the MPIA by failing to perform a search of records sufficient to cover the lawful scope of Compass's MPIA requests in 2024, and had unjustifiably redacted information under the pretext of statutory exemptions that similarly could not be justified.  Indeed, this January 31, 2025, decision held that "we find that the City's search was inadequate and unreasonable and that this inadequate search led the City to constructively deny the complainant's PIA request."

Corporate Credit Card Scheme

230.    Michael and Daniel used Compass corporate credit cards to charge personal expenses to Compass (the "Corporate Credit Card Scheme").

231.    Compass issues American Express Blue Business Plus credit cards ("AmEx Blue") to its employees.  Each employee's AmEx Blue card is integrated with a platform called Expensables.  Every charge made on an AmEx Blue card is automatically logged to the appropriate employee's Expensables registry.

232.    Compass uses Expensables to review, approve, and categorize charges.  Compass entrusted Michael with reviewing and approving the Expensables reports each month.

233.    In or around February 2012, the link between Daniel's AmEx Blue card and Expensables was terminated, which caused his charges to his company-issued card to no longer be visible to Compass.

234.    Between 2012 and 2017, Daniel's expense reports were submitted to Michael in batches that listed nothing more than a total dollar figure and the description "personal expenses."

56

235.    Daniel's "personal expenses" included tuition for his three children to attend a private high school, purchases related to his coin collecting hobby, an annual subscription to a Switzerland based Proton email account, and vacations for Julie White.

236.    Between 2013 and 2019, Daniel incurred more than $950,000 in personal charges on the AmEx Blue card.  Daniel intentionally failed to reimburse Compass for any of these personal expenditures.

237.    Prior to 2012, Michael opened an American Express Business Green Rewards Card ("AmEx Green Card") in the Compass account.  Michael did not link the AmEx Green card to the Expensables platform, so the charges were never visible to Compass.

238.    The AmEx Green Card was obtained without Compass's knowledge or approval.

239.    The personal expenses Michael charged to the AmEx Green Card included purchases with the Washington Football Team (now the Washington Commanders) and vacations and flights for friends and family.

240.    Between 2012 and 2019, Michael incurred more than $980,000 in personal charges on the AmEx Green card.  Michael intentionally failed to reimburse Compass for any of these personal expenditures.

241.    Importantly, the financial records show that Daniel and Michael continued to charge personal expenses to Compass after the date they were fired and removed from the Board.

<u>Flywheel Severance Scheme</u>

242.    A Compass auditor on the internal investigation team discovered multiple checks issued from Daniel White's personal account to Defendant Chip DiPaula.  These checks were part of a severance scheme designed to deprive Compass of funds (and harm Compass in other respects, such as using Compass's funds to covertly invest in and build a competing business that became Flywheel).

243.     On October 14, 2015, more than 13 months after Defendant DiPaula resigned from Compass, Daniel caused M&T Bank to issue a cashier's check for $10,000 to DiPaula, using Daniel's personal funds.



244.     On December 1, 2015, nearly 15 months after Defendants DiPaula and Miller resigned from Compass, Michael White secretly issued a check to Daniel White from Compass's M&T bank account for $65,000.  The memo portion of the check read "Final Payments to James DiPaula and Patrick Miller."



245.    Eight days later, on December 9, 2015, Daniel had M&T Bank issue another cashier's check for $25,000 to DiPaula, using Daniel's personal funds.

246.    Compass did not owe any severance to DiPaula or Miller, either upon their voluntary resignations in September 2014, in October and December of 2015, or at any other time. In any event, the Severance Scheme involving DiPaula and Miller was false, and any purported payments to DiPaula and Miller—whether from Compass's M&T Bank account or from Daniel

White's personal M&T Bank account—was in violation of Compass policies and Daniel's and Michael's fiduciary duties.

247.    Upon information and belief, Daniel provided the funds that are part of the Flywheel Severance Scheme to DiPaula and Miller to support their funding and operation of Flywheel.

248.    Daniel White and Michael White were able to effectuate these payments to DiPaula and Miller without the knowledge of Compass and/or John White due to Daniel and Michael's control over, access to, and responsibility for Compass's finances and financial records prior to their removal from the company in 2019.

249.    Unbeknownst to Compass, DiPaula and Miller secretly secured embezzled funds from Compass through this Severance Scheme in collaboration with Daniel White and Michael White.

Boshea Severance Scheme

250.    Daniel White and Michael White are *currently* perpetrating a similar severance scheme involving another former Compass employee, David J. Boshea.

251.    In connection with a lawsuit Boshea filed against Compass, Boshea contends Daniel and/or Michael "reminded" him about a purported severance provision in an alleged employment agreement that purportedly calls for a payment to Boshea in excess of $500,000.

252.    Despite being shareholders of Compass, Daniel and Michael have provided Boshea substantial and material support in connection with his lawsuit against Compass, currently pending in the United States District Court for the District of Maryland (the "Boshea Litigation").

253.    Upon information and belief, Daniel White, Michael White, and George White have tried to support Boshea in the Boshea Litigation by, among other things, searching through Compass's old emails, document management system (the .com domain), and electronic financial records which they can access by virtue of Michael and George remaining the only two

administrators on the account(s) while blocking Compass's access to the account(s).

254.    Such support has also included Daniel finding Boshea a lawyer to sue Compass, Daniel and Michael providing documents voluntarily to Boshea's counsel, and Daniel and/or Michael providing information to Boshea (much of which is factually inaccurate) to try to tarnish John White's reputation in an attempt to pressure John White to agree to a settlement on behalf of Compass. Daniel White attended a recent hearing in the Boshea Litigation that even Boshea did not attend. Upon information and belief, Daniel helped fabricate at least one, if not more, documents in the Boshea Litigation.

255.    Compass contends that the purported agreement upon which Boshea relies in bringing his lawsuit is a forgery and has obtained an expert opinion that explains the basis upon which the agreement is a forgery.

256.    Compass has expended substantial monies defending the baseless Boshea Litigation that has been encouraged, supported, and even solicited by Daniel and/or Michael.

### Boshea Theft of Trade Secrets

257.    During the Sham litigation brought by Boshea in coordination with Michael and Daniel White (*David J. Boshea v. Compass Marketing Inc*., Case No. 1:21-CV-00309-ELH), several of the documents Boshea produced in discovery appear on their face to have included highly confidential information of Compass that qualify for trade secret protection, such as customer lists and financial records.

258.    For instance, Boshea produced significant amounts of text and email communications between Boshea and Flywheel Defendants Daniel and Michael White, including emails dated May 29 and 30, 2023. These communications show Boshea solicited highly confidential Compass information from Michael and Daniel White pertaining to Compass's operations from 2006 through 2020.

259.    The date and time stamp on the bottom of the documents, suggest that these numerous highly confidential and proprietary Compass documents were accessed and printed on May 29, 2023, and then communicated to Boshea by Michael White within a few minutes later in an email titled "CMI Income."

260.    Not only do Boshea's solicitation and acquisition of these documents constitute misappropriation in itself, but these communications demonstrate that Defendants Daniel and Michael White continue to wrongfully exercise possession over and/or access to Compass's trade secrets and have unlawfully provided such to third parties, including in May of 2023.

<u>Sham Ownership Interest Scheme</u>

261.    Daniel White and Michael White perpetrated many of the above-detailed schemes under the false premise that they collectively own 50% of shares of Compass by claiming that they each own 25% of the shares of Compass.

262.    In reality, Daniel White owns 150 shares of Compass, which amounts to approximately 16.7% of the shares of Compass.

263.    Likewise, Michael White actually owns 150 shares of Compass, which amounts to approximately 16.7% of the shares of Compass.

264.    On the other hand, John White owns 600 shares of Compass, which amounts to approximately 66.7% of the shares of Compass, and has maintained majority ownership of Compass throughout the relevant time period.

265.    Daniel White and Michael White have knowingly and intentionally misrepresented their ownership interest in Compass on multiple occasions in connection with and in furtherance of many of the above- referenced schemes.

Other Acts of Misconduct

266.    According to a police report obtained in connection with litigation filed by George White against a Compass employee, Ron Bateman, George and Michael accessed the Compass email account(s) (the .com domain) after they were no longer employed by Compass and after Michael was no longer serving on the Board.

267.    In connection with various legal actions brought against Compass, including the Boshea Litigation in October and November 2021, and in other instances, Michael White, who is an Orphan's Court Judge and has an understanding of the duty to protect the attorney-client privilege, work product doctrine, and other doctrines protecting against disclosure, unlawfully produced email communications, including privileged communications, to which he was not a sender or recipient and maintained in e-mail accounts to which Michael is not authorized to access.

Compass Discovers DiPaula's, Miller's and Flywheel's Misappropriation of Trade Secrets

268.    On or about January 20, 2020, Compass Controller Fernandez discovered an article written by Miller entitled, "The Future of Amazon Fresh?" dated August 25, 2015. The last line of the article stated that "Patrick Miller, Co-Founder, Flywheel Digital spent the last four years deconstructing eCommerce sites and helping American manufacturers figure out Amazon from a brand, search, social, customer service, supply chain, pricing and sales perspective."

269.    "[T]he last four years" encompass the period from August 25, 2011 to August 25, 2015. Miller was employed with Compass from on or about February 1, 2011, to on or about September 4, 2014—meaning, all but 11 months of the period referenced in Miller's 2015 article were during his employment with Compass.

270.    Fernandez engaged in further research and located a Flywheel-branded Power Point presentation and voiceover that Miller purportedly gave at the Online & Digital Grocery Summit USA on or about November 5, 2015 ("the Digital Grocery Presentation"). Miller's introduction included a review of his clients: P&G, J&J, Mars, McCormick, Ferrero, 5 Hour Energy, and Colgate. All of these

companies were Compass clients or former Compass clients at the time of the presentation. On information and belief, the presentation was not accessible to the public, including Compass, before 2020 when it was discovered.

271.    Fernandez gave a copy of the article and the Digital Grocery Presentation to John White, who immediately recognized the clients Miller claimed were Flywheel's as Compass clients. John White further recognized the contents of the Digital Grocery Presentation as content that could only have been generated with knowledge of Compass's trade secret information and proprietary business know-how. The Digital Grocery Presentation revealed, for the first time, that Flywheel, DiPaula, and Miller were in possession of the more comprehensive repository of Compass trade secrets, the eCommerce Guide. The Digital Grocery Presentation included key pieces of information that could only be known from the original Compass eCommerce Guide.

272.    For example, the Digital Grocery Presentation provided information concerning Compass's general strategy to prioritize customer's search results on Amazon. Even more significantly, the Digital Grocery Presentation represented an approach to selling clients' products through Amazon that precisely mirrors the Compass approach and could only be mimicked with possession of the eCommerce Guide.

273.    As previously outlined, Compass maintained only a single printed version of the eCommerce Guide as part of the protocol to maintain its confidentiality. However, while at Compass and by virtue of his senior position, Miller had access to an electronic version of the eCommerce Guide. Upon information and belief, Miller misappropriated the electronic version of the Compass eCommerce Guide while he was employed by Compass, and then, in conjunction with DiPaula, used it to develop the Flywheel business model. Based on Flywheel's own description of its business on the Flywheel website, the use of the Compass's misappropriated information continues today:

**WE ACCELERATE WORLDWIDE BRAND GROWTH IN DIGITAL RETAIL**

As an early leader in Amazon Advertising, and certified partner, our massive scale allows us to cull insights to better inform our technology and client brand strategy, creating additional value and superior results.

Our team of account managers, search specialists, analysts, data scientists, and software developers work together to help brands come to life across digital retailers and execute so customers convert. We love the hard questions and want the clients that dig in to understand this massive opportunity.

**amazon**advertising

As an early leader in Amazon Advertising, our massive scale allows us to cull insights to better inform our technology and our client's brand strategy, creating additional value and superior results. We believe the first dollar should be spent on search, but once you max out on sponsored ads, Amazon's programmatic display and video ad buying platform is where you should focus next to drive sales online and off. In addition to managing media efficiencies, we have created a series of ensemble models to forecast business growth down to an ASIN so you have better visibility to what Amazon will order.



274.    The metadata for the Digital Grocery Presentation is prima facie evidence of misappropriation in 2014 – around the time that DiPaula and Miller secretly launched Flywheel and then left Compass. The metadata indicates that the Digital Grocery Presentation was created on November 12, 2013, while Miller and DiPaula were still at Compass. Then, on or about November 4, 2015, one day before the Online & Digital Grocery Summit, Miller updated the file, presumably to reflect Flywheel branding and to remove the original Compass-branding.

275.    It was not until on or about January 20, 2020, that Compass discovered this prima facie evidence of Flywheel's misappropriation activities. Given the contents of the Digital Grocery Presentation, which was copied from Compass's files, there is every reason to believe that the

65

eCommerce Guide was also copied or otherwise exported to Flywheel by DiPaula and/or Miller. This brazen misappropriation was not known to Compass and could not reasonably have been known because DiPaula and Miller had acted in secret and concealed the existence of the misappropriation.

276.    After Compass discovered the theft of its trade secrets, it investigated whether any of the clients that left Compass since 2014 subsequently engaged Flywheel for identical eCommerce services.

277.    On information and belief, using Compass's trade secrets, Flywheel has poached a long list of Compass eCommerce clients, including well-established brands such as P&G, Allergan, Amplify Snacks Brands, Colgate, Ferrero, Johnson & Johnson, Mars, McCormick, Old Wisconsin, and 5 Hour Energy.

278.    Compass later came to learn in connection with its investigation that a student from the University of Maryland, Shiwen Xu ("Xu"), led Flywheel's analytics group using Compass's stolen trade secrets, and managed analytics reporting for Flywheel's P&G account. Xu also became the registered agent for Flywheel in California, and the only other Director/Officer besides DiPaula listed on the Flywheel Board of Directors in California.

279.    Flywheel, Miller, and DiPaula were only in a position to pursue Compass's employees and clients because they founded a company built on the misappropriation of Compass's trade secrets and proprietary business know-how, and future strategic plans. Because of this misappropriation, concealment, and interference, Flywheel has been unfairly competing with, and continues to unfairly compete with, Compass. Further, because of this misappropriation, concealment, and interference, Flywheel, Miller, DiPaula, Daniel White, and Michael White have profited from, and continue to profit from, Compass's investment in its eCommerce capabilities.

Ascential's Role as a Co-Conspirator in Flywheel's Misappropriation of Compass's Trade Secrets

280.    On or about November 2, 2018, four years after Flywheel was founded, Ascential, a London-based global specialist information company, acquired Flywheel for the purchase price

of approximately $400 million, with an initial payment of $60 million and $340 million of contingent earn out payments over the following three years in the event certain milestone and performance metrics were achieved.

281.    Following this 2018 acquisition, Flywheel re-branded itself as an "Ascential Company," as seen on the home page of the Flywheel website:[1]



282.    The Ascential press release that announced the acquisition defined the Flywheel business model as "a provider of managed services to consumer product companies trading on Amazon."[2]  Ascential also stated that "Flywheel offers customers Amazon-specific software, tools and expertise to drive sales and brand performance across Amazon platforms by directly actioning solutions for clients."

283.    Ascential's subsequent 2021 Interim Report noted Flywheel's astounding growth. In 2016, Flywheel operated in one marketplace in one country.  By 2020, Flywheel was operating in 60 marketplaces in 14 countries.

---

[1] https://www.flywheeldigital.com/

[2] https://www.ascential.com/sites/default/files/content-files/press-releases/acquisition-of-flywheel-digital-01-11-18.pdf

284.    Upon realizing the misappropriation, interference, and unfair competition, which is ongoing, Compass sought to engage with Ascential, as Flywheel's then-parent company, with the goal of working through Ascential to remediate past harms. Compass compiled known facts of Flywheel's misappropriation and other misdeeds as of May 2021 and contacted Duncan Painter, the Ascential CEO, and Scott Forbes, the Chair of Ascential's Board, to initiate what Compass hoped would be productive settlement discussions.

285.    Jeff Moorad, acting as an advisor to Compass and a long-time friend of John White, first initiated contact with Duncan Painter, Ascential's CEO, on or about May 9, 2021, to discuss, among other things, Ascential's acquisition of Flywheel and inform him of Compass's contention that Flywheel stole and continued to use Compass's trade secrets and proprietary information and know how. After receiving no response, Mr. Moorad contacted Scott Forbes, the Chairman of Ascential's Board of Directors, on or about May 17, 2021.

286.    Mr. Forbes accommodated Mr. Moorad's request for a meeting, and they met over lunch on or about May 24, 2021 at the Four Seasons Park Lane in London.  During that lunch meeting, Mr. Moorad communicated Compass's concerns relating to Flywheel's pre-acquisition conduct, including Compass's investigation that uncovered extensive evidence of Flywheel's use of Compass's misappropriated trade secrets and proprietary information and know how.  Mr. Moorad advised Mr. Forbes of Compass's desire to engage in direct discussions with Ascential to find a business solution short of contentious, public, and long-tail litigation that would ensue to remedy the substantial harm inflicted upon Compass by Flywheel, DiPaula, Miller and others.

287.    On or about May 26, 2021, Mr. Forbes wrote to Mr. Moorad to confirm that Compass's concerns and desire for a business resolution had been communicated to Ascential:  "I just want to acknowledge that as promised, I communicated your messages promptly to Ascential on Monday."

288.    Thereafter, Mr. Moorad responded to Mr. Forbes: "Specific to the Ascential/Compass part of our discussion, as mentioned, I'd be happy to share additional details around the situation and explore ways to work together to find a business solution - if Ascential is interested in this approach, I'm happy to facilitate discussions - I know you mentioned that you'd reach back out and I'll wait on your timing - if there is a way to manage reputational risk and shareholder value for both companies, that would be a win/win result."

289.    Mr. Moorad followed up with Mr. Forbes on or about June 5, 2021, and on or about June 7, 2021, Mr. Moorad and Mr. Forbes spoke briefly by phone to discuss the Compass/Flywheel situation, including Flywheel having misappropriated Compass's assets.

290.    On or about June 24, 2021, Mr. Moorad emailed Mr. Forbes, and Mr. Forbes responded that day, noting that he would pass Mr. Moorad's note "along to the lawyers."

291.    On or about July 1, 2021, Mr. Moorad emailed Mr. Forbes to update him on issues that were arising between Compass and Flywheel.  According to Mr. Moorad's email, Dayna Acevedo (former Compass Chief of Staff and current Flywheel Vice President of People & Digital Commerce) held a meeting in her home on or about June 24, 2021, where she interrogated a Compass employee about the lunch and discussion between Mr. Moorad and Mr. Forbes.  Mr. Moorad again relayed in this email Compass's concerns about Ascential's due diligence failures in acquiring Flywheel, including that DiPaula had incorporated Flywheel while still an employee at Compass and that Acevedo was a managing director of Flywheel.  Mr. Moorad closed the email by noting his hopefulness that a resolution could be reached without resorting to litigation.

292.    In response, on or about July 5, 2021, an attorney from Fried, Frank, Harris, Shriver & Jacobson LLP, who represents Ascential, emailed Mr. Moorad and asked him to "discontinue all communications with Mr. Forbes regarding these matters."

293.    On or about October 7, 2021, Compass sent a formal cease and desist communication to Ascential and Flywheel.

294.    Since May 2021, and certainly by no later than early July 2021, Ascential has been fully on notice of Compass's claims of misappropriation of Compass's trade secrets and proprietary information and know-how by Flywheel, DiPaula, and Miller.  Notwithstanding this notice, Ascential chose to allow the harms to continue and to escalate, continuing to profit from same as the parent company of Flywheel. Ascential's endorsement of and continued facilitation of Flywheel's wrongful conduct renders Ascential a participant in the ongoing misappropriation and unfair competition, as well as an active participant in the ongoing conspiracy pled in this Complaint.

<u>Ascential's Sale of Flywheel to Omnicom, Informa's Acquisition of Ascential, and Omnicom's Continued Profiteering on Stolen Trade Secrets</u>

295.    Perhaps not coincidentally, only approximately two years after being specifically notified of Flywheel's misappropriation of Compass's trade secrets, the core foundational technology for how Amazon works, in or about October 2023, Ascential agreed to sell Flywheel Digital, its digital commerce business, to Omnicom.

296.    On information and belief, Omnicom purchased Flywheel from Ascential for a net cash purchase price of approximately $835 million.

297.    On information and belief, Ascential's sale of Flywheel to Omnicom was only one component of the company's overarching goal to dismantle and sell its business after realizing the legal liability it faced in connection with its acquisition and use of Compass's trade secrets.

298.    Indeed, given Compass's October 7, 2021, cease and desist correspondence to Ascential and Compass's subsequent discussions and/or negotiations with the company, Ascential was aware at the time of its 2023 sale of Flywheel to Omnicom that Flywheel's success was based upon trade secrets and confidential information misappropriated from Compass.

299. On information and belief, and due to Compass's communications to Ascential since October of 2021, and the filing of Federal Litigation in 2022, Ascential resolved to dismantle and sell both Flywheel and all of Ascential's other assets to different buyers. Notably Ascential CEO Duncan Painter went with the Flywheel sale to Omnicom, before Ascential then sold its remaining assets and itself, including to Informa, and was delisted on the London Stock Exchange.

300. In October of 2024, Informa acquired Ascential and, on information and belief, pursuant to the terms of such acquisition, assumed the debts and liabilities of Ascential.

301. By acquiring Ascential in October of 2024, Informa is a successor in interest as to Ascential's debts and liabilities, and therefore is liable to Compass as to Ascential's misappropriation of trade secrets, tortious interference with Compass's business, and participation in the Defendants' overarching conspiracy to destroy Compass's business.

302. The liabilities arising from Ascential's asset sale following Compass's cease-and-desist correspondence and initiation of the Federal Litigation in February of 2022, were not limited to Informa. Indeed, it was Omnicom that acquired Flywheel despite being aware prior to the finalization of the sale that Flywheel technology was stolen.

303. On information and belief, Omnicom performed due diligence in connection with its 2023 acquisition of Flywheel from Ascential. Indeed, as a publicly traded company, Omnicom had fiduciary and/or statutory duties to perform due diligence in connection with its 2023 acquisition of Flywheel from Ascential. As a component of its obligation to perform due diligence in connection with its 2023 acquisition of Flywheel, Omnicom inquired and/or had a duty to inquire about actual and/or threatened legal claims involving the operations of Flywheel.

304. Upon information and belief, Omnicom learned through its due diligence efforts that Flywheel's operations depended on its use of Compass's trade secrets and confidential information, which had been obtained through improper means.

305.    Omnicom knew or should have known that Compass had asserted a legal claim against Flywheel and Ascential for misappropriation of Compass's trade secrets and confidential information prior to or at the time Omnicom purchased Flywheel.  Indeed, eighteen months before Omnicom announced its acquisition of Flywheel, Compass had initiated Federal Litigation against Ascential and Flywheel, alleging that Flywheel had misappropriated Compass's trade secrets and proprietary information and that Ascential knowingly acquired these trade secrets and proprietary information by purchasing Flywheel.  The material allegations underlying the Federal Litigation were both publicly available online and the source of many news articles.  It is inconceivable that Omnicom acquired Flywheel from Ascential without being aware of Compass's allegations that the value of Flywheel's business stemmed from its misappropriation and ongoing use of Compass's trade secrets.

306.    Accordingly, Omnicom knew or should have known that its purchase of Flywheel would necessitate Omnicom's acquisition of Compass's trade secrets and confidential information that Flywheel obtained through improper means (and assumption of the risks associated with the litigation Compass had initiated).

307.    Further, upon Omnicom's completion of its acquisition of Flywheel from Ascential on or around January 2, 2024, Compass promptly informed Omnicom of its pending legal claims against Flywheel and Ascential, including those entities' unlawful acquisition and use of Compass's trade secrets.  By way of example, on January 3, 2024, one day after Omnicom's acquisition of Flywheel, and again on January 10, 2024, John White e-mailed Mr. John Wren, CEO of Omnicom, and advised that Compass had pending claims against Flywheel and Ascential concerning their theft of and profiteering from misappropriated Compass intellectual property.  After Omnicom failed to meaningfully respond to this January 3, 2024, correspondence, on January 18, 2024, Compass sent a formal cease-and-desist to Omnicom demanding that Omnicom

refrain from using Compass's trade secrets acquired by Omnicom by virtue of its purchase of Flywheel from Ascential, including Omnicom's announced plans to incorporating Flywheel's technology with Omnicom's products and offerings, including integrating the companies' respective mobile applications.

308.    Omnicom demonstrated its knowledge of the fact it was acquiring Compass's trade secrets through its acquisition of Flywheel in January of 2024, through negotiating and/or purchasing "buy-side" warranty and indemnity insurance, which is relatively rare in such transactions.  Indeed, on information and belief, in Omnicom and Ascential's (now Informa's) Flywheel Purchase Agreement, Omnicom purchased such insurance to mitigate its legal exposure in light of Compass's well-founded public allegations of trade secret misappropriation and other business torts.

309.    Despite Omnicom having actual knowledge of its acquisition of Compass's trade secrets and confidential information through its purchase of Flywheel, Omnicom nonetheless used such trade secrets to secure highly lucrative contracts.  By way of example, in the fall of 2024, Compass's stolen trade secrets were used to help secure a $20 billion contract with Amazon that is scheduled to commence this year.

310.    In its press release announcing this contract with Amazon, Omnicom directly and unabashedly credited its 2023 purchase of Flywheel to secure this deal.  Specifically, when asked by the press what gave Omnicom the winning edge with respect to securing this Amazon contract, Omnicom CEO, John Wren, stated: "Amazon was just the largest win in quite a while, and quite phenomenal…And we're very, very happy to have been selected, and proud of it…It proves a number of points. **One is the solid relationship we had with Amazon coming off of the Flywheel acquisition**."(https://www.adnews.com.au/news/how-omnicom-won-the-biggest-media-pitch) (https://www.adnews.com.au/news/how-omnicom-won-the-biggest-media-pitch)(emphasis

added).

311.    Like Ascential, Omnicom has actual and/or constructive knowledge that it wrongfully acquired Compass's trade secrets and confidential information through its purchase of Flywheel in 2023. However, Omnicom has chosen to perpetuate and escalate the harm Compass continues to suffer, continuing to profit from Compass's trade secrets and proprietary information as the new parent company of Flywheel. Omnicom's endorsement of and continued facilitation of Flywheel's wrongful conduct renders Omnicom a participant in the ongoing misappropriation and unfair competition, as well as an active participant in the ongoing conspiracy pled in this Second Amended Complaint.

## COUNT I – Breach of Fiduciary Duty
### (Daniel and Michael White)

312.    Compass incorporates Paragraphs 1 through 311 above as if fully set forth herein.

313.    As officers and directors of Compass, Daniel White and Michael White owed fiduciary duties to the company, including the duty of loyalty and duty of care.

314.    Daniel White and Michael White breached those fiduciary duties by, among other things, perpetrating the Secret Bank Account Scheme, Ghost Employee Scheme, IRS Tax Check Scheme, Shareholder Loan Scheme, Information Technology Lockout of Compass Business Records and Accounts Scheme, Sham Legal Claims Scheme, Anonymous Mailings Scheme, Corporate Credit Card Scheme, Severance Schemes,[3] Sham Ownership Interest Scheme, and the scheme to collaborate with Flywheel and its founders to misappropriate Compass's trade secrets and compete unfairly against Compass (collectively, the "Various Schemes").

---

[3] The Flywheel Severance Scheme and the Boshea Severance Scheme may be referred to collectively herein as the "Severance Schemes."

315.    Daniel White and Michael White did not act in good faith in performing their respective fiduciary duties.

316.    In fact, Daniel White and Michael White perpetrated each of the Various Schemes intentionally and maliciously, with the intent to or at the very least the understanding and expectation that their actions would cause harm to Compass.

317.    By engaging in each of the Various Schemes, Daniel White and Michael White breached their respective fiduciary duties to Compass and caused Compass substantial actual damages, including economic damages, such as misappropriated funds, lost revenues, lost clients, lost business opportunities, lost investments, inaccessible documents, and lost employees.

318.    In addition, as a result of the Various Schemes, including particularly the Sham Legal Claims Scheme, Severance Scheme (with respect to the Boshea Litigation), and the Sham Ownership Scheme (with respect to the Virginia Lawsuit), Compass has had to incur substantial, unnecessary legal fees from unwarranted lawsuits and investigations.

### COUNT II – FRAUD/FRAUDULENT CONCEALMENT
### (Daniel, Julie, Kelly, Debra, and Michael White)

319.    Compass incorporates Paragraphs 1 through 318 above as if fully set forth herein.

320.    Over several years, unbeknownst to Compass, Daniel White and Michael White perpetrated the Secret Bank Account Scheme, Ghost Employee Scheme, IRS Tax Check Scheme, Shareholder Loan Scheme, Information Technology Lockout of Compass Business Records and Accounts Scheme, Sham Legal Claims Scheme, Anonymous Mailings Scheme, Corporate Credit Card Scheme, Severance Schemes, Sham Ownership Interest Scheme, and the scheme to collaborate with Flywheel and its founders to misappropriate Compass's trade secrets and compete unfairly against Compass (collectively, the "Various Schemes").

321.    Daniel White and Michael White went to great lengths to conceal the Various Schemes to prevent others at Compass, including its majority owner and CEO, John White, from

discovering the Various Schemes.

322.    Compass justifiably relied on Daniel White and Michael White to perform their fiduciary duties in good faith and consistent with their duties of loyalty and care.  These fiduciary duties entailed an obligation to disclose to Compass information regarding potential and/or ongoing misconduct that is impacting or may impact the company.

323.    Compass justifiably relied on the information reported by Daniel White and Michael White, as well as the information omitted from reports and other documents provided by Daniel White and Michael White, which resulted in Compass being unable to detect the Various Schemes.

324.    Compass justifiably relied on Michael and Daniel's misrepresentations and deceitful actions secretly intended to conceal their misconduct.

325.    As a result of Defendants' fraud and concealment, Compass was unable to uncover the Various Schemes for many years.

326.    As a result of the Various Schemes, Compass has suffered substantial actual damages, including economic damages, such as misappropriated funds, lost revenues, lost clients, lost business opportunities, lost investments, inaccessible documents, and lost employees.

327.    In addition, as a result of the Various Schemes, including particularly the Sham Legal Claims Scheme, Boshea Severance Scheme, and the Sham Ownership Scheme (with respect to the Virginia Lawsuit), Compass has had to incur substantial, unnecessary fees from unwarranted lawsuits and investigations.


### COUNT III – FRAUD/FRAUDULENT CONCEALMENT
### (Chip DiPaula, Patrick Miller, and Flywheel)

328.    Compass incorporates Paragraphs 1 through 327 as if fully set forth herein.

329.    Unbeknownst to Compass, DiPaula and Miller received payments on behalf of Flywheel and/or themselves.  These funds were received directly and/or indirectly from Compass in connection with the Flywheel Severance Scheme.

330.    DiPaula and Miller knew they were not owed any additional funds from Compass when they received the payments directly and/or indirectly from Compass in connection with the Flywheel Severance Scheme.

331.    DiPaula and Miller knew neither they nor Flywheel were entitled to receive the payments they received directly and/or indirectly from Compass in connection with the Flywheel Severance Scheme.

332.    Despite knowing neither they nor Flywheel were owed any money from Compass and that they were not entitled to receive the payments directly and/or indirectly from Compass in connection with the Flywheel Severance Schemes, DiPaula and Miller, on behalf of themselves and/or Flywheel, did not disclose to Compass the payments they received directly and/or indirectly from Compass in connection with the Flywheel Severance Scheme.

333.    Compass justifiably relied on DiPaula and Miller to disclose any improper payments they received directly and/or indirectly from Compass on behalf of themselves and/or Flywheel.

334.    As a result of DiPaula's and Miller's participation in the Flywheel Severance Scheme on behalf of themselves and/or Flywheel, Compass has suffered substantial actual damages, including economic damages, such as misappropriated funds and by not receiving the appreciation in value of those funds that were invested in Flywheel.

### COUNT IV – UNJUST ENRICHMENT
### (Daniel and Michael White, DiPaula, Miller and Flywheel )

335.    Compass incorporates Paragraphs 1 through 334 above as if fully set forth herein.

336.    As a result of their participation in the Secret Bank Account Scheme, Ghost Employee Scheme, IRS Tax Check Scheme, Shareholder Loan Scheme, Corporate Credit Card Scheme, Severance Schemes, Sham Ownership Interest Scheme, and the scheme to collaborate with Flywheel and its founders to misappropriate Compass's trade secrets and compete unfairly against Compass Daniel White and Michael White unjustly enriched themselves while causing Compass to lose substantial funds.

337.    As a result of their participation in the Flywheel Severance Scheme, DiPaula, Miller, and/or Flywheel have unjustly enriched themselves while causing Compass to lose substantial funds, including the misappropriated funds and the loss in appreciation in value of those funds that were invested in Flywheel.

338.    As a consequence of the Secret Bank Account Scheme, Ghost Employee Scheme, IRS Tax Check Scheme, Shareholder Loan Scheme, Corporate Credit Card Scheme, Severance Schemes, Sham Ownership Interest Scheme, and the scheme to collaborate with Flywheel and its founders to misappropriate Compass's trade secrets and compete unfairly against Compass has suffered an impoverishment.

339.    As a result of their misappropriation of Compass's trade secrets and proprietary information, Defendants Michael and Daniel White, Flywheel, Ascential and Omnicom were unjustly enriched while causing Compass to lose market share and enormous profits.

340.    Daniel White's, Michael White's, DiPaula's, Miller's, Flywheel's enrichment and Compass's impoverishment were without justification or cause.

341.    It would be inequitable for Daniel White, Michael White, DiPaula, Miller, and Flywheel to retain and profit from the funds of which they deprived Compass and, as a result, Daniel White, Michael White, DiPaula, Miller, and Flywheel should be held liable to compensate Compass in an amount equal to their respective unjust enrichment(s).

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACT
### (Daniel White and Michael White, DiPaula, Miller, Flywheel)

342.    Compass incorporates Paragraphs 1 through 341 above as if fully set forth herein.

343.    Compass entered into valid and enforceable contracts with numerous clients.

344.    Daniel White and Michael White knew about many of Compass's client contracts because they were owners and former Compass executives who either worked with various Compass clients and/or had access to numerous Compass business records that identified Compass's clients and the various contacts of those clients.

345.    Daniel White and Michael White intentionally and maliciously interfered with various Compass contracts, such as Duracell, by engaging in the Anonymous Mailings Scheme and targeting those clients.

346.    Daniel White and Michael White also knew most, if not all, of Compass's employees by having owned and worked for the company for many years prior to their termination from employment.

347.    Daniel White and Michael White intentionally and maliciously interfered with Compass's employment relationships with certain employees, such as Shawn McGlaughlin, Marty Monserez, and Jerry Cain, by targeting them with mailings in the Anonymous Mailings Scheme, which had the effect of discouraging them from remaining employed by Compass.

348.    As a result of Daniel White's and Michael White's tortious interference with these and other contracts, Compass suffered actual damages, including economic damages.

## COUNT VI – TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE
### (Daniel White and Michael White, DiPaula, Miller, Flywheel )

349.    Compass incorporates Paragraphs 1 through 348 above as if fully set forth herein.

350.    Daniel White, Michael White, DiPaula, Miller and Flywheel knew about many of Compass's potential clients because they were owners and former Compass executives who either worked on plans to develop various client relationships and/or had access to numerous Compass

79

business records that identified Compass's potential clients and the various contacts of those clients.

351.    Daniel White, Michael White, DiPaula, Miller and Flywheel intentionally and maliciously interfered with various potential Compass clients, such as Colgate, and partnerships, such as Compass's and Tagnetics's partnership with SES and Qualcomm, by engaging in the Anonymous Mailings Scheme and targeting those potential clients.

352.    As a result of Daniel White's and Michael White's tortious interference with these and other potential Compass clients, Compass suffered actual damages, including economic damages.

## COUNT VII – CONSPIRACY TO TORTIOUSLY INTERFERE WITH CONTRACTS
### (Daniel White and Michael White, DiPaula, Miller, Flywheel)

353.    Compass incorporates Paragraphs 1 through 352 above as if fully set forth herein.

354.    Daniel White, Michael White, DiPaula, Miller and Flywheel agreed to work together and in concert to intentionally interfere with Compass client contracts, as described above in Count V.

355.    As a result of Daniel White's and Michael White's coordinated effort to interfere with Compass's client relationships and existing contracts, Compass suffered and continues to suffer actual damages, including economic damages.

## COUNT VIII – CONSPIRACY TO TORTIOUSLY INTERFERE WITH PROSPECTIVE ADVANTAGE
### (Daniel White and Michael White, DiPaula, Miller, McCord, Flywheel)

356.    Compass incorporates Paragraphs 1 through 355 above as if fully set forth herein.

357.    Daniel White and Michael White agreed to work together and in concert to intentionally interfere with Compass's prospective client relationships, as described above in Count VI.

358.    As a result of Daniel White's and Michael White's coordinated effort to interfere with Compass's prospective client relationships, Compass has suffered and continues to suffer actual damages, including economic damages.

## COUNT IX – CONSPIRACY TO COMMIT FRAUD/FRAUDULENT CONCEALMENT
**(Daniel, Michael, Kelly, Julie, and Debra White, DiPaula, McCord, Miller, and Flywheel)**

359.    Compass incorporates Paragraphs 1 through 358 above as if fully set forth herein.

360.    Daniel White and Michael White agreed to work together and in concert to conceal and perpetuate the Various Schemes, and they worked in concert with DiPaula and Miller in concealing and perpetrating the Severance Scheme, to profit from Compass unlawfully.

361.    As a result of Daniel White's, Michael White's, DiPaula's, and Miller's conspiracy(ies) to commit fraud/fraudulent concealment to benefit themselves, to the detriment of Compass, Compass suffered and continues to suffer actual damages, including economic damages.

## COUNT X – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH CONTRACTS
**(Daniel White and Michael White, Dipaula, Miller, McCord, Flywheel)**

362.    Compass incorporates Paragraphs 1 through 361 above as if fully set forth herein.

363.    Daniel White and Michael White substantially assisted and encouraged one another to intentionally interfere with Compass client contracts, as described above in Count V.

364.    As a result, Compass suffered and continues to suffer actual damages, including economic damages.

## COUNT XI – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE
**(Daniel White and Michael White, Dipaula, Miller, McCord, Flywheel)**

365.    Compass incorporates Paragraphs 1 through 364 above as if fully set forth herein.

366.    Daniel White and Michael White substantially assisted and encouraged one another to intentionally interfere with Compass's prospective client relationships, as described above in Count VI.

367.    As a result, Compass suffered and continues to suffer actual damages, including economic damages.

### COUNT XII – AIDING AND ABETTING FRAUD/FRAUDULENT CONCEALMENT
### (Daniel White, Michael White, DiPaula, and Miller, McCord, Flywheel)

368.    Compass incorporates Paragraphs 1 through 367 above as if fully set forth herein.

369.    Daniel White and Michael White substantially assisted and encouraged one another to engage in the Various Schemes and to conceal the Various Schemes.

370.    Daniel White, Michael White, DiPaula, and Miller substantially assisted and encouraged one another to engage in the Severance Scheme and to conceal the Severance Scheme.

371.    As a result, Compass suffered and continues to suffer actual damages, including economic damages.

### COUNT XIII – CONVERSION
### (Michael White and George White)

372.    Compass incorporates Paragraphs 1 through 371 above as if fully set forth herein.

373.    Michael White and George White intentionally and wrongfully exercised dominion and control over Compass's personal property, as alleged above and including via George White's acts to intentionally and maliciously cut off Compass's access to employee email accounts with the compassmarketinginc.com domain, Microsoft, QuickBooks, and other business records and accounts.

374.    Daniel and Julie White intentionally and wrongly exercised control over Compass's insurance by secretly purchasing attorney malpractice insurance using the controlled company email account to purport that Julie White was an employee buying the lawyers malpractice insurance.

375.    Consequently, Compass was not able to communicate by email with clients or otherwise access the records required to do business.  Compass had to rebuild its IT infrastructure

and establish a new compassmarketinginc.net domain at significant expense.

376.    Compass expended significant effort, time, and money to create new accounts and business records.  Compass employees engaged in the time-consuming task of reaching out to clients and leads to address problems arising from missing records and provide new contact information.

377.    Michael White and George White continue to intentionally and wrongfully exercise dominion and control over Compass's network and, on information and belief, will continue to do so unless enjoined.

378.    As a result of Michael White's and George White's conversion of Compass's network, emails, and insurance, Compass suffered and continues to suffer actual damages, including economic damages.

## COUNT XIV – CONSPIRACY TO VIOLATE THE MARYLAND STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS ACT
### (Michael ,George, and Daniel White)

379.    Compass incorporates Paragraphs 1 through 378 above as if fully set forth herein.

380.    Pursuant to Section 10-4A-02 of the Maryland Stored Wire and Electronic Communications and Transactional Records Access Act (the "Maryland Stored Communications Act"), "a person may not obtain, alter, or prevent authorized access to a wire or electronic communication while it is in electronic storage in an electronic communications system by: (1) intentionally accessing without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeding an authorization to access a facility through which an electronic communication service is provided."

381.    Michael, Daniel, and George White agreed to work together and in concert to intentionally engage in conduct that violates the Maryland Stored Communications Act.

382.    In this regard, Michael, Daniel and George White have conspired to continuously block access to Compass's email accounts, and QuickBooks account, as described in the Information Technology Lockout of Compass Business Records and Accounts Scheme.

383.    In addition, on numerous occasions after George resigned from employment with Compass, Michael, Daniel, and George White have conspired to access and utilize for their own purposes and for the purposes of other Flywheel Defendants, various email accounts of Compass employees without authorization from Compass, as well as financial records to assist a former employee competing with the company

384.    Furthermore, in connection with various pieces of litigation against the company, including the Boshea Litigation in October and November 2021, and in other instances, Michael White, in collaboration with George White, has produced email communications to which he was not a sender or recipient, which is indicative of Michael White's and George White's conspiracy to improperly access stored electronic communications that they were not given authorization to access, view, disclose, or otherwise use.

385.    As a result of Michael, Daniel, and George White's conspiracy to block Compass's access to its email accounts, as well as their conspiracy to access, view, disclose, and otherwise use emails without authorization, Compass has suffered and continues to suffer actual damages, including economic damages.

### COUNT XV – AIDING AND ABETTING VIOLATION OF MARYLAND STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS ACT
### (Michael White and George White and Daniel White)

386.    Compass incorporates Paragraphs 1 through 385 above as if fully set forth herein.

387.    Pursuant to Section 10-4A-02 of the Maryland Stored Communications Act, "a person may not obtain, alter, or prevent authorized access to a wire or electronic communication while it is in electronic storage in an electronic communications system by: (1) intentionally

accessing without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeding an authorization to access a facility through which an electronic communication service is provided."

388.    Michael, Daniel, and George White substantially assisted and encouraged one another to intentionally engage in conduct that violates the Maryland Stored Communications Act.

389.    In this regard, Michael, Daniel, and George White have assisted and encouraged one another to continuously block access to Compass's email and other accounts, as described in the Information Technology Lockout of Compass Business Records and Accounts Scheme.

390.    In addition, on numerous occasions after George resigned from employment with Compass, Michael Daniel, and George White have assisted and encouraged one another to access and utilize for their own purposes various email accounts of Compass employees without authorization from Compass.

391.    Furthermore, in connection with various pieces of litigation against the company, including the Boshea Litigation in October and November 2021, and in other instances, Michael White, with assistance and encouragement from Daniel and George White, has produced email communications to which he was not a sender or recipient, which is indicative of Michael Daniel and George White's assisting and encouraging of one another to improperly access stored electronic communications that they were not given authorization to access, view, disclose, or otherwise use.

392.    As a result of Michael, Daniel and George White's assisting and encouraging one another to block Compass's access to its email accounts, as well as access, view, disclose, and otherwise use emails without authorization, Compass has suffered and continues to suffer actual damages, including economic damages.

## COUNT XVI – DECLARATORY JUDGMENT
### (Daniel White and Michael White)

393.    Compass incorporates Paragraphs 1 through 392 above as if fully set forth herein.

394.    This Court has jurisdiction to provide declaratory relief pursuant to MD. CTS. & JUD. PROC. § 3-403.

395.    Pursuant to MD. CTS. & JUD. PROC. § 3-406, "[a]ny person [which includes a business entity] interested under a . . . written contract, or other writing constituting a contract, or whose rights, status, or other legal relations are affected by a . . . contract, or franchise, may have determined any question of construction or validity arising under the instrument, . . . contract, or franchise and obtain a declaration of rights, status, or other legal relations under it."

396.    Pursuant to MD. CTS. & JUD. PROC. § 3-409, "a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if: (1) An actual controversy exists between contending parties; (2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or (3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it."

397.    When issuing a declaratory judgment, pursuant to MD. CTS. & JUD. PROC. § 3-410, the Court may award costs to a party if the Court deems it equitable and just.

398.    In this case, an actual controversy exists regarding the respective ownership interests of Compass, and this controversy has resulted in disputes and sham litigation and will continue to result in disputes and litigation that is harmful to Compass's interests unless and until the controversy is resolved.

399.    To this end, Compass seeks a declaration as to the respective ownership interests.

## COUNT XVII – MARYLAND UNIFORM TRADE SECRETS ACT (MUTSA)
### (Flywheel, DiPaula, Miller, Michael White, Ascential (now Informa) and Omnicom)

400.    Compass incorporates Paragraphs 1 through 399 above as if fully set forth herein.

401.    Compass is the owner of trade secrets that were accessed by DiPaula and Miller by virtue of their employment with Compass's eCommerce team.

402.    Compass is also the owner of trade secrets that were misappropriated during the course of the 2019 IT lockout or other points when certain of the Defendants, as pleaded above, accessed, acquired, used and/or disclosed Compass property following DiPaula and Miller's departure from Compass.

403.    The representative categories of trade secrets identified in the factual background of this Complaint are owned by Compass and constitute trade secrets within the meaning of the Maryland Uniform Trade Secrets Act ("MUTSA").

404.    Flywheel, Ascential and Omnicom have used and/or continue to use the misappropriated Compass trade secrets, which include, among other categories, formulas, marketing, pricing, sales, and business information.

405.    Compass has taken reasonable measures under the circumstances to protect its trade secrets, including, but not limited to, by limiting access to the eCommerce Guide to only members of the eCommerce team with whom Compass had confidentiality agreements, maintaining only one physical copy of the eCommerce guide kept in a monitored location with limited access, limiting electronic access to the eCommerce guide through password protection, and only allowing select eCommerce team members to maintain and access the eCommerce Guide.

406.    As a result of the above-mentioned protective measures, the trade secrets at issue in this matter are not generally known or readily available to the public or Compass's competitors.

407.    Alternatively, to the extent that the trade secrets at issue in this matter are now generally known or readily available to the public or Compass's competitors due to the

misappropriation and subsequent disclosure by Flywheel, DiPaula, Miller, Ascential and/or Omnicom at the time of misappropriation, the trade secrets were not and would not have been generally known or readily available to the public or Compass's competitors but for these Defendants' actions. Any such unauthorized disclosures of Compass's trade secrets by Flywheel, DiPaula, Miller, Ascential, and Omnicom were separate acts of misappropriation.  Moreover, at the time of misappropriation, Flywheel benefitted from the fact that the information it stole was not generally known or readily available to the public or its competitors.

408.    The trade secrets at issue in this case have independent economic value to Compass by virtue of being unknown or not readily available to others in the industry.

409.    Compass spent more than a decade compiling the information underlying the misappropriated trade secrets and engaged in the reasonable protection measures outlined herein to ensure that this trade secret information and proprietary business know how would not fall into the hands of competitors. Compass sought to protect the misappropriated information because Compass understood the trade secret information and proprietary business know how to be objectively valuable—*i.e.*, its "crown jewels"—and provided Compass with competitive advantages in the marketplace.

410.    Flywheel, Ascential and Omnicom's access to, acquisition of, and subsequent unauthorized use of the Compass trade secret information and proprietary business know how has  driven Flywheel's position in the market to the disadvantage of Compass, who would have otherwise maintained its relationships with clients solicited by Flywheel and its parent companies.

411.    The independent economic value of the misappropriated trade secret information and proprietary business know how is reflected in the $400 million purchase price that Ascential paid to acquire Flywheel and Ascential's recent projections as to Flywheel's future growth, as identified above (depicting Ascential's Interim Report dated July 2021 with Flywheel financial

projections).

412.   The independent economic value of the misappropriated trade secret information and proprietary business know how is further reflected in the $830 million that Omnicom paid to acquire Flywheel from Ascential, as well as a contract Omnicom secured with Amazon by leveraging Compass's stolen trade secrets and confidential information that is worth over $4 billion.

413.   Compass took reasonable steps to maintain the secrecy of the trade secret information and proprietary business know how.  To the extent that the trade secrets at issue in this matter are now available to the public or Compass's competitors, it is because the Defendants in this Count made such disclosures without Compass's authorization.

414.   By misappropriating Compass's trade secrets, Flywheel, DiPaula, Miller, Ascential, and Omnicom benefitted and/or are benefitting from Compass's significant investment of energy, resources, and time.  For example, DiPaula, Miller, Flywheel, and Omnicom used and/or are using Compass's client relationships, relationships with Amazon, independent analysis and scrutiny of Amazon's complex sales and marketing algorithms, and independent and unparalleled access to sales and consumer information from Amazon's platforms in order to compete with Compass in the eCommerce industry.  Through this misappropriation, Flywheel, DiPaula, Miller, Ascential and Omnicom have received an illicit head start and saved untold millions of dollars in independent client development and data analysis.

415.   The Presentation discovered by Fernandez on January 20, 2020, demonstrates that Flywheel, DiPaula, Miller, Ascential and Omnicom are using and/or have used Compass's trade secrets and proprietary business know how to profit from a competitive company built on Compass's experience and investments in the eCommerce industry such that Flywheel and its parent companies unfairly competed and/or can unfairly compete against Compass.  It is unknown when

the web site made the presentations available to the public.

416.    Flywheel's business incorporates trade secrets and other proprietary business know how that DiPaula and Miller learned and developed while part of Compass's eCommerce team. Flywheel, Ascential and Omnicom use(d) this misappropriated information to provide the same services Compass provides to many of the same clients that had previously been Compass eCommerce clients.

417.    Because DiPaula and Miller had little to no experience in the CPG or eCommerce industries prior to joining Compass, the proprietary business methods, processes, and platform communication strategies DiPaula and Miller utilize at Flywheel was fully conceived during their employment with Compass and constitutes Compass's trade secret information.

418.    DiPaula and Miller knew or had reason to know that their use of Compass's trade secrets was improper because they had a duty to limit the use of the trade secrets under the terms of their employment with Compass. Neither Flywheel, DiPaula, Miller, Ascential, nor Omnicom had consent from Compass to use its trade secrets to compete with Compass.

419.    Ascential has been fully on notice as to the trade secret misappropriation contentions set forth herein since May 2021 yet has chosen to enable, participate in, and profit from the past and continued misappropriation of Compass's trade secret information.

420.    Omnicom has had actual and/or constructive notice as to the trade secret misappropriation contentions as of the fall 2023 by virtue of the due diligence it was required to perform in connection with its purchase of Flywheel from Ascential, announced in October of 2023.  However, Omnicom has chosen to enable, participate in, and profit from the past and continued misappropriation of Compass's trade secret information.

421.    Again in 2023 Flywheel co-conspirators Boshea and Michael White did again misappropriate Compass's trade secrets, namely its financial records and customer lists, for the

benefit of Boshea and Michael White and the other Flywheel defendants in its goal to destroy Compass.

422.    The actions alleged herein by Flywheel, DiPaula, Miller, Boshea, Michael White, Ascential, and Omnicom constitute misappropriation under the MUTSA.

423.    The misappropriation has caused and will continue to cause damage to Compass including, but not limited to, Compass's competitive disadvantage in relation to Flywheel, Compass's loss of business and market share to Flywheel, thus unjustly enriching Flywheel, and devaluation of Compass's trade secrets. Therefore, Compass is entitled to and requests an award of damages in its favor for actual loss caused by the misappropriation, damages for all unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss, and/or damages measured by imposition of liability for a reasonable royalty for the unauthorized disclosure or use of Compass's trade secrets.

424.    Flywheel, DiPaula, Miller, Ascential, and Omnicom have willfully and maliciously misappropriated Compass's trade secrets and have profited and continue to profit from Compass's trade secrets. Compass therefore is entitled to and requests exemplary damages in an amount not more than double Compass's economic damages, plus reasonable attorneys' fees and costs.

425.    As a result of Defendants' misappropriation of Compass's trade secrets, Compass has suffered and continues to suffer irreparable harm for which no adequate remedy at law exists, including without limitation the unauthorized use and disclosure of Compass's trade secrets and harm to Compass's competitive market position and business reputation.

426.    Under the MUTSA, Compass is entitled to and requests permanent injunctive relief to prohibit Flywheel, DiPaula, Miller, Boshea, Michael White, Ascential and Omnicom from using, disclosing, or retaining any of Compass's trade secrets.

## COUNT XVIII – TORTIOUS INTERFERENCE WITH CONTRACT
### (DiPaula, Miller, and Flywheel)

427.    Compass incorporates Paragraphs 1 through 426 above as if fully set forth herein.

428.   Compass entered into valid and enforceable contracts with CPG clients and Compass employees.

429.    Defendants DiPaula, Miller, and Flywheel knew about the contracts because they were former Compass employees who worked with these CPG clients and employees on a daily basis.

430.    Defendants intentionally interfered with the Compass contracts by poaching a long list of Compass eCommerce clients, including well-established brands such as Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, Proctor and Gamble ("P&G") and 5 Hour Energy.

431.    Defendants also intentionally interfered with Compass contracts by recruiting Compass employees who worked on the CPG client accounts to join Flywheel, knowing that the brain trust provided a valuable service that could not be duplicated, and that each employee was under non-disclosure agreement about the trade secrets and confidential projects with which they were working. Miller and Dipaula encouraged and continue to encourage employees to breach their contracts

432.    Defendants' actions caused these eCommerce clients to terminate their contracts with Compass and hire Flywheel so the clients could receive the same services by the same employees that handled the accounts at Compass, in violation of their non-disclosure agreements.

433.    As a result of Defendants' interference, Compass suffered actual damages, including economic damages.

## COUNT XIX – TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE
### (Flywheel, DiPaula, Miller)

434.    Compass incorporates Paragraphs 1 through 433 above as if fully set forth herein.

435.    Defendants DiPaula and Miller intentionally and maliciously lied to potential Compass eCommerce client Proctor & Gamble when they said that Compass was getting out of the eCommerce business.

436.    DiPaula and Miller lied in an attempt to end the Compass and P&G relationship, to prevent P&G from entering into an eCommerce contract with Compass, and to facilitate Flywheel's engagement of P&G as a client.

437.    As a result of DiPaula and Miller's deceit, Compass lost the prospective advantage as P&G ceased conversations about hiring Compass for its eCommerce services.

438.    Later, Flywheel acquired and retained P&G as an eCommerce client.

439.    As a result of DiPaula, Miller, and Flywheel's conduct, Compass suffered economic damages.

## COUNT XX – UNFAIR COMPETITION
### (Flywheel, DiPaula, Miller, McCord, Ascential (now Informa), and Omnicom)

440.    Compass incorporates Paragraphs 1 through 439 above as if fully set forth herein.

441.    Defendants Flywheel, DiPaula, Miller, Ascential and Omnicom engaged in a coordinated series of unfair and deceptive acts intended to damage and destroy Compass's business and ultimately steal Compass's eCommerce customers.

442.    Flywheel, Miller, and DiPaula stole Compass's trade secrets and other proprietary and confidential business information and know-how, and used such to form the competitor entity Flywheel and continue to use Compass's trade secrets, proprietary business know how, and confidential information to poach clients and Compass employees.

443.    Flywheel's success both in terms of increased revenue year over year and its eventual $400 million acquisition by Ascential and subsequent $830 million acquisition by Omnicom would not have been possible but for Flywheel's reliance on Compass's stolen trade secrets and proprietary information and know-how.

444.    Flywheel's continued success following the Ascential and Omnicom acquisitions would not have been possible but for Ascential's and Omnicom's reliance on Compass's stolen trade secrets and proprietary information and know-how.

445.    As a result of the unfair and deceptive statements and conduct directed at Compass and Compass's eCommerce customers by Flywheel, DiPaula, Miller, Ascential, and Omnicom Compass's business was severely damaged through the loss of valuable business relationships with eCommerce customers in Maryland and other locations.

446.    When they were employees and executives of Compass, DiPaula and Miller owed fiduciary duties to Compass.

447.    DiPaula and Miller breached their fiduciary duties through their misappropriation of trade secrets and other confidential and proprietary information belonging to Compass.

448.    DiPaula, McCord, and Miller's breaches of their fiduciary duties harmed Compass, including because Compass's confidential and proprietary information, including its business know how, was misused to usurp from Compass its corporate opportunities and Compass's resources were converted for the benefit of others.

449.    As a result of Flywheel, DiPaula, Miller, McCord, Ascential and Omnicom's conduct, Compass suffered actual damages, including economic damages.

## COUNT XXI – UNJUST ENRICHMENT
### (DiPaula, Miller, Flywheel, McCord, Daniel White, Michael White, Ascential (now Informa) and Omnicom)

450.    Compass incorporates Paragraphs 1 through 449 above as if fully set forth herein.

451.    By reason of improper conduct by Flywheel, DiPaula, Miller, Daniel, Michael White, McCord, Ascential (now Informa) and Omnicom Defendants have enriched themselves and the corporate entities with which they are affiliated.

452.    Flywheel, DiPaula, Miller, Daniel and Michael White, Ascential (now Informa), and Omnicom have profited and continue to profit from use of Compass's trade secret, proprietary, and confidential information. In particular, Flywheel, DiPaula, and Michael White have received as much as $400 million from Ascential as a direct result of their unauthorized and unlawful use of Compass's trade secret, proprietary, and confidential information.

453.    Flywheel, DiPaula, Miller, Ascential, and Omnicom have willfully and maliciously misappropriated Compass's trade secret, proprietary, and confidential information.

454.    Ascential knew or was informed no later than May 2021 that it was profiting from Compass's trade secret, proprietary, and confidential information, yet chose to take no action despite its knowledge that it was unlawfully benefitting from Compass's intellectual property.

455.    Similarly, Omnicom knew or should have known prior to its purchase of Flywheel in 2023 that it was profiting from Compass's trade secret, proprietary, and confidential information, yet chose to take no action despite its knowledge that it is unlawfully benefitting from Compass's intellectual property, and continues to enjoy the financial benefits from the actionable misconduct of Flywheel, DiPaula, and Miller.

456.    As a consequence of the unlawful acquisition, use, and/or disclosure of Compass's trade secret, proprietary, and confidential information by Flywheel, DiPaula, Miller, Ascential, and Omnicom, Compass has suffered an impoverishment.

457.    Defendants' enrichment and Compass's impoverishment were without justification or cause.

458.    It would be inequitable for Flywheel, DiPaula, Miller, Ascential, and Omnicom to profit and continue to profit from Compass's stolen trade secret, proprietary, and confidential information.  Should Compass have no other remedy in law against Flywheel, DiPaula, Miller, Ascential, and Omnicom for their various tortious misconduct, each defendant is bound to compensate Compass in an amount equal to their respective unjust enrichment.

### COUNT XXII – FRAUD/FRAUDULENT CONCEALMENT
### (All Defendants)

459.    Compass incorporates Paragraphs 1 through 458 above as if fully set forth herein.

460.    All Defendants have committed countless wrongful acts and misrepresentations in order to conceal and further perpetuate the schemes detailed above, including misappropriation of Compass's trade secret, proprietary, and confidential information and racketeering schemes.

461.    Specifically, DiPaula, Miller, and Flywheel worked in concert to conceal the misappropriation of Compass's trade secrets to found and operate Flywheel as a competing eCommerce entity.  Michael White and Daniel White worked in concert to support Flywheel by issuing checks that involved Compass funds to Chip DiPaula that he used to fund and operate the Flywheel business.  George White engaged in the alleged IT misconduct to interfere with Compass's business in competition with Flywheel, among other things.  Ascential and Omnicom, through their respective acquisitions of and post-acquisition support of Flywheel's business, worked to continually conceal the past and continued misappropriation of Compass's trade secrets and proprietary business information and know-how.

462.    Michael White and Daniel White owed a duty to Compass to disclose their financial decisions and conflicting financial interests as Compass officers but worked tirelessly to actively conceal and misrepresent their actions, as pled above.

463.    Compass justifiably relied upon Michael White's and Daniel White's deceitful actions, including by declining to pursue legal action against DiPaula, Miller, Flywheel, and former Flywheel employees due to Daniel White's conflicted legal advice that resulted from his undisclosed financial interest in Flywheel.

464.    As a result of Defendants' fraud and concealment, Compass was unable to uncover the misappropriation of its trade secret, proprietary, and confidential information and, as a result, suffered actual damages including, but not limited to, loss of economic value of its trade secret, proprietary, and confidential information, loss of clients, revenues, economic opportunities, investments, and employees. As a further result of Defendants' actions, Compass has suffered actual damages from years of embezzlement and fraud and legal fees from unwarranted lawsuits intended to conceal Defendants' actions.

## COUNT XXIII – CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS
### (Daniel White, Michael White, McCord, Flywheel, Ascential (now Informa), Omnicom

465.    Compass incorporates Paragraphs 1 through 464 above as if fully set forth herein.

466.    Defendants agreed to work together and in concert to benefit Flywheel and cause financial harm and reputational damage to Compass, as evidenced by the coordinated actions of Defendants to:

a.    Steal Compass trade secrets, and proprietary information;

b.    Provide Flywheel with access to the stolen Compass trade secrets, and proprietary information; and

c.    Financially support Flywheel, through unwarranted payments to Chip DiPaula, as Flywheel continuously misappropriates Compass trade secrets, and proprietary information.

467.    As a result of Defendants' coordinated effort to benefit Flywheel and cause financial harm and reputational damage to Compass, Compass suffered and continues to suffer actual damages, including economic damages.

## COUNT XXIV – BREACH OF CONTRACT
### (DiPaula & Miller)

468.    Compass incorporates Paragraphs 1 through 467 above as if fully set forth herein.

469.    Compass's offer of employment required DiPaula and Miller to be bound by the terms of the "Agreement[s] Relating to Employment and Post Employment," the Employee Handbook, and Compass policies and procedures.

470.    The "Agreement Relating to Employment and Post Employment" states:

   a.    Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where recognized by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged.

   b.    During the period of Employee's employment with COMPASS and for a period of two years following the termination of Employee's employment, regardless of the reason for termination, Employee shall not, directly or indirectly: (i) induce or encourage any employee of COMPASS to leave the employ of COMPASS, (ii) hire any individual who is or was an employee of COMPASS as of the date of employee's termination of employment or within a one year period prior to such date, or (iii) induce or encourage any customer, client, potential customer, potential client and/or other business relation of COMPASS to not do business or cease or reduce doing business with COMPASS or in any way interfere with the relationship between any such customer, client, potential client, supplier or other business relation and COMPASS.

471.    Compass's Employee Handbook prohibits:

a. Theft, misappropriation or unauthorized possession or use of property, documents, records or funds belonging to the Company, or any client or employee; removal of same from Company premises without authorization.

b. Divulging trade secrets or other confidential business information to any unauthorized persons or to others without an official need to know.

c. Obtaining unauthorized confidential information pertaining to clients or employees.

472.    DiPaula and Miller agreed to the terms of the "Agreement Relating to Employment and Post Employment," the Employee Handbook, and Compass policies and procedures in consideration for jobs, salaries, and benefits, including $1,000 for agreeing to be bound by the terms of the "Agreement Relating to Employment and Post Employment."

473.    DiPaula and Miller breached the terms of the "Agreement Relating to Employment and Post Employment" by:

a. Stealing Compass trade secrets, and proprietary business know how to found and operate their business at Flywheel;

b. Soliciting Compass clients to join Flywheel; and

c. Soliciting potential eCommerce client Proctor and Gamble ("P&G") by lying about the state of Compass's eCommerce Department and slowing negotiations with P&G while DiPaula and Miller were still Compass employees.

474.    DiPaula and Miller breached the terms of the Employee Handbook by:

a. Stealing Compass trade secrets and in particular, misappropriating the Compass eCommerce Guide;

b. Divulging trade secrets and/or confidential and proprietary business information to Flywheel, its clients, and the general public as evidenced by Miller's 2015 Flywheel Power Point presentation at the Grocers Summit; and

c. Obtaining unauthorized confidential information pertaining to clients or employees by requesting client information from Compass employees after DiPaula and Miller left the Company and started Flywheel.

475.    As a result of the above breaches of contract, DiPaula and Miller caused Compass to incur significant actual damages. These damages are ongoing since Flywheel, DiPaula, Miller, Ascential and Omnicom continue to use Compass trade secrets and proprietary know how to operate the Flywheel business.

### COUNT XXV – CONSPIRACY TO INDUCE BREACH OF CONTRACT (DiPaula & Miller)

476.    Compass incorporates Paragraphs 1 through 475 above as if fully set forth herein.

477.    Defendants DiPaula and Miller agreed to work together and in concert to breach their "Agreement[s] Relating to Employment and Post Employment" to benefit Flywheel and for personal financial gain, as evidenced by the coordinated actions of Defendants to:

   a.    Use Compass trade secrets, and confidential and proprietary information to found and operate their business at Flywheel;

   b.    Solicit Compass employees Alex McCord, Dayna Acevedo, Justin Liu, Mike Menefee and Mike O'Donnell who ultimately resigned from Compass and joined Flywheel; and

   c.    Solicit Compass potential eCommerce client Proctor and Gamble ("P&G") causing it to terminate negotiations, and Compass clients including Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, and 5 Hour Energy which ultimately terminated their service contracts with Compass and hired Flywheel.

478.    As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages, including economic damages.

### COUNT XXVI – CONSPIRACY TO TORTIOUSLY INTERFERE WITH CONTRACTS (DiPaula, Miller, and Flywheel)

479.    Compass incorporates Paragraphs 1 through 478 above as if fully set forth herein.

480.    Defendants DiPaula, Miller, and Flywheel agreed to work together and in concert to intentionally interfere with Compass client contracts as is evidenced by the coordinated actions

of Defendants to cause Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, and 5 Hour Energy to terminate their contracts with Compass and hire Flywheel to provide the same eCommerce marketing services.

481.    As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages, including economic damages.

### COUNT XXVII – CONSPIRACY TO TORTIOUSLY INTERFERE WITH PROSPECTIVE ADVANTAGE
#### (DiPaula, Miller, and Flywheel)

482.    Compass incorporates Paragraphs 1 through 481 above as if fully set forth herein.

483.    Defendants DiPaula, Miller, and Flywheel agreed to work together and in concert to prevent Compass from obtaining an eCommerce contract with Proctor & Gamble ("P&G") as evidenced by the coordinated actions of Defendants to intentionally and maliciously lie and tell P&G corporate representatives that Compass was getting out of the eCommerce business.

484.    As a result of Defendants' coordinated effort to end the Compass and P&G relationship so Flywheel could attempt to retain P&G as a client, Compass has suffered and continues to suffer actual damages, including economic damages.

### COUNT XXVIII – CONSPIRACY TO UNFAIRLY COMPETE
#### (Michael White, Daniel White, McCord, Flywheel, Ascential (now Informa), and Omnicom)

485.    Compass incorporates Paragraphs 1 through 484 above as if fully set forth herein.

486.    Defendants agreed to work together and in concert to damage and destroy Compass's business and ultimately steal Compass's eCommerce customers as evidenced by the coordinated actions of Defendants to:

a.    Steal Compass trade secrets and other proprietary and confidential information;

b.    Use such information to find Flywheel; and

    c.    Continue to use Compass trade secrets and other proprietary and confidential information to poach clients and Compass employees.

487.    As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages, including economic damages.

## COUNT XXIX – CONSPIRACY TO COMMIT FRAUD/ FRAUDULENT CONCEALMENT
### (Michael White, Daniel White, George White, Debra White, Julie White, Kelly White and Flywheel)

488.    Compass incorporates Paragraphs 1 through 487 above as if fully set forth herein.

489.    Defendants agreed to work together and in concert to conceal their schemes to benefit from Compass's trade secrets and confidential and proprietary information and otherwise profit from Compass unlawfully, as described in the Various Schemes and misappropriations set forth herein.

490.    As a result of these Defendants fraudulent concealment, Compass was unable to discover the tortious conduct of the Defendants until its internal audit conducted in 2019.

491.    As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages, including economic damages.

## COUNT XXX – AIDING AND ABETTING MISAPPROPRIATION OF TRADE SECRETS
### (DiPaula, Miller, and Flywheel)

492.    Compass incorporates Paragraphs 1 through 491 above as if fully set forth herein.

493.    DiPaula, Miller, and Flywheel substantially assisted and encouraged one another to use Compass's trade secrets, proprietary business know-how, and confidential information in order to compete with Compass in the eCommerce industry.

494.    As a result, Compass suffered and continues to suffer actual damages, including economic damages.

## COUNT XXXI – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH CONTRACTS
### (DiPaula, Miller, and Flywheel)

495.    Compass incorporates Paragraphs 1 through 494 above as if fully set forth herein.

496.    Defendants DiPaula, Miller, and Flywheel substantially assisted and encouraged one another to intentionally interfere with Compass contracts as is evidenced by the coordinated actions of Defendants to cause Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, and 5 Hour Energy to terminate their contracts with Compass and hire Flywheel to provide the same eCommerce marketing services.

497.    As a result, Compass suffered and continues to suffer actual damages, including economic damages.

## COUNT XXXII – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE
### (DiPaula, Miller, and Flywheel)

498.    Compass incorporates Paragraphs 1 through 497 above as if fully set forth herein.

499.    Defendants DiPaula, Miller, and Flywheel substantially assisted and encouraged one another to prevent Compass from obtaining an eCommerce contract with Proctor & Gamble ("P&G") as evidenced by the coordinated actions of Defendants to intentionally and maliciously misrepresent to P&G corporate representatives that Compass was getting out of the eCommerce business.

500.    As a result, Compass suffered and continues to suffer actual damages, including economic damages.

## COUNT XXXIII – AIDING AND ABETTING UNFAIR COMPETITION
### (DiPaula, Miller, and Flywheel)

501.    Compass incorporates Paragraphs 1 through 500 above as if fully set forth herein.

502.    Defendants DiPaula, Miller, and Flywheel substantially assisted and encouraged one another to commit a coordinated series of unfair and deceptive acts intended to damage and destroy Compass's business and ultimately steal Compass's eCommerce customers.

503.    As a result, Compass suffered and continues to suffer actual damages, including economic damages.

### COUNT XXXIV – AIDING AND ABETTING FRAUD/ FRAUDULENT CONCEALMENT/FRAUD (All Defendants)

504.    Compass incorporates Paragraphs 1 through 503 above as if fully set forth herein.

505.    Defendants substantially assisted and encouraged one another to conceal their schemes to benefit from Compass's trade secrets and confidential and proprietary information and otherwise profit from Compass unlawfully, as described in the Various Schemes and misappropriations set forth herein.

506.    As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages, including economic damages.

### COUNT XXXV – CONSTRUCTIVE FRAUD (Daniel White and Michael White)

507.    Compass incorporates Paragraphs 1 through 506 above as if fully set forth herein.

508.    As officers, owners and agents of Compass before their removal from the company in 2019, Daniel White and Michael White maintained a confidential relationship with Compass and owed the business fiduciary duties.

509.    Despite this confidential relationship and their fiduciary duties to Compass, Daniel and Michael White abused their senior positions at Compass and the associated trust placed in them to perpetrate the Secret Bank Account Scheme, Ghost Employee Scheme, IRS Tax Check Scheme, Shareholder Loan Scheme, Information Technology Lockout of Compass Business Records and Accounts Scheme, Sham Legal Claims Scheme, Anonymous Mailings Scheme, Corporate Credit Card Scheme, Severance Schemes, Sham Ownership Interest Scheme, and the scheme to collaborate with Flywheel and its founders to misappropriate Compass's trade secrets and compete unfairly against Compass  (collectively, the "Various Schemes").

510.    Daniel White and Michael White carried out the Various Schemes for both their own benefit and that of Flywheel—a competing entity—as well as Flywheel's founders, DiPaula and Miller.

511.    Daniel White and Michael White also failed to disclose Flywheel, DiPaula and Miller's misappropriation of Compass's trade secrets and confidential information, despite Daniel White and Michael White being aware of such during their Compass employment.  Instead, Daniel White and Michael White affirmatively acted to dissuade Compass from investigating potential wrongdoing by Flywheel and/or its founders and acted covertly to siphon Compass's money and intellectual property to Flywheel.

512.    As a result of the Various Schemes, as well as Michael White's and Daniel White's failures to disclose the unlawful conduct by Flywheel, DiPaula and Miller to Compass that stood to undermine Compass's interests, As a result of the Various Schemes, Compass has suffered substantial actual damages, including economic damages, such as misappropriated funds, lost revenues, lost clients, lost business opportunities, lost investments, inaccessible documents, and lost employees.

## COUNT XXXVI – CONVERSION
### (Julie White, Debra White and Kelly White)

513.   Compass incorporates Paragraphs 1 through 512 above as if fully set forth herein.

514.   Defendants Julie White, Debra White and Kelly White have never performed employment services for Compass.

515.   Between 2010 and 2017, Michael and Daniel White added Julie White, Debra White and Kelly White to Compass's payroll for purposes of unlawfully diverting monies from Compass.

516.   At the time they were added to Compass's payroll, Julie White, Debra White and Kelly White were aware that they had never performed employment services for Compass yet accepted and unlawfully exercised dominion over the wages unlawfully paid to them through Compass's payroll.

517.   On information and belief, Julie White, Debra White and Kelly White were aware that Michael and Daniel White had added them to the company's payroll for purposes of unlawfully diverting monies from Compass.

518.   As a result of this conversion of Compass's monies, Compass suffered actual damages, including economic damages.

## COUNT XXXVII – UNJUST ENRICHMENT
### (Julie White, Debra White and Kelly White)

519.   Compass incorporates Paragraphs 1 through 518 above as if fully set forth herein.

520.   Julie White, Debra White and Kelly White were unjustly enriched by their receipt of wages from Compass despite having never performed employment services for the business as a result of Daniel and Michael White's perpetration of the Ghost Employee Scheme.

521.   Julie White, Debra White and Kelly White enrichment and Compass's impoverishment were without justification or cause.

522.   It would be inequitable for Julie White, Debra White and Kelly White to retain and

profit from the funds of which they deprived Compass and, as a result, Julie White, Debra White and Kelly White should be held liable to compensate Compass in an amount equal to their respective unjust enrichment(s).

### COUNT XXXVIII – BREACH OF NON-DISCLOSURE AGREEMENT
### (Alexander McCord)

523.    Compass incorporates Paragraphs 1 through 522 as if fully set forth herein.

524.    As a condition of his employment with Compass, Defendant McCord agreed to certain covenants, including a non-disclosure agreement wherein he agreed to not use any proprietary information to which he gained access by virtue of his employment with Compass and that was not otherwise publicly accessible as a result of Compass's standard practices.

525.    On information and belief, McCord breached his obligations under the non-disclosure agreement by sharing Compass's proprietary information with Ascential and then Omnicom.

526.    McCord's breach of his non-disclosure obligations caused Compass to suffer monetary damages.

### COUNT XXXIX – VIOLATION OF THE MPIA
### (MD. CODE, GEN. PROVISIONS § 4-401; UNAUTHORIZED DISCLOSURE)
### (City of Annapolis, the APD and Miguel Dennis)

527.    Compass incorporates Paragraphs 1 through 526 above as if fully set forth herein.

528.    On information and belief, sometime between the spring of 2023 and February of 2024, Miguel Dennis disclosed the Miguel Dennis Police Report to Defendant Michael White and/or another co-conspirator.

529.    Dennis was able to access and disclose the Miguel Dennis Police Report by virtue of his government capacity as the APD's Public Information Officer.

530.    Dennis is a close friend of Defendant Michael White.

531.    Due to the City's previous denials of the very same records when requested by Daniel White some months earlier, as well as Dennis's presumed knowledge about the MPIA, its statutory framework and its relevant exemptions, Dennis was aware that the Miguel Dennis Police Report was not subject to disclosure under the MPIA.

532.    Despite knowing that the Miguel Dennis Police Report was not subject to disclosure, Dennis deliberately, willfully and maliciously utilized his position as the APD's Public Information Officer to disclose the Miguel Dennis Report to Michael White.

533.    On information and belief, Dennis was aware of Michael White's intentions to use the Miguel Dennis Report in anonymous communications to Compass clients, prospective clients, and other business associates, and therefore intended that such endeavors by Michael White succeed.

534.    On information and belief, based upon Dennis's friendships and/or acquaintances with Michael and Daniel White, all three having been former Maryland State Troopers, Dennis expressly agreed to assist Michael and Daniel White in their ongoing conspiracy to convert Compass's assets and destroy its business to conceal Michael and Daniel's prior fraud and conversion committed while still officers of Compass.

535.    Pursuant to Md. Code Gen. § 4-401, the City, the APD and Dennis, both in his official and individual capacity, are liable to Compass for actual damages arising from Dennis's unauthorized disclosure(s) of the Miguel Dennis Police Report, including all monetary damages arising from the defamatory and tortious use of such document(s) after such unlawful disclosure(s).

536.    On or around January 17, 2025, Compass timely notified the City of Annapolis, the APD, and Miguel Dennis of Compass's pending claims against such parties and its intention to file related litigation, the basis of which was first discovered by Compass in or around February of 2024, in accordance with the Local Government Tort Claims Act and the Maryland Tort Claims Act.

537.    As a result of the City's, the APD's and Dennis's unlawful disclosure of the Miguel Dennis Police Report, Compass has suffered actual damages in an amount exceeding $200,000.00.

**COUNT XXXX – VIOLATION OF THE MPIA**
**(MD. CODE, GEN. PROVISIONS § 4-362; FAILURE TO DISCLOSE)**
**(City of Annapolis and the APD)**

538.    Compass incorporates Paragraphs 1 through 537 as if fully set forth herein.

539.    The MPIA requires a person or governmental unit to permit inspection of a public record unless otherwise exempt.

540.    In furtherance of its claims against the City, the APD and Miguel Dennis, Compass, through John White, requested inspection of public records under the MPIA on four occasions in 2024.

541.    The City and the APD, in furtherance of their efforts to protect their employees and agents, including Miguel Dennis, refused to sufficiently search for the records requested by Compass or produce such in proper format, instead limiting their search for records to a mere couple of search terms and heavily, not to mention unjustifiably, redacting the documents produced pursuant to such search.

542.    On January 31, 2025, the MPIA Board found that the City and the APD had violated the MPIA by improperly confining their search for responsive documents, seemingly to ensure that evidence relevant to the conspiracy would not be produced, and/or unjustifiably redacting the documents that were produced.

543.    To date, the City and the APD continue to fail to produce the documents demanded by Compass's requests for public information under the MPIA, in violation of such statute and the MPIA Board's January 31, 2025, order.

544.    Compass has suffered actual damages, and incurred significant attorneys' fees, in connection with the City and the APD's violations of the MPIA.

## COUNT XXXXI – SUCCESSOR IN INTEREST
### (Informa)

545.    Compass incorporates Paragraphs 1 through 544 above as if fully set forth herein.

546.    In or around November of 2024, Informa acquired Ascential.

547.    As a result of Informa's acquisition of Ascential, Informa assumed the debts and liabilities of Ascential, including the tortious conduct for which Ascential was liable to Compass.

548.    As such, Informa is liable to Compass in a monetary amount equal to the damages for which Ascential is, was, or would be liable to Compass.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Compass prays for the following relief:

(A)    Enter judgment in Compass's favor on all Counts identified herein;

(B)    Enter judgment against the named Defendants, jointly and severally, as identified in each of the above-referenced Counts;

(C)    Compensatory damages for all losses caused by Defendants' wrongful conduct, including, but not limited to, actual damages, reasonable royalty, unjust enrichment, diminution of value, and punitive damages, due to Defendants' wrongful conduct pursuant to MD. CODE COM. LAW § 11-1202;

(D)    Equitable relief pursuant to MD. CODE COM. LAW § 11-1202;

(E)     Exemplary damages for Defendants' willful and malicious conduct pursuant to MD. CODE COM. LAW § 11-1203;

(F)     Punitive damages as permitted by applicable law;

(G)     The amount by which the Defendants have been unjustly enriched due to Defendants' wrongful conduct as permitted by common law and/or pursuant to MD. CODE COM. LAW § 11-1203;

(H)     Reasonable attorneys' fees and costs incurred in connection with this lawsuit, including, but not limited to, pursuant to MD. CODE COM. LAW § 11-1204;

(I)     Damages for conversion of Compass's personal property in an amount no less than fair market value of Compass's network and the information thereon, including, but not limited to, trade secret information;

(J)     Injunctive relief barring Defendants from using or disclosing Compass's trade secrets, proprietary business know-how, and confidential information and ordering Defendants to return to Compass all documents and materials containing Compass's trade secret, proprietary, and confidential information;

(K)     Injunctive relief barring Defendants from directly or indirectly soliciting, inducing or encouraging any entity or person who is a client of Compass, or otherwise tortiously interfering with Compass's contracts or prospective advantage;

(L)     Injunctive relief barring Defendants from accessing or controlling Compass's networks and other accounts;

(M)     An order returning control of Compass's network and other accounts to Compass;

(N)     A declaration as to the respective ownership interests of Compass;

(O)     Injunctive relief that requires Daniel White and Michael White for surrender of their shares of Compass and not to receive any of the proceeds from this lawsuit in their capacity

111

as shareowners of Compass;

(P)    An award of pre-judgment and post-judgment interest and costs of suit to the extent

permitted by law; and

(Q)    Any such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Maryland Rule 2-325, Compass demands a trial by jury as to all issues so

triable in this action.

Respectfully submitted,

SMITHEY LAW GROUP, LLC

 /s/ *Joyce E. Smithey*
Joyce E. Smithey (AIS # 0406150286)
Reuben W. Wolfson (AIS # 1212130309)
David M.E. Moon (AIS # 1512160128)
Liesel J. Schopler (AIS # 0712110174)
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
P: (410) 919-2990; F: (410) 280-1602
joyce.smithey@smitheylaw.com
reuben.wolfson@smitheylaw.com
david.moon@smitheylaw.com
liesel.schopler@smitheylaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of February, 2025, the foregoing motion was electronically filed and served via MDEC and email on all counsel of record.

/s/ *David M. E. Moon*
David M.E. Moon,
AIS No. 1512160128