# EXHIBIT 1

```
                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
                          NORTHERN DIVISION

ASHLEY BOSHEA,              )
Administrator of the        )
Estate of David John        )
Boshea, Deceased,           )  CASE NUMBER: 1:21-cv-00309-ELH
     Plaintiff,             )       Excerpt of Proceedings
                            )     Testimony of Donna Eisenberg
     v.                     )
                            )
COMPASS MARKETING, INC.,    )
et al,                      )
     Defendants.            )
_____)

       EXCERPT OF TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE ELLEN L. HOLLANDER
                UNITED STATES DISTRICT JUDGE
                  Wednesday, August 6, 2025
                        Courtroom 5B

                     A P P E A R A N C E S

FOR THE PLAINTIFF:
    BY: GREGORY J. JORDAN, ESQUIRE
        JORDAN & ZITO, LLC
        350 North LaSalle Street, Suite 700
        Chicago, Illinois  60654

    BY: THOMAS J. GAGLIARDO, ESQUIRE
        GILBERT EMPLOYMENT LAW, P.C.
        Suite 900
        8403 Colesville Road, Suite 1000
        Silver Spring, Maryland  20910

FOR THE DEFENDANT:
    BY: STEPHEN STERN, ESQUIRE
        SHANNON HAYDEN, ESQUIRE
        KAGAN, STERN, MARINELLO & BEARD, LLC
        238 West Street
        Annapolis, Maryland  21401

Also Present:
Noah Wolf, Paralegal
Ryan Oswald, Paralegal
_____
    ***Proceedings Recorded by Mechanical Stenography***
      Transcript Produced by Computer-Aided Transcription
```

```
 1    Q.   What is the simulation?
 2    A.   A simulation is when someone tries to duplicate, forge
 3    someone else's signature.
 4    Q.   When you say "of course not," what do you mean?  If I
 5    just give you a signature and you look at it you can't tell
 6    whether it's a simulation/forgery or not?
 7    A.   No, because I would have no idea how that person
 8    naturally writes so it's impossible to make such an
 9    assessment.
10    Q.   Okay.  And what materials did you review related to this
11    particular engagement?
12    A.   There was a questioned signature on an agreement and then
13    I worked with 31 known samples of the suspect writer's
14    signature.
15    Q.   Okay.  And let's see if we can't -- now take a look at
16    the first chart, chart number one which relates -- Noah, can
17    you put that up, please?
18              THE COURTROOM DEPUTY:  What's the exhibit number,
19    Counsel?
20              MR. JORDAN:  I'm sorry?
21              THE COURTROOM DEPUTY:  What's the exhibit number?
22              MR. JORDAN:  It's not an exhibit.  We are using this
23    as a demonstrative just like they did with the chart so that
24    we're not putting this into evidence.
25              MR. STERN:  Can you clarify which page of the report
```

1   we're looking at?
2           **MR. JORDAN:**  This is a part of her rebuttal report.
3           **MR. GAGLIARDO:**  Page 1 it says.
4           **MR. STERN:**  Page 1 of what?
5           **MR. GAGLIARDO:**  Looking on the screen it says page
6   1.
7           **MR. JORDAN:**  This was a report that I delivered to
8   you on December 23rd last year.
9           **MR. STERN:**  I know.  I've got the hardcopy, but I'm
10  not seeing this.
11          **MR. JORDAN:**  Okay, if you can just look on the
12  screen, Stephen.
13  **BY MR. JORDAN:**
14  Q.   Anyway --
15          **MR. GAGLIARDO:**  Hang on one sec.
16  **BY MR. JORDAN:**
17  Q.   Can you tell me what this first chart, it says variation,
18  peak formation.  Exhibit Q1.  What is exhibit Q1?
19  A.   Q1 is the questioned signature that I was asked to
20  determine if it was authentic or not.
21  Q.   Okay.  And then there are a series of signatures below
22  that.  Relating to peak formations, can you kind of explain to
23  the jury your view on the peak formations here?
24  A.   Yes.  So the blue background is the questioned signature.
25  The green background on these charts are the known signatures,

1    the known samples.  And one of -- so what I did was I looked
2    at the known writing to determine what is in common among them
3    to determine what we call individual characteristics.  So
4    those are features that are in the handwriting of the
5    signature of Mr. White and determine -- so I look at those and
6    then I look at the questioned and say, do those features that
7    are in the known, are they duplicated within the questioned
8    signature.
9         And in this particular chart what you see is -- now
10   understand that this is an illegible signature, so I'm going
11   to say what it should be.  So the red arrow is pointing to the
12   peak of what is, in theory, the left side of a W.  And that
13   feature which is peaked is pointed and it's tented.  Tented
14   means it's not retraced.
15        So if you look at K1, that signature has the same
16   formation.  It's peaked and it's not retraced.  Same in K2.
17   It's peaked and it's not retraced.
18            **THE COURT:**  How do you know that it's not retraced?
19            **THE WITNESS:**  Because there's a space in between.
20   So the pen is coming up and then it's coming down, but it's
21   tented.  So if it was retraced, it would come up and go down
22   in the exact same spot.  And you can see that formation what
23   you're asking about, Judge, in K13, the bottom right.  That
24   one is retraced.
25   **BY MR. JORDAN:**

1   Q.   So that was John White's actual signature.  All of the
2   ones in green are exemplars that were brought in to us by
3   Compass as true signatures of John White; is that right?
4   A.   Exactly.  Yes, sir.
5   Q.   And you're saying which one is the one that is retraced
6   by John White?
7   A.   13 is retraced; 7, K7 is also retraced; and K5 is
8   retraced.  So there's a lot of variation in how he forms this
9   character.
10  Q.   So if Compass' expert said that this peak formation was
11  not reflected in -- I think he said he looked at 50, but his
12  report seemed to focus on 19.  But even of the 50 I think he
13  said that this peak formation did not appear.  Do you agree or
14  disagree?
15  A.   I completely disagree.  I reviewed Mr. Payne's report and
16  he was very selective; cherry-picking is what we call it.  So
17  he found what he called differences and he found -- and he
18  showed examples in his report of those differences, but he
19  didn't utilize all of the evidence.  And if he had, he would
20  have found -- everything that he talked about as a difference
21  was also included in all of the knowns.  Not every single one,
22  but you look at all of them and you determine did the
23  questioned signature fall within the range of variation
24  exhibited within the known writing.  And it did.  And he chose
25  to ignore those.

```
 1    Q.   Okay.  Can you put up the chart 2, please?  I'm sorry.
 2    Yeah, chart 2.
 3              MR. STERN:  Could we get clarification where this is
 4    coming from?  Because we don't have this in our exhibits.
 5              MR. JORDAN:  This is the rebuttal report that I
 6    delivered to you on December 23, 2024.
 7              MR. STERN:  So looking at it I don't see that right
 8    now.  I'm not seeing where it is.
 9              MR. JORDAN:  It's on the screen.
10              MR. STERN:  I'm looking at that report right now and
11    I don't see it.
12              THE COURT:  So can you explain, Mr. Jordan?  He
13    doesn't seem to have it.
14              MR. JORDAN:  He has it.
15              MR. STERN:  There's an electronic copy too.
16              MR. JORDAN:  He has it.  I gave it to him on
17    December 23rd.
18              MR. STERN:  We're not --
19              THE COURT:  One at a time.
20              MR. JORDAN:  Before I came up here at lunchtime I
21    said I want to make sure there's not an issue this time.  I
22    sent the rebuttal report on December 23rd.  I'll tell you what
23    I'll do.  I will email it to you right now.
24              MR. STERN:  I'm just saying --
25              MR. JORDAN:  I'm forwarding the email that I sent to
```

```
 1    you.
 2            MR. STERN:  I'm looking at the report that's dated
 3    December 2024 and I don't see it in there.
 4            THE COURT:  Do you want to come up?
 5            MR. STERN:  Can we get a page number?  We're
 6    looking.  We can't find it.  He did send us something back in
 7    December 2024.  I'm not disputing that.
 8            THE COURT:  So he's saying you did send him
 9    something, but he doesn't think this was part of it.
10            MR. STERN:  I'm sorry.  I just want to get
11    clarification on it.
12            MS. HAYDEN:  I just need the page number.
13            MR. JORDAN:  All right, I just re-emailed you.
14            THE COURT:  Come up, Counsel.  The jury doesn't need
15    to hear all of this.
16            (Counsel approached the bench.)
17            THE COURT:  Is this déjà vu all over again?
18            MR. JORDAN:  I'm hoping not.
19            THE COURT:  Just so everybody knows what I'm talking
20    about, that was the first trial where there was something not
21    produced.
22            MR. STERN:  Mr. Jordan, in December of 2024, did
23    email me the report.  That's not in dispute.  I just can't
24    find this page that they've been testifying off of in the
25    hardcopy of it and Ms. Hayden couldn't find it electronically
```

1    either.  So are we looking at the wrong thing?
2            **MR. JORDAN:**  I just forwarded it to them, both of
3    them.
4            **THE COURT:**  Well, can you establish that it was part
5    of your original email in December of 2024?
6            **MR. JORDAN:**  Yes; sure.
7            **MR. STERN:**  I just don't know if I'm looking at the
8    wrong document.
9            **THE COURT:**  Then why would it be that the one
10   document that he's asking about is the one you don't have?  I
11   am revisiting my life, it seems.
12           **MR. STERN:**  I've raised this very reluctantly, Your
13   Honor.  I just --
14           **MR. JORDAN:**  Here is my email.  And then pages 6, 7,
15   8, 9, 10, 11 and 12.
16           **MR. STERN:**  I see all of those.  And I --
17           **MS. HAYDEN:**  The actual chart that you're showing is
18   not in this email.  I just -- I don't know.  I was just trying
19   to find it.
20           **MR. JORDAN:**  Okay.  Ms. Eisenberg emailed me these
21   charts again today.
22           **MR. GAGLIARDO:**  This is it.
23           **MS. HAYDEN:**  His is different.  I just want to be
24   sure --
25           **MR. JORDAN:**  She's going through and it appears to

```
 1   those.  That's why I was asking, was I looking at the wrong
 2   page.
 3          MR. JORDAN:  I sent two sets of charts to Noah
 4   today.
 5          MS. HAYDEN:  Do the charts exist separate and apart
 6   from the report?
 7          MR. JORDAN:  No.
 8          MS. HAYDEN:  No?
 9          MR. JORDAN:  She sent these to me this morning.
10          THE COURT:  This morning doesn't count.
11          MR. STERN:  Yeah.  At first I thought it was my
12   mistake.  I'm starting to think it may be déjà vu, I don't
13   know.
14          THE COURT:  Hard to believe we could have the same
15   issue this time around that we had the first time around.
16          MS. HAYDEN:  He just emailed the charts.
17          MR. STERN:  Well, let's see what comes in and try to
18   figure out what the discrepancy is.
19          THE COURT:  Okay, well I want to make sure they're
20   here.
21          MR. JORDAN:  It was emailed to you, the email I got
22   from him this morning.
23          MR. STERN:  I do want to be clear these are charts
24   that came in this morning.  That doesn't seem part of the
25   December 2024 report.  Mr. Jordan said he sent us a report in
```

```
1    assumed that that's what it was, it was just redacted.  Here
2    is the chart, and there's no analysis on it --
3              THE COURT:  Can we get going then?
4              MR. STERN:  No, we still don't have them.  Are they
5    in the report?
6              MS. HAYDEN:  I don't think so.  I do not see them.
7              MR. STERN:  I mean, that's -- we may object to just
8    the discussion of these reports.  I want the comparison.
9              THE COURT:  How is this possible, Mr. Jordan?
10             MR. JORDAN:   What's that?
11             THE COURT:  How is it possible that you would have
12   the same mistake this time as last time?  Can you show me you
13   gave him this document?
14             MR. JORDAN:  This is the same charts.
15             MR. STERN:  But I'm asking --
16             MR. JORDAN:  I sent it to Ms. Hayden --
17             MR. STERN:  No.  Show me in the December 2024 report
18   where so I can -- look, I assumed that -- I had doubts I was
19   wrong.
20             THE COURT:  Is there anything different about this
21   though than anything else we've seen already?
22             MR. STERN:  I don't know.  This is -- what I'm
23   concerned about is this is new.
24             MR. JORDAN:  I can send you -- I'll ask her on the
25   record, are these the same charts included in your December
```

1   report?  Which my understanding is they are.
2           **MR. STERN:**  The page references so I can see it.
3           **MR. JORDAN:**  I'll ask her to identify the page
4   number.
5           **MR. STERN:**  I'm not saying -- that's why I said this
6   most reluctantly.
7           **THE COURT:**  You're saying this was in the December
8   report, but you're saying you didn't have them in the December
9   report so how does that help?
10          **MR. JORDAN:**  I gave her -- I emailed him December
11  23rd.
12          **THE COURT:**  But he's saying he didn't get these.
13          **MR. STERN:**  She's saying they're in the December
14  report.  I want to reference the page numbers so I can look at
15  them and confirm that's correct.  Right now everything that
16  I'm seeing -- and maybe I'm just being dense and if I am this
17  is very embarrassing, but I don't see them and I just want a
18  confirmation that they're in there, that's all.
19          **MR. GAGLIARDO:**  Stephen, can we see what you
20  actually had?
21          **THE COURT:**  Yes.  That's what he's saying.  He
22  doesn't see it.
23          **MR. STERN:**  Here it is.  And Shannon also went
24  through it electronically.
25          **THE COURT:**  We are going to really frustrate this