[Exhibit 2]

## 23-1324

# United States Court of Appeals

### *for the*

# Fourth Circuit

COMPASS MARKETING, INC.,

*Plaintiff/Appellant,*

— v. —

FLYWHEEL DIGITAL LLC; JAMES COLUMBUS DIPAULA, JR.;
PATRICK MILLER; DANIEL J. WHITE; MICHAEL WHITE;
GEORGE WHITE; ASCENTIAL PLC,

*Defendants/Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

## BRIEF OF APPELLANT

Stephen B. Stern
Michael Marinello
Meagan C. Borgerson
KAGAN STERN
 MARINELLO & BEARD, LLC
238 West Street
Annapolis, Maryland 21401
(410) 216-7900

*Counsel for Appellant*

 COUNSEL PRESS • VA – (804) 648-366

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1324__          Caption: __Compass Marketing, Inc. v. Flywheel Digital LLC, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Compass Marketing, Inc.__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                      ☐YES☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                        ☐YES☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?        ☐YES☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Stephen B. Stern                    Date:      April 6, 2023

Counsel for: Appellant Compass Marketing, Inc.

Print to PDF for Filing

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF JURISDICTION .......................................................1

STATEMENT OF ISSUES ...................................................................1

STATEMENT OF THE CASE ...............................................................2

    I.     INTRODUCTION .................................................................2

    II.    FACTS RELEVANT TO THE ISSUES .................................3

    III.   PROCEDURAL HISTORY AND IDENTIFICATION OF
         RULINGS PRESENTED FOR REVIEW .............................8

SUMMARY OF ARGUMENT .............................................................10

STANDARD OF REVIEW ..................................................................12

ARGUMENT ......................................................................................13

    I.     THE DISTRICT COURT ERRONEOUSLY DISMISSED
        COMPASS'S CLAIMS AGAINST THE FLYWHEEL
        DEFENDANTS AT THE PLEADINGS STAGE ON
        STATUTE OF LIMITATIONS GROUNDS .......................13

        A.    THE DISTRICT COURT FAILED TO ACCEPT THE
            TRUTH OF COMPASS'S ALLEGATIONS, FAILED
            TO DRAW ALL REASONABLE INFERENCES IN
            FAVOR OF COMPASS, AND MADE
            IMPERMISSIBLE CREDIBILITY
            DETERMINATIONS AGAINST COMPASS .........................14

        B.    THE DISTRICT COURT MISAPPLIED THE
            INQUIRY NOTICE STANDARD BY IMPOSING AN
            UNTENABLE BURDEN ON COMPASS AND BY
            APPLYING THE STANDARD AT THE PLEADING
            STAGE ...................................................................25

        C.    THE DISTRICT COURT ERRED WHEN IT
            APPLIED THE STATUTE OF LIMITATIONS TO
            BAR CLAIMS AGAINST ASCENTIAL ...............................33

i

       D.    THE DISTRICT COURT ERRED BY FAILING TO
              EVEN CONSIDER FRAUDULENT
              CONCEALMENT IN RELATION TO THE
              STATUTE OF LIMITATIONS ................................................. 35

II.    THE DISTRICT COURT ERRED BY DISMISSING THE
       RICO CLAIMS AGAINST THE WHITE DEFENDANTS
       FOR FAILURE TO STATE A CLAIM AND,
       ALTERNATIVELY, IT ERRED BY FAILING TO GRANT
       COMPASS LEAVE TO AMEND ITS COMPLAINT ...................... 39

       A.    COMPASS PLED SUFFICIENT FACTS TO
              DEMONSTRATE A RICO ASSOCIATION-IN-FACT
              ENTERPRISE UNDER COUNT III ........................................ 40

       B.    COMPASS PLED SUFFICIENT FACTS TO
              DEMONSTRATE A RICO ASSOCIATION-IN-FACT
              ENTERPRISE UNDER COUNT IV ........................................ 46

       C.    COMPASS PLED SUFFICIENT FACTS TO
              DEMONSTRATE GEORGE WHITE ENGAGED IN
              A PATTERN OF RACKETEERING ....................................... 48

III.   THE DISTRICT COURT ABUSED ITS DISCRETION
       WHEN IT FAILED TO GRANT LEAVE TO AMEND
       COMPASS'S COMPLAINT ................................................. 49

CONCLUSION ............................................................................................. 52

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Al-Abood v. El-Shamari,*
    217 F.3d 225 (4th Cir. 2000) ..................................................................48

*Anderson v. Found. for Advancement,*
    155 F.3d 500 (4th Cir. 1998) ........................................................ 13, 19, 24

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).............................................................................30

*Attia v. Google LLC,*
    983 F.3d 420 (9th Cir. 2020) .................................................................34

*Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v.*
    *Four-C-Aire, Inc.,*
    929 F.3d 135 (4th Cir. 2019) ............................................................ 15, 30

*Boyle v. United States,*
    556 U.S. 938 (2009)....................................................................... passim

*Brandenburg v. Seidel,*
    859 F.2d 1179 (4th Cir. 1988) ...............................................................48

*Capital Lighting & Supply, LLC v. Wirtz,*
    No. JKB-17-3765, 2018 U.S. Dist. LEXIS 140711
    (D. Md. Aug. 20, 2018) .......................................................................48

*Chambers v. King Buick GMC, LLC,*
    43 F. Supp. 3d 575 (D. Md. 2014)..........................................................36

*Chesapeake Bay Found., Inc. v. Weyerhaeuser Co.,*
    580 F. App'x 203 (4th Cir. 2014)...........................................................28

*Conner v. Lemelle,*
    298 So. 3d 361 (La. App. 2020) .............................................................23

*Cruz v. Maypa,*
    773 F.3d 138 (4th Cir. 2014) .................................................................12

*CSX Transp., Inc. v. Gilkison,*
    406 F. App'x 723 (4th Cir. 2010).............................................................14

*Edmonson v. Eagle Nat'l Bank*,
    922 F.3d 535 (4th Cir. 2019) ................................................................ 36, 38

*Fid. & Guar. Life Ins. Co. v. Sharma*,
    Civil Action No. RDB-17-1508, 2019 U.S. Dist. LEXIS 54727
    (D. Md. Mar. 29, 2019) ..............................................................................48

*Foman v. Davis*,
    371 U.S. 178 (1962)....................................................................................50

*Frederick Rd. Ltd. Pshp. v. Brown & Sturm*,
    360 Md. 76 (2000) ................................................................................ 25, 26

*Goodman v. PraxAir, Inc.*,
    494 F.3d 458 (4th Cir. 2007) ...................................................... 14, 15, 31, 50

*Goodrow v. Friedman & Macfadyen, P.A.*,
    Civil Action No. 3:11cv20, 2012 U.S. Dist. LEXIS 182188
    (E.D. Va. Dec. 27, 2012) ...........................................................................50

*Gray v. Spillman*,
    925 F.2d 90 (4th Cir. 1991) ........................................................................30

*Hall v. DIRECTV, LLC*,
    846 F.3d 757 (4th Cir. 2017) .......................................................... 13, 19, 24

*Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999) ......................................................................36

*Holmberg v. Armbrecht*,
    327 U.S. 392 (1946)....................................................................................35

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) .......................................................................41

*Lambeth v. Bd. of Comm'rs*,
    407 F.3d 266 (4th Cir. 2005) ......................................................................13

*Layani v. Ouazana*,
    Civil Action No. ELH-20-420, 2021 U.S. Dist. LEXIS 39894
    (D. Md. Mar. 3, 2021) ................................................................................50

*Lumsden v. Design Tech Builders, Inc.*,
    358 Md. 435 (2000) ............................................................................. 26, 27

*Menasco, Inc. v. Wasserman*,
    886 F.2d 681 (4th Cir. 1989) ......................................................................50

*O'Hara v. Kovens*,
    305 Md. 280 (1986) .................................................................................... 26, 30

*Orteck Int'l, Inc. v. TransPacific Tire & Wheel, Inc.*,
    Civil Action No. DKC 2005-2882, 2006 U.S. Dist. LEXIS 67702
    (D. Md. Sep. 5, 2006) .....................................................................................51

*Pilz v. FDIC*,
    No. 96-2243, 1997 U.S. App. LEXIS 16161 (4th Cir. July 1, 1997)............26

*Proctor v. Metro. Money Store Corp.*,
    645 F. Supp. 2d 464 (D. Md. 2009).................................................................40

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993)........................................................................................49

*Rojas v. Delta Airlines, Inc.*,
    425 F. Supp. 3d 524 (D. Md. 2019)......................................................... 41, 42

*Salinas v. United States*,
    522 U.S. 52 (1997)..........................................................................................47

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)........................................................................................40

*Shaw v. Brown & Williamson Tobacco Corp.*,
    973 F. Supp. 539 (D. Md. 1997).....................................................................36

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,
    71 F.3d 119 (4th Cir. 1995) ...................................................................... 28, 35

*United States v. Adoma*,
    781 F. App'x 199 (4th Cir. 2019)............................................................. 46, 47

*United States v. Gutierrez*,
    963 F.3d 320 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1112 (2021) ............47

*United States v. Moussaoui*,
    591 F.3d 263 (4th Cir. 2010) ........................................................................47

*United States v. Mouzone*,
    687 F.3d 207 (4th Cir. 2012) .................................................................... 46, 47

*United States v. Oreto*,
    37 F.3d 739 (1st Cir. 1994).............................................................................49

*United States v. Tillett,*
    763 F.2d 628 (4th Cir. 1985) ...........................................................................40

*Walls v. Sierra Pac. Mortg., Co.,*
    Civil Action No. GLR-19-595, 2021 U.S. Dist. LEXIS 14316
    (D. Md. Jan. 26, 2021)......................................................................................46

*Williams v. Equity Holding Corp.*, No.,
    2:07cv66, 498 F. Supp. 2d 831, 2007 U.S. Dist. LEXIS 56762,
    2007 WL 2230723 (E.D. Va. Aug. 3, 2007) ....................................................51

*WW, LLC v. Coffee Beanery, Ltd.,*
    No. WMN-05-3360, 2012 U.S. Dist. LEXIS 121347
    (D. Md. Aug. 27, 2012) ....................................................................................40

**Statutes & Other Authorities:**

18 U.S.C. § 1836.................................................................................................. 1, 34

18 U.S.C. § 1961(4) ..................................................................................................40

18 U.S.C. § 1961(5) ..................................................................................................48

18 U.S.C. § 1962(c) ............................................................................................ 40, 47

18 U.S.C. § 1962(d) ..................................................................................................46

18 U.S.C. § 1965........................................................................................................1

28 U.S.C. § 1291........................................................................................................1

28 U.S.C. § 1331........................................................................................................1

28 U.S.C. § 1367........................................................................................................1

Fed. R. Civ. P. 12(b)(6)........................................................................ 3, 12, 14, 15, 25

Fed. R. Civ. P. 15(a)................................................................................................49

Fed. R. Civ. P. 8(c)..................................................................................................14

Fed. R. Civ. P. 9(b) ..................................................................................................40

Mark Hendricks, *What is a Serial Entrepreneur?*, SMART ASSET
(Mar. 20, 2023), https://smartasset.com/small-business/serial-entrepreneur ..........20

Mike Mcevoy, *Reasons Google Search Results Vary Dramatically (Updated and Expanded)*, WEB PRESENCE SOLUTIONS (June 29, 2020),
https://www.webpresencesolutions.net/7-reasons-google-search-results-vary-dramatically..................................................................................................................32

## STATEMENT OF JURISDICTION

The district court had original jurisdiction pursuant to 28 U.S.C. § 1331, as Appellant Compass Marketing, Inc. ("Appellant" or "Compass") asserted claims under 18 U.S.C. § 1836, The Defend Trade Secrets Act ("DTSA"), and 18 U.S.C. § 1965, the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The district court had supplemental jurisdiction over Compass's remaining claims pursuant to 28 U.S.C. § 1367. On February 24, 2023, the district court dismissed the DTSA and RICO claims and declined to exercise supplemental jurisdiction over the remaining state law counts. This was a final decision over which this Court has jurisdiction pursuant to 28 U.S.C. § 1291. On March 24, 2023, Compass timely filed its notice of appeal.

## STATEMENT OF ISSUES

(1)   Whether the district court erred in dismissing Compass's claims against the Flywheel Defendants on statute of limitations grounds at the pleading stage, with prejudice and without leave to amend, by (i) disregarding Appellant's allegations, which must be taken as true, (ii) drawing inferences in favor of the Flywheel Defendants and failing to draw all reasonable inferences in favor of Compass, and (iii) making impermissible credibility determinations adverse to Compass;

(2)   Whether the district court erred by declining to apply fraudulent concealment to toll the applicable statutes of limitations before any discovery had been taken on contested factual issues directly germane to the statute of limitations analysis; and

1

(3)   Whether the district court erred in dismissing Appellant's RICO claims against the White Defendants, with prejudice and without leave to amend, where Appellant's factual allegations established a plausible claim that the White Defendants were engaged in an "enterprise" and that George White engaged in a pattern of racketeering.

## STATEMENT OF THE CASE

## I.   INTRODUCTION

This appeal stems from the district court's decision, at the pleading stage, to impose a new, heightened standard of inquiry notice on Compass by requiring Compass to presume its trade secrets had been stolen following the departure of certain employees and the loss of certain clients over the next few years.  The departure of employees, even if they might be suspected of competing with their former employer, does not reasonably require a former employer to assume such employees have misappropriated its trade secrets and does not trigger the reasonable diligence standard for investigating trade secret misappropriation.  Nor does the loss of clients over the course of several years trigger such a duty to investigate, particularly where the former employer (in this case Compass) has alleged it remains uncertain as to where the clients went after ending their business relationship.

Here, Compass expressly alleged that it did not know its trade secrets had been stolen when its employees resigned, when it lost particular clients over the subsequent years, or at any time until January 2020 during its investigation into other misconduct by certain Appellees.  Compass further alleged that it could not have

known its trade secrets were stolen due to the pervasive and ongoing concealment by Appellees acting together. In reaching a contrary conclusion, the district court disbelieved Compass's allegations, made inferences in favor of Appellees, failed to draw all reasonable inferences in Compass's favor, and even made express credibility determinations against Compass. In doing so, the district court disregarded the standard under Rule 12(b)(6), misapplied the inquiry notice standard, imposed a burden that would be untenable on Compass (or any other company), and failed to alternatively toll the statute of limitations under the fraudulent concealment doctrine. Each of these errors warrants reversal by this Court.

This appeal further stems from the district court misconstruing the law governing RICO claims in concluding that Compass failed to sufficiently plead the "enterprise" element. The Complaint more than adequately pled the requisite collaboration or agreement to satisfy the "enterprise" element, and the district court's dismissal on such grounds, with prejudice and without any opportunity to amend (despite Compass's request for such leave), further warrants reversal by this Court.

## II.    **FACTS RELEVANT TO THE ISSUES**

The Complaint pled, in overwhelming detail, actionable claims for relief against Defendants Flywheel Digital LLC ("Flywheel"), James DiPaula ("DiPaula"), Patrick Miller ("Miller"), and Ascential plc ("Ascential") (collectively,

"Flywheel Defendants"), as well as Defendants Michael White ("Michael"), Daniel White ("Daniel"), and George White ("George") (collectively, "White Defendants"). Those allegations lay bare intersecting schemes by and among the Flywheel Defendants to misappropriate Compass's trade secrets, unfairly compete with Compass, tortiously interfere with Compass's client relationships, and breach confidentiality obligations owed to Compass together with *nine* separate schemes undertaken by the White Defendants to embezzle Compass's funds, fund the Flywheel Defendants, enrich themselves, and inflict devastating harm on Compass – all in secret and concealed from Compass.

Compass, led by Chief Executive Officer John White, started as a marketing company serving clients selling consumer packaged goods ("CPGs") in 1998. JA16-17, JA24, JA43-44, ¶¶ 2, 32, 92. After 2005, with the expansion of online retail, Compass tailored its business to optimally position CPG clients and their products on eCommerce platforms, including Amazon.com. JA16-17, JA24-25, ¶¶ 2, 34. Compass spent more than a decade investing in and building out trade secrets relating to its eCommerce offerings. JA29, JA33-34, ¶¶ 43, 56. By 2013, those efforts set Compass apart. JA27-29, ¶¶ 40-42.

John's brother, Daniel, served as Compass's General Counsel for twenty years. JA21, ¶ 18. In 2011, John's brother, Michael, joined Compass as the Vice President of Operations and Comptroller. JA21-22, ¶ 19. Compass was organized

such that John, Daniel, and Michael chose to oversee separate aspects of Compass. JA43, ¶ 92.

In 2010 and 2011, Compass hired DiPaula and Miller to eventually run its eCommerce Department. JA30-31, ¶¶ 45-47. Both DiPaula and Miller entered into employment agreements that contained confidentiality and non-solicitation clauses. *Id.* Neither DiPaula nor Miller had any prior eCommerce experience and were trained exclusively by Compass. JA32, ¶ 51. DiPaula and Miller emerged as what Compass then believed to be trusted senior executives who ran the fastest growing part of Compass. JA17-18, ¶ 5.

On September 4, 2014, DiPaula and Miller each resigned. JA39, ¶ 75. Although Compass did not know until five years later, DiPaula's and Miller's departures were part of a calculated plan, with surreptitious support from Daniel and Michael, to start a rival eCommerce company by stealing virtually all of Compass's trade secrets and proprietary business know how and employing it in their new, competing eCommerce company, Flywheel. *Id.*, ¶ 76. Specifically, DiPaula and Miller copied or otherwise retained access to a Compass step-by-step eCommerce Guide, JA38-39, ¶¶ 71, JA74, JA76-77, when they left Compass to launch Flywheel. The eCommerce Guide memorialized Compass's investment in its trade secrets and proprietary business information. JA35, ¶ 63.

5

In October 2016, six of Compass's eCommerce employees resigned, all of whom now work at Flywheel and, upon information and belief, took files that memorialized Compass's trade secret and confidential information regarding maximizing sales on Amazon—the crowning achievement of Compass's eCommerce business. JA41-42, ¶¶ 83-85. Compass did not know at the time that the employees left to join Flywheel or that they stole trade secrets. JA18, ¶ 6.

While Compass was aware of Flywheel's existence at some point after the departure of DiPaula and Miller, *e.g.,* JA41-42, ¶¶ 82-86, Compass had no way of knowing until January 2020, at the earliest, that Flywheel was using the exact methods, formulas, protocols, and strategies that were developed at Compass. JA57-60, ¶¶ 184-91. DiPaula and Miller concealed not only the scheme to steal trade secrets and unfairly compete with Compass, but also the illicit funding that enabled them to execute the scheme. More than a year after DiPaula and Miller resigned from Compass, they conspired with Daniel and Michael to embezzle Compass funds—funds that were (on information and belief) infused into Flywheel as startup capital. JA63-65, ¶¶ 202-08. And within four years, that embezzled seed money paid dividends when DiPaula and Miller sold Flywheel to Ascential for up to $400 million.[1] JA65-66, ¶¶ 209-12.

---

[1] In May 2021, Compass notified Ascential regarding Compass's recent discovery of Flywheel's misappropriation, interference, and unfair competition.

Around the time of the sale of Flywheel to Ascential, conflicts arose between the White brothers, culminating in the termination and removal of Daniel and Michael from Compass in late 2018 and early 2019. JA44-45, ¶ 94. Shortly thereafter, Compass launched an investigation to review Compass's books and records. JA45, ¶ 96. The investigation uncovered 14 years of mail and wire fraud, money laundering, and embezzlement by Daniel and Michael. Around this time Compass also learned of their involvement and encouragement of DiPaula's and Miller's theft of Compass's trade secrets. *See* JA65, ¶ 208. Daniel and Michael were able to cover up their fraud given the way the brothers ran their respective business units independently and because Michael was the sole administrator of Compass's payroll and oversaw the bookkeeping and financial accounts. JA43-45, ¶¶ 92, 93, 97.

Also following the brothers' ouster, Michael's son, George, resigned as IT Administrator from Compass, intentionally and maliciously cut off access to employee email accounts with the compassmarketinginc.com domain as well as Compass's access to its Microsoft suite, QuickBooks, and other business records, all of which George and Michael maintain dominion and control over today. JA52-54, ¶¶ 147-56.

---

Notwithstanding this notice, Ascential is allowing the harms to continue and escalate while profiting from the same as the parent company of Flywheel. JA66-68, ¶¶ 213-223.

## III. PROCEDURAL HISTORY AND IDENTIFICATION OF RULINGS PRESENTED FOR REVIEW

Compass filed its 23-count Complaint on February 14, 2022. JA14. Appellees Flywheel, Ascential, DiPaula, and Miller filed a motion to dismiss on April 4, 2022. Appellees Daniel, Michael, and George White filed motions to dismiss on April 25, 2022, with Daniel filing separately from Michael and George. Compass filed oppositions to the motions on May 4 and May 16, 2022.

On February 24, 2023, without oral argument, the district court entered a memorandum opinion and order granting Appellees' motions to dismiss Count I (the DTSA claim), Count III (RICO), and Count IV (RICO conspiracy), and declining to exercise supplemental jurisdiction over the remaining state law claims in Counts II and V - XXIII. JA274-300.[2] The grounds articulated by the court were based entirely on the statute of limitations for the DTSA and RICO claims against the Flywheel Defendants and the "enterprise" element of the RICO claims against the White Defendants. JA285-96.[3]

---

[2]     The district court's order specifically stated that Compass may pursue its state law claims in state court. JA298.

[3]     Count I was not brought against the White Defendants, and the district court declined to dismiss Counts III and IV against them based on limitations because the "claims against the Whites do not contain all the necessary facts for the Court to reach a determination on limitations" and "thus more fact-finding would be necessary before the Court could assess notice." JA291-92. Counts III and IV were dismissed against the White Defendants based solely on the "enterprise" element of RICO.

8

Noting that the DTSA and RICO claims against the Flywheel Defendants were premised on the misappropriation of trade secrets, the district court found that Compass knew or should have known of such claims in late 2014 when two employees left Compass or, alternatively, when several eCommerce department employees left in late 2016, *see* JA286-288, despite Compass expressly alleging how it first discovered the misappropriation in January 2020 (just over two years before it filed the Complaint). *See*, *e.g.*, JA60, ¶ 191. Finding that Compass's allegation of discovering the misappropriation in January 2020 "strains credulity," the district court made credibility determinations against Compass. JA288. The court further disbelieved and drew inferences against Compass by finding it was "implausible" Compass did not notice or investigate the loss of certain clients "in real time." JA289. Without explaining how such a conclusion was clear from the face of the Complaint, the district court found that, "[i]f Compass exercised reasonable diligence, it would have found [a] publicly accessible article . . . much sooner" and "where [its] clients went and whether Flywheel could be using its proprietary information to 'poach' those clients." JA288-289. Moreover, the district court lumped the allegations against Ascential with the allegations against the other Flywheel Defendants, JA286-291, even though the factual allegations in the Complaint clearly show that Ascential's initial misappropriation in November 2018 occurred within the RICO statute of limitations and that its current, ongoing

misappropriation (not discovered by Compass until January 2020 at the earliest) falls within the DTSA's statute of limitations. JA65-68, ¶¶ 209-23. Lastly, the district court failed to address the extensive fraudulent concealment asserted by Compass.

With respect to the RICO claims against the White Defendants, the district court concluded with little analysis that, "[a]lthough Compass alleges that Daniel and Michael White 'engaged in a pattern of egregious behavior' since 2008, it has not pleaded that they formed any type of agreement [or enterprise] to engage in that conduct." JA295. According to the court, "Compass has failed to provide 'specific allegations as to how, when, or where' any agreement took place, [and] it has not stated a RICO or RICO conspiracy claim." *Id.* (citations omitted).

Even though Compass requested, in the alternative, leave to amend the Complaint, the district court made no mention of any opportunity for Compass to do so, electing instead to "dismiss the Complaint in its entirety." JA298.

## SUMMARY OF ARGUMENT

In dismissing the DTSA and RICO claims on statute of limitations grounds, the district court effectively created and applied a new standard of inquiry notice, unsupported by the law, for a company with employees who resign. According to the district court, such a company has an affirmative duty to assume and investigate specifically whether departing employees have misappropriated trade secrets, even though the company disclaims any knowledge or suspicion of trade secret

misappropriation.  The law imposes no burden on a company to assume and inquire

into torts or other claims of misconduct that it does not reasonably suspect.  Even

assuming a company might suspect a departed employee is competing with it in

violation of an employment agreement, which might give rise to investigating the

employee's potential breach of competition provisions, it does not require the

company to assume and investigate the potential theft of trade secrets.  The error in

imposing such a burden is even more obvious when such departing employees

engage in fraudulent concealment of their actions, either on their own or in a

conspiracy with others.

To reach its conclusion in this case, the district court disregarded Compass's

express allegations, made inferences in favor of the Flywheel Defendants, failed to

draw all reasonable inferences in Compass's favor, and even made express

credibility determinations against Compass.  Compass expressly alleged that it did

not know its trade secrets had been stolen by the Flywheel Defendants, either when

DiPaula and Miller left in 2014, when other employees left in 2016, or at any time

until January 2020 following its investigation into the White Defendants.  And it

expressly alleged that it could not have known its trade secrets were stolen due to

the pervasive and ongoing concealment by both the Flywheel Defendants and White

Defendants acting in concert together.  By finding to the contrary – at the pleading

stage – that Compass could have and should have known of its trade secret claims

sooner, the district court disregarded the standard under Rule 12(b)(6), misapplied the inquiry notice standard, imposed an untenable burden on Compass (and other companies), and failed to alternatively toll the statute of limitations under the fraudulent concealment doctrine.

Similarly, having declined to dismiss the RICO claims against the White Defendant on limitations grounds (for substantially similar reasons they should not have been dismissed as to the Flywheel Defendants), the district court misconstrued the law governing RICO claims in concluding that Compass failed to sufficiently plead the "enterprise" element. The Complaint, however, more than adequately pled the requisite collaboration or agreement for the "enterprise" element. In addition, the court erred in holding that George White did not engage in a pattern of racketeering.

Lastly, each of the purported deficiencies the district court found to plague the Complaint could have been cured with leave to amend, and the district court erred by failing to even consider Compass's alternative request to amend the Complaint.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of a motion to dismiss. *Cruz v. Maypa*, 773 F.3d 138, 143 (4th Cir. 2014). Pursuant to FED. R. CIV. P. 12(b)(6), a district court may dismiss a complaint for failure to state a claim upon which relief can be granted, but "only if it appears beyond doubt that the plaintiff

can prove no set of facts that would entitle him to relief." *Lambeth v. Bd. of Comm'rs*, 407 F.3d 266, 268 (4th Cir. 2005).

Importantly, this Court has recognized that that "[w]hen ruling on a motion to dismiss, courts must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017) (internal citations omitted); *see also Anderson v. Found. for Advancement*, 155 F.3d 500, 505 (4th Cir. 1998) ("[T]he complaint [should] be read liberally in favor of the plaintiff.") (citations omitted).

## ARGUMENT

## I. THE DISTRICT COURT ERRONEOUSLY DISMISSED COMPASS'S CLAIMS AGAINST THE FLYWHEEL DEFENDANTS AT THE PLEADINGS STAGE ON STATUTE OF LIMITATIONS GROUNDS

The district court viewed all three federal claims (Counts I, III, and IV) against the Flywheel Defendants as premised upon the theft of Compass's trade secrets. JA286. In holding these claims were time-barred, the district court found, from the face of the Complaint, that Compass knew or should have known of the misappropriation before February 14, 2019 (for the DTSA claim) and before February 14, 2018 (for the RICO claims) by exercising due diligence in 2014 or no later than 2016. The district court also failed to apply fraudulent concealment to toll the DTSA claim. The district court erred.

13

A. **THE DISTRICT COURT FAILED TO ACCEPT THE TRUTH OF COMPASS'S ALLEGATIONS, FAILED TO DRAW ALL REASONABLE INFERENCES IN FAVOR OF COMPASS, AND MADE IMPERMISSIBLE CREDIBILITY DETERMINATIONS AGAINST COMPASS**

When evaluating a motion to dismiss under Rule 12(b)(6), the non-moving party is entitled to have the truth of its allegations accepted and all inferences drawn in its favor. The district court did the opposite in this case, however, by rendering a decision that disregarded many of Compass's express allegations, made numerous inferences in the Defendants' favor (not Compass's), and made credibility determinations adverse to Compass.

"[A]sserting an affirmative defense, like a statute of limitations defense, in a motion to dismiss presents a particular 'procedural stumbling block' for defendants." *CSX Transp., Inc. v. Gilkison*, 406 F. App'x 723, 728 (4th Cir. 2010) (citation omitted). This is because, "[o]rdinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, *see* Fed. R. Civ. P. 8(c), and the burden of establishing the affirmative defense rests on the defendant." *Goodman v. PraxAir, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (citations omitted). Indeed, "a motion to dismiss filed under [Rule 12(b)(6)], which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred." *Id.*

14

Only "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, [may] the defense [ ] be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman*, 494 F.3d at 464. "This principle only applies, however, if <u>all facts necessary</u> to the affirmative defense 'clearly appear[] *on the face of the complaint*.'" *Id.* (citations omitted) (underline added and italics in original). "To require otherwise would require a plaintiff to plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised." *Id.* at 466; *see also Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 152 (4th Cir. 2019) ("Plaintiffs are not ordinarily required to plead allegations relevant to potential affirmative defenses to an asserted claim.").

This case does not present one of the "rare circumstances" where a statute of limitations defense can be reached on the face of the complaint, and the district court's holding to the contrary was erroneous. According to the district court, it was able to conclude from the face of the Complaint that Compass "should have discovered the alleged misappropriation [of trade secrets] . . . in 2014 when two of its 'trusted senior executives' left to form Flywheel" or, alternatively, "no later than 2016" following the departure "of six of its eCommerce department employees to Flywheel." JA287-288. In reaching this conclusion, the district court disregarded numerous factual allegations in the Complaint that tell a very different story and, in

15

fact, allege the opposite of what the court concluded.  For example, the Complaint alleged:

> What Compass (i) *did not know* in 2014, (ii) *did not and could not have known* when DiPaula and Miller launched Flywheel, and (iii) *did not and could not have known* when DiPaula and Miller resigned from Compass and, later in 2016, poached virtually all its eCommerce talent, was that DiPaula and Miller . . . built Flywheel upon the trade secret information and proprietary business know how that rightfully belonged to Compass . . . . Indeed, *due to extensive and ongoing concealment efforts, Compass did not learn until 2020* that DiPaula and Miller stole and used Compass materials to build out Flywheel as an enterprise to eventually offer identical services as Compass to the identical Compass clients and customers.

JA18, ¶ 6 (emphasis added).

The Complaint is replete with allegations that explain Compass did not know and could not have reasonably known of Appellees' actions in 2014 or 2016 and ultimately did not learn of such actions until January 2020.  For example:

- "*Unbeknownst to Compass* . . . Flywheel has competed with Compass . . . by misusing stolen trade secrets and proprietary information . . . . Defendants DiPaula, Miller, [Michael, and Daniel] have conspired to *conceal their misappropriation and cover up their actionable misconduct*. . . ." JA16, ¶ 1.

- "From its inception, *though unbeknownst to Compass*, Flywheel conspired to compete unfairly, both by using Compass's *secretly stolen* intellectual property, *while concealing the fraud* . . . ." JA18, ¶ 7.

- "*On January 20, 2020*, . . . Compass's Controller located on the internet a Flywheel-branded Power Point presentation created by Patrick Miller that revealed, *for the first time*, that Flywheel had stolen and was continuing to misuse for unauthorized purposes Compass's trade secrets and proprietary business know how." JA19-20, ¶ 11.

16

- "*It was not until January 20, 2020, that Compass discovered this prima facie evidence of Flywheel's misappropriation activities*.  Given the contents of the Digital Grocery Presentation, which was copied from Compass's files, there is every reason to believe that the eCommerce Guide was also copied or otherwise exported to Flywheel by DiPaula and/or Miller.  *This information was not known to Compass and could not reasonably have been known because DiPaula and Miller had acted in secret and concealed the existence of the misappropriation*."  JA60, ¶ 191.

- ". . . Compass *recently discovered* that . . . DiPaula and Miller misappropriated the trade secrets described herein in or around September 2014 and used Compass trade secrets to form Flywheel to unfairly compete with Compass."  JA38-39, ¶ 74.

- "*Although Compass did not know it at the time*, DiPaula and Miller's departure was part of a *calculated plan*, with *surreptitious support* by Daniel and Michael [], to start a rival eCommerce company by stealing virtually all of Compass's trade secrets and proprietary business know how . . . ."  JA39, ¶ 76.

- "DiPaula again emailed John White on October 8, 2014, . . . [and] *unbeknownst to John White and Compass*, DiPaula and Miller *had already stolen* and were using [Compass's trade secrets] for Flywheel's benefit to Compass's detriment."  JA25-26, ¶ 80.

- "*At the time*, Compass was *unaware* of Daniel's involvement in Flywheel, his conflict of interest, or the real reasons . . . why his legal advice was to not have the Company pursue non-solicitation litigation."  JA43, ¶ 90.

- "*On February 14, 2019*, the Compass Board of Directors held a special meeting and removed Daniel and Michael from the Board.  *After the termination and removal*, Compass hired [a] criminal investigator [and certified forensic fraud examiner] . . . to investigate Daniel's and Michael's conduct . . . .  *The investigation and examination uncovered* 14 years of substantial [misconduct]."  JA45, ¶¶ 95-97.

17

- "Sometime *after April 30, 2019*, George . . . cut off Compass access to employee email accounts with the compassmarketinginc.com domain, Microsoft, QuickBooks, and other business records and accounts . . . ." JA52, ¶ 149.

- "*To this day*, Compass remains *locked out* of its own compassmarketinginc.com domain.  Compass does *not have access* to any of the employee email accounts or other business records maintained on QuickBooks that were maintained within the compassmarketinginc.com domain. . . ."  JA52, ¶ 151.

- "*After Compass discovered the stolen trade secrets*, it investigated whether any of the clients that left Compass since 2014 subsequently engaged Flywheel for identical eCommerce services."  JA61, ¶ 192.

- "*Upon realizing the misappropriation, interference, and unfair competition that is ongoing*, Compass sought to engage with Ascential, as Flywheel's parent company, with the goal of working through Ascential to remediate past harms."  JA66, ¶ 213.

(all emphasis added); *see also* JA45, ¶ 98; JA53, ¶ 152; JA53, ¶ 153; JA62, ¶ 200.

The Complaint even alleges an entire count dedicated to Appellees' fraudulent concealment of their actions, including – primarily – the misappropriation of Compass's trade secrets.  *See, e.g.*, JA84, ¶ 308 ("All defendants have committed countless wrongful acts and misrepresentations in order to conceal and further perpetuate the schemes detailed above, including misappropriation of Compass's trade secret, proprietary, and confidential information and racketeering schemes."); JA84-85, ¶¶ 309, 312.

Instead of applying the well-established standard that requires a district court to "accept as true all of the factual allegations contained in the complaint and draw

all reasonable inferences in favor of the plaintiff," *DIRECTV, LLC*, 846 F.3d at 765, and read a complaint "liberally in favor of the plaintiff," *Anderson*, 155 F.3d at 505, the district court made findings that disregarded Compass's express allegations and the drew inferences against Compass. For example, the district court held Compass was on inquiry notice of its trade secret claim in 2014 when DiPaula and Miller resigned and left the company and it reached this holding by finding (1) Compass knew at the time that Flywheel was a "direct competitor" and (2) DiPaula and Miller "did not keep their plan to form their own eCommerce company a secret." JA287.

The Complaint, however, contains no allegations that Compass knew Flywheel was a "direct competitor" at the time DiPaula and Miller resigned (or that they even knew the name of their company was Flywheel). In fact, Compass alleged the exact opposite: "*Although Compass did not know it at the time*, DiPaula and Miller's departure was part of a calculated plan . . . to start a rival eCommerce company." JA39, ¶ 76 (emphasis added).

The district court further erred in finding that DiPaula and Miller "did not keep their plan to form their own eCommerce company a secret" by relying on allegations related to Miller's September 2014 resignation email and DiPaula's October 2014 emails inquiring into a possible purchase of Compass's eCommerce division. The Complaint quoted the September 2014 resignation email from Miller, and it merely stated, "Thank you for the opportunity to start and grow the Compass

19

eCommerce business. I'm proud of what we have built and have lots of great memories of shared success. Like you, I've long wanted to own my own company. To do so, I'm giving you my two weeks' notice and resigning from Compass." JA39, ¶ 75. Nothing in that email can reasonably be construed as putting Compass on notice that DiPaula and Miller were forming a "direct competitor," "their own eCommerce company," or that they even formed a company named Flywheel. As for the October 2014 emails expressing DiPaula's and Miller's interest in a "spin off" of Compass's eCommerce division and potentially purchasing Compass's eCommerce business (*see* JA40, ¶¶ 78 and 80), such an inquiry does not equate to Compass affirmatively knowing that DiPaula and Miller were forming Flywheel as a direct competitor or that their plan was to run an eCommerce business. The fact that an inquiry to purchase the eCommerce business was made and Compass chose not to sell that line of business does not mean Compass knew or should have known DiPaula and Miller were planning to compete with Compass. DiPaula and Miller could have just as easily pursued an entirely different line of business after their inquiry was declined.[4]

In any event, the issue is not whether Compass was aware that DiPaula and Miller intended to compete or were competing with Compass; the issue is whether

---

[4]    *See* Mark Hendricks, *What is a Serial Entrepreneur?*, SMART ASSET (Mar. 20, 2023), https://smartasset.com/small-business/serial-entrepreneur.

Compass knew or had reason to believe that DiPaula and Miller had misappropriated Compass's trade secrets. The desire to purchase Compass's eCommerce business cannot possibly be deemed notice of their intent to misappropriate trade secrets or engage in other unfair competition, as inquiries to purchase businesses occur regularly in the business world and such inquiries do not put the potential sellers on notice to inquire into possible misconduct by the potential buyers. In fact, DiPaula's and Miller's expressed interest in purchasing Compass's eCommerce business can just as easily be construed as an effort to conceal their misappropriation because there would be no need to purchase the eCommerce business if they had Compass's trade secrets (other than to cover up their misconduct). Thus, in reaching its conclusion, the district court made inferences against Compass and disregarded its express allegations.

The district court's alternative finding – that Compass "should have discovered the misappropriation no later than 2016" based on the departure of six Compass employees (*see* JA288) – also drew inferences against Compass and conflated what Compass is able to allege now with what it knew at the time of those employee departures. According to the district court, "Compass alleges that in October 2016, there was a 'mass exodus' of six of its eCommerce department employees to Flywheel." JA288 (citing JA41-42, ¶ 83). But nothing in the Complaint alleges that Compass knew – at that time – that the employees left "to [go

to] Flywheel." All Paragraph 83 alleges is that "[a]ll of these former Compass employees *now work at Flywheel.*" (emphasis added). The only way the district court could find contemporaneous knowledge on the part of Compass is by drawing an inference against Compass and disbelieving its express contrary allegations. *See, e.g.*, JA39, ¶ 76 (alleging "Compass did not know it at the time" that DiPaula and Miller planned "to poach Compass employees who were knowledgeable in these unique eCommerce processes").

Similarly, according to the district court, "Compass claims that DiPaula and Miller specifically 'recruited' the eCommerce Team 'to unlawfully compete with Compass using Compass's trade secrets and proprietary information.'[ ] Moreover, Compass claims that the eCommerce Team actually stole electronic or hard copy files 'that memorialized Compass's trade secret, proprietary, and confidential information regarding maximizing sales on Amazon.'" JA288 (citing JA42, ¶¶ 84-85). This finding, however, took Compass's allegations out of context by ignoring the entirety of the allegations and misconstrued the allegations to imply contemporaneous knowledge by Compass. The allegations are clearly based upon what Compass knows (or believes) now, rather than what it knew at the time the employees resigned. Indeed, use of the term "on information and belief" reflects that Compass still does not know exactly what occurred when the eCommerce employees departed, and Compass is drawing its own reasonable inferences. *See*

*Conner v. Lemelle*, 298 So. 3d 361, 365 n.1 (La. App. 2020) ("Qualifying words such as 'upon information and belief' and 'appear' are the appropriate manner to plead when a plaintiff is drawing reasonable inferences from facts.").

The district court also found that Compass "should have noticed the potential misappropriation when it began to lose prominent clients to Flywheel." JA289. According to the district court, "In its own words, Flywheel 'poached a long list of Compass eCommerce clients . . . .'" *Id.* (citing JA61, ¶ 193). Once again, the district court misconstrued Compass's allegations, which actually stated, "*On information and belief*, using Compass's trade secrets, Flywheel *has poached* a long list of Compass eCommerce clients, including . . . ." *Id.* (emphasis added). Contrary to the district court's interpretation that imputed contemporaneous knowledge on the part of Compass, the Complaint does *not* indicate Compass knew any or all of the listed clients were being lost to Flywheel at the time. Instead, it reflects a reasonable inference that Compass is drawing from facts it knows now.

Lastly, perhaps most telling, is the district court's finding that "Compass' argument that it could not discover the trade secret misappropriation until 2020 *strains credulity*" in part because "[t]he Profitero blog post [Compass] *allegedly*

23

_found_ in 2020 was posted online in 2015." JA288 (emphasis added).[5]   These

characterizations by the district court are the antithesis of accepting all factual

allegations in the Complaint as true and drawing all reasonable inferences in favor

of Compass. _See DIRECTV, LLC_, 846 F.3d at 765; _see also Anderson_, 155 F.3d at

505. Instead, they reflect credibility determinations the court made against Compass

as well as a factual determination about whether a search should have taken place

and what it may or may not have found.

Ultimately, the facts necessary to determine Compass was on inquiry notice

in 2014, in 2016, or based on the loss of customers do not "clearly appear on the face

of the complaint." Even if the allegations could be construed against Compass as

the district court did, as illustrated herein, there are equally plausible (or even more

likely) ways to construe the same allegations in Compass's favor and, at the motion

to dismiss stage, these equally plausible (or more likely) interpretations of the facts

must be construed in Compass's favor. At bottom, the district court erred by

---

[5]   The district court's emphasis on the Profitero blog post was misplaced and
reflects another inference improperly drawn against Compass. As alleged in the
Complaint, that blog post only referenced Miller's past four years of work in the
eCommerce industry, the majority of which had been with Compass. JA57-58, ¶184.
It was the PowerPoint that Compass subsequently found (unrelated to the Profitero
article) through investigation that revealed the theft of Compass's trade secrets.
JA58-60, ¶¶ 185-91. While the Profitero article may have been dated August 2015,
the Complaint does not allege, and it is not clear from the face of the Complaint,
how or when the unassociated PowerPoint was posted online or first became publicly
available.

disregarding numerous allegations made by Compass and making inferences in Appellees' favor, not Compass's.  When applying the Rule 12(b)(6) standard correctly, a proper reading of the Complaint should result in a reversal of the district court's decision to dismiss the DTSA claim on statute of limitations grounds.

### B.    THE DISTRICT COURT MISAPPLIED THE INQUIRY NOTICE STANDARD BY IMPOSING AN UNTENABLE BURDEN ON COMPASS AND BY APPLYING THE STANDARD AT THE PLEADING STAGE

At its core, the district court's finding regarding the statute of limitations is that Compass was on "inquiry notice" in 2014 or 2016 and that "reasonable diligence" required it to investigate and inquire.  In making this finding, the district court imposed an untenable and onerous burden on Compass that does not comport with the factual allegations and disregards applicable law; plus, it resulted in the district court making factual determinations that are not appropriate when ruling on a motion to dismiss.

"The discovery rule tolls the accrual of the limitations period until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury.  Thus, before an action is said to have accrued, a plaintiff must have notice of the nature and cause of his or her injury." *Frederick Rd. Ltd. Pshp. v. Brown & Sturm*, 360 Md. 76, 95-96 (2000) (citation omitted).  "[A] plaintiff is only on inquiry notice . . . when the plaintiff has knowledge of circumstances which would cause a reasonable person in the position of the plaintiff to undertake

an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged tort.'" *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 446 (2000) (quotations and brackets omitted).

"Aware that the question of notice generally requires the balancing of *factual issues* and *the assessment of the credibility* or believability of the evidence, [the Supreme Court of Maryland] made clear: '*whether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of fact for the jury*.'" *Frederick Rd. Ltd. Pshp.*, 360 Md. at 96 (quoting *O'Hara v. Kovens*, 305 Md. 280, 294-295 (1986) (emphasis added). "Numerous other decisions in [the Supreme Court of Maryland] demonstrate that questions of fact on which a limitations defense will turn *are to be decided by the jury or, when sitting as a jury, by the court*." *O'Hara*, 305 Md. at 301. In this Court's own view:

> Maryland courts have applied the "discovery rule" in such a manner that makes it difficult for a defendant to secure judgment as a matter of law on the issue of notice as it pertains to the statute of limitations. Even when plaintiffs have some reason to suspect they may have a claim, Maryland courts have been unwilling to resolve the notice issue as a matter of law, especially when a plaintiff has relied on the defendant's or some other skilled person's assurances that there was no problem.

*Pilz v. FDIC*, No. 96-2243, 1997 U.S. App. LEXIS 16161, at *11-12 (4th Cir. July 1, 1997) (citations omitted).

According to the district court, the departure of two employees in 2014 required Compass to assume and investigate whether either had misappropriated trade secrets. This finding held Compass to an untenable and onerous burden inconsistent with applicable law. Inquiry notice contemplates a company in such position "undertak[ing] an investigation which, if pursued with reasonable diligence, would have led to knowledge of *the alleged tort*.'" *Lumsden*, 358 Md. at 446 (emphasis added; brackets omitted). Here, the "alleged tort" at issue is the misappropriation of trade secrets. Even assuming Compass knew at the time that DiPaula and Miller had left Compass to form Flywheel and that Flywheel was an eCommerce business in direct competition with Compass (which are improper inferences to draw based on the contrary allegations in the Complaint), such knowledge might lead to an investigation regarding potential breaches of non-competition covenants, but there is no basis in law to hold Compass also was required to assume and investigate theft of trade secrets as "the alleged tort" at issue here.

Indeed, potential enforcement of non-compete provisions was the only question on Compass's mind at the time. As alleged in the Complaint:

> *With respect solely to the question concerning whether Compass should seek to enforce the non-competition provisions in the DiPaula Agreement and the Miller Agreement, and with no corresponding knowledge or suspicion that DiPaula and Miller*

> *had stolen Compass's trade secrets and proprietary information and know how*, John presented the emails to Daniel White, Compass's acting General Counsel, and sought legal advice regarding how the Company should proceed.  Daniel advised John White that Compass should not pursue legal action against Flywheel, DiPaula, and/or Miller, and should instead compete with Flywheel in the marketplace, *where Compass's trade secrets and proprietary information and know how provided Compass with such a substantial competitive advantage in comparison to a newly formed business like Flywheel without such information*.

JA41, ¶ 81 (emphasis added).  This allegation expressly demonstrates Compass believed the Flywheel Defendants were *not* in possession of Compass's know-how and proprietary information and how theft of trade secrets was *not* contemplated. Moreover, it is important to bear in mind that the statement about DiPaula, Miller, and Flywheel not possessing Compass's trade secrets was made by Daniel White – one of the conspirators who was collaborating with the Flywheel Defendants without Compass's knowledge – and it specifically led Compass to believe at the time of DiPaula's and Miller's departure (by telling John, the company's CEO and majority shareholder) that the newly formed company did not possess Compass's trade secrets or other proprietary information.[6]

---

[6]     This interaction is but one example of the fraudulent concealment (addressed in Section II(D), *infra*) which should have tolled the statute of limitations and which should be decided by the jury.  *See Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995) ("[T]he fraudulent concealment tolling doctrine is to be 'read into every federal statute of limitation.'") (citation omitted); *Chesapeake Bay Found., Inc. v. Weyerhaeuser Co.*, 580 F. App'x 203, 207

The same holds true with the departure of Compass's employees two years later, which, according to the district court, required Compass to "investigate" and "ensure that those employees did not take its proprietary information with them." JA288. While the departure of these employees might lead to an investigation of whether DiPaula and Miller solicited them in violation of non-solicitation covenants, there is no basis in law for holding Compass was required to assume and investigate theft of trade secrets.[7] Imposing such a burden on Compass (or any company) to assume misappropriation of trade secrets when employees depart is untenable, onerous, and contrary to the realities of what transpires in business on a daily basis. Employees leave companies every day – and even often leave to work for competitors. It is reasonable to assume that most of them do not misappropriate trade secrets from their former employers. By holding Compass was on inquiry notice to investigate trade secret misappropriation as a result of these departures not only imposed this untenable and onerous burden on Compass, it also as a practical

_____

(4th Cir. 2014) ("Whether a plaintiff's failure to discover a cause of action was attributable to fraudulent concealment by the defendant is ordinarily a question of fact to be determined by the factfinder, typically a jury.") (citations omitted).

[7] Once again, as alleged in the Complaint, when "John White brought his concerns to Daniel White and asked for legal advice," he did so solely with respect to "whether Compass could pursue DiPaula, Miller, and Flywheel for _non-solicitation issues_ associated with the 2016 gutting of the eCommerce Department," JA43, ¶ 89, which is tantamount to Compass alleging that it had no concern at the time about misappropriation of its trade secrets, and consistent with its myriad allegations that it had no knowledge of any trade secret theft prior to January 2020.

matter created a new heightened pleading standard that requires parties to allege

facts that confirm an investigation was conducted and the results of the investigation

(if there was no contemporaneous finding of misappropriation), which is contrary to

applicable law. *See Four-C-Aire, Inc.*, 929 F.3d at 152 ("Plaintiffs are not ordinarily

required to plead allegations relevant to potential affirmative defenses to an asserted

claim.").

When the issue of inquiry notice requires credibility determinations and

questions of fact, such determinations and questions "are to be decided by the jury."

*O'Hara*, 305 Md. at 301. Here, there is a litany of issues that can be decided only

by a trier of fact after discovery. One of the most obvious examples is where the

district court expressly determined Compass's allegation of discovering the trade

secret claims in January 2020 was not credible. The district court was required to

accept Compass's allegations as true and draw all inferences in its favor. Even at

the summary judgment stage the court would be precluded from making such a

credibility determination. *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) ("It is

not our job [at summary judgment] to weigh the evidence . . . or to disregard stories

that seem hard to believe.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986)). Only the trier of fact can make such a credibility determination.

Beyond this improper credibility determination, questions of fact abound.

Numerous questions must be answered for the statute of limitations to be evaluated

with respect to the Flywheel Defendants, none of which "clearly appear on the face of the complaint," *Goodman*, 494 F.3d at 464, including:

- When did Compass first learn the identity of Flywheel as the company formed by DiPaula and Miller?

- When did the Compass auditor learn that Compass funds were paid to DiPaula and Miller more than a year after their employment ended and through a check issued without authorization by Michael?

- When did Compass learn that each of its eCommerce department employees had gone to work for Flywheel?

- When did Compass lose its contracts with the various customers identified in the Complaint and when did Compass first suspect or learn, if at all, that any of those companies became Flywheel customers?

- When did Compass learn its own general counsel was conspiring with Flywheel to steal Compass's trade secrets?

- Even if Compass suspected contemporaneously that customers had gone to Flywheel, was it even possible to discover that was the case or is such information protected by, for example, non-disclosure agreements between those customers and Flywheel?

- Would a reasonable person have been on notice to investigate theft of trade secrets based on the departures of DiPaula and Miller in 2014, the departures of the eCommerce employees in 2016, or the loss of certain customers over a multi-year period of time?

- How exactly did Compass's investigation beginning in 2019 proceed and what exactly was Compass's controller searching for or what led to discovery of the August 2015 article written by Miller and the

PowerPoint evidencing Compass's trade secrets which were discovered in January 2020?[8]

- If Compass conducted the same, or at least similar, investigation earlier than February 14, 2019 (three years prior to filing of this action), would the investigation have proceeded in the same fashion, would it have conducted the same searches, and/or would it have found the same information?[9]

- How, if at all, did Appellees' alleged fraudulent conduct affect Compass's knowledge or suspicion of any trade secret claim in the first place and Compass's ability to discover any such claim?

None of the answers to these questions are clearly apparent on the face of the Complaint. To fully answer these questions, discovery would need to be conducted, and the Flywheel Defendants would have the burden of proving to a trier of fact that Compass was on inquiry notice earlier than February 14, 2019 (for the DTSA claim) or February 14, 2018 (for the RICO claims). Because the district court took this task

---

[8]    This is the very issue the district court relied upon in determining that more fact-finding would be necessary before it could evaluate inquiry notice with respect to the claims against the White Defendants. *See* JA291-92 ("Although Compass explains that it discovered the alleged misdeeds after hiring a private investigator, it does not plead details about how the investigator discovered this alleged misconduct, what concrete evidence exists of the misconduct, or whether or when Compass had access and control over the sources of this information."). The same lack of "all the necessary facts" applies to analyzing inquiry notice regarding the claims against the Flywheel Defendants.

[9]    Searching the internet is vastly different than searching an employee's desk, for example, as search results vary significantly for various reasons and can even vary at different points in time based on historical search results. *See* Mike Mcevoy, *Reasons Google Search Results Vary Dramatically (Updated and Expanded)*, WEB PRESENCE SOLUTIONS (June 29, 2020), https://www.webpresencesolutions.net/7-reasons-google-search-results-vary-dramatically/.

upon itself, at the pleading stage no less (and ultimately drew inferences against Compass and refused to accept Compass's allegations as true in order to find the limitations defense applied), the district court erred and should be reversed on such grounds.

## C. THE DISTRICT COURT ERRED WHEN IT APPLIED THE STATUTE OF LIMITATIONS TO BAR CLAIMS AGAINST ASCENTIAL

Even if all the inferences drawn by the lower court were true, the DTSA and RICO claims brought against Ascential are not barred by the applicable statutes of limitations. The lower court conflated Ascential's knowledge and involvement in the misappropriation of trade secrets with the other Flywheel Defendants and completely ignored the allegations on the face of the Complaint: that Ascential's first act of misappropriation occurred when it purchased the stolen trade secrets from Flywheel in late 2018. JA65-66, ¶¶ 209-12. Thereafter, Ascential was affirmatively put on notice of the misappropriation in May 2021 when Compass notified Ascential of its recent discovery of Flywheel's misappropriation, interference, and unfair competition. Notwithstanding this notice, Ascential chose to continue using Compass's trade secrets and has continued to do so since that time. JA66-68, ¶¶ 213-23. Nothing in the Complaint alleges or indicates Ascential was involved in stealing trade secrets from Compass in 2014 and 2016 as the court imputes to the other Flywheel Defendants.

The earliest conceivable date that Compass could possibly have been on notice of Ascential's potential involvement was November 1, 2018, when Ascential's purchase of Flywheel was publicly announced. JA44-45, ¶ 94. Even if Compass knew then (which it did not) that Ascential had misappropriated its trade secrets through its purchase of Flywheel, the Complaint was filed less than four years later. This means that the RICO claims against Ascential cannot possibly be time-barred since Ascential's first act of misappropriation occurred within RICO's four-year limitations period. Of course, as alleged in the Complaint, Compass did not discover the theft of its trade secrets until January 2020 and, after presenting Ascential with the facts Compass had gathered, Compass learned for the first time in July 2021 that Ascential had no intent of ceasing its exploitation of Compass's trade secrets and would continue using them. JA68. Both the initial January 2020 discovery and the separate May-July 2021 discovery with respect to Ascential clearly fall within the three-year statute of limitations under the DTSA.[10]

_____

[10] In a footnote, the district court also commented, without holding, that "Compass' DTSA claim against the Flywheel Defendants would also fail to the extent it seeks relief for the theft of trade secrets that took place before May 11, 2016. That is when the DTSA became effective, and it does not apply retroactively. See 18 U.S.C. § 1836. Thus, even if the DTSA claim were timely, Compass would fail to state a claim under 12(b)(6) regarding any conduct that preceded the date of the DTSA's effectiveness. . . ." JA291 n.3. While not yet decided by the Supreme Court or this Court, "the misappropriation of a trade secret prior to the enactment of the DTSA does not preclude a claim arising from post-enactment misappropriation or continued use of the same trade secret." *Attia v. Google LLC*, 983 F.3d 420, 425

The district court erred when it lumped Ascential together with the other Flywheel Defendants and dismissed the DTSA and RICO claims against Ascential. As such, this Court should reverse and remand.

### D. THE DISTRICT COURT ERRED BY FAILING TO EVEN CONSIDER FRAUDULENT CONCEALMENT IN RELATION TO THE STATUTE OF LIMITATIONS

Although Compass argued that the statute of limitations also was tolled due to Defendants' fraudulent concealment of the actions underlying its claims, the lower court failed to address this alternative argument in ruling that the motions to dismiss should be granted. The Supreme Court, however, has held that "the fraudulent concealment tolling doctrine is to be 'read into every federal statute of limitation.'" *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)). Compass pled all three elements of fraudulent concealment: "(1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within

---

(9th Cir. 2020). As such, Compass's DTSA claim would not fail to state a claim based on the many other acts by the Flywheel Defendants constituting continued, post-enactment misappropriation, including use of the trade secrets after May 11, 2016, sale of trade secrets to Ascential in late 2018, and use of trade secrets by both Flywheel and Ascential post-sale through today. *See* JA42, 65-68, ¶ 84, 209-12, 223.

the statutory period, despite (3) the exercise of due diligence." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 548 (4th Cir. 2019) (quotation marks omitted).

Allegations arising under Rule 9(b) "typically include the time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby[,]" but, "[i]n cases involving concealment or omissions of material facts, however, meeting Rule 9(b)'s particularity requirement will likely take a different form." *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 586 (D. Md. 2014); *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (recognizing that an omission likely "cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation"). "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant[s were] made aware of the particular circumstances for which [they] will have to prepare a defense at trial and (2) that [the] plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

The Complaint sufficiently pled a fraudulent concealment claim against the Flywheel Defendants in alleging that DiPaula and Miller, using embezzled funds from Compass and with support from the White Defendants, "secretly built Flywheel upon the trade secret information and proprietary business know how that rightfully

belonged to Compass." JA18, JA39, JA43, JA60-62, ¶¶ 6, 76, 88, 191-200. Compass was unable to discover the misappropriation of its trade secrets and confidential information until 2020 due to DiPaula, Miller, and the Whites' "extensive and ongoing concealment efforts," JA18, JA43, JA51-54, ¶¶ 6, 88, 144-57, and sufficiently pled that the Flywheel Defendants' misappropriation of trade secrets was done "in secret." *See, e.g.,* JA33, ¶ 76 ("Although Compass did not know it at the time, DiPaula and Miller's departure was part of a calculated plan . . . to start a rival eCommerce company by stealing virtually all of Compass's trade secrets and proprietary business know how"); JA43, ¶ 88 ("Flywheel's achievements are not a business success story, but rather are attributable to DiPaula and Miller's long-secret scheme to steal Compass's trade secrets and proprietary business know how to unfairly compete with Compass.").

Moreover, Compass later learned that DiPaula and Miller were working in conjunction with Daniel and Michael to take down Compass and, therefore, actions taken by Daniel and Michael on behalf of the Flywheel Defendants acts as further concealment of the fraud. For example, DiPaula and Miller received from Daniel and Michael money that was stolen from Compass and disguised as "severance payments," which is part of the larger scheme to fund and operate Flywheel to the detriment of Compass. JA65, ¶¶ 207-08. Daniel, who Compass later came to believe was an investor in Flywheel, also discouraged John and Compass from pursuing

legal action against DiPaula and Miller regarding enforcement of their non-compete agreements, presumably to protect or cover up any further misdeeds (including the misappropriation of Compass trade secrets) that would be discovered if Compass dug further. JA41, ¶ 81. The Complaint gives the who, what, when, where, and why required by Rule 9, down to the specific dates that emails were sent and checks written.

Likewise, Compass sufficiently pled many examples of its due diligence. For instance, Compass sought legal advice when DiPaula and Miller left and its employees quit to join Flywheel. JA41, JA43, ¶¶ 81, 89. In any event, whether Compass exercised due diligence "is a jury issue not amenable to resolution on the pleadings or at summary judgment." *Edmonson*, 922 F.3d at 554. Accordingly, dismissal on diligence grounds is improper.

The Complaint sufficiently alleged facts establishing that Appellees fraudulently concealed their conduct, actions, and scheme and that Compass acted with reasonable due diligence. If necessary, the statute of limitations should have been tolled until Compass was able to discover the fraud and its claims, and the district court erred by refusing to analyze and apply fraudulent concealment.

## II. THE DISTRICT COURT ERRED BY DISMISSING THE RICO CLAIMS AGAINST THE WHITE DEFENDANTS FOR FAILURE TO STATE A CLAIM AND, ALTERNATIVELY, IT ERRED BY FAILING TO GRANT COMPASS LEAVE TO AMEND ITS COMPLAINT

Counts III and IV of the Complaint were brought pursuant to Sections 1962(c) and (d) of RICO against all Defendants. JA74-78. Because the Court dismissed all federal causes of action (the DTSA and RICO claims) against the Flywheel Defendants on statute of limitations grounds, it did not reach the issue of whether Compass adequately pled causes of action under RICO against the Flywheel Defendants. Accordingly, Compass addresses only the Court's holding that it failed to adequately allege causes of action under RICO against the White Defendants. The White Defendants sought dismissal of the RICO claims against them by contesting the second and third elements: the use of an "enterprise," and a "pattern" of racketeering activity. The district court, however, only reached the second element regarding Daniel and Michael, holding that Compass failed to adequately allege the existence of an "enterprise." JA294. Regarding George, the district court held that Compass failed to adequately allege facts to satisfy both elements. JA296. Inherent in the district court's opinion is that it believed Compass adequately pled a pattern of racketeering activity as to Daniel and Michael.

**A.  COMPASS PLED SUFFICIENT FACTS TO DEMONSTRATE A RICO ASSOCIATION-IN-FACT ENTERPRISE UNDER COUNT III**

"A violation of 18 U.S.C. § 1962(c) . . . requires (1) [injurious] conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). "Enterprise" is defined under RICO as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To establish an enterprise, Compass must show: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477-78 (D. Md. 2009). "[A]n associated-in-fact enterprise is one type of enterprise defined in § 1961(4)." *United States v. Tillett,* 763 F.2d 628, 631 n.2 (4th Cir. 1985). "The term 'any' [as enumerated in the statute] ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations omitted).

Preliminarily, heightened pleading requirements pursuant to Fed. R. Civ. P. 9(b) do not apply where the analysis only reaches the existence of an enterprise. *See WW, LLC v. Coffee Beanery, Ltd.*, No. WMN-05-3360, 2012 U.S. Dist. LEXIS 121347, at *43-44 (D. Md. Aug. 27, 2012) (holding that heightened pleading

requirements only apply to allegations of fraudulent predicate acts, but "it is generally accepted, that any non-fraud elements of a RICO claim may be pled pursuant to the less-stringent notice pleading standard of Rule 8") (quotations and citations omitted). Notice pleading is all that is required for the "enterprise" element of a RICO claim. *Id.*

The district court cherry-picked one sentence of an opinion from its own court to support its position that a RICO enterprise requires a formal agreement between the members. *See* JA293; *see also Rojas v. Delta Airlines, Inc.*, 425 F. Supp. 3d 524, 537 (D. Md. 2019). That sentence in *Rojas* is footnoted to clarify that "some level of coordination is necessary in order for enterprise members to function as a continuing unit for a common purpose[,]" but that a formal agreement is not required. *Id.* at 537 n.6. Indeed, the cases in *Rojas* cited in support do not stand for the proposition that a formal agreement must be pled. *Id.* (citing *Boyle*, 556 U.S. at 947 n.4; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010) (stating that the RICO enterprise element is a "close analogue" of the agreement element in antitrust law, and plaintiffs must "allege something more than the fact that individuals were engaged in the same type of illicit conduct during the same time period")). In fact, the court in *Rojas* clarified, "Importantly, a RICO enterprise requires the existence of *collaboration or agreement* between members of the enterprise." *Rojas*, 425 F. Supp. 3d at 537 (emphasis added).

In *Boyle*, the Supreme Court recognized that "the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct[,]" but specifically rejected the notion that a formal, structured agreement is required. 556 U.S. at 948. The Supreme Court in *Boyle* set forth the three structural features an association-in-fact enterprise must have: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*. at 944. In *Boyle*, the Supreme Court emphasized that a RICO enterprise "need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods." *Id*. at 948. Further, "[m]embers of the group need not have fixed roles; different members may perform different roles at different times." *Id*. While several individuals, acting independently and without coordination, engaging in a pattern of crimes, would not be enough to establish a RICO enterprise, establishing some level of informal coordination should be sufficient. *See id*. at 947-48.

Even if an agreement is not expressly alleged in the Complaint, an agreement at minimum should be inferred, as Compass alleged *at least* "some level of coordination" between the members of an associated-in-fact enterprise, *see Rojas*, 425 F. Supp. 3d at 537 n.6, or "relationships among those associated with the

enterprise," *see Boyle*, 556 U.S. at 948, and, therefore, Count III should have survived the motions to dismiss.[11]

With respect to the White Defendants' Enterprise, Compass specifically alleged:

- Daniel and Michael (who are brothers) opened a secret checking account in Compass's name, with them being the only authorized signatories, and then used improperly deposited checks from Compass clients for personal gain, with the obvious implication being Daniel and Michael coordinated these efforts. JA54, ¶¶ 100-103.

- Michael, as sole administrator of Compass's payroll, added Daniel's wife, daughters, and a colleague to the payroll without Compass's knowledge or approval, and Daniel's wife and daughter received bi-weekly direct deposits. The reasonable inference being Daniel knew and collaborated on this scheme. JA44, JA47, ¶¶ 93, 109.

---

[11] The district court did not make specific findings regarding Compass's allegations of any other elements or structural features of a RICO enterprise; therefore, Compass presumes the district court was otherwise satisfied with the facts alleged in the Complaint. Therein, Compass sets forth two separate enterprises: the White Defendants make up one enterprise, and the Flywheel Defendants make up another. JA74, ¶¶ 250, 254. The White Defendants share the common purpose of, in part, "harming Compass to hide the impropriety of their corporate spending for personal financial gain[.]" *Id.*, ¶ 254. The Flywheel Defendants "share the common purpose of using Compass stolen trade secrets, proprietary business know how, and confidential information for economic gain." *Id.*, ¶ 250. The enterprises ultimately joined forces with the common purpose of using Compass's trade secrets and other confidential business information to harm Compass. *Id.*, ¶ 254. Compass also properly pled that the White Defendants' enterprise (as well as the Flywheel and joint enterprises) is an entity "separate and apart from the pattern of activity in which it engages." In this regard, Daniel, Michael, and George make up the RICO enterprise, which is separate and apart from the legitimate business they conducted through Compass. Compass also adequately pled longevity, as the pattern of racketeering by the White Defendants' enterprise began as early as 1998, *see, e.g.*, JA47, ¶ 109, and continues today, *see, e.g.*, JA54, ¶ 156.

- Daniel and Michael both worked on Compass's tax returns (with an outside CPA), and Michael processed tax withholding payments to himself and Daniel, as well as their families. "Michael and Daniel knowingly funneled money through the IRS through payroll disbursements that far exceeded their normal federal payroll tax withholdings to obtain large refunds, thereby embezzling millions of dollars from Compass." JA44, JA48-49, ¶¶ 93, 119-125.

- Daniel emailed Michael about paying his daughter as a ghost employee: "Anything she makes can come out of my BS [bullshit] loan," and "Michael and Daniel continued to use Compass funds from the secret Compass bank account they controlled to repay their fake loans even after they were fired and removed as Compass directors." JA51, ¶¶ 142-43.

- George, Michael, and possibly others destroyed evidence obtained in the IT lockout to cover up past wrongdoing of Daniel and Michael and, even today, "George and Michael [who are father and son] maintain dominion and control over the lost accounts and business records." JA53-54, ¶¶ 152, 156.

*See also* JA69, ¶ 310.a.

With respect to the Joint Flywheel/White Defendants Enterprise, Compass specifically alleged:

- DiPaula, Miller, Michael, and Daniel conspired to conceal their misappropriation and cover up their actionable misconduct. JA16, ¶ 1.

- "Although Compass did not know it at the time, DiPaula and Miller's departure was part of a *calculated plan, with surreptitious support by Daniel and Michael White*, to start a rival eCommerce company by stealing virtually all of Compass's trade secrets and proprietary business know how and employing it in their new, competing eCommerce company." JA39, ¶ 76 (emphasis added).

- The IT lockout orchestrated by George and Michael served to remove from Compass's control "evidence of wrongdoing by Daniel or

Michael and evidence of misappropriation of trade secrets and other proprietary business know how by DiPaula and Miller almost certainly resides on the compassmarketinginc.com domain." To infer that Daniel and the Flywheel Defendants did not know about this strains logic. JA53, ¶ 152.

- "Michael and Daniel White are part of the conspiracy by DiPaula and Miller to found and operate Flywheel as a competitor of Compass's using Compass's stolen trade secrets and proprietary information and know how." JA63, ¶ 202. For example, "Michael White secretly issued to Daniel White a check from Compass's M&T bank account for $65,000. The memo portion of the check read "Final Payments to James DiPaula and Patrick Miller." *Id.*, ¶ 204. Daniel also issued several personal checks to DiPaula "to support [DiPaula and Miller's] funding and operation of Flywheel." "Daniel and Michael knew and encouraged DiPaula and Miller's theft of Compass trade secrets, and wanted Flywheel to succeed to the detriment of Compass." JA63-65, ¶¶ 203-208.

*See also* JA44-45, ¶ 94.

Without a doubt, at least at the early pleading stage of the litigation, this Court should find that Compass pled enough to survive a motion to dismiss. The Supreme Court has previously held the "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Boyle*, 556 U.S. at 951. But, the district court did not allow that question to reach a jury or even to proceed to discovery. Instead, the district court dismissed Count III for failure to plead an enterprise and, in doing so, disregarded a pervasive pattern of racketeering activity that spans a long period of time (more than a decade for some and nearly a decade for others) where the individual members of the enterprise are related and worked together for many years.

45

In another recent opinion by the same judge who dismissed Compass's RICO claims, a plaintiff's mere identification of a scheme "designed and executed by [one party] and participated in by [another party]" was sufficient "at the pleading stage to allege the existence of an enterprise." *See Walls v. Sierra Pac. Mortg., Co.*, Civil Action No. GLR-19-595, 2021 U.S. Dist. LEXIS 14316, at *15 (D. Md. Jan. 26, 2021). Compass pled far more than that. By finding Compass's allegations insufficient, the district court held Compass to an inconsistent and higher standard than it did in *Walls*. Compass's detailed Complaint has far surpassed the pleading floor set forth in *Walls* and should be found sufficient to state a claim under § 1962(c) of RICO.

**B.   COMPASS PLED SUFFICIENT FACTS TO DEMONSTRATE A RICO ASSOCIATION-IN-FACT ENTERPRISE UNDER COUNT IV**

To plead a § 1962(d) violation for conspiracy, the key element is that "each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." *United States v. Adoma*, 781 F. App'x 199, 203 (4th Cir. 2019) (quoting *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012)). The Fourth Circuit has explained:

> This element renders the activities of co-conspirators relevant if those acts were made in furtherance of the enterprise, even if the defendants did not participate in (or even know the details of) every such act. Because it is the agreement to commit the crime that creates the conspiracy, the defendant need not know the details of the underlying crime or the entire breadth of the

46

> criminal enterprise. In fact, a defendant may be liable for
> conspiracy even though he was incapable of committing the
> substantive offense.

*Adoma*, 781 F. App'x. at 203 (quotations omitted) (citing *United States v.*

*Moussaoui*, 591 F.3d 263, 297 (4th Cir. 2010); *Salinas v. United States*, 522 U.S.

52, 64 (1997)); *see also United States v. Gutierrez*, 963 F.3d 320, 343 (4th Cir. 2020)

(citation omitted) ("[T]he object of a RICO conspiracy is 'to engage in racketeering,'

not to commit each predicate racketeering act."), *cert. denied*, 141 S. Ct. 1112

(2021). Section 1962(d) liability does not "require that a defendant have a role in

directing an enterprise. Just as a conspirator need not himself commit or agree to

commit the predicate acts required under § 1962(c), he also is not required to play

the managerial role required for § 1962(c) liability." *Mouzone*, 687 F.3d 207, 218

(2012) (citations omitted).

As set forth in section II(A), *supra*, Compass alleged more than enough

(expressly and/or by inference) to establish agreements between the individual

White Defendants (and the Flywheel Defendants) to commit predicate acts. *See,*

*e.g.*, JA77, ¶ 265. As set forth in Section II(C), *infra*, George committed two or

more predicate acts sufficient to establish liability under § 1962(c). His agreement

to commit those acts is implicit in the allegations that he "knowingly" did so, *see*

JA78, ¶ 266, but, if the Court finds otherwise, Compass should have been given

leave to amend.

### C. COMPASS PLED SUFFICIENT FACTS TO DEMONSTRATE GEORGE WHITE ENGAGED IN A PATTERN OF RACKETEERING

In a footnote, the district court also noted that it would separately find that George did not engage in a pattern of racketeering activity because Compass alleged only one predicate act against George and, therefore, George should be dismissed on those grounds as well. A pattern of racketeering activity requires a showing of "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). "[T]he Fourth Circuit has adopted a flexible approach to the pattern inquiry which looks to the criminal dimension and degree of the alleged misconduct." *Fid. & Guar. Life Ins. Co. v. Sharma*, Civil Action No. RDB-17-1508, 2019 U.S. Dist. LEXIS 54727 *27 (D. Md. Mar. 29, 2019) (quoting *Capital Lighting & Supply, LLC v. Wirtz*, No. JKB-17-3765, 2018 U.S. Dist. LEXIS 140711 at *6 (D. Md. Aug. 20, 2018))(quotations and citations omitted)). "The mere fact that the predicate acts were all in furtherance of a single scheme or directed at a single victim does not automatically foreclose RICO liability." *Capital Lighting & Supply, LLC*, 2018 U.S. Dist. LEXIS 140711, 2018 WL 3970469, at *6 (citing *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000); *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1988)).

Compass adequately pled George committed two or more predicate acts when it alleged that George: (1) cut off access to Compass employee email accounts; (2)

cut off access to Compass's Microsoft suite; (3) cut off access to Compass's QuickBooks and other business records; (4) destroyed relevant evidence to cover up past wrongdoing amounting to fraudulent spoliation; and (5) along with Michael, continues to maintain dominion and control over the lost accounts and business records. JA52-54, ¶¶ 149, 152, 156. Should the Court deem these factual allegations insufficient to establish two or more predicate acts committed by George, the Court should give Compass leave to amend as more fully set forth *infra*.[12]

## III.   THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT FAILED TO GRANT LEAVE TO AMEND COMPASS'S COMPLAINT

Leave to amend "shall be freely given when justice so requires." FED. R. CIV. P. 15(a). The Supreme Court has held that "the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the

---

[12]   Although the district court did not explicitly state so, it insinuates that even if Compass pled two or more predicate acts by George, that his role was a minor one that did not fall within the scope of RICO liability. But, "Congress intended to reach all who participate in the [RICO] enterprise, whether they are generals or foot soldiers," *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994); *see also Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993) ("An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."). The fact that George had a different, and arguably lesser, role in the enterprise than Daniel or Michael does not negate his liability. Where George committed predicate acts in furtherance of the common purpose, *i.e.*, to harm Compass, with involvement from at least Michael, Compass has pled enough for the Court to determine George's acts are covered under RICO.

49

Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Here, the district court abused its discretion when it refused to grant leave to amend without any justifying reason. In fact, despite Compass's request for alternate relief that it be given leave to amend, *see* JA258, the district court failed to address this request at all when it summarily dismissed the Complaint. JA299.

As to the dismissal of the claims against the Flywheel Defendants on statute of limitations grounds, the law is clear that a plaintiff is not required to plead in a complaint "matters that might be responsive to affirmative defenses even before the affirmative defenses are raised." *Goodman*, 494 F.3d at 466. Had Compass known the district court was going to hold it to a higher standard than required by law, it could have pled additional facts to further demonstrate its lack of knowledge of the Flywheel Defendant's misappropriation. Accordingly, at a minimum, Compass should be afforded leave to amend the Complaint in this regard.

Because of the fact-intensive nature of RICO claims, courts in this Circuit frequently give leave to amend. *See, e.g., Menasco, Inc. v. Wasserman*, 886 F.2d 681 (4th Cir. 1989) (allowing leave to amend RICO allegations in light of new precedent); *Layani v. Ouazana*, Civil Action No. ELH-20-420, 2021 U.S. Dist. LEXIS 39894 *103 (D. Md. Mar. 3, 2021) (holding plaintiffs failed to allege a pattern of racketeering activity and dismissing the counts without prejudice and with leave to amend); *Goodrow v. Friedman & Macfadyen, P.A.*, Civil Action No.

50

3:11cv20, 2012 U.S. Dist. LEXIS 182188 (E.D. Va. Dec. 27, 2012) (granting leave

to amend the allegations regarding a RICO enterprise, in part); *Williams v. Equity*

*Holding Corp.*, No. 2:07cv66, 498 F. Supp. 2d 831, 2007 U.S. Dist. LEXIS 56762,

2007 WL 2230723, at *11 (E.D. Va. Aug. 3, 2007) (granting leave to amend RICO

claim); *Orteck Int'l, Inc. v. TransPacific Tire & Wheel, Inc.*, Civil Action No. DKC

2005-2882, 2006 U.S. Dist. LEXIS 67702 *63 (D. Md. Sep. 5, 2006) (holding

plaintiffs failed to allege a pattern of racketeering activity and dismissing the counts

without prejudice while granting leave to amend).

Even if the Court is not convinced that Compass adequately pled

collaboration, a relationship, or agreement between the members of the White

Defendants enterprise, Compass should be given leave to amend and so plead.

Regarding George (if the Court finds the allegations against George are insufficient),

Compass should be given leave to amend to include additional facts as to George's

participation in the enterprise, as well as to establish that each lockout to email

accounts, Microsoft, QuickBooks, and other business records and accounts,

constitutes a distinct predicate act such that George engaged in a pattern of

racketeering.   For the foregoing reasons, the district court should have, at a

minimum, given Compass leave to amend its Complaint to expound upon its

allegations to establish liability under RICO.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court, find that Compass has sufficiently pled claims under the DTSA and RICO, and remand this case for further proceedings before the district court so that Compass may conduct discovery in support of its claims. In the alternative, the Court should reverse the district court by remanding the case and granting Compass leave to amend its Complaint.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 34(a) of the Federal Rules of Appellate Procedure, Appellant respectfully requests oral argument.

Respectfully submitted,

Dated: June 23, 2023

/s/ Stephen B. Stern
Stephen B. Stern

/s/ Michael J. Marinello
Michael J. Marinello

/s/ Meagan C. Borgerson
Meagan C. Borgerson
KAGAN STERN MARINELLO & BEARD, LLC
238 West Street
Annapolis, Maryland 21401
Tel (410) 216-7900
stern@kaganstern.com
marinello@kaganstern.com
borgerson@kaganstern.com

*Counsel for Appellant*
*Compass Marketing, Inc.*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [ X ] this brief contains [*12,968*] words.

    [    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.  This brief complies with the typeface and type style requirements because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: June 23, 2023          /s/ Stephen B. Stern
                              Stephen B. Stern

                              /s/ Michael J. Marinello
                              Michael J. Marinello

                              /s/ Meagan C. Borgerson
                              Meagan C. Borgerson

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 23rd day of June, 2023, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all counsel as registered CM/ECF users.

/s/ Stephen B. Stern
Stephen B. Stern

/s/ Michael J. Marinello
Michael J. Marinello

/s/ Meagan C. Borgerson
Meagan C. Borgerson