1
```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2                        NORTHERN DIVISION
```

3
```
  ASHLEY BOSHEA,           )
  Administrator of the     )
4 Estate of David John     )
  Boshea, Deceased,        )   CASE NUMBER: 1:21-cv-00309-ELH
5       Plaintiff,          )       Excerpt of Proceedings
                           )     Testimony of Donna Eisenberg
6       v.                  )
                           )
7 COMPASS MARKETING, INC., )
  et al,                    )
8       Defendants.         )
  _____)
```

9

```
         EXCERPT OF TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
10          BEFORE THE HONORABLE ELLEN L. HOLLANDER
                   UNITED STATES DISTRICT JUDGE
11                 Wednesday, August 6, 2025
                        Courtroom 5B
12
                    A P P E A R A N C E S
13

  FOR THE PLAINTIFF:
14      BY: GREGORY J. JORDAN, ESQUIRE
             JORDAN & ZITO, LLC
15           350 North LaSalle Street, Suite 700
             Chicago, Illinois  60654
16
        BY: THOMAS J. GAGLIARDO, ESQUIRE
17           GILBERT EMPLOYMENT LAW, P.C.
             Suite 900
18           8403 Colesville Road, Suite 1000
             Silver Spring, Maryland  20910
19
  FOR THE DEFENDANT:
20      BY: STEPHEN STERN, ESQUIRE
             SHANNON HAYDEN, ESQUIRE
21           KAGAN, STERN, MARINELLO & BEARD, LLC
             238 West Street
22           Annapolis, Maryland  21401

23  Also Present:
  Noah Wolf, Paralegal
24  Ryan Oswald, Paralegal

25  _____
         ***Proceedings Recorded by Mechanical Stenography***
          Transcript Produced by Computer-Aided Transcription
```

```
 1                    (Requested excerpt of transcript begins.)
 2        (3:26 p.m.)
 3                    THE COURT:  The defense rests.
 4             Is there a rebuttal case?
 5                    MR. JORDAN:  Yes.  We will call Donna Eisenberg.
 6                    THE COURT:  All right.
 7                    THE COURTROOM DEPUTY:  Good afternoon, ma'am.  Would
 8        you please raise your right hand?
 9                    (Witness, sworn.)
10                    THE COURTROOM DEPUTY:  Thank you; you can have a
11        seat.  Please adjust that chair and that microphone so that
12        you're speaking directly into it.  And please state and spell
13        your first and last name for the record.
14                    THE WITNESS:  My name is Donna Eisenberg.
15        E-i-s-e-n-b-e-r-g.
16                    D I R E C T   E X A M I N A T I O N
17        BY MR. JORDAN:
18        Q.   Good afternoon, Ms. Eisenberg.
19        A.   Good afternoon.
20        Q.   Can you tell me, tell the jury, really, what you do for a
21        living?
22        A.   As a forensic document examiner I take documents and
23        determine whether they are genuine or counterfeit or altered
24        in any way and I do handwriting identification to determine if
25        a signature or a body of writing was or was not written by
```

1    another person.

2    Q.    Are you employed by a company or have your own company?

3    A.    I have my own company.  It's called Forensic Document

4    Examination Services, LLC.

5    Q.    Okay.  And how long have you worked in the field -- have

6    you worked in the field of handwriting analysis?

7    A.    Yes, sir.

8    Q.    And how long have you worked in that field?

9    A.    37 years.

10   Q.    Okay.  And where did you go to college?

11   A.    I went to the University of Maryland in College Park.

12   Q.    And did you obtain a degree from that University?

13   A.    I have a bachelor of arts degree in psychology from

14   Maryland.

15   Q.    And did you subsequently obtain any other degrees?

16   A.    Yes.  I also have a masters of forensic science degree

17   from the George Washington University in Washington, DC.

18   Q.    And does your degree in psychology assist you in your

19   handwriting analysis profession?

20   A.    Not so much, but, you know, all education is good and it

21   gave me the basis for applying to graduate school which

22   ultimately became my field of expertise.

23   Q.    And does your masters in forensic science from GW assist

24   you in your profession?

25   A.    Yes.  That program -- I took basically one class in a

Eisenberg - direct

```
1    variety of disciplines in forensic science such as toxicology,

2    pathology, questioned documents and it made me a better

3    candidate for when applying for a job in the forensics field.

4    Q.   Okay.  Did you have an apprenticeship in that field?

5    A.   Yes, sir.  There was a three-year apprenticeship in the

6    field of questioned documents at the Secret Service Laboratory

7    where I was given instruction on determining what class

8    characteristics are in handwriting, what individual

9    characteristics are, and detecting various printing processes

10   and typewriter identification.  The whole --

11   Q.   Gamut?

12   A.   Gamut of questioned documents, yes.

13   Q.   And where did you work in your first position related to

14   handwriting analysis?

15   A.   I worked at the United States Secret Service Forensic

16   Lab.  I worked there for ten years.

17   Q.   Okay.  And what did that job entail?

18   A.   I would receive documents, primarily U.S. monetary

19   obligations, currency, and foreign currency.  I did hammering

20   identification.  I did death threats to the president and

21   anyone else under Secret Service protection.  So I did

22   counterfeit and -- counterfeit and handwriting identification.

23   Q.   And did the handwriting identification work assist you in

24   developing any kind of expertise in analysis of handwriting?

25   A.   Yes, sir.  I am an expert in identifying handwriting.
```

1    Q.   Okay.  And do those kind of examinations include

2    microscopic, instrumental, and comparative analysis of

3    handwriting and other processes?

4    A.   Yes, sir; they do.

5    Q.   Okay.  And how many of those types of examinations have

6    you done over the years?

7    A.   Individual cases?

8    Q.   Just estimate.

9    A.   50,000.

10   Q.   Okay.  And how long have you been employed by the Secret

11   Service?

12   A.   Ten years.

13   Q.   And I know you have an independent practice, as you

14   mentioned.  Do you have any other governmental experience?

15   A.   Yes.  I spent 24 years in the forensic lab of what was

16   then Immigration and Naturalization Service which became the

17   Department of Homeland Security.  So I worked there for 24

18   years.

19   Q.   And why did you leave Homeland Security?

20   A.   I retired.

21   Q.   Okay.  And what exactly did you do for

22   Immigration/Homeland Security?

23   A.   So all the forensic labs for the U.S. Government all

24   specialize in different documents.  So with Secret Service it

25   was currency and monetary obligations.  At Homeland Security

1    it's identity documents, travel and identity documents like

2    passports and driver's licenses, birth certificates, those

3    types of things.

4    Q.   Did that include handwriting analysis?

5    A.   Yes, sir.

6    Q.   And that was amongst the 50,000 analyses you've done?

7    A.   Yes.

8    Q.   Do you have any certifications that you've obtained?

9    A.   Yes.  I am certified by the American Board of Forensic

10   Document Examiners which is the North American body recognized

11   by the Courts for certifying qualified document examiners.

12   Q.   And how long have you been certified as a forensic

13   document examiner by the American Board of Forensic Document

14   Examiners?

15   A.   Since 2002.

16   Q.   And you maintain that certification currently?

17   A.   Yes.  In order to become board certified you need both

18   professional and educational requirements.  You need letters

19   of recommendation and then you have to take a written test, a

20   practical test, and an oral examination.  After becoming

21   certified, every five years you have to be recertified and you

22   collect points by attending professional conferences, or

23   writing a research paper, or workshops.

24   Q.   So that's something you regularly would do?

25   A.   Yes, sir, I do.

Eisenberg - direct

```
 1    Q.   Okay.  Do you have any other certifications?
 2    A.   I'm a member of the American Academy of Forensic
 3    Sciences.
 4    Q.   Okay.  And have you been certified by the Collaborative
 5    Testing Services?
 6    A.   Yes.  My laboratory at the -- at Homeland Security, its
 7    CTS exams are two a year, And from I believe it was 2000 until
 8    I retired in '22 that I did those tests -- two tests a year
 9    and I passed them every time.
10    Q.   Okay.  And before we talk about the private practice, did
11    the Government allow you to maintain a private practice?
12    A.   They did.  But I was restricted from -- to doing only
13    civil work.  I was not allowed to do any criminal work.  After
14    retiring I can do both criminal and civil work.
15    Q.   And you mentioned that your business is Forensic Document
16    Examination Services, LLC; is that right?
17    A.   Yes, sir.
18    Q.   And how long have you run that business?
19    A.   Since 2008.
20    Q.   Okay.  And how would you describe Forensic Document
21    Examination Services, LLC?
22    A.   Well, I accept cases where there's either a document or
23    handwriting that's in question and I am provided with known
24    exemplars, known samples and I compare that to the questioned
25    material.
```

1    Q.   And have you testified as a handwriting expert in state

2    and federal courts?

3    A.   Yes, sir; I have.

4    Q.   And in what courts have you been accepted as an expert

5    witness in forensic document examination?

6    A.   U.S. district courts; state and federal courts; county;

7    all courts.  I've never been excluded.

8    Q.   Okay.  Have you published any materials concerning

9    document examination?

10   A.   Yes.  I wrote a chapter in a textbook.  It's called the

11   Forensic Handwriting Examinations in the 21st Century and I

12   wrote a chapter in there concerning foreign handwriting.

13   Q.   Okay.  And have you ever heard of the American Board of

14   Forensic Document Examiners diplomate?

15   A.   Yes, I am a diplomate.

16   Q.   What does that mean?

17   A.   That I am certified by the American Board of Forensic

18   Document Examiners.  And I was actually on the board of

19   directors with three years in the role of vice president.

20   Q.   Okay.

21          **MR. JORDAN:**  And, Your Honor, we tender Donna

22   Eisenberg as an expert in the area of forensic document

23   examination and handwriting analysis.

24          **THE COURT:**  Any voir dire?

25          **MR. STERN:**  No, Your Honor.

```
 1                THE COURT:  Then she will -- any objection?
 2                MR. STERN:  No, Your Honor.
 3                THE COURT:  She will be received as an expert in
 4       forensic document examination and handwriting analysis.
 5       BY MR. JORDAN:
 6       Q.   Okay.  Now in the book that we have, exhibit book, have
 7       you prepared a report or more than one report related to this
 8       case?
 9       A.   Yes, sir; I did.
10       Q.   Okay.  And I don't want to get the jury's hopes up
11       because we're not going to publish it, but if you look at tab
12       No. 18 --
13       A.   18?
14       Q.   Yes.
15       A.   Okay.
16       Q.   Tell me if that is your report.
17       A.   That's the first report that I issued in this case.
18       Q.   Okay.  And then there was a second report?
19       A.   Yes, because I got additional evidence.
20       Q.   Okay; all right.
21            As an opening question, as a person who is an expert in
22       this area, can you as an expert look at a questioned signature
23       without looking at any known signatures and form an opinion as
24       to whether that signature is a simulation?
25       A.   Of course not.  No.
```

1    Q.    What is the simulation?

2    A.    A simulation is when someone tries to duplicate, forge

3    someone else's signature.

4    Q.    When you say "of course not," what do you mean?  If I

5    just give you a signature and you look at it you can't tell

6    whether it's a simulation/forgery or not?

7    A.    No, because I would have no idea how that person

8    naturally writes so it's impossible to make such an

9    assessment.

10   Q.    Okay.  And what materials did you review related to this

11   particular engagement?

12   A.    There was a questioned signature on an agreement and then

13   I worked with 31 known samples of the suspect writer's

14   signature.

15   Q.    Okay.  And let's see if we can't -- now take a look at

16   the first chart, chart number one which relates -- Noah, can

17   you put that up, please?

18          THE COURTROOM DEPUTY:  What's the exhibit number,

19   Counsel?

20          MR. JORDAN:  I'm sorry?

21          THE COURTROOM DEPUTY:  What's the exhibit number?

22          MR. JORDAN:  It's not an exhibit.  We are using this

23   as a demonstrative just like they did with the chart so that

24   we're not putting this into evidence.

25          MR. STERN:  Can you clarify which page of the report

```
 1    we're looking at?
 2              MR. JORDAN:  This is a part of her rebuttal report.
 3              MR. GAGLIARDO:  Page 1 it says.
 4              MR. STERN:  Page 1 of what?
 5              MR. GAGLIARDO:  Looking on the screen it says page
 6    1.
 7              MR. JORDAN:  This was a report that I delivered to
 8    you on December 23rd last year.
 9              MR. STERN:  I know.  I've got the hardcopy, but I'm
10    not seeing this.
11              MR. JORDAN:  Okay, if you can just look on the
12    screen, Stephen.
13    BY MR. JORDAN:
14    Q.   Anyway --
15              MR. GAGLIARDO:  Hang on one sec.
16    BY MR. JORDAN:
17    Q.   Can you tell me what this first chart, it says variation,
18    peak formation.  Exhibit Q1.  What is exhibit Q1?
19    A.   Q1 is the questioned signature that I was asked to
20    determine if it was authentic or not.
21    Q.   Okay.  And then there are a series of signatures below
22    that.  Relating to peak formations, can you kind of explain to
23    the jury your view on the peak formations here?
24    A.   Yes.  So the blue background is the questioned signature.
25    The green background on these charts are the known signatures,
```

1    the known samples.  And one of -- so what I did was I looked

2    at the known writing to determine what is in common among them

3    to determine what we call individual characteristics.  So

4    those are features that are in the handwriting of the

5    signature of Mr. White and determine -- so I look at those and

6    then I look at the questioned and say, do those features that

7    are in the known, are they duplicated within the questioned

8    signature.

9        And in this particular chart what you see is -- now

10    understand that this is an illegible signature, so I'm going

11    to say what it should be.  So the red arrow is pointing to the

12    peak of what is, in theory, the left side of a W.  And that

13    feature which is peaked is pointed and it's tented.  Tented

14    means it's not retraced.

15        So if you look at K1, that signature has the same

16    formation.  It's peaked and it's not retraced.  Same in K2.

17    It's peaked and it's not retraced.

18            **THE COURT:**  How do you know that it's not retraced?

19            **THE WITNESS:**  Because there's a space in between.

20    So the pen is coming up and then it's coming down, but it's

21    tented.  So if it was retraced, it would come up and go down

22    in the exact same spot.  And you can see that formation what

23    you're asking about, Judge, in K13, the bottom right.  That

24    one is retraced.

25    **BY MR. JORDAN:**

1    Q.    So that was John White's actual signature.  All of the

2    ones in green are exemplars that were brought in to us by

3    Compass as true signatures of John White; is that right?

4    A.    Exactly.  Yes, sir.

5    Q.    And you're saying which one is the one that is retraced

6    by John White?

7    A.    13 is retraced; 7, K7 is also retraced; and K5 is

8    retraced.  So there's a lot of variation in how he forms this

9    character.

10   Q.    So if Compass' expert said that this peak formation was

11   not reflected in -- I think he said he looked at 50, but his

12   report seemed to focus on 19.  But even of the 50 I think he

13   said that this peak formation did not appear.  Do you agree or

14   disagree?

15   A.    I completely disagree.  I reviewed Mr. Payne's report and

16   he was very selective; cherry-picking is what we call it.  So

17   he found what he called differences and he found -- and he

18   showed examples in his report of those differences, but he

19   didn't utilize all of the evidence.  And if he had, he would

20   have found -- everything that he talked about as a difference

21   was also included in all of the knowns.  Not every single one,

22   but you look at all of them and you determine did the

23   questioned signature fall within the range of variation

24   exhibited within the known writing.  And it did.  And he chose

25   to ignore those.

```
 1   Q.   Okay.  Can you put up the chart 2, please?  I'm sorry.

 2   Yeah, chart 2.

 3            MR. STERN:  Could we get clarification where this is

 4   coming from?  Because we don't have this in our exhibits.

 5            MR. JORDAN:  This is the rebuttal report that I

 6   delivered to you on December 23, 2024.

 7            MR. STERN:  So looking at it I don't see that right

 8   now.  I'm not seeing where it is.

 9            MR. JORDAN:  It's on the screen.

10            MR. STERN:  I'm looking at that report right now and

11   I don't see it.

12            THE COURT:  So can you explain, Mr. Jordan?  He

13   doesn't seem to have it.

14            MR. JORDAN:  He has it.

15            MR. STERN:  There's an electronic copy too.

16            MR. JORDAN:  He has it.  I gave it to him on

17   December 23rd.

18            MR. STERN:  We're not --

19            THE COURT:  One at a time.

20            MR. JORDAN:  Before I came up here at lunchtime I

21   said I want to make sure there's not an issue this time.  I

22   sent the rebuttal report on December 23rd.  I'll tell you what

23   I'll do.  I will email it to you right now.

24            MR. STERN:  I'm just saying --

25            MR. JORDAN:  I'm forwarding the email that I sent to
```

1    you.

2              **MR. STERN:**  I'm looking at the report that's dated

3    December 2024 and I don't see it in there.

4              **THE COURT:**  Do you want to come up?

5              **MR. STERN:**  Can we get a page number?  We're

6    looking.  We can't find it.  He did send us something back in

7    December 2024.  I'm not disputing that.

8              **THE COURT:**  So he's saying you did send him

9    something, but he doesn't think this was part of it.

10             **MR. STERN:**  I'm sorry.  I just want to get

11   clarification on it.

12             **MS. HAYDEN:**  I just need the page number.

13             **MR. JORDAN:**  All right, I just re-emailed you.

14             **THE COURT:**  Come up, Counsel.  The jury doesn't need

15   to hear all of this.

16             **(Counsel approached the bench.)**

17             **THE COURT:**  Is this déjà vu all over again?

18             **MR. JORDAN:**  I'm hoping not.

19             **THE COURT:**  Just so everybody knows what I'm talking

20   about, that was the first trial where there was something not

21   produced.

22             **MR. STERN:**  Mr. Jordan, in December of 2024, did

23   email me the report.  That's not in dispute.  I just can't

24   find this page that they've been testifying off of in the

25   hardcopy of it and Ms. Hayden couldn't find it electronically

```
 1    either.  So are we looking at the wrong thing?

 2              MR. JORDAN:  I just forwarded it to them, both of

 3    them.

 4              THE COURT:  Well, can you establish that it was part

 5    of your original email in December of 2024?

 6              MR. JORDAN:  Yes; sure.

 7              MR. STERN:  I just don't know if I'm looking at the

 8    wrong document.

 9              THE COURT:  Then why would it be that the one

10    document that he's asking about is the one you don't have?  I

11    am revisiting my life, it seems.

12              MR. STERN:  I've raised this very reluctantly, Your

13    Honor.  I just --

14              MR. JORDAN:  Here is my email.  And then pages 6, 7,

15    8, 9, 10, 11 and 12.

16              MR. STERN:  I see all of those.  And I --

17              MS. HAYDEN:  The actual chart that you're showing is

18    not in this email.  I just -- I don't know.  I was just trying

19    to find it.

20              MR. JORDAN:  Okay.  Ms. Eisenberg emailed me these

21    charts again today.

22              MR. GAGLIARDO:  This is it.

23              MS. HAYDEN:  His is different.  I just want to be

24    sure --

25              MR. JORDAN:  She's going through and it appears to
```

```
 1    be the same.
 2              MS. HAYDEN:  Yours is dated --
 3              MR. JORDAN:  What's that?
 4              MS. HAYDEN:  If you go to the signatures, they're
 5    dated signatures.
 6              MR. JORDAN:  It's the same signatures.
 7              MS. HAYDEN:  I was trying to match them up.
 8              MR. JORDAN:  Okay, are you able to match it up now?
 9    It looks like it.
10              MS. HAYDEN:  That's a little different.
11              MR. STERN:  That's different.
12              THE COURT:  Is it there?
13              MR. STERN:  No, it's a different one.  He's looking
14    at it.
15              THE COURT:  I'm sorry?
16              MR. STERN:  Ms. Hayden is looking at it more
17    closely, but it looks different from where I'm standing.
18              MR. JORDAN:  I can ask.
19              MS. HAYDEN:  Are these the original rebuttal charts
20    from '21?
21              MR. JORDAN:  Donna -- these are the original
22    rebuttal charts from 2024, not from '21.  If you're looking at
23    '21, this is the rebuttal charts.
24              MS. HAYDEN:  But it's not the same.
25              MR. STERN:  I've got a hardcopy and I don't see
```

```
 1    those.  That's why I was asking, was I looking at the wrong

 2    page.

 3              MR. JORDAN:  I sent two sets of charts to Noah

 4    today.

 5              MS. HAYDEN:  Do the charts exist separate and apart

 6    from the report?

 7              MR. JORDAN:  No.

 8              MS. HAYDEN:  No?

 9              MR. JORDAN:  She sent these to me this morning.

10              THE COURT:  This morning doesn't count.

11              MR. STERN:  Yeah.  At first I thought it was my

12    mistake.  I'm starting to think it may be déjà vu, I don't

13    know.

14              THE COURT:  Hard to believe we could have the same

15    issue this time around that we had the first time around.

16              MS. HAYDEN:  He just emailed the charts.

17              MR. STERN:  Well, let's see what comes in and try to

18    figure out what the discrepancy is.

19              THE COURT:  Okay, well I want to make sure they're

20    here.

21              MR. JORDAN:  It was emailed to you, the email I got

22    from him this morning.

23              MR. STERN:  I do want to be clear these are charts

24    that came in this morning.  That doesn't seem part of the

25    December 2024 report.  Mr. Jordan said he sent us a report in
```

1    December of 2024.  I'm not disputing that at all.  I've got a

2    printout up here.  It's pretty thick.  I just didn't recognize

3    this part of it.

4            MR. JORDAN:  I'm sorry?

5            MR. STERN:  I said I'm not disputing that you sent

6    us something in December of 2024.  You clearly did.  I

7    acknowledged that multiple times you definitely did.  I just

8    don't see these charts in that report.  That's the only thing

9    I'm asking.

10           MR. JORDAN:  There's a chart that Ms. Eisenberg sent

11   me this morning.  She sent me two different emails.

12           MR. STERN:  But my question is why is it being sent

13   this morning?  That's my concern.

14           MR. JORDAN:  She just said here are separate charts

15   so I can put them up because of course --

16           MR. STERN:  Well, if I'm understanding you

17   correctly, is it something that was in the report that's

18   redacted because there's no analysis on it?

19           MR. JORDAN:  There's, like, all the various --

20           MR. STERN:  But if that's the case that's what I was

21   thinking at first.  Maybe you redacted it because there's an

22   analysis on there.

23           MR. JORDAN:  She made it easier to review, but it's

24   the same.

25           MR. STERN:  I didn't see those in the report.  I

```
 1    assumed that that's what it was, it was just redacted.  Here

 2    is the chart, and there's no analysis on it --

 3              THE COURT:  Can we get going then?

 4              MR. STERN:  No, we still don't have them.  Are they

 5    in the report?

 6              MS. HAYDEN:  I don't think so.  I do not see them.

 7              MR. STERN:  I mean, that's -- we may object to just

 8    the discussion of these reports.  I want the comparison.

 9              THE COURT:  How is this possible, Mr. Jordan?

10              MR. JORDAN:  What's that?

11              THE COURT:  How is it possible that you would have

12    the same mistake this time as last time?  Can you show me you

13    gave him this document?

14              MR. JORDAN:  This is the same charts.

15              MR. STERN:  But I'm asking --

16              MR. JORDAN:  I sent it to Ms. Hayden --

17              MR. STERN:  No.  Show me in the December 2024 report

18    where so I can -- look, I assumed that -- I had doubts I was

19    wrong.

20              THE COURT:  Is there anything different about this

21    though than anything else we've seen already?

22              MR. STERN:  I don't know.  This is -- what I'm

23    concerned about is this is new.

24              MR. JORDAN:  I can send you -- I'll ask her on the

25    record, are these the same charts included in your December
```

```
 1    report?  Which my understanding is they are.
 2              MR. STERN:  The page references so I can see it.
 3              MR. JORDAN:  I'll ask her to identify the page
 4    number.
 5              MR. STERN:  I'm not saying -- that's why I said this
 6    most reluctantly.
 7              THE COURT:  You're saying this was in the December
 8    report, but you're saying you didn't have them in the December
 9    report so how does that help?
10              MR. JORDAN:  I gave her -- I emailed him December
11    23rd.
12              THE COURT:  But he's saying he didn't get these.
13              MR. STERN:  She's saying they're in the December
14    report.  I want to reference the page numbers so I can look at
15    them and confirm that's correct.  Right now everything that
16    I'm seeing -- and maybe I'm just being dense and if I am this
17    is very embarrassing, but I don't see them and I just want a
18    confirmation that they're in there, that's all.
19              MR. GAGLIARDO:  Stephen, can we see what you
20    actually had?
21              THE COURT:  Yes.  That's what he's saying.  He
22    doesn't see it.
23              MR. STERN:  Here it is.  And Shannon also went
24    through it electronically.
25              THE COURT:  We are going to really frustrate this
```

1    jury and it's not good.

2                 **MR. STERN:**  Your Honor --

3                 **MS. HAYDEN:**  The exhibit that you sent

4    electronically, that was actually the 2021.  So I pulled up

5    the 2024 because I figured that's what you meant to send.

6    It's just not the same.  If this is the chart she's

7    referencing, fine.  But it does not look the same so I'm just

8    -- it's just missing the dates and everything.

9                 **MR. GAGLIARDO:**  Can you agree that there's some

10   chart that you got that she can testify to?

11                 **MR. STERN:**  But it should be in the one that we got.

12                 **THE COURT:**  Can she go forward with the testimony

13   and iron this out later because how would this make any

14   difference in the long run?  Are you going to technically

15   question her about the peaks and valleys and the ebbs and the

16   flows?

17                 **MR. STERN:**  Probably not, Your Honor.

18                 **THE COURT:**  So can we just get going?  I appreciate

19   you may not have gotten it.  It seems to me they can't show

20   you you did, but there are so many of these charts out there

21   and they're always the same, more or less.

22                 **MR. STERN:**  I want to make sure our objection is

23   noted on the record.

24                 **THE COURT:**  It's on the record.  What would you like

25   to do about it?

1          **MR. STERN:**  I think they're not supposed to be able

2   to use that chart.  I guess the real solution is the issue and

3   that's what I'm -- Your Honor, to be honest I'm probably not

4   going to be examining her on that detail, but they shouldn't

5   be able to use something that's by surprise again.

6          **THE COURT:**  At the end of the day it's a different

7   chart that shows the same things.

8          **MR. GAGLIARDO:**  That's why I'm saying is there a

9   chart --

10          **THE COURT:**  Everybody's charts look the same.  The

11  known writing is the known writing.  The questioned signature

12  is the questioned signature.  She can still make her points on

13  some other document that you did get.  So at the end of the

14  day this is a very concerning point.  I get it, Mr. Stern.

15  They haven't satisfied me that they gave it to you, but does

16  it really affect anything?

17          **MR. STERN:**  I guess I won't know until the end of

18  her testimony.

19          **THE COURT:**  Well, we know what she's going to say.

20  She never formed a conclusion.

21          **MR. STERN:**  Right.  Okay.

22          **THE COURT:**  Okay, I suggest we do this:  Why don't

23  we keep going and then anything that you think would be

24  something that is appropriate by resolution, I'll entertain

25  it.  I don't know what else to do, but it's 4:00.  We were

 1  going to finish and we're not.

 2          **MR. STERN:**  I think we're going to finish the

 3  examinations today.  I'm hoping so.  I would think so.

 4          **THE COURT:**  I've got to take time to figure out the

 5  jury instructions with you where they're nowhere near ready,

 6  as far as I'm concerned, with what you gave me last night.

 7  You never identify what was in dispute, by the way, on that

 8  page.  Never.

 9          **MR. GAGLIARDO:**  I thought that it was the last one--

10          **THE COURT:**  I saw nothing.

11          **MR. STERN:**  Mr. Jordan wrote it in.

12          **THE COURT:**  Mystery to me and it was incomplete,

13  from my perspective.  You opened the door, but you don't

14  really talk enough about the topics that you added.  But

15  that's a different matter, but I need time with you is my

16  point.  And when are we going to do it?  So -- okay.

17          **(Counsel returned to their trial tables.)**

18          **THE COURT:**  We're going to resume with apologies,

19  ladies and gentlemen, for the delay.

20  **BY MR. JORDAN:**

21  Q.   Okay, let's look back on I believe we're at chart 2.  Do

22  you have that?

23  A.   I don't have it.

24  Q.   Can you put up chart 2, please?  And this says Variation

25  EE.  Do you see that?  And what are you attempting to identify

 1    with regard to the --

 2                 **MR. GAGLIARDO:**  Greg, hang on a second.

 3                 **THE COURT:**  Can I just ask one clarifying question?

 4    These known samples that you're looking at, I believe you said

 5    you had a total of 31.  Did you get them all at once?

 6                 **THE WITNESS:**  No, ma'am.

 7                 **THE COURT:**  So can you tell the jury the groupings?

 8    For example, was it 20 at one time and 11 at another time or

 9    exactly how did they come?  And what --

10                 **THE WITNESS:**  Hang on one second, Your Honor.  I

11    first received -- I believe it was, like, 21.  I'm not

12    positive, but 21.

13                 **THE COURT:**  21 initially?

14                 **THE WITNESS:**  Yes.  And then an additional to make

15    it, like, 31, I think.

16                 **THE COURT:**  So ten more?

17                 **THE WITNESS:**  Something like that.

18                 **THE COURT:**  And as of the -- the jury knows there

19    was a prior trial.  And as of the first trial, the known

20    samples that are on this document that you have been shown

21    that's on the screen, are you using samples that you had as of

22    the time of the first trial?

23                 **THE WITNESS:**  Some of them, yes.

24                 **THE COURT:**  Are there any that weren't there at the

25    first trial?

1          **THE WITNESS:**  So in the first report, everything --

2     the knowns are labeled K1 -- K for known -- 1 through 15.  And

3     now I have 17.  But within 15 and within 17 there are

4     multiples within those.  So I name them 17a, b, c, and so

5     forth.

6          **THE COURT:**  I guess my question is can you tell from

7     looking at the document on the screen how many of these known

8     documents were considered as of the time of the first trial?

9          **THE WITNESS:**  Yes.  Anything that's labeled K1

10    through 15 I had for the first time.  And 16 and 17 was

11    subsequent.

12         **THE COURT:**  So this document on the screen then

13    would have out of ten known samples, there was one that you

14    hadn't considered as of the first trial.  Would that be

15    accurate?

16         **THE WITNESS:**  Yes, ma'am.

17         **THE COURT:**  Thank you.

18         **THE WITNESS:**  Okay.

19       So on this chart in the questioned signature in the blue,

20    you see these two large loops.  Now what they really should be

21    is a t-e for White, but it's completely illegible.

22         **THE COURT:**  And which number are you up to?  I'm

23    sorry.

24         **THE WITNESS:**   Q1 at the very top.  So the red arrow

25    points out these two large loops which I'm saying are

     1    allegedly a t-e, but it's not legible.

     2         Now if you look at K16 you see it's that same motion,

     3    that same movement, the same two large loops.  And then if you

     4    look at all the rest of them, they're all varied.  So if you

     5    look at K2 it's smaller loops and they're kind of separated

     6    from each other as opposed to Q1 and K16 which abut one

     7    another, they touch one another.  If you look at K11 it's like

     8    one circle.  If you look at K4 there's no circle at all.  K5

     9    it's one small e kind of formation.  K6 it's no loop, just a

    10    kind of closed eyelet e formation.  K7 is one looped

    11    formation.  K8 is two small, like, normal looking e's.  K1 --

    12    again, they're all varied.  But they all were written by Mr.

    13    White.  And so it just is demonstrating his wide range of

    14    variation when writing any of his characters.

    15         And so the question for me is does Q1, the questioned

    16    signature, fall within the range of variation exhibited among

    17    the known writing.  And it does, particularly in K16.

    18    **BY MR. JORDAN:**

    19    Q.   Now put chart 3 up, please, Noah.  Let me know when you

    20    have it up there.  Okay.  This relates to the j-pointed apex

    21    which I believe Mr. Payne talked about.  And can you explain

    22    your views with regard to the j-pointed apex here?

    23    A.   Yes.  So Mr. Payne said that the questioned signature had

    24    a pointed apex for the j and he showed a lot of curved

    25    formations of the j's in the known samples.  But as you can

1    see in this chart, every one of the ones that I'm pointing out

2    here with the red arrow has a pointed j top.  So as I

3    mentioned before, Mr. Payne came up with these quote/unquote

4    "differences," but he cherry-picked what he used for the

5    samples.  And I'm showing you that all of these samples on

6    this page in the green all have a pointed apex for the j.  So

7    he does -- Mr. White does make this formation.

8    Q.   Okay.  And so does the questioned document fall within

9    the range of documents with regard to the apex?

10   A.   Yes, sir, it does.

11   Q.   Okay.  Can you take a look at chart 4?  And this relates

12   to the beginning stroke which is another thing Mr. Payne

13   talked about in the -- and terminus and those types of things.

14          MR. STERN:  Your Honor, can I have a continuing

15   objection?  I think each of these charts are not in the

16   December 2024 --

17          THE COURT:  You didn't get any of these?

18          MR. STERN:  I don't think we have any of them.

19          MR. GAGLIARDO:  Could we do this outside the

20   presence of the jury?

21          THE COURT:  I'm sorry?

22          MR. STERN:  I want a standing objection.

23          THE COURT:  You had mentioned one.  I didn't know

24   that this was --

25          MR. STERN:  We've been trying to figure it out, Your

```
 1   Honor.  And again, it looks like we don't have these.
 2          THE COURT:  Did you have the one before the one
 3   that's on the screen now?
 4          MS. HAYDEN:  We received them in the email.
 5          MR. STERN:  Just now.
 6          THE COURT:  No, I meant in December.  Were any of
 7   the ones that have been shown so far been provided as of
 8   December?
 9          MS. HAYDEN:  I don't believe they are in the report
10   that was provided in December.
11          MR. JORDAN:  Let me ask the witness.
12          THE COURT:  Okay.  Let's find out what the witness
13   says.
14   BY MR. JORDAN:
15   Q.  Ms. Eisenberg, where are the charts we're talking about,
16   are they in your rebuttal report?
17   A.  Almost all of them are in the rebuttal report and if
18   there's a problem, we can just use the report.
19          MR. STERN:  I'd like to know which page number so we
20   can be looking at apples to apples here.
21          THE COURT:  Let's use the report then.  That will
22   make it simpler.
23          MR. STERN:  Or if it is in there, just say which one
24   because I think part of the issue with the report is there are
25   writings on it that are not going to be able to be shown to
```

1    the Court.

2            THE WITNESS:  This is the wrong report.  This is the

3    '21 report, not the '24 report.

4            MR. JORDAN:  Can you put the '24 report up, please?

5            THE COURT:  I thought the plan was to use the

6    earlier report.

7            MR. JORDAN:  No.  It's a rebuttal report is the one

8    we want to use.

9            THE COURT:  But that's the one they don't have the

10   exhibits for.

11           MR. STERN:  So what I thought was at first, Your

12   Honor, was that I thought -- I'm looking at it, it must be one

13   of these charts.  There are charts in the December of 2024

14   report that we have.  Not disputing that.  And I thought maybe

15   what they did is redacted some of the writings that can't be

16   introduced.  From the top I thought it would just be that

17   chart below and I thought that's what we're looking at just

18   with that reacted.  But yet they have different charts from

19   what we can see.  That's what I wanted to establish.

20           THE COURTROOM DEPUTY:  I need you near a mic,

21   please.

22           MR. STERN:  I don't know what was heard, so I'll

23   just say it again; my apologies.  I thought at first what we

24   were looking at, there are charts that resemble, like, look

25   something like this in the same general format in the December

1    2024 report.  That's not in dispute.  But because all the text

2    on that page cannot be introduced, I thought we were just

3    looking at a redacted version of it without the analysis

4    written at the top of the page.  And as we look more closely,

5    the charts that we were looking at here in court today do not

6    match the charts we were looking at in the December 2024

7    report and that's the concern that we have.

8          I hope I explained that clearly, Your Honor.

9          **THE COURT:**  So if we can save time, if there are

10   other charts available to this witness that have definitely

11   been produced to the defense, let's use those.

12         **MR. JORDAN:**  We're going to just use the rebuttal

13   report.  And Mr. Wolf, put the rebuttal report up and we'll go

14   to page 6.

15         **THE COURT:**  But he can't -- the problem is that they

16   don't seem to have the exhibits.

17         **MR. JORDAN:**  It's within the report.

18         **MR. STERN:**  Within the report we do, but I think

19   what they had pulled up, they just have to make sure the right

20   portion that is showing is visible because I think there's

21   portions on those charts, at least the ones we're looking at,

22   that cannot be introduced.

23         **THE COURT:**  Do you have the ones -- do you have

24   copies of what the jury has been shown so far?  Did you get

25   them in December of 2024?

```
 1              MS. HAYDEN:  No.

 2              MR. STERN:  No.

 3              MR. GAGLIARDO:  They were sent.

 4              MR. STERN:  No one has shown us that yet.

 5         But I want to be clear about if we use the December

 6    report -- I want to show Your Honor what I think would solve

 7    the issue.

 8              THE COURT:  We can also use the Elmo instead of the

 9    computer, and put it on a screen.

10              MR. STERN:  Can I explain to Your Honor what I'm

11    proposing and so we get the right answer?

12              THE COURT:  I'd much rather have a solution.  I

13    don't really want to hear about the problem; I want to fix it

14    because I've got a jury waiting to hear what's going on.

15              (Counsel approached the bench.)

16              MR. STERN:  So there are analyses up here that

17    cannot be introduced.

18              THE COURT:  Of course.

19              MR. STERN:  So what I was suggesting is that they

20    just show the chart and I thought that's what we're looking

21    at, but it wasn't.

22              THE COURT:  Is this what he's shown?

23              MR. STERN:  No.  These are different charts.

24              THE COURT:  That's the issue.

25              MR. GAGLIARDO:  So here is what Noah has on his
```

1    screen.  It is a list.  It's not the picture, it's the list

2    that says "I find these similarities" or "these

3    dissimilarities," whatever it is.

4            THE COURT:  Are you saying it's the same content of

5    the chart?  We get this part.  We're not interested in that.

6    Is from here to here, the chart itself the same?

7            MR. GAGLIARDO:  I understand the question.  They say

8    no.  I don't know.  I have to tell you, I have nothing to do

9    with this.  I don't want to be the bad guy.

10           MR. STERN:  I realize Mr. Jordan --

11           MR. GAGLIARDO:  I'll take responsibility.  I'm a

12   part of the team, so I'll take responsibility.  But let me

13   show you what Noah has.

14           THE COURT:  We've got to move this along.

15           MR. GAGLIARDO:  I know.

16           THE COURT:  This is almost comical.  This cannot be

17   the same mistake that we had last time.

18           MR. STERN:  I think we've solved the problem.  Mr.

19   Jordan and we are on the same page.

20           THE COURT:  That's to be celebrated.

21           MR. GAGLIARDO:  At dinner.

22           THE COURT:  So can we move on?

23           MR. STERN:  Yes.  At this point, yes, we have a

24   solution.

25           **(Counsel returned to their trial tables.)**

1          **MR. STERN:**  Before -- just really quick, I want to

2     be clear for the record that the charts that were shown so far

3     were not in our possession as of December of 2024 and the

4     charts that will be used now, are.

5          **MR. JORDAN:**  I'm confused.

6     **BY MR. JORDAN:**

7     Q.   Ms. Eisenberg, the charts that we looked at, were they in

8     your December report?

9     A.   They show the same thing.  They're demonstratively the

10    same, but they're not the ones that are in the report.

11    They're just separate.

12    Q.   Not the same setup, but the same pictures, the same

13    questioned document, the same knowns?

14    A.   Yes, sir.

15    **BY MR. JORDAN:**

16    Q.   Right, okay.

17         Take a look I think on the screen, please.  We're going

18    to look at pen lifts, okay?

19    A.    Yes, sir.

20    Q.   And we're going to make sure that we don't show any of

21    your analysis on there because we want to stay within the

22    bumpers here.

23         So this is -- what are we showing regarding -- because

24    this is also something I think Mr. Payne discussed in the pen

25    lift on the questioned document which is Exhibit Q1.

```
 1    A.   Okay, the screen is not showing -- we need to move a
 2    couple pages past this.
 3    Q.   Okay.  Is this the letter formation?
 4         THE COURTROOM DEPUTY:  Mr. Jordan, your screen does
 5    not reflect on them.
 6         MR. JORDAN:  No, she said move a couple pages so I'm
 7    guessing because --
 8         THE WITNESS:  So this is correct.
 9    BY MR. JORDAN:
10    Q.   Okay, this is letter formation?
11    A.   This is pen lift.  This is talking about pen lifts.  So
12    in Mr. Payne's report he talked about unnatural pen lifts
13    where the pen comes off the paper before resuming on the
14    paper.  And he notes that in Q1, which is the blue background,
15    the top, there is -- the red arrow shows the pen coming back
16    to the paper to form the next character.  And he put a lot of
17    emphasis on this pen lift.  And what I'm showing in the rest
18    of this screen in the green are various other pen lifts
19    written by Mr. White.
20    Q.   These are documents produced by Compass?
21    A.   That's correct.  So the fact that Mr. Payne made a
22    significant finding about this pen lift, I'm saying that Mr.
23    White routinely lifts his pen throughout writing his report --
24    his signature -- in various locations.
25    Q.   Okay.  So let's go to the next page which is height
```

```
 1        ratios.
 2        A.    Right.  So the term "height ratio" refers to the height
 3        of every letter relative to the height of every other letter.
 4        In Q1 -- if you could slide it down -- thank you very much.
 5        The j by that red horizontal line is the tallest character,
 6        followed by the d which is shorter and then followed by this
 7        third character which is basically the left side of the w.
 8        And this same ratio, the height ratio, the tall, the short,
 9        and the middle is repeated throughout the questioned --
10        throughout the known samples.
11             And this is an example of people when they write their
12        names they don't really pay attention to what they do.  For
13        example, if I were to ask you and the jury, do you write your
14        o's clockwise or counterclockwise?  Most likely you're going
15        to be thinking, I don't know.  Do I do it right or left?
16        That's the same with these types of height ratios.  The writer
17        is not really aware of what he does, but he does this.  And
18        again, this individual characteristic of these height ratios
19        is repeated in the questioned signature.
20        Q.    Okay.  Now going to the next page.
21                  THE COURT:  Can I just ask one thing?  You called it
22        a "d."
23                  THE WITNESS:  Yeah, his name is John D. White.
24                  THE COURT:  Oh, so -- okay.
25                  THE WITNESS:  So I think that --
```

1           THE COURT:  You didn't mean the second letter.

2           THE WITNESS:  I mean the second character, yes.

3    Second letter.  It's illegible, so it's kind of hard to

4    identify any one particular character or letter.

5           THE COURT:  Thank you.

6    BY MR. JORDAN:

7    Q.   All right, the next, the next slide is for letter

8    formation.  Okay.  And what is your comment with regard to

9    that?

10   A.   Right.  If we go to the top chart and if you slide it

11   down a little bit, please.  Thank you.  So we're looking at

12   the top chart.  And Mr. Payne made a point in his report to

13   say that the beginning stroke when the pen hits the paper to

14   start forming the letter j it is to the right of the downward

15   stroke of the letter j.  And in the questioned it starts

16   inside, kind of abuts the beginning stroke and that terminal

17   stroke.  And in K2, K15a, K15c and K15e, that same placement

18   of the initial stroke and that downward stroke are the same.

19   So it starts inside, whereas Mr. Payne makes a point of saying

20   that it starts to the right of and moves in a leftward

21   direction.

22        So again, as I had mentioned, he's cherry-picking because

23   these exemplars were provided to him as well and these

24   features do exist.

25   Q.   And then the b part there it says, secondly for length is

```
 1      abrupt ending of the single line downward.
 2  A.    So another feature that Mr. Payne makes issue with is in
 3      the Q1 where the red arrow is, he calls it a blunt terminal
 4      stroke.  So that's when the letter is done.  And most of the
 5      known writing it curves up and it doesn't stop bluntly like
 6      that.  But in these two samples that I have here, K1 and K11,
 7      it is the same movement.  It stops below the baseline.  It
 8      doesn't curve any way; it just stops.  So there's two samples
 9      right there of him doing -- of Mr. White doing the same
10      movement.
11  Q.    Okay.  And then going to the next page.
12  A.    So the j we already talked about previously.
13  Q.    The same chart that we saw --
14  A.    Essentially, yes.  So we already talked about that.
15  Q.    Would your testimony be any different if you looked at
16      this chart as opposed to the other one?
17  A.    No, sir.
18  Q.    Okay.  It shows the same thing?
19  A.    It shows the same thing.  And again, Mr. Payne makes a
20      point of saying that the known samples have a curved top of
21      the j and I have multiple samples of it being pointed.
22  Q.    And then in the next page which is relating to attention
23      to baseline.
24  A.    So another feature that people are not necessarily aware
25      of when they write is their attention to the baseline.  The
```

```
 1    baseline is that drawn or imaginary line upon which the
 2    writing rests.  And in the questioned signature, in Q1, it's a
 3    downward movement, as you can tell from the red horizontal
 4    line.  And that same feature, that same downward slope is
 5    found in K2, K9, K14a and K17u.
 6    Q.   Okay.  And then moving down to the letter forms.
 7    A.   And that one I already discussed, as well.
 8    Q.   And would your testimony -- are these exemplars that were
 9    in here what you discussed previously?
10    A.   It's the chart that we already went over.
11    Q.   Your testimony would be the same with this chart?
12    A.   Yes, sir.
13    Q.   Going to the next page relating to tremor.
14    A.   Right.  So Mr. Payne makes a big concern about the tremor
15    that's found in Q1, the questioned signature.  And this arrow
16    in the Q points to a tremor, or a not smooth line.  And the
17    David Boshea signature which is on the exact same document
18    also has that kind of tremor.  So it's not really possible to
19    say is it the reprographic reproduction or is there tremor.  I
20    don't know because it's in both signatures.  So I don't know
21    if it's because of the copy or because there's tremor in both.
22    It's not possible to tell.  Absent the original questioned
23    signature, it's not possible to know for sure if that tremor
24    is a tremor or if there was a problem with the pen or any of a
25    number of possibilities.
```

1  Q.   Okay.  And can you go down to the chart, proportionality?

2  Page 18 of 115.

3      Okay.  And this is relating to the enlarged or reduced

4  proportionality?

5  A.   So this chart -- I don't know why, but the colors came

6  out wrong.  But the Q1 is supposed to be a blue background and

7  everything else, all the notes are green background, but they

8  kind of look similar on this screen.  But this is just a chart

9  of every sample that I was provided.

10 Q.   Okay.

11 A.   So there's many pages to this.

12 Q.   Just kind of scroll through there, Noah, just to get a

13 sense of the effect.

14     And would you say there's a variety in Mr. White's

15 signature?

16 A.   Mr. White has a very broad range of variation.  And by

17 "variation" I mean that humans are not like machines.  We

18 can't duplicate our -- what we do exactly.  So there's always

19 variation.  Like if you look at the page that we're looking at

20 right now on the screen, none of them can be superimposed on

21 any other, yet they were all written by Mr. White.

22     So the question that was posed to me was did Mr. White

23 sign or not sign the questioned signature.  And because there

24 are so many individual characteristics that I've pointed out

25 that are similar, that are -- the questioned signature does

1    fall within the range of variation found, but the questioned

2    signature is also weird looking.  It's awkward looking.  So

3    because of that I couldn't -- I wasn't there, so I just have

4    to go with the evidence.  And the evidence supports the fact

5    that Mr. White could have written it; Mr. White could have

6    self-simulated which means he intentionally wrote it in a way

7    that's a little bit different than normal so it will pass

8    scrutiny at the time of execution, but he could later deny it;

9    or someone else wrote it.  Any of those scenarios are possible

10   which is why my opinion is no conclusion.  I can't reach an

11   opinion one way or the other towards elimination or

12   identification.

13   Q.   So that would be -- so your opinion is it's inconclusive?

14   A.   Yes, sir.

15   Q.   Because of the broad range of signatures?

16   A.   Well, yes.  Yes.  And because it's odd looking, but there

17   are so many individual characteristics which I've pointed out

18   that are -- that are in common between the questioned and the

19   known.

20   Q.   So could you pick other signatures from John White and

21   put that on the top as a questioned document and have

22   questions whether that was inconclusive as to whether that was

23   John White's signature as well?

24   A.   Exactly, yes.  He has so much variation that any one

25   individual signature could be a questioned signature and I

1    would reach the same opinion.

2    Q.    Okay.  And so for that reason I think we talked about it,

3    the fact that if you just had an individual document as a

4    questioned document, you would not be able to form an opinion

5    as to whether that was a simulation or not?

6    A.    Possibly, right.  Yes.

7    Q.    And as an expert examiner, would you ever just take a

8    questioned document without ever looking at other exemplars

9    and draw an opinion?

10   A.    Of course not.  That would make no sense.  How would I

11   possibly know how somebody writes by just looking at the

12   questioned signature.

13            MR. JORDAN:  Okay.  Pass the witness.

14            THE COURT:  Cross.

15            MR. STERN:  Why don't we leave this one up.  I guess

16   we'll go in order to make it easier.  Is the first one on page

17   6 of 12?  That's the one I'm looking at.

18            MR. JORDAN:  Hold on just a second.

19            MR. STERN:  What I'm looking at --

20            MR. JORDAN:  I've got 115 pages.  Do you have 115

21   pages?

22            MR. STERN:  Am I looking at the right one?  I'm

23   looking at this December -- the first chart I'm looking at is

24   6 of 12.  I thought that's what you guys were going off of.

25            MR. GAGLIARDO:  This is 6 of 12.

 1          **MR. STERN:**  Yes, that's what you guys were showing.

 2     From 6 through 11 I think are the ones that I see in the

 3     report.  So at some point I'm going to go from one to the

 4     other.

 5          **MR. JORDAN:**  Tell us what you want us to put up.

 6              **C R O S S - E X A M I N A T I O N**

 7     BY MR. STERN:

 8     Q.   Ms. Eisenberg, at one point you were explaining on one of

 9     the known samples or maybe it was multiple known samples, I

10     don't remember how many, you explained that there was -- it

11     was an illegible sample; is that correct?

12     A.   Yes, sir.

13     Q.   Okay.  And was that from the original batch that you

14     received?

15     A.   Anything labeled 1 through 15 was the original batch I

16     received.

17     Q.   And so you subsequently received 31 additional samples?

18     A.   I don't know if it was 31, but yes.

19     Q.   Ultimately you had a total of 50 samples from which you

20     could review, known samples of John White's signature?

21     A.   Let me just double-check that.

22          **THE COURT:**  I thought you said was it 31 total?

23          **MR. STERN:**  Later received an additional 31 for a

24     total of more than 50.

25          **MR. JORDAN:**  50.

```
 1              MR. STERN:  Or 50.

 2              THE WITNESS:  I had 31 known samples.

 3    BY MR. STERN:

 4    Q.   Total?

 5    A.   Yes, I believe so.

 6    Q.   All right.  Did you receive any other samples from that

 7    earlier --

 8    A.   As I said, anything labeled K1 through K15 I received

 9    initially.  And then I received 16 and 17.  And 17 has

10    multiple signatures.  So anything labeled K16 or 17 was

11    subsequently submitted.

12    Q.   So then there was a total of 50 cumulative signatures for

13    you to review?

14    A.   Let me just count them up.  Yes, sir.  51.

15    Q.   Thank you.

16         So out of that 51, were there more -- were more than half

17    of them illegible?

18    A.   I think they tend to all be illegible.

19    Q.   All of them are illegible?

20    A.   I mean, I can look at every one of them.  Where are you

21    going with this so I can actually answer the question?

22    Q.   Well, you were critiquing one of the samples that you

23    relied on and saying it's illegible and you had compared to

24    that one, 49 other samples that you could have chosen.  And

25    I'm asking then are all 49 of the other ones illegible for
```

```
 1        your analysis?
 2        A.    I think all of his signatures are illegible, sir.
 3        Q.    But in your December 2024 report you did not critique the
 4        quality of the samples, did you?
 5        A.    What do you mean?
 6        Q.    In your analysis you did not say there was problems with
 7        the quality of the samples that you were provided in December
 8        of 2024?
 9        A.    I would have preferred original documents, if that's your
10        -- I'm not sure where you're going.
11        Q.    Of course original documents are preferred, but you can
12        do an analysis from copies, can't you?
13        A.    Yes, sir.
14        Q.    In fact, you frequently do analyses from copies, don't
15        you?
16        A.    Yes.
17        Q.    All right.  And you can reach conclusions from copies in
18        conducting your analyses, can't you?
19        A.    Yes.
20        Q.    All right.  Now you said Mr. Payne was cherry-picking
21        from the knowns to illustrate his points.  I'd like to direct
22        your attention to the monitor for the moment.  I guess this is
23        -- what I have is I just want to make sure, 6 of 12 on the
24        report.  Is that -- yes, 6 -- I just want to make sure we have
25        the right one up.
```

```
1        And in here to make the point you were making, you relied

2   on 6 of the 50 knowns to illustrate your point?

3   A.   I utilized all 51 exemplars and I utilized these six to

4   demonstrate the patch -- the pen lift.

5   Q.   And didn't Mr. Payne rely on the totality of the samples

6   that were provided to him in conducting his analysis?

7            MR. JORDAN:  Objection.  How would she know?

8            MR. STERN:  She's saying he's cherry-picked.  I'm

9   asking --

10           THE COURT:  From the report.

11           MR. STERN:  From the report.

12           THE COURT:  That's how.  So I'll overrule the

13  objection.  If she knows.

14           THE WITNESS:  I know that when I read Mr. Payne's

15  report, that the features that he pointed out as differences

16  were actually found among the known writing that he just

17  didn't show.

18  BY MR. STERN:

19  Q.   Okay.  And are you suggesting that how these six on page

20  6 of 12 are reflected in all 51 or all 50 of the signatures

21  that you were looking at for Mr. White?

22  A.   Are you asking me if all 50 have pen lifts?

23  Q.   This is a pen lift page.  Are you suggesting all 50 have

24  pen lifts?

25  A.   I did not say that; no, sir.
```

1    Q.   So is it fair to say that you're cherry-picking these six

2    to illustrate your point?

3    A.   I'm showing the similarities between the questioned and

4    the known.

5    Q.   Okay.  And then -- actually, we don't have to go through

6    all of them.

7    A.   It wouldn't make sense.

8    Q.   There's no question pending.

9         **THE COURT:**  Well, I thought she was answering, but

10   we'll let Mr. Jordan follow up.

11   **BY MR. STERN:**

12   Q.   Let's go to 8 of 12.  On this page to illustrate letter

13   formation, you were relying on 4 of the 50 samples to

14   illustrate your point?

15   A.   Yes, sir.

16   Q.   Okay.  So again, is this cherry-picking out of the 50?

17   A.   It's not cherry-picking if I'm duplicating the same

18   movements.  So I'm showing that the same movements are found

19   in the known.

20   Q.   And didn't Mr. Payne's analysis account for samples more

21   than what he was using to illustrate his concepts?

22   A.   I don't understand your question.

23   Q.   Fair enough; it wasn't the best worded question.

24        When you were reviewing Mr. Payne's analysis, or report,

25   was there an indication that he was relying on only the

1    samples -- the illustrative samples to make his point?

2    A.    Those are the ones that he showed, yes.

3    Q.    And are you saying that his analysis relied solely on

4    those samples to reach those conclusions, meaning those

5    limited illustrative samples?

6    A.    No.   What I'm saying is that he found what he can refer

7    to as a difference and he showed samples of that difference.

8    And what I'm saying is that within all of the knowns there

9    were things that did not support what he was saying.

10   Q.    And again, I just want to go through a few more of these.

11   Can you scroll down a little bit to b on this one page?   And

12   here you're using two of the 50 samples to illustrate the

13   concept about the length and abrupt ending of a single line?

14   A.    Yes, because Mr. Payne said that it's not found in the

15   knowns and I'm showing two samples that it is found in the

16   knowns.

17   Q.    And if we could turn to the next page -- I'm sorry, 10 of

18   12; I apologize.   And -- for the baseline you're relying on 4

19   out of the 50 -- and if we could scroll a little bit further

20   down, the letter forms, 2 out of the 50?

21   A.    Right.   So the point is, the question is does the

22   questioned signature fall within the range of variation

23   exhibited within the known.   And here are two examples where

24   it does.

25   Q.    Now if you could -- 2 out of 50?

```
 1    A.    Yes, sir.
 2    Q.    All right.  Now if we could turn to the next page where
 3    you were talking about tremors.  And if I remember your
 4    testimony correctly and I'm sure you'll correct me if I'm
 5    wrong, you were pointing to this -- it looks like the h in Mr.
 6    Boshea's signature as a tremor and you did acknowledge that
 7    there's a tremor in the Q, the questioned signature; correct?
 8    A.    Yes, sir.
 9    Q.    And you were saying you couldn't determine definitively,
10    if I remember correctly, that David Boshea signed the
11    signature that is the questioned signature.  Is that what you
12    were referring to?
13    A.    I don't understand your question.
14    Q.    I'm trying to understand why was there a reference --
15    reliance on David Boshea's signature to illustrate the tremor
16    concept in John White's signature?
17    A.    Because it's on the same document.  So my suggestion is
18    it's possible that that's a tremor in Mr. White's signature.
19    It's possible that the reprographic process created some sort
20    of problem; I don't know.  But my point being that there's
21    tremor in both of these signatures that are on the same
22    document.
23    Q.    All right.  Well, is it possible that the tremor in Mr.
24    Boshea's signature could also be an indication that he's the
25    one that wrote Mr. White's signature on that same document?
```

```
1    A.    No, sir.  That doesn't make any sense.

2    Q.    So it is impossible that that tremor in Mr. Boshea's

3    signature is an indication that he was the one that signed Mr.

4    White's signature?

5    A.    I don't know who signed Mr. White's signature.

6    Q.    And that's back to your ultimate conclusion was you don't

7    know.  You have no opinion one way or the other whether that

8    was a forged signature or not?

9    A.    That's right.

10   Q.    Now in looking at -- we'll keep this up.  In looking at

11   the Q, the questioned signature, would you agree that there

12   are indications of simulation in this questioned document,

13   questioned signature?

14   A.    No, I don't agree with that.

15   Q.    There are no indications of simulation whatsoever?

16   A.    No.  I will say that it is an oddly written signature and

17   as I mentioned in my testimony before, it could be something

18   weird going on when Mr. White signed his name.  It could be

19   Mr. White self-simulating his own signature.  It could be

20   someone else who wrote that name.  Any of those scenarios are

21   possible.

22   Q.    But in saying that it could have been someone else that

23   wrote it, presumably then there are some indications in the

24   signature itself that would be consistent with it being a

25   simulation, correct?
```

1    A.    Can you repeat that?

2    Q.    Well, you're saying it's an odd signature.  And so are

3    any of the oddities indications of a simulation?

4    A.    Not when compared with the known samples.

5    Q.    So that blunt -- let me get the -- the blunt beginning at

6    the bottom of the j, for example, do you see that, in the Q?

7    Right here.  We'll stick with this one.

8    A.    The ending stroke.  So not the beginning stroke, the

9    ending stroke, right?

10   Q.    Beginning or ending; whichever one it is.

11   A.    Okay.

12   Q.    Would you agree that that's a blunt beginning or ending

13   at the bottom of the j below all the other letters?

14   A.    I do agree it's blunt.

15   Q.    And is a blunt beginning or ending typically -- let me

16   rephrase that.  Is a blunt beginning or ending of a stroke an

17   indication of a simulation?

18   A.    It could be.

19   Q.    And the tremor that you pointed to, could that be an

20   indication of a simulation?

21   A.    It could be.

22   Q.    And then above -- how do I describe it -- at the right

23   side of the w before the -- where it blends into the first of

24   the two loops, do you see where I'm talking about?  And

25   there's a little tail coming off on the left side?

```
1    A.   Yes, sir.

2    Q.   Is that an indication of an irregular pen lift?

3    A.   I think you're looking for the term "patching."

4    Q.   Patching?

5    A.   Patching.  Except that we found -- yes, but it's also

6    found in the known samples, as well.

7    Q.   But patching is an indication of a simulation?

8    A.   It can be.

9    Q.   All right.

10            THE COURT:  And what do you mean by "patching"?

11            THE WITNESS:   It's kind of, like, overcorrecting.

12   BY MR. STERN:

13   Q.   And then were you paid for your analysis, Ms. Eisenberg?

14   A.   Yes.

15   Q.   How much were you paid for your original report?

16   A.   I'm not sure.  I'm not sure.

17   Q.   Would approximately $30,000 sound familiar?

18   A.   Yes, sir.

19   Q.   Okay.  And then how much were you paid for your

20   supplemental report?

21   A.   I'm sorry, I don't have those figures.  I don't know.

22   Q.   Would almost $7,000 sound accurate?

23   A.   Yes.

24            MR. STERN:  No further questions.

25            THE COURT:  Any redirect?
```

```
 1              MR. JORDAN:  No -- oh, wait.

 2              THE COURT:  I'm sorry, redirect?

 3              MR. JORDAN:  Yeah, just a couple questions.

 4              R E D I R E C T   E X A M I N A T I O N

 5    BY MR. JORDAN:

 6    Q.   Do you do handwriting analysis for a living?

 7    A.   Yes, sir.

 8    Q.   Do you get paid for all of the engagements when you

 9    appear in court?

10    A.   Yes, sir.

11    Q.   Do you know of any handwriting analysts who do this

12    gratis?

13    A.   No, sir, I don't.

14    Q.   Did the fact that you were paid influence in any way your

15    opinion?

16    A.   No, sir.

17    Q.   Okay.  The fact that the things that Mr. Stern pointed

18    out could be simulations, if I asked the same question and

19    said is that maybe not a simulation, maybe that is something

20    consistent with John White's other exemplars?

21              MR. STERN:  Objection.  Compound, leading.

22              THE COURT:  I'm sorry?

23              MR. STERN:  Objection.  Compound and leading.

24              THE COURT:  Well, I don't even understand the

25    question.
```

1    **BY MR. JORDAN:**

2    Q.   Okay, you just turn it around.  Instead of saying is it

3    an example of a simulation, were each of those items examples

4    of known signatures?

5    A.   Yes, sir.

6    Q.   Is that why you couldn't make a conclusion?

7    A.   Yes, sir.

8    Q.   And again, would you say that he has a consistent

9    signature, some variation, or extreme variation in his

10   signature?

11   A.   Extreme variation.

12   Q.   Okay, thank you.

13           **THE COURT:**  Anything else, Counsel?

14           **MR. STERN:**  No, Your Honor.

15           **THE COURT:**  All right.  May the witness be excused?

16           **MR. STERN:**  Yes, for us.

17           **THE COURT:**  Everybody agree the witness can be

18   excused?

19           **MR. JORDAN:**  Yes.

20           **THE COURT:**  Thank you, Ms. Eisenberg.  You're

21   excused.

22           **THE WITNESS:**  Thank you.

23           **(Witness, excused.)**

24           **(Requested excerpt of proceedings is complete.)**

25

# CERTIFICATE OF OFFICIAL REPORTER

I, Nadine M. Bachmann, Certified Realtime Reporter and Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this **4th** day of **September, 2025**.

-S-

_____

NADINE M. BACHMANN, CRR, RMR
FEDERAL OFFICIAL COURT REPORTER

## $

**$30,000** [1] - 52:17
**$7,000** [1] - 52:22

## '

**'21** [4] - 17:20, 17:22, 17:23, 30:3
**'22** [1] - 7:8
**'24** [2] - 30:3, 30:4

## 1

**1** [5] - 11:3, 11:4, 11:6, 26:2, 43:15
**10** [2] - 16:15, 48:17
**1000** [1] - 1:18
**11** [3] - 16:15, 25:8, 43:2
**115** [3] - 40:2, 42:20
**12** [8] - 16:15, 42:17, 42:24, 42:25, 45:23, 46:20, 47:12, 48:18
**13** [1] - 13:7
**15** [4] - 26:2, 26:3, 26:10, 43:15
**16** [2] - 26:10, 44:9
**17** [6] - 26:3, 26:10, 44:9, 44:10
**17a** [1] - 26:4
**18** [3] - 9:12, 9:13, 40:2
**19** [1] - 13:12
**1:21-cv-00309-ELH** [1] - 1:4

## 2

**2** [6] - 14:1, 14:2, 24:21, 24:24, 48:20, 48:25
**20** [1] - 25:8
**2000** [1] - 7:7
**2002** [1] - 6:15
**2008** [1] - 7:19
**2021** [1] - 22:4
**2024** [19] - 14:6, 15:3, 15:7, 15:22, 16:5, 17:22, 18:25, 19:1, 19:6, 20:17, 22:5, 28:16, 30:13, 31:1, 31:6, 31:25, 34:3, 45:3, 45:8
**2025** [2] - 1:11, 55:15
**20910** [1] - 1:18
**21** [3] - 25:11, 25:12, 25:13
**21401** [1] - 1:22
**21st** [1] - 8:11

## 23

**23** [1] - 14:6
**238** [1] - 1:21
**23rd** [4] - 11:8, 14:17, 14:22, 21:11
**24** [2] - 5:15, 5:17
**28** [1] - 55:8

## 3

**3** [1] - 27:19
**31** [8] - 10:13, 25:5, 25:15, 43:17, 43:18, 43:22, 43:23, 44:2
**350** [1] - 1:15
**37** [1] - 3:9
**3:26** [1] - 2:2

## 4

**4** [3] - 28:11, 47:13, 48:18
**49** [2] - 44:24, 44:25
**4:00** [1] - 23:25
**4th** [1] - 55:14

## 5

**50** [17] - 13:11, 13:12, 43:19, 43:24, 43:25, 44:1, 44:12, 46:2, 46:20, 46:22, 46:23, 47:13, 47:16, 48:12, 48:19, 48:20, 48:25
**50,000** [2] - 5:9, 6:6
**51** [4] - 44:14, 44:16, 46:3, 46:20
**5B** [1] - 1:11

## 6

**6** [11] - 1:11, 16:14, 31:14, 42:17, 42:24, 42:25, 43:2, 45:23, 45:24, 46:2, 46:20
**60654** [1] - 1:15

## 7

**7** [2] - 13:7, 16:14
**700** [1] - 1:15
**753** [1] - 55:8

## 8

**8** [2] - 16:15, 47:12
**8403** [1] - 1:18

## 9

**9** [1] - 16:15
**900** [1] - 1:17

## A

**able** [5] - 17:8, 23:1, 23:5, 29:25, 42:4
**above-entitled** [1] - 55:10
**abrupt** [2] - 38:1, 48:13
**absent** [1] - 39:22
**abut** [1] - 27:6
**abuts** [1] - 37:16
**Academy** [1] - 7:2
**accept** [1] - 7:22
**accepted** [1] - 8:4
**account** [1] - 47:20
**accurate** [2] - 26:15, 52:22
**acknowledge** [1] - 49:6
**acknowledged** [1] - 19:7
**actual** [2] - 13:1, 16:17
**added** [1] - 24:14
**additional** [4] - 9:19, 25:14, 43:17, 43:23
**adjust** [1] - 2:11
**Administrator** [1] - 1:3
**affect** [1] - 23:16
**afternoon** [3] - 2:7, 2:18, 2:19
**agree** [7] - 13:13, 22:9, 50:11, 50:14, 51:12, 51:14, 54:17
**agreement** [1] - 10:12
**Aided** [1] - 1:25
**al** [1] - 1:7
**allegedly** [1] - 27:1
**allow** [1] - 7:11
**allowed** [1] - 7:13
**almost** [3] - 29:17, 33:16, 52:22
**altered** [1] - 2:23
**American** [6] - 6:9, 6:10, 6:13, 7:2, 8:13, 8:17
**analyses** [4] - 6:6, 32:16, 45:14, 45:18
**analysis** [22] - 3:6, 3:19, 4:14, 4:24, 5:2, 6:4, 8:23, 9:4, 19:18, 19:22, 20:2, 31:3, 34:21, 45:1, 45:6, 45:12, 46:6, 47:20, 47:24, 48:3, 52:13, 53:6
**analysts** [1] - 53:11
**Annapolis** [1] - 1:22
**answer** [2] - 32:11, 44:21
**answering** [1] - 47:9

## B

**anyway** [1] - 11:14
**apart** [1] - 18:5
**apex** [5] - 27:20, 27:22, 27:24, 28:6, 28:9
**apologies** [2] - 24:18, 30:23
**apologize** [1] - 48:18
**appear** [2] - 13:13, 53:9
**apples** [1] - 29:20
**applying** [2] - 3:21, 4:3
**appreciate** [1] - 22:18
**apprenticeship** [2] - 4:4, 4:5
**approached** [2] - 15:16, 32:15
**appropriate** [1] - 23:24
**area** [2] - 8:22, 9:22
**arrow** [6] - 12:11, 26:24, 28:2, 35:15, 38:3, 39:15
**arts** [1] - 3:13
**ASHLEY** [1] - 1:3
**assessment** [1] - 10:9
**assist** [3] - 3:18, 3:23, 4:23
**assumed** [2] - 20:1, 20:18
**attempting** [1] - 24:25
**attending** [1] - 6:22
**attention** [4] - 36:12, 38:22, 38:25, 45:22
**August** [1] - 1:11
**authentic** [1] - 11:20
**available** [1] - 31:10
**aware** [2] - 36:17, 38:24
**awkward** [1] - 41:2

## B

**bachelor** [1] - 3:13
**Bachmann** [1] - 55:5
**BACHMANN** [1] - 55:19
**background** [5] - 11:24, 11:25, 35:14, 40:6, 40:7
**bad** [1] - 33:9
**baseline** [5] - 38:7, 38:23, 38:25, 39:1, 48:18
**basis** [1] - 3:21
**batch** [2] - 43:13, 43:15
**BEARD** [1] - 1:21
**became** [2] - 3:22,

## (right column continued)

5:16
**become** [1] - 6:17
**becoming** [1] - 6:20
**BEFORE** [1] - 1:10
**beginning** [9] - 28:12, 37:13, 37:16, 51:5, 51:8, 51:10, 51:12, 51:15, 51:16
**begins** [1] - 2:1
**below** [4] - 11:21, 30:17, 38:7, 51:13
**bench** [2] - 15:16, 32:15
**best** [1] - 47:23
**better** [1] - 4:2
**between** [3] - 12:19, 41:18, 47:3
**big** [1] - 39:14
**birth** [1] - 6:2
**bit** [4] - 37:11, 41:7, 48:11, 48:19
**blends** [1] - 51:23
**blue** [4] - 11:24, 26:19, 35:14, 40:6
**blunt** [7] - 38:3, 51:5, 51:12, 51:14, 51:15, 51:16
**bluntly** [1] - 38:5
**Board** [4] - 6:9, 6:13, 8:13, 8:17
**board** [2] - 6:17, 8:18
**body** [2] - 2:25, 6:10
**book** [2] - 9:6
**BOSHEA** [1] - 1:3
**Boshea** [3] - 1:4, 39:17, 49:10
**Boshea's** [4] - 49:6, 49:15, 49:24, 50:2
**bottom** [2] - 12:23, 51:6, 51:13
**broad** [2] - 40:16, 41:15
**brought** [1] - 13:2
**bumpers** [1] - 34:22
**business** [2] - 7:15, 7:18
**BY** [22] - 1:14, 1:16, 1:20, 2:17, 9:5, 11:13, 11:16, 12:25, 24:20, 27:18, 29:14, 34:6, 34:15, 35:9, 37:6, 43:7, 44:3, 46:18, 47:11, 52:12, 53:5, 54:1

## C

**candidate** [1] - 4:3
**cannot** [4] - 31:2, 31:22, 32:17, 33:16

**CASE** [1] - 1:4
**case** [4] - 2:4, 9:8, 9:17, 19:20
**cases** [2] - 5:7, 7:22
**celebrated** [1] - 33:20
**Century** [1] - 8:11
**CERTIFICATE** [1] - 55:1
**certificates** [1] - 6:2
**certification** [1] - 6:16
**certifications** [2] - 6:8, 7:1
**Certified** [1] - 55:5
**certified** [6] - 6:9, 6:12, 6:17, 6:21, 7:4, 8:17
**certify** [1] - 55:8
**certifying** [1] - 6:11
**chair** [1] - 2:11
**chapter** [2] - 8:10, 8:12
**character** [6] - 13:9, 35:16, 36:5, 36:7, 37:2, 37:4
**characteristic** [1] - 36:18
**characteristics** [5] - 4:8, 4:9, 12:3, 40:24, 41:17
**characters** [1] - 27:14
**chart** [35] - 10:16, 10:23, 11:17, 12:9, 14:1, 14:2, 16:17, 19:10, 20:2, 22:6, 22:10, 23:2, 23:7, 23:9, 24:21, 24:24, 26:19, 27:19, 28:1, 28:11, 30:17, 32:20, 33:5, 33:6, 37:10, 37:12, 38:13, 38:16, 39:10, 39:11, 40:1, 40:5, 40:8, 42:23
**charts** [29] - 11:25, 16:21, 17:19, 17:22, 17:23, 18:3, 18:5, 18:16, 18:23, 19:8, 19:14, 20:14, 20:25, 22:20, 23:10, 28:15, 29:15, 30:13, 30:18, 30:24, 31:5, 31:6, 31:10, 31:21, 32:23, 34:2, 34:4, 34:7
**check** [1] - 43:21
**cherry** [8] - 13:16, 28:4, 37:22, 45:20, 46:8, 47:1, 47:16, 47:17
**cherry-picked** [2] - 28:4, 46:8
**cherry-picking** [6] -

13:16, 37:22, 45:20, 47:1, 47:16, 47:17
**Chicago** [1] - 1:15
**chose** [1] - 13:24
**chosen** [1] - 44:24
**circle** [2] - 27:8
**civil** [2] - 7:13, 7:14
**clarification** [1] - 14:3, 15:11
**clarify** [1] - 10:25
**clarifying** [1] - 25:3
**class** [2] - 3:25, 4:7
**clear** [3] - 18:23, 32:5, 34:2
**clearly** [2] - 19:6, 31:8
**clockwise** [1] - 36:14
**closed** [1] - 27:10
**closely** [2] - 17:17, 31:4
**Colesville** [1] - 1:18
**Collaborative** [1] - 7:4
**collect** [1] - 6:22
**college** [1] - 3:10
**College** [1] - 3:11
**colors** [1] - 40:5
**comical** [1] - 33:16
**coming** [5] - 12:20, 14:4, 35:15, 51:25
**comment** [1] - 37:8
**common** [2] - 12:2, 41:18
**company** [3] - 3:2, 3:3
**comparative** [1] - 5:2
**compare** [1] - 7:24
**compared** [2] - 44:23, 51:4
**comparison** [1] - 20:8
**Compass** [2] - 13:3, 35:20
**COMPASS** [1] - 1:7
**Compass'** [1] - 13:10
**complete** [1] - 54:24
**completely** [2] - 13:15, 26:21
**compound** [2] - 53:21, 53:23
**computer** [1] - 32:9
**Computer** [1] - 1:25
**Computer-Aided** [1] - 1:25
**concept** [2] - 48:13, 49:16
**concepts** [1] - 47:21
**concern** [3] - 19:13, 31:7, 39:14
**concerned** [2] - 20:23, 24:6
**concerning** [3] - 8:8, 8:12, 23:14

**conclusion** [4] - 23:20, 41:10, 50:6, 54:6
**conclusions** [2] - 45:17, 48:4
**conducting** [2] - 45:18, 46:6
**Conference** [1] - 55:12
**conferences** [1] - 6:22
**confirm** [1] - 21:15
**confirmation** [1] - 21:18
**conformance** [1] - 55:11
**confused** [1] - 34:5
**considered** [2] - 26:8, 26:14
**consistent** [3] - 50:24, 53:20, 54:8
**content** [1] - 33:4
**continuing** [1] - 28:14
**copies** [4] - 31:24, 45:12, 45:14, 45:17
**copy** [2] - 14:15, 39:21
**correct** [8] - 21:15, 35:8, 35:21, 43:11, 49:4, 49:7, 50:25, 55:9
**correctly** [3] - 19:17, 49:4, 49:10
**Counsel** [7] - 10:19, 15:14, 15:16, 24:17, 32:15, 33:25, 54:13
**count** [2] - 18:10, 44:14
**counterclockwise** [1] - 36:14
**counterfeit** [3] - 2:23, 4:22
**county** [1] - 8:6
**couple** [3] - 35:2, 35:6, 53:3
**course** [6] - 9:25, 10:4, 19:15, 32:18, 42:10, 45:11
**Court** [2] - 30:1, 55:7
**COURT** [91] - 1:1, 2:3, 2:6, 8:24, 9:1, 9:3, 12:18, 14:12, 14:19, 15:4, 15:8, 15:14, 15:17, 15:19, 16:4, 16:9, 17:12, 17:15, 18:10, 18:14, 18:19, 20:3, 20:9, 20:11, 20:20, 21:7, 21:12, 21:21, 21:25, 22:12, 22:18, 22:24, 23:6, 23:10, 23:19, 23:22, 24:4, 24:10, 24:12,

24:18, 25:3, 25:7, 25:13, 25:16, 25:18, 25:24, 26:6, 26:12, 26:17, 26:22, 28:17, 28:21, 28:23, 29:2, 29:6, 29:12, 29:21, 30:5, 30:9, 31:9, 31:15, 31:23, 32:8, 32:12, 32:18, 32:22, 32:24, 33:4, 33:14, 33:16, 33:20, 33:22, 36:21, 36:24, 37:1, 37:5, 42:14, 43:22, 46:10, 46:12, 47:9, 52:10, 52:25, 53:2, 53:22, 53:24, 54:13, 54:15, 54:17, 54:20, 55:19
**court** [2] - 31:5, 53:9
**COURTROOM** [6] - 2:7, 2:10, 10:18, 10:21, 30:20, 35:4
**Courtroom** [1] - 1:11
**courts** [5] - 8:2, 8:4, 8:6, 8:7
**Courts** [1] - 6:11
**created** [1] - 49:19
**criminal** [2] - 7:13, 7:14
**critique** [1] - 45:3
**critiquing** [1] - 44:22
**cross** [1] - 42:14
**CRR** [1] - 55:19
**CTS** [1] - 7:7
**cumulative** [1] - 44:12
**currency** [2] - 4:19, 5:25
**curve** [1] - 38:8
**curved** [2] - 27:24, 38:20
**curves** [1] - 38:5

**D**

**Dated** [1] - 55:14
**dated** [3] - 15:2, 17:2, 17:5
**dates** [1] - 22:8
**David** [4] - 1:4, 39:17, 49:10, 49:15
**DC** [1] - 3:17
**death** [1] - 4:20
**Deceased** [1] - 1:4
**December** [31] - 11:8, 14:6, 14:17, 14:22, 15:3, 15:7, 15:22, 16:5, 18:25, 19:1, 19:6, 20:17, 20:25, 21:7, 21:8, 21:10, 21:13, 28:16, 29:6,

29:8, 29:10, 30:13, 30:25, 31:6, 31:25, 32:5, 34:3, 34:8, 42:23, 45:3, 45:7
**DEFENDANT** [1] - 1:19
**Defendants** [1] - 1:8
**defense** [2] - 2:3, 31:11
**definitely** [2] - 19:7, 31:10
**definitively** [1] - 49:9
**degree** [4] - 3:12, 3:13, 3:16, 3:18
**degrees** [1] - 3:15
**delay** [1] - 24:19
**delivered** [2] - 11:7, 14:6
**demonstrate** [1] - 46:4
**demonstrating** [1] - 27:13
**demonstrative** [1] - 10:23
**demonstratively** [1] - 34:9
**dense** [1] - 21:16
**deny** [1] - 41:8
**Department** [1] - 5:17
**DEPUTY** [6] - 2:7, 2:10, 10:18, 10:21, 30:20, 35:4
**describe** [2] - 7:20, 51:22
**detail** [1] - 23:4
**detecting** [1] - 4:9
**determine** [8] - 2:23, 2:24, 11:20, 12:2, 12:3, 12:5, 13:22, 49:9
**determining** [1] - 4:7
**developing** [1] - 4:24
**difference** [4] - 13:20, 22:14, 48:7
**differences** [4] - 13:17, 13:18, 28:4, 46:15
**different** [14] - 5:24, 16:23, 17:10, 17:11, 17:13, 17:17, 19:11, 20:20, 23:6, 24:15, 30:18, 32:23, 38:15, 41:7
**dinner** [1] - 33:21
**diplomate** [2] - 8:14, 8:15
**dire** [1] - 8:24
**direct** [1] - 45:21
**direction** [1] - 37:21
**directly** [1] - 2:12
**directors** [1] - 8:19

**disagree** [2] - 13:14, 13:15
**disciplines** [1] - 4:1
**discrepancy** [1] - 18:18
**discussed** [3] - 34:24, 39:7, 39:9
**discussion** [1] - 20:8
**dispute** [3] - 15:23, 24:7, 31:1
**disputing** [4] - 15:7, 19:1, 19:5, 30:14
**dissimilarities** [1] - 33:3
**District** [2] - 55:7
**DISTRICT** [3] - 1:1, 1:1, 1:10
**district** [1] - 8:6
**DIVISION** [1] - 1:2
**document** [27] - 2:22, 6:11, 6:13, 7:22, 8:5, 8:9, 8:22, 9:4, 16:8, 16:10, 20:13, 23:13, 25:20, 26:7, 26:12, 28:8, 34:13, 34:25, 39:17, 41:21, 42:3, 42:4, 42:8, 49:17, 49:22, 49:25, 50:12
**Document** [7] - 3:3, 6:10, 6:13, 7:15, 7:20, 8:14, 8:18
**documents** [13] - 2:22, 4:2, 4:6, 4:12, 4:18, 5:24, 6:1, 26:8, 28:9, 35:20, 45:9, 45:11
**done** [3] - 5:6, 6:6, 38:4
**Donna** [5] - 1:5, 2:5, 2:14, 8:21, 17:21
**door** [1] - 24:13
**double** [1] - 43:21
**double-check** [1] - 43:21
**doubts** [1] - 20:18
**down** [8] - 12:20, 12:21, 36:4, 37:11, 39:6, 40:1, 48:11, 48:20
**downward** [5] - 37:14, 37:18, 38:1, 39:3, 39:4
**draw** [1] - 42:9
**drawn** [1] - 39:1
**driver's** [1] - 6:2
**duplicate** [2] - 10:2, 40:18
**duplicated** [1] - 12:7
**duplicating** [1] - 47:17
**déjà** [2] - 15:17, 18:12

**E**

**e's** [1] - 27:11
**E-i-s-e-n-b-e-r-g** [1] - 2:15
**easier** [2] - 19:23, 42:16
**ebbs** [1] - 22:15
**education** [1] - 3:20
**educational** [1] - 6:18
**EE** [1] - 24:25
**effect** [1] - 40:13
**Eisenberg** [11] - 1:5, 2:5, 2:14, 2:18, 8:22, 19:10, 29:15, 34:7, 43:8, 52:13, 54:20
**eisenberg** [1] - 16:20
**either** [2] - 7:22, 16:1
**electronic** [1] - 14:15
**electronically** [3] - 15:25, 21:24, 22:4
**elimination** [1] - 41:11
**ELLEN** [1] - 1:10
**Elmo** [1] - 32:8
**email** [8] - 14:23, 14:25, 15:23, 16:5, 16:14, 16:18, 18:21, 29:4
**emailed** [5] - 15:13, 16:20, 18:16, 18:21, 21:10
**emails** [1] - 19:11
**embarrassing** [1] - 21:17
**emphasis** [1] - 35:17
**employed** [2] - 3:2, 5:10
**EMPLOYMENT** [1] - 1:17
**end** [3] - 23:6, 23:13, 23:17
**ending** [8] - 38:1, 48:13, 51:8, 51:9, 51:10, 51:12, 51:15, 51:16
**engagement** [1] - 10:11
**engagements** [1] - 53:8
**enlarged** [1] - 40:3
**entail** [1] - 4:17
**entertain** [1] - 23:24
**entitled** [1] - 55:10
**ESQUIRE** [4] - 1:14, 1:16, 1:20, 1:20
**essentially** [1] - 38:14
**establish** [2] - 16:4, 30:19
**Estate** [1] - 1:4
**estimate** [1] - 5:8

**et** [1] - 1:7
**evidence** [5] - 9:19, 10:24, 13:19, 41:4
**exact** [2] - 12:22, 39:17
**exactly** [5] - 5:21, 13:4, 25:9, 40:18, 41:24
**Examination** [3] - 3:4, 7:16, 7:21
**examination** [5] - 6:20, 8:5, 8:9, 8:23, 9:4
**examinations** [3] - 5:1, 5:5, 24:3
**Examinations** [1] - 8:11
**examiner** [3] - 2:22, 6:13, 42:7
**Examiners** [4] - 6:10, 6:14, 8:14, 8:18
**examiners** [1] - 6:11
**examining** [1] - 23:4
**example** [5] - 25:8, 36:11, 36:13, 51:6, 54:3
**examples** [3] - 13:18, 48:23, 54:3
**exams** [1] - 7:7
**except** [1] - 52:5
**excerpt** [2] - 2:1, 54:24
**Excerpt** [1] - 1:5
**EXCERPT** [1] - 1:9
**excluded** [1] - 8:7
**excused** [4] - 54:15, 54:18, 54:21, 54:23
**execution** [1] - 41:8
**exemplars** [7] - 7:24, 13:2, 37:23, 39:8, 42:8, 46:3, 53:20
**exhibit** [7] - 9:6, 10:18, 10:21, 10:22, 11:18, 22:3
**Exhibit** [1] - 34:25
**exhibited** [3] - 13:24, 27:16, 48:23
**exhibits** [3] - 14:4, 30:10, 31:16
**exist** [2] - 18:5, 37:24
**experience** [1] - 5:14
**expert** [9] - 4:25, 8:1, 8:4, 8:22, 9:3, 9:21, 9:22, 13:10, 42:7
**expertise** [2] - 3:22, 4:24
**explain** [4] - 11:22, 14:12, 27:21, 32:10
**explained** [2] - 31:8, 43:10

**explaining** [1] - 43:8
**extreme** [2] - 54:9, 54:11
**eyelet** [1] - 27:10

**F**

**fact** [6] - 35:21, 41:4, 42:3, 45:14, 53:14, 53:17
**fair** [2] - 47:1, 47:23
**fall** [5] - 13:23, 27:16, 28:8, 41:1, 48:22
**familiar** [1] - 52:17
**far** [4] - 24:6, 29:7, 31:24, 34:2
**feature** [4] - 12:13, 38:2, 38:24, 39:4
**features** [4] - 12:4, 12:6, 37:24, 46:15
**FEDERAL** [1] - 55:19
**federal** [2] - 8:2, 8:6
**few** [1] - 48:10
**field** [7] - 3:5, 3:6, 3:8, 3:22, 4:3, 4:4, 4:6
**figure** [3] - 18:18, 24:4, 28:25
**figured** [1] - 22:5
**figures** [1] - 52:21
**fine** [1] - 22:7
**finish** [2] - 24:1, 24:2
**first** [22] - 2:13, 4:13, 9:17, 10:16, 11:17, 15:20, 18:11, 18:15, 19:21, 25:11, 25:19, 25:22, 25:25, 26:1, 26:8, 26:10, 26:14, 30:11, 30:23, 42:16, 42:23, 51:23
**five** [1] - 6:21
**fix** [1] - 32:13
**flows** [1] - 22:16
**focus** [1] - 13:12
**follow** [1] - 47:10
**followed** [2] - 36:6
**FOR** [3] - 1:1, 1:13, 1:19
**foregoing** [1] - 55:8
**foreign** [2] - 4:19, 8:12
**forensic** [10] - 2:22, 3:16, 3:23, 4:1, 5:15, 5:23, 6:12, 8:5, 8:22, 9:4
**Forensic** [10] - 3:3, 4:15, 6:9, 6:13, 7:2, 7:15, 7:20, 8:11, 8:14, 8:17
**forensics** [1] - 4:3
**forge** [1] - 10:2
**forged** [1] - 50:8

**form** [3] - 9:23, 35:16, 42:4
**format** [2] - 30:25, 55:11
**formation** [13] - 11:18, 12:16, 12:22, 13:10, 13:13, 27:9, 27:10, 27:11, 28:7, 35:3, 35:10, 37:8, 47:13
**formations** [3] - 11:22, 11:23, 27:25
**formed** [1] - 23:20
**forming** [1] - 37:14
**forms** [3] - 13:8, 39:6, 48:20
**forth** [1] - 26:5
**forward** [1] - 22:12
**forwarded** [1] - 16:2
**forwarding** [1] - 14:25
**frequently** [1] - 45:14
**frustrate** [1] - 21:25

**G**

**GAGLIARDO** [18] - 1:16, 11:5, 11:3, 11:15, 16:22, 21:19, 22:9, 23:8, 24:9, 25:2, 28:19, 32:3, 32:25, 33:7, 33:11, 33:15, 33:21, 42:25
**gamut** [2] - 4:11, 4:12
**general** [1] - 30:25
**gentlemen** [1] - 24:19
**genuine** [1] - 2:23
**George** [1] - 3:17
**GILBERT** [1] - 1:17
**given** [1] - 4:7
**Government** [2] - 5:23, 7:11
**governmental** [1] - 5:14
**graduate** [1] - 3:21
**gratis** [1] - 53:12
**green** [5] - 11:25, 13:2, 28:6, 35:18, 40:7
**Greg** [1] - 25:2
**GREGORY** [1] - 1:14
**groupings** [1] - 25:7
**guess** [5] - 23:2, 23:17, 26:6, 42:15, 45:22
**guessing** [1] - 35:7
**guy** [1] - 33:9
**guys** [2] - 42:24, 43:1
**GW** [1] - 3:23

## H

**half** [1] - 44:16
**hammering** [1] - 4:19
**hand** [1] - 2:8
**handwriting** [19] -
    2:24, 3:6, 3:19, 4:8,
    4:14, 4:22, 4:23,
    4:24, 4:25, 5:3, 6:4,
    7:23, 8:1, 8:12, 8:23,
    9:4, 12:4, 53:6,
    53:11
**Handwriting** [1] - 8:11
**hang** [3] - 11:15, 25:2,
    25:10
**hard** [2] - 18:14, 37:3
**hardcopy** [3] - 11:9,
    15:25, 17:25
**HAYDEN** [18] - 1:20,
    15:12, 16:17, 16:23,
    17:2, 17:4, 17:7,
    17:10, 17:19, 17:24,
    18:5, 18:8, 18:16,
    20:6, 22:3, 29:4,
    29:9, 32:1
**Hayden** [3] - 15:25,
    17:16, 20:16
**hear** [3] - 15:15,
    32:13, 32:14
**heard** [2] - 8:13, 30:22
**height** [7] - 35:25,
    36:2, 36:3, 36:8,
    36:16, 36:18
**held** [1] - 55:10
**help** [1] - 21:9
**hereby** [1] - 55:7
**hits** [1] - 37:13
**hold** [1] - 42:18
**HOLLANDER** [1] -
    1:10
**Homeland** [4] - 5:17,
    5:19, 5:25, 7:6
**honest** [1] - 23:3
**Honor** [15] - 8:21,
    8:25, 9:2, 16:13,
    22:2, 22:17, 23:3,
    25:10, 28:14, 29:1,
    30:12, 31:8, 32:6,
    32:10, 54:14
**HONORABLE** [1] -
    1:10
**hope** [1] - 31:8
**hopes** [1] - 9:10
**hoping** [2] - 15:18,
    24:3
**horizontal** [2] - 36:5,
    39:3
**humans** [1] - 40:17

## I

**idea** [1] - 10:7
**identification** [6] -
    2:24, 4:10, 4:20,
    4:22, 4:23, 41:12
**identify** [4] - 21:3,
    24:7, 24:25, 37:4
**identifying** [1] - 4:25
**identity** [2] - 6:1
**ignore** [1] - 13:25
**illegible** [10] - 12:10,
    26:21, 37:3, 43:11,
    44:17, 44:18, 44:19,
    44:23, 44:25, 45:2
**Illinois** [1] - 1:15
**illustrate** [8] - 45:21,
    46:2, 47:2, 47:12,
    47:14, 47:21, 48:12,
    49:15
**illustrative** [2] - 48:1,
    48:5
**imaginary** [1] - 39:1
**Immigration** [1] - 5:16
**Immigration/**
    **Homeland** [1] - 5:22
**impossible** [2] - 10:8,
    50:2
**IN** [1] - 1:1
**INC** [1] - 1:7
**include** [2] - 5:1, 6:4
**included** [2] - 13:21,
    20:25
**incomplete** [1] - 24:12
**inconclusive** [2] -
    41:13, 41:22
**independent** [1] - 5:13
**indication** [7] - 47:25,
    49:24, 50:3, 51:17,
    51:20, 52:2, 52:7
**indications** [4] -
    50:12, 50:15, 50:23,
    51:3
**individual** [8] - 4:8,
    5:7, 12:3, 36:18,
    40:24, 41:17, 41:25,
    42:3
**influence** [1] - 53:14
**initial** [1] - 37:18
**inside** [2] - 37:16,
    37:19
**instead** [2] - 32:8,
    54:2
**instruction** [1] - 4:7
**instructions** [1] - 24:5
**instrumental** [1] - 5:2
**intentionally** [1] - 41:6
**interested** [1] - 33:5
**introduced** [4] -
    30:16, 31:2, 31:22,

    32:17
**iron** [1] - 22:13
**irregular** [1] - 52:2
**issue** [7] - 14:21,
    18:15, 23:2, 29:24,
    32:7, 32:24, 38:2
**issued** [1] - 9:17
**items** [1] - 54:3
**itself** [2] - 33:6, 50:24

## J

**j's** [1] - 27:25
**j-pointed** [2] - 27:20,
    27:22
**job** [2] - 4:3, 4:17
**John** [10] - 1:4, 13:1,
    13:3, 13:6, 36:23,
    41:20, 41:23, 43:20,
    49:16, 53:20
**Jordan** [9] - 14:12,
    15:22, 18:25, 20:9,
    24:11, 33:10, 33:19,
    35:4, 47:10
**JORDAN** [72] - 1:14,
    1:14, 2:5, 2:17, 8:21,
    9:5, 10:20, 10:22,
    11:2, 11:7, 11:11,
    11:13, 11:16, 12:25,
    14:5, 14:9, 14:14,
    14:16, 14:20, 14:25,
    15:13, 15:18, 16:2,
    16:6, 16:14, 16:20,
    16:25, 17:3, 17:6,
    17:8, 17:18, 17:21,
    18:3, 18:7, 18:9,
    18:21, 19:4, 19:10,
    19:14, 19:19, 19:23,
    20:10, 20:14, 20:16,
    20:24, 21:3, 21:10,
    24:20, 27:18, 29:11,
    29:14, 30:4, 30:7,
    31:12, 31:17, 34:5,
    34:6, 34:15, 35:6,
    35:9, 37:6, 42:13,
    42:18, 42:20, 43:5,
    43:25, 46:7, 53:1,
    53:3, 53:5, 54:1,
    54:19
**Judge** [1] - 12:23
**JUDGE** [1] - 1:10
**Judicial** [1] - 55:12
**jury** [11] - 2:20, 11:23,
    15:14, 22:1, 24:5,
    25:7, 25:18, 28:20,
    31:24, 32:14, 36:13
**JURY** [1] - 1:9
**jury's** [1] - 9:10

## K

**K1** [6] - 12:15, 26:2,
    26:9, 27:11, 38:6,
    44:8
**K11** [2] - 27:7, 38:6
**K13** [1] - 12:23
**K14a** [1] - 39:5
**K15** [1] - 44:8
**K15a** [1] - 37:17
**K15c** [1] - 37:17
**K15e** [1] - 37:17
**K16** [4] - 27:2, 27:6,
    27:17, 44:10
**K17u** [1] - 39:5
**K2** [4] - 12:16, 27:5,
    37:17, 39:5
**K4** [1] - 27:8
**K5** [2] - 13:7, 27:8
**K6** [1] - 27:9
**K7** [2] - 13:7, 27:10
**K8** [1] - 27:11
**K9** [1] - 39:5
**KAGAN** [1] - 1:21
**keep** [2] - 23:23, 50:10
**kind** [12] - 4:24, 5:1,
    11:22, 27:5, 27:9,
    27:10, 37:3, 37:16,
    39:18, 40:8, 40:12,
    52:11
**known** [33] - 7:23,
    7:24, 9:23, 10:13,
    11:25, 12:1, 12:2,
    12:7, 13:24, 23:11,
    25:4, 25:19, 26:2,
    26:7, 26:13, 27:17,
    27:25, 36:10, 38:5,
    38:20, 41:19, 43:9,
    43:20, 44:2, 46:16,
    47:4, 47:19, 48:23,
    51:4, 52:6, 54:4
**knowns** [8] - 13:21,
    26:2, 34:13, 45:21,
    46:2, 48:8, 48:15,
    48:16
**knows** [3] - 15:19,
    25:18, 46:13

## L

**lab** [1] - 5:15
**Lab** [1] - 4:16
**labeled** [5] - 26:2,
    26:9, 43:15, 44:8,
    44:10
**laboratory** [1] - 7:6
**Laboratory** [1] - 4:6
**labs** [1] - 5:23
**ladies** [1] - 24:19
**large** [3] - 26:20,

    26:25, 27:3
**LaSalle** [1] - 1:15
**last** [6] - 2:13, 11:8,
    20:12, 24:6, 24:9,
    33:17
**LAW** [1] - 1:17
**leading** [2] - 53:21,
    53:23
**least** [1] - 31:21
**leave** [2] - 5:19, 42:15
**left** [4] - 12:12, 36:7,
    36:15, 51:25
**leftward** [1] - 37:20
**legible** [1] - 27:1
**length** [2] - 37:25,
    48:13
**less** [1] - 22:21
**letter** [14] - 35:3,
    35:10, 36:3, 37:1,
    37:3, 37:4, 37:7,
    37:14, 37:15, 38:4,
    39:6, 47:12, 48:20
**letters** [2] - 6:18,
    51:13
**licenses** [1] - 6:2
**life** [1] - 16:11
**lift** [7] - 34:25, 35:11,
    35:17, 35:22, 46:4,
    46:23, 52:2
**lifts** [7] - 34:18, 35:11,
    35:12, 35:18, 35:23,
    46:22, 46:24
**likely** [1] - 36:14
**limited** [1] - 48:5
**line** [6] - 36:5, 38:1,
    39:1, 39:4, 39:16,
    48:13
**list** [2] - 33:1
**living** [2] - 2:21, 53:6
**LLC** [5] - 1:14, 1:21,
    3:4, 7:16, 7:21
**locations** [1] - 35:24
**look** [27] - 9:11, 9:22,
    10:5, 10:15, 11:11,
    12:5, 12:6, 12:15,
    13:22, 20:18, 21:14,
    22:7, 23:10, 24:21,
    27:2, 27:4, 27:5,
    27:7, 27:8, 28:11,
    30:24, 31:4, 34:17,
    34:18, 40:8, 40:19,
    44:20
**looked** [4] - 12:1,
    13:11, 34:7, 38:15
**looking** [41] - 9:23,
    11:1, 11:5, 14:7,
    14:10, 15:2, 15:6,
    16:1, 16:7, 17:13,
    17:16, 17:22, 18:1,
    25:4, 26:7, 27:11,

29:20, 30:12, 30:17, 30:24, 31:3, 31:5, 31:6, 31:21, 32:20, 37:11, 40:19, 41:2, 41:16, 42:8, 42:11, 42:17, 42:19, 42:22, 42:23, 46:21, 50:10, 52:3

**looks** [4] - 17:9, 17:17, 29:1, 49:5
**loop** [1] - 27:9
**looped** [1] - 27:10
**loops** [5] - 26:20, 26:25, 27:3, 27:5, 51:24
**lunchtime** [1] - 14:20

# M

**ma'am** [3] - 2:7, 25:6, 26:16
**machines** [1] - 40:17
**maintain** [2] - 6:16, 7:11
**MARINELLO** [1] - 1:21
**MARKETING** [1] - 1:7
**Maryland** [5] - 1:18, 1:22, 3:11, 3:14, 55:7
**MARYLAND** [1] - 1:1
**masters** [2] - 3:16, 3:23
**match** [3] - 17:7, 17:8, 31:6
**material** [1] - 7:25
**materials** [2] - 8:8, 10:10
**matter** [2] - 24:15, 55:10
**mean** [9] - 8:16, 10:4, 20:7, 37:1, 37:2, 40:17, 44:20, 45:5, 52:10
**meaning** [1] - 48:4
**means** [2] - 12:14, 41:6
**meant** [2] - 22:5, 29:6
**Mechanical** [1] - 1:25
**member** [1] - 7:2
**mentioned** [6] - 5:14, 7:15, 28:3, 28:23, 37:22, 50:17
**Merit** [1] - 55:6
**mic** [1] - 30:20
**microphone** [1] - 2:11
**microscopic** [1] - 5:2
**middle** [1] - 36:9
**missing** [1] - 22:8
**mistake** [3] - 18:12, 20:12, 33:17

**moment** [1] - 45:22
**monetary** [2] - 4:18, 5:25
**monitor** [1] - 45:22
**morning** [6] - 18:9, 18:10, 18:22, 18:24, 19:11, 19:13
**most** [3] - 21:6, 36:14, 38:4
**motion** [1] - 27:2
**move** [4] - 33:14, 33:22, 35:1, 35:6
**movement** [4] - 27:3, 38:7, 38:10, 39:3
**movements** [2] - 47:18
**moves** [1] - 37:20
**moving** [1] - 39:6
**MR** [173] - 2:5, 2:17, 8:21, 8:25, 9:2, 9:5, 10:20, 10:22, 10:25, 11:2, 11:3, 11:4, 11:5, 11:7, 11:9, 11:11, 11:13, 11:15, 11:16, 12:25, 14:3, 14:5, 14:7, 14:9, 14:10, 14:14, 14:15, 14:16, 14:18, 14:20, 14:24, 14:25, 15:2, 15:5, 15:10, 15:13, 15:18, 15:22, 16:2, 16:6, 16:7, 16:12, 16:14, 16:16, 16:20, 16:22, 16:25, 17:3, 17:6, 17:8, 17:11, 17:13, 17:16, 17:18, 17:21, 17:25, 18:3, 18:7, 18:9, 18:11, 18:17, 18:21, 18:23, 19:4, 19:5, 19:10, 19:12, 19:14, 19:16, 19:19, 19:20, 19:23, 19:25, 20:4, 20:7, 20:10, 20:14, 20:15, 20:16, 20:17, 20:22, 20:24, 21:2, 21:3, 21:5, 21:10, 21:13, 21:19, 21:23, 22:2, 22:9, 22:11, 22:17, 22:22, 23:1, 23:8, 23:17, 23:21, 24:2, 24:9, 24:11, 24:20, 25:2, 27:18, 28:14, 28:18, 28:19, 28:22, 28:25, 29:5, 29:11, 29:14, 29:19, 29:23, 30:4, 30:7, 30:11, 30:22, 31:12, 31:17, 31:18, 32:2, 32:3, 32:4, 32:10, 32:16,

32:19, 32:23, 32:25, 33:7, 33:10, 33:11, 33:15, 33:18, 33:21, 33:23, 34:1, 34:5, 34:6, 34:15, 35:6, 35:9, 37:6, 42:13, 42:15, 42:18, 42:19, 42:20, 42:22, 42:25, 43:1, 43:5, 43:7, 43:23, 43:25, 44:1, 44:3, 46:7, 46:8, 46:11, 46:18, 47:11, 52:12, 52:24, 53:1, 53:3, 53:5, 53:21, 53:23, 54:1, 54:14, 54:16, 54:19
**MS** [17] - 15:12, 16:17, 16:23, 17:2, 17:4, 17:7, 17:10, 17:19, 17:24, 18:5, 18:8, 18:16, 20:6, 22:3, 29:4, 29:9, 32:1
**multiple** [4] - 19:7, 38:21, 43:9, 44:10
**multiples** [1] - 26:4
**must** [1] - 30:12
**mystery** [1] - 24:12

# N

**Nadine** [1] - 55:5
**NADINE** [1] - 55:19
**name** [6] - 2:13, 2:14, 26:4, 36:23, 50:18, 50:20
**names** [1] - 36:12
**Naturalization** [1] - 5:16
**naturally** [1] - 10:8
**near** [2] - 24:5, 30:20
**necessarily** [1] - 38:24
**need** [7] - 6:17, 6:18, 15:12, 15:14, 24:15, 30:20, 35:1
**never** [4] - 8:7, 23:20, 24:7, 24:8
**new** [1] - 20:23
**next** [10] - 35:16, 35:25, 36:20, 37:7, 38:11, 38:22, 39:13, 48:17, 49:2
**night** [1] - 24:6
**Noah** [7] - 1:23, 10:16, 18:3, 27:19, 32:25, 33:13, 40:12
**none** [1] - 40:20
**normal** [2] - 27:11, 41:7
**North** [2] - 1:15, 6:10
**NORTHERN** [1] - 1:2

**noted** [1] - 22:23
**notes** [2] - 35:14, 40:7
**nothing** [2] - 24:10, 33:8
**nowhere** [1] - 24:5
**number** [9] - 10:16, 10:18, 10:21, 15:5, 15:12, 21:4, 26:22, 29:19, 39:25
**NUMBER** [1] - 1:4
**numbers** [1] - 21:14

# O

**o's** [1] - 36:14
**object** [1] - 20:7
**objection** [8] - 9:1, 22:22, 28:15, 28:22, 46:7, 46:13, 53:21, 53:23
**obligations** [2] - 4:19, 5:25
**obtain** [2] - 3:12, 3:15
**obtained** [1] - 6:8
**odd** [2] - 41:16, 51:2
**oddities** [1] - 51:3
**oddly** [1] - 50:16
**OF** [4] - 1:1, 1:9, 55:1
**OFFICIAL** [2] - 55:1, 55:19
**once** [1] - 25:5
**one** [56] - 3:25, 9:7, 10:16, 11:15, 12:1, 12:24, 13:5, 13:21, 14:19, 16:9, 16:10, 17:13, 22:11, 24:9, 25:3, 25:8, 25:10, 26:13, 27:6, 27:7, 27:8, 27:9, 27:10, 28:1, 28:23, 29:2, 29:23, 30:7, 30:9, 30:12, 32:4, 36:21, 37:4, 38:16, 39:7, 41:11, 41:24, 42:15, 42:16, 42:17, 42:22, 43:3, 43:8, 44:20, 44:22, 44:24, 45:25, 48:11, 49:25, 50:3, 50:7, 51:7, 51:10
**ones** [9] - 13:2, 28:1, 29:7, 31:21, 31:23, 34:10, 43:2, 44:25, 48:2
**opened** [1] - 24:13
**opening** [1] - 9:21
**opinion** [9] - 9:23, 41:10, 41:11, 41:13, 42:1, 42:4, 42:9, 50:7, 53:15
**opposed** [2] - 27:6,

38:16
**oral** [1] - 6:20
**order** [2] - 6:17, 42:16
**original** [9] - 16:5, 17:19, 17:21, 39:22, 43:13, 43:15, 45:9, 45:11, 52:15
**Oswald** [1] - 1:24
**outside** [1] - 28:19
**overcorrecting** [1] - 52:11
**overrule** [1] - 46:12
**own** [3] - 3:2, 3:3, 50:19

# P

**P.C** [1] - 1:17
**p.m** [1] - 2:2
**page** [33] - 10:25, 11:3, 11:4, 11:5, 15:5, 15:12, 15:24, 18:2, 21:2, 21:3, 21:14, 24:8, 28:6, 29:19, 31:2, 31:4, 31:14, 33:19, 35:25, 36:20, 38:11, 38:22, 39:13, 40:2, 40:19, 42:16, 46:19, 46:23, 47:12, 48:11, 48:17, 49:2, 55:11
**pages** [6] - 16:14, 35:2, 35:6, 40:11, 42:20, 42:21
**paid** [5] - 52:13, 52:15, 52:19, 53:8, 53:14
**paper** [5] - 6:23, 35:13, 35:14, 35:16, 37:13
**Paralegal** [2] - 1:23, 1:24
**Park** [1] - 3:11
**part** [9] - 11:2, 15:9, 16:4, 18:24, 19:3, 29:24, 33:5, 33:12, 37:25
**particular** [3] - 10:11, 12:9, 37:4
**particularly** [1] - 27:17
**pass** [2] - 41:7, 42:13
**passed** [1] - 7:9
**passports** [1] - 6:2
**past** [1] - 35:2
**patch** [1] - 46:4
**patching** [5] - 52:3, 52:4, 52:5, 52:7, 52:10
**pathology** [1] - 4:2
**pay** [1] - 36:12
**Payne** [14] - 27:21,

27:23, 28:3, 28:12, 34:24, 35:21, 37:12, 37:19, 38:2, 38:19, 39:14, 45:20, 46:5, 48:14
**Payne's** [5] - 13:15, 35:12, 46:14, 47:20, 47:24
**peak** [6] - 11:18, 11:22, 11:23, 12:12, 13:10, 13:13
**peaked** [3] - 12:13, 12:16, 12:17
**peaks** [1] - 22:15
**pen** [19] - 12:20, 34:18, 34:24, 35:11, 35:12, 35:13, 35:15, 35:17, 35:18, 35:22, 35:23, 37:13, 39:24, 46:4, 46:22, 46:23, 46:24, 52:2
**pending** [1] - 47:8
**people** [2] - 36:11, 38:24
**person** [3] - 3:1, 9:21, 10:7
**perspective** [1] - 24:13
**pick** [1] - 41:20
**picked** [2] - 28:4, 46:8
**picking** [6] - 13:16, 37:22, 45:20, 47:1, 47:16, 47:17
**picture** [1] - 33:1
**pictures** [1] - 34:12
**placement** [1] - 37:17
**Plaintiff** [1] - 1:5
**PLAINTIFF** [1] - 1:13
**plan** [1] - 30:5
**point** [15] - 23:14, 24:16, 33:23, 37:12, 37:19, 38:20, 43:3, 43:8, 46:1, 46:2, 47:2, 47:14, 48:1, 48:21, 49:20
**pointed** [12] - 12:13, 27:20, 27:22, 27:24, 28:2, 28:6, 38:21, 40:24, 41:17, 46:15, 51:19, 53:17
**pointing** [3] - 12:11, 28:1, 49:5
**points** [5] - 6:22, 23:12, 26:25, 39:16, 45:21
**portion** [1] - 31:20
**portions** [1] - 31:21
**posed** [1] - 40:22
**position** [1] - 4:13
**positive** [1] - 25:12

**possession** [1] - 34:3
**possibilities** [1] - 39:25
**possible** [10] - 20:9, 20:11, 39:18, 39:22, 39:23, 41:9, 49:18, 49:19, 49:23, 50:21
**possibly** [2] - 42:6, 42:11
**practical** [1] - 6:20
**practice** [5] - 5:13, 7:10, 7:11
**preferred** [2] - 45:9, 45:11
**prepared** [1] - 9:7
**presence** [1] - 28:20
**Present** [1] - 1:23
**president** [2] - 4:20, 8:19
**presumably** [1] - 50:23
**pretty** [1] - 19:2
**previously** [2] - 38:12, 39:9
**primarily** [1] - 4:18
**printing** [1] - 4:9
**printout** [1] - 19:2
**private** [2] - 7:10, 7:11
**problem** [6] - 29:18, 31:15, 32:13, 33:18, 39:24, 49:20
**problems** [1] - 45:6
**proceedings** [2] - 54:24, 55:10
**Proceedings** [2] - 1:5, 1:25
**PROCEEDINGS** [1] - 1:9
**process** [1] - 49:19
**processes** [2] - 4:9, 5:3
**Produced** [1] - 1:25
**produced** [3] - 15:21, 31:11, 35:20
**profession** [2] - 3:19, 3:24
**professional** [2] - 6:18, 6:22
**program** [1] - 3:25
**proportionality** [2] - 40:1, 40:4
**proposing** [1] - 32:11
**protection** [1] - 4:21
**provided** [7] - 7:23, 29:7, 29:10, 37:23, 40:9, 45:7, 46:6
**psychology** [2] - 3:13, 3:18
**publish** [1] - 9:11
**published** [1] - 8:8

**pulled** [2] - 22:4, 31:19
**pursuant** [1] - 55:8
**put** [11] - 10:17, 14:1, 19:15, 24:24, 27:19, 30:4, 31:13, 32:9, 35:16, 41:21, 43:5
**putting** [1] - 10:24

**Q**

**Q1** [13] - 11:18, 11:19, 26:24, 27:6, 27:15, 34:25, 35:14, 36:4, 38:3, 39:2, 39:15, 40:6
**qualified** [1] - 6:11
**quality** [2] - 45:4, 45:7
**questioned** [41] - 4:2, 4:6, 4:12, 7:24, 9:22, 10:12, 11:19, 11:24, 12:6, 12:7, 13:23, 23:11, 23:12, 26:19, 27:15, 27:23, 28:8, 34:13, 34:25, 36:9, 36:19, 37:15, 39:2, 39:15, 39:22, 40:23, 40:25, 41:1, 41:18, 41:21, 41:25, 42:4, 42:8, 42:12, 47:3, 48:22, 49:7, 49:11, 50:11, 50:12, 50:13
**questions** [3] - 41:22, 52:24, 53:3
**quick** [1] - 34:1
**quote/unquote** [1] - 28:3

**R**

**raise** [1] - 2:8
**raised** [1] - 16:12
**range** [8] - 13:23, 27:13, 27:16, 28:9, 40:16, 41:1, 41:15, 48:22
**rather** [1] - 32:12
**ratio** [3] - 36:2, 36:8
**ratios** [3] - 36:1, 36:16, 36:18
**re** [1] - 15:13
**re-emailed** [1] - 15:13
**reach** [4] - 41:10, 42:1, 45:17, 48:4
**reacted** [1] - 30:18
**read** [1] - 46:14
**ready** [1] - 24:5
**real** [1] - 23:2
**realize** [1] - 33:10
**really** [10] - 2:20,

21:25, 23:16, 24:14, 26:20, 32:13, 34:1, 36:12, 36:17, 39:18
**Realtime** [1] - 55:5
**reason** [1] - 42:2
**rebuttal** [12] - 2:4, 11:2, 14:5, 14:22, 17:19, 17:22, 17:23, 29:16, 29:17, 30:7, 31:12, 31:13
**receive** [2] - 4:18, 44:6
**received** [9] - 9:3, 25:11, 29:4, 43:14, 43:16, 43:17, 43:23, 44:8, 44:9
**recertified** [1] - 6:21
**recognize** [1] - 19:2
**recognized** [1] - 6:10
**recommendation** [1] - 6:19
**record** [5] - 2:13, 20:25, 22:23, 22:24, 34:2
**Recorded** [1] - 1:25
**red** [7] - 12:11, 26:24, 28:2, 35:15, 36:5, 38:3, 39:3
**redacted** [5] - 19:18, 19:21, 20:1, 30:15, 31:3
**redirect** [2] - 52:25, 53:2
**reduced** [1] - 40:3
**refer** [1] - 48:6
**reference** [2] - 21:14, 49:14
**references** [1] - 21:2
**referencing** [1] - 22:7
**referring** [1] - 49:12
**refers** [1] - 36:2
**reflect** [1] - 35:5
**reflected** [2] - 13:11, 46:20
**regard** [4] - 25:1, 27:22, 28:9, 37:8
**regarding** [1] - 34:23
**Registered** [1] - 55:6
**regularly** [1] - 6:24
**regulations** [1] - 55:11
**related** [3] - 4:13, 9:7, 10:10
**relates** [3] - 10:16, 27:20, 28:11
**relating** [4] - 11:22, 38:22, 39:13, 40:3
**relative** [1] - 36:3
**reliance** [1] - 49:15
**relied** [3] - 44:23, 46:1, 48:3
**reluctantly** [2] - 16:12,

21:6
**rely** [1] - 46:5
**relying** [3] - 47:13, 47:25, 48:18
**remember** [3] - 43:10, 49:3, 49:10
**repeat** [1] - 51:1
**repeated** [2] - 36:9, 36:19
**rephrase** [1] - 51:16
**report** [63] - 9:7, 9:16, 9:17, 9:18, 10:25, 11:2, 11:7, 13:12, 13:15, 13:18, 14:5, 14:10, 14:22, 15:2, 15:23, 18:6, 18:25, 19:8, 19:17, 19:25, 20:5, 20:17, 21:1, 21:8, 21:9, 21:14, 26:1, 29:9, 29:16, 29:17, 29:18, 29:21, 29:24, 30:2, 30:3, 30:4, 30:6, 30:7, 30:14, 31:1, 31:7, 31:13, 31:17, 31:18, 32:6, 34:8, 34:10, 35:12, 35:23, 37:12, 43:3, 45:3, 45:24, 46:10, 46:11, 46:15, 47:24, 52:15, 52:20
**reported** [1] - 55:9
**REPORTER** [2] - 55:1, 55:19
**Reporter** [2] - 55:5, 55:6
**reports** [1] - 20:8
**reproduction** [1] - 39:19
**reprographic** [2] - 39:19, 49:19
**Requested** [2] - 2:1, 54:24
**requirements** [1] - 6:18
**research** [1] - 6:23
**resemble** [1] - 30:24
**resolution** [1] - 23:24
**responsibility** [2] - 33:11, 33:12
**rest** [2] - 27:4, 35:17
**restricted** [1] - 7:12
**rests** [2] - 2:3, 39:2
**resume** [1] - 24:18
**resuming** [1] - 35:13
**retired** [2] - 5:20, 7:8
**retiring** [1] - 7:14
**retraced** [10] - 12:14, 12:16, 12:17, 12:18, 12:21, 12:24, 13:5, 13:7, 13:8

**returned** [2] - 24:17, 33:25
**review** [4] - 10:10, 19:23, 43:20, 44:13
**reviewed** [1] - 13:15
**reviewing** [1] - 47:24
**revisiting** [1] - 16:11
**RMR** [1] - 55:19
**Road** [1] - 1:18
**role** [1] - 8:19
**routinely** [1] - 35:23
**run** [2] - 7:18, 22:14
**Ryan** [1] - 1:24

## S

**sample** [2] - 40:9, 43:11
**samples** [38] - 7:24, 10:13, 12:1, 25:4, 25:20, 25:21, 26:13, 27:25, 28:5, 36:10, 38:6, 38:8, 38:20, 38:21, 43:9, 43:17, 43:19, 43:20, 44:2, 44:6, 44:22, 44:24, 45:4, 45:7, 46:5, 47:13, 47:20, 48:1, 48:4, 48:5, 48:7, 48:12, 48:15, 51:4, 52:6
**satisfied** [1] - 23:15
**save** [1] - 31:9
**saw** [2] - 24:10, 38:13
**scenarios** [2] - 41:9, 50:20
**school** [1] - 3:21
**science** [3] - 3:16, 3:23, 4:1
**Sciences** [1] - 7:3
**screen** [15] - 11:5, 11:12, 14:9, 25:21, 26:7, 26:12, 29:3, 32:9, 33:1, 34:17, 35:1, 35:4, 35:18, 40:8, 40:20
**scroll** [3] - 40:12, 48:11, 48:19
**scrutiny** [1] - 41:8
**seat** [1] - 2:11
**sec** [1] - 11:15
**second** [7] - 9:18, 25:2, 25:10, 37:1, 37:2, 37:3, 42:18
**secondly** [1] - 37:25
**Secret** [5] - 4:6, 4:15, 4:21, 5:10, 5:24
**Security** [5] - 5:17, 5:19, 5:22, 5:25, 7:6
**see** [24] - 10:15, 12:9,

12:22, 14:7, 14:11, 15:3, 16:16, 17:25, 18:17, 19:8, 19:25, 20:6, 21:2, 21:17, 21:19, 21:22, 24:25, 26:20, 27:2, 28:1, 30:19, 43:2, 51:6, 51:24
**seeing** [3] - 11:10, 14:8, 21:16
**seem** [3] - 14:13, 18:24, 31:16
**selective** [1] - 13:16
**self** [2] - 41:6, 50:19
**self-simulated** [1] - 41:6
**self-simulating** - 50:19
**send** [4] - 15:6, 15:8, 20:24, 22:5
**sense** [4] - 40:13, 42:10, 47:7, 50:1
**sent** [12] - 14:22, 14:25, 18:3, 18:9, 18:25, 19:5, 19:10, 19:11, 19:12, 20:16, 22:3, 32:3
**separate** [3] - 18:5, 19:14, 34:11
**separated** [1] - 27:5
**September** [1] - 55:14
**series** [1] - 11:21
**Service** [6] - 4:6, 4:15, 4:21, 5:11, 5:16, 5:24
**Services** [4] - 3:4, 7:5, 7:16, 7:21
**sets** [1] - 18:3
**setup** [1] - 34:12
**Shannon** [1] - 21:23
**SHANNON** [1] - 1:20
**short** [1] - 36:8
**shorter** [1] - 36:6
**show** [9] - 20:12, 20:17, 22:19, 32:6, 32:20, 33:13, 34:9, 34:20, 46:17
**showed** [4] - 13:18, 27:24, 48:2, 48:7
**showing** [10] - 16:17, 28:5, 31:20, 34:23, 35:1, 35:17, 43:1, 47:3, 47:18, 48:15
**shown** [7] - 25:20, 29:7, 29:25, 31:24, 32:4, 32:22, 34:2
**shows** [4] - 23:7, 35:15, 38:18, 38:19
**side** [4] - 12:12, 36:7, 51:23, 51:25

**sign** [1] - 40:23
**signature** [57] - 2:25, 9:22, 9:24, 10:3, 10:5, 10:12, 10:14, 11:19, 11:24, 12:5, 12:8, 12:10, 12:15, 13:1, 13:23, 23:11, 23:12, 26:19, 27:16, 27:23, 35:24, 36:19, 39:2, 39:15, 39:17, 39:23, 40:15, 40:23, 40:25, 41:2, 41:23, 41:25, 42:12, 43:20, 48:22, 49:6, 49:7, 49:11, 49:15, 49:16, 49:18, 49:24, 49:25, 50:3, 50:4, 50:5, 50:8, 50:11, 50:13, 50:16, 50:19, 50:24, 51:2, 54:9, 54:10
**signatures** [16] - 9:23, 11:21, 11:25, 13:3, 17:4, 17:5, 17:6, 39:20, 41:15, 41:20, 44:10, 44:12, 45:2, 46:20, 49:21, 54:4
**signed** [4] - 49:10, 50:3, 50:5, 50:18
**significant** [1] - 35:22
**Silver** [1] - 1:18
**similar** [2] - 40:8, 40:25
**similarities** [2] - 33:2, 47:3
**simpler** [1] - 29:22
**simulated** [1] - 41:6
**simulating** [1] - 50:19
**simulation** [13] - 9:24, 10:1, 10:2, 42:5, 50:12, 50:15, 50:25, 51:3, 51:17, 51:20, 52:7, 53:19, 54:3
**simulation/forgery** [1] - 10:6
**simulations** [1] - 53:18
**single** [3] - 13:21, 38:1, 48:13
**six** [3] - 46:3, 46:19, 47:1
**slide** [3] - 36:4, 37:7, 37:10
**slope** [1] - 39:4
**small** [2] - 27:9, 27:11
**smaller** [1] - 27:5
**smooth** [1] - 39:16
**solely** [1] - 48:3
**solution** [3] - 23:2, 32:12, 33:24
**solve** [1] - 32:6

**solved** [1] - 33:18
**someone** [5] - 10:2, 10:3, 41:9, 50:20, 50:22
**sorry** [11] - 10:20, 14:1, 15:10, 17:15, 19:4, 26:23, 28:21, 48:17, 52:21, 53:2, 53:22
**sort** [1] - 49:19
**sound** [2] - 52:17, 52:22
**space** [1] - 12:19
**speaking** [1] - 2:12
**specialize** [1] - 5:24
**spell** [1] - 2:12
**spent** [1] - 5:15
**spot** [1] - 12:22
**Spring** [1] - 1:18
**standing** [2] - 17:17, 28:22
**start** [1] - 37:14
**starting** [1] - 18:12
**starts** [3] - 37:15, 37:19, 37:20
**state** [3] - 2:12, 8:1, 8:6
**States** [3] - 4:15, 55:6, 55:12
**STATES** [2] - 1:1, 1:10
**stay** [1] - 34:21
**stenographically** [1] - 55:9
**stenographically-reported** [1] - 55:9
**Stenography** [1] - 1:25
**Stephen** [2] - 11:12, 21:19
**STEPHEN** [1] - 1:20
**stern** [2] - 23:14, 53:17
**STERN** [88] - 1:20, 1:21, 8:25, 9:2, 10:25, 11:4, 11:9, 14:3, 14:7, 14:10, 14:15, 14:18, 14:24, 15:2, 15:5, 15:10, 15:22, 16:7, 16:12, 16:16, 17:11, 17:13, 17:16, 17:25, 18:11, 18:17, 18:23, 19:5, 19:12, 19:16, 19:20, 19:25, 20:4, 20:7, 20:15, 20:17, 20:22, 21:2, 21:5, 21:13, 21:23, 22:2, 22:11, 22:17, 22:22, 23:1, 23:17, 23:21, 24:2, 24:11, 28:14, 28:18,

28:22, 28:25, 29:5, 29:19, 29:23, 30:11, 30:22, 31:18, 32:2, 32:4, 32:10, 32:16, 32:19, 32:23, 33:10, 33:18, 33:23, 34:1, 42:15, 42:19, 42:22, 43:1, 43:7, 43:23, 44:1, 44:3, 46:8, 46:11, 46:18, 47:11, 52:12, 52:24, 53:21, 53:23, 54:14, 54:16
**stick** [1] - 51:7
**still** [2] - 20:4, 23:12
**stop** [1] - 38:5
**stops** [2] - 38:7, 38:8
**Street** [2] - 1:15, 1:21
**stroke** [12] - 28:12, 37:13, 37:15, 37:16, 37:17, 37:18, 38:4, 51:8, 51:9, 51:16
**submitted** [1] - 44:11
**subsequent** [1] - 26:11
**subsequently** [3] - 3:15, 43:17, 44:11
**suggest** [1] - 23:22
**suggesting** [3] - 32:19, 46:19, 46:23
**suggestion** [1] - 49:17
**Suite** [3] - 1:15, 1:17, 1:18
**superimposed** [1] - 40:20
**supplemental** [1] - 52:20
**support** [1] - 48:9
**supports** [1] - 41:4
**supposed** [2] - 23:1, 40:6
**surprise** [1] - 23:5
**suspect** [1] - 10:13
**sworn** [1] - 2:9

## T

**tab** [1] - 9:11
**tables** [2] - 24:17, 33:25
**tail** [1] - 51:25
**tall** [1] - 36:8
**tallest** [1] - 36:5
**TE** [2] - 26:21, 27:1
**team** [1] - 33:12
**technically** [1] - 22:14
**ten** [4] - 4:16, 5:12, 25:16, 26:13
**tend** [1] - 44:18
**tender** [1] - 8:21
**tented** [2] - 12:13,

12:21
**Tented** [1] - 12:13
**term** [2] - 36:2, 52:3
**terminal** [2] - 37:16, 38:3
**terminus** [1] - 28:13
**test** [2] - 6:19, 6:20
**testified** [1] - 8:1
**testify** [1] - 22:10
**testifying** [1] - 15:24
**testimony** [7] - 22:12, 23:18, 38:15, 39:8, 39:11, 49:4, 50:17
**Testimony** [1] - 1:5
**Testing** [1] - 7:5
**tests** [2] - 7:8
**text** [1] - 31:1
**textbook** [1] - 8:10
**THE** [121] - 1:1, 1:1, 1:10, 1:13, 1:19, 2:3, 2:6, 2:7, 2:10, 2:14, 8:24, 9:1, 9:3, 10:18, 10:21, 12:18, 12:19, 14:12, 14:19, 15:4, 15:8, 15:14, 15:17, 15:19, 16:4, 16:9, 17:12, 17:15, 18:10, 18:14, 18:19, 20:3, 20:9, 20:11, 20:20, 21:7, 21:12, 21:21, 21:25, 22:12, 22:18, 22:24, 23:6, 23:10, 23:19, 23:22, 24:4, 24:10, 24:12, 24:18, 25:3, 25:6, 25:7, 25:10, 25:13, 25:14, 25:16, 25:17, 25:18, 25:23, 25:24, 26:1, 26:6, 26:9, 26:12, 26:16, 26:17, 26:18, 26:22, 26:24, 28:17, 28:21, 28:23, 29:2, 29:6, 29:12, 29:21, 30:2, 30:5, 30:9, 30:20, 31:9, 31:15, 31:23, 32:8, 32:12, 32:18, 32:22, 32:24, 33:4, 33:14, 33:16, 33:20, 33:22, 35:4, 35:8, 36:21, 36:23, 36:24, 36:25, 37:1, 37:2, 37:5, 42:14, 43:22, 44:2, 46:10, 46:12, 46:14, 47:9, 52:10, 52:11, 52:25, 53:2, 53:22, 53:24, 54:13, 54:15, 54:17, 54:20, 54:22
**theory** [1] - 12:12
**they've** [1] - 15:24

**thick** [1] - 19:2
**thinking** [2] - 19:21, 36:15
**third** [1] - 36:7
**THOMAS** [1] - 1:16
**threats** [1] - 4:20
**three** [2] - 4:5, 8:19
**three-year** [1] - 4:5
**throughout** [3] - 35:23, 36:9, 36:10
**today** [4] - 16:21, 18:4, 24:3, 31:5
**took** [1] - 3:25
**top** [9] - 26:24, 28:2, 30:16, 31:4, 35:15, 37:10, 37:12, 38:20, 41:21
**topics** [1] - 24:14
**total** [6] - 25:5, 43:19, 43:22, 43:24, 44:4, 44:12
**totality** [1] - 46:5
**touch** [1] - 27:7
**towards** [1] - 41:11
**toxicology** [1] - 4:1
**TRANSCRIPT** [1] - 1:9
**Transcript** [1] - 1:25
**transcript** [3] - 2:1, 55:9, 55:11
**Transcription** [1] - 1:25
**travel** [1] - 6:1
**tremor** [16] - 39:13, 39:14, 39:16, 39:18, 39:19, 39:21, 39:23, 39:24, 49:6, 49:7, 49:15, 49:18, 49:21, 49:23, 50:2, 51:19
**tremors** [1] - 49:3
**trial** [9] - 15:20, 24:17, 25:19, 25:22, 25:25, 26:8, 26:14, 33:25
**TRIAL** [1] - 1:9
**tries** [1] - 10:2
**true** [2] - 13:3, 55:9
**try** [1] - 18:17
**trying** [4] - 16:18, 17:7, 28:25, 49:14
**turn** [3] - 48:17, 49:2, 54:2
**two** [14] - 7:7, 7:8, 18:3, 19:11, 26:20, 26:25, 27:3, 27:11, 38:6, 38:8, 48:12, 48:15, 48:23, 51:24
**types** [4] - 5:5, 6:3, 28:13, 36:16
**typewriter** [1] - 4:10
**typically** [1] - 51:15

## U

**U.S** [3] - 4:18, 5:23, 8:6
**U.S.C** [1] - 55:8
**ultimate** [1] - 50:6
**ultimately** [2] - 3:22, 43:19
**under** [1] - 4:21
**UNITED** [2] - 1:1, 1:10
**United** [3] - 4:15, 55:6, 55:12
**University** [3] - 3:11, 3:12, 3:17
**unnatural** [1] - 35:12
**up** [29] - 9:10, 10:17, 12:20, 12:21, 14:1, 14:20, 15:4, 15:14, 17:7, 17:8, 19:2, 19:15, 22:4, 24:24, 26:22, 27:19, 27:20, 28:3, 30:4, 31:13, 31:19, 32:16, 38:5, 42:15, 43:5, 44:14, 45:25, 47:10, 50:10
**utilize** [1] - 13:19
**utilized** [2] - 46:3

## V

**valleys** [1] - 22:15
**variation** [14] - 11:17, 13:8, 13:23, 27:14, 27:16, 40:16, 40:17, 40:19, 41:1, 41:24, 48:22, 54:9, 54:11
**Variation** [1] - 24:24
**varied** [2] - 27:4, 27:12
**variety** [2] - 4:1, 40:14
**various** [4] - 4:9, 19:19, 35:18, 35:24
**version** [1] - 31:3
**vice** [1] - 8:19
**view** [1] - 11:23
**views** [1] - 27:22
**visible** [1] - 31:20
**voir** [1] - 8:24
**vu** [2] - 15:17, 18:12

## W

**wait** [1] - 53:1
**waiting** [1] - 32:14
**Washington** [2] - 3:17
**Wednesday** [1] - 1:11
**weird** [2] - 41:2, 50:18
**West** [1] - 1:21
**whatsoever** [1] - 50:15
**whereas** [1] - 37:19

**whichever** [1] - 51:10
**white** [15] - 12:5, 27:13, 28:7, 35:19, 35:23, 36:23, 38:9, 40:16, 40:21, 40:22, 41:5, 46:21, 50:18, 50:19
**White** [4] - 13:3, 13:6, 26:21, 41:20
**white's** [5] - 40:14, 49:18, 49:25, 50:4, 50:5
**White's** [5] - 13:1, 41:23, 43:20, 49:16, 53:20
**whole** [1] - 4:10
**wide** [1] - 27:13
**WITNESS** [21] - 2:14, 12:19, 25:6, 25:10, 25:14, 25:17, 25:23, 26:1, 26:9, 26:16, 26:18, 26:24, 30:2, 35:8, 36:23, 36:25, 37:2, 44:2, 46:14, 52:11, 54:22
**witness** [7] - 8:5, 29:11, 29:12, 31:10, 42:13, 54:15, 54:17
**Witness** [2] - 2:9, 54:23
**wolf** [1] - 31:13
**Wolf** [1] - 1:23
**worded** [1] - 47:23
**workshops** [1] - 6:23
**write** [3] - 36:11, 36:13, 38:25
**writer** [1] - 36:16
**writer's** [1] - 10:13
**writes** [2] - 10:8, 42:11
**writing** [12] - 2:25, 6:23, 12:2, 13:24, 23:11, 27:14, 27:17, 35:23, 38:5, 39:2, 46:16
**writings** [2] - 29:25, 30:15
**written** [8] - 2:25, 6:19, 27:12, 31:4, 35:19, 40:21, 41:5, 50:16
**wrote** [8] - 8:10, 8:12, 24:11, 41:6, 41:9, 49:25, 50:20, 50:23

## Y

**year** [4] - 4:5, 7:7, 7:8, 11:8
**years** [8] - 3:9, 4:16, 5:6, 5:12, 5:15, 5:18,

6:21, 8:19

## Z

**ZITO** [1] - 1:14

## §

**§** [1] - 55:8