# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ASHLEY BOSHEA as Administrator of the
Estate of DAVID JOHN BOSHEA,

    Plaintiff.

    v.

COMPASS MARKETING, INC.,

    Defendant.

**Civil Action No. 1:21-CV-00309-ELH**

## DEFENDANT COMPASS MARKETING, INC.'S MOTION FOR RELIEF FROM A JUDGMENT, OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

Defendant Compass Marketing, Inc. ("Compass Marketing" or the "Company"), by and through its undersigned counsel and pursuant to Rules 60(b) and 59(a) of the Federal Rules of Civil Procedure, hereby files this Motion for Relief from a Judgment or, in the Alternative, for a New Trial.

## INTRODUCTION

In a shocking turn of events, Plaintiff Ashley Boshea, as Administrator of the Estate of David John Boshea ("Boshea"), engaged in the same misconduct in the second trial that Plaintiff David J. Boshea engaged in during the first trial.[1]  By failing to disclose substantive portions of testimony by his expert witness, Donna Eisenberg ("Ms. Eisenberg"), Boshea *yet again* engaged in trial by ambush in clear violation of the Federal Rules of Civil Procedure.

---

[1] David J. Boshea, the original Plaintiff in this case, passed away on January 28, 2025.  Thereafter, Mr. Boshea's daughter, Ashley Boshea, as Administrator of the Estate of Mr. Boshea, was substituted as the named Plaintiff.  For ease of reference, this filing continues to refer to *Plaintiff* as "Boshea," and references herein to "Boshea" should be understood to include the Estate of David J. Boshea, by and through its Administrator.

Similar to what transpired at the first trial, where Boshea had Ms. Eisenberg testify about a sur-rebuttal report hidden on her lap during her testimony and which was not disclosed to Compass Marketing prior to her testimony at trial, Boshea again had Ms. Eisenberg testify about charts and analyses that were shown to the jury, even though they were not disclosed to Compass Marketing prior to trial.[2]  Her testimony also included other opinions that *were not disclosed* to Compass Marketing prior to trial.  Such withholding of this expert material and information clearly constitutes misconduct under Rule 60(b) of the Federal Rules of Civil Procedure, and it unfairly deprived Compass Marketing of the opportunity to present a complete defense to the claims being advanced by Boshea.  For these reasons, which are discussed in greater detail below, the Court should grant Compass Marketing relief under Rule 60(b) from the judgment that has been entered, or, in the alternative, the Court should order a new trial under Rule 59(a) of the Federal Rules of Civil Procedure.

## FACTUAL AND PROCEDURAL BACKGROUND

In light of the Court's familiarity with the factual and procedural history of this case, Compass Marketing submits the following brief recitation of the relevant background.

On February 5, 2021, Plaintiff David J. Boshea filed a two-count Complaint against Compass Marketing alleging breach of contract (Count I) and violation of the Maryland Wage Payment and Collection Law ("MWPCL") (Count II).  *See* ECF 1 (Complaint).  Boshea's Complaint was filed "to recover unpaid sums owing to him under an agreement titled 'Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment Compensation.'"  *See* ECF 1 at ¶ 1.  Attached as Exhibit A to the Complaint was the purported written contract entered into between Boshea and Compass Marketing titled "Compass Marketing, Inc. Agreement

---

[2] Boshea's counsel falsely and boldly represented to the Court that the charts and analyses were properly disclosed, but Compass Marketing demonstrated this was false.

Relating to Employment and Post-Employment Compensation" (the "Agreement") that formed the entire basis of Boshea's claims against Compass Marketing.

Compass Marketing always denied that it entered into the alleged Agreement and that the alleged signature of John White, the Company's CEO at the time, was forged. *See* ECF 125-2 (Defendant Compass Marketing, Inc's Answers to Plaintiff David J. Boshea's First Set of Interrogatories) at 8; *see also* ECF 14 (Defendant Compass Marketing, Inc.'s Answer to Plaintiffs' Complaint for Breach of Contract) at p. 7 (Sixth Affirmative Defense); ECF 53 (Defendant Compass Marketing, Inc.'s Answer to Plaintiff's Second Amended Complaint) at p. 8 (Fifth Affirmative Defense).

The parties proceeded to a jury trial from February 20, 2024 to February 27, 2024 on the claims set forth in Boshea's operative Complaint. During the testimony of Boshea's expert, Donna Eisenberg ("Ms. Eisenberg"), Compass Marketing realized Ms. Eisenberg had prepared a sur-rebuttal report that Compass Marketing was not aware existed. Compass Marketing only came to realize while Ms. Eisenberg was testifying at trial that her testimony was premised on the previously undisclosed report. Had Compass Marketing not noticed Ms. Eisenberg was reading from, or at least referring to, a document she had placed on or around her lap throughout her testimony,[3] Compass Marketing likely would not have discovered the existence of the previously undisclosed sur-rebuttal report or the fact that Ms. Eisenberg had testified at trial about analyses in her sur-rebuttal report that was never produced.

Ms. Eisenberg's testimony from the sur-rebuttal report was no accident, however. As evidenced by an email exchange between counsel, Boshea planned to use Ms. Eisenberg's sur-

---

[3] Ms. Eisenberg kept the sur-rebuttal report on or around her lap, which was largely not in counsel's view during her testimony.

rebuttal report in testimony at trial even though Boshea knew Ms. Eisenberg's sur-rebuttal report was never shared with Compass Marketing. On February 19, 2024 (one day before trial), Boshea's counsel emailed counsel for Compass Marketing the following: "I want to confirm that Donna Eisenberg will be allowed to provide rebuttal testimony. Please let me know." That same day, counsel for Compass Marketing replied, "I do not recall receiving a report from her in rebuttal to the report or testimony of Jeffrey Payne. Was that provided?" Two days later – after trial had already commenced – counsel for Boshea simply responded to the question with "No." Despite knowing that Ms. Eisenberg's sur-rebuttal report had not been produced to Compass Marketing, Boshea had Ms. Eisenberg testify at trial about the findings, conclusions, and analyses Ms. Eisenberg included in her sur-rebuttal report. Ms. Eisenberg's testimony went on for some time before Compass Marketing realized that Ms. Eisenberg was potentially testifying from a supplemental report it did not receive. Once it was confirmed that Ms. Eisenberg was reading from or being guided by the undisclosed sur-rebuttal report, Compass Marketing objected to its use and moved for a mistrial, which this Court denied.

At the end of the first trial, the jury returned a verdict in favor of Compass Marketing on the written contract claims. During Compass Marketing's motion for judgment after the close of all the evidence, however, Boshea moved to amend his Complaint further (it had already been amended twice ) and, for the first time, Boshea sought to add a breach of oral contract claim. The Court granted the motion to amend over Compass Marketing's objection. The jury returned a verdict for Boshea on the new oral contract claim – a claim Compass Marketing did not defend against.

Compass Marketing filed a Renewed Motion for Judgement as a Matter of Law, or, in the Alternative, Motion for a New Trial. The Court denied Compass Marketing's Renewed Motion

for Judgement as a Matter of Law, but granted the Motion for a New Trial and allowed Boshea to amend his Complaint to add a claim for breach of oral contract.  Before the second trial began, Boshea passed away and his daughter Ashley Boshea, as the Administrator of Mr. Boshea's Estate, became the Plaintiff.

The second trial began on August 4, 2025.  During the second trial, Boshea decided not to have Ms. Eisenberg testify during his case-in-chief, and, instead, decided to put her on solely in rebuttal to testimony by Jeffrey Payne ("Mr. Payne"), Compass Marketing's expert.  During Ms. Eisenberg's testimony, she began testifying about charts and analyses that she had prepared as a supplement to her report.  It quickly became apparent to Compass Marketing that Boshea again did not produce charts and analyses that Ms. Eisenberg was relying on.  In fact, almost immediately upon hearing the testimony about the undisclosed charts and analyses, counsel for Compass Marketing questioned what Ms. Eisenberg was referring to in her testimony.  Shockingly, counsel for Boshea stated, "This was a report that I delivered to you on December 23rd last year."  *See* Exhibit 1 (Trial Testimony of D. Eisenberg) at 10:25-11:10.  The charts, however, were not included in Ms. Eisenberg's report, and, in fact, Boshea never produced them.  Boshea's counsel clearly knew the charts and analyses had not been produced to Compass Marketing prior to trial (despite representing multiple times they had been produced)[4] because Boshea's counsel admitted that Ms. Eisenberg emailed the charts to Boshea's counsel the *morning of the trial*.  *See* Exhibit 1 at 18:9 ("She sent these to me this morning.").  Expert documents emailed to Boshea's counsel during the trial obviously could not have been disclosed to Compass Marketing prior to trial.

---

[4] Counsel for Boshea stated at least six times that the charts and analyses had been produced with the December 2024 report and/or that Compass Marketing had the charts and analyses, which was blatantly not true.  *See* Exhibit 1 at 10:25-11:10, 14:3-11, 14:7-17, 14:20-23, 16:4-6, and 21:7-11.  When asked whether the charts existed separate from the December 2024 report, counsel for Boshea stated "No[,]" even though that was not true.  *See* Exhibit 1 at 18:5-7.

Before it was resolved that Boshea would no longer use the undisclosed charts and analysis, Ms. Eisenberg had already provided several minutes of highly prejudicial of testimony. The damage had been done, as Compass Marketing was ambushed yet again and deprived of a meaningful opportunity to defend against Ms. Eisenberg's testimony. The shock of having this development happen not once, but twice, is summed up best by the Court's comments upon realizing Boshea ambushed Compass Marketing yet again with Ms. Eisenberg's testimony, "Is this déjà vu all over again?," "Then why would it be that the one document that he's asking about is the one you don't have? I am revisiting my life, it seems[,]" and "How is this possible, Mr. Jordan? How is it possible that you would have the same mistake this time as last time?" *See* Exhibit 1 at 15:17, 16:9-11, and 20:9-13.

The circumstances surrounding Ms. Eisenberg's undisclosed charts and analyses underscore why relief from the judgment is warranted under Rules 60(b), or, why a new trial is warranted under 59(a) of the Federal Rules of Civil Procedure. By intentionally withholding materials that should have been produced, Boshea again deprived Compass Marketing of a fair opportunity to confront and respond to key rebuttal evidence. This misconduct unfairly prejudiced Compass Marketing, undermined the integrity of the proceedings, and materially impacted the jury's consideration of critical issues related to the breach of the written contract claim. Accordingly, a new trial is necessary to ensure that this case is decided on a full and fair record, not through surprise, nondisclosure and misconduct.

## ARGUMENT

## I.   BOSHEA'S MISCONDUCT WARRANTS RELIEF FROM THIS COURT PURSUANT TO RULE 60(b)(3) OF THE FEDERAL RULES OF CIVIL PROCEDURE

### A.   Standard for Motion for Relief from a Judgment Under Rule 60(b) of the Federal Rules of Civil Procedure

Rule 60(b)(3) of the Federal Rules of Civil Procedure states that a court "may relieve a party" from a "final judgment, order, or proceeding" for "fraud . . . , misrepresentation, or misconduct by an opposing party." FED. R. CIV. P. 60(b)(3).  In reviewing a request for such relief, a court does not "assess the merits of a judgment or order[,]" but, instead, "focuses on the unfair means by which a judgment or order is procured."  *See Barlow v. Colgate Palmolive Co.*, 772 F.3d 1001, 1010 (4th Cir. 2014) (citing *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994)).  A motion under Rule 60(b)(3) "does not attack 'the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity' of the proceedings."  *Morgan v. Tincher*, 90 F.4th 172, 177 (4th Cir. 2024) (citing *Gonzalez v. Crosby*, 545 U.S. 524, 532, 125 S. Ct. 2641, 2644 (2005)).

"To obtain relief under Rule 60(b)(3) for 'misconduct,' the moving party must: (1) 'have a meritorious [claim or] defense'; (2) demonstrate misconduct by clear and convincing evidence, and (3) show that 'the misconduct prevented the moving party from fully presenting its case.'"  *Morgan v. Tincher*, 90 F.4th 172, 177 (4th Cir. 2024) (quoting *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994)).  After proof of these elements, "'the court must balance the competing policies favoring the finality of judgments and justice being done in view of all the facts, to determine within its discretion, whether relief is appropriate in each case.'"  *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994) (quoting *Square Constr. Co. v. Wash. Metro. Area Transit Auth.*, 657 F.2d 68, 71 (4th Cir. 1981)).

In this case, the failure to properly disclose expert charts and analyses as well as other analyses that were part of the testimony Ms. Eisenberg presented to the jury warrants relief from the judgment under Rule 60(b) of the Federal Rules of Civil Procedure.

**B.     Rule 26 of the Federal Rules of Civil Procedure Includes Mandatory Disclosure Requirements That Boshea Failed to Observe (Yet Again)**

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, a party is required to disclose to the other party "the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." *See* FED. R. CIV. P. 26(a)(2)(A). Federal Rules of Evidence 702, 703, and 705 govern testimony by an expert witness, bases of an expert's opinion testimony, and disclosing the facts or data underlying an expert's opinion respectively. *See* FED. R. EVID. 702, 703, and 705. And, in making the disclosure, the party must provide "a written report— prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." *See* FED. R. CIV. P. 26(a)(2)(B). The report must contain the following:

> (i)     a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii)    the facts or data considered by the witness in forming them;
>
> (iii)   any exhibits that will be used to summarize or support them;
>
> (iv)   the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v)    a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi)   a statement of the compensation to be paid for the study and testimony in the case.

*See* FED. R. CIV. P. 26(a)(2)(B)(i-vi). A party also is required to "supplement or correct its disclosure or response" "in a timely manner if the party learns that in some material respect the

disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"  *See* FED. R. CIV. P. 26(e)(1)(A).

Further, prior to trial, "in addition to the to the disclosures required by Rule 26(a)(1) and (2), a party must provide to the other part[y] . . . the following information about the evidence that it may present at trial other than solely for impeachment: . . . (iii) an identification of each document or other exhibit, including summaries of other evidence—separately identifying those items the party expects to offer and those it may offer if the need arises."  *See* FED. R. CIV. P. 26(a)(3)(A)(iii).

As explained further below, Boshea's failure to supplement Ms. Eisenberg's report with the charts and analyses that she prepared clearly violates Rules 26(a)(2)(B) and Rule 26(e) of the Federal Rules of Civil Procedure and constitutes misconduct that warrants granting Compass Marketing relief from the judgment that has been entered.  And, as explained below, Boshea's ambush in the second trial clearly prejudiced Compass Marketing in its defense against Boshea's breach of written contract claim.  Accordingly, Compass Marketing is entitled to relief under Rule 60(b)(3) from the judgment entered by the Court.

### C.    Boshea's Actions Constitute Misconduct Pursuant to Rule 60(b)(3)

In order to prevail on a Rule 60(b)(3) motion, "the moving party must prove misconduct by clear and convincing evidence."  *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994).  Boshea's failure to disclose the additional charts and analyses Ms. Eisenberg prepared and relied on in her testimony clearly satisfies the misconduct element to grant relief under Rule 60(b)(3) (and it is compounded further by counsel's misleading statements regarding the failure to disclose).

In *Schultz v. Butcher*, the United States Court of Appeals for the Fourth Circuit held that a party's failure to produce requested, clearly pertinent discovery material was misconduct under Rule 60(b)(3), irrespective whether that failure was inadvertent or intentional. *See Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994) (citing *Stridiron v. Stridiron*, 698 F.2d 204, 207, 19 V.I. 642 (3d Cir. 1983) (failure to produce discovery material can constitute Rule 60(b)(3) misconduct)); *Square Constr. Co. v. Wash. Metro. Area Transit Auth.*, 657 F.2d 68, 71 (4th Cir. 1981) (same). In *Schultz*, the plaintiff was injured while riding in a small boat that crossed the wake of a large vessel. *Id.* at 628. The plaintiff filed a civil lawsuit seeking damages against both the operator of the small boat and the operator of the large vessel. *Id.* During discovery, the plaintiff failed to disclose knowledge of a Coast Guard report in which an official had concluded that (1) there was no evidence that the large vessel had been speeding, and (2) the operator of the small boat likely caused the injuries. *Id.* at 629. Based on other evidence presented, the district court found that the large vessel's speed caused the plaintiff's injury. *Id.*

The district court in *Schultz* denied a motion under Rule 60(b)(3) filed by the operator of the large vessel, holding that the undisclosed document "would not have changed the court's finding as to the liability of [the defendants]." *Id.* at 630. The Fourth Circuit reversed, however, holding that the district court abused its discretion in denying the Rule 60(b)(3) motion and that a new trial was required. *Id.* at 632. In doing so, the Fourth Circuit held that the failure to produce the report constituted misconduct. *Id.* at 631. And, of particular import, the Fourth Circuit explained that the standard under Rule 60(b)(3) is not whether the evidence that was not disclosed would have altered the outcome of the case; rather, a far less onerous standard applies: "[w]hen wrongful secretion of discovery material makes it inequitable for the withholder to retain the benefit of the verdict, the aggrieved party should not be required to assemble a further showing."

10

*See Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994) (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 n.10 (1st Cir. 1988)).

The Fourth Circuit's application of this far less onerous standard has not changed in thirty years, as it recently vacated a final judgment under Rule 60(b)(3) in *Morgan v. Tincher*, 90 F.4th 172 (4th Cir. 2024), when it found that the defendant committed misconduct by failing to supplement his answers to interrogatories. In *Morgan*, the plaintiff sued the defendant, a police officer, for use of excessive force in violation of the Fourth Amendment, and a myriad of other state law claims. *See Morgan v. Tincher*, 90 F.4th 172, 174 (4th Cir. 2024). During discovery the plaintiff asked the defendant to disclose all other lawsuits in which the defendant was a named party. *See id.* at 175. The defendant had identified one prior lawsuit. *Id.* Two months before trial, however, the defendant was named in a separate lawsuit with similar factual allegations of excessive force, but the defendant (who was represented by the same counsel in both the disclosed prior lawsuit and the more recently filed lawsuit) failed to supplement his answers to interrogatories to include the new lawsuit. *See id.* After the jury returned a verdict for the defendant, the plaintiff filed a motion for relief from judgment and "asked for a new trial under Federal Rule of Civil Procedure 60(b), arguing in relevant part that he was entitled to relief under Rule 60(b)(3)." *See id.* at 177. The district court denied the motion, and the Fourth Circuit reversed.

The Fourth Circuit concluded that the plaintiff "established misconduct by clear and convincing evidence based on [the defendant's] failure to disclose evidence of the [new] lawsuit[]" because "the [plaintiff's] interrogatories and request for documents made clear that he was seeking disclosure of any lawsuit in which [the defendant] was a named party." *See id.* at 179. The Fourth Circuit further held that, under Rule 26(e), the defendant had an obligation to supplement his

11

discovery responses when the new lawsuit was filed, and his failure to do so constituted misconduct. *See id.* at 180.

Turning to the instant case, Ms. Eisenberg was presented as an expert witness under Rule 702 of the Federal Rules of Evidence. It cannot be disputed that Boshea had a duty to provide Ms. Eisenberg's charts and analyses, as well as any other opinions she planned to include in her testimony, to Compass Marketing prior to trial. *See* FED. R. CIV. P. 26(a)(2)(B)(i-iii). The failure to make this mandatory disclosure alone reflects misconduct that warrants relief from the judgment. Boshea's failure to disclose the charts and analyses and opinions Ms. Eisenberg relied on at the second trial is particularly egregious, as it represents a pattern of misconduct that began during the first trial when it was discovered during Ms. Eisenberg's testimony that she had prepared an entire second report that was never provided to Compass Marketing (for approximately two years) prior to the first trial. It is incomprehensible that a nearly identical event would occur during the second trial, but that is exactly what happened, as Boshea yet again failed to disclose relevant information regarding the bases for Ms. Eisenberg's expert's opinions. As the Court exclaimed upon witnessing the same shocking behavior in the second trial, "Is this déjà vu all over again?" *See* Exhibit 1 at 15:17.

But, it is even worse than it appears at first glance. Unlike the first trial, Boshea presented Ms. Eisenberg only as a rebuttal expert witness, meaning she would testify only after Compass Marketing's expert, Mr. Payne. This change in tactic seems to have been part of a strategy to limit Compass Marketing's ability to counter Ms. Eisenberg's undisclosed charts and analyses and other opinions she shared. In this regard, if Compass Marketing discovered the deceptive tactic of not disclosing the charts and analyses, which it ultimately did, Compass Marketing still would not have the ability to present contrary testimony by Mr. Payne or, alternatively, get the benefit of Mr.

Payne's input on how to more effectively cross-examine Ms. Eisenberg about the new charts and analyses and her opinions that should have been disclosed approximately nine months earlier when Boshea produced Ms. Eisenberg's December 2024 report.  The prejudice in this regard should be apparent and obvious.[5]

Even if Boshea inadvertently failed to supplement Ms. Eisenberg's report (it is hard to believe Boshea inadvertently failed to supplement Ms. Eisenberg's report for a second time, particularly in light of the circumstances described herein), it does not change the analysis or outcome.  *See Schultz*, 24 F.3d at 630 (holding "that an adverse party's failure, *either inadvertent or intentional*, to produce such obviously pertinent requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3)") (emphasis added).  As such, the misconduct element undeniably has been satisfied.

**D.     Compass Marketing Presented a Meritorious Defense and It Was Prevented from Fully Presenting Its Case**

The next two elements required under Rule 60(b)(3), namely, that the moving party must have a meritorious defense and that the misconduct prevented the moving party from fully presenting its case, are closely interrelated.

In analyzing these two elements, the question is not "whether the undisclosed material would have changed the outcome of the trial[,]" but, instead, "the proper inquiry under Rule 60(b)(3) is whether the judgment was 'unfairly procured' based on the withholding of discoverable

---

[5] The prejudice is compounded even further by the fact that Compass Marketing's counsel did not even hear Ms. Eisenberg's testimony regarding the new charts and analyses.  As was abundantly clear to any observer in the courtroom, including the jury, both of Compass Marketing's counsel were trying desperately to locate the charts and analyses that Boshea's counsel repeatedly represented (falsely) it had disclosed to Compass Marketing.  This frantic search is even captured on the record in that Compass Marketing's counsel made at least four  requests (at least some from counsel's table) to identify where the charts and analyses were located in the December 2024 report.  *See* Exhibit 1 at 10:25-11:10, 14:3-11, 15:5-7, 15:12.  Thus, the failure to produce the expert materials – and then misrepresent that they were produced – had a secondary effect of not allowing Compass Marketing's counsel even to comprehend Ms. Eisenberg's testimony and try to develop an effective plan to try to cross-examine Ms. Eisenberg on these new charts and analyses.

material[.]" *Morgan v. Tincher*, 90 F.4th 172, 180 (4th Cir. 2024) (quoting *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994)). In other words, "[w]hen wrongful secretion of discovery material makes it inequitable for the withholder to retain the benefit of the verdict, the aggrieved party should not be required to assemble a further showing." *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994) (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 n.10 (1st Cir. 1988)).

Compass Marketing clearly meets both elements. First, as to whether Compass Marketing had a meritorious defense, the Court can simply look at the outcome of the first trial regarding the written contract claim. In the first trial, Compass Marketing demonstrated that its defense – that John White's signature on the agreement had been forged – was meritorious, as the jury returned a verdict in favor of Compass Marketing on the breach of written contract claim and found in favor of Boshea only on the belated breach of oral contract claim (the claim that Compass Marketing did not have the opportunity to defend against in light of the late amendment), even though the jury could have returned a verdict for Boshea on both the written and oral contract claims based on the construct of the verdict sheet. Clearly, Compass Marketing presented a meritorious defense.

Moreover, the defense goes to the very formation of the contract itself: if the signature on the written agreement was forged, no enforceable written contract ever existed. That strikes at the heart of Boshea's claims and indisputably qualifies as a meritorious defense. The fact that two different juries reached opposite conclusions further underscores that Compass Marketing's defense is both substantive and significant.

Second, Boshea's misconduct prevented Compass Marketing from fully presenting its case because it was unable to rebut the opinion testimony of Ms. Eisenberg that it was not aware existed until she was testifying at trial. As explained above, unlike the first trial, Boshea presented Ms. Eisenberg only as a rebuttal expert witness, meaning she would testify only after Compass

14

Marketing's expert, Mr. Payne. This change in tactic seems to have been part of a strategy to limit Compass Marketing's ability to counter Ms. Eisenberg's undisclosed charts and analyses, as Compass Marketing did not have the ability to present contrary testimony from Mr. Payne or, alternatively, get the benefit of input from Mr. Payne on how to more effectively cross-examine Ms. Eisenberg about the new charts and analyses she testified about during her direct examination.[6] Again, Compass Marketing is not required to show that the undisclosed evidence would have altered the result of the trial. *See Schultz v. Butche*r, 24 F.3d 626, 631 (4th Cir. 1994). Rather, Compass Marketing must only show that it is inequitable for Boshea, who withheld pertinent evidence that was required to be disclosed, to retain the benefit of the verdict. *See id.*

The significant prejudice to Compass Marketing's defense can be illustrated even further by examining some of the details from Mr. Eisenberg's testimony. For example, Ms. Eisenberg's testimony in the second trial began with a discussion of "peak formations" and she improperly utilized the undisclosed charts and analyses to illustrate this concept. *See* Exhibit 1 (Trial Testimony of D. Eisenberg) at 11:16-13:25. Even more problematic is the fact that Ms. Eisenberg's December 2024 report – the report disclosed to Compass Marketing – does not make a single reference to "peak formations." *See* Exhibit 2 (D. Eisenberg Report). Thus, Ms. Eisenberg's trial testimony about "peak formations" clearly violated Rule 26(a)(2) because Compass Marketing was entitled to receive "a *complete statement of all opinions the witness will express* and the basis and reasons for them." *See* FED. R. CIV. P. 26(a)(2)(B)(i) (emphasis added). Ms. Eisenberg's testimony regarding "peak formations" was then used as the basis for her to try to discredit Mr. Payne's testimony. *See* Exhibit 1 at 13:15-25. The prejudice from this ambush testimony was compounded even further by the fact that Mr. Payne had already finished testifying by the time

---

[6] *See* footnote 5, *supra*.

Ms. Eisenberg revealed her new theories and, because her new theory had not been disclosed in Ms. Eisenberg's report, Mr. Payne did not have the opportunity to address it in his testimony, thereby limiting Compass Marketing's defense.

While it is impossible to determine with any degree of precision how much Ms. Eisenberg's testimony impacted the jury's decision, anecdotally and off the record, both Boshea's counsel and this Court acknowledged that Ms. Eisenberg's testimony at the second trial appeared stronger than her testimony at the first trial. One can certainly infer that this is at least in part due to the fact that Boshea undertook efforts to insulate Ms. Eisenberg as much as possible from Mr. Payne's responses to her testimony. Indeed, it cannot be coincidence that Boshea – not once, but twice – sandbagged Compass Marketing with surprise testimony from Ms. Eisenberg. One can certainly infer that these repeated surprises were driven at least in part by a desire to derive some unfair advantage to limit the effectiveness of Mr. Payne (who is clearly regarded as one of the leading experts in the field of forensic document examination) by depriving Mr. Payne the opportunity to know all of Ms. Eisenberg's analyses and opinions. Simply put, Compass Marketing was prohibited from fully presenting its case due to the misconduct of Boshea and his counsel. Therefore, all three elements under Rule 60(b)(3) of the Federal Rules of Civil Procedure are satisfied.

### E.     Relief from the Judgment is Warranted to Ensure the Fairness and Integrity of the Fact Finding Process

After concluding the three elements have been satisfied, "'the court must balance the competing policies favoring the finality of judgments and justice being done in view of all the facts, to determine within its discretion, whether relief is appropriate in each case.'" *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994) (quoting *Square Constr. Co. v. Wash. Metro. Area Transit Auth.*, 657 F.2d 68, 71 (4th Cir. 1981)). This balance tips in favor of Compass Marketing because,

as the Fourth Circuit acknowledged in *Schultz*, "the fairness and integrity of the fact finding process is of greater concern" than the "finality of judgments." *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994). Indeed, a party's failure to produce a document that is clearly a critical part of that party's case, and which it was required to produce, impedes the fairness and integrity of the fact-finding process, thereby requiring redress in the form of a new trial. *See id.* at 631. Therefore, pursuant to Rule 60(b)(3) of the Federal Rules of Civil Procedure, this Court should vacate the judgment entered against Compass Marketing.

## II.     A NEW TRIAL IS WARRANTED PURSUANT TO RULE 59(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE

### A.     Standard for a Motion for New Trial Under Rule 59(a) of the Federal Rules of Civil Procedure

Upon motion, Federal Rule of Civil Procedure 59 permits a court to "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). The Fourth Circuit has interpreted Rule 59 to require district courts to "'set aside the verdict and grant a new trial' where '(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" *Doe v. Fairfax Cty. Sch. Bd.*, 1 F.4th 257, 268 (4th Cir. 2021) (quoting *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014)). "A new trial is warranted when the 'erroneous inclusion or exclusion of evidence in the underlying proceeding prejudices a party's right to a fair trial.'" *Tevra Brands LLC v. Bayer Healthcare LLC*, No. 19-cv-04312-BLF, 2025 U.S. Dist. LEXIS 10649, at *4 (N.D. Cal. Jan. 21, 2025) (quoting *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1189 (9th Cir. 2005)).

As set forth above, Boshea's failure to disclose Ms. Eisenberg's supplemental charts and analyses, and the misleading statements made by counsel regarding their production, resulted in Compass Marketing being ambushed at trial and deprived of a meaningful opportunity to respond to Ms. Eisenberg's undisclosed charts, analyses, and theories, all of which she was able to testify about unchallenged at trial.  The undisclosed materials formed the basis of critical testimony presented to the jury, and their improper introduction constituted both the admission of evidence that was never produced in discovery and testimony grounded in falsehoods regarding its disclosure.  This misconduct not only prejudiced Compass Marketing's ability to fairly defend against Ms. Eisenberg's opinions, but it also resulted in a proceeding infected by surprise and false evidence, thereby producing a miscarriage of justice.  Under these circumstances, the jury's verdict cannot stand, and a new trial is required.

## CONCLUSION

For the foregoing reasons, the Court should vacate the judgment entered against Compass Marketing pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, or, in the alternative, grant a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure.

Dated:  September 10, 2025

Respectfully submitted,

*/s/Stephen B. Stern*
Stephen B. Stern, Bar No.: 25335
Shannon M. Hayden, Bar No.: 30380
KAGAN STERN MARINELLO & BEARD, LLC
238 West Street
Annapolis, Maryland 21401
(Phone): (410) 216-7900
(Fax):  (410) 705-0836
Email:  stern@kaganstern.com
Email:  hayden@kaganstern.com

*Counsel for Defendant*
*Compass Marketing, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of September, 2025, the foregoing Motion for a New Trial, or, in the Alternative, Motion for Relief from a Judgment was served via the CM/ECF system on the following counsel of record:

Thomas J. Gagliardo
Gilbert Employment Law, PC
1100 Wayne Avenue, Suite 900
Silver Spring, Maryland 20910
Email:  tgagliardo@gelawyer.com

Gregory J. Jordan
Mark Zito
Jordan & Zito, LLC
350 N. LaSalle Drive, Suite 1100
Chicago, Illinois 60654
Email:  gjordan@jz-llc.com

*Attorneys for Plaintiff*
*David Boshea*

*/s/ Stephen B. Stern*
Stephen B. Stern

19

# EXHIBIT 1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2                      NORTHERN DIVISION

3    ASHLEY BOSHEA,             )
     Administrator of the       )
4    Estate of David John       )
     Boshea, Deceased,          )  CASE NUMBER: 1:21-cv-00309-ELH
5         Plaintiff,            )      Excerpt of Proceedings
                                )    Testimony of Donna Eisenberg
6         v.                    )
                                )
7    COMPASS MARKETING, INC., )
     et al,                     )
8         Defendants.           )
     _____)
9

10        EXCERPT OF TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
             BEFORE THE HONORABLE ELLEN L. HOLLANDER
11                 UNITED STATES DISTRICT JUDGE
                    Wednesday, August 6, 2025
12                         Courtroom 5B

13                  A P P E A R A N C E S

14   FOR THE PLAINTIFF:
          BY: GREGORY J. JORDAN, ESQUIRE
15             JORDAN & ZITO, LLC
               350 North LaSalle Street, Suite 700
16             Chicago, Illinois  60654

17        BY: THOMAS J. GAGLIARDO, ESQUIRE
               GILBERT EMPLOYMENT LAW, P.C.
18             Suite 900
               8403 Colesville Road, Suite 1000
19             Silver Spring, Maryland  20910

20   FOR THE DEFENDANT:
          BY: STEPHEN STERN, ESQUIRE
21             SHANNON HAYDEN, ESQUIRE
               KAGAN, STERN, MARINELLO & BEARD, LLC
22             238 West Street
               Annapolis, Maryland  21401

23   Also Present:
     Noah Wolf, Paralegal
24   Ryan Oswald, Paralegal

25   _____
          ***Proceedings Recorded by Mechanical Stenography***
          Transcript Produced by Computer-Aided Transcription
```

1    Q.    What is the simulation?

2    A.    A simulation is when someone tries to duplicate, forge

3    someone else's signature.

4    Q.    When you say "of course not," what do you mean?  If I

5    just give you a signature and you look at it you can't tell

6    whether it's a simulation/forgery or not?

7    A.    No, because I would have no idea how that person

8    naturally writes so it's impossible to make such an

9    assessment.

10   Q.    Okay.  And what materials did you review related to this

11   particular engagement?

12   A.    There was a questioned signature on an agreement and then

13   I worked with 31 known samples of the suspect writer's

14   signature.

15   Q.    Okay.  And let's see if we can't -- now take a look at

16   the first chart, chart number one which relates -- Noah, can

17   you put that up, please?

18          **THE COURTROOM DEPUTY:**  What's the exhibit number,

19   Counsel?

20          **MR. JORDAN:**  I'm sorry?

21          **THE COURTROOM DEPUTY:**  What's the exhibit number?

22          **MR. JORDAN:**  It's not an exhibit.  We are using this

23   as a demonstrative just like they did with the chart so that

24   we're not putting this into evidence.

25          **MR. STERN:**  Can you clarify which page of the report

1    we're looking at?

2                MR. JORDAN:   This is a part of her rebuttal report.

3                MR. GAGLIARDO:   Page 1 it says.

4                MR. STERN:   Page 1 of what?

5                MR. GAGLIARDO:   Looking on the screen it says page

6    1.

7                MR. JORDAN:   This was a report that I delivered to

8    you on December 23rd last year.

9                MR. STERN:   I know.  I've got the hardcopy, but I'm

10   not seeing this.

11               MR. JORDAN:   Okay, if you can just look on the

12   screen, Stephen.

13   BY MR. JORDAN:

14   Q.   Anyway --

15               MR. GAGLIARDO:   Hang on one sec.

16   BY MR. JORDAN:

17   Q.   Can you tell me what this first chart, it says variation,

18   peak formation.  Exhibit Q1.  What is exhibit Q1?

19   A.   Q1 is the questioned signature that I was asked to

20   determine if it was authentic or not.

21   Q.   Okay.  And then there are a series of signatures below

22   that.  Relating to peak formations, can you kind of explain to

23   the jury your view on the peak formations here?

24   A.   Yes.  So the blue background is the questioned signature.

25   The green background on these charts are the known signatures,

1    the known samples.  And one of -- so what I did was I looked

2    at the known writing to determine what is in common among them

3    to determine what we call individual characteristics.  So

4    those are features that are in the handwriting of the

5    signature of Mr. White and determine -- so I look at those and

6    then I look at the questioned and say, do those features that

7    are in the known, are they duplicated within the questioned

8    signature.

9         And in this particular chart what you see is -- now

10   understand that this is an illegible signature, so I'm going

11   to say what it should be.  So the red arrow is pointing to the

12   peak of what is, in theory, the left side of a W.  And that

13   feature which is peaked is pointed and it's tented.  Tented

14   means it's not retraced.

15        So if you look at K1, that signature has the same

16   formation.  It's peaked and it's not retraced.  Same in K2.

17   It's peaked and it's not retraced.

18              **THE COURT:**  How do you know that it's not retraced?

19              **THE WITNESS:**  Because there's a space in between.

20   So the pen is coming up and then it's coming down, but it's

21   tented.  So if it was retraced, it would come up and go down

22   in the exact same spot.  And you can see that formation what

23   you're asking about, Judge, in K13, the bottom right.  That

24   one is retraced.

25   **BY MR. JORDAN:**

1    Q.    So that was John White's actual signature.  All of the

2    ones in green are exemplars that were brought in to us by

3    Compass as true signatures of John White; is that right?

4    A.    Exactly.  Yes, sir.

5    Q.    And you're saying which one is the one that is retraced

6    by John White?

7    A.    13 is retraced; 7, K7 is also retraced; and K5 is

8    retraced.  So there's a lot of variation in how he forms this

9    character.

10   Q.    So if Compass' expert said that this peak formation was

11   not reflected in -- I think he said he looked at 50, but his

12   report seemed to focus on 19.  But even of the 50 I think he

13   said that this peak formation did not appear.  Do you agree or

14   disagree?

15   A.    I completely disagree.  I reviewed Mr. Payne's report and

16   he was very selective; cherry-picking is what we call it.  So

17   he found what he called differences and he found -- and he

18   showed examples in his report of those differences, but he

19   didn't utilize all of the evidence.  And if he had, he would

20   have found -- everything that he talked about as a difference

21   was also included in all of the knowns.  Not every single one,

22   but you look at all of them and you determine did the

23   questioned signature fall within the range of variation

24   exhibited within the known writing.  And it did.  And he chose

25   to ignore those.

1    Q.    Okay.  Can you put up the chart 2, please?  I'm sorry.

2    Yeah, chart 2.

3              MR. STERN:  Could we get clarification where this is

4    coming from?  Because we don't have this in our exhibits.

5              MR. JORDAN:  This is the rebuttal report that I

6    delivered to you on December 23, 2024.

7              MR. STERN:  So looking at it I don't see that right

8    now.  I'm not seeing where it is.

9              MR. JORDAN:  It's on the screen.

10             MR. STERN:  I'm looking at that report right now and

11   I don't see it.

12             THE COURT:  So can you explain, Mr. Jordan?  He

13   doesn't seem to have it.

14             MR. JORDAN:  He has it.

15             MR. STERN:  There's an electronic copy too.

16             MR. JORDAN:  He has it.  I gave it to him on

17   December 23rd.

18             MR. STERN:  We're not --

19             THE COURT:  One at a time.

20             MR. JORDAN:  Before I came up here at lunchtime I

21   said I want to make sure there's not an issue this time.  I

22   sent the rebuttal report on December 23rd.  I'll tell you what

23   I'll do.  I will email it to you right now.

24             MR. STERN:  I'm just saying --

25             MR. JORDAN:  I'm forwarding the email that I sent to

1     you.

2            **MR. STERN:**  I'm looking at the report that's dated

3     December 2024 and I don't see it in there.

4            **THE COURT:**  Do you want to come up?

5            **MR. STERN:**  Can we get a page number?  We're

6     looking.  We can't find it.  He did send us something back in

7     December 2024.  I'm not disputing that.

8            **THE COURT:**  So he's saying you did send him

9     something, but he doesn't think this was part of it.

10           **MR. STERN:**  I'm sorry.  I just want to get

11    clarification on it.

12           **MS. HAYDEN:**  I just need the page number.

13           **MR. JORDAN:**  All right, I just re-emailed you.

14           **THE COURT:**  Come up, Counsel.  The jury doesn't need

15    to hear all of this.

16           **(Counsel approached the bench.)**

17           **THE COURT:**  Is this déjà vu all over again?

18           **MR. JORDAN:**  I'm hoping not.

19           **THE COURT:**  Just so everybody knows what I'm talking

20    about, that was the first trial where there was something not

21    produced.

22           **MR. STERN:**  Mr. Jordan, in December of 2024, did

23    email me the report.  That's not in dispute.  I just can't

24    find this page that they've been testifying off of in the

25    hardcopy of it and Ms. Hayden couldn't find it electronically

 1      either.  So are we looking at the wrong thing?

 2                MR. JORDAN:  I just forwarded it to them, both of

 3      them.

 4                THE COURT:  Well, can you establish that it was part

 5      of your original email in December of 2024?

 6                MR. JORDAN:  Yes; sure.

 7                MR. STERN:  I just don't know if I'm looking at the

 8      wrong document.

 9                THE COURT:  Then why would it be that the one

10      document that he's asking about is the one you don't have?  I

11      am revisiting my life, it seems.

12                MR. STERN:  I've raised this very reluctantly, Your

13      Honor.  I just --

14                MR. JORDAN:  Here is my email.  And then pages 6, 7,

15      8, 9, 10, 11 and 12.

16                MR. STERN:  I see all of those.  And I --

17                MS. HAYDEN:  The actual chart that you're showing is

18      not in this email.  I just -- I don't know.  I was just trying

19      to find it.

20                MR. JORDAN:  Okay.  Ms. Eisenberg emailed me these

21      charts again today.

22                MR. GAGLIARDO:  This is it.

23                MS. HAYDEN:  His is different.  I just want to be

24      sure --

25                MR. JORDAN:  She's going through and it appears to

1    those.  That's why I was asking, was I looking at the wrong

2    page.

3            MR. JORDAN:  I sent two sets of charts to Noah

4    today.

5            MS. HAYDEN:  Do the charts exist separate and apart

6    from the report?

7            MR. JORDAN:  No.

8            MS. HAYDEN:  No?

9            MR. JORDAN:  She sent these to me this morning.

10           THE COURT:  This morning doesn't count.

11           MR. STERN:  Yeah.  At first I thought it was my

12    mistake.  I'm starting to think it may be déjà vu, I don't

13    know.

14           THE COURT:  Hard to believe we could have the same

15    issue this time around that we had the first time around.

16           MS. HAYDEN:  He just emailed the charts.

17           MR. STERN:  Well, let's see what comes in and try to

18    figure out what the discrepancy is.

19           THE COURT:  Okay, well I want to make sure they're

20    here.

21           MR. JORDAN:  It was emailed to you, the email I got

22    from him this morning.

23           MR. STERN:  I do want to be clear these are charts

24    that came in this morning.  That doesn't seem part of the

25    December 2024 report.  Mr. Jordan said he sent us a report in

1    assumed that that's what it was, it was just redacted.  Here

2    is the chart, and there's no analysis on it --

3              THE COURT:  Can we get going then?

4              MR. STERN:  No, we still don't have them.  Are they

5    in the report?

6              MS. HAYDEN:  I don't think so.  I do not see them.

7              MR. STERN:  I mean, that's -- we may object to just

8    the discussion of these reports.  I want the comparison.

9              THE COURT:  How is this possible, Mr. Jordan?

10             MR. JORDAN:   What's that?

11             THE COURT:  How is it possible that you would have

12   the same mistake this time as last time?  Can you show me you

13   gave him this document?

14             MR. JORDAN:  This is the same charts.

15             MR. STERN:  But I'm asking --

16             MR. JORDAN:  I sent it to Ms. Hayden --

17             MR. STERN:  No.  Show me in the December 2024 report

18   where so I can -- look, I assumed that -- I had doubts I was

19   wrong.

20             THE COURT:  Is there anything different about this

21   though than anything else we've seen already?

22             MR. STERN:  I don't know.  This is -- what I'm

23   concerned about is this is new.

24             MR. JORDAN:  I can send you -- I'll ask her on the

25   record, are these the same charts included in your December

```
1    report?  Which my understanding is they are.
2              MR. STERN:  The page references so I can see it.
3              MR. JORDAN:  I'll ask her to identify the page
4    number.
5              MR. STERN:  I'm not saying -- that's why I said this
6    most reluctantly.
7              THE COURT:  You're saying this was in the December
8    report, but you're saying you didn't have them in the December
9    report so how does that help?
10             MR. JORDAN:  I gave her -- I emailed him December
11   23rd.
12             THE COURT:  But he's saying he didn't get these.
13             MR. STERN:  She's saying they're in the December
14   report.  I want to reference the page numbers so I can look at
15   them and confirm that's correct.  Right now everything that
16   I'm seeing -- and maybe I'm just being dense and if I am this
17   is very embarrassing, but I don't see them and I just want a
18   confirmation that they're in there, that's all.
19             MR. GAGLIARDO:  Stephen, can we see what you
20   actually had?
21             THE COURT:  Yes.  That's what he's saying.  He
22   doesn't see it.
23             MR. STERN:  Here it is.  And Shannon also went
24   through it electronically.
25             THE COURT:  We are going to really frustrate this
```

# EXHIBIT 2


# DONNA O. EISENBERG
## FORENSIC DOCUMENT EXAMINATION SERVICES

December 20, 2024

Gregory J. Jordan, Esquire
Jordan & Zito, LLC
350 North LaSalle Street, Suite 1100
Chicago, IL 60654
312-543-7354
gjordan@jz-llc.com

Re:   *David Boshea v. Compass Marketing, Inc.*
      Case No. 1:21-CV-00309-ELH

Mr. Jordan:

Enclosed is a binder containing my forensic handwriting report with attachments.

Also enclosed is a copy of my Invoice for services rendered to date.

Please contact me at your convenience regarding any additional assistance I may provide.

Cordially,

Donna O. Eisenberg, President
Forensic Document Examination Services, LLC

www.donnaeisenberg.com

tel. 240-731-7737
email donna@donnaeisenberg.com
address 6 China Rose Court, Rockville, MD 20850

# Forensic Document Examination Services, LLC
## Invoice #5

**Invoice Date** | 20-Dec-24
**Matter Name** | Boshea v. Compass Marketing, Inc.

| Date | Description of Services | Hours/Costs | Rate | Amount |
|------|------------------------|-------------|------|--------|
| 11/24/24 | Telephone communication with Attorney Jordan regarding re-trial of case | 0.25 | $400.00 | $100.00 |
| 11/27/24 | Review, scan, and chart all signatures (previously and newly submitted evidence) | 1.25 | $400.00 | $500.00 |
| 12/15/24 | Download additional known evidence; review all known material and assemble previous and new evidence into charts | 1.75 | $400.00 | $700.00 |
| 12/16/24 | Preparation of charts; comparative handwriting examination | 3.25 | $400.00 | $1,300.00 |
| 12/17/24 | Comparative handwriting examination | 2.25 | $400.00 | $900.00 |
| 12/18/24 | Preparation of forensic handwriting report | 4.00 | $400.00 | $1,600.00 |
| 12/19/24 | Preparation of forensic handwriting report; assemble binder | 3.75 | $400.00 | $1,500.00 |
| 02/19/24 | FedEx Delivery | 1.00 | $28.16 | $28.16 |

| | | | Total | $6,628.16 |
|--|--|--|-------|-----------|

| Date | Amount Paid | | | |
|------|-------------|--|--|--|
| | | | | |
| | | | Amount Due | $6,628.16 |

# Transaction Record



| TRACKING NO.: | SHIP DATE: | ESTIMATED SHIPPING CHARGES: |
|---|---|---|
| 770915624614 | Dec 19, 2024 | 28.16 USD |

## From address

**Donna Eisenberg**
Donna Eisenberg
6 China Rose Court
20850 MD Rockville
US
Phone: 2407317737
donna@donnaeisenberg.com

## To address

**Greg Jordan, Esquire**
Jordan & Zito, LLC
350 North La Salle Street
Suite 1100
60654 IL Chicago
US
Phone: 3128547181
gjordan@jz-llc.com

## Package information

| Pieces | Weight | Dimensions (LxWxH) | Carriage value | Package options |
|---|---|---|---|---|
| 1 x | 1.00 lb | | | n/a |

| Packaging type: | Service: | Pickup / drop-off type: |
|---|---|---|
| FedEx Envelope | FedEx 2Day | I'll drop off my shipment at a FedEx location |

## Billing information

| Bill transportation cost to: | ******901 | P.O. No.: | |
|---|---|---|---|
| Bill duties, taxes and fees to: | | Invoice No.: | |
| Your reference: | Jordan-Boshea | Department No.: | |

**Please note:** This transaction record is neither a statement nor an invoice, and does not confirm shipment tendered to FedEx or payment. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details. The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

# Forensic Handwriting Report

# DONNA O. EISENBERG
## FORENSIC DOCUMENT EXAMINATION SERVICES

December 20, 2024

Gregory J. Jordan, Esquire
Jordan & Zito, LLC
350 North LaSalle Street, Suite 1100
Chicago, IL 60654
312-543-7354
gjordan@jz-llc.com

Re:   *David Boshea v. Compass Marketing, Inc.*
      Case No. 1:21-CV-00309-ELH

Mr. Jordan:

Pursuant to your request on September 18, 2024, I conducted a forensic handwriting examination comparing the one questioned signature of John D. White (hereinafter referred to as "Mr. White"), described below as Exhibit Q1, with the thirty-one known signatures of Mr. White, described below as Exhibits K1 through K17, to determine whether Mr. White signed the Exhibit Q1 document. Throughout this report, the letter "Q" denotes questioned evidence, and the letter "K" denotes known evidence.

## Questioned Document:

Exhibit Q1   Non-original "John D. White" signature on page 5 of Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment Competition purportedly signed June 2007

## Known Documents:

Exhibit K1   Non-original "John D. White" signature on page 4 of Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment Competition dated January 28, 2007

Exhibit K2   Non-original "John D. White" signature on page 4 of Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment dated February 6, 2007

www.donnaeisenberg.com

tel. 240-731-7737
email donna@donnaeisenberg.com
address 6 China Rose Court, Rockville, MD 20850

Exhibit K3      Non-original "John D. White" signature on page 4 of Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment Competition dated June 7, 2007

Exhibit K4      Non-original "John D. White" signature on page 4 of Compass Marketing, Inc. Agreement Relating to Employment and Post-Employment Competition dated August 1, 2007

Exhibit K5      Non-original "John D. White" signature on page 4 of Compass Marketing, Inc. Agreement Relating to Employment and Post Employment dated September 10, 2008

Exhibit K6      Non-original "John D. White" signature on page 3 of Compass Marketing, Inc. Agreement Relating to Employment and Post Employment dated February 24, 2010

Exhibit K7      Non-original "John D. White" signature on Compass Marketing, Inc. Bank Check no. 5253 dated August 2, 2011

Exhibit K8      Non-original "John D. White" signature on page 3 of Compass Marketing, Inc. Agreement Relating to Employment and Post Employment dated October 17, 2014

Exhibit K9      Non-original "John D. White" signature on page 5 of Compass Marketing, Inc. Agreement Relating to Employment and Post Employment dated June 15, 2016

Exhibit K10     Non-original "John D. White" signature on page 4 of Compass Marketing, Inc. Agreement Relating to Employment and Post Employment purportedly dated March 6, 2017

Exhibit K11     Non-original "John D. White" signature on Compass Marketing, Inc. Agreement Relating to Employment and Post Employment purportedly dated September 26, 2017

Exhibit K12     Non-original "John D. White" signature on Compass Marketing, Inc. Agreement Relating to Employment and Post Employment purportedly dated January 8, 2018

Exhibit K13     Non-original "John D. White" signature on Compass Marketing, Inc. Agreement Relating to Employment and Post Employment dated April 15, 2019

Exhibit K14    Two non-original "John D. White" signatures on Manufacturers and Traders
A and B        Trust Company Certified Banking Resolutions of Corporation undated

Exhibit K15    Five non-original "John D. White" signatures on blank sheet of paper undated
A thru E

Exhibit K16    Non-original "John D. White" signature on page 11 on Broker Agreement
               Between Wyeth LLC and Compass Marketing Agreement dated November 15,
               2012

Exhibit K17    Thirty non-original "John D. White" signatures on blank sheet of paper
A thru AD      undated

## Finding:

After conducting a forensic handwriting examination of the questioned Exhibit Q1 signature
with the known Exhibit K1 through K17 signatures, it is my opinion that **no conclusion** can
be reached regarding authorship of the Exhibit Q1 signature. An opinion of no conclusion is
proffered when there are limiting factors within the evidence, and the evidence affords
nothing upon which an opinion regarding the identification or elimination of the known writer
can be based.

The opinion in this report is derived from my education, knowledge, training, and experience
as applied to the handwriting characteristics present within the submitted evidence. In
conducting this comparative handwriting examination, I followed the Scientific Working Group
for Document Examination ("SWGDOC") protocols, and my stated opinion is in keeping within
the SWGDOC guidelines for expressing opinions. See https://www.swgdoc.org/ for all
SWGDOC standards and guidelines for the field of forensic document examination,[1] of which
the *Standard Terminology for Expressing Conclusions of Forensic Document Examiners* is
attached to this report. This examination and opinion also followed the Academy Standards
Board ("ASB")[2] guideline entitled *Standard for Examination of Handwritten Items* which is also
attached to this report (see https://www.aafs.org for ANSI/ASB Standard 070, First Edition
2022).

---

[1] *SWGDOC developed standards and guidelines for the field of forensic document examination in 1997. SWGDOC is comprised of private examiners and government examiners from local, state, and federal laboratories throughout the United States. These standards, published through the Organization of Scientific Area Committees for Forensic Science, strengthen the nation's use of forensic science by facilitating the development and promoting the use of high-quality, technically sound standards. The standards define minimum requirements, best practices, standard protocols, and other guidance to help ensure that the results of forensic analysis are reliable and reproducible.*

[2] *The ASB develops consensus- based forensic science standards within an American National Standards Institute accredited framework and provides training to support those standards. The ASB mission enhances the American Academy of Forensic Sciences to empower the forensic, criminal justice, and legal communities. ASB standards are based on and supersede SWGDOC standards.*

Case 1:21-cv-00309-ELH   Document 376-2   Filed 01/06/25   Page 40 of 147
FORENSIC DOCUMENT EXAMINATION SERVICES, LLC
December 20, 2024

Page **4** of 12

**Principles of Forensic Handwriting Examinations:**

No individual can produce a writing that is exactly the same on multiple occasions (i.e., with machine-like precision). Rather, every individual's handwriting will vary to some degree between writing acts. The degree of variation will depend upon the individual writer. That is, everyone's handwriting falls within a range of variation which is centered in his own basic handwriting habits and abilities. The term "range of variation" refers to the accumulation of deviations among repetitions of respective handwriting characteristics and are demonstrated within the writing habits of an individual. As shown in the attached *John D. White Signature Chart*, none of the known signatures written by Mr. White are identical to any other; that is, none can be superimposed upon any other to align perfectly, yet all were written by Mr. White in varying ways.

One example of variation in Mr. White's known signatures is demonstrated in the chart below which shows that each of the letters "J" in "John" follows a pattern of execution, yet none is the same as any other. The charted "J"'s are enlarged proportionally with one another.

| Exhibit K3 | Exhibit K6 | Exhibit K17D | Exhibit K17K |
|---|---|---|---|
|  | | | |

Another example of variation in Mr. White's signatures is found among the letters "D" which follow a pattern of execution yet are not the exact same as each other. The charted "D"'s are enlarged proportionally with one another.

| Exhibit K2 | Exhibit K5 | Exhibit K16 | Exhibit K17J |
|---|---|---|---|
| | | | |

No two individuals, taken at random, will ever share the exact same set of unique handwriting habits and characteristics. In other words, no two individuals will write exactly the same in all

Case 1:21-cv-00389-EH Document 33-2 Filed 01/06/25 Page 41 of 147

facets of handwriting. Rather, everyone will write within a specified range of variation that is unique unto themselves.

Forensic handwriting examinations are based upon comparisons of handwriting that are sufficient in quantity, quality, and comparability. That is, there must be an adequate amount of written material; the quality of the evidence must be sufficient to enable a detailed study of all aspects of the writing act; and the writings must be comparable; that is, they must share the same letters and letter combinations. In this case, the quantity and comparability of the questioned and known evidence are adequate, but the quality of the Exhibit Q1 signature is problematic and created challenges for this examiner. Specifically, the Exhibit Q1 signature reflects a uniformly broad and bold writing line which appears awkwardly written. The odd nature of this signature forced this examiner to focus on whether the true writer's (Mr. White) range of variation could remove him from writing his own name in the questioned document. It was determined that eliminating Mr. White was not possible because of Mr. White's broad range of variation when writing his name in combination with the many subtle handwriting habits in common between Exhibit Q1 and the known signatures. Some of those shared writing habits are set forth in the handwriting charts incorporated into this report.

Another reason it was not possible to eliminate Mr. White as the writer of his own name is because Exhibit Q1 could be a *self-simulation* which is defined as a writer signing his own name with the intent to later deny the signature. Intentionally changing one's signature often results in a drawn appearance rather than a naturally and rapidly executed signature. The success of all simulations is strengthened significantly when the original document is unavailable for examination because original documents permit a comprehensive assessment of signatures while reproductions like Exhibit Q1 do not. Further, it is seldom possible to identify the writer of a simulated signature because it is not written freely and naturally.

## Discussion:

The submitted questioned and known evidence have many subtle handwriting habits in common. These shared habits, combined with the odd nature of the Exhibit Q1 signature, support my finding that no conclusion can be reached regarding whether Mr. White wrote his own name or not.

The demonstrative charts incorporated into this report depict some of the individualizing handwriting characteristics found in common between the questioned and known signatures. In the charts, the blue background represents the questioned signature of Mr. White, and the green background represents his known/authentic signatures. All writings are enlarged proportionally for demonstrative purposes.

FORENSIC DOCUMENT EXAMINATION SERVICES, LLC

1. The handwriting term **Pen Lift** refers to an interruption in a writing stroke caused by the removal of the writing instrument from the writing surface. As shown in the known signatures in the chart below, Mr. White routinely picks his pen off the page at various locations when writing his name. This habitual pen lifting is also found in the Exhibit Q1 signature.

| Exhibit Q1 |  | | |
|---|---|---|---|
| Exhibit K10 |  |  | Exhibit K15B |
| Exhibit 15E |  |  | Exhibit K16 |
| Exhibit K17E |  |  | Exhibit K17J |

Case 1:21-cv-00309-ELH   Document 337-2   Filed 10/06/25   Page 43 of 147

2.  The handwriting term **Height Ratios** refers to the height of each letter relative to the height of every other letter. In the questioned signature, the height of the capital letter "J" in "John" is taller than the capital middle initial "D", and the next letter form, which is illegible, is taller than the "D" and shorter than the "J". This same height ratio relationship is repeated in the known signatures as denoted in the chart below.

| | | | |
|---|---|---|---|
| Exhibit Q1 |  | | |
| Exhibit K2 |  |  | Exhibit K5 |
| Exhibit K9 |  |  | Exhibit K13 |
| Exhibit K14A |  |  | Exhibit K16 |
| Exhibit K17D |  |  | Exhibit K17H |

3. The handwriting term *Letter Formation* refers to how a letter is written. In Exhibit Q1, three portions of the letter "J" in "John" will be discussed.

   a. First is the location of the beginning stroke which is located inside of where the downward terminal stroke of the letter is drawn.

| | | | |
|---|---|---|---|
| Exhibit Q1 |  | | |
| Exhibit K2 |  John D. White, CEO |  | Exhibit K15A |
| ExhibitK15C |  |  | Exhibit K15E |

   b. Second is the length and abrupt ending of the single line downward terminal stroke.

| | | | |
|---|---|---|---|
| Exhibit Q1 |  | | |
| Exhibit K1 | Date:  |  . Whi. CEO | Exhibit K11 |

c. Third is the pointed apex at the top of the letter form.

| | | | |
|---|---|---|---|
| Exhibit Q1 |  | | |
| Exhibit K1 |  |  | Exhibit K6 |
| Exhibit K7 |  |  | Exhibit K8 |
| Exhibit K11 |  |  | Exhibit K12 |
| Exhibit K17C |  |  | Exhibit K17X |

4. The handwriting term ***Attention to Baseline*** refers to the relationship of the handwriting relative to the drawn or imaginary line upon which the writing rests. In Exhibit Q1, the signature slants downward. This habit is also found among some of the known signatures as shown below.



5. Another example of **Letter Forms** is seen in the letters "te" in "White". While the "te" varies greatly in Mr. White's known signatures, the same formation of the "te" in Exhibit Q1 is repeated within the known signatures.

| Exhibit Q1 | | | |
|---|---|---|---|
| Exhibit K2 | | | Exhibit K16 |

Case 1:21-cv-00309-ELH Document 337-2 Filed 10/06/25 Page 47 of 147
FORENSIC DOCUMENT EXAMINATION SERVICES, INC.

December 20, 2024
Page **11** of **12**

6. The handwriting term ***Tremor*** refers to shaky, irregular handwriting movements. While tremor was observed in Mr. White's questioned signature, it was also found in the undisputed signature of Mr. Boshea on the very same document which raises questions about the reprographic process(es) of the Exhibit Q1 document itself.



| Exhibit Q1 | |
| Exhibit Q1 | |

**Opinion:**

As set forth in this report, the submitted evidence is insufficient to reach a conclusion regarding authorship. Therefore, no conclusion can be rendered regarding the authenticity of the Exhibit Q1 signature due to the restrictions imposed by the absence of the original evidence.

**Attachments:**

Attached to this Report are the following documents:

- Signature Chart depicting the Exhibit Q1 and K1 through K17 signatures;

- Copies of the Exhibit Q1 and K1 through K17 documents (note that only the first page and signature page of multi-page Exhibits are included);

- SWGDOC Standard for Expressing Conclusions of Forensic Document Examiners;

Case 1:21-cv-00389-ELH   Document 537-2   Filed 10/06/25   Page 48 of 147

- ASB Standard for Examination of Handwritten Items

- Curriculum Vitae

Please contact me at your convenience regarding any additional assistance I may provide.

Donna O. Eisenberg, President
Forensic Document Examination Services, LLC

# John D. White

# Signature Chart

## John D. White Signature Chart
### (Enlarged/Reduced Proportionally)

| | | | |
|---|---|---|---|
| Exhibit Q1<br>06/2007 |  |  | Exhibit K1<br>01/28/2007 |
| Exhibit K2<br>02/06/2007 |  |  | Exhibit K3<br>06/07/2007 |
| Exhibit K4<br>08/01/2007 |  |  | Exhibit K5<br>09/10/2008 |

Blue Background = Questioned Signatures / Green Background = Known Signatures

Page 1

## John D. White Signature Chart
### (Enlarged/Reduced Proportionally)

| | | |
|---|---|---|
| Exhibit K6<br>02/24/2010 | | Exhibit K7<br>08/02/2011 |
| Exhibit K8<br>10/17/2014 | | Exhibit K9<br>06/15/2016 |
| Exhibit K10<br>09/26/2017 | | Exhibit K11<br>09/26/2017 |

## John D. White Signature Chart
### (Enlarged/Reduced Proportionally)

| | | | |
|---|---|---|---|
| Exhibit K12<br>01/08/2018 |  |  | Exhibit K13<br>04/15/2019 |
| Exhibit K14A<br>Undated |  |  | Exhibit K14B<br>Undated |
| Exhibit K15A<br>Undated |  |  | Exhibit K15B<br>Undated |

**John D. White Signature Chart**
**(Enlarged/Reduced Proportionally)**

| | | | |
|---|---|---|---|
| Exhibit K15C<br>Undated |  |  | Exhibit K15D<br>Undated |
| Exhibit K15E<br>Undated |  |  | Exhibit K16<br>11/15/2012 |
| Exhibit K17A<br>Undated |  |  | Exhibit K17B<br>Undated |

**John D. White Signature Chart**
**(Enlarged/Reduced Proportionally)**

| | | | |
|---|---|---|---|
| Exhibit K17C<br>Undated | | | Exhibit K17D<br>Undated |
| Exhibit K17E<br>Undated | | | Exhibit K17F<br>Undated |
| Exhibit K17G<br>Undated | | | Exhibit K17H<br>undated |

## John D. White Signature Chart
### (Enlarged/Reduced Proportionally)

| | | | |
|---|---|---|---|
| Exhibit K17I<br>Undated | | | Exhibit K17J<br>Undated |
| Exhibit K17K<br>Undated | | | Exhibit K17L<br>Undated |
| Exhibit K17M<br>Undated | | | Exhibit K17N<br>Undated |

**John D. White Signature Chart**
**(Enlarged/Reduced Proportionally)**

| | | | |
|---|---|---|---|
| Exhibit K17O<br>Undated | | | Exhibit K17P<br>Undated |
| Exhibit K17Q<br>Undated | | | Exhibit K17R<br>Undated |
| Exhibit K17S<br>Undated | | | Exhibit K17T<br>Undated |

**John D. White Signature Chart**
**(Enlarged/Reduced Proportionally)**

| | | | |
|---|---|---|---|
| Exhibit K17U<br>Undated | | | Exhibit K17V<br>Undated |
| Exhibit K17W<br>Undated | | | Exhibit K17X<br>Undated |
| Exhibit K17Y<br>Undated | | | Exhibit K17Z<br>Undated |

**John D. White Signature Chart**
**(Enlarged/Reduced Proportionally)**

| Exhibit K17AA Undated |  |  | Exhibit K17AB Undated |
|---|---|---|---|
| Exhibit K17AC Undated |  |  | Exhibit K17AD undated |

# Exhibit Q1

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND

## POST-EMPLOYMENT COMPETITION

This Agreement is between the David John Boshea, residing at 4839 Clearwater LN. Naperville, IL. 60564  ("Employee") and COMPASS MARKETING, INC ("COMPASS"), having a place of business at 612 Third Street, Annapolis

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories:  food, health-beauty care, over the counter medicine, consumer products,  and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases: information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible. intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee, as a senior executive, will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS senior executives;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

WHEREAS, COMPASS will be vulnerable to unfair post-employment competition by Employee because Employee will have access to and knowledge of COMPASS's Proprietary Information, will have a personal relationship with COMPASS's clients, customers, suppliers and others, and will generate good will which Employee acknowledges belongs to COMPASS;

NOW, THEREFORE, in consideration of Employee's employment with COMPASS,  the severance benefit and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agrees to enter into this Agreement with COMPASS as a condition of employment pursuant to which COMPASS will limit Employee's rights, including, but not limited to, the right to compete against COMPASS, during and following termination of employment on the terms set forth in this Agreement. Intending to be legally bound, the parties agree as follows:

### ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:

Exhibit Q1

Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, policies or products, other than to comply with law.

## ARTICLE 2. NON-COMPETITION:

A.      Subject to Article 2.B. below, Employee, during Employee's period of employment with COMPASS, and for a period of three years following the voluntary or involuntary termination of employment, shall not, without COMPASS's written permission, which shall be granted or denied in COMPASS's sole discretion, directly or indirectly, associate with (including, but not limited to, association as a sole proprietor, owner, employer, partner, principal, investor, joint venturer, shareholder, associate, employee, member, consultant, contractor or otherwise), or acquire or maintain ownership interest in, any Business which is competitive with that conducted by or developed for later implementation by COMPASS at any time during the term of Employee's employment, provided, however, if Employee's employment is involuntarily terminated by COMPASS for any reason other than Cause (as defined herein) then the term of the non-competition provision set forth herein will be modified to be one year following such termination of employment. For purposes of this Agreement, "Business" shall be defined as a person, corporation, firm, LLC, partnership, joint venture or other entity. Nothing in the foregoing shall prevent Employee from investing in a Business that is or becomes publicly traded, if Employee's ownership is as a passive investor of less than 1 % of the outstanding publicly traded stock of the Business.

B.      The provision set forth in Article 2.A above, shall apply to (i) all fifty states, and (ii) each foreign country, possession or territory in which COMPASS may be engaged in, or have plans to engage in, business (x) during Employee's period of employment, or (y) in the case of a termination of employment, as of the effective date of such termination or at any time during the twenty-four month period prior thereto.

C.      Employee acknowledges that these restrictions are reasonable and necessary to protect the business interests of COMPASS, and that enforcement of the provisions set forth in this Article 2 will not unnecessarily or unreasonably impair Employee's ability to obtain other employment following the termination (voluntary or involuntary) of Employee's employment with COMPASS. Further, Employee acknowledges that the provisions set forth in this Article 2 shall apply if Employee's employment is involuntarily terminated by COMPASS for Cause; as a result of the elimination of employee's position for performance-related issues; or for any other reason or no reason at all.

D.

## ARTICLE 3. NON-SOLICITATION:

A.  During the period of Employee's employment with COMPASS and for a period of three years following the termination of Employee's employment, regardless of the reason for termination, Employee shall not, directly or indirectly: (i) induce or encourage any employee of COMPASS to leave the employ of COMPASS, (ii) hire any individual who is or was an employee of COMPASS, or (iii) induce or encourage any customer, client, potential client, supplier or other business relation of COMPASS to cease or reduce doing business with COMPASS or in any way interfere with the relationship between any such customer, client, supplier or other business relation and COMPASS.

B.      A "customer of COMPASS" shall be defined to mean the entities or businesses to whom COMPASS sells the product lines of its clients.

C.      A "client of COMPASS" shall be defined to mean the supplier of product lines to COMPASS, which product lines are sold by COMPASS to its customers.

D.      A "potential client of COMPASS" shall be defined to mean the supplier of product lines to COMPASS that COMPASS is actively negotiating with to represent as a future COMPASS client, during the period of Employee's employment.

## ARTICLE 4. DISCOVERIES' AND WORKS:

Exhibit Q1

Initial 

Employee hereby irrevocably assigns, transfers, and conveys to COMPASS to the maximum extent permitted by applicable law Employee's right, title and interest now or hereinafter acquired, in and to all Discoveries and Works (as defined below) created, invented, designed, developed, improved or contributed to by Employee, either alone or jointly with others, while employed by COMPASS and within the scope of Employee's employment and/or with the use of COMPASS's resources. The terms "Discoveries and Works" include all works of authorship, inventions, intellectual property, materials, documents. or other work product (including, without limitation, Proprietary Information, patents and patent applications, patentable inventions, research, reports, software, code, databases, systems, applications, presentations, textual works, graphics and audiovisual materials). Employee shall have the burden of proving that any materials or works created, invented, designed, developed, contributed to or improved by Employee that are implicated by or relevant to employment by COMPASS are not implicated by this provision. Employee agrees to (i) keep accurate records and promptly notify, make full disclosure to, and execute and deliver any documents and to take any further actions requested by COMPASS to assist it in validating, effectuating, maintaining, protecting, enforcing, perfecting, recording, patenting or registering any of its rights hereunder, and (ii) renounce any and all claims, including, without limitation, claims of ownership and royalty, with respect to all Discoveries and Works and all other property owned or licensed by COMPASS. Any Discoveries and Works that, within six months after the termination of Employee's employment with COMPASS, are made, disclosed, reduced to a tangible or written form or description, or are reduced to practice by Employee and which pertain to the business carried on or products or services being sold or developed by COMPASS at the time of such termination shall, as between Employee and COMPASS, be presumed to have been made during such employment with COMPASS. Employee acknowledges that, to the fullest extent permitted by law, all Discoveries and Works shall be deemed "works made for hire" under the Copyright Act of 1976, as amended, 17 U.S.C. Section 101. Employee hereby grants COMPASS a perpetual, nonexclusive, royalty-free, worldwide, assignable, sublicensable license under all rights and intellectual property rights (including patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) in any Works and Discoveries, for all purposes in connection with COMPASS's current and future business, that Employee has created, invented, designed, developed, improved or contributed to prior to Employee's employment with COMPASS that are relevant to or implicated by such employment ("Prior Works"). Any Prior Works are disclosed by Employee in Schedule 1.

## ARTICLE 5. REMEDIES:

Employee acknowledges that in the event of any violation by Employee of the provisions set forth in Articles 1, 2, 3 or 4 above, COMPASS will sustain serious, irreparable and substantial harm to its business, the extent of which will be difficult to determine and impossible to fully remedy by an action at law for money damages. Accordingly, Employee agrees that, in the event of such violation or threatened violation by Employee, COMPASS shall be entitled to an injunction before trial before any court of competent jurisdiction as a matter of course upon the posting of not more than a nominal bond, in addition to all such other legal and equitable remedies as may be available to COMPASS. If COMPASS is required to enforce the provisions set forth in Articles 2 and 3 above by seeking an injunction, Employee agrees that the relevant time periods set forth in Articles 2 and 3 shall commence with the entry of the injunction. Employee further agrees that, in the event any of the provisions of this Agreement are determined by a court at competent jurisdiction to be invalid, illegal, or for any reason unenforceable as written, such court shall substitute a valid provision which most closely approximates the intent and purpose of the invalid provision and which would be enforceable to the maximum extent permitted by law.

## ARTICLE 6. SEVERANCE:

A.      If Employee's employment is terminated by COMPASS for any reason other than Cause, Employee shall receive severance payments totaling $180,000 (one hundred and eighty thousand U.S. dollars) which will be divided up into twenty-four payments and will commence with the Employee's effective date of termination and shall be made in accordance with COMPASS's normal payroll cycle. The period during which Employee receives severance payments shall be referred to as the "Severance Pay Period." Severance will increase one month for every month employed to a maximum severance of $540,000.

B       There are no other post-employment benefits. Employee, however, shall have certain rights to continue the Medical Plan under COBRA.

C       Termination for "Cause shall be defined as termination of employment due to: (i) conviction of or entry of a plea of guilty or nolo contendere to any criminal charge (or any similar crime for purposes of laws outside the United States), (ii) fraud or dishonesty, (iii) failure to perform assigned duties, (iv) working against the best interests of COMPASS, or (v) the violation of any of the covenants set forth in Articles 1, 2, 3 and 4 above.

Initial 

Exhibit Q1

D.      If Employee is terminated by COMPASS for reasons other than Cause, Employee will receive the severance payments during the Severance Pay Period even if Employee commences other employment during such period provided such employment does not violate the terms of Article 1, 2, 3 and 4 of this Agreement.

E.      In addition to the remedies set forth in Article 5, COMPASS reserves the right to terminate all severance payments if Employee violates any covenants set forth in Articles 1, 2, 3 or 4 of this Agreement.

F.      Employee's receipt of severance under this Agreement is contingent on Employee's execution of a release in a form reasonably acceptable to COMPASS, except that such release shall not include any claims by Employee to enforce Employee's rights under, or with respect to, this Agreement or any COMPASS benefit plan pursuant to its terms, and that the employee not revoking the release prior to the expiration of the applicable Age Discrimination in Employment Act revocation period.

## ARTICLE 7. TERM OF EMPLOYMENT:

Employee acknowledges that COMPASS has the right to terminate Employee's employment at any time for any reason whatsoever, provided, however, that any termination by COMPASS for reasons other than Cause shall result in the severance described in Article 6 above, to become due in accordance with the terms of this Agreement subject to the conditions set forth in this Agreement. Employee further acknowledges that the severance payments provided by COMPASS are in full satisfaction of any obligations COMPASS may have resulting from COMPASS's exercise of its right to terminate Employee's employment, except for those obligations which are intended to survive termination such as the payments to be made pursuant to retirement plans, deferred compensation plans and conversion of insurance.

## ARTICLE 8. MISCELLANEOUS:

A.      As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B.      This Agreement shall supersede and substitute for any previous employment, post-employment or severance agreement between Employee and COMPASS.

C.      If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.      Employee shall not be required to mitigate damages or the amount of any payment provided for under this Agreement by seeking other employment or otherwise.

E.      In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.      The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.

G.      Employee expressly consents to the application of Article 8.F to any judicial action or proceeding arising out of or relating to this Agreement. COMPASS shall have the right to serve legal process upon Employee in any manner permitted bylaw. In addition, Employee irrevocably appoints the General Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of

Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H.    Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 8.F and hereby agrees not to plead or claim the same.

I.    Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.    At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.    Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.    Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF**, and intending to he legally bound, the parties hereto have caused this Agreement to be signed.

by COMPASS MARKETING, INC.                    by EMPLOYEE

Date:                                         Date:

/s/                                           /s/

John D. White, CEO                            David John Boshea

Exhibit Q1

Initial

## Schedule 1

### Prior Works*

---

\*      if no Prior Works are listed, Employee certifies that there are none.

Exhibit Q1

Initial

# Exhibit K1

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND

## POST-EMPLOYMENT COMPETITION

This Agreement is between the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to companies in the following categories: food, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee, as a senior executive, will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS senior executives;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

WHEREAS, COMPASS will be vulnerable to unfair post-employment competition by Employee because Employee will have access to and knowledge of COMPASS's Proprietary Information, will have a personal relationship with COMPASS's clients, customers, suppliers and others, and will generate good will which Employee acknowledges belongs to COMPASS;

NOW, THEREFORE, in consideration of Employee's employment with COMPASS, a one time cash payment of $1,000.00 (one thousand U.S. dollars), the severance benefit and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agrees to enter into this Agreement with COMPASS as a condition of employment pursuant to which COMPASS will limit Employee's right to compete against COMPASS during and following termination of employment on the terms set forth in this Agreement. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after

Initial _SMC_

CM 02'

Exhibit
K1

G.      Employee expressly consents to the application of Article 8.F to any judicial action or proceeding arising out of or relating to this Agreement. COMPASS shall have the right to serve legal process upon Employee in any manner permitted by law. In addition, Employee irrevocably appoints the General Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H.      Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 8.F and hereby agrees not to plead or claim the same.

I.      Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.      At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.      Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.      Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF**, and intending to be legally bound, the parties hereto have caused this Agreement to be signed.

by COMPASS MARKETING, INC.          by EMPLOYEE

Date: 1/28/07                        Date: 1/28/07

/s/ _____                  /s/ _____

John D. White, CEO                   Alisa Greenwood

CM 0222

**Exhibit K1**

# Exhibit K2

# COMPASS MARKETING, INC.

## AGREEMENT RELATING TO EMPLOYMENT AND POST-EMPLOYMENT

This Agreement is between the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee, as a senior executive, will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS senior executives;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

WHEREAS, COMPASS will be vulnerable to unfair employment and post-employment competition by Employee because Employee will have access to and knowledge of COMPASS's Proprietary Information, will have a personal relationship with COMPASS's clients, customers, suppliers and others, and will generate good will which Employee acknowledges belongs to COMPASS;

NOW, THEREFORE, in consideration of Employee's employment with COMPASS, a one time cash payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agrees to enter into this Agreement with COMPASS as a condition of employment pursuant to which COMPASS will limit Employee's rights during and following termination of employment on the terms set forth in this Agreement. Intending to be legally bound, the parties agree as follows:

### ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:

Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which

Initial _____

CM 0224

Exhibit K2

In addition, Employee irrevocably appoints the General Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H.  Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 6.F and hereby agrees not to plead or claim the same.

I.  Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.  At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

L.  Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

M.  Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, the parties hereto have caused this Agreement to be signed.


by COMPASS MARKETING, INC.                by EMPLOYEE

Date: 2/6/07                              Date: 2/8/07

/s/                                       /s/
John D. White, CEO                        Gary Panebianco

Initial

CM 0227

Exhibit
K2

# Exhibit K3

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND

## POST-EMPLOYMENT COMPETITION

This Agreement is between the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to consumer product companies in the following categories: food, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases: information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, John Greenwood ("Employee"), as a senior executive, will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS senior execitoves;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

WHEREAS, COMPASS will be vulnerable to unfair post-employment competition by Employee because Employee will have access to and knowledge of COMPASS's Proprietary Information, will have a personal relationship with COMPASS's clients, customers, suppliers and others, and will generate good will which Employee acknowledges belongs to COMPASS;

NOW, THEREFORE, in consideration of Employee's employment with COMPASS, a one time cash payment of $1,000.00 (one thousand U.S. dollars), the severance benefit and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agrees to enter into this Agreement with COMPASS as a condition of employment pursuant to which COMPASS will limit Employee's right to compete against COMPASS during and following termination of employment on the terms set forth in this Agreement. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been

Page 1 of 5

Initial

G.    Employee expressly consents to the application of Article 8.F to any judicial action or proceeding arising out of or relating to this Agreement. COMPASS shall have the right to serve legal process upon Employee in any manner permitted by law. In addition, Employee irrevocably appoints the General Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H.    Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 8.F and hereby agrees not to plead or claim the same.

I.    Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.    At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.    Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.    Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, the parties hereto have caused this Agreement to be signed.

by COMPASS MARKETING, INC.

Date:  6/7/07

/s/

John D. White, CEO

by EMPLOYEE

Date:  5 - 16-07

/s/  John Greenwood

John Greenwood

Page 4 of 5

Initial

Exhibit
K3

Exhibit K4

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND

## POST-EMPLOYMENT COMPETITION

This Agreement is between the John Mancini , ("Employee") residing at 108 Little Bridge Road, Hanover PA 17331and COMPASS MARKETING, INC ("COMPASS"), having a place of business at 612 Third Street, Annapolis MD 21403

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, health-beauty care, over the counter medicine, consumer products, and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee, as a senior executive, will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS senior executives;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

WHEREAS, COMPASS will be vulnerable to unfair post-employment competition by Employee because Employee will have access to and knowledge of COMPASS's Proprietary Information, will have a personal relationship with COMPASS's clients, customers, suppliers and others, and will generate good will which Employee acknowledges belongs to COMPASS;

NOW, THEREFORE, in consideration of Employee's employment with COMPASS,and for $1,000, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agrees to enter into this Agreement with COMPASS as a condition of employment pursuant to which COMPASS will limit Employee's rights, including, but not limited to, the right to compete against COMPASS, during and following termination of employment on the terms set forth in this Agreement. Intending to be legally bound, the parties agree as follows:

### ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:

CM 023

Exhibit
K4

agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.    Employee shall not be required to mitigate damages or the amount of any payment provided for under this Agreement by seeking other employment or otherwise.

E.    In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.    The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.

G.    Employee expressly consents to the application of Article 8.F to any judicial action or proceeding arising out of or relating to this Agreement. COMPASS shall have the right to serve legal process upon Employee in any manner permitted by law. In addition, Employee irrevocably appoints the General Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H.    Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 8.F and hereby agrees not to plead or claim the same.

I.    Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.    At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.    Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.    Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, the parties hereto have caused this Agreement to be signed.

by COMPASS MARKETING, INC.         by EMPLOYEE

Date: Aug 1, 2007         Date: July 20, 2007

/s/                 /s/

John D. White, CEO         John Mancini

Exhibit
K4

Exhibit K5

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT

This Agreement is between the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases: information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible. intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

NOW, THEREFORE, in consideration of a one time payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, whether or not, if paid by check, said check is cashed by Employee, Employee agrees to enter into this Agreement with COMPASS. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, employees, contractors, clients, customers, supplier, vendors, policies or products, other than to comply with law.

Date: 9/13/08

Initial: _____

CM 0238

Exhibit
K5

'L.     Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

IN WITNESS WHEREOF, and intending to he legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.                    by EMPLOYEE

Date: _____Sept 10, 2008_____                 Date: _____Sept 13, 2008_____

/s/ _____                 /s/ _____

John D. White, CEO                            Dayna Bernard

Page 4 of 5

Date: 9/13/08

Initial:

CM 0241

Exhibit
K5

# Exhibit K6

## COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT

This Agreement is between James Chip DiPaula, the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases: information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible. intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

NOW, THEREFORE, in consideration of a one time payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, whether or not, if paid by check, said check is cashed by Employee, Employee agrees to enter into this Agreement with COMPASS. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, employees, contractors, clients, customers, supplier, vendors, policies or products, other than to comply with law.

Page 1 of 4

Date: 2/24/10

Initial: 
CM 0243

Exhibit
K6

**ARTICLE 5. TERM OF EMPLOYMENT:** Employee acknowledges that COMPASS has the right to terminate Employee's employment at any time for any reason whatsoever.

**ARTICLE 6. MISCELLANEOUS:**

A.        As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B.        This Agreement shall supersede and substitute for any previous employment or post-employment agreements between Employee and COMPASS.

C.        If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.        Removed.

E.        In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.        The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.
G.

I.        Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law. withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.        At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.        Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.        Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF,** and intending to he legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.                    by EMPLOYEE

Date: _____                     Date: _2/24/2010_____

/s/ _____                       /s/ _____

John D. White, CEO

Date: 2/24/10

Initial:
CM 0245

**Exhibit
K6**

# Exhibit K7

COMPASS MARKETING  COMPASS MARKETING INC                MANUFACTURERS & TRADERS TR CO           5253
                   222 BEVERN AVE, SUITE 200                        7-11/820
                   ANNAPOLIS, MD 21403

                                                                                  08/02/2011

PAY TO THE
ORDER OF _____ Michael R White _____  $**119,239.00

One hundred nineteen thousand two hundred thirty-nine and 00/100********************************************** DOLLARS

        Michael R White
        39650 Hiawatha Circle
        Mechanicsville, MD  20659

MEMO    2010 Taxes $83118.00 Fed  $36121.00 state

   ⑆005253⑆  ⑆052000113⑆  97008124 3⑈

COMPASS MARKETING INC
        08/02/2011        Michael R White                                             5253
                                        2010 Taxes $83118.00 Fed  $36121.00 state          119,239.00

Checking - M&T Bank  2010 Taxes $83118.00 Fed  $36121.00 state                        119,239.00

        08/02/2011        Michael R White                                             5253
COMPASS MARKETING INC
                                        2010 Taxes $83118.00 Fed  $36121.00 state          119,239.00

Checking - M&T Bank  2010 Taxes $83118.00 Fed  $36121.00 state                        119,239.00

60595 (12/10)                       007851                               Rev 1910

**Exhibit
K7**

Exhibit K8

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT

This Agreement is between Alex McCord, the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

NOW, THEREFORE, in consideration of a one time payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, whether or not, if paid by check, said check is cashed by Employee, Employee agrees to enter into this Agreement with COMPASS. Intending to be legally bound, the parties agree as follows:

ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT: Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, employees, contractors, clients, customers, supplier, vendors, policies or products, other than to comply with law.

Date: 10/17/14

Initial: AJM

CM 0248

**Exhibit K8**

**ARTICLE 5. TERM OF EMPLOYMENT:** Employee acknowledges that COMPASS has the right to terminate Employee's employment at any time for any reason whatsoever.

**ARTICLE 6. MISCELLANEOUS:**

A.    As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B.    This Agreement shall supersede and substitute for any previous employment or post-employment agreements between Employee and COMPASS.

C.    If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.    Removed.

E.    In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.    The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.

G.    Removed.

I.    Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.    At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.    Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.    Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF,** and intending to be legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.

Date: _16/17/2014_

/s/ _____

John D. White, CEO

by EMPLOYEE

Date: _10/17/14_

/s/ _____

Page 3 of 4

Date: 10/17/14
Initial: AJM

Exhibit
K8

# Exhibit K9

**COMPASS MARKETING, INC**

**AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT**

This Agreement is between Jonathan Staples, the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

<u>RECITALS</u>

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases: information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible. intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which

Date: _____

Initials _____  CM 0292

Exhibit K9

Counsel of COMPASS MARKETING, Inc. (or any successor) as Employee's agent for service of legal process in connection with any such action or proceeding and Employee agrees that service of legal process upon such agent, who shall promptly advise Employee of any such service of legal process at the address of Employee then in the records of COMPASS, shall be deemed in every respect effective service of legal process upon Employee in any such action or proceeding.

H.   Employee hereby waives, to the fullest extent permitted by applicable law, any objection that Employee now or hereafter may have to personal jurisdiction or to the laying of venue of any action or proceeding brought in any court referenced in Article 8.F and hereby agrees not to plead or claim the same.

I.   Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.   At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.   Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.   Employee affirms that Employee has had the opportunity to seek the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF**, and intending to he legally bound, the parties hereto have caused this Agreement to be signed:

By **COMPASS MARKETING, INC.**          By **EMPLOYEE**

Date: ___6/15/16___                     Date: ___6/15/16___

/s/ _____                     /s/ _____

Date: 6/15/16

Initials: _____

**Exhibit K9**

# Exhibit K10

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT

This Agreement is between Jamie Nash, the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

NOW, THEREFORE, in consideration of a one time payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, whether or not, if paid by check, said check is cashed by Employee, Employee agrees to enter into this Agreement with COMPASS. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third

Page 1 of 5

Date: 3/6/2017

Initial: _____

CM 0258

Exhibit K10

Date: _____

/s/ _____

John D. White, CEO

Date: 3/6/2017 _____

/s/ Jamie Nash _____

Jamie Nash

Page 4 of 5

Date: 3/6/2017 _____

Initial: JN _____

# Exhibit K11

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT

This Agreement is between Kevin Van Deusen, the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

NOW, THEREFORE, in consideration of a one time payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, whether or not, if paid by check, said check is cashed by Employee, Employee agrees to enter into this Agreement with COMPASS, intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, employees, contractors, clients, customers, supplier, vendors, policies or products, other than to comply with law.

**ARTICLE 2. NON-SOLICITATION:**

Exhibit
K11

A.    As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B.    This Agreement shall supersede and substitute for any previous employment or post-employment agreements between Employee and COMPASS.

C.    If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.    Removed.

E.    In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.    The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.
G.

I.    Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.    At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.    Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.    Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.                    by Kevin Von Duenen

Date: _____                         Date: 9/26/17

/s/ _____                           /s/ _____

John D. White, CEO

Exhibit
K11

# Exhibit K12

# COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT

This Agreement is between Max Wait, the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

NOW, THEREFORE, in consideration of a one time payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, whether or not, if paid by check, said check is cashed by Employee, Employee agrees to enter into this Agreement with COMPASS. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, employees, contractors, clients, customers, supplier, vendors, policies or products, other than to comply with law.

**ARTICLE 2. NON-SOLICITATION:**

CM 0267

**Exhibit K12**

A.      As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B.      This Agreement shall supersede and substitute for any previous employment or post-employment agreements between Employee and COMPASS.

C.      If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.      Removed.

E.      In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.      The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.

G.

I.      Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.      At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.      Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.      Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF,** and intending to be legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.                    by Max Wait

Date: _____                   Date: _January 8, 2018_

/s/  _____                    /s/  _____

John D. White, CEO

CM 0269

**Exhibit
K12**

Exhibit K13

## COMPASS MARKETING, INC

## AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT

This Agreement is between Drew Rayman, the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

### RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases; information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible, intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

NOW, THEREFORE, in consideration of a one time payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, whether or not, if paid by check, said check is cashed by Employee, Employee agrees to enter into this Agreement with COMPASS. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, employees, contractors, clients, customers, supplier, vendors, policies or products, other than to comply with law.

**ARTICLE 2. NON-SOLICITATION:**

CM 027<br>Exhibit<br>K13

**ARTICLE 6. MISCELLANEOUS:**

A.    As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B.    This Agreement shall supersede and substitute for any previous employment or post-employment agreements between Employee and COMPASS.

C.    If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D.    Removed.

E.    In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F.    The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.
G.

I.    Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J.    At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K.    Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L.    Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF**, and intending to be legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.                    by Drew Rayman

Date:    4/15/2014                            Date:    4/10/19

/s/                                           /s/

John D. White, CEO

CM 0273

Exhibit
K13

Exhibit K14

**MANUFACTURERS AND TRADERS TRUST COMPANY**
**CERTIFIED BANKING RESOLUTIONS OF CORPORATION**

ACCOUNT NUMBER:     00016004207862301

DEPOSITOR:     COMPASS MARKETING INC

| | |
|---|---|
| Name    JOHN D WHITE | Name |
| Title | Title |
| Address | Address |
| | |
| Telephone | Telephone |
| SSN | SSN |
| Signature | Signature |
| | |
| Name | Name |
| Title | Title |
| Address | Address |
| | |
| Telephone | Telephone |
| SSN | SSN |
| Signature | Signature |

I certify that the resolutions set forth below or provided separately to M&T Bank were duly adopted by the Board of Directors of Depositor, a corporation duly organized and validly existing under the laws of the State of _____, (the "Depositor") by unanimous consent or at a meeting duly called and held on _____; that each of such resolutions is in full force and effect and none has been rescinded, revoked or modified; and that none of such resolutions or any action pursuant thereto will violate any law, certificate of incorporation, by-law or agreement by which Depositor or any of its assets is bound. RESOLVED that

1.    Manufacturers and Traders Trust Company ("M&T Bank") is hereby designated a depository for the Depositor and the officers or employees named herein or on a Rider hereto are hereby authorized to open a deposit account (the "Account") on behalf of the Depositor.

2.    M&T Bank may purchase, discount for cash, accept, certify and pay from funds on deposit in the Account, without inquiry, all items signed, drawn, accepted or endorsed on behalf of Depositor, whether under a title, the words "Authorized Signature" or otherwise, with the facial or purported facsimile signature of any one of the persons whose name, titles and specimen signature appear above or on a Rider hereto or his or her successor in office (each an "Authorized Signer"), regardless of the circumstances under which the signature shall have become affixed so long as the signature is the actual signature of an Authorized Signer or resembles the facsimile signature of an Authorized Signer previously certified to M&T Bank. Depositor shall indemnify M&T Bank against all claims, damages, liabilities, costs and expenses (including, but not limited to, attorneys' fees and disbursements) incurred by M&T Bank in connection with any signature of any Authorized Signer (including any facsimile signature) that resembles the facsimile signature of an Authorized Signer and holds harmless M&T Bank for any refusal to honor the signature of any person who is not an Authorized Signer. Depositor acknowledges and agrees that any requirement of Depositor that any item or other instrument for the payment of money (signed, drawn, accepted or endorsed on behalf of Depositor) bear the signature of more than one Authorized Signer is solely an internal requirement of Depositor and imposes no duty of enforcement on M&T Bank.

3.    Any Authorized Signer may, on behalf of Depositor, transact with and through M&T Bank all such business as he or she deems advisable upon such terms as he or she deems proper, including, but not limited to, discounting, selling, endorsing and negotiating items, guaranteeing the obligations of others, applying for and using any ATM or debit card providing access to the deposit, contracting for Automated Clearing House ("ACH") payments and funds transfer services, cash management, trust and investment products and any other services and transactions in any way related to the Account or the funds on deposit from time to time therein, and pledging, assigning or granting security interests or other rights in the Account to M&T Bank or to third parties, and in connection with any such transaction to perform all such acts or other things as he or she shall deem proper, including, but not limited to, signing, drawing, accepting, endorsing, executing and delivering items, guarantees, assignments, pledges, receipts, waivers, releases, indemnities and other instruments, agreements and documents, accepting, receiving, withdrawing and releasing demands and notices and incurring and paying liabilities, costs and expenses.

4.    In the event an Authorized Signer acting on behalf of Depositor shall apply for or contract with M&T Bank for any electronic funds transfer service that M&T Bank may make available to Depositor, including, but not limited to, any service that contemplates M&T Bank's execution of payment orders initiated by Depositor for the wire or ACH transfer of funds to or from an Account of Depositor, such Authorized Signer shall be empowered on behalf of Depositor to designate one or more persons (who may, but need not be, Authorized Signers), each of whom, acting alone, shall be authorized on behalf of Depositor to transmit payment orders to M&T Bank for the transfer of funds to or from Depositor's Account.

5.    Each person identified as an Authorized Signer and each person or persons designated by an Authorized Signer to act on behalf of Depositor (who may, but need not be, Authorized Signers), shall have the power and authority to transact business and bind Depositor through electronic means (e.g., the Internet) and M&T Bank may rely on any of the following to the same extent as the actual signature of any person and of inability of such person to bind Depositor: any electronic signature or digital signature, under applicable law, of such person; any identifier issued by M&T Bank, the affiliates or any other party (e.g., Personal Identification Number) associated with ATM or credit card or any access device) to such person; or any other criteria that M&T Bank may reasonably rely on which may serve as an indicator of authentication for such person.

I further certify that each person whose name appears above or on a Rider hereto opposite an office has been duly elected or appointed to and now holds such office of Depositor; that each other person whose name then appears is acting for Depositor in the capacity opposite such other person's name; and that each signature on this certification or a Rider hereto is a true specimen of the signature of the person whose signature it purports to be.

☐ I further certify that I am the sole owner of all the issued and outstanding stock of Depositor.

| | |
|---|---|
| Signature of Corporate Secretary | Date |
| John White. | |
| Print Name | |

Original - Account Services; Copy - Branch
PAD48 (12/03)                                                                    AN5

Exhibit
K14

Exhibit K15

Signature Page For John White

Exhibit
K15

# Exhibit K16

November 15, 2012

Re:     Broker Agreement between Wyeth LLC and Compass Marketing ("Agreement")

Gentlemen:

This letter agreement (this "Agreement") sets forth the terms of the agreement between Compass Marketing, Inc., a corporation organized and existing under the laws of the State of Commonwealth of Virginia with offices at  222 Severn Avenue, Suite 200, Annapolis, MD 21403 ("Broker" or "you") and Wyeth LLC, on behalf of its Pfizer Consumer Healthcare business unit, a limited liability company organized and existing under the laws of the State of Delaware with offices at 5 Giralda Farms, Madison, New Jersey 07940 ("Pfizer", "we", "us" or "our"), in connection with the sale of the products described below:

<u>Appointment</u>

1.      Subject to the exclusions set forth in Paragraph 2 below, we hereby appoint  you as a non-exclusive broker in the fifty (50) United States and the District of Columbia ("the Territory"), and for the Pfizer products (the "Products") listed and described in the Appendix A annexed hereto, and you hereby accept such appointment and agree to perform the services described in this Agreement (the "Services") in accordance with the terms and conditions set forth in this Agreement.  During the Term, Broker shall use its best commercially reasonable efforts to promote the Products to the Customers (as defined in paragraph 2) in the Territory.

2.      "Customers" means retail customers listed in the Appendix B annexed hereto, and such other retail customers as may be agreed to in writing by the parties from time to time, subject to the exclusions set forth in this paragraph 2.  Specifically excluded from your appointment are, and "Customers" excludes, military accounts, national retail grocery accounts, membership warehouse club accounts, and mass accounts, as such accounts are determined from time to time by Pfizer.  We shall have the right in our sole discretion, upon thirty (90) days prior written notice to you, to remove any customer, account or geographic area from the Territory.

3.      You understand that you are being appointed as a marketing and sales agency and not a franchisee or distributor, and that this Agreement does not authorize you to sell, distribute, or offer to sell or distribute the Products.  You represent that you have the present capacity to act as a marketing and sales broker in the Territory and that you need not make any substantial financial investment to take on these obligations.

4.      We reserve the right in our sole discretion to (i) add or delete items from the list of Products; (ii) discontinue the marketing, distribution and/or sale of any of the Products; (iii) make any change or modifications to any Products, or (iv) change our prices and/or terms and conditions of sale at any time and for any reason.  Said changes can be made by providing you with a revised Appendix A or other written notice of changes in terms, which shall become effective upon ten (30) days following your receipt of the same.

**Counterparts**

34.   This Agreement may be executed in counterparts each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

Please sign the 2 enclosed copies of this Agreement in the space provided for your signature, and return both of the signed copies to us as soon as possible.

Very truly yours,

Pfizer, Inc.

By: _____          By: _____
Erik Fretland                                          Ron Schone
Customer Team Manager                          Vice President Sales

ACCEPTED AND AGREED

Compass Marketing

By: _____
John D. White
Chairman and CEO

# Exhibit K17

Exhibit
K17

# SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners

**SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners**

**1. Scope**
1.1 This terminology is intended to assist forensic document examiners in expressing conclusions or opinions based on their examinations.
1.2 The terms in this terminology are based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science that was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners.[1]

**2. Referenced Documents**
2.1 *Standards*
SWGDOC Standard for Scope of Work of Forensic Document Examiners

**3. Significance and Use**
3.1 Document examiners begin examinations from a point of neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.
3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. The expressions used to differentiate the gradations of opinions should not be considered as strongly defined "categories". These expressions should be guidelines without sharply defined boundaries.
3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.
3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, that is, to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.
3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in SWGDOC Standard for Scope of Work of Forensic Document Examiners, and it may be used by forensic examiners in other areas, as appropriate.
3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

**4. Terminology**
4.1 *Recommended Terms:*
**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.
*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.
**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order; however, the examiner is virtually certain that the questioned and known writings were written by the same individual.
*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.
DISCUSSION—Some examiners doubt the desirability of differentiating between strong probability and probable, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

---

[1] McAlexander T.V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science*, Vol 36, No. 2, March 1991, pp. 311–319.

Copyright by SWGDOC (all rights reserved); Wed Jan 14 13:26:05 CDT 2015

SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners

**probable**—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the "virtually certain" degree of confidence. *Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

**indications (evidence to suggest)**—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.

*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.

DISCUSSION—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**no conclusion (totally inconclusive, indeterminable)**—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another. *Examples*—*No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

**indications did not**—this carries the same weight as the indications term that is, it is a very weak opinion.

*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence suggests that the John Doe of the known material did not write the questioned material, or I found indications that the John Doe of the known material did not write the questioned material but the evidence is far from conclusive.

See Discussion after indications.

**probably did not**—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.

*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.

DISCUSSION—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

**strong probability did not**—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.

*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

DISCUSSION—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

**elimination**—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.

*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

DISCUSSION—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1 When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

4.2 *Deprecated and Discouraged Expressions*:

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so

SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners

blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion*. To say that the suspect "could have written the material in question" says nothing about probability and is therefore meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

**consistent with**—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

**could not be identified/cannot identify**—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

**similarities were noted/differences as well as similarities**— these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

**cannot be associated/cannot be connected**—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

**no identification**—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing; to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as. "I no identified the writer" or "I made a no ident in this case."

**inconclusive**—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

**positive identification**—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

**[strong] reason to believe**—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

**qualified identification**—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination*.

Copyright by SWGDOC (all rights reserved); Wed Jan 14 13:26:05 CDT 2015

# ASB Standard for Examination of Handwritten Items

ANSI/ASB Standard 070, First Edition
2022

# Standard for Examination of Handwritten Items





*This document is copyrighted © by the AAFS Standards Board, LLC. 2022 All rights are reserved.*
*410 North 21st Street, Colorado Springs, CO 80904, www.aafs.org/academy-standards-board.*

ANSI/ASB Standard 070, 1st Ed. 2022

# Standard for Examination of Handwritten Items

## ASB Approved April 2022

## ANSI Approved October 2022



410 North 21st Street
Colorado Springs, CO 80904

This document may be downloaded from: www.aafs.org/academy-standards-board

*This document is provided by the AAFS Academy Standards Board. Users are permitted to print and download the document and extracts from the document for personal use, however the following actions are prohibited under copyright:*

— *modifying this document or its related graphics in any way;*

— *using any illustrations or any graphics separately from any accompanying text; and,*

— *failing to include an acknowledgment alongside the copied material noting the AAFS Academy Standards Board as the copyright holder and publisher.*

*Users may not reproduce, duplicate, copy, sell, resell, or exploit for any commercial purposes this document or any portion of it. Users may create a hyperlink to www.aafs.org/academy-standards-board to allow persons to download their individual free copy of this document. The hyperlink must not portray AAFS, the AAFS Standards Board, this document, our agents, associates and affiliates in an offensive manner, or be misleading or false. ASB trademarks may not be used as part of a link without written permission from ASB.*

*The AAFS Standards Board retains the sole right to submit this document to any other forum for any purpose.*

*Certain commercial entities, equipment or materials may be identified in this document to describe a procedure or concept adequately. Such identification is not intended to imply recommendations or endorsement by the AAFS or the AAFS Standards Board, nor is it intended to imply that the entities, materials, or equipment are necessarily the best available for the purpose.*

*Proper citation of ASB documents includes the designation, title, edition, and year of publication. (See Annex I, ASB Guide 001)*

*This document is copyrighted © by the AAFS Standards Board, LLC. 2022 All rights are reserved. 410 North 21st Street, Colorado Springs, CO 80904, www.aafs.org/academy-standards-board*

# Foreword

The procedures outlined here are grounded in the generally used body of knowledge and experience in the field of forensic document examination.

The American Academy of Forensic Sciences established the Academy Standards Board (ASB) in 2015 with a vision of safeguarding Justice, Integrity and Fairness through Consensus Based American National Standards. To that end, the ASB develops consensus based forensic standards within a framework accredited by the American National Standards Institute (ANSI), and provides training to support those standards. ASB values integrity, scientific rigor, openness, due process, collaboration, excellence, diversity and inclusion. ASB is dedicated to developing and making freely accessible the highest quality documentary forensic science consensus Standards, Guidelines, Best Practices, and Technical Reports in a wide range of forensic science disciplines as a service to forensic practitioners and the legal system.

This document was revised, prepared, and finalized as a standard by the Forensic Document Examination Consensus Body of the AAFS Standards Board (ASB). It was originally developed by the Scientific Working Group on Forensic Document Examination (SWGDOC). That document was updated by the Forensic Document Examination Committee under the Organization of Scientific Area Committees (OSAC) for Forensic Science, who in turn updated and approved the draft document.

Questions, comments, and suggestions for the improvement of this document can be sent to AAFS-ASB Secretariat, asb@aafs.org or 401 N 21st Street, Colorado Springs, CO 80904.

All hyperlinks and web addresses shown in this document are current as of the publication date of this standard.

ASB procedures are publicly available, free of cost, at www.aafs.org/academy-standards-board.

**Keywords:** *handwriting, forensic document examination.*

## Table of Contents

1    Scope ...................................................................................................................................1

2    Normative References ..........................................................................................................1

3    Terms and Definitions .........................................................................................................1

4    Technical Discussion ...........................................................................................................1
4.1    Significance and Use .......................................................................................................1
4.2    Interferences ...................................................................................................................1

5    Equipment and Requirements ............................................................................................2

6    Procedure .............................................................................................................................2
6.1    General ............................................................................................................................2
6.2    Scope of Examination .....................................................................................................3
6.3    Examination of the Questioned Writing ........................................................................4
6.4    Examination of the Known Writing ...............................................................................6
6.5    Comparison of the Bodies of Writing (questioned writing to known writing or
       exclusively questioned writing) .....................................................................................7
6.6    Evaluation of Observations ............................................................................................9
6.7    Review of Work ...............................................................................................................9
6.8    Results .............................................................................................................................9

Annex A (informative) Bibliography ......................................................................................... 10

# Standard for Examination of Handwritten Items

## 1   Scope

This standard provides procedures used by forensic document examiners for examinations and comparisons involving handwritten items. These procedures apply to the examination and comparison of questioned and known items or of exclusively questioned items. The procedures in this standard include evaluation of the sufficiency of the material (questioned, or known, or both) available for examination.

The particular methods employed in a given case depend upon the nature of the material available for examination. This standard might not cover all aspects of unusual or uncommon examinations of handwritten items.

This standard cannot replace the requisite knowledge, skills, or abilities acquired through task-specific education, training, research, and experience.

## 2   Normative References

There are no normative reference documents. Annex A, Bibliography, contains informative references.

## 3   Terms and Definitions

Refer to Section 3 of the *SWGDOC Standard for Examination of Handwritten Items*[a] and Section 3 of the *SWGDOC Standard Terminology Relating to the Examination of Questioned Documents*[b].

## 4   Technical Discussion

### 4.1   Significance and Use

The procedures outlined in Section 6 are grounded in the generally used body of knowledge and experience in the field of forensic document examination. These procedures shall be used by a forensic document examiner trained in the procedures and instruments described in this document.

### 4.2   Interferences

Items submitted for examination may have inherent limitations that can interfere with the procedures in this standard. Limitations should be noted and recorded.

**4.2.1**   Limitations can be due to such factors as the submission of non-original documents, the condition of the items submitted for examination, the quantity, complexity, or comparability of the writing submitted, alphabet, language, or absent or insufficient characteristics. Such features are taken into account in this standard. The effects of prior storage, handling, testing, or chemical

---

[a] Available from: http://www.swgdoc.org/documents/SWGDOC%20Standard%20for%20Examination%20of%20Handwritten%20Items.pdf

[b] Available from: http://www.swgdoc.org/documents/SWGDOC%20Standard%20Terminology%20Relating%20to%20the%20Examination%20of%20Questioned%20Documents.pdf

processing (for example, for latent prints) can interfere with the ability of the examiner to see certain characteristics, or can eradicate writing entirely. Whenever possible, document examinations should be conducted prior to any chemical processing. Items should be handled to avoid compromising subsequent examinations.

Caution should be exercised when evaluating quantity and comparability of known materials collected by a stakeholder. Stakeholder selected specimens may not reflect a writer's full range of variation.

**4.2.2**  Limitations can be due to unnaturalness of any writings.

Consideration shall be given to the various forms of simulations, imitations, and duplications of handwriting that can be generated by computer and other means.

The drawn nature of many handwritten simulations and tracings can limit their comparability with known writing. It is not always possible to differentiate between handwritten simulations and tracings.

Distorted writing can appear similar to some forms of simulation or tracing, or may be the product of other intrinsic or extrinsic factors.

## 5  Equipment and Requirements

**5.1**  The items in 5.2 through 5.6 are required for forensic document examination of handwritten items. Their use is case specific.

**5.2**  Light source(s) of intensity and appropriate type to allow fine detail to be distinguished shall be used. Light sources include those capable of producing transmitted lighting, oblique lighting, vertical incident lighting, and other alternative lighting and filters.

**5.3**  The examiner shall use necessary magnification that allows pertinent fine detail to be distinguished. Magnification may include low power hand lenses but may require higher magnification such as a stereomicroscope, or digital microscope, with a range of magnification.

**5.4**  Photographic or other imaging equipment for recording observations shall be available. This may include: image capture device(s) capable of resolution to reliably record pertinent details; image output device(s) (for display or hardcopy production) capable of resolution and color balance for the intended purpose(s), and; media and appropriate systems for intermediate storage and archiving of images.

**5.5**  The examiner should utilize other apparatus and software as appropriate.

**5.6**  There shall be adequate time and facilities to complete all applicable procedures.

## 6  Procedure

### 6.1  General

The examiner shall not treat, handle, alter, or mark a document in any way that will affect the examination integrity of the document.

If permission is granted or required by the laboratory to label the document sets, it shall be done in a manner that does not affect the examination integrity of the document.

The examiner shall contemporaneously document the examinations performed, relevant observations, and basis for results, in detail to allow for an internal or external review and assessment of the utilized examination processes by a forensic document examiner. The documentation shall include any relevant information, method(s), interpretation(s), evaluation(s), and conclusion(s), opinion(s), or other finding(s).

At various points in these procedures, a determination that an important character or feature is not present or that an item is lacking in quality, quantity, or comparability can indicate that the examiner should discontinue or limit the procedure(s). It is at the discretion of the examiner to discontinue the procedure at that point and report accordingly or to continue with the applicable procedures to the extent possible. The examiner shall document the reason(s) for such a decision.

NOTE  Although there is some support within forensic disciplines for the evaluation and documentation of the questioned material prior to the evaluation of the known material, there are currently limited studies specific to handwriting examinations that support requiring the evaluation of the questioned material first.

## 6.2    Scope of Examination

**6.2.1**    The examiner shall perform and document all applicable procedures in sections 6.2.2 through 6.2.6. These procedures need not be performed in the order given. Deviations from these procedures shall be documented and justified.

**6.2.2**    The examiner shall determine whether the examination is a comparison of questioned writing to known writing or a comparison of questioned writing to questioned writing.

**6.2.3**    If the scope of the examinations to be undertaken is not clear based upon submission materials or communication(s) with the submitter, the examiner shall endeavor to clarify the examination(s) to be undertaken or question(s) to be evaluated.

**6.2.4**    The examiner shall document the scope of the examinations and comparisons. The scope can be as simple as a statement of the initial relevant question(s) to be answered.

NOTE  The scope may be written as two or more mutually exclusive competing hypotheses and propositions for each set of comparisons. There are typically two competing hypotheses for each set of comparisons; however, sub-hypotheses may also arise.

Commonly encountered hypotheses which, when mutually exclusive, may be combined as competing hypotheses for evaluation, include:

a)  the questioned material was written by the writer of the known material;

b)  the questioned material was written by a random and unspecified writer in a relevant alternative population;

c)  the questioned material was written by another specified writer;

d)  the questioned material was written by the writer of the known material in a distorted manner.

**6.2.5**    The examiner shall analyze the submitted item(s) to determine sufficiency relative to the scope.

**6.2.6** The examiner shall consider factors that might affect the writing (i.e., unnatural writing, simulation, tracing, reproduction). The examiner may consider information regarding intrinsic or extrinsic factors that might affect the writing.

**6.2.7** The examiner shall endeavor to avoid exposure to potentially biasing information that is not necessary for evaluation purposes within the examination process.

**6.2.8** If modification of the original scope is appropriate during the examination (6.3 through 6.6), the examiner shall document the reason and restate the scope. If modifications are made to the scope, the examiner shall reconsider aspects of 6.2.

### 6.3    Examination of the Questioned Writing

**6.3.1** The examiner shall perform and document all applicable procedures in sections 6.3.2 through 6.3.10. These procedures need not be performed in the order given. Deviations from these procedures shall be documented and justified.

**6.3.2** The examiner shall determine whether the questioned writing is original writing. If it is not original writing, request the original.

If the original questioned writing is not submitted, the examiner shall evaluate the quality of the submitted reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for analysis and comparison purposes and proceed to the extent possible. The degree of limitation will vary depending upon the specifics of the case. If the writing has not been reproduced with sufficient clarity for meaningful analysis or comparison purposes, the examiner shall discontinue these procedures and report accordingly.

NOTE  The absence of original writing does not preclude the examinations in this standard; however, examination of the original writing is preferable. Limitations associated with reproductions can include the inability to detect: guide lines; writing instrument type; direction of stroke; pressure; sequence of strokes; hesitations and stops; indentations; erasures; line quality; and artifacts of cut and paste alterations. The extent of these limitations may vary greatly.

**6.3.3** The examiner shall examine the questioned writing for characteristics of duplication, such as those of cut and paste manipulation, by electronic or other means.

**6.3.4** The examiner shall evaluate the questioned writing for the following.

a) *Type of Writing*—If there is more than one type of writing (hand printing, cursive writing, numerals, symbols, or combinations thereof, and signatures) within the questioned writing, separate the questioned writing into groups of single types of writing.

b) *Internal Consistency*—If there are inconsistencies within any one of the groups created in a) (for example, suggestive of multiple writers), divide the group(s) into consistent sub-groups.

c) *Complexity*—Assess the perceived ease or difficulty with which the questioned writing could be simulated by another writer for purposes of determining the suitability of the questioned writing for comparison purposes. Factors to be considered include speed, skill, style, construction, changes of directions, retracings, pen lifts, level of stylization, and degree of repetitive movements or shapes. This includes the examiner's assessment of overall rarity or generic nature of the characteristics.

Proceed to 6.3.5 for the questioned writing. If it is sub-divided, proceed for each group or subgroup created.

**6.3.5**   The examiner shall perform an analysis of the questioned writing.

NOTE  Among the features to be considered are elements of the writing such as: abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; distortion; embellishments; formation; freedom of execution; inconsistencies; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; sister lines; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation, both overall and with respect to each of the above features/elements.

**6.3.6**   The examiner shall examine the questioned writing for characteristics indicative of speed of execution.

NOTE  Features that may indicate rapid execution include: varied pen pressure; tapered beginning and ending strokes; and smooth, continuous strokes. Features that may indicate slow execution include: lifts, stops, and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unvaried pressure; and unnatural tremor.

**6.3.7**   The examiner shall determine whether the questioned writing appears to be distorted.

NOTE  Distortion can be attributable to internal or external factors and can be intentional. Features that may indicate distortion include: poor line quality; excessive angularity; unusual overall size; tremor; and wide variation in slant, shapes, spacing, and size.

**6.3.8**   The examiner shall examine the questioned writing for indicia of simulation and tracing. Consideration shall be given to the following:

— if characteristics of slow execution are observed, determine whether these characteristics are specifically indicative of an attempt to simulate or to trace;

   NOTE  Some handwritten simulations and tracings might not display significant characteristics of slow execution (for example, practiced freehand simulations). Simulations and tracings executed in a rapid manner can reflect the preparer's individual writing habits.

— whether guide lines or sister lines are present;

— whether, including the above factors, there is an unnatural similarity between multiple questioned items;

— if indicia of simulation or tracing are found, see 6.5.6 through 6.5.6.1.

**6.3.9**   The examiner shall consider additional features such as date, nature of the substrate, writing instrument, document type, margins, and the area available for writing.

**6.3.10**   If the examination is a comparison of exclusively questioned writing, go to 6.5.

### 6.4 Examination of the Known Writing

**6.4.1** The examiner shall perform and document all applicable procedures in sections 6.4.2 through 6.4.7. These procedures need not be performed in the order given. Deviations from these procedures shall be documented and justified.

**6.4.2** For known writing submitted, the examiner shall determine whether the known writing is original writing. If it is not original writing, the examiner may request the original. .

If no original known writing is submitted, the examiner shall evaluate the quality of the submitted reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for analysis and comparison purposes and proceed to the extent possible. The degree of limitation will vary depending upon the specifics of the case. If both original and non-original known writings are submitted, the examiner shall evaluate the known writings as a group. If the writing has not been reproduced with sufficient clarity for any analysis or comparison purposes, and neither the original nor better copies are available, the examiner may discontinue these procedures and report accordingly.

NOTE  The absence of original writing does not preclude the examinations in this standard; however, examination of the original writing is preferable. Limitations associated with reproductions can include the inability to detect: guide lines; writing instrument type; direction of stroke; pressure; sequence of strokes; hesitations and stops; indentations; erasures; line quality; and artifacts of cut and paste alterations. The extent of these limitations may vary greatly.

**6.4.3** The examiner shall evaluate the known writing for the following.

a) *Type of Writing*—If there is more than one type of writing (hand printing, cursive writing, numerals, symbols, or combinations thereof, and signatures) within the known writing, separate the known writing into groups of single types of writing.

b) *Internal Consistency*—If there are unresolved inconsistencies within any of the groups created in 6.4.3 a) (for example, suggestive of multiple writers), contact the submitter for authentication. If any inconsistencies are not resolved to the examiner's satisfaction, discontinue these procedures for the affected group(s), and report accordingly.

c) *Source of Specimens*— Known specimens may include both those written in the normal course of business and those that were written specifically at request for comparison purposes. Known specimens solely collected by a stakeholder may not reflect a writer's full range of variation.

Proceed to 6.4.4 for the known writing. If it is sub-divided, proceed for each group or subgroup created.

**6.4.4** The examiner shall determine whether any of the known writing appears to be distorted. If it appears to be distorted, the examiner shall determine whether it is possible to establish that the distorted writing is natural writing.

If it is not possible to establish whether apparently distorted writing is natural writing, the examiner shall determine whether the writing is suitable for analysis and comparison and proceed to the extent possible. It should be determined whether additional known writing could be of assistance, and if so, it should be requested. If the available known writing is not suitable for any analysis or comparison, the examiner shall discontinue these procedures and report accordingly.

**6.4.5**    The examiner shall perform an analysis of the known writing (see Note in 6.3.5).

**6.4.6**    The examiner shall examine the known writing for characteristics indicative of speed of execution (see NOTE in 6.3.6).

**6.4.7**    The examiner shall consider additional features such as date, nature of the substrate, writing instrument, document type, margins, and the area available for writing.

**6.5    Comparison of the Bodies of Writing (questioned writing to known writing or exclusively questioned writing)**

**6.5.1**    The examiner shall perform and note all applicable procedures in sections 6.5.2 through 6.5.6.1. These procedures need not be performed in the order given. Deviations from these procedures shall be documented and justified.

**6.5.2**    The examiner shall evaluate the comparability of the bodies of writing.

**6.5.2.1**    Features limiting comparability may include the type of writing, non-contemporaneousness, dissimilarities in text content, capture methods, writing instruments, and writing surfaces. Consideration of factors in 6.5.4 shall be taken into account regardless of whether contemporary writings are available.

NOTE  A lack of contemporaneous writings can hamper the assessment of characteristic dissimilarities. The consideration of the quality of any submitted known writings that are nearest in date to the item(s) in question may indicate if more contemporary writings are needed.

**6.5.2.2**    The evaluation of pictorial images from digitally captured signatures (DCS, also known as electronically captured signatures) generally follows the procedures outlined in this standard. However, the pictorial characteristics of such images may exhibit poor quality and distortion. The examination of the data utilized to create those signatures (i.e., X and Y position of the stylus tip, timing of execution, and exercised Force) may prove useful, but is beyond the scope of this document.

**6.5.2.3**    In questioned to questioned examinations, if the bodies of writing are not comparable, the examiner shall discontinue and report accordingly per laboratory policy. In questioned to known examinations, if the bodies of writing are not comparable, the examiner shall request additional known writing per laboratory policy.

**6.5.2.4**    If contemporaneous writings are requested but not obtained, continue as appropriate.

**6.5.2.5**    If additional known writing is made available, return to 6.4.

**6.5.3**    The examiner shall conduct a side-by-side comparison of comparable portions of the bodies of writing.

NOTE  In some cases, when known writings are submitted from multiple writers, the volume of material may require a methodical assessment of characteristics for comparability, also known as screening. The screening process is used to denote certain significant characteristics that tend to be obvious, particularly uncommon, or in some other way may allow for comparisons of limited characteristics in a timely manner and may include questioned or known material. Once the screening process is complete, the selected items will be fully examined.

**6.5.3.1**    The examiner shall note absent characters relevant to the comparison.

**6.5.3.2**    The examiner shall evaluate the quantity and quality of writing (questioned writing, or known writing, or both) with respect to all of the characteristics (see Note in 6.3.5).

**6.5.4**  If distortion or affects were previously noted in the questioned or known writing, such distortion or affects shall be considered in the comparison process. Factors which might affect writing include age; illness or injury; medication, drugs or alcohol (intoxication or withdrawal); awkward writing position; writing instrument(s); substrate(s); cold or heat; fatigue; haste or carelessness; nervousness; nature of the document, use of the unaccustomed hand; attempts to disguise should be considered.

**6.5.5**  The examiner shall evaluate the significance of dissimilarities and similarities, individually and in combination, with respect to discriminating elements (see Note in 6.3.5.).

NOTE  A dissimilarity is a feature within the questioned writing that is not found in any of the submitted known specimens. The presence of a feature, even in one specimen, constitutes evidence that the feature is within the repertoire of the writer and cannot be assessed as a dissimilarity.  The assessment of a dissimilarity being evidence of a different source (writer) is in large part relative to the confidence level of the assessment that the provided handwriting specimens constitute a comprehensive sample of the writer's full range of variation as opposed to a feature that is not present within the specimen samples. This is a very high level of proof requiring extensive known specimens from multiple sources, over a large timeframe, and with a well-defined and well-established range of variation.

**6.5.6**    If indicia of simulation or tracing are noted in the examination of the questioned writing, the examiner shall determine whether the model(s) is among the submitted writings. The examiner shall individually evaluate the presence of unnatural pictorial similarities in order to determine whether the known writing was used as a model or if two or more questioned writings are simulations or tracings based on a common model. Overlay comparisons have been found to be an effective method of evaluation. If the model(s) is located among the submitted writings, report accordingly. If the model(s) is not located among the submitted writings, a request for additional materials may be appropriate.

NOTE  Tracings can be produced by various techniques, including: direct tracing, where the model is placed behind the target and seen through the target by ambient light; transmitted light tracing, where the model is placed between the target and a light source; or guideline tracing, where an intermediate model, such as an indentation or a carbon, pencil or printed image, is transferred to the target and overwritten following the intermediate model. Tracings might not involve an exact overlay of an entire signature or entry(s). A segmented tracing can result from shifts in the substrate, hesitations during the tracing process, or the use of multiple models in its creation. Distortion due to copying or reproduction of an intermediate model may also preclude an exact overlay.

**6.5.6.1**    The examiner shall evaluate for evidence of exact replication among multiple writings indicative of duplication by electronic or other means.

**6.5.6.2**    The examiner shall evaluate features of the questioned writing that deviate from the characteristics of the purported writer to determine whether they include natural handwriting characteristics of the person making the simulation or tracing.

ANSI/ASB Standard 070, 1st Ed. 2022

## 6.6   Evaluation of Observations

The examiner shall consider the results of the above procedures in relation to the scope of examination based on the characteristics, features, or information under observation as interpreted with the knowledge, skills, and abilities acquired through appropriate education, training, and experience.

The examiner shall form a conclusion for each set of comparisons with respect to the results of the above procedures and report accordingly.

The bases and reasons for the conclusion(s) and opinion(s) shall be included in the examiner's documentation. Limitations shall also be documented if present.

## 6.7   Review of Work

The examiner shall review all observations, comparisons, evaluations, and relevant documentation in accordance with applicable standards and policies. The examiner shall consider alternative interpretations.

## 6.8   Results

**6.8.1**   Conclusion(s), or opinion(s), or observation(s) may be reached after following the appropriate procedures outlined in this standard. A conclusion is not based solely upon any one characteristic, but rather on the combination of characteristics within the set of writing in conjunction with any limitations that may be present. The number and nature of the examination results are dependent on the question(s) at hand.

**6.8.2**   Methods of reporting may be dictated by confidentialities, laboratory policy, and rules of procedure.

**6.8.3**   For generally accepted phrases expressing conclusions, refer to professional Forensic Document Examination organizations and published standards.

ANSI/ASB Standard 070, 1st Ed. 2022

# Annex A
(informative)

## Bibliography

The following bibliography is not intended to be an all-inclusive list, review, or endorsement of literature on this topic. The goal of the bibliography is to provide published standards directly used in the preparation of this standard.

1] SWGDOC *Standard for Examination of Handwritten Items*, 2013.[c]

2] SWGDOC *Standard Terminology Relating to the Examination of Questioned Documents*, 2013.[3]

---

[c] Available from: http://www.swgdoc.org/index.php/standards/published-standards



Academy Standards Board
410 North 21st Street
Colorado Springs, CO 80904

www.aafs.org/academy-standards-board.

# Curriculum Vitae

**DONNA U. EISENBERG**
FORENSIC DOCUMENT EXAMINATION SERVICES

# CURRICULUM VITAE

**Professional Experience**

**Forensic Document Examination Services, LLC 2008 to Present**
Private Examiner

**U.S. Department of Homeland Security 2024 to Present**
U.S. Secret Service (USSS)
Forensic Services Division
Contractor—Forensic Document Examiner

**U.S. Department of Homeland Security 1998 to 2022 (Retired)**
U.S. Immigration and Customs Enforcement (ICE)
Homeland Security Investigations—Forensic Laboratory
(Formerly U.S. Immigration and Naturalization Service)
The laboratory has been accredited by the American Society of Crime Laboratory Directors Laboratory
Accreditation Board (ASCLD/LAB) since 2001.

**U.S. Department of the Treasury 1988 to 1998**
U.S. Secret Service
Forensic Services Division
Counterfeit Division

**Forensic Document Examiner, 1991 - present**
At the USSS, I conducted examinations of monetary obligations (U.S. and foreign banknotes, U.S. Treasury
checks, etc.) to assess their authenticity and reveal alterations; and handwriting identification examinations of
Treasury Check endorsements and written threats directed at all personnel under USSS protection.

At ICE, I conducted examinations of domestic and international travel and identification documents to assess their
authenticity and reveal alterations; and handwriting identification examinations of U.S. immigration related
documents.

My examinations include but are not limited to microscopic, instrumental, and comparative analysis of handwriting,
typewriting, printing processes and stamp impressions. I prepare written laboratory reports and provide expert
testimony. I served as a mentor for apprentice examiners by providing on the job training through casework
examinations and by participating in panels for question-and-answer training sessions and mock trials. I have also
provided instructional seminars to domestic and foreign officials encompassing various components of forensic
document examinations.

**Apprentice Forensic Document Examiner, February 1988 to February 1991**
Completed a three-year resident training program in the forensic science of questioned document examination at
the U.S. Secret Service Forensic Laboratory

www.donnaeisenberg.com

tel. 240-731-7737
email donna@donnaeisenberg.com
address 6 China Rose Court, Rockville, MD 20850

**Education**

**Master of Forensic Sciences, 1988**
The George Washington University, Washington, DC

**Bachelor of Arts/Psychology, 1981**
The University of Maryland, College Park, MD

**Certifications**

**American Board of Forensic Document Examiners, Inc. (ABFDE),** certified Forensic Document Examiner, 2002 to present
*(Prior to the establishment of the ABFDE in 1977, the need to identify qualified forensic scientists capable of providing essential professional services was long recognized. Within its mandate, the ABFDE provides a program of certification in forensic document examination with the dual purpose of serving the public interest and promoting the advancement of forensic science. In purpose, function, and organization, therefore, the ABFDE is analogous to the certifying boards in other scientific fields. The ABFDE is recognized by, and was originally sponsored by, the American Academy of Forensic Sciences.)*

**Collaborative Testing Services**, successful completion of bi-annual proficiency testing in the forensic disciplines of Questioned Documents and Handwriting Examination, 2000 to 2022

**Testimony**

Accepted as an expert witness in forensic document examination at every appearance in U.S. Federal District Courts, U.S. Immigration Courts, and various State and County courts throughout the United States

**Publication**

Eisenberg, Donna O., Examination of Foreign-Influenced Handwriting, Chapter 11, Forensic Document Examination in the 21st Century, Kelly and Angel editors; CRC Press; 2021; p. 119-130

**Professional Affiliations**

American Board of Forensic Document Examiners, Inc., Diplomate, 2002 to present; also served on the Board of Directors from 2005 to 2010, including serving as Vice President from 2007 to 2010

American Academy of Forensic Sciences, Questioned Documents Section, Associate Member, 2018 to present

American Society for Testing and Materials (ASTM), E30/E30.02, Member, 2009 to 2014

Case 1:21-cv-03899-ELH   Document 337-2   Filed 10/06/25   Page 137 of 147

# CONTINUING EDUCATION / PRESENTATIONS

**Attendance at Professional Conferences/Meetings**

Forensic Document Examiners Live International Knowledge Exchange on Documents (Linked) Conference

- Virtual (2023)

Southeastern Association of Forensic Document Examiners (SAFDE)

- Biloxi, MI (2024)
- Duluth, GA (2015)

Mid-Atlantic Association of Forensic Scientists (MAAFS)

- Cambridge, MD (2015)
- Fredericksburg, VA (1990)

National Institute of Standards and Technology (NIST)

- "Measurements, Science and Standards in Forensic Handwriting Analysis" Gaithersburg, MD (2013)

American Society of Questioned Document Examiners (ASQDE)

- Dearborn, MI (2009)
- Baltimore, MD (2003)
- San Diego, CA (2002)
- Lake Buena Vista, FL (1991)
- Crystal City, VA (1989)

American Academy of Forensic Sciences (AAFS)

- Virtual (2021)
- Baltimore, MD (2019)
- New Orleans, LA (2017)
- Denver, CO (2009)
- Washington, DC (2008)

Southwestern Association of Forensic Document Examiners (SWAFDE)

- Denver, CO (2019)
- Las Vegas, NV (1999)

Case 1:21-cv-00389-EJL Document 37-62 Filed 10/06/25 Page 138 of 147

Diamond Research Corporation, Toner and Photoreceptor Annual Conference and Tutorial

• Santa Barbara, CA (1994)

MasterCard International, Inc., Credit Card Technology Conference

• Washington, DC (1988)

**Presentations and Instruction**

Documentary, Xploration Earth 2050—Future Law Enforcement https://vimeo.com/144391170 (Password: Earth). Presentation of new technologies and software in forensic handwriting examinations (2015)

Instructor, "Forensic Document Examination and Detection of Security Features in U.S. Travel Documents," sponsored by the Office of American Studies, Inter-American Committee Against Terrorism (OAS-CICTE) for Mexican government forensic document examiners and prosecutors, Mexico City, Mexico (2008)

Instructor, "Using Demonstrative Evidence in Conjunction with Expert Testimony," sponsored by the U.S. Department of Justice, International Criminal Investigative Training Assistance Program (ICITAP) for Colombian government forensic document examiners and prosecutors, Bogota, Colombia (2007)

Instructor, "Detection of Counterfeit US Banknotes and Introduction of Newly Incorporated Security Features into Genuine US Banknotes," sponsored by the U.S. Department of Treasury for:

• Federal Reserve Banks and Currency Technology Personnel (1993 through 1997)
• Foreign forensic document examiners, law enforcement officers, central and commercial bank employees, and US Embassy cash handlers:

  ➤ Abidjan, Ivory Coast (1997)
  ➤ Tallinn, Estonia (1996)
  ➤ Lyon, France, INTERPOL (1996)
  ➤ Paris, France (1996)
  ➤ St. Kitts (1996)
  ➤ St. Lucia (1996)
  ➤ Bogota, Colombia (1996)
  ➤ Budapest, Hungary (1996)
  ➤ Warsaw, Poland (1996)
  ➤ Bucharest, Romania (1996 and 1993)
  ➤ Minsk, Belarus (1995)
  ➤ Vienna, Austria (1995)
  ➤ Bratislava, Slovakia (1995)
  ➤ Prague, Czech Republic (1995)
  ➤ Lisbon, Portugal (1995)
  ➤ Madrid, Spain (1995)
  ➤ Rome, Italy (1993)
  ➤ Sofia, Bulgaria (1993)
  ➤ Riga, Latvia (1993)

FORENSIC DOCUMENT EXAMINATION SERVICES, LLC

> Vilnius, Lithuania (1993)

**Specialized Training**

- "Separating Ground Truth from Provable Opinions" workshop, (SAFDE) Mark Goff, Biloxi, MI (2024)
- "Technology and Design of Security Documents for Counterfeiting and Alteration Resistance Workshop," Virtual (2021)
- Gemalto Digital Driver's Licenses, McLean, VA (2019)
- Tour of ITW Security and Brand Identity, Cranbury, NJ (2018)
- Foster + Freeman Video Spectral Comparator 8000, McLean, VA (2018)
- Keyence Digital Microscope, McLean, VA (2017)
- Tour of U.S. Government Printing Office, Washington, DC (2017)
- "Communication Strategies to Mitigate Bias and Strengthen Scientific Foundations in Forensic Science" workshop, American Academy of Forensic Sciences, New Orleans, LA (2017)
- "Questioned Document Expert Testimony Workshop" (MAAFS) Manassas, VA (2017)
- "Forensic Examination of Biometrically Captured e-Signatures Workshop", William Flynn, Cambridge, MD (2015)
- "Measurements, Science and Standards in Forensic Handwriting Analysis Conference" National Institute of Standards and Technology (NIST), Gaithersburg, MD (2013)
- Hyperspectral Imaging Workshop, Library of Congress, Washington, DC (2013)
- Tour of Appleton, Inc. Paper Mill, security paper manufacturing facility, Roaring Spring, PA (2012)
- "Adobe Photoshop Workshop," George Reis, Imaging Forensics, McLean, VA (2010)
- "Assessor/Auditor Training Course," ASCLD/LAB International, Denver, CO (2010)
- Tour of production facility for autopens, Damilic Corporation Autopen, Rockville, MD (2010)
- "Laboratory Preparation Course," ASCLD/LAB International, Vienna, VA, (2010)
- "ESDA Sequencing Workshop," ASQDE, Dearborn, MI (2009)
- "Homogenous Handwriting Workshop", Marie Durina, Dearborn, MI (2009)
- "Business Records Examinations Workshop," ABFDE, Asheville, NC (2008)
- "Authentications and Simulations Workshop," ABFDE, Las Vegas, NV (2007)
- "Disguised Handwriting Workshop," LaTrobe University, SAFDE, Atlanta, GA (2006)
- Tour of production facility for AXALTO smart cards, a Schlumberger company, Owings Mill, MD (2003)
- "Paper Knowledge Field Seminar," MeadWestvaco, Washington, DC (2003)
- "Overview of Digital Printing Technologies," Annette Jaffe Consulting, Washington, DC (2002)
- Tour of production facility for genuine U.S. passports, U.S. Government Printing Office, Washington, DC (2002)
- Observation of U.S. Immigration & Naturalization Service asylum applicant interviews, Rosslyn, VA Asylum Office (2001)
- "U.S. Identity Documents Workshop," U.S. Immigration & Naturalization Service, Forensic Document Laboratory, McLean, VA (2001)
- Tour of rubber stamp making facility, Baumgarten Corporate Headquarters, Manufacturer of Wet and Dry Seals, Laurel, MD (2001)

- Tour of security printing facility, Portals Ltd./De La Rue Security Print, Dulles, VA (2000)
- "Typewriter Examination and Classification Workshop", Dr. Phillip Bouffard, SAFDE, Las Vegas, NV (1999)
- Tour of manufacturing facility for genuine U.S. Visas, Banknote Corporation of America, Inc., Greensboro, NC (1999)
- "The Future of Banknote Substrates and Security Devices Workshop," International Counter Measures Association, McLean, VA (1998)
- "Digital Photography," Rochester Institute of Technology, Rochester, NY (1997)
- Tour of manufacturing facility for genuine U.S. Treasury checks, Banknote Corporation of America, Inc., Greensboro, NC (1997)
- Tour of minting facility for genuine U.S. coins, U.S. Mint, Denver, CO (1997)
- "Detection of Counterfeit & Altered Coins," American Numismatic Association, Colorado Springs, CO (1997)
- "Pulp and Paper Technology for Non-technical People," Institute of Paper Science and Technology, Atlanta, GA (1996)
- Tour of minting facility for genuine U.S. coins, U.S. Mint, Philadelphia, PA (1996)
- "Etching and Intaglio Printing," The Art League School, Alexandria, VA (1996)
- Tour of manufacturing facility for genuine U.S. Treasury checks, American Bank Note Company, Bedford Park, IL (1995)
- Tour of security printing facility, Dittler Brothers Security Printers, Oakwood, GA (1993)
- "Serial Number Decoding of Color Copiers Workshop," Canon USA, Lake Success, NY (1993)
- Tour of security thread manufacturing facility for genuine U.S. currency, Technical Graphics, Inc., Milford, NH (1993)
- Tour of ink manufacturing facility for genuine U.S. currency, SICPA Security Inks, Springfield, VA (1992)
- "Electronic Imaging," Graphic Arts Technical Foundation, Pittsburgh, PA (1992)
- "Graphics Arts Photography," Montgomery College, Rockville, MD (1992)
- "Principles of Lithography," Montgomery College, Rockville, MD (1991)
- "Offset Lithography Printing Workshop," Counterfeit Division, U.S. Secret Service, Washington, DC (1991)
- "Advances and Challenges in Electronic Printer Quality Workshop," BIS Strategic Decisions, San Jose, CA (1991)
- "Expert Testimony Workshop," Mid-Atlantic Association of Forensic Scientists, Hagerstown, MD (1991)
- "Fundamentals of Typewriter Examination for Laboratory Personnel," Federal Bureau of Investigation Academy, Quantico, VA (1990)
- Tour of ink manufacturing facility, Capital Ink Company, Washington, DC (1990)
- Tour of paper manufacturing facility for genuine U.S. currency, Crane Paper Company, Dalton, MA (1990)
- "Fundamentals of Document Examination for Laboratory Personnel," Federal Bureau of Investigation Academy, Quantico, VA (1989)
- Tours of forensic laboratories, Royal Canadian Mounted Police, Ottawa and Quebec, Canada (1989)
- Tour of engraving and printing facility for foreign genuine currencies, British American Bank Note Inc., Ottawa, Canada (1989)
- "Printing Techniques for Questioned Document Examiners," Rochester Institute of Technology, Rochester, NY (1989)

- "U.S. Secret Service Questioned Document School," Federal Law Enforcement Training Center, Glynco, GA (1988)
- Tour of paper manufacturing facility, Glatfelder's Paper Mill, Spring Grove, PA (1988)
- "Counterfeiting Techniques Workshop" Counterfeit Division, U.S. Secret Service, Washington, DC (1988)
- Tour of the United States currency engraving and printing facility, U.S. Bureau of Engraving & Printing, Washington, DC (1988)
- Tour of credit card manufacturing facility, Malco Plastics Company, Baltimore, MD (1988)

## COURT AND DEPOSITION TESTIMONIES

Listed below are the testimonies (depositions and courtroom) I have provided as an expert witness in the field of forensic document examination:

Circuit Court for the City of Hampton, Virginia, Case #CL08000184-00
Douglas Hornsby, as Administrator of the Estate of Fernando M. Huerta v Captain Garland, Inc.
Court Testimony: 1/21/2009
Respondent's Attorney David Ventker (Ventker & Warman PLLC), Norfolk, VA

U.S. District Court for the District of Maryland, Case #09-1861
Ariel B. Dimonte, et al v Lillian Gonzalex Naranjo
Deposition Testimony: 5/1/2010
Deposed by Allen Cohen and Rig Baldwin (Baldwin, Kagan & Gormley), Annapolis, MD
Respondent's Attorney Paul Thaler (Thaler Liebeler LLP), Washington, DC

U.S. District Court for the District of Maryland, Civil Action RWT-10-916
David Barmer v Errol Walker, et al
Court Testimony: 8/2/2011
Respondent's Attorney Stephen Metz (Shulman Rogers), Potomac, MD

Circuit Court of Anne Arundel County, Maryland, Case #13-488
Judge Paul Harris
State of Maryland v David B. Piccione
Court Testimony:  8/28/2013
Public Defender Denis O'Connell, Annapolis, MD

U.S. District Court for the Southern District of Florida, Case #13-20160-Cr
Judge Donald Graham
United States of America v Oliver Gayle
Court Testimony: 10/18/2013
Prosecutor Assistant U.S. Attorney Michael Garofola, Miami FL

Case 1:21-cv-00389-ELH Document 37-62 Filed 10/06/25 Page 142 of 147

Circuit Court for Loudoun County, Virginia, Case #CR0002479500
Commonwealth of Virginia v Jamal Lee
Court Testimony: 11/13/2013
Defense Attorney Jerri Fuller, Alexandria, VA

Circuit Court of Anne Arundel County, Maryland, Case #02-C-13-177699
Judge Dennis Sweeny
Sadie M. Castruccio, Caveator v Estate of Peter A. Castruccio
Court Testimony: 7/16/2014
Respondent's Attorney Melissa L. Mackiewicz (DLA Piper LLP (US)), Baltimore, MD

Circuit Court for Montgomery County, Maryland, Case #369846V
Edward S. Cohn, et al v Martin F. Sheehan, et al; Amanda Sheehan v HSBC Bank USA, N.A., et al
Deposition Testimony: 04/03/2015
Deposed by Jerry Hyatt (The McKeon Law Firm), Gaithersburg, MD
Plaintiff's Attorney John J. Hathway (Whiteford, Taylor & Preston LLP), Washington, DC

Circuit Court of Culpeper County, Virginia Case #15001164-00
Judge Susan Whitlock
Estate of Imma Corbin, Deceased: Stephen W. Corbin, et al. v Michael Wright, Sr.
Court Testimony: 09/23/2016
Respondent's Attorney Bruce W. McLaughlin, Culpeper, VA

Circuit Court for Montgomery County, Maryland, Case #402107-V
Judge Terrence McGann
Ward, et al v Davis, et al
Court Testimony: 11/2/2016
Plaintiff's Attorney Stephen Metz (Shulman Rogers), Potomac, MD

Superior Court of Delaware, Case #1511001595
Judge Jeffrey Clark
State of Delaware v Mark Bartell
Court Testimony: 03/23/2017
Public Defender J'Aime Walker, Dover, DE

District of Columbia Superior Court, Civil Branch, Case 2014 CA 000098 R(RP)
JPMorgan Chase Bank, National Association v Suzanne Elizabeth Weadon, et al
Deposition Testimony: 09/27/2017
Deposed by Lisa M. Ernest (Fidelity National Law Group), Vienna, VA
Defendant's Attorney Anthony R. Champ (Kass Legal Group, PLLC), Washington, DC

Circuit Court for Montgomery County, Maryland, Case #433541-V
Farimah Fleschute v Hengameh Nikmorad, et al
Deposition Testimony: 04/19/2018
Deposed by Aaron Neal (McNamee Hosea) and Joshua Schmand (Lerch, Early, Brewer), Bethesda, MD
Plaintiff's Attorney Elizabeth McInturff, (Stein, Sperling), Rockville, MD

Circuit Court for Montgomery County, Maryland, Case #433541-V
Judge Karla Smith
Farimah Fleschute v Hengameh Nikmorad, et al
Court Testimony: 07/26/2018
Plaintiff's Attorney Elizabeth McInturff, (Stein, Sperling), Rockville, MD


U.S. Bankruptcy Court, Southern District of New York, Case #17-22242
Broadway Equity Holdings, et al v 152 Broadway Haverstraw NY LLC, et al
Deposition Testimony: 12/17/2018
Deposed by Jeffrey Fleischmann
Plaintiff's Attorney Fred Ringel (Robinson, Brog, Leinwand, Green, Genovese & Gluck, P.C.), New York, NY


Register of Wills for Philadelphia County, Pennsylvania, Will #4157-2018
Deputy Register John Raimondi
Estate of Sean M. Schellenger
Hearing Testimony: 12/19/2018
Petitioner's Attorney Marissa Parker (Stradley Ronon), Philadelphia, PA


Circuit Court for Prince George's County, Maryland, Case #CAL 17-31723
Indika R. Samarawickreme v Herman Zarate, DPM, et al
Deposition Testimony: 01/24/2019
Deposed by Bruce M. Bender (Axelson, Williamowsky, Bender & Fishman, PC) Rockville, MD
Defendant's Attorney Lisa J. Russell (Waranch & Brown, LLC), Lutherville, MD


Circuit Court for Montgomery County, Maryland, Case #155377-FL
David Orta v Lori Starzec Orta
Deposition Testimony: 02/26/2019
Deposed by Kristina Badalian (Brodsky, Renehan, Pearlstein & Bouquet), Gaithersburg, MD
Plaintiff's Attorneys J. Stephen McAuliffe III and Rosalyn Tang (Miles & Stockbridge, PC), Rockville, MD


Circuit Court for Prince George's County, Maryland, Case #CAL 17-31723
Judge Dwight Jackson
Indika R. Samarawickreme v Herman Zarate, DPM, et al
Court Testimony: 03/19/2019
Defendant's Attorney Lisa J. Russell (Waranch & Brown, LLC), Lutherville, MD


U.S. Bankruptcy Court, Southern District of New York, Case #17-22242
Judge Robert Drain
Broadway Equity Holdings, et al v 152 Broadway Haverstraw NY LLC, et al
Court Testimony: 06/24/2019
Plaintiff's Attorney Fred Ringel (Robinson, Brog, Leinwand, Green, Genovese & Gluck, P.C.), New York, NY

 U.S. District Court for the Eastern District of Texas, Case No. 4:19-CR-252
Judge Amar Mazzant, III
United States of America v. Babatope Joseph Aderinoye
Court Testimony: 10/06/2020
AUSA Wes Wynne, Sherman, TX


Circuit Court for Montgomery County, MD Case #485262-V
Gregory F. Hicks, et al v Sheri L. Hamersley, M.D., et al
Deposition Testimony: 02/02/2022
Deposed by Andrew Booth (Gleason, Flynn, Emig & McAfee Charted), Rockville, MD
Plaintiff's Attorney Valerie Grove (Joseph, Greenwald & Laake, P.A.), Greenbelt, MD


Circuit Court for Montgomery County, MD, C.A. No.8:20-cv-279
Judge Steven Salant
Mills v. JPMorgan Chase Bank, N.A.
O'Sullivan, et al., v. Mills, Case No. 472760-V
Hearing Testimony: 07/14/2022
Plaintiff's Attorney Michael Blumenfeld (Nelson, Mullins), Baltimore, MD


Superior Court for the District of Columbia Civil Division, Case No. 2018 CA 007262B
Theresa Lowther, et al v. U.S. Bank National Association as Trustee and Adam Helfer
Deposition Testimony: 08/09/2022
Deposed by Joanne Savage (AARP Legal Counsel for the Elderly)
Defendant's Attorney Stephen Metz (Offit | Kurman), Bethesda, MD


Circuit Court for Charles County, MD, Case No. C-08-FM-21-759
Judge Donine Carrigan Martin
Coward v. Coward
Court Testimony: 08/23/2022
Plaintiff's Attorney Olivia Halleck (The Law Offices of Thomas Pyles, P.A.), Waldorf, MD


Merit Systems Protection Board, Case No. DC-0831-22-0046-I-2
Judge Paul DiTomasso
Cheryl Metz v. OPM
Testimony: 11/03/2022
Appellant's Attorney Katherine Krems (Kalijarvi, Chuzi, Newman & Fitch, PC), Washington, DC


Circuit Court for Montgomery County, MD
Judge Sharon Burrell
Nuria de la Pena v. Heywood Fleisig
Hearing: 6/16/2023
Defendant's Attorney Robert Kostecka (Paradiso, Taub, Sinay, Owel & Kostecka, PC), Bethesda, MD

Case 1:21-cv-03899-ELH    Document 337-62    Filed 09/06/25    Page 145 of 147

Circuit Court for Prince William County, VA, Case No. CL22-9995-00
Judge Robert Coleman
<u>Linda T. Le v. Frederick Haas and Richard Hampton</u>
Testimony: 10/02/2023
Respondents' Attorney Mihir Elchuri (Hirschler Law) McLean VA


U.S. District Court (Maryland-Baltimore Division)
Judge Ellen Hollander
<u>David Boshea v. Compass Marketing, Inc., et al</u>
Testimony: 02/22/2024
Plaintiff's Attorney Gregory Jordan


I have testified in federal courts throughout the United States since 1991 as an expert for the U.S. government as an employee of the U.S. Secret Service, U.S. Immigration and Naturalization Service, and the U.S. Department of Homeland Security. For these testimonies, I have provided the dates, cities, states, names of some government attorneys, and names of some presiding judges. I am unable to provide additional information, such as the criminal trial titles or case numbers, as I did not keep track of such information at the time.

| DATE | CITY/STATE | AUSA | JUDGE |
|------|-----------|------|-------|
| 12/19/91 | Uniondale, NY | William Gurin | George Pratt |
| 02/19/92 | Lexington, KY | David Marye | |
| 03/11/92 | Las Vegas, NV | | |
| 04/30/92 | Phoenix, AZ | Mike Morrissey | |
| 05/14/92 | Newark, NJ | Sherry Hutchins | |
| 12/02/92 | Corpus Christi, TX | | |
| 12/08/92 | Dallas, TX | Lynn Hastings | |
| 09/03/93 | Dothan, AL | | |
| 01/13/94 | Miami, FL | Robert Waters | |
| 03/03 94 | San Antonio, TX | | |
| 04/13/94 | New York, NY | | |
| 09/13/94 | Oxford, MS | Paul Roberts | |
| 11/30/94 | Montgomery, AL | | |
| 12/19/94 | Orlando, FL | Robert Stickney | |
| 03/09/95 | Los Angeles, CA | Patrick Fitzgerald | |
| 06/21/95 | San Francisco, CA | Eduardo Roy | |
| 09/05/95 | Madison, WI | Rita Klemp | Crabb |
| 01/18/96 | Los Angeles, CA | Jerry Freidburg | Lourdes Baird |
| 03/07/96 | Tampa, FL | Robert Stickney | Elizabeth Kovachevich |
| 03/28/96 | Los Angeles, CA | Robert Borthwick | William Rea |

| DATE | CITY/STATE | AUSA | JUDGE |
|------|-----------|------|-------|
| 01/22/97 | Chicago, IL | Madeline Murphy | Plunkett |
| 09/24/97 | Akron, OH | Steve Katzman | Sam Bell |
| 11/24/98 | Grand Rapids, MI | Mark Courtade | Robrt Bell |
| 05/11/99 | Miami, FL | Gregor Wald | Sukkar |
| 06/25/99 | Miami, FL | George Farmakides | |
| 07/14/99 | Miami, FL | Adis Cano | Sonom |
| 07/07/99 | Washington, DC | Alan Boyd | Emmet Sullivan |
| 11/18/99 | Miami, FL | Loren Coy | Sandra Coleman |
| 07/19/00 | Miami, FL | Karen Gilbert | James King |
| 10/19/00 | Miami, FL | Michele Ressler | Pedro Miranda |
| 01/31/01 | Miami, FL | Robert Emery | Middlebrooks |
| 03/28/01 | New York, NY | Ada Guillod | Chu |
| 05/30/01 | Miami, FL | Frieda Goldstein | Torreh Bayou |
| 08/20/01 | Oakdale, LA | Lorraine Griffin | Duck |
| 02/25/02 | St. Thomas, VI | Sarah Weyler | Finch |
| 05/06/02 | Miami, FL | Milton Aponte | Sumin |
| 05/15/02 | San Diego, CA | Damon Forney | Jeffrey Miller |
| 11/05/02 | Brooklyn, NY | Mike Asaro | Block |
| 11/18/02 | Miami, FL | Alex Goring | Lane |
| 02/27/03 | Miami, FL | A. Sanchez | Martinez |
| 03/17/03 | Miami, FL | Eduerdo Sanchez | Joan Leonard |
| 04/30/03 | Miami, FL | Melanie Allan | Seitz |
| 10/27/03 | St. Thomas, VI | Sarah Weyler | |
| 01/20/04 | Chicago, IL | Michael Gurlend | Holderman |
| 02/09/04 | Miami, FL | Marcia Gottesman | Hanson |
| 02/25/04 | Miami, FL | Monica Atkins-White | Kleinfeld |
| 09/17/04 | Miami, FL | Yordanka Delioado | Marcia Cooke |
| 09/20/04 | Boston, MA | Susan Hiller | |
| 07/21/05 | Boston, MA | Jennifer Mulcahy | Shepard |
| 12/05/05 | Miami, FL | Phil D'Adesky | Slavin |
| 01/31/06 | Elizabeth, NJ | Tom Callahan | |
| 03/09/06 | San Francisco, CA | Stephen Johnston | Yeargin |
| 03/29/06 | Miami, FL | Meg Nocero | Pedro Miranda |
| 05/22/06 | Miami, FL | Fanny Behar-Ostrow | Adam Opaciuch |
| 06/22/06 | Miami, FL | Philippe D'Adesky | Nancy McCormick |
| 07/17/06 | Brooklyn, NY | Steve Tiscione | Eric Vitaliano |

| DATE | CITY/STATE | AUSA | JUDGE |
|---|---|---|---|
| 09/18/06 | Miami, FL | Philippe D'Adesky | Nancy McCormick |
| 09/26/06 | Miami, FL | Philippe D'Adesky | Wilson |
| 01/11/07 | Miami, FL | Richard Jurgens | Pedro Miranda |
| 05/29/07 | Boston, MA | Melissa Gavegnano | Eliza Klein |
| 06/12/07 | Albany, NY | Ed Grogan | Gary Sharpe |
| 09/10/08 | Miami, FL | Matthew Gordan | Pedro Miranda |
| 07/30/09 | Alexandria, VA | Robert Friedman | Edie Brinkman |
| 11/12/09 | San Francisco, CA | Eileen Keenan | Marilyn Teeter |
| 11/17/09 | Orlando, FL | John Gihon | Daniel Littman |