## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ASHLEY BOSHEA as Administrator of the Estate of DAVID JOHN BOSHEA,

    *Plaintiff,*

    v.

COMPASS MARKETING, INC.,

    *Defendant.*

Civil No. ELH-21-309

## MEMORANDUM OPINION

This contract and wage payment case is rooted in a dispute between the late David Boshea ("Boshea" or "Decedent") and his former employer, Compass Marketing, Inc. ("Compass"), with respect to an alleged severance agreement.

Boshea, who lived in Illinois, worked for Compass for thirteen years and was terminated without cause in March 2020.[1]  In February 2021, Boshea filed suit against Compass, contending, *inter alia*, that Compass owed him $540,000 pursuant to a written severance agreement (the "Agreement").  Compass and its owner, John White,[2] contested the validity of the severance agreement.  In particular, defendant maintained that White's signature on the Agreement was a forgery.

---

[1] Jurisdiction is predicated on diversity of citizenship. 28 U.S.C. § 1332.

[2] John White has been understood to be an owner and the CEO of Compass and, at one time, a friend of Boshea. He was identified as CEO in Compass's filings and testified to that fact at trial. *See, e.g.*, ECF 315 at 2 (proposed Preliminary Jury Instructions by Compass); ECF 347 at 2 (proposed Amended Pretrial Order, Boshea's statement of facts).

The case proceeded to a jury trial that began on February 20, 2024. ECF 230. The Second Amended Complaint (ECF 48) was the operative pleading. At trial, the parties presented expert witnesses who opined on the authenticity of White's signature. During the testimony of Donna Eisenberg, plaintiff's expert, the defense learned that Eisenberg relied on a supplemental report that plaintiff had failed to provide in discovery. As discussed, *infra*, the Court rectified the error.

At the close of evidence, plaintiff moved to amend the suit to add a claim for breach of oral contract, relying largely on the same facts that were in evidence regarding the claim of breach of a written contract. For the reasons stated on the record, I granted the motion to amend, pursuant to Fed. R. Civ. P. 15. ECF 301 at 153, 164–67, 172–73.

On February 27, 2024, the jury returned a verdict in favor of Boshea with respect to his claim for breach of oral contract and for violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code (2016 Repl. Vol., 2021 Supp.) §§ 3-501 et seq. of the Labor and Employment Article. ECF 246. The jury awarded Boshea the sum of $540,000 in compensatory damages under the MWPCL and $193,000 for breach of contract. *Id.* I entered judgment in favor of Boshea in the amount of $540,000 in compensatory damages, noting that he was "not entitled to duplicate recovery." ECF 254 at 1.[3]

Thereafter, Compass filed "Defendant Compass Marketing, Inc.'s Renewed Motion for Judgment as a Matter of Law, or, in the Alternative, Motion for a New Trial." ECF 255. In a Memorandum Opinion and Order of August 7, 2024 (ECF 275; ECF 276), I granted Compass's request for a new trial, based on the belated addition at trial of the oral contract claim. But, I

---

[3] I also awarded prejudgment interest at the rate of 6% per annum on the sum of $193,000, dating from March 3, 2020, and post-judgment interest at the rate of 5% per annum. ECF 254 at 1–2.

granted leave to Boshea to amend his suit to add an oral contract claim.  And, I permitted the parties to reopen discovery, limited to allowing plaintiff to obtain additional handwriting exemplars from John White for use by plaintiff's handwriting expert, who had testified that she was not provided with a sufficient number of samples.  Further, I permitted depositions of the parties' handwriting experts with respect to any revised or new opinions arising from White's production of additional handwriting exemplars.

Dissatisfied with the Court's ruling, on September 5, 2024, defendant filed "Defendant Compass Marketing, Inc.'s Motion for Reconsideration of Order Denying Renewed Motion for Judgment as a Matter of Law Or, In the Alternative, Motion For Reconsideration of Order Granting a New Trial on All Claims."  ECF 279.  By Memorandum Opinion and Order of November 8, 2024 (ECF 288; ECF 289), I denied that motion.

In January 2025, while awaiting retrial set for February 2025, Boshea died, at the age of 62.[4]  Boshea's daughter, Ashley Boshea, as Administrator of the Estate of David Boshea, is the substitute plaintiff.  ECF 322.  However, for convenience, I shall refer to Boshea as the plaintiff.

The second jury trial began on August 4, 2025.  ECF 349; ECF 351; ECF 352; ECF 353. The parties presented the same expert witnesses who testified at the first trial.  The jury found that Compass breached a written severance agreement (Count II) and violated the MWPCL (Count III). ECF 361.  It awarded a total of $1,020,800 in damages, representing compensatory and enhanced damages, along with prejudgment interest.  Judgment was entered on August 15, 2025.  ECF 365.[5]

---

[4] The Court does not know if Mr. Boshea's death was unexpected.  But, the news was certainly a shock to the Court.

[5] The issue of attorney's fees under the MWPCL is unresolved.

Now pending is "Defendant Compass Marketing, Inc.'s Motion for Relief From A Judgment, Or, In The Alternative, For A New Trial." ECF 370 (the "Motion"). Compass appended to its Motion excerpts of Eisenberg's testimony at the second trial (ECF 370-1), as well as a copy of Eisenberg's expert rebuttal report, titled "Forensic Handwriting Report". ECF 370-2 ("Rebuttal Report"). Plaintiff disclosed the Rebuttal Report to Compass in December 2024, *i.e.*, well before the second trial began.

In the Motion, Compass asks the Court to vacate the jury's verdict pursuant to Fed. R. Civ. P. 60(b)(3) or, in the alternative, to grant a new trial pursuant to Fed. R. Civ. P. 59(a). ECF 370 at 7, 17–18. Compass argues that it is entitled to this relief because, before Eisenberg testified at the second trial, plaintiff failed to disclose "substantive portions" of her testimony. *Id.* at 1. In particular, the defense contends that Eisenberg referenced charts during her testimony that plaintiff failed to produce prior to trial.

Plaintiff opposes the Motion. ECF 374. He has submitted the entire transcript of Eisenberg's trial testimony at the second trial. ECF 374-1. Compass has replied (ECF 382) and has submitted a copy of the charts that Boshea's counsel provided to Compass on the day Eisenberg testified at the second trial. ECF 382-1.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I.    Factual and Procedural Summary[6]

Two jury trials have taken place to resolve Boshea's claim that Compass wrongfully deprived him of his severance pay. At both trials, Compass called Jeffrey Payne as its handwriting

---

[6] The parties are familiar with the factual and procedural background, and therefore I need not recount all of it at length. Moreover, the Court has written numerous opinions in the case. *See*

expert (ECF 300 at 98–99; ECF 347 at 10) and Boshea called Donna Eisenberg as his expert.  ECF 299 at 110, 115; ECF 374-1 at 2.  At each trial, Eisenberg had "no conclusion" as to whether the questioned signature on the Agreement was that of John White.  ECF 299 at 117; ECF 374-1 at 41.  In contrast, Payne twice opined that John White "highly probably . . . did not sign" the Agreement and that the questioned signature on the Agreement appeared to be "a simulation of a John White signature."  ECF 300 at 119; *see* Defendant's Trial Exhibit 2 (Payne's March 2025 Expert Report), at 2.[7]

On direct examination at the first trial, Eisenberg referred to a supplemental report that plaintiff's counsel had failed to disclose in discovery.  *See* ECF 299 at 156–57, 170, 173; ECF 255-4 at 2.  The revelation of non-disclosure occurred when defense counsel realized that Eisenberg was reading from something that had not been provided to the defense.  ECF 255 at 23.  Boshea's lead counsel, from Illinois, claimed that he "forgot" to provide Compass with Eisenberg's "Surrebuttal Report" of November 2021, which contained Eisenberg's response to Payne's report.  *See* ECF 299 at 157, 170, 173; ECF 255-4 at 2.[8]  The Court responded: "That's a big thing to forget."  ECF 299 at 157.  Plaintiff's counsel claimed that the failure was merely an "oversight."  *Id.* at 173.  But, I characterized the failure to produce the report as "a very serious

---

ECF 110; ECF 117; ECF 160; ECF 205; ECF 275; ECF 288; ECF 304; ECF 328; ECF 340; ECF 385.  To the extent relevant, I incorporate here the factual and procedural summaries set forth in my earlier opinions.

[7] The Court has not been provided with a transcript of Payne's testimony from the second trial.  Therefore, I must rely on my trial notes.

[8] It is not clear why the report was referred to as a Surrebuttal Report. But, I have used the terminology that was used by counsel for the parties.

mistake," *id.* at 173, and as "inexplicable." *Id.* at 185. I directed plaintiff's counsel to provide the defense with the Surrebuttal Report immediately. *Id.* at 162, 174–75.

Despite the error committed by plaintiff's counsel, I cautioned, *id.* at 175: "[L]et's not conflate the fact that there was a violation of counsel's obligation to produce that document with whether it actually is significant." I was not persuaded that the Surrebuttal Report "really varies from [the expert's] original report." *Id.* at 176. In particular, there was no change in the expert's conclusion. *Id.* at 187–88. Moreover, defense counsel caught the error before Eisenberg testified in detail about the content of the Surrebuttal Report. *Id.* at 182–84.

In an effort to "preserve the ability of the case to go forward," I sought to "ameliorate the error." *Id.* at 176. Of course, I did not permit Boshea's expert to make further use of the Surrebuttal Report. *Id.* at 181.[9] Rather, I limited Eisenberg's testimony to the content of her original report. *Id.* In addition, I provided Compass with time to review the Surrebuttal Report with its expert and delayed the cross-examination of Eisenberg as well as the direct examination of Payne, in order to provide the defense with preparation time. ECF 299 at 245–46; ECF 300 at 10. I also required plaintiff to obtain a transcript of Eisenberg's trial testimony so as to assist the defense in its preparation. ECF 300 at 96–97. And, I advised the defense that it could depose Eisenberg. ECF 299 at 175.

As noted, at the end of the trial, plaintiff moved to add a claim for breach of oral contract. ECF 301 at 153. And, for the reasons stated on the record, *id.* at 164–67, 172–73, I granted that motion. *Id.* at 172–73.[10]

---

[9] Nonetheless, Compass moved for a mistrial, based on Boshea's failure to disclose Eisenberg's supplemental report. I denied the mistrial motion. ECF 300 at 4, 10–11.

[10] Although I granted that motion, I have expressed my frustration at the issues that have unnecessarily resulted from the inexplicable failure of plaintiff to have lodged an oral contract

The jury found that Compass breached an oral contract with Boshea for a severance payment. ECF 246 at 1. The jury awarded Boshea $193,000 for breach of oral contract and also found that Boshea was entitled to prejudgment interest on that amount. *Id.* at 2. Further, the jury found that Compass violated the MWPCL by failing to pay the severance payment owed to Boshea. *Id.* And, the jury found that Compass's failure to pay the severance amount was not the result of a bona fide dispute. *Id.* It also determined that, under the MWPCL, Boshea was entitled to a severance payment of $540,000, which equated to three years of Boshea's salary. *Id.* However, the jury did not award plaintiff any additional statutory damages, *i.e.*, a sum up to three times the amount of unpaid wages. *Id.* at 3.

Judgment in favor of plaintiff was entered on March 8, 2024, for a total of $540,000 in compensatory damages.[11] However, I subsequently granted Compass's motion for a new trial. ECF 275; ECF 276.

---

claim before trial. *See, e.g.*, ECF 301 at 152–53 (The Court stating to Boshea's counsel, "I don't know how they do it in Chicago, but here in Maryland if there's a claim you have to assert it."); *id.* at 155 (the Court noting that Boshea's belated addition of the oral contract claim "is not something that I should be sandbagged with, and I feel that I am."); *id.* at 173 (the Court expressing that it was "not happy with the way [the addition of the oral contract claim] transpired here"); *see* ECF 275 (Memorandum Opinion) at 21 (explaining that the Court "might" have made a different evidentiary ruling "if plaintiff had moved even when trial began to add an oral contract claim"); *id.* at 24 (describing how "the amendment to add an oral contract claim spawned a serious legal issue that was briefed only on the fly, concerning the defense of the statute of frauds").

The belated amendment led to several post-trial motions filed by the defendant. And, the Court devoted countless hours in writing opinions to address those motions. All of this could have been avoided if plaintiff's counsel had filed a timely motion to amend the suit.

[11] The Court stated that, as to compensatory damages, Boshea "is not entitled to duplicate recovery." ECF 254, ¶ 3.

At the second trial, held in August 2025, Payne again appeared as the defense expert in handwriting analysis. ECF 347 at 10, 19.[12]  But, Eisenberg was called only in rebuttal.  ECF 374-1; ECF 370 at 5.

I pause to describe briefly the methodology generally used by the handwriting experts in attempting to identify or verify the author of the questioned signature.[13]  The discipline of handwriting analysis recognizes that no two people share the exact same handwriting characteristics, and no individual writes in the exact same way twice.  ECF 300 at 109.  In other words, from one signature to the next, written by the same individual, there are likely common shapes and patterns, but signatures are never identical.  *See* ECF 299 at 119–20.  To explain this difference, handwriting experts use the term "range of variation," which refers to the different features that can appear in one person's handwriting samples.  ECF 300 at 110.

Put another way, a person's handwriting has individual characteristics, such as the slant and the size of the letters.  *Id.* at 109.  Handwriting experts use specific terminology to describe these individual characteristics, such as connecting strokes, letter formations, pen-lifts, and height ratios.  *Id.* at 71.  And, handwriting experts use these concepts—the individual characteristics in a person's handwriting and each person's range of variation—in an effort to identify the author of a questioned handwriting sample.

---

[12] At trial, Compass included on its exhibit list Payne's 2025 expert report (Defendant's Exhibit 2) and his 2021 rebuttal report from the first trial (Defendant's Exhibit 6).  ECF 347 at 19.  The transcript of Payne's testimony during the second trial is not available.  But, based on my notes, Compass did not introduce these reports at the second trial.

[13] I rely on the testimony of both experts at the first trial for this summary, because that trial transcript is available.  *See* ECF 299 to ECF 301.  Although Eisenberg and Payne came to different conclusions, both experts used the same methodology.

In particular, a handwriting expert identifies the individual characteristics on known writing samples and compares an adequate number of known samples with the questioned writing. ECF 301 at 24. If there are significant differences between the individual characteristics of the questioned writing and the known samples, the expert may conclude that it is unlikely that the author of the known samples wrote the questioned writing. *See id.* at 43–44.

On December 20, 2024, more than seven months before the start of the second trial, Eisenberg provided Boshea's counsel with her Rebuttal Report. ECF 370-2. The Rebuttal Report included eight "demonstrative charts[.]" *Id.* at 11–16.[14] In turn, on December 23, 2024, Boshea's counsel produced that report to Compass. ECF 374-1 at 14.[15]

In Eisenberg's Rebuttal Report, she included a "John D. White Signature Chart" that contained enlargements of White's known signatures, labeled exhibits K1 through K17AD. ECF 370-2 at 18–27.[16] Eisenberg compared the known signatures to the questioned signature on the Agreement, *i.e.*, "Exhibit Q1." *Id.* at 19. In addition, Eisenberg included copies of the actual documents that contained the known signatures of White, as well as the questioned signature on the Agreement.

During Eisenberg's direct examination at the second trial, Eisenberg was questioned about four charts that were not included in her Rebuttal Report. *See* ECF 382-1; ECF 374-1 at 10–11,

---

[14] Eisenberg numbered the charts as one through six. *See* ECF 370-2 at 11–16. However, there are three sub-charts encompassed in chart three. *Id.* at 13–14. So, there are a total of eight charts.

[15] Boshea did not introduce Eisenberg's Rebuttal Report at the second trial. Nor is it included on Boshea's exhibit list. ECF 347 at 18–19.

[16] Some of the exhibits contain multiple known signatures. For example, exhibit K17 contains thirty signatures of John White. In other words, Mr. White wrote his name thirty times on one page. *See* ECF 370-2 at 82.

24, 27–28.    Unfortunately, the Undisclosed Charts were not assigned exhibit numbers for

identification.  ECF 374-1 at 10.  When asked for an exhibit number, plaintiff's counsel said, *id.*:

"It's not an exhibit.  We are using this as a demonstrative just like they [*i.e.*, Compass] did with

the chart so that we're not putting this into evidence."  *Id.*    I will refer to these four charts

collectively as the "Undisclosed Charts" and individually as First Undisclosed Chart, Second

Undisclosed Chart, Third Undisclosed Chart, and Fourth Undisclosed Chart.

Eisenberg apparently sent the Undisclosed Charts to plaintiff's counsel shortly before she

testified.  ECF 374-1 at 18.  About 25 minutes after Eisenberg's testimony began, when it became

apparent that the Undisclosed Charts had not been provided to defense counsel, plaintiff's counsel

emailed the Undisclosed Charts to defense counsel.  ECF 382-1 at 2; ECF 374-1 at 2.

At the outset of Eisenberg's direct examination at the second trial, Boshea's counsel

displayed the First Undisclosed Chart.  ECF 374-1 at 10; *see also* ECF 382-1 at 4–5. [17]  As noted,

it was not introduced into new evidence.  ECF 374-1 at 10.  When Boshea's counsel displayed the

chart, Compass's counsel asked for a corresponding page number in the Rebuttal Report to locate

the chart.  *Id.* at 10–11.  Boshea's co-counsel responded, "Page 1 it says . . . Looking on the screen

it says page 1."  *Id.* at 11. Boshea's counsel added, *id.*:  "This was a report that I delivered to you

on December 23rd last year."

The First Undisclosed Chart is reproduced below.[18]

---

[17] The charts were displayed to the jury on computer screens.  ECF 374-1 at 32.

[18] The First Undisclosed Chart is called "Variation."  ECF 382 at 3.  But, two of the charts
Boshea's counsel sent to Compass on the day of Eisenberg's testimony are titled "Variation".  *See*
ECF 382-1 at 4–5 (the "First Undisclosed Chart"); *id.* at 6–7 (the "Second Undisclosed Chart").
The difference between the two charts is the placement of arrows.

At trial, Boshea's attorney described the first chart as "variation, peak formation."  ECF
374-1 at 11.  In the First Undisclosed Chart, at the top, in a shaded box, there is an arrow pointing

The First Undisclosed Chart contains a red arrow pointing to a peak on the "W" in the questioned signature.  ECF 374-1 at 12.  A peak formation is an individualized handwriting characteristic.  *Id.*  Boshea's counsel asked Eisenberg to "explain to the jury" her "view on the peak formations" in the questioned signature and White's known samples.  *Id.* at 11.  The Rebuttal

_____

to the peak of a jagged line in the questioned signature that appears to be the left side of the "W" in White.  ECF 382-1 at 4.  In the Second Undisclosed Chart, there is an arrow pointing to the top of the final loop in the questioned signature.  *Id.* at 6.

When testifying regarding the First Undisclosed Chart, Eisenberg indicated that the "red arrow is pointing to the peak of what is, in theory, the left side of a W."  ECF 374-1 at 12.  Unfortunately, the Court does not have a color printer.  So, the reproduction does not show the arrow in red.  However, it appears that the chart that I have titled "First Undisclosed Chart (Peak Formation)" is the first chart that Eisenberg testified about at trial.

Report does not mention peak formations. Moreover, the Rebuttal Report charts do not contain an arrow pointing to the same part of the questioned signature, as depicted in the First Undisclosed Chart. *See* ECF 370-2 at 11–16.

Boshea's counsel proceeded to ask Eisenberg a handful of questions about the First Undisclosed Chart, and the Court also asked a question. *Id.* at 11–13. Referring to Q1, *i.e.*, the disputed signature on the Agreement, Eisenberg testified that the peak on the "W" is "tented." *Id.* at 12. And, because the peak is tented, she concluded that the signature was not retraced. *Id.* Eisenberg compared the peak in the questioned signature on the Agreement with known signatures of White that had the same peak and were not retraced. *Id.* Notably, Eisenberg's analysis that the signature did not appear to be retraced did not change her opinion: she could not determine whether the questioned signature was authentic. *See* ECF 374-1 at 41.

Boshea's counsel noted that Payne had opined "that this peak formation did not appear" in any of White's known signatures. *Id.* at 13. Eisenberg "completely disagree[d]" and claimed that Payne was "cherry-picking" among White's known signatures, finding differences between White's known signatures and the questioned signature, but failing to "utilize all of the evidence." *Id.* She added that "everything that [Payne] talked about as a difference was also included in all of the knowns." *Id.* But, claimed Eisenberg, Payne "chose to ignore those." *Id.*

Boshea's counsel then sought to display the Second Undisclosed Chart. *Id.* at 14. At that time, Compass's counsel asked for "clarification" on "where" the chart was "coming from[.]" *Id.* Echoing an earlier comment, Boshea's counsel responded: "This is the rebuttal report that I delivered to you on December 23, 2024." *Id.* But, Compass's attorney responded that the chart was not included in Eisenberg's Rebuttal Report of December 2024. *Id.* at 14, 15.

Before Boshea's counsel actually questioned Eisenberg about the content of the Second Undisclosed Chart, counsel approached the bench. The Court, recalling the failure of plaintiff's counsel to produce Eisenberg's Surrebuttal Report at the first trial, asked, rhetorically: "Is this déjà vu all over again?" *Id.* at 15. I also asked Boshea's counsel to establish that the charts in issue were previously provided to Compass in December 2024. *Id.* at 16. Boshea's counsel affirmed that he could "establish" that the charts in issue were "part of [the] original email in December of 2024" that he had sent to Compass with Eisenberg's Rebuttal Report. *Id.* at 16; *see also id.* at 17 (Boshea's counsel declaring that the Undisclosed Charts "are the original rebuttal charts from 2024").

But, Boshea's counsel then claimed that Eisenberg had "sent" the Undisclosed Charts "this morning." *Id.* at 18. The Court responded: "This morning doesn't count. . . . Hard to believe we could have the same issue this time around that we had the first time around." *Id.*

Plaintiff's counsel appeared confused about which charts Eisenberg had sent to him that morning, stating: "There's a chart that Ms. Eisenberg sent me this morning. She sent me two different emails. . . . She just said here are separate charts so I can put them up[.]" *Id.* at 19. Boshea's counsel also claimed that Eisenberg "made" the chart presented at the second trial "easier to review," but he otherwise asserted that the chart was "the same" as what had been included in the Rebuttal Report. *Id.*

Defense counsel commented, *id.* at 18: "Well, let's see what comes in and try to figure out what the discrepancy is." Nonetheless, I asked Boshea's counsel, *id.* at 20: "How is it possible that you would have the same mistake this time as last time?" But, plaintiff's counsel insisted, *id.*: "This is the same charts."

During the bench conference, I asked defense counsel if he planned to "question [Eisenberg] about the peaks and valleys and the ebbs and the flows." *Id.* at 22. Defense counsel responded: "Probably not[.]" *Id.* The Court stated, *id.* at 22: "I appreciate [that Compass] may not have gotten it. It seems to me that [Boshea] can't show you did, but there are so many of these charts out there and they're always the same, more or less."

Notably, I also asked Compass: "What would you like to do [about the non-disclosure]." *Id.* Compass asked that the record reflect its "objection" to Boshea's use of the Undisclosed Charts. *Id.* Further, defense counsel stated that Boshea should "not . . . be able to use that chart." *Id.* at 23. Nevertheless, defense counsel acknowledged: "[T]o be honest I'm probably not going to be examining her on that detail, but they shouldn't be able to use something that's by surprise again." *Id.* I commented, *id.*: "At the end of the day it's a different chart that shows the same things . . . . [Eisenberg] can still make her points on some other document that you did get."

Then, I asked Compass's counsel whether Eisenberg's reliance on these Undisclosed Charts would "really affect anything?" *Id.* Compass's counsel responded, "I won't know until the end of her testimony." *Id.* In response, I said "Well, we know what she's going to say. She never formed a conclusion." *Id.* Compass's counsel replied, "Right." *Id.* At that point, I suggested, *id.* "Why don't we keep going and then anything that you [Compass] think would be something that is appropriate by resolution, I'll entertain it." *Id.* No objections, suggestions, or requests were made.

Boshea's attorney continued with the direct examination of Eisenberg as to the Second Undisclosed Chart, without objection. *Id.* at 14, 24–28. Boshea's counsel also presented the Third Undisclosed Chart, again without objection. *Id.* at 27.

14

When plaintiff's counsel sought to question Eisenberg about the Fourth Undisclosed Chart, Compass's counsel sought "a continuing objection." *Id.* at 28. He reiterated that the four demonstrative exhibits were not included in the Rebuttal Report of December 2024. *Id.* at 28–29. I asked Compass's lawyer, *id.* at 28: "You didn't get any of these?" I also asked, *id.* at 29: "Were any of the ones that have been shown so far . . . provided as of December [2024]?" Compass responded, "I don't think we have any of them." *Id.* at 28. Defense counsel explained that, during Eisenberg's testimony, he had "been trying to figure . . . out" whether he had received the demonstrative exhibits. *Id.* at 28–29. Defense counsel also stated: "[I]t looks like we don't have [the demonstrative exhibits]." *Id.* at 29. Rather, Compass's lawyer claimed that he received the Undisclosed Charts "just now," via "email." *Id.*

Boshea's counsel then asked Eisenberg: "[W]here are the charts we're talking about, are they in your rebuttal report?" *Id.* Eisenberg responded: "Almost all of them are in the rebuttal report and if there's a problem, we can just use the report." *Id.* The Court said, *id.*: "Let's use the report then [*i.e.*, the Rebuttal Report]. That will make it simpler."

Compass's counsel remarked that he initially "thought" that the demonstrative exhibits used by Eisenberg were "a redacted version" of the charts in the Rebuttal Report because "the text" on those charts could not "be introduced[.]" *Id.* at 30-31. However, defense counsel noted: "[A]s we look more closely, the charts that we were looking at here in court today do not match the charts we were looking at in the December 2024 report and that's the concern we have." *Id.*

When defense counsel reiterated that the defense was not provided with the charts that had been shown to the jury (*id.* at 31–32), Boshea's co-counsel responded, *id.* at 32: "They were sent." Compass's counsel asked for a page number in the Rebuttal Report that contained the demonstrative exhibits. *Id.* at 29. But, no page numbers were provided.

The Court reminded counsel that the jury was waiting and that the Court wanted "to fix" the problem. *Id.* at 32. I said, *id.* at 31: "[I]f there are other charts available to this witness that have definitely been produced to the defense, let's use those."

Then, Compass's counsel announced: "I think we've solved the problem. [Boshea's counsel] and we are on the same page." *Id.* at 33. I commented, *id.*: "That's to be celebrated" and asked: "So can we move on?" *Id.* Compass's attorney responded, *id.*: "Yes. At this point, yes, we have a solution." *Id.*

Compass's counsel noted that there were "analyses" in the Rebuttal Report charts "that cannot be introduced." *Id.* at 32. But, he proposed that Boshea's counsel "just show the [Rebuttal Report] chart," without the accompanying written text. *Id.* And, Boshea's counsel confirmed that he would "just use the rebuttal report." *Id.* at 31. Nevertheless, Compass's counsel also said, *id.* at 34: "I want to be clear for the record that the charts that were shown so far were not in our possession as of December of 2024 and the charts that will be used now, are."

To be sure, the Court was dismayed by what had occurred. It appears that the source of the problem was Eisenberg's belated production of additional charts, and the failure of plaintiff's counsel to realize that these charts were not the same as the charts that had been produced in discovery in December of 2024. Nevertheless, after a lengthy discussion, Compass and Boshea agreed to proceed by restricting Eisenberg's testimony to charts that were timely disclosed to Compass. *Id.* at 33–34.

Of import, when Boshea's counsel resumed direct examination of Eisenberg, he asked her about the previously Undisclosed Charts about which she had testified. *Id.* at 34. Eisenberg testified that the charts that she had been shown were "demonstratively the same" as the charts in the Rebuttal Report, but they were not contained in the Rebuttal Report. *Id.* Eisenberg added that

the Undisclosed Charts "show the same thing" as the charts in the Rebuttal Report. *Id.* She claimed that the Undisclosed Charts had the "same pictures, the same questioned document, the same knowns" but merely had a different "setup" from the charts in the Rebuttal Report. *Id*. Eisenberg also asserted that her testimony would remain the same regardless of whether she was testifying based on the charts in her Rebuttal Report or the charts she had used that day in the courtroom. *See id.* at 39 (Eisenberg responding "yes" to a question of Boshea's counsel as to whether Eisenberg's "testimony would be the same" based on a Rebuttal Report Chart as with an Undisclosed Chart).

Eisenberg maintained that Payne had cherry-picked among White's known signatures to find differences with the questioned signature. *See, e.g., id.* at 46, 48. In her view, individualized characteristics in the questioned signature *did* appear in some of White's known samples. *See, e.g., id.* at 37. Eisenberg testified, *id.* at 41:

> [T]he questioned signature does fall within [White's] range of variation . . . but the questioned signature is also weird looking . . . . the evidence supports the fact that Mr. White could have written it; Mr. White could have self-simulated which means he intentionally wrote it in a way that's a little bit different than normal so it will pass scrutiny at the time of execution, but he could later deny it; or someone else wrote it. Any of those scenarios are possible which is why my opinion is no conclusion.

*See also* ECF 370-2 at 8 (opining that "***no conclusion***" could "be reached regarding authorship" of the questioned signature on the severance Agreement) (emphasis in original).

According to Eisenberg, there is such variation in White's known signatures that she could not "reach an opinion one way or the other" as to whether White signed the Severance Agreement. ECF 374-1 at 40–41. Compass's counsel proceeded to cross-examine Eisenberg, using the charts from her 2024 Rebuttal Report. *Id.* at 45, 47, 48. Boshea's counsel then briefly questioned Eisenberg on redirect. *Id.* at 53.

Additional facts are included, *infra*.

## II. Contentions

### A. Compass's Contentions

Compass complains that history has repeated itself, because Boshea's counsel failed at the second trial to produce "substantive portions of testimony by his expert witness", just as he did at the first trial. ECF 370 at 1. In particular, Compass claims that "Boshea again had Ms. Eisenberg testify about charts and analyses that were shown to the jury, even though they were not disclosed to Compass Marketing prior to trial." *Id.* at 2. Compass adds that Eisenberg's "testimony also included other opinions that *were not disclosed* to Compass Marketing prior to trial." *Id.* (emphasis in original).

Further, Compass argues that it suffered "significant prejudice" as a result of the use of the Undisclosed Charts at trial. ECF 370 at 15. According to Compass, Eisenberg began her testimony "with a discussion of 'peak formations'", yet her Rebuttal Report "does not make a single reference to 'peak formations.'" *Id.* Compass also claims that Boshea mischaracterizes the impact of Eisenberg's testimony about peak formations by claiming that the concept of peak formations appears in the Rebuttal Report in the context of the discussion of the apex of the "J" in the questioned signature. ECF 382 at 3. Compass argues: "Variation is a different concept than apex, which is why they appear in different charts and are termed differently." *Id*.

Moreover, Compass insists that Boshea "clearly knew" that "the charts and analyses had not been produced to Compass Marketing prior to trial (despite representing multiple times they had been produced)[] because Boshea's counsel admitted that Ms. Eisenberg emailed the charts to Boshea's counsel the *morning of the trial*." ECF 370 at 5 (emphasis in original). In its view, Boshea "intentionally with[held] materials that should have been produced" and thereby "deprived

Compass Marketing of a fair opportunity to confront and respond to key rebuttal evidence." *Id.* at 6. In Compass's view, plaintiff "undermined the integrity of the proceedings, and materially impacted the jury's consideration of critical issues[.]" *Id.*

Compass also highlights that Boshea strategically "presented Ms. Eisenberg only as a rebuttal expert witness, meaning she would testify only after Compass Marketing's expert, Mr. Payne." *Id.* at 12; *see* ECF 382 at 6. In this way, argues Compass, defendant "did not have the ability to present contrary testimony from Mr. Payne." ECF 370 at 15. Rather, Boshea "limit[ed] Compass Marketing's ability to counter Ms. Eisenberg's undisclosed charts and analyses and other opinions she shared." *Id.* at 12.

Compass also complains that it was deprived of "input from Mr. Payne on how to more effectively cross-examine Ms. Eisenberg about the new charts and analyses she testified about during her direct examination." *Id.* at 15. According to Compass, it would have been "impossible for Mr. Payne, who was not present during Ms. Eisenberg's testimony and did not review her undisclosed charts and analyses prior to trial, to rebut Ms. Eisenberg's testimony that he was not aware of and did not witness." ECF 382 at 6.[19]

As a result, posits Compass, Boshea "prevented" Compass "from fully presenting its case because it was unable to rebut the opinion testimony of Ms. Eisenberg that it was not aware existed until she was testifying at trial." ECF 370 at 14. Compass asserts: "Such withholding of this expert material and information clearly constitutes misconduct under Rule 60(b) of the Federal Rules of Civil Procedure, and it unfairly deprived Compass Marketing of the opportunity to present

---

[19] Compass also complains that its counsel "did not even hear Ms. Eisenberg's testimony regarding the new charts and analyses . . . ." ECF 370 at 13 n.5. Rather, Compass states that its lawyers "were trying desperately to locate the charts and analyses that Boshea's counsel repeatedly represented (falsely) it had disclosed to Compass Marketing." *Id.*

a complete defense to the claims being advanced by Boshea." ECF 370 at 2. Compass adds that "Boshea's failure to make this mandatory disclosure alone reflects misconduct that warrants relief from the judgment." ECF 382 at 3. Therefore, Compass asks the Court to "vacate the judgment entered against Compass Marketing pursuant to Rule 60(b) of the Federal Rules of Civil Procedure[.]" ECF 370 at 18.

As to Compass's claims for relief under Fed. R. Civ. P. 59(a), Compass argues that because of the continued assertion by plaintiff's counsel that he had produced these charts, Eisenberg's testimony was "grounded in falsehoods regarding its disclosure." *Id.* Compass maintains that it was "ambushed at trial and deprived of a meaningful opportunity to respond to Ms. Eisenberg's undisclosed charts, analyses, and theories, all of which she was able to testify about unchallenged at trial." *Id.*

According to Compass, Boshea's misconduct "resulted in a proceeding infected by surprise and false evidence, thereby producing a miscarriage of justice." *Id.* In its reply, Compass reiterates its claim that the "second trial was tainted by undisclosed expert materials and opinions and false representations of disclosure." ECF 382 at 7.

### B. Boshea's Contentions

Boshea's counsel does not dispute that, prior to the second trial, he failed to disclose certain charts about which Eisenberg testified. Nevertheless, Boshea contends that Compass is not entitled to relief under either Fed. R. Civ. P. 59(e) or 60(b).[20]

---

[20] In his Opposition, Boshea argues that Compass should not be granted a new trial pursuant to Fed. R. Civ. P. 59(e). But, Compass has sought this relief pursuant to Fed. R. Civ. P. 59(a). *See* ECF 374 at 6 (Boshea's Opposition, arguing that "[b]ecause Compass has not demonstrated any of the limited grounds for relief under Rule 59(e), the motion should be denied.") Fed. R. Civ. P. 59(e) states (emphasis added): "A motion *to alter or amend a judgment* must be filed no later than 28 days after the entry of the judgment."

With respect to Rule 60(b), Boshea claims that Compass did not present clear and convincing evidence of misconduct.  ECF 374 at 3.  In its view, Compass merely presents "two and one half pages of testimony in which Donna Eisenberg spoke of peaks in John White's signature as dispositive." *Id.*  But, argues Boshea, "[e]ven if misconduct had occurred," Compass was not prevented from fully presenting its case.  ECF 374 at 3.

In this regard, Boshea observes that Compass was not "impaired . . . from recalling its expert . . . ." *Id.*  To the contrary, Boshea claims that "Compass had ample opportunity to present Jeffrey Payne a second time, present evidence, and argue its claims." *Id.* at 4.  Moreover, Boshea claims that Compass did not have a meritorious defense, pointing to "the jury's award of enhanced damages" against Compass.  *Id.* at 2.  According to Boshea, the jury's verdict shows that "[t]his was not a close case." *Id.*

As to Compass's Rule 59(a) motion, Boshea argues that Eisenberg's testimony "did not provide new or different opinions." *Id.* at 6.  According to Boshea, Eisenberg "discussed the apexes in John White's signature, which she termed peaks in at [sic] trial." *Id.*  Boshea asserts: "The mention of peaks and the use of a chart did not alter the outcome in this case." *Id.* at 5.  Rather, according to Boshea, "[t]he power of Ms. Eisenberg's testimony using the report that she provided years before was that John White had such a variety of signatures that no reasonable person could say he only had one." *Id.* at 5.  Additionally, Boshea claims that Eisenberg used her report to opine that Compass's expert had cherry-picked signatures to come to his conclusion that the questioned signature was fraudulent.  *Id.* at 5–6.

### III.    Fed. R. Civ. P. 60(b)

#### A.  Legal Standard

Fed. R. Civ. P. 60 is titled "Relief from a Judgment or Order."  Rule 60(b) is titled "Grounds

For Relief From A Final Judgment, Order, Or Proceeding."  It states:

> On motion and just terms, the court may relieve a party or its legal representative from
> a final judgment, order, or proceeding for the following reasons:
>
>> (1) mistake, inadvertence, surprise, or excusable neglect;
>
>> (2) newly discovered evidence that, with reasonable diligence, could not have
>> been discovered in time to move for a new trial under Rule 59(b);
>
>> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation,
>> or misconduct by an opposing party;
>
>> (4) the judgment is void;
>
>> (5) the judgment has been satisfied, released, or discharged; it is based on an
>> earlier judgment that has been reversed or vacated; or applying it prospectively is no
>> longer equitable; or
>
>> (6) any other reason that justifies relief.

Compass moves for relief from judgment under Fed. R. Civ. P. 60(b)(3).  ECF 370 at 7.

A movant must satisfy multiple criteria to prevail with respect to a Rule 60(b) motion.  In

addition to satisfying several threshold criteria, a movant must show that he qualifies for relief as

to one of six specific categories set forth in Rule 60(b).  *See Justus v. Clarke*, 78 F.4th 97, 105–06

(4th Cir. 2023) (stating that a movant can only show "that he qualifies for relief under one of the

six specific categories listed in Rule 60(b)" after he has shown that he meets the threshold elements

for relief under Fed. R. Civ. P. 60(b)), *cert. denied sub nom. Dotson v. Justus*, 144 S. Ct. 1096

(2024).

### 1. Threshold Criteria

As to the threshold criteria, the Fourth Circuit has said: "'To prevail, a party must first demonstrate (1) timeliness,[] (2) a meritorious defense,[] (3) a lack of unfair prejudice to the opposing party,[] and (4) exceptional circumstances.'" *Justus*, 78 F.4th at 105 (quoting *Wells Fargo Bank, N.A. v. AMH Roman Two NC, LLC*, 859 F.3d 295, 299 (4th Cir. 2017)); *see Gallagher v. Cohen*, DLB-24-1998, 2025 WL 2418596, at *5 (D. Md. Aug. 21, 2025); *Burnett v. Aldi, Inc. Maryland*, JRR-23-00376, 2025 WL 1284584, at *2 (D. Md. May 2, 2025); *Johnson-Lancaster & Assocs., Inc. v. H.M.C, Inc.*, GLR-20-992, 2020 WL 13592932, at *1 (D. Md. Nov. 2, 2020); *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, RDB-10-0318, 2012 WL 1145027, at *2 (D. Md. Apr. 3, 2012).

But, the Fourth Circuit has also enunciated a test with only three elements. In *United States v. Welsh*, 879 F.3d 530, 533 (4th Cir. 2018), it said: "To obtain relief from a judgment under Rule 60(b), a moving party must first show (1) that the motion is timely, (2) that he has a meritorious claim or defense, and (3) that the opposing party will not suffer unfair prejudice if the judgment is set aside." (internal citation omitted); *see Choice Hotels Int'l, Inc. v. Bonham*, 125 F.3d 847, 1997 WL 600061, at *1 (4th Cir. 1997) (per curiam) (unpublished table decision). It appears that the only difference concerns the timing of consideration regarding exceptional circumstances.

The evaluation of "exceptional circumstances", the fourth element of the threshold analysis, requires the Court to balance the value of finality of judgments against the concerns for fairness in proceedings. This balance is also included in the Fed. R. Civ. P. 60(b)(3) analysis. So, in some cases, the analysis occurs in the context of the Rule 60(b)(3) discussion. *Compare Compton v. Alton Steamship Co.*, 608 F.2d 96, 102 (4th Cir. 1979) (quoting *Bankers Mortg. Co. v. United States*, 423 F.2d 73, 77 (5th Cir. 1970)) (cleaned up) (stating that the exceptional

circumstances element in the threshold analysis requires the court to balance "'the sanctity of final judgments, expressed in the doctrine of res judicata, and the incessant command of the court's conscience that justice be done in light of all the facts.'") *with Schultz*, 24 F.3d at 630 (stating that in the final step of the Fed. R. Civ. P. 60(b)(3) analysis "'the court must balance the competing policies favoring the finality of judgments and justice being done in view of all the facts, to determine within its discretion, whether relief is appropriate in each case.'") (quoting *Square Const. Co. v. Washington Metro. Area Transit Auth.*, 657 F.2d 68, 71 (4th Cir. 1981)).

The first threshold element is that of timeliness. Rule 60(c)(1), titled "*Timing*", provides: "A motion under Rule 60(b) must be made **within a reasonable time**—and for reasons (1), (2), and (3) [in Rule 60(b)] no more than a year after the entry of the judgment or order or the date of the proceeding." (Boldface added). Thus, a party "must make a Rule 60(b) motion 'within a reasonable time,' Fed. R. Civ. P. 60(c)(1), and 'the movant bears the burden of showing timeliness.'" *Wells Fargo Bank, N.A.*, 859 F.3d at 300 (quoting *Moses v. Joyner*, 815 F.3d 163, 166 (4th Cir. 2016), *cert. denied sub nom. Moses v. Thomas*, 580 U.S. 1161 (2017)).

Wright and Miller posit: "What constitutes reasonable time necessarily depends on the facts in each individual case.[ ]" C. Wright & A. Miller, 11 Fed. Prac. & Proc. Civ. § 2866 (3d ed.). Further, they state, *id.*: "The courts consider whether the party opposing the motion has been prejudiced by the delay in seeking relief[ ] and whether the moving party had some good reason for the failure to take appropriate action sooner.[ ]"

The Fourth Circuit has explained that "the one-year limit is an *outer limit* of what may be timely[.]" *United States v. Williams*, 56 F.4th 366, 370 (4th Cir. 2023), *cert. denied,* 143 S. Ct. 2682 (2023) (emphasis in original). But, the "one-year period" is "not subject to equitable tolling." *United States v. Jones*, 2023 WL 314166, at *1 (4th Cir. Jan. 19, 2023) (per curiam).

The Fourth Circuit has "held on several occasions that a Rule 60(b) motion is not timely brought when it is made three to four months after the original judgment and no valid reason is given for the delay." *McLawhorn v. John W. Daniel & Co.*, 924 F.2d 535, 538 (4th Cir. 1991) (affirming district court's conclusion that movant's 60(b)(3) motion was untimely based on a delay of three and a half months between entry of summary judgment and filing of motion) (citing *Central Operating Co. v. Utility Workers of America,* 491 F.2d 245, 253 (4th Cir.1974)) (affirming denial of a Rule 60(b)(1) motion when defendants delayed "almost four months" between the filing of their Rule 60(b)(1) motion and "receiving notice of the default judgments"); *Consolidated Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.,* 383 F.2d 249, 251 (4th Cir.1967) (affirming court's refusal to set aside a default judgment pursuant to Fed. R. Civ. P. 55(c) and 60(b), partly because defendant did not act "promptly", delaying more than two and one-half months between entry of default and submission of motion to vacate judgment).

As to the second threshold element, the claim or defense must not "obviously lack merit." *Edmondson v. Eagle Nat'l Bank,* 348 F.R.D. 292, 295–96 (D. Md. 2024); *see Morgan v. Tincher*, 90 F.4th 172, 180 (4th Cir. 2024) (describing that this element will be met if the claim is "not plainly without merit or subject to judgment as a matter of law" in favor of the non-moving party). Allegations that are "conclusory" are not meritorious. *See Moeller v. D'Arrigo*, 163 F.R.D. 489, 492 (E.D. Va. 1995) (finding that a party who had only presented conclusory allegations did not present a meritorious claim).

In the context of Rule 60(b)(3), the Fourth Circuit has considered whether the defense presented a "close question" at trial. *Schultz*, 24 F.3d at 630. In *Morgan*, 90 F.4th at 180, the Fourth Circuit observed that the plaintiff's claims were meritorious because his suit "proceeded to

trial" and was "not plainly without merit or subject to judgment as a matter of law" in favor of the defendant.

In addition, a movant must show that relief would not result in unfair prejudice to the opposing party. The Fourth Circuit has said that the "prejudice factor is of lesser importance" than the meritorious defense factor. *Nat'l Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 265 (4th Cir. 1993); *see also Compton,* 608 F.2d at 102 ("[T]he court should in every case give some, though not controlling, consideration to the question whether the party in whose favor judgment has been entered will be unfairly prejudiced by the vacation of his judgment."). To constitute unfair prejudice, the harm must be more than "the inevitable result whenever a judgment is vacated." *Gray*, 1 F.3d at 265 (quoting *Randall v. Merrill Lynch*, 820 F.2d 1317, 1322 (D.C. Cir. 1987)); *see also Westlake Legal Grp. v. Yelp, Inc.*, 599 F. App'x 481, 484 (4th Cir. 2015); *Davey Tree Expert Co. v. Moon Site Mgmt., Inc.*, CCB-19-1220, 2020 WL 230895, at *3 (D. Md. Jan. 15, 2020).

### 2. Rule 60(b)(3)

As indicated, there is some overlap between the threshold elements for lodging a Rule 60(b) motion and the elements needed to prevail under Rule 60(b)(3). In determining whether relief pursuant to Rule 60(b)(3) is appropriate, the Fourth Circuit and lower courts in this Circuit have sometimes confined their analysis to the specific criteria pertinent to Rule 60(b)(3). *See, e.g., Morgan,* 90 F.4th at 177; *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994); *Young v. Act Fast Delivery of W. Virginia, Inc.*, ICB-16-09788, 2019 WL 4859009, at *2 (S.D.W. Va. Oct. 1, 2019); *Al-Sabah v. Agbodjogbe*, 2021 WL 5176463, at *3 (4th Cir. Nov. 8, 2021) (per curiam); *see also Zahariev*, 2023 WL 1519520, at *2 (noting that relief under Fed. R. Civ. P. 60 must only be awarded in exceptional circumstances and then only analyzing the movant's claim under the elements required "to prevail on a Rule 60(b)(3) motion").

For a party to prevail under Fed. R. Civ. P. 60(b)(3), the movant must "'have a meritorious [claim or] defense'; (2) demonstrate misconduct by clear and convincing evidence, and (3) show that 'the misconduct prevented the moving party from fully presenting its case.'" *Morgan*, 90 F.4th at 177 (alterations in original) (quoting *Schultz*, 24 F.3d at 630). Once the moving party has established these elements, "'the court must balance the competing policies favoring the finality of judgments and justice being done in view of all the facts, to determine within its discretion, whether relief is appropriate in each case.'" *Schultz*, 24 F.3d at 630 (quoting *Square Const. Co*, 657 F.2d at 71); *see Morgan*, 90 F.4th at 177; *Edmondson,* 348 F.R.D. at 295 (D. Md. 2024).

In determining whether to grant relief under Rule 60(b)(3), "a court does not assess the merits of a judgment, but instead focuses on whether the judgment was procured by unfair means." *Morgan*, 90 F.4th 177 (citing *Barlow v. Colgate Palmolive Co.*, 772 F.3d 1001, 1010 (4th Cir. 2014) (en banc)). This is a "high hurdle[.]" *Gallagher*, 2025 WL 2418596, at *9.

The matter of alleged misconduct arises here in the context of failure of plaintiff's counsel to produce certain demonstrative charts prepared by plaintiff's expert. A party's disclosure obligations with respect to an expert implicate Fed. R. Civ. P. 26(a). The purpose of Rule 26(a) is to allow litigants 'to adequately prepare their cases for trial and to avoid unfair surprise.'" *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 190 (4th Cir. 2017) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014)).

"Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses." *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278 (4th Cir. 2005). Rule 26(a)(2) provides (emphasis added):

(2) *Disclosure of Expert Testimony.*

(A) *In General.* In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

(B) *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report— prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) *any exhibits that will be used to summarize or support them*;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

(C) *Witnesses Who Do Not Provide a Written Report.* Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:

(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and

(ii) a summary of the facts and opinions to which the witness is expected to testify.

(D) *Time to Disclose Expert Testimony.* A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

 (i) at least 90 days before the date set for trial or for the case to be ready for trial; or

(ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

Additionally, Fed. R. Civ. P. 26(e)(1) provides:

A party who has made a disclosure under Rule 26(a) —or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court.

Fed. R. Civ. P. 37 "'gives teeth' to the Rule 26(a)(2) requirements by 'forbidding a party's use of improperly disclosed information at a trial, at a hearing, or on a motion, unless the party's failure to disclose is substantially justified or harmless.'" *Barnett v. United States*, DCN-20-2517, 2021 WL 5888542, at *2 (D.S.C. Dec. 13, 2021) (quoting *Tokai Corp. v. Easton Enters.*, 632 F.3d 1358, 1365 (Fed. Cir. 2011)). Rule 37(c)(1) imposes an "'automatic sanction' of exclusion," and the "general rule" is that any evidence that a party has "failed to properly disclose" should be excluded. *S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.,* 318 F.3d 592, 595 n.2, 596 (4th Cir. 2003) (quoting 1993 Advisory Committee Note to Fed. R. Civ. P. 37). In addition, Rule 37(c)(1) provides: "[T]he court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i) —(vi)."

Of relevance here, "a party's failure to produce 'obviously pertinent requested discovery material in its possession' qualifies as misconduct." *Morgan*, 90 F.4th at 177 (quoting *Schultz*, 24 F.3d at 630); *see Al-Sabah*, 2021 WL 5176463, at *1 (stating that "a party's misconduct during discovery can constitute a basis for Rule 60(b)(3) relief in certain circumstances.") For example, in *Morgan*, 90 F.4th at 179–80, the Court found that a party had engaged in misconduct because he failed to meet his obligations under Fed. R. Civ. P. 26(e) to "'supplement or correct' his response" to a discovery request "in 'a timely manner[.]'" (quoting Fed. R. Civ. P. 26(e)(1)). Such

a failure constitutes misconduct "irrespective" of whether it was "inadvertent or intentional[.]" *Id.* at 179.

When the misconduct involves the wrongful withholding of discovery material, relief under Rule 60(b)(3) is appropriate if that conduct "'makes it inequitable for the withholder to retain the benefit of the verdict[.]'" *Schultz*, 24 F.3d at 631 (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 n.10 (1st Cir. 1988), *aff'd*, 900 F.2d 388 (1st Cir. 1990)). However, misconduct alone is not dispositive as to Rule 60(b)(3). Notably, the movant must show that "the misconduct prevented the moving party from fully presenting its case." *Schultz*, 24 F.3d at 630; *see, e.g., Edmondson*, 348 F.R.D. at 297 (finding this element fulfilled because plaintiffs' "discovery strategy would have been different and they would have presented more compelling arguments" had they received the undisclosed discovery).

## B. Discussion

### 1. Rule 60(b) Threshold Elements

Compass's Rule 60(b) motion is clearly timely. Judgment was entered in favor of Boshea on August 15, 2025. ECF 365. Less than a month later, on September 10, 2025, Compass sought relief under Rule 60(b)(3). ECF 370.

Boshea argues that Compass lacked a "meritorious defense." ECF 374 at 2. He points to the "jury's award of enhanced damages" in favor of Boshea. But, Boshea appears to misunderstand what is required to meet this element. This inquiry asks the court to determine whether the claim or defense was "plainly without merit" or "subject to judgment as a matter of law" in favor of the nonmoving party, not whether the jury was ultimately persuaded by one side or the other. *Morgan*, 90 F.4th 180.

I readily conclude that Compass presented a meritorious defense at trial. Compass maintained that it did not have an obligation to pay severance to Boshea because it never made a severance agreement, oral or written, with Boshea and that White's signature on the Agreement was forged. *See, e.g.*, ECF 14 at 7 (asserting the affirmative defense that Boshea's "claims are barred in whole or in part by fraud"); ECF 38 at 3 ("The purported employment agreement upon which Boshea relied in filing the instant lawsuit . . . was not signed by Compass Marketing. Indeed, it is a forged document, as it was not signed by John White . . . and John White did not authorize anyone to sign the document on his behalf."); ECF 53 at 8 (asserting the affirmative defense that the employment agreement "is not authentic, as it was not entered into by Plaintiff and Compass Marketing"); ECF 125-2 at 9 (Compass claiming, in its answer to Boshea's interrogatories, that "[t]he alleged contract upon which Boshea relies . . . was never executed. The signature that appears on [the Agreement] above John White's typed name was not placed there by John White and was not authorized by John White . . . [E]ither Boshea or someone collaborating with Boshea forged the alleged employment agreement for John White without his authorization"); ECF 327 at 2 (Compass asserting in its Pretrial Order for the second trial that it "intends to prove that [the Agreement], relied on by Boshea, is fraudulent, was never signed by John White, and the signature on the Agreement purporting to be John White's signature is a forgery").

In support of its defense, Compass produced Payne, an expert witness, who opined at two trials that the signature on the Agreement was a forgery. *See* ECF 300 at 119 (Payne opining at the first trial that "John White highly probably did not sign the signature in his own name on the

questioned document [the Agreement]")[21]; *see also* ECF 142 at 1–2 (describing how Payne "determined that the signature on the contract at issue in this litigation purporting to be John White's is a forgery"). *See Wells Fargo Com. Distribution Fin., LLC v. Craft*, NGE-19-11544, 2020 WL 5223568, at *2, *4 (E.D. Mich. Apr. 15, 2020) (vacating default judgment against defendant pursuant to Fed. R. Civ. P. 60(b)(1), concluding that the defendant's assertion that the "signature" on the "guaranty" at issue in the suit was a forgery is a meritorious defense).

Boshea makes no argument that he would be subject to unfair prejudice if the Court vacated the judgment and ordered a new trial. *See* ECF 374. Moreover, there is no basis to conclude that Boshea would suffer prejudice, beyond "the inevitable result whenever a judgment is vacated." *Nat'l Credit Union Admin. Bd.*, 1 F.3d at 265. Therefore, Compass has also met this element.

In sum, Compass's motion is timely, made pursuant to a meritorious claim, and there is no showing of unfair prejudice. Therefore, Compass has satisfied the threshold elements to lodge a motion for relief pursuant to Fed. R. Civ. P. 60(b)(3).

### 2. Rule 60(b)(3)

As stated, a movant must demonstrate a meritorious defense to prevail under Rule 60(b)(3). Compass's claim that it never entered into a severance agreement with Boshea, oral or written, and that the signature of John White on the Agreement is a forgery, constitutes a meritorious defense. That element is readily met. I turn next to the requirement that the movant must establish, by clear

---

[21] At the first trial, the jury found an oral contract, not a written one. ECF 370 at 14; *see* ECF 246 at 1. As noted, I cannot cite to a transcript from the second trial because the parties have not provided the Court with the transcript.

and convincing evidence, that the opponent engaged in misconduct.  This element is also easily met.

Boshea retained Eisenberg as an expert to undertake a handwriting analysis of White's purported signature on the Agreement.  ECF 370-2 at 3, 6.  As noted, Boshea produced Eisenberg's Rebuttal Report to Compass in December 2024, in compliance with his obligations under Fed. R. Civ. P. 26(a)(2)(B).  ECF 374-1 at 18–19.  That report included several demonstrative charts, pertinent to the expert's analysis.

As noted, it appears that plaintiff's expert belatedly provided plaintiff's counsel with additional charts shortly before she was to testify at the second trial.  *Id.* at 18 (Boshea's counsel stating: "[Eisenberg] sent these [charts] to me this morning").  Obviously, Boshea's lawyers could not have provided Compass's counsel with the Undisclosed Charts prior to trial, because they only received them shortly before the trial.  *See* ECF 382-1 at 2.  Yet, Boshea's counsel seemed unaware that there were any differences between the charts Eisenberg emailed to counsel just before trial and those in the Rebuttal Report, insisting that he had produced the new charts in December of 2024 and that they were the "same."  ECF 374-1 at 19; *see also*, *e.g.*, *id.* at 14 (Boshea's counsel claiming the Second Undisclosed Chart had been produced in December 2024); *id.* at 20–21 (Boshea's counsel offering to ask Eisenberg "on the record" whether the charts she had been testifying about were "the same charts included in [her] December report" and affirming that it was his "understanding" that the charts were the same).  However, as stated earlier, the expert maintained that the charts in issue were substantively the same as the charts contained in the Rebuttal Report.  ECF 374-1 at 34, 39.

To be sure, plaintiff's counsel is ultimately responsible for the use of the Undisclosed Charts, even if counsel did so without realizing that they had never been produced to Compass.

Although the failure of plaintiff's counsel to disclose the new charts to Compass in a timely manner was unintentional, the lack of sinister intent does not foreclose a finding of misconduct under Rule 60(b)(3). Boshea's counsel violated his discovery obligations under Fed. R. Civ. P. 26(a), (e).

As discussed, Fed. R. Civ. P. 26(e)(2) governs disclosure of supplemental expert disclosures. It states: "Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Local Rule 106(4)(c) states: "Submission of a pretrial order . . . shall be deemed to constitute compliance with Fed. R. Civ. P. 26(a)(3)." And, Local Rule 106(4)(a) dictates: "Unless otherwise ordered by the Court, the pretrial order shall be submitted to the judge seven (7) days before the pretrial conference is to be held." Therefore, pursuant to Fed. R. Civ. P. 26(e)(2) and Local Rule 106(4), Boshea's disclosure of any supplemental expert material was due by the time of the submission of the proposed pretrial order. Compass and Boshea submitted proposed pretrial orders on March 17, 2025. ECF 316 (Compass); ECF 317 (Boshea).[22]

Even assuming the submission of an amended pretrial order, it would have been due seven days before the pretrial conference of July 29, 2025. *See* ECF 346; *see* Local Rule 106(4)(a). On July 28, 2025, the day before the pretrial conference, Boshea's counsel submitted a proposed pretrial order (ECF 345) and appended a redlined version (ECF 345-1) with a comparison to Boshea's previous pretrial order (ECF 317). The amended pretrial order reflected that Ashley

---

[22] Initially, the submission of the pretrial order was due by January 17, 2025. ECF 277. The date was extended when the trial was postponed at the request of defense counsel. ECF 296. Thereafter, on January 28, 2025, Mr. Boshea died. *See* ECF 304 at 1 n.1. At a hearing in Illinois on April 3, 2025, the Illinois probate court declined to appoint Boshea's adult daughter as the administrator of Boshea's estate, because of an objection lodged by Compass. ECF 331, ECF 332. And, that court set the next probate hearing for mid June of 2025. ECF 331. This necessitated the postponement of the second trial here, which was then set for April 21, 2025. *Id.* The trial was reset for August 4, 2025. *Id.*

Boshea had been named as the administrator of David Boshea's estate. ECF 345-1 at 1. Then, on August 3, 2025, counsel for the parties submitted another amended pretrial order. ECF 347. But, the Undisclosed Charts were never mentioned, presumably because plaintiff's counsel did not yet have them.

Courts have found that the failure "to disclose or produce evidence requested in discovery" qualifies as misconduct under Rule 60(b)(3). *Camastro v. W. Virginia Alcohol Beverage Control Comm'n*, FPS-14-67, 2015 WL 9244286, at *4 (N.D.W. Va. Dec. 17, 2015); *see Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983) ("Failure to disclose or produce evidence requested in discovery can constitute Rule 60(b)(3) misconduct."); *Montgomery v. Hall*, 592 F.2d 278, 279 (5th Cir. 1979) ("Our cases have held that a party may engage in rule 60(b)(3) misconduct if he fails to disclose evidence he knows about and the production of such evidence was clearly called for "by any fair reading" of the discovery order."). Compass has shown by clear and convincing evidence that Boshea engaged in misconduct within the meaning of Rule 60(b).

That said, I am readily satisfied that the conduct here—glaring as it is—is little more than the proverbial tempest in a teapot. As to the third element, Boshea's misconduct did not preclude Compass from fully presenting its case.

With respect to the third element, Compass contends that the use of the Undisclosed Charts during Eisenberg's testimony prevented Compass from fully presenting its case. It asserts, ECF 382 at 7:

> (1) Compass Marketing did not have advance notice of this new testimony and the new charts and, therefore, it could not plan how to cross-examine Ms. Eisenberg on these new analyses; (2) Mr. Payne was not given the opportunity to review these new charts or hear her testimony to give counsel any guidance on how to rebut these technical issues; (3) Mr. Payne could not rebut this testimony himself because Ms. Eisenberg was called solely as a rebuttal witness, which precluded Mr. Payne from testifying further.

As I assess this factor, I am mindful that, despite Compass's repeated cries of foul play, and its insistence that it was fatally disadvantaged by Boshea's misconduct with respect to such a critical witness, Compass never once bothered to depose that witness. In a case in which Compass has never failed to pursue every grievance and every avenue available to it for relief, including a seemingly baseless objection to the appointment of Boshea's daughter as the Administrator of Boshea's estate, it never bothered to depose Eisenberg, whose charts it now claims were so crucial to the presentation of its case. And, it had ample opportunity to do so, before the first trial; during the first trial (ECF 299 at 172–73, 175); and before the second trial. The failure of Compass to ever depose Eisenberg suggests that Compass did not really attach the weight to the charts that it assigns to them in its Motion.

In support of Compass's claim that it has satisfied the third element, Compass relies heavily on two Fourth Circuit cases in which the Court granted relief under Rule 60(b)(3): *Morgan*, 90 F.4th 172, and *Schultz*, 24 F.3d 626. ECF 370 at 10–11. The Fourth Circuit's analysis in both cases is instructive. But, the facts at issue here stand in stark contrast to the impact of the misconduct in those cases.

In *Morgan*, 90 F.4th at 174, the plaintiff, Frank Morgan, filed a civil rights suit pursuant to 42 U.S.C. § 1983 against a police officer, J. D. Tincher, alleging that the officer had subjected plaintiff to the use of excessive force, in violation of the Fourth Amendment. According to the plaintiff, Tincher "struck Morgan several times with a police baton without cause during his arrest on a public street." *Id.* at 175. Additionally, Morgan claimed that Tincher hit Morgan with his hands, feet, and a metal pipe, while Morgan was handcuffed at the police station. *Id.*

Plaintiff submitted discovery requests to Tincher ten days after the court's discovery deadline. *Id.* He sought disclosure of "any allegation that had been made against Tincher 'by any person' while Tincher was employed with the police department, as well as 'all litigation,' excluding domestic matters, in which Tincher was a named party, including 'the allegations, the nature of the case and the outcome.'" *Id.* Additionally, plaintiff sought "any documents relating to 'any lawsuits' against Officer Tincher or 'claims of excessive physical abuse' or 'physical assault' while he was employed by the police department." *Id.*

Tincher did not object to the untimely discovery requests and disclosed one prior allegation of excessive force. *Id.* But, "Tincher did not disclose that any lawsuits had been filed against him." *Id.* Before trial, however, plaintiff discovered that Tincher had been sued for use of excessive force. *Id.* Pursuant to Federal Rule of Evidence 404(b), Morgan "filed a notice of intent to introduce at trial" evidence from the lawsuit as a "'prior bad act[.]'" *Id.* At trial, Morgan questioned Tincher about the suit. *Id.* Tincher testified that he was "not a defendant in a lawsuit", claiming that suit against him had been "dropped." *Id.* After Morgan presented his evidence, he discovered "from a third party" that another individual had filed a similar excessive force claim against Tincher two months before Morgan's trial. *Id.* This individual claimed that Tincher struck him with closed fists during the course of his arrest and assaulted him while he was handcuffed at the police station. *Id.* at 176. The same attorney who represented Tincher in Morgan's case was also defending him in the other suit, and clearly had knowledge of it. *Id.*

While the trial was in progress, Morgan brought Tincher's failure to disclose the third lawsuit to the attention of the district judge, who chastised Tincher's counsel for failing to comply with his "'duty to supplement'" his responses to Morgan's discovery requests. *Id.* Additionally, Morgan asked the district judge to allow him to "recall Officer Tincher as a witness to question

him" about the newly discovered suit.  *Id.*  The judge "did not rule on this request but advised Morgan to file a pleading addressing the issue."  *Id.*  Morgan did so, moving for sanctions for failure to supplement discovery, in violation of Fed. R. Civ. P. 26(e)(1)(A).  *Id.*  Before the court addressed Morgan's motion, however, the jury reached its verdict, finding in favor of Tincher.  *Id.*

Thereafter, Morgan moved for relief under Fed. R. Civ. P. 60(b)(3).  *Id.*  The district court denied Morgan's motion for sanctions and his Rule 60(b)(3) motion.  The Fourth Circuit reversed and remanded for a new trial.  *Id.* at 174.

The Fourth Circuit concluded that Tincher's failure to supplement his responses to discovery requests with information about the third lawsuit, as required by Rule 26(e), constituted "misconduct by clear and convincing evidence[.]"  *Id.* at 179.  As to whether Morgan's claim was meritorious, the Court found that "Morgan's claims against Officer Tincher proceeded to verdict in a jury trial and thus, were not plainly without merit or subject to judgment as a matter of law in Officer Tincher's favor."  *Id.*  at 180.  As to the third factor, the court "easily conclude[d] that evidence of the" third lawsuit "'would have helped' strengthen Morgan's arguments before the jury."  *Id.* (quoting *Schultz*, 24 F.3d at 630).

The Court explained that the undisclosed evidence was helpful because it was "a third claim of excessive force against Officer Tincher" and the "allegations regarding Tincher's actions against [the plaintiff in the third suit] were strikingly similar to Morgan's own allegations against Tincher."[23]  The Court also noted that "additional evidence of Tincher's allegedly assaultive

---

[23] The standards for discovery and admission of evidence at trial are quite different.  It appears that Morgan sought to introduce the evidence of the third excessive force claim to show that the defendant had a propensity for misuse of force.  In *Morgan*, the Fourth Circuit seemed to conclude, without discussion, that the evidence of the defendant's other bad acts would have been admissible.

behavior plainly would have strengthened Morgan's case against Tincher." *Id.* Therefore, the Court concluded that "Morgan's inability to present evidence regarding [the third lawsuit]" was "'obviously pertinent requested discovery material'" and the failure to disclose interfered with Morgan's ability to "'fully present[ ]' his case against Officer Tincher." *Id.* (quoting *Schultz*, 24 F.3d at 630) (alterations in original).

In the final step of the analysis, the Court found that the balance of the consideration for final judgments as compared to the "fairness and integrity of the fact-finding process, weighed in Morgan's favor." *Morgan,* 90 F.4th at 180. In its view, Tincher's "failure to produce evidence" of the third lawsuit "impede[d] the pursuit of 'justice[.]'" *Id.* at 180–81. Additionally, the Court stated that Tincher's "misconduct may have led to the presentation of false testimony as well," because Tincher testified that he was "not a defendant in a lawsuit, even though the" third lawsuit "was pending" when he testified. *Id.* at 181.

S*chultz*, 24 F.3d 626, is also illuminating. In *Schultz*, the plaintiff was injured when the small pleasure boat on which she was a passenger crossed a high wake that was created by a large

---

Other bad acts are admissible under Fed. R. Evid. 404(b)(2) to prove, *e.g.*, motive, plan, knowledge, absence of mistake, or lack of accident. But, Fed. R. Evid. 404(b)(1) states: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *See*, *e.g.*, *United States v. Bush*, 944 F.3d 189, 195 (4th Cir. 2019) (stating that Rule 404(b) precludes admission of other bad acts to show a person acted in accordance with that other conduct); *United States v. Sterling*, 860 F.3d 233, 246 (4th Cir. 2017) (stating that evidence of other wrongs may not be offered to prove the defendant's predisposition to wrongful conduct); *see United States v. Webb*, 965 F.3d 262, 266 (4th Cir. 2020) (stating that prior or other bad acts are admissible when intrinsic to the crime charged or if necessary to complete the story on trial); *United States v. Denton*, 944 F.3d 170, 186 (4th Cir. 2019) (noting that "[a]cts that are intrinsic to the charged offense . . . 'do not fall under Rule 404(b)'s limitations on admissible evidence.'") (quoting *United States v. Chin*, 83 F.3d 83, 87–88 (4th Cir. 1996)), *cert. denied*, 140 S. Ct. 2585 (2020); *Sparks v. Gilley Trucking Co.*, 992 F.2d 50, 51–53 (4th Cir. 1993) (concluding that prior evidence of speeding was inadmissible to show that the driver was speeding at the time of the incident at issue). *See also* Fed. R. Evid. 403.

passenger vessel. *Id.* at 628. The plaintiff brought a negligence suit against the owner and the operator of the small boat and the large boat and its owner. *Id.* Both the operator and the owner of the small boat had "consumed alcoholic beverages" prior to the accident. *Id.* The plaintiff alleged that the operator of the large boat "was negligent for operating its vessel at an excessive speed and creating an unreasonable wake," and claimed that the small boat's owner and operator were "negligent for operating the small craft at an excessive speed and handling the wake in an improper manner." *Id.*

The defense served an interrogatory on the plaintiff, asking her to "identify and describe in detail any . . . report concerning the incident[.]" *Id.* at 629. The plaintiff disclosed two reports. But, she did not disclose a report from the United States Coast Guard Marine Safety Office that "concluded that there was 'no evidence that [the large boat] was operating at an excessive speed,'" and stating that a small boat "'[c]rossing a four foot wake in a 16 foot boat with five persons aboard at ten knots is very likely to cause injuries to the persons aboard.'" *Id.* (quoting the undisclosed report) (alteration in *Schultz*).

In the district court's findings of fact and conclusions of law, it found that the large boat's "failure to reduce speed was negligence and this negligence was the proximate cause of" the plaintiff's "injury because its excessive speed created the three foot wake and the wake caused the smaller boat to 'slam down' on the water." *Id.* Additionally, the court "absolved" the owner and the operator of the small boat from "liability", finding that both had acted reasonably. *Id.*

The large boat company filed a Rule 60(b) motion, seeking, *inter alia*, a new trial. *Id.* at 630. The company claimed that it had been prejudiced by the withholding of the Coast Guard's report, "although such reports had been properly requested during discovery." *Id.* The district court denied the company's motion, concluding that the report "was not newly discovered

evidence because it could have been discovered by the exercise of due diligence and that the report would not have changed the court's finding as to the liability of" the boat company. *Id.* The Fourth Circuit reversed and remanded for a new trial. *Id.* at 632.

The Fourth Circuit determined that the defendant large boat company presented a meritorious defense, to the effect that the other defendant, the operator of the small boat, was responsible for the plaintiff's injuries, and that negligence of the operator "was a close question." *Id.* at 630. The Court also found that even though the plaintiff claimed she did not intentionally withhold the Coast Guard report, "the failure to produce such an important report which contained information helpful to an adversary's position is not easily excused." *Id.* Notably, the Court concluded that "an adverse party's failure, either inadvertent or intentional, to produce such obviously pertinent requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3)." *Id.*

As to the third factor, the Court was of the view that the report "would have helped" the large boat company "bolster its defense because the report implicated" the small boat operator and "exonerated" the big boat. *Id.* The Court also noted a variety of litigation strategies that the big boat company could have pursued if it had been provided with the report, such as calling the author of the report to testify, or conducting further investigation to uncover additional exculpatory evidence. *Id.* In balancing the interest in finality of judgments against the importance of integrity in the fact-finding process, the Court said that "a party's failure to produce a requested document *so favorable to an adversary* impedes that process and requires redress in the form of a new trial." *Id.* at 631 (emphasis added).

41

The movants in both *Schultz* and *Morgan* were clearly disadvantaged by the discovery violations. Unlike in this case, the movants in those cases did not learn of the discovery failures until it was too late to cure the misconduct.

In *Schultz*, 24 F.3d at 630, the withholding of the Coast Guard report apparently came to light after trial and the matter was not raised until after trial.[24] So, during the trial, the movant did not have an opportunity to address the report or use it in its defense. *Id.* In *Morgan*, 90 F.4th at 175–76, the movant did not learn that there was a third lawsuit against the defendant for excessive force until the conclusion of his presentation of evidence at trial. The movant "alerted the district court" about the pending litigation; "asked the district court to recall" the defendant about the previously undisclosed third lawsuit; "filed a motion for sanctions based on" the defendant's "failure to supplement discovery"; and "asked that the" third lawsuit be introduced at trial because the defendant was available to "testify to the" allegations in the third lawsuit. *Id.* at 176. But, before the district court "address[ed] the sanctions motion" or the movant's "request to question" the defendant about the third lawsuit, the jury rendered a verdict in favor of the defendant. *Id.* at 176–77.

Here, the matter of the Undisclosed Charts surfaced at the outset of Eisenberg's direct testimony, providing an opportunity to redress the belated disclosure. The plaintiff did not introduce the charts into evidence. The parties came to a joint resolution, by which plaintiff agreed not to make further use of the Undisclosed Charts. Moreover, the Undisclosed Charts are largely duplicative of charts that had already been timely produced.

---

[24] The document was apparently accessible to the public but counsel for the larger boat did not obtain a copy of it.

To review briefly, Compass complained about the First Undisclosed Chart after Boshea's counsel began to question Eisenberg about it, and discussed this omission with the Court almost immediately after Boshea's counsel presented the Second Undisclosed Chart.  ECF 374-1 at 10–11, 14–15.  So, the error of plaintiff's counsel as to that chart was caught quickly.  I also told Compass that I would "entertain" an "appropriate" solution.  *Id.* at 23.  Compass's counsel acknowledged that he did not expect "to be examining" Eisenberg "on that detail[.]"  *Id.*  After plaintiff's counsel made reference to the Fourth Undisclosed Chart, the parties agreed that plaintiff would limit the expert's testimony to the charts that had been included in the Rebuttal Report, produced months earlier.  *Id.* at 28, 31–34.

Compass did not ask for time to review the Undisclosed Charts, either with its own expert, Payne, or in regard to Eisenberg's cross-examination.  Nor did Compass ask to recall Payne or to depose Eisenberg.  Instead, counsel for both sides agreed that plaintiff would only use charts that had been disclosed to Compass in Eisenberg's 2024 Rebuttal Report.  *Id.* at 32–34.  After Compass's counsel proposed this solution, I asked if the trial could "move on."  *Id.* at 33.  Compass's counsel expressly replied: "At this point, yes, we have a solution."  *Id.*

Defense counsel knew from the first trial that, as to a discovery snafu, this Court would accommodate a request for a deposition; provide additional time to prepare for cross-examination of the expert; and allow time to confer with an expert.  But, the only remedy Compass sought from this Court was an assurance that its "objection is noted on the record,", *id.* at 22, and the limitation on plaintiff's use of the Undisclosed Charts.  *Id.* at 34.  The failure to ask this Court for any other relief reflects the relative insignificance of the difference between the information in the Undisclosed Charts and the charts that had been produced months earlier in the 2024 Rebuttal

Report.  Compass's conduct reminds the Court of the famous refrain from Disney's *Frozen*: Compass "let it go."

Compass claims that it was harmed because "Mr. Payne *could not* rebut this testimony himself because Ms. Eisenberg was called solely as a rebuttal witness."  ECF 382 at 7 (emphasis added).  In *Morgan*, the movant had asked to recall the defendant, who had not disclosed a similar excessive force suit filed against him.  In contrast, Compass never asked to recall Payne.  Had Compass made that request, Payne's testimony would have been in the form of surrebuttal testimony.  Such evidence "is admissible to respond to any new matter brought up on rebuttal." *United States v. King*, 879 F.2d 137, 138 (4th Cir. 1989).  And, the matter of "surrebuttal testimony is entirely within the trial court's sound discretion."  *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 757 F. Supp. 1088, 1096 (S.D. Cal. 1990), *aff'd*, 977 F.2d 1555 (Fed. Cir. 1972).

This Court would have allowed Payne to testify again, had such a request been made.  But, defense counsel led the Court to believe that, apart from a formal objection on the record, he was amenable to proceeding, so long as no further use was made of the Undisclosed Charts.[25]

Critically, as to the substance of Eisenberg's testimony in connection with the Undisclosed Charts, the belated disclosure of the Undisclosed Charts and Eisenberg's reference to them did not prevent Compass from fully presenting its case.  *Morgan* and *Schultz* are distinguishable on this basis, as well.

---

[25] I am also unmoved by Compass's claim that in its frantic attempt to determine the source of the Undisclosed Charts, it was unable to hear Eisenberg's testimony.  ECF 370 at 13 n.5.  Two capable attorneys represented Compass at the second trial.  ECF 374-1 at 1.  It strains credulity to believe that both attorneys were so desperate to find the charts that neither one could listen to Eisenberg's testimony.  Even if this were the case, as in the first trial, Compass could have asked that plaintiff provide a transcript of Eisenberg's testimony, as happened at the first trial.  *See* ECF 299 at 200–201; ECF 300 at 96–97.

In *Schultz*, 24 F.3d at 629, the undisclosed report exculpated the movant.  In the Fourth Circuit's analysis of the impact of non-disclosure on the movant's ability to present its case, the Court considered that the undisclosed report "would have helped" the large boat "bolster its defense because the report implicated" the other defendants and "exonerated" the movant.  *Id.* at 630.  The Court listed the variety of investigatory strategies and litigation techniques the movant could have employed if it had received the report, including calling the author of the report to testify or enabling the defense attorneys to find "additional evidence that supported the report's findings and conclusions, which are *favorable* to" the movant.  *Id.* (emphasis added).

In *Morgan*, 90 F.4th at 180, the Court concluded that the withholding of evidence of another excessive force lawsuit lodged against the defendant "interfered" with the movant's "ability to 'fully present [ ]' his case against" the officer.  Noting the similarities between the allegations in the undisclosed third lawsuit and the plaintiff's claims of the officer's "assaultive behavior," the Court stated that it could "easily conclude that evidence of the [third] lawsuit 'would have helped' strengthen" the movant's case.  *Id.*

In sharp contrast here, the Undisclosed Charts do not support Compass's theory that White's signature on the Agreement was a forgery.  In other words, they do not strengthen defendant's case.  Moreover, the signatures that are included in the Undisclosed Charts were included in Eisenberg's Rebuttal Report.  Both experts relied on multiple features of White's known signatures and the questioned signature to form their conclusions.  The new charts were largely just more of the same.  Instead of serving ten slices of cake, a few additional slices were added.

A review of the Charts in the Rebuttal Report and all of the Undisclosed Charts makes clear that neither their belated disclosure nor Eisenberg's testimony impeded Compass's ability to present its case.

All of the charts in the Rebuttal Report and the Undisclosed Charts have a rectangle at the top, labeled Exhibit Q1, the questioned signature. All of the known signatures in the Undisclosed Charts also appear in the Rebuttal Report, although some are labeled differently.[26] And, of import, three of the four Undisclosed Charts had close analogs in the Rebuttal Report.

The Second Undisclosed Chart (ECF 382-1 at 6–7) and Chart Five in the Rebuttal Report (ECF 370-2 at 15) are similar. Both charts, reproduced below, highlight the same point regarding the questioned signature. Chart Five in the Rebuttal Report places a circle around two loops at the end of the questioned signature and a circle around loops on exhibit K2 and exhibit K16, which are known exemplars. It also states that "the 'te' varies greatly in Mr. White's known signatures, [and] the same formation of the 'te' in Exhibit Q1 is repeated within the known signatures." ECF 370-2 at 15. In the Second Undisclosed Chart, the arrow pointing to the questioned signature highlights the loops in the questioned signature. Eisenberg also had arrows pointing to the same area in the known signatures at exhibits K2, K4, K5, K10, K11, K15A, and K15E. Eisenberg compared the loops in the questioned signature to the "t-e" in White's known signatures. ECF 374-1 at 26–27.

The main distinction between Eisenberg's testimony and the content of Chart Five in the Rebuttal Report is the number of comparator known signatures. In Eisenberg's testimony, she

---

[26] Exhibit K14 contains two separate signatures, which Eisenberg labeled as exhibit 14A and 14B in the Undisclosed Charts. *Compare* ECF 382-1 at 4–5 *with* ECF 370-2 at 74–75. Exhibit K15 in the Rebuttal Report contains five separate signatures, labeled as K15A, K15B, K15C, K15D, and K15E in the Undisclosed Charts. *Compare* ECF 382-1 at 5 *with* ECF 370-2 at 76–77.

discussed nine of White's known signatures, whereas Chart Five only compares White's questioned signature to two of his known samples. *Compare* ECF 374-1 at 27 *with* ECF 370-2 at 15.



Chart 3(c) in the Rebuttal Report is an analog to the Third Undisclosed Chart (ECF 382-1 at 8–9). Both are reproduced below.

Chart 3(c) describes the "pointed apex at the top of the letter form." ECF 370-2 at 14. Both Chart 3(c) and the Third Undisclosed Chart have an arrow pointing to the same location of the questioned signature. Six of the eight known signatures used in Chart 3(c) appear in the Third Undisclosed Chart. Additionally, the Third Undisclosed Chart includes exhibits K2, K3, K4, K5, K9, K10, K13, K14A, K14B, and K15A to K15E. Chart 3(c) and the Third Undisclosed Chart have red arrows that point to the peak in the "J" in the following known samples of White's signature: exhibits K1; K6; K7; K8; K11; and K12. Additionally, Chart 3(c) has red arrows pointing to the apex in the "J" in the known exemplars on exhibits K17C and K17X. *Id.* These known samples were not used in the Third Undisclosed Chart.



THIRD UNDISCLOSED CHART (APEX CHART)

**REBUTTAL REPORT CHART 3(c) (APEX CHART)**

c.  Third is the pointed apex at the top of the letter form.

The Fourth Undisclosed Chart (ECF 382-1 at 10–11) highlights the same individual characteristic in the questioned signature as Chart 3(a) in the Rebuttal Report (ECF 370-2 at 13): the "beginning stroke."  All the signatures in Chart 3(a) are part of the Fourth Undisclosed Chart. Both charts are reproduced below.

Chart 3(a) in the Rebuttal Report has red arrows pointing to the "beginning stroke" in known samples exhibits K2, K15A, K15C, K15E.  The Fourth Undisclosed Chart has red arrows pointing the same known samples of White's known signature, except for exhibit K2.  Even so, at trial, Eisenberg testified that there was the "same placement of the" beginning stroke in the questioned signature as "in K2, K15a, K15c and K15e[.]"  ECF 374-1 at 37.

## FOURTH UNDISCLOSED CHART (STROKE CHART)

Letter Formation – "J" Beginning Stroke



Letter Formation – "J" Beginning Stroke



Blue Background = Questioned Signature / Green Background = Known Signatures
Page 1

Blue Background = Questioned Signature / Green Background = Known Signatures
Page 2



The significant overlap in content between the Second, Third, and Fourth Undisclosed Charts and the charts that are included in the Rebuttal Report render specious any claim that these Undisclosed Charts prevented Compass from fully presenting its case.

I turn to the First Undisclosed Chart (ECF 382-1 at 4–5), reproduced below. Using the First Undisclosed Chart, Eisenberg testified about the peak formation in the "W" in the questioned signature. ECF 374-1 at 11–13; *see* ECF 370 at 15. This information does not appear in the charts included with the Rebuttal Report of December 2024.

FIRST UNDISCLOSED CHART (PEAK FORMATION)

Blue Background = Questioned Signature / Green Background = Known Signatures
Page 1

Blue Background = Questioned Signature / Green Background = Known Signatures
Page 2

Compass argues that Eisenberg relied on peak formations "to try to discredit Mr. Payne's testimony." ECF 370 at 15. Conversely, Boshea claims that "Eisenberg did not change her testimony or offer new opinions." ECF 374 at 3. Moreover, Boshea contends that the testimony regarding peak formations was similar to Eisenberg's observations about the "pointed edges that John White uses in his signature" that were part of Eisenberg's Rebuttal Report. *Id.* Boshea points to Eisenberg's Rebuttal Report chart regarding the "apex" that appears in the "J" in the questioned signature. *Id.* (citing Rebuttal Report Chart 3(c), ECF 370-2 at 14). Compass disagrees with

Boshea's characterization, stating: "Variation is a different concept than apex, which is why they appear in different charts and are termed differently." ECF 382 at 3.

As noted, Rebuttal Report Chart 3(c) and the Third Undisclosed Chart focus on the "J" in the questioned signature, whereas the First Undisclosed Chart pertains to peak formations in the "W" in the questioned signature. But, the difference does not equate to significance. Eisenberg relied on her analysis of the peak formations to support her critique of Payne, claiming that Payne cherry-picked among White's known signatures to support his conclusion that the questioned signature was not White's. Eisenberg claimed that peak formations were present in the universe of known signatures that Payne reviewed, and noted Payne's failure to identify them. ECF 374-1 at 13.

Later in her testimony, Eisenberg claimed that Payne cherry-picked differences about White's questioned signature from the known samples, this time examining the pointed apex or top of the "J" in the questioned signature, a concept supported with a chart in the Rebuttal Report. *Id.* at 27–28. Payne had opined "that the questioned signature had a pointed apex for the j" and he contrasted this characteristic with multiple known samples that "showed a lot of curved formations of the j's[.]" *Id.* at 27. At trial, Eisenberg opined that there were known samples of White's signature that had "a pointed j top" or apex. *Id.* Eisenberg made this observation to support her opinion that Payne was coming "up with these quote/unquote 'differences,'" even though there were known samples that had a pointed apex. *Id.* at 28. Eisenberg also claimed that, "again," Payne was "cherry-picking" differences between the beginning stroke of the questioned signature and the known samples. *Id.* at 37. According to Eisenberg, "that same placement of the initial stroke" in the questioned signature appears in four known White signatures, which Payne's analysis did not reflect. *Id.*

Compass's argument that Eisenberg's reliance on peak formations was a significant part of her analysis is unpersuasive. Eisenberg made the point to rebut Payne's testimony, relying on charts and analyses that had either previously been disclosed to Compass or were substantively very similar to what had been disclosed. And, on cross-examination, defense counsel had the opportunity to question Eisenberg and challenge her allegations that Payne had cherry-picked signatures in his analysis. *Id.* at 46–47.

Notably, Eisenberg did not change her opinion that she could not determine whether the questioned signature was authentic. *Id.* at 41. This was the same conclusion set forth in Eisenberg's Rebuttal Report. ECF 370-2 at 8.[27] Comparing the Undisclosed Charts and the analysis in Eisenberg's testimony with her Rebuttal Report, the differences between these analyses are insignificant.

Indeed, Compass does not explain how its case would have been strengthened if Compass had been provided with the Undisclosed Charts before trial, or how it was harmed by their belated disclosure. Furthermore, as discussed earlier, Compass's actions at trial belie its claim that it was prejudiced in its presentation by the belated disclosure of Eisenberg's four Undisclosed Charts.

As I see it, Compass does not meet the third element required for relief under Fed. R. Civ. P. 60(b)(3). But, assuming, *arguendo*, that Compass has shown that it was prevented from fully presenting its case, the Court must then weigh the policy considerations favoring the finality of judgments against "the consideration of fairness and integrity of the fact-finding process." *See Morgan,* 90 F.4th at 180. This element weighs in Boshea's favor.

---

[27] This was also consistent with Eisenberg's testimony at the first trial.

The parties have twice invested resources to resolve Boshea's claim for severance. Unfortunately, Boshea died before the second trial. Twice, a jury heard John White, in person, dispute the existence of a severance agreement, oral and/or written. Twice, two separate juries rejected his version of events. White personally told each jury that his signature was forged. That claim was rejected at the second trial.

Moreover, as I have discussed, there were ample avenues Compass could have pursued to remedy the misconduct of plaintiff's counsel. Compass proposed a reasonable and practical solution to keep the trial moving forward, insisting that Eisenberg use only previously disclosed charts in her testimony. Although Compass has shown by clear and convincing evidence that Boshea engaged in misconduct and that it had a meritorious claim, Compass's claim that it was "ambushed" by the presentation of Eisenberg's testimony rings hollow. *See* ECF 370 at 18.

The misconduct of Boshea's counsel in failing to disclose Eisenberg's four additional charts did not impede the integrity of the second trial. On balance, the concern for finality of judgments far outweighs any concerns about the integrity of these proceedings.

I am satisfied that relief under Fed. R. Civ. P. 60(b)(3) is inappropriate.

## IV.    Fed. R. Civ. P. 59(a)

### A.  Legal Standard

Fed. R. Civ. P. 59(a)(1)(A) provides, in relevant part: "The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Because "every litigant is entitled to one fair trial, not two," *Glassman Const. Co. v. United States ex rel. Clark–Fontana Paint Co.*, 421 F.2d 212, 215 (4th Cir. 1970), "the decision of whether to grant or deny a motion for a new trial lies within the discretion of the district court." *Wallace v. Poulos*,

861 F. Supp. 2d 587, 599 (D. Md. 2012) (citing *King v. McMillan*, 594 F.3d 301, 314–315 (4th Cir. 2010)); *see Butler v. Windsor*, 143 F. Supp. 3d 332, 335–36 (D. Md. 2015) ("Whether to grant a new trial 'rests within the sound discretion of the trial court but such discretion must not be arbitrarily exercised.'") (quoting *City of Richmond v. Atl. Co.*, 273 F.2d 902, 916 (4th Cir. 1960)). In making this determination, "'a trial judge may weigh the evidence and consider the credibility of the witnesses.'" *Hicks v. Ferreyra*, 64 F.4th 156, 175 (4th Cir. 2023), *cert. denied,* 144 S. Ct. 555 (2024) (quoting *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989)).

"The court must exercise its discretion to grant a new trial only if the verdict (1) is against the clear weight of the evidence, (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Wallace*, 861 F. Supp. 2d at 599 (citing *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001)); *see Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 268 (4th Cir. 2021); *Young v. Omnicare, Inc.*, 750 F. App'x 230, 233 (4th Cir. 2019) (per curiam); *King v. McMillan*, 594 F.3d 301, 314 (4th Cir. 2010); *Atlas Food Sys. & Serv., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996); *Windsor*, 143 F. Supp. 3d at 336.   "[S]uch a motion should be granted only when it 'is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done.'" *Wallace*, 861 F. Supp. 2d at 599 (quoting *Pathways Psychosocial v. Town of Leonardtown, Md.,* 223 F. Supp. 2d 699, 706 (D. Md. 2002)). "[T]he burden of showing harmful error rests on the party seeking the new trial.[]" 11 Charles Wright & Arthur Miller, 11 Fed. Prac. & Proc. Civ. § 2803 (3d ed.); *see Precision Fabrics Grp., Inc. v. Tietex Int'l, Ltd*., 367 F. Supp. 3d 487, 518 (D.S.C. 2019), *aff'd,* 790 F. App'x 208 (Fed. Cir. 2020) ("The party seeking [a new trial pursuant to Fed. R. Civ. P. 59] bears the burden of demonstrating harmful error").

"Courts have ordered new trials 'when opposing counsel's conduct causes prejudice to [the moving] party . . . thereby unfairly influencing [the] verdict.'" *E.E.O.C. v. McGee Bros. Co.*, FDW-10-142, 2011 WL 2119140, at *3 (W.D.N.C. May 26, 2011) (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998)). "'The crucial inquiry on review is whether an error occurred in the conduct of the trial that was so grievous as to have rendered the trial unfair.'" *Staudner v. Robinson Aviation, Inc.*, 853 F. App'x 806, 810 (4th Cir. 2021) (quoting *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 241 (4th Cir. 2016)). "However, where 'such prejudice is cured by instructions of the court, the motion for a new trial should be denied.'" *McGee Bros. Co.*, 2011 WL 2119140, at *3 (quoting *Clarksville–Montgomery Cnty. School Sys. v. United States Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991)). In determining whether relief under Rule 59(a) is appropriate, the court will also consider whether either party "asked for a curative instruction by the Court." *Hicks v. Ferreyra*, 582 F. Supp. 3d 269, 291 (D. Md. 2022), *aff'd,* 64 F.4th 156 (4th Cir. 2023).

According to the Fourth Circuit, "'while it may not always be simple for the members of a jury to obey' a curative instruction, there is an 'almost invariable assumption of the law that jurors follow their instructions . . . .'" *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 501 (4th Cir. 2001) (quoting *Richardson v. Marsh,* 481 U.S. 200, 208 (1987)); *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 442 (4th Cir. 2004) ("A jury is presumed to follow the instructions of the court."). Thus, the Fourth Circuit "defer[s] to the district court's finding" as to the effect of misconduct and a curative instruction on a jury. *Nichols*, 251 F.3d at 501; *see Prichard v. Kurucz*, 22 Fed.Appx. 122, 126 (4th Cir. 2001) ("We defer to this assessment because the district court is in the best position to gauge the effects of an attorney's improper remarks and of its own remedial efforts.").

### B.  Discussion

Compass claims a new trial is required "to ensure that a verdict is based on evidence that is properly disclosed pursuant to the Federal Rules of Civil Procedure."  ECF 382 at 8.  However, a party's violation of the Federal Rules of Civil Procedure does not automatically render the entire proceeding unjust.  *See DePaoli v. Vacation Sales Assocs., L.L.C.*, JJ-4-635, 2006 WL 1117799, at *10 (E.D. Va. Apr. 25, 2006) ("[I]t is only errors that cause substantial harm to the moving party that justify a new trial, and errors that are not prejudicial do not necessitate a new trial."), *aff'd as modified,* 489 F.3d 615 (4th Cir. 2007).  Rather, "[i]f a motion for new trial is based upon an alleged erroneous evidentiary ruling, a new trial is warranted only if the party was 'substantially prejudiced' by that ruling."  *Williams v. United States*, DAD-16-01540, 2025 WL 3039878, at *3 (E.D. Cal. Oct. 30, 2025) (quoting *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995)).

The failure of Boshea's counsel to disclose the four new charts constituted a violation of Fed. R. Civ. P. 26.  But, there is no showing that this failure tainted the trial or impeded Compass's ability to present its defense.  In support of Compass's claim for relief, Compass does little more than lodge bald accusations about the outsized impact of Boshea's misconduct on the integrity of the proceedings.

At trial, the parties proposed a solution, which I adopted.  The remedy that the parties proposed was reasonable and sensible, restricting any further testimony of Eisenberg to material that had previously been disclosed to Compass.  This remedy demonstrates the relative insignificance of the undisclosed demonstrative exhibits that plaintiff's expert used to assist in presenting her analysis.

For the reasons stated in connection with the Rule 60(b) analysis, relief under Fed. R. Civ. P. 59(a) is not warranted.

### V.    Conclusion

For the foregoing reasons, I shall deny Compass's Motion.  An Order follows, consistent with this Memorandum Opinion.

Date:  December 12, 2025

                                                        /s/
                                            Ellen Lipton Hollander
                                            United States District Judge